UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC., a Nevada corporation,

    Plaintiff,

v.

ADIL SHAFI, an individual,

    Defendant.

_____/

Case No.

Hon.

## COMPLAINT

Plaintiff, Braintech, Inc. ("Braintech"), through its attorneys, Pepper Hamilton LLP, for its Complaint, states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Braintech is a Nevada corporation with its principal place of business in McLean, Virginia.

2. Defendant Adil Shafi ("Shafi" or "Defendant") is an individual who resides at 7517 Radcliffe, Brighton, Michigan 48114.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between Braintech, a citizen of Nevada, and Shafi, a citizen of Michigan.

4. Defendant is subject to personal jurisdiction in this District as Shafi resides and conducts business in Brighton, Michigan.

5. Venue is appropriate in this Court under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims stated herein occurred in this

District, Defendant resides in this District, and Defendant is subject to the personal jurisdiction of the Court in this District.

## COMMON ALLEGATIONS

6. Plaintiff Braintech is a publicly traded robotic vision software technology company whose vision software and technologies enable vision recognition and robot guidance processes in manufacturing, logistics, material handling, automation, situation awareness, security and reconnaissance.

7. Prior to August 12, 2008, Shafi was the President and sole owner of SHAFI, Inc. ("SI"), a Michigan corporation with its principal place of business in Brighton, Michigan, and SHAFI Innovation, Inc. ("SII"), also a Michigan corporation with its principal place of business in Brighton, Michigan.

8. SI and SII are Michigan corporations that provide simplified software solutions for vision guided robotics.

9. On or about June 19, 2008, Braintech and Shafi entered into a non-binding confidential letter of intent ("Letter of Intent") setting forth Braintech's proposal to purchase all of the outstanding capital stock of SI and 80% of the outstanding capital stock of SII, which would result in each company becoming operating subsidiaries of Braintech.

10. The Letter of Intent also set forth terms of a lucrative three-year employment agreement for Shafi to serve as Braintech's Chief Operating Officer, provided that Braintech closed on the deal.

11. On June 5, 2008, Braintech advanced SI $50,000. Shafi represented that this $50,000 was required to keep SI operating and to satisfy its creditors regarding late payments. However, without prior disclosure to Braintech, Shafi misappropriated $7,500 from

these funds for his own personal use. Shafi subsequently misappropriated an additional $19,740 for his personal use from a second advance of $50,000.

    12.  In order to induce Braintech to close on the transaction, execute the employment agreement, and advance funds, Shafi, in his individual capacity, and his capacity as President of SI and SII, represented that SI and SII possessed a fully functional, market-revenue-ready product, a strong, fully-trained channel network of integrators capable of executing the product in the field, and a discrete and fully disclosed amount of indebtedness with solid revenue commitments. Unbeknownst to Braintech, each of these representations was false and fraudulent when made.

    13.  Specifically, Shafi made numerous, material misrepresentations about SI and SII's principal product (Reliabot), and sales force (integrators), including, without limitation:

    i.  That Reliabot contained a host of advanced scientific algorithms for visual object location and unstructured random bin picking. (It did not.);

    ii.  That Reliabot had advanced robot interfacing capabilities. (It did not. Instead, its communication interface is antiquated, slow and very simplistic.);

    iii.  That Reliabot was market revenue ready. (It was not and did not include the requisite documents and training to create a solution.);

    iv.  That SI and SII had a network of more than 100 integrators selling, engineering and supporting Reliabot. (There was no such network.);

    v.  That Shafi personally produced the technology code to operate the Reliabot. (The codes were, in fact, created by former employees of SI and/or SII who had not been paid and would have nothing to do with SI or SII, or were outsourced to third parties that would no longer engage with Shafi personnel. None of this was disclosed to Braintech.);

    vi.  That the lists of robot programs and robot communication modules in Reliabot were available. (They are not.);

       vii.    That fifteen manufacturers were linked into the Reliabot. (Only four manufacturers were linked into the Reliabot.); and

       viii.    That, at the August 26, 2008 Braintech Technology and Revenue Summit Meeting held in Harrison Hot Springs British Columbia, Shafi confirmed that there were six (6) revenue-ready Reliabot products. (There were none).

14. Based on such fraudulent misrepresentations, Braintech reasonably believed that it was purchasing a market-revenue-ready product supported by a fully-trained engineering and support force.

15. Shafi also made numerous fraudulent misrepresentations understating the financial indebtedness of SI and SII and inflating their future revenue streams.

16. For example, Shafi represented that the SI and SII's total indebtedness was $1,071,633.00 when, in fact, it was significantly more.

17. Shafi also made numerous fraudulent misrepresentations regarding the revenue commitments for SI and SII.

18. For example, Shafi represented that $175,000 of revenue was committed to be generated by November 30, 2008 with an additional $620,000 to be generated by June 2009.

19. In reliance on these various material fraudulent misrepresentations, on or about August 12, 2008, Braintech was fraudulently induced to enter into a series of six agreements with Shafi in his individual capacity and as President of SI and SII: (1) Share Purchase Agreement, which included a number of schedules, (2) Lock-Up Agreement, (3) Employment Agreement, (4) Non-Competition Agreement, (5) Letter Agreement regarding Indebtedness of SI and SII, and (6) Promissory Note (collectively referred to as the "Sale Agreements").

**The Share Purchase Agreement**

20. On or about August 12, 2008, Braintech entered into the Share Purchase Agreement ("SPA") with Shafi in his individual capacity and as President of SI and SII. *See Exhibit 1, SPA.*

21. Pursuant to the SPA, Braintech agreed to acquire all of the outstanding stock of SI and 80% of the outstanding stock of SII. *See Id.* at 2.2.

22. The purchase price consisted of 2,999,700 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria. *Id.*

23. Pertinent to this dispute, Defendant specifically represented and warranted that the Creditor and Payment Schedule attached to the SPA was complete and accurate:

> The Creditor and Payment Schedule sets forth all of the Company Indebtedness … and such Company Indebtedness and information related thereto all as set forth on the Creditor and Payment Schedule is true, accurate and complete. With respect to Company Indebtedness to any creditor as set forth on the Creditor and Payment Schedule, if payments relating to such creditor are made in the amounts and on the dates indicated on the Creditor and Payment Schedule, all obligations to such creditor shall have been satisfied in full; provided, however, nothing herein shall limit Buyer's right to negotiate reduced amounts or alternative payment dates with any creditor of a Company.

*Exhibit 1, SPA at 3.5.3 (emphasis in original).*

24. Braintech subsequently discovered that the Creditor and Payment Schedule was not accurate and instead contained numerous materially false and misleading misrepresentations.

25. By way of example only, the Schedule provided for seventeen (17) monthly payments of $550 to Comerica. Despite Braintech's payment of some of these monthly

-5-

payments following the closing of the SPA, in or around October 2008 Comerica filed suit against Shafi seeking over $75,000.

26.     Additionally, according to Comerica, Shafi was not authorized to transfer his SI shares without Comerica's approval.  This was not disclosed to Braintech.  Comerica further alleges that Shafi engaged in fraud by willfully and intentionally converting certain additional collateral that secured his Comerica loan.

27.     The SPA further stated that Braintech would cause SI to pay, certain Braintech accepted indebtedness from revenue based on revenue commitments generated by SI.  This certain indebtedness was not to exceed $900,000 of the total indebtedness listed on the Creditor and Payment Schedule ("Braintech Accepted Debt") and Shafi remained liable for any debt in excess of that amount ("Excess Debt").  This structure provided that Braintech would net out the revenue from Shafi's revenue commitments against certain Shafi obligations.  The SPA provided:

> As of the Closing, (i) no Company will have liability for borrowed money or Taxes due and owing except for Braintech Accepted Debt, which shall not exceed an aggregate of $900,000, upon the terms set forth on the Creditor and Payment Schedule, and (ii) Seller shall fully and finally satisfy in a timely manner, without any Liability to Buyer or any Company, any and all Excess Debt.

*Exhibit 1, SPA at 3.5.3.*

28.     Importantly, Braintech did not assume the Braintech Accepted Debt as a liability for Braintech but, instead, merely stated it would cause SI to satisfy the Braintech Accepted Debt.  *See Id.* at 6.3.  ("[Braintech] will cause Shafi, Inc. to satisfy the Braintech Accepted Debt").  The only consideration was stock for stock.  100% of SI stock and 80% of SII stock was exchanged for approximately 3,000,000 shares of Braintech stock.  There was no agreement by Braintech to assume any debt.

-6-

29. There was no obligation anywhere in the SPA for Braintech to pay any of the Shafi obligations.

30. Shafi also represented that he would not contact any of the creditors related to the Braintech Accepted Debt or attempt to negotiate or settle any of the Braintech Accepted Debt. *Id.* at 6.14 ("Seller covenants and agrees that he shall not negotiate, attempt to negotiate, settle or attempt to settle any Braintech Accepted Debt, or discuss or attempt to discuss the same with any creditor thereof, in each case without prior written consent of Buyer's Chief Executive Officer.").

31. Defendant also represented that, except as specifically set forth on Schedule 3.12.2, all taxes due on or before the Closing would be paid in full. *Id.* at 3.12.2.

32. Defendant specifically warranted that the representations and warranties contained in the SPA were true and correct:

> **Representations and Warranties.**  The representations and warranties of each Company and Seller contained in this Agreement shall be true and correct … in all material respects on and as of the Closing Date … .

*Id.* at 7.2.1.

33. The SPA's Creditor and Payment Schedule represented that the total liabilities at closing was $1,071,633.00.

34. Accordingly, pursuant to the terms of the SPA and its Creditor and Payment Schedule, $171,633.00 of the indebtedness listed on the Creditor and Payment Schedule was Excess Debt which was to be paid directly by Shafi as Buyer.

35. To the best of Braintech's knowledge, Shafi has not paid any of his Excess Debt obligations.

### The Letter Agreement Regarding Indebtedness of SI and SII

36. In reliance on the various fraudulent misrepresentations described above, Braintech also accepted and acknowledged a Letter Agreement dated August 12, 2008 regarding the indebtedness of SI and SII ("Letter Agreement"). *See Exhibit 2, Letter Agreement.*

37. The Letter Agreement further outlined the responsibilities of each party with respect to the indebtedness of SI and SII at the date of closing. *Id.*

38. The Letter Agreement reiterated that Braintech only agreed, based on SI's revenue commitments in the pipeline to fund certain SI and SII indebtedness, based on revenue generated from Shafi products.

39. The Letter Agreement further provided:

> Without limiting the foregoing, but for the avoidance of doubt: (i) if a party to whom either Company is indebted as of immediately prior to the Closing (a "creditor") is not set forth on the Creditor and Payment Schedule, the undersigned shall be responsible for all Company Indebtedness to such creditor pursuant to paragraph 2 above, (ii) if a creditor is set forth on the Creditor and Payment Schedule with a specified amount that is Braintech Accepted Debt but a Company is indebted to such creditor immediately prior to the Closing in an amount that is in excess of such specified amount, the undersigned shall be responsible for such excess indebtedness to such creditor pursuant to paragraph 2 above, and (iii) the undersigned's obligations hereunder shall not be reduced in any way as a result of the negotiated reduction of any Braintech Accepted Debt or settlement of Braintech Accepted Debt for less than the amount shown on the Creditor and Payment Schedule.

*Id.*

40. The Letter Agreement is "irrevocable and cannot be modified without written consent by [Braintech]." *Id.*

**The Promissory Note And Other Shafi Obligations**

41.     The Parties also entered into a Promissory Note on or about August 12, 2008 to reflect the $100,000 that Braintech advanced to SI and SII prior to the closing (the "Promissory Note"). *See Exhibit 3, Promissory Note.*

42.     Pursuant to the Promissory Note, "[t]he principal amount together with all interest accrued and unpaid to date, if not sooner paid, shall be due and payable upon by demand by [Braintech]." *See id. at ¶2.*

43.     Braintech has demanded repayment from Shafi, but has not been repaid.

44.     Additionally, Braintech began using a Braintech checking account to pay certain SI obligations. Braintech was forced to utilize funds from its checking account because, previously unbeknownst to Braintech, SI checking accounts had been closed because they were overdrawn. These SI obligations that Braintech funded exceeded $100,000, in addition to the other expenditures and damages described elsewhere in this Complaint, which together total over $200,000.

**Lock-Up Agreement**

45.     In connection with the SPA, the parties also entered into a Lock-Up Agreement on or about August 12, 2008 ("Lock-Up Agreement"). *See Exhibit 4, Lock-Up Agreement.*

46.     The Lock-Up Agreement generally provides that for a period of six (6) months, Shafi will not sell, transfer or otherwise dispose of, or contract to dispose of the Braintech stock he received pursuant to the SPA. *Id.*

47.     Following the expiration of the six (6) month lock-up period, Shafi would be free to sell or otherwise transfer his shares, provided that the aggregate price or such transfer does not exceed $25,000 in any one calendar week period. *Id.*

48. In connection with the SPA, Shafi currently has 3,000,000 Braintech shares. (Although the SPA provided for the transfer of 2,999,700 Braintech shares, the transfer agent has advised that 3,000,000 shares were transferred.)

49. The lock-up period is set to expire on February 12, 2009. *Id.*

50. Based on the false and fraudulent misrepresentations made by Defendant, as set forth in this Complaint, equity prohibits Shafi from selling or otherwise transferring these Braintech shares even following the expiration of the lock-up period.

### The Employment Agreement And Non-Competition Agreement

51. In reliance on the various misrepresentations outlined above, Braintech also entered into the Employment Agreement with Shafi on or about August 12, 2008 (the "Employment Agreement"). *Exhibit 5, Employment Agreement.*

52. The Employment Agreement provided that Shafi would serve as Braintech's Chief Operating Officer for a three-year term, with a base salary of $180,000.00 and a guaranteed annual increase of at least ten percent. *Id.* at ¶¶ 2,5.

53. The Employment Agreement also sets forth various bonus incentives. *Id.* at ¶¶ 6-8.

54. Pursuant to the Employment Agreement, Shafi would have several critical duties including, without limitation, management of technology, market access and business acceleration, and the hiring, managing and directing of employees. *Id.* at ¶ 4 a-e.

55. The Employment Agreement specifically provided that Braintech can terminate the agreement under certain circumstances:

> Termination By BRAINTECH. BRAINTECH may terminate the employment of the EXECUTIVE with 30 day notice for any reason. In such event, the EXECUTIVE or the EXECUTIVE heirs will be entitled to all unpaid compensation and benefits, stocks and options earned (achieved milestones as of termination date) up to

       the termination date.  In the event BRAINTECH terminates EXECUTIVE's employment for Good Cause, EXECUTIVE shall be entitled to keep all Bonus Stock for which the milestone conditions have been satisfied, free of all restrictions, escrows [after year of escrow for indemnification] or other conditions and to all Bonus Stock Options which are vested as of such time and such Bonus Stock Options may be exercised at any time within twenty-four (24) months of such termination.

*Id*. at 12(d).

56.    "Good Cause" is specifically defined in the Employment Agreement as follows:

       (a) "Good Cause" shall mean:

       i.    the willful and continued failure by the EXECUTIVE to substantially perform his duties hereunder (other than due to incapacity from physical or mental illness);

       ii.    gross misconduct which is or could reasonably be expected to become materially injurious to BRAINTECH or its business or reputation, including, without limitation, fraud, or misappropriation of Company property or unauthorized disclosure and/or non-disclosure of confidential information; and

       iii.    dishonesty resulting, or intending to result, directly or indirectly, in gain or personal enrichment at the expense of the Company.

*Id.*

57.    Shafi and Braintech also entered into a Non-Competition Agreement on or about August 12, 2008 ("Non-Competition Agreement").  *Exhibit 6, Non-Competition Agreement.*

## Braintech Discovers Defendant's Misrepresentations

58.    In the fourth quarter of 2008, and after the Sale Agreements were executed, Braintech learned that material representations Shafi made to induce Braintech into entering into the Sale Agreements were, in fact, false and fraudulent.

-11-

59. Specifically, Braintech learned that various representations regarding the Reliabot and the number of integrators, including without limitation, the representations outlined in Paragraph 13 (i) – (viii) above, were untrue when made.

60. Indeed, instead of finding that the Reliabot was market-revenue-ready, Braintech learned that it was inadequate and not market-revenue-ready.

61. Similarly, Braintech discovered that SI and SII were not supported by a large number of integrators already in the field marketing and selling the products, as represented.

62. Moreover, it became apparent that the Creditor and Payment Schedule was grossly understated and did not represent the actual liabilities of SI and SII. Indeed, by way of example, in or around October 2008, Comerica sued Shafi even though the payments that Shafi set forth on the Creditor and Payment Schedule were being made.

63. Additionally, Braintech contacted those creditors for the Braintech Accepted Debt pursuant to the SPA with the intent of negotiating settlement arrangements.

64. During these discussions, Braintech learned that some of the significant creditor amounts on the Creditor and Payment Schedule were discounted from the original amounts owed and were subject to settlement agreements and specific terms of repayment.

65. Braintech also learned that many of the creditors had already obtained judgments against SI and SII.

66. Braintech further discovered that many of the settlement agreements were in default for non-payment and that the creditors were in a position to enforce the agreements.

67. Based on these discussions, Braintech also learned that Shafi, both before and after execution of the SPA, was contacting and falsely informing those creditors that

Braintech had assumed all of the liabilities, that the debts were now directly Braintech liabilities, and that all amounts would be paid in full.

68. Braintech also discovered that the SI checking accounts had been closed because they were overdrawn.

69. It also became apparent that revenue commitments and account receivable schedules were fraudulently produced and materially misleading.

70. Shortly after learning the revenue commitments from the pipeline were not being realized, Braintech had a series of conversations with Shafi both regarding the misrepresentations and Shafi's performance or lack thereof.

71. For example, on October 1, 2008, Braintech instructed Shafi to cease informing creditors that Braintech had assumed SI's liabilities.

72. Nonetheless, Shafi continued to misrepresent that Braintech had agreed to pay certain SI obligations, including past wages of former employees.

73. Moreover, Shafi failed to appropriately fulfill his responsibilities under the Employment Agreement, including failing to provide critical reports when requested, failing to attend important meetings without justification or notice, and not keeping the CEO apprised of vital developments, such as the fact that an application expected to generate $900,000 had not been approved.

74. By letter dated November 19, 2008, while reserving their right to terminate for the Good Cause that existed as of November 19, 2008, Braintech notified Shafi that he was being placed on administrative leave with pay and benefits. *See Exhibit 7, November 19, 2008.*

75. Shortly thereafter, Shafi began destroying company e-mails and other documents, and deleting employee computer files, thus causing further harm to the company.

76. As a result, on November 24, 2008, Braintech moved Shafi's status to administrative leave without pay and benefits. *See Exhibit 8, November 24, 2008 E-mail.*

77. Also by letter dated November 19, 2008, Braintech specifically notified Defendant of its decision to rescind the Sale Agreements:

> This letter confirms that Braintech, Inc. (the "Company") has decided to rescind the August 12, 2008 acquisition of Shafi Inc. ("SI") and 80% of the stock of Shafi Innovation Inc. ("SII"). Accordingly, we tender back to you, as Seller, all of the consideration you gave to the Company, i.e., the shares of SI and SII, along with your agreement to serve as an officer and director of the Company. In return, we demand back all consideration that the Company gave to you.

*Exhibit 7, November 19, 2008 Letter.*

78. Braintech reiterated this decision by e-mail dated November 24, 2008. *See Exhibit 8.*

79. Despite this notice and demand, Defendant has failed to return the consideration, has failed to place Braintech in the position it was prior to execution of the Sale Agreements, and has failed to respond.

### COUNT I
### RESCISSION OF SALE AGREEMENTS
### DUE TO MATERIAL MISREPRESENTATIONS AND FRAUDULENT INDUCEMENT

80. Braintech repeats and realleges the preceding allegations as though fully set forth herein.

81. As discussed in detail above in paragraphs 13, 15-18, 24-26, and 58-69, Defendant made numerous factual and material misrepresentations regarding the nature and

amount of SI and SII's indebtedness and projected revenue, the quality and market-revenue-readiness of the Reliabot, and the nature of its marketing and sales channels.

82. These representations were false and fraudulent when made.

83. Defendant knew these representations were false when made or made them recklessly without knowledge of their truth and as a positive assertion.

84. The representations were made with the intention to induce Braintech's reliance.

85. Braintech acted in reliance on these representations by entering into the Sale Agreements and has been damaged as a result.

86. Braintech clearly and unambiguously notified Defendant of its intent to rescind the Sale Agreements within a reasonable time of learning of the misrepresentations.

87. Rescission of the Sale Agreements would restore both parties to the positions which they would have occupied if the Sale Agreements had not been made.

88. Braintech makes the request for rescission with clean hands.

WHEREFORE, Braintech respectfully requests that the Sale Agreements be rescinded, that Defendant shall return all consideration, including salary, Braintech provided in connection with the Sale Agreements, that Shafi be immediately directed by the Court to resign from the Braintech Board of Directors, that Braintech be placed in the same position it would have been but for execution of the Sale Agreements, that Shafi be prohibited from selling or otherwise transferring the Braintech shares that were issued to him through the SPA after the expiration of the lock-up period, and that Braintech be awarded damages, interest, costs, attorneys fees, incidental and consequential damages, and whatever further relief as this Honorable Court may deem appropriate.

**COUNT II**
**RESCISSION OF SALE AGREEMENTS**
**DUE TO SUBSTANTIAL BREACH OF SALE AGREEMENTS**

89. Braintech repeats and realleges the preceding allegations as though fully set forth herein.

90. Braintech and Defendant entered into the Sale Agreements, which constituted valid and binding contracts.

91. Through the Sale Agreements, Defendant made certain representations and agreements, as described in more detail above.

92. Defendant failed to abide by the representations and agreements that he made in the Sale Agreements, thus causing a substantial and material breach of the Sale Agreements.

93. As a result of Defendant's substantial and material breach of the Sale Agreements, Braintech is entitled to rescission of the Sale Agreements.

WHEREFORE, Braintech respectfully requests that the Sale Agreements be rescinded, that Defendant shall return all consideration, including salary, Braintech provided in connection with the Sale Agreements, that Shafi be immediately directed by the Court to resign from the Braintech Board of Directors, that Braintech be placed in the same position it would have been but for execution of the Sale Agreements, that Shafi be prohibited from selling or otherwise transferring the Braintech shares that were issued to him through the SPA after the expiration of the lock-up period, and that Braintech be awarded damages, interest, costs, attorneys fees, incidental and consequential damages, and whatever further relief as this Honorable Court may deem appropriate.

## COUNT III
## **DECLARATORY RELIEF**

94. Braintech repeats and realleges the preceding allegations as though fully set forth herein.

95. This Court is vested with jurisdiction to provide declaratory relief as further set forth in 28 U.S.C. § 2201 and § 2202.

96. 28 U.S.C. § 2201 provides that the Court may declare the rights and other legal relations of any interested party seeking such declaration in a case of actual controversy within its jurisdiction.

97. Braintech maintains that it possesses the right to rescind the Sale Agreements and has tendered back all consideration it received pursuant to the Sale Agreements. Defendant refuses to rescind the Sale Agreements and tender to Braintech its consideration and place Braintech in the same position it would have been but for the Sale Agreements.

98. The issuance of a Declaratory Judgment by this Court would resolve the existing controversy between the parties in an expeditious manner, and resolve the stated uncertainty with regard to the status of the alleged rights and obligations of the parties related to the Sale Agreements.

99. For the reasons discussed above, Braintech requests that this Honorable Court enter a Declaratory Judgment declaring that the Sale Agreements are rescinded, that Braintech is entitled to return of all consideration it provided in connection with the Sale Agreements, and that Braintech is entitled to be placed in the same position it would have been but for execution of the Sale Agreements.

WHEREFORE, Braintech requests the following relief:

A. A declaratory judgment that the Sale Agreements are rescinded, that Braintech is entitled to the return of all consideration, including salary, it provided in connection with the Sale Agreements, that Shafi be immediately directed by the Court to resign from the Braintech Board of Directors, that Shafi be prohibited from selling or otherwise transferring the Braintech shares that were issued to him through the SPA after the expiration of the lock-up period, and that Braintech be placed in the same position it would have been but for execution of the Sale Agreements.

B. That Braintech be awarded such further damages, interest, costs, attorneys fees, incidental and consequential damages, and declaratory relief as this Honorable Court may deem appropriate.

Respectfully submitted,

s/James D. VandeWyngearde
JAMES V. VANDEWYNGEARDE (P58634)
MARY K. DEON (P63019)
PEPPER HAMILTON LLP
Suite 3600
100 Renaissance Center
Detroit, MI 48243-1157
313.259.7110
*vandewyj@pepperlaw.com*
*deonm@pepperlaw.com*
Attorneys for Plaintiff

Dated:  February 6, 2009

#10465288 v5 (135776.2)