UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC., a Nevada corporation,

          Plaintiff,

v.

ADIL SHAFI, an individual,

          Defendant,

and v.

FREDERICK WEIDINGER, an individual

          Additional Counterclaim
          Defendant.

Case No. 2:09-cv-10454-VAR-VMM

Hon.  Victoria A. Roberts

## SECOND AMENDED COUNTERCLAIM

Defendant Adil Shafi ("Shafi"), through his attorneys, Berry Moorman P.C., states for his Amended Counterclaim as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Shafi is an individual who resides, transacts business and may be found in Livingston County, Michigan.

2.      Braintech, Inc. ("Braintech") is a corporation organized under the laws of Nevada and maintains its principal place of business in McLean, Virginia.

3.      Frederick W. Weidinger ("Weidinger") is an individual who resides, transacts business and is domiciled in the State of Virginia.  Weidinger is the Chief

Executive Officer and a shareholder of Braintech.  Weidinger is added as an additional party defendant to this Amended Counterclaim pursuant to Fed. R. Civ. Pro. 13(h) and 20.

4.      The claims asserted herein against Weidinger arise from the same transaction or occurrence as the counterclaim against Braintech.

5.      This is, in part, a fraud case where Weidinger, acting for Braintech, and Braintech, acting for Weidinger, fraudulently induced Shafi to acquire shares of Braintech in exchange for Shafi's shares of Shafi Inc. ("SI") and 80% of Shafi's shares of Shafi Innovation Inc. ("SII").

## GENERAL ALLEGATIONS

### A.      The Parties

6.      Braintech is in the software business.  Braintech manufactures and sells vision guided robotics ("VGR") software.  Weidinger is a major shareholder, Director and Chief Executive Officer of Braintech.

7.      Shafi is an entrepreneur, an engineer by training and has focused on VGR software for over 19 years.

8.      In 1991 Shafi founded his company SHAFI and incorporated it as SHAFI, Inc. in 1993.  Until August 12, 2008, SI was owned entirely by Shafi.

9.      SI is in the VGR software business and over the course of its existence, SI, under the control and direction of Shafi, developed a line of proprietary VGR software known as RELIABOT.  SI was an industry leader in VGR software.

10.    In 2007 Shafi incorporated Shafi Innovation Inc.  Until August 12, 2008, SII was entirely owned by Shafi.

11.    SII is in the business of VGR software for applications outside traditional factory automation.

### B.    Braintech's Acquisition of Stock of SI and SII

12.    SI and Braintech were competitors in the marketplace of VGR software. As of the beginning of 2008, SI had a completely diversified customer base and its VGR software was compatible with multiple brands of robots and multiple brands of vision systems.   SI had dozens of different types of applications solutions, in multiple industries, with over 300 customer installations.  In addition, SI operated with a flexible business model which allowed for flexibility of choice of industry, system integrator, robot, vision system and applications solution in virtually every sale.

13.    As of the beginning of 2008, Braintech was largely focused on one customer, ABB Robotics.  ABB and Braintech were parties to a long term exclusive supply agreement pursuant to which Braintech supplied its VGR software to ABB. Braintech also maintained a significant research and development division which for several years was focused on automotive applications of VGR software.  Despite the significant research and development in the automotive sector, Braintech had only a handful of applications solutions in the automotive industry.  As such, the completely flexible business model, installed base, market knowhow and relationships of SI were of great interest to Braintech.

14.    Braintech is a publically traded company and in 2008 and prior to 2008 had made public statements about its plans to diversify and expand its customer base as well as gain access to markets in which it had not previously focused for its products.

15.    In 2008, Weidinger approached Shafi in order to discuss a business combination between Braintech and SI.

16.    In discussions between Shafi and Weidinger, Weidinger expressed Braintech's observation that a combination with SI would advance Braintech's plans on a significantly faster track, allow it to expand its market access and penetration, expose it to new customers, allow Braintech to exploit and develop SI's proprietary VGR software in combination with Braintech's software in order to develop new products using the combined unique characteristics of both.  Weidinger stated that these goals would be accomplished with a business combination and with Shafi in a leadership position with respect to technology in the combination.

17.    SI was an attractive candidate for a merger or sale to Braintech due to its diversified position in the market for VGR software, its proven track record of success with multiple robot and vision systems, many applications solutions, and its diversified customer list.

18.    In addition, SI had an established presence in the state of Michigan and a strong relationship with many automotive suppliers.  SI was known in the automotive industry as the industry leader for vision-guided robotic software.

19.     The negotiations led to the execution of a Letter of Intent and later a Share Purchase Agreement whereby Braintech acquired 100% of the issued and outstanding stock of SI and 80% of the issued and outstanding stock of SII.

20.     Effective August 12, 2008 Braintech acquired 100% of the issued and outstanding stock of SI, and 80% of the issued and outstanding stock of SII.

21.     In exchange, in part Shafi acquired 3,000,000 restricted shares in Braintech for the sale and transfer of Shafi's stock in SI and SII.

22.     Following the closing Braintech issued a press release stating in part: "Braintech Inc. (OTC BB: BRH) has acquired 100 percent of the ownership of Shafi Inc. and 80 percent of the ownership of Shafi Innovation Inc. (together SHAFI).  As a result, Braintech will acquire key proprietary assets from SHAFI, providing Braintech with a technological launching pad to accelerate its expansion into a wide-range of new markets that include aerospace, consumer, food and beverage, government, medical pharmaceutical, plastics, and semi-conductor."

### C.     Pre-Closing Discussion and Braintech's Diligence

23.     Since the formation of SI, Shafi had invested his time and money and also contributed valuable intellectual property in the form of software code for SI's proprietary vision guided robotics software, RELIABOT.  In fact, at the time of the sale of stock in SI to Braintech, RELIABOT was the standard in the industry and was far more versatile than any Braintech products because of its ability to communicate with robots and vision systems from multiple manufacturers.  SI's profile and applications solutions were ranked within the top ten in the world by Google, and similar search engines, out of

more than 1 million hits for "Bin Picking" or "AutoRacking", for more than two years, at the time of sale to Braintech.  Braintech never had this coveted ranking.

24.     2008 was a difficult year financially for SI due to a slowdown in capital investment in the robotics automation market.  SI had fallen behind in its obligations to creditors, including the IRS and its secured creditor, Comerica Bank.  Braintech was well aware of the financial position of SI.  SI's financial difficulties had nothing to do with its technology or products, rather the financial difficulties stemmed from the deterioration of the U.S. economy and the fact that customers and potential customers had been and would continue to hold any capital investments in new systems and technologies.  Prior to the sale of SI and SII stock to Braintech and Shafi's acquisition of Braintech stock, Braintech had performed a lengthy and far reaching due diligence.  Braintech was aware of the general state of the market and was well aware and had satisfied itself that SI's financial difficulties were the result of external market forces.

25.     In addition, Braintech was facing its own market economic issues.  Braintech in 2008 was approaching the end of its exclusive supply contract (through December 2008) with its main customer ABB and the fact that ABB had been unable to resell approximately $6 million in inventory of software in the marketplace that it had purchased from Braintech (a fact divulged by Weidinger to Shafi on the closing date of August 12, 2008). This lack of resale capacity by ABB was perceived as a major weakness of Braintech by Weidinger and Weidinger knew that Braintech was not likely to renew the lucrative contract that Braintech had enjoyed with ABB.   Therefore Braintech was motivated to move outside its dependence on ABB in an accelerated

manner.   With Braintech's revenue stream threatened with the end of this supply contract, Weidinger was in the process of implementing his own plans to diversify Braintech's technology, customer base and market penetration.

26.   Prior to the closing of the Stock Purchase Agreement, SI and Shafi, with the assistance of counsel, performed an exhaustive process of entering into payment arrangements between SI and its creditors.   By and large the creditors cooperated and entered into such payment over time agreements with SI.   The fees and expenses of legal counsel who provided assistance to SI were for the most part, paid by Braintech.

27.   The Stock Purchase Agreement contained a schedule of all SI debts, created a category of assumed debt ("Braintech Accepted Debt") which was memorialized into a Debt Schedule.   The Schedule was painstakingly prepared as part of Braintech's due diligence prior to the effective date of the Stock Purchase Agreement.   The Debt Schedule and the Braintech Accepted Debt Schedule was not finalized by Weidinger until one hour before the closing on August 12, 2008.

28.   As part of the Stock Purchase Agreement, Braintech assumed responsibility to pay certain debts owed by SI to various creditors, including the Internal Revenue Service, Comerica Bank and the State of Michigan.   The terms of payments for the assumed debt were according to the schedules which had been negotiated between SI and its creditors prior to the closing.

**D.    The Consideration for the SI and SII Stock and Shafi's Acquisition of Braintech Stock**

29.    The transaction in which Braintech acquired the stock of SI and SII and Shafi in turn acquired his stock in Braintech was complicated and structured so that very little cash was paid up front for the stock of SI and SII.

30.    Included in the contracts executed at closing were the Share  Purchase Agreement ("SPA"), Shafi's Employment Agreement, an Escrow Agreement, a Lockup Agreement, Side Letter Agreement, Promissory Note and Non-Competition Agreement.

31.    The SPA and Employment Agreement of Shafi established four major components of consideration to be paid for the stock of SI and SII.

32.    The first component of the consideration was cash.  An advance payment of $50,000.00 was paid to SI upon execution of the letter of intent and an additional $50,000.00 was paid to SI on or about the closing date.  The cash portion was intended by the parties to be used for SI obligations, including repayment of loans made by Shafi to SI.  Each advance was accompanied by an agreed upon schedule of how and to whom the advances would be disbursed by SI.

33.    The second component of the consideration was assumption of SI debt. The SPA contained a schedule of all SI debts, created a category of assumed debt, Braintech Accepted Debt, which was memorialized into a Debt Schedule.  Pursuant to the SPA and related Debt Schedule, Braintech agreed to assume the obligation to effect payment of $900,000 of SI debt and further agreed to retire the assumed debt over a period of time as provided in the Debt Schedule.  The Debt Schedule mirrored the payment agreements that SI had painstakingly negotiated with its creditors in the

months before the closing with counsel whose fees were paid by Braintech.  The Debt Schedule and the Braintech Assumed Debt schedule were created by Weidinger.

34.    The third component of the consideration was the sale of 3,000,000 shares of restricted stock in Braintech to Shafi.  According to the SPA, the stock sold to Shafi could not be sold, traded or otherwise disposed of until registered by Braintech under the 1934 Securities Exchange Act.  However, pursuant to the SPA, Braintech committed to expend its best efforts to register the stock sold to Shafi as part of the SPA.  Braintech committed to register the stock within six months or the closing.

35.    The fourth component of the consideration was the employment of Shafi by Braintech.  As of the effective date of the SPA, Shafi became employed by Braintech pursuant to an Employment Agreement.

36.    The Employment Agreement entitled Shafi to annual compensation of $180,000, with guaranteed increases of 10% per year, in the second and third years of his employment.  The Employment Agreement also entitled Shafi to minimum cash bonuses of 25% of his salary in each year of his employment and other benefits such as health insurance, expense reimbursement, additional stock and options and an outright payment of net revenue from automotive related sales of VGR software.

37.    Pursuant to the Employment Agreement, Shafi became employed as the Chief Operating Officer of Braintech effective August 16, 2008.

38.     Together, the four components of consideration amounted to an effective sales price for the stock in SI and SII of approximately $3,000,000.00.

### E.     The Representations of Weidinger and Braintech

39.     In all material aspects, Weidinger was the spokesperson for Braintech and the sole individual with whom Shafi discussed and negotiated material provisions of the overall transaction.

40.     As of the beginning of May, 2008, Weidinger and Shafi had engaged in discussions, but it was not until late May, 2008 that Shafi and SI decided to pursue substantive negotiations that were intended to result in a business combination with Braintech, SI and SII.

41.     Prior to June 2008 in discussions between Weidinger and Shafi, Shafi learned from Weidinger that Braintech did not have a widely marketable VGR software product – other than its exclusive ABB software, but the ABB contract would expire at year end 2008.

42.     Shafi also learned from Weidinger that although Braintech had invested significant resources in product development, Braintech did not have any VGR software products to deliver to market and likely would not be able to develop marketable VGR software products before the end of the year when its exclusive contract with ABB and its virtually exclusive source of revenue came to an end in 2008.

43.     Shafi also learned from Weidinger that Braintech was lacking leadership in sales and marketing and Weidinger expressed that he lacked confidence in the existing

Braintech sales organization to promote and sell the limited VGR software products which Braintech was capable of supporting.

44.     As a result of the foregoing, Shafi was skeptical of the benefits he would receive in any business combination with Braintech, however Weidinger persisted and made a series of representations to Shafi as to how specifically Shafi would personally benefit from a business combination between Braintech, SI and SII.

45.     On May 28, 2008 in an email Weidinger implored Shafi to proceed stating that "an acquisition with Braintech assuming your business debt and buying your stock, *all brhi [Braintech] stock upfront to you, big leadership contract for you with monthly payments for 2.5 years of agreement, cash deposit at execution and certain cf ip back to you after 2.5 years would be best transaction for all* [emphasis supplied].

46.     Following the May 28, 2008 email, Weidinger involved his attorneys and began forwarding draft agreements to Shafi.

47.     The draft agreements were long, convoluted and confusing.  Shafi often spent hours reviewing certain agreements only to be provided with completely revised agreements containing materially different terms.   In the initial drafts, contrary to Weidinger's representations, there were considerable adverse tax consequences to Shafi and any Braintech stock issued to Shafi would be held in escrow for a stated period of time before Shafi could obtain any financial benefit through sale of the stock.

48.     While these discussions proceeded, Shafi fully disclosed the financial circumstances of SI and frankly informed Weidinger that SI was in default on certain

loans, behind in its obligations to creditors and unable to make its payroll despite having laid off many employees in the preceding months.

49.     As of June 18, 2008 Shafi was prepared to "walk away" from any deal with Braintech because of the materially different terms in the draft agreements as opposed to Weidinger's representations.   Shafi informed Weidinger of this, but Weidinger persisted in his efforts to convince Shafi to complete the transaction.

50.     In response to Shafi's announcement that he was no longer interested in any deal, Weidinger made a series of representations in a written email dated June 18, 2008, including:

> *i.*      "we will do what is best for Braintech which is also best for you."
>
> *ii.*     "things have moved, but not materially adverse to you."
>
> *iii.*    "you are getting all stock up front."
>
> *iv.*    "you should have confidence in me that we are putting the best deal for both."
>
> *v.*     "adil: you need to do this deal and I still think it will accelerate business for brhi [Braintech]. It is not perfect for either of us but is very good for you bottomline."

51.     As a result of these representations, upon which Shafi relied, Shafi approached the transaction with renewed vigor.   In fact, Shafi immediately began discussing sales ideas and information with Braintech sales staff and began working on an "Access and Acceleration" plan which would become the blueprint for sales and marketing activities for the combined companies.

52.    This led to the execution of the Letter of Intent which roughly outlined the parameters of the transaction and provided some immediate financial relief to SI because as part of the Letter of Intent, Braintech agreed to fund SI with $100,000 which was treated as an advance deposit and intended by the parties to cover SI obligations to creditors, including Shafi who had loaned operating funds to SI to keep its creditors at bay.

53.    Through June, 2008 several drafts of long and complicated agreements were circulated.  During this period Shafi was not only running his own business, but also working on the sales blueprint for the combined companies while he reviewed the revised agreements.

54.    Meanwhile, Weidinger kept pressing.   By July 8, 2008, Weidinger complained that Shafi and his advisors were taking too long to review the draft agreements.  Weidinger was anxious to finalize the transaction and close.  However, Shafi pushed back, informing Weidinger that he was merely being careful. Shafi also informed Weidinger that proposed sales efforts, particularly automotive sales, would not result in a revenue stream to the combined companies because a closing after July 11, 2008 would have the combined companies facing a slow period in the automotive industry marked by summer plant shut downs and lack of interest in buying or upgrading existing plant infrastructure – including robotic equipment and software.

55.    New and revised drafts of the complicated agreements continued to be created and forwarded to Shafi during July, 2008.

56.     During this period, the amount and extent of SI debt was discussed at length.  In the negotiations, the SI debt was a material aspect of the transaction.  Shafi expressed on repeated occasions that full payment of SI debt was critical to SI's reputation and also critical to Shafi's personal reputation in the marketplace.   On multiple occasions Shafi reminded Weidinger that the world of VGR software was a small one and failure to honor SI debt as agreed in the SPA would materially impact the reputation of the combined companies in the future.

57.     In response to Shafi's concerns, in an email dated August 2, 2008, Weidinger responded and represented the following:

> *i.*     Braintech would handle all SI debt issues, including negotiations with creditors.
>
> *ii.*    Braintech employees who would be directly dealing with SI debt issues, were not only familiar with the SI debt situation, but were capable and experienced in such matters.
>
> *iii.*   Braintech fully recognized that it was obligated to timely pay $900,000 of SI debt "reflected in the debt schedule" which called for monthly installments to be paid to SI creditors.

58.     Prior to the closing, Shafi informed Weidinger that his own personal financial situation was precarious due to the financial situation of SI.  Shafi informed Weidinger that his family health care coverage had been cancelled due to non-payment of premiums.

59.     Nevertheless, as part of the transaction, Weidinger and Shafi agreed that Braintech's assumption of SI debt would be capped at $1,000,000.  Any SI debt in excess of $1,000,000 would be paid by Shafi personally.  Shafi agreed to this but it was understood that Braintech would focus on payment of secured debt over unsecured debt given Shafi's personal financial situation.

60.     In fact, Weidinger had represented and emphasized in numerous emails to Shafi that the "substantial" consideration to Shafi paid "up front" was intended to address Shafi's personal financial situation and enable Shafi to repay his agreed share of SI debt.

61.     In an email dated August 5, 2008, Weidinger expressed that he was more concerned about Shafi's ability to payoff secured debt than unsecured.  Accordingly, Weidinger represented that Braintech agreed not to substitute anything that would accelerate collection activity directed to Shafi within the first 6 months of the closing.

62.     Shafi interpreted this as a promise that Braintech would cover secured claims of creditors of debts Shafi had personally guaranteed.  In fact, in the same email. Weidinger suggested that Braintech might even choose to pay off secured debt of SI sooner than provided in the Braintech Accepted Debt schedule.

63.     In the August 5, 2008 email, Weidinger represented that he and Braintech "fully recognize our obligation to the $900,000 as reflected in this debt schedule and assume Adil will assist but be far to busy with other matters to manage this which payment [Braintech Accepted Debt] schedule is already on autopilot."  The reference to

$900,000 was consistent with prior representations because $100,000 had already been advanced to SI pursuant to the Letter of Intent.

64.     In response to this, in an August 5, 2008 email, Shafi responded to Weidinger that it was critical and material to the deal that all SI creditors be paid according to the Braintech Accepted Debt Schedule, in particular because of the painstaking negotiations with SI creditors performed by an attorney on behalf of SI whose fees were paid by Braintech.

## F.   Braintech Never Intended to Honor the Agreements

65.     The transaction in which Braintech acquired the stock of SI enabled Braintech to obtain access to vast amounts of proprietary information, software code, goodwill, access to employees and the knowledge of the employees, some of whom had worked for years with Shafi, access to customers, access to new markets, particularly automotive markets, access to technology, access to applications solutions and evolutions of SI's world leading RELIABOT VGR software.

66.     Almost immediately after the closing of the transaction in which Braintech acquired the stock of SI and SII, it appeared that Braintech would not honor various undertakings as promised in the SPA, Employment Agreement and Braintech Accepted Debt Schedule, such as making timely payments to SI creditors, the timely opening of a Detroit metropolitan office, attending customer introduction meetings in an agreed "Access and Acceleration" schedule, the hiring of personnel to support sales of SI software and other material promises made by Braintech to advance the common goals stated in the closing documents.

67.    As early as September, 22, 2008, Shafi learned that payments were not being made to at least some creditors as promised and pursuant to the Braintech Accepted Debt schedule, including certain former SI employees AND secured debt owed to Bank of America.  In fact, Shafi learned on September 23, 2008 that Braintech had "bounced" checks payable to Bank of America for August payments Braintech undertook to pay in the Braintech Accepted Debt schedule.

68.    By November 2008 Braintech had failed to take any steps to open an office location in the Detroit metropolitan area within the agreed period of time specified in the Access and Acceleration Schedule.

69.    By November 2008 Braintech had failed to hire any technical employees in order to appropriately staff both sales and engineering positions to support the sales and expansion of the SI lines of software.  Additionally, Braintech failed to hire technical support as specified in Shafi's Employment Agreement.

70.    By November 2008, Shafi became aware that Braintech was failing to meet its obligations to pay installments of debt owed by SI to SI creditors (the "Braintech Assumed Debt").

71.    In September and October, 2008 Shafi had to resort to requesting to use credit cards issued to Weidinger and other Braintech managers in order to book travel to support his sales efforts.  Although Weidinger and Braintech knew of Shafi's precarious financial circumstances, it soon became apparent that Braintech hardly had the resources to support Shafi in the discharge of his duties under his Employment Agreement.

72.     By November 2008, Braintech flat out reneged on certain promises to reimburse certain expenses to Shafi.

73.     On November 25, 2008, Shafi was scheduled to qualify for coverage under Braintech's health and medical insurance through Braintech pursuant to a 90 day vesting policy.

74.     On November 19, 2008, Shafi was informed by his superiors at Braintech that he was being placed on "administrative leave" with full pay.  No explanation or reason for this action was given.  The term "administrative leave" was not defined in Shafi's Employment Agreement.

75.     On November 24, 2008 Shafi was informed that his status was changed to "administrative leave without pay or benefits."

76.     According to Shafi's Employment Agreement there is no right granted to the employer, Braintech, to place Shafi on any sort of "administrative leave."

77.     According to Shafi's Employment Agreement with Braintech, Braintech has the right to terminate his employment for cause or without cause.  In the event that Shafi was terminated for cause, certain rights to post-employment remuneration would be forfeited.

78.     In the event of a termination without cause, Shafi retained certain post-employment compensation benefits, including the right to collect 100% of his salary through the term of the Employment Agreement.

79.     Since November 24, 2008, Shafi has had no further communication from Braintech concerning the termination of his employment and Braintech has failed to honor its promises to continue to pay Shafi's salary.

80.     As Chief Operating Officer of Braintech, part of Shafi's responsibilities was to manage Braintech's intellectual property.  In fact, Section 4(a) of Shafi's employment contract described in part Shafi's duties as:

> Manage overall technology of combined company.  In this role, EXECUTIVE shall manage the product lines and technical personnel of BRAINTECH and SHAFI, Inc. and SHAFI Innovation, Inc.  BRAINTECH's Vancouver technical teams and a US based technical team comprised of current and new technical personnel will report to EXECUTIVE.  In addition, EXECUTIVE shall define product and personnel direction, plan product development and manage testing and release of all future products including synergies between the combined product offerings. EXECUTIVE shall work closely with BRAINTECH's market oriented sales teams.  EXECUTIVE shall manage technical documentation, the technical training of and technical support to BRAINTECH's employees, partners and customers.  EXECUTIVE, shall transition to Houghton, MI on or about September 30, 2009.

81.     Contrary to this description of his duties, once employed, Shafi was given no access whatsoever to any technology of the combined company.  Rather there was a concerted effort to deny access to any Braintech generated technology, despite the efforts of Shafi to perform his employment and move forward with an integration of the combined technology of the two companies.

82.     By the time Shafi was placed on so called administrative leave, Shafi knew that Braintech had already defaulted in its promises to pay several installments of the SI assumed debt, to transfer additional stock to Shafi pursuant to the Employment Agreement, to make incentive bonus payments pursuant to the Employment

Agreement, to proceed to take any steps to open a Michigan location and hire sales and technological staff or to take any steps to register the Braintech shares sold to Shafi.

83.     Although Braintech represented in the agreements that it would take all reasonable steps in order to advance the registration process of the Braintech stock sold to Shafi, to date, Braintech has taken no steps whatsoever to register the stock, rendering the stock worthless.  The issuance of Braintech stock to Shafi was touted by Braintech, upon closing in August 2008, in a press release to its shareholders and the general public as a major part of its consideration for the purchase of SI and SII.

84.     Following the apparent termination of Shafi, Braintech made an unsupported claim that the Share Purchase Agreement had to be rescinded, but to date other than as alleged in its complaint some three months after the purported termination, has offered no explanation to why rescission is needed.

85.     The complaint itself filed by Braintech is full of misrepresentations and contradicts the exhaustive and far reaching due diligence conducted by Braintech.  By way of example only Braintech knew that:

  a.     various debts of SI had been liquidated to a judgment before August 12, 2008.

  b.     SI was delinquent with certain tax obligations.

  c.     Shafi was the intended payee of a portion of each of the two $50,000 advances.

  d.     SI revenue projections were just that; projections.

e.    non-Braintech Accepted Debt was outstanding as of August 12, 2008 and would be paid by Shafi post closing, but no time limits were placed on Shafi's payment of same and payment of compensation and prompt reimbursement of expenses was intended by the parties to assist Shafi in covering the share he would personally pay.

86.    To date Braintech has failed to provide any additional information to Shafi concerning his termination.  The lack of any explanation for the termination of Shafi's employment constitutes an admission that his termination was without cause.

87.    Since the apparent termination of Shafi's employment, Braintech has moved aggressively to create a presence in Southeastern Michigan, by recently opening a facility in Auburn Hills, Michigan and by its recently announced hiring of several key new personnel for its Michigan office.

88.    Since terminating Shafi's employment, Braintech as been making a concerted effort to make contact with SI customers in order to solicit business.

89.    In negotiating, executing and initially performing the SPA, the related agreements and Employment Agreement for a period of approximately 90 days, Braintech and Weidinger intended to induce Shafi to turn over control of SI, its assets, intellectual property, goodwill and customer lists, use Shafi to implement an effective marketing program and gain access to markets Braintech had no previous access to, but Braintech had no intention of performing and honoring its promises beyond a period

of 90 days after it acquired complete control of these assets and obtained a complete company wide marketing plan developed by Shafi known as Access and Acceleration.

90.     Through the acquisition of SI, Braintech and Weidinger have advanced their plan to diversify and gain access to new markets in a far shorter period than it would have been able to accomplish according to its initial internal plans.  Braintech acquired the means to carry out its plans at a fraction of the arms length negotiated price that it would have paid under the terms of the SPA, Employment Agreement and related agreements.

91.     As anticipated, Braintech contends in its complaint that it is entitled to rescind all of the contracts related to its acquisition of SI and SII and the sale of stock to Shafi.  Braintech's claim for rescission is merely a ruse since it has already had access (and continues to access) technology, customers, markets and know how of SI and SII.

92.     The acquisition of SI and SII was merely an elaborate plan to commit the theft of valuable corporate property at a time when Braintech was itself facing the demise of its business with the impending end of its only contract to sell its own VGR software products, and Braintech knew that due to the lack of resale of $6 million worth of software by ABB, Braintech's renewal of its exclusive contract with ABB from 2009 onwards, had become a highly unlikely possibility.

93.     Weidinger was motivated to participate in the theft of corporate property because he has personally invested millions of dollars in Braintech in order to keep it afloat.  In fact, disclosures in SEC filings indicate that Weidinger personally loaned

Braintech $50,000 of the cash portion of the consideration paid to SI and as a result was awarded additional shares in the company.

94.     Weidinger has been personally involved with the scheme to commit theft of corporate property from the beginning.  Weidinger personally approached Shafi in early 2008, Weidinger personally conducted months of Due Diligence and difficult negotiation, Weidinger negotiated the agreements, and finalized specific payment terms in the Debt Schedule (up to an hour before closing), Weidinger negotiated the Employment Agreement and SPA.  At several key points in negotiations, Shafi informed Weidinger that Shafi was ready to terminate further discussions and pursue other interests.  At each of these points Weidinger immediately responded exhorting Shafi that a deal with Braintech would be too lucrative to Shafi to turn down.

95.     Later, Weidinger blocked Shafi's effectiveness at Braintech after the closing, personally authorized the breach of the Agreements to Braintech employees, and finally made the decision to terminate Shafi's involvement at Braintech.

96.     Weidinger was further motivated to commit the theft of corporate property in order to advance his own personal goals to profit from an eventual public offering of stock in Braintech in the future.

97.     Without the technology, customers, markets, sales blueprint and know how of SI and SII, it would have taken Braintech years to reach the market position it now has by virtue of the theft of corporate property.  Weidinger has through these actions, now accrued for himself and for Braintech all of the valuable intellectual

property, assets and goodwill of SI and SII and through its claim for rescission intends to merely shed the carcass.

## COUNT I
## DECLARATORY JUDGMENT (EMPLOYMENT CONTRACT)

(Braintech)

98.     Shafi incorporates paragraphs 1 through 97 here.

99.     An actual case or controversy exists between Shafi on the one hand and Braintech on the other hand regarding the enforceability of the obligations created by Shafi's Employment Agreement with Braintech.

100.    Effective August 16, 2008, Shafi became the Chief Operating Officer of Braintech and continued in his capacity as President of SI, President of SII and was appointed to the Braintech Board of Directors.

101.    Shafi performed all of this duties and obligations set forth in the Employment Agreement in a satisfactory manner.

102.    Pursuant to Section 12 of the Employment Agreement, Shafi could be terminated.

103.    In the event of termination of Shafi's employment by Braintech, without good cause, Shafi is and was entitled to:

        a.      unpaid compensation earned to the termination date, and

        b.      a lump sum payment of the remaining "base salary" of the term of the Employment Agreement (3 years), subject to the execution of a release.

104.   On November 19, 2008, Braintech informed Shafi that he would be on "administrative leave" as of November 19, 2008 but would continue to be paid his salary and benefits.  Braintech claimed in writing that it had decided to "rescind" the acquisition of SI and SII but offered no further explanation.

105.   On November 24, 2008, Braintech informed Shafi that his status of "administrative leave" would continue, but effective November 24, 2008, Shafi would not receive his salary and benefits.   In the same communication, Braintech outlined its demands for a "mutually agreeable" rescission agreement, but offered no reason or cause for Shafi's administrative leave or its demand for rescission.

106.   Braintech's use of so called "administrative leave" in connection with the termination of Shafi's employment is a breach of the Employment Agreement.

107.   Effectively Shafi's employment with Braintech has been terminated as of November 19, 2008.

108.   Shafi's employment with Braintech was terminated by Braintech without good cause as defined in the Employment Agreement, and Shafi is accordingly entitled to severance benefits under the Employment Agreement.

109.   Shafi is entitled to a declaratory judgment that Braintech has breached the Employment Agreement by terminating Shafi without good cause and failing to pay Shafi severance benefits provided under the Employment Agreement.

## COUNT II
## BREACH OF CONTRACT (EMPLOYMENT CONTRACT)

(Braintech)

110.   Shafi incorporates paragraphs 1 through 109 here.

111.    Shafi and Braintech are parties to an Employment Agreement.

112.    Braintech is presently in breach of the Employment Agreement because Braintech has terminated Shafi's employment without good cause and failed to pay severance called for under the Employment Agreement.

113.    Braintech's breach of the Employment Agreement terminated Shafi's ability to receive bonuses of cash and stock for his services and particularly revenues from automotive sales.

114.    As a result of the foregoing, Shafi is entitled to an award of damages in the minimum amount of $700,000 plus an amount to be determined for future bonus income and the value of stock awards, any applicable costs, interest and attorney's fees as a result of Braintech's breach of the Employment Agreement.

## COUNT III
## FRAUD/FRAUD IN THE INDUCEMENT

(Braintech and Weidinger)

115.    Shafi incorporates paragraphs 1 through 114 here.

116.    At all relevant times during the period in which Shafi began negotiating with Weidinger and Braintech for a business combination, the actual negotiations for the acquisition of stock in SI and SII, the due diligence carried out by Weidinger and Braintech in connection with the ultimate closing of the transaction, up to and including the transaction, Weidinger on behalf of Braintech represented that Braintech fully intended to carry out all of the promises and undertakings set forth in all of the contracts and documents associated with the acquisition of the stock in SI and SII.

117.    In particular, Weidinger made the representations alleged in paragraphs 45, 50, 57, 60 and 63 in order to induce Shafi to complete the transactions, sell stock in SI and SII and acquire stock in Braintech.

118.    Weidinger represented to Shafi that Shafi would receive substantial "up front" value from the purchase of 3 million shares of stock issued by Braintech as part of the transaction and that Braintech would take all reasonable and necessary steps to register the stock after a period of six months to enable Shafi to realize a profit from the sale of SI and SII to Braintech.

119.    In an email dated August 3, 2008, Weidinger represented to Shafi that Shafi would be part of an important management team and, in fact, would have daily control over both technology and sales, reporting only to Weidinger, and that he would receive substantial compensation in bonuses, stock options and other benefits from the newly-formed position of Chief Operating Officer of Braintech for the newly combined enterprise.

120.    Weidinger represented that the assumption of debt owed by SI to its creditors, Braintech Accepted Debt, would alleviate significant financial pressure faced by Shafi absent the sale of stock of SI and SII to Braintech.

121.    The foregoing representations and others were material in that had Shafi known that Braintech had no intention to honor the contractual undertakings and otherwise perform the promises made to Shafi in connection with his acquisition of stock in Braintech and the sale of his stock in SI and SII to Braintech, Shafi would not have consummated the transaction.

122.   The representations as alleged herein were false when made and were part of a scheme and artifice whereby Weidinger through Braintech would acquire valuable corporate assets of SI and SII in exchange for only a fraction of the total consideration promised to Shafi for those assets.

123.   Shafi's reliance on the representations of Weidinger and Braintech as alleged above was reasonable in that as part of the scheme and artifice, Weidinger and Braintech undertook a substantial and far-reaching due diligence of SI, its business, its creditors, its customers, its market penetration, its intellectual property and any and all other aspects of the business of SI and SII.  Shafi had ample reason to believe that he was engaging in an arms length legitimate transaction in which he would enjoy the future benefits of all of his years of hard work invested in the creation, evolution and then current value of SI and SII.

124.   As a result of the misrepresentations of Weidinger and Braintech concerning the acquisition of SI and SII, and Shafi's acquisition of stock in Braintech in exchange for SI and SII stock, Shafi has been damaged by the complete loss of the business of SI and SII, his receipt of worthless stock in Braintech and loss of his personal reputation and goodwill in the marketplace.

**COUNT IV**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**

(Braintech and Weidinger)

125.   Shafi incorporates paragraphs 1 through 124 here.

126.   During the period beginning January 1, 2008, through November 19, 2008, Weidinger and Braintech carried out a plan, scheme and course of conduct which was intended to and throughout this period did: (i) deceive Shafi, as alleged herein; (ii) enable Braintech and Weidinger to sell 3 million shares of stock in Braintech to Shafi as partial consideration for Braintech's acquisition of the stock in SI and SII; and (iii) cause Shafi to turn over all of the business assets of SI and SII, including customer lists, proprietary information, software source code, intellectual property, goodwill, employees and employee expertise to Braintech all in exchange for a mere $100,000 down payment and approximately $45,000.00 in salary paid to Shafi between August 6, 2008 and November 19, 2008 in salary, which is a fraction of the value of SI and SII.   In furtherance of this unlawful scheme, plan and course of conduct, Weidinger and Braintech, jointly and individually, took the action set forth herein.

127.   Weidinger and Braintech (a) employed devices, schemes and artifices to defraud Shafi; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Shafi in an effort to acquire all of the stock and business assets in SI and SII in part consideration for and in connection with the sale of Braintech securities to Shafi in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   Weidinger and Braintech are primary participants in the wrongful and illegal conduct charged herein.

128.   Weidinger and Braintech, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the

mails, engaged and participated in a continuous course of conduct between January 1, 2008 and November 19, 2008 to conceal the fact that the negotiations, due diligence, closing and execution of all of the agreements, the sale of worthless securities, to wit: the Braintech stock was merely an elaborate ruse and Weidinger and Braintech in fact had no intention of performing all of the Agreements.

129.   Weidinger and Braintech omitted to disclose material information concerning the lack of any intention to carry out any of the contractual commitments beyond a period of 90 days and that their plan to acquire the assets of SI and SII was an elaborate fraud.

130.   In connection with the transaction and prior to it, Weidinger represented in an August 3, 2008 email that Braintech would allow Shafi to hire skilled sales employees to focus on sales of SI software.  Following the transaction, Weidinger and Braintech failed to approve the hire any sales employees thereby making it impossible for SI to meet any sales or revenue projections.

131.   In connection with the transaction and prior to it, Weidinger represented in an August 3, 2008 email that Braintech would allow Shafi to hire skilled software engineers to assist Shafi in the integration of the software of both companies.  Following the transaction, Weidinger and Braintech failed to approve the hire any software engineers, effectively making it impossible for Shafi to work on the integration of the software of the two companies.

132.   In connection with the transaction and prior to it, in several emails and in particular in an email dated July 29, 2008 and in a phone call which occurred July 30,

2008 Weidinger represented that Braintech would provide Shafi access to its own intellectual property and software code so that Shafi could work on integration of the most favorable qualities of each companies software.  Following the transaction, Weidinger and Braintech blocked all access to any Braintech owned software, effectively making it impossible for Shafi to work on the integration of the software of the two companies.

133.   In connection with the transaction and prior to it, in several emails and in particular in an email dated July 31, 2008, Weidinger represented that Braintech would open a sales office in Michigan on later than September 30, 2008 in order for Shafi to continue to focus a portion of his sales and engineering on automotive applications. Following the transaction Weidinger failed to take any steps to open a Braintech office in Michigan, despite repeated requests from Shafi.

134.   In connection with the transaction and prior to it, in several emails and telephone conversations and in particular an email dated August 5, 2008, Weidinger represented that Braintech would pay Shafi 50% of any net revenue generated by sales of software to the automotive as a further inducement for Shafi to earn income from successful sales to the automotive sector.  Following the transaction, Weidinger's failure to provide any sales or engineering support, failure to give Shafi access to Braintech software and failure to take any steps to open a Michigan office made automotive sales all but impossible.

135.   In connection with the transaction and prior to it, in various discussions and in particular in an email dated August 2, 2008, Weidinger represented that

Braintech would assume the obligation to make payment on debts of SI, some of which Shafi was personally liable for, including IRS tax debt, Comerica bank loan and unpaid wages to SI employees and former employees. Many of these debts were the subject of exhaustive negotiations for reductions and for payments over time all known to Weidinger and approved by Weidinger as late as one hour before the closing on August 12, 2008. Following the transaction, Weidinger and Braintech failed to make these payments causing these creditors to claim breaches of the previously negotiated payment plans and causing some of these creditors to undertake collection activity against Shafi.

136. In connection with the transaction and prior to it, in various discussions and in the context of Weidinger's approval of the Access and Acceleration plan which called for Weidinger's participation in customer contacts, Weidinger represented that he would attend customer introduction meetings on an agreed schedule as part of the integration of the two companies. Following the transaction, Weidinger expended no efforts to attend or even schedule customer introduction meetings.

137. In connection with the transaction and prior to it, in various discussions and in particular in emails dated May 28, 2008 and June 17, 2008, Weidinger represented that Shafi would receive the full value of the 3,000,000 shares of Braintech stock sold to Shafi in exchange for Shafi's interests in SI and SII "up front." Following the transaction Weidinger and Braintech failed to take any steps to register Shafi's 3,000,000 shares. Because the stock is unregistered, Shafi cannot sell the stock and as a result, the stock is worthless.

138.   Weidinger and Braintech had knowledge of their misrepresentations and omissions as alleged herein and in fact, had no intention of carrying out any of their representations or contractual promises and acted with deliberate disregard for the truth of such representations and omissions to state material facts.   Such material misrepresentations and/or omissions were done knowingly and/or deliberately and for the purpose and effect of concealing the truth about their intentions to acquire SI and SII and to sell securities of Braintech to Shafi.

139.   Weidinger acted with scienter in connection with the sale of Braintech stock to Shafi as is more particularly set forth in paragraphs 92 through 97 above.

140.   Shafi relied directly on the false and misleading statements made by Weidinger and Braintech concerning their undertakings to perform all of the promises and representations in connection with the sale of stock in Braintech to Shafi.

141.   Shafi acquired and continues to hold the worthless Braintech securities in connection with the acquisition of SI and SII by Braintech.

142.   At the time of the closing on August 12, 2008, Shafi was ignorant of the true plan and true intentions of Weidinger and Braintech to perpetrate an elaborate fraud and theft of corporate property of SI and SII in connection with the sale of Braintech securities to Shafi.

143.   Had the true intentions of Weidinger and Braintech been known to Shafi, which were not disclosed to Shafi, Shafi would not have acquired the Braintech securities at any price.

144.    By virtue of the foregoing, Weidinger and Braintech have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated hereunder.

145.    As a direct and proximate result of the wrongful conduct of Weidinger and Braintech, Shafi has suffered damages in connection with his acquisition of Braintech securities sold by Braintech in connection with Braintech's acquisition of SI and SII.

**COUNT V**
**VIOLATION OF MICHIGAN UNIFORM SECURITIES ACT**
**SECTION 410(a)(2), MCLA 451.810(a)(2)**

(Braintech and Weidinger)

146.    Shafi incorporates paragraphs 1 through 145 here.

147.    Weidinger and Braintech made the misrepresentations and omissions alleged in paragraphs 108 though 115 above in connection with the sale of Braintech stock to Shafi.

148.    In connection with the sale of Braintech stock to Shafi, Braintech and Weidinger made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the facts and circumstances in which they were made, not misleading in violation of Section 410(a)(2) of the Michigan Uniform Securities Act ("MUSA").

149.    Pursuant to Section 410(b) of MUSA, both Braintech and Weidinger, as a responsible officer, and Weidinger individually as a principal are equally liable to Shafi for such misrepresentations and omissions of material facts.

150.    Shafi did not know of the misrepresentations and omissions and could not have known of the misrepresentations and omissions in the exercise of ordinary care. Shafi justifiably relied upon the misrepresentations and omissions.

151.    Shafi has suffered damages as a result of his justifiable reliance.

152.    By reason of the violations described in this Count VI, Braintech and Weidinger and each of them are liable to Shafi for the value of the consideration received by Braintech for the Braintech stock sold to Shafi, which is the fair market value of the business assets and goodwill of SI and SII.

**COUNT VI**
**CONVERSION**

(Braintech and Weidinger)

153.    Shafi incorporates paragraphs 1 through 152 here.

154.    Prior to August 12, 2008, Shafi was the lawful owner of 100% of the issued and outstanding stock in SI and SII.

155.    As alleged herein, as part of an elaborate and complicated scheme to commit theft of corporate property, Weidinger and Braintech made a series of fraudulent misrepresentations and omissions to state material facts in order to induce Shafi to sell his interests in SI and SII.

156.    In reliance upon the fraudulent misrepresentations and omissions to state material facts, Shafi did in fact turn over his interests in SI and SII to Weidinger and Braintech.

157.    The misrepresentations and omissions to state material facts were false and known by Weidinger and Braintech to be false when made, and were intended by

Weidinger and Braintech to induce Shafi to turn over all of his stock in SI and 80% of his stock in SII.

158.   Once Weidinger and Braintech obtained possession of all of the corporate property of SI and SII, Weidinger and Braintech unlawfully converted such corporate property to their own use causing damages to Shafi in an amount to be determined by this Court, then trebled.

**COUNT VII**
**UNJUST ENRICHMENT**

(Braintech and Weidinger)

159.   Shafi incorporates paragraphs 1 through 158 here.

160.   Prior to August 12, 2008, Shafi was the lawful owner of 100% of the issued and outstanding stock in SI and SII.

161.   As alleged herein, as part of an elaborate and complicated scheme to commit theft of corporate property, Weidinger and Braintech made a series of fraudulent misrepresentations and omissions to state material facts in order to induce Shafi to sell his interests in SI and SII.

162.   In reliance upon the fraudulent representations and omissions to state material facts, Shafi did in fact turn over his interests in SI and SII to Weidinger and Braintech.

163.   To the extent Weidinger and Braintech have retained and benefited from the corporate assets of SI and SII, they have been unjustly enriched at Shafi's expense.

164.    Weidinger personally benefitted from the theft of corporate assets of SI and SII because he is single largest shareholder of Braintech, the most highly compensated employee of Braintech and if properly exploited, the corporate property, goodwill and sales blueprint obtained by Braintech from Shafi, SI and SII was intended by Weidinger to result in a public sale of Braintech securities from which Weidinger expected to profit through the sale of his own substantial holdings of Braintech stock.

165.    Shafi is entitled to recover the value of the corporate assets of SI and SII in an amount to be determined by this Court.

## RELIEF

Wherefore, Shafi demands:

A.    A Declaration that the Employment Agreement is enforceable according to its terms, that Shafi was terminated without cause and that Shafi is entitled to the benefit of the compensation and benefits payable through the term of the Employment Agreement.

B.    An award of damages for all debts of SI for which Shafi is directly personally liable to creditors of SI.

C.    An award of damages for the fraud fraud in the inducement and 10b-5 claims.

D.    An award of damages plus reasonable attorneys fees for the fraud and Michigan Uniform Securities Act claim.

E.    An award of damages for the conversion claim, trebled and an award of attorneys' fees.

F.      An award of damages for unjust enrichment.

G.      Such other and further relief as this Court deems just and prudent.

## **JURY DEMAND**

Shafi demands a trial by jury.

Respectfully submitted,

BERRY MOORMAN P.C.

By:  s/James P. Murphy
        James P. Murphy (P36728)
        Attorneys for Defendant
        535 Griswold, Suite 1900
        Detroit, Michigan 48226
        (313) 496-1200
        murph@berrymoorman.com

Dated:  July 22, 2009

## **CERTIFICATE OF SERVICE**

STATE OF MICHIGAN )
                              ) ss
COUNTY OF WAYNE  )

       I hereby certify that on the 22nd day of July, 2009, copies of the foregoing Second Amended Counterclaim and Jury Demand were filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                    s/James P. Murphy
                                    James P. Murphy
                                    535 Griswold, Suite 1900
                                    Detroit, Michigan 48226