UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC., a Nevada corporation,

       Plaintiff/Counter-Defendant,

v.                                     Case No. 09-10454

ADIL SHAFI, an individual,                  Hon. Victoria A. Roberts

       Defendant/Counter-Plaintiff/
       Third-Party Plaintiff,

v.

FREDERICK WEIDINGER, an individual,

       Third-Party Defendant.

_____/

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL
SUPPLEMENTAL RESPONSES TO DISCOVERY**

       Defendant, Adil Shafi, through his attorneys, Berry Moorman P.C., provides the
following memorandum of law in support of Shafi's opposition to Plaintiff's Motion to
Compel Discovery.

## I.   INTRODUCTION AND GENERAL BACKGROUND

       Plaintiff, Braintech, seems to be bent on portraying Shafi as hiding in the
shadows of some hundreds of thousands of documents which Braintech claims have
been indiscriminately "dumped" on Braintech in the course of this discovery.  Most likely
due to the 25 interrogatory limitation, Braintech has taken the concept of "contention
interrogatories" to the next step and has effectively propounded 82 document requests

which are nothing more than "contention" document requests.  This will be expounded upon below.  Nevertheless, to properly understand the context of the present discovery problem, some background on the claims is in order.

Braintech acquired all of the outstanding common stock of Shafi, Inc. on August 12, 2008.  Braintech also acquired 80% of the outstanding common stock of Shafi, Innovation, Inc.  (Shafi, Inc. will be referred to as "SI" and Shafi Innovation, Inc. will be referred to as "SII").  Prior to the August 12, 2008 transactions, Defendant Adil Shafi owned 100% of the outstanding common stock of both SI and SII.

Prior to the August 12, 2008 transaction, both SI and Braintech were involved in the  VGR software market.  VGR is an acronym for Vision Guided Robotics software.  Both Braintech and SI were in the business of developing and selling computer software intended to be installed on computers which control robots and robotic systems.  The "vision" aspect of the software allows the computer controls to guide the robot to detect or "see" a particular piece or item that needs to be picked up, loaded, installed, moved or placed in a particular location.  The VGR software industry is a very narrowly focused aspect of software in general and solely related to integration with robots and robotic controls.

After the transaction in which Braintech acquired the stock in SI and SII, Braintech issued a press release.  In the first paragraph, Braintech wrote

> —Braintech Inc. (OTC BB: BRHI) has acquired 100 percent of the ownership of SHAFI Inc. and 80 percent of the ownership of SHAFI Innovation Inc. (together SHAFI). As a result, Braintech will acquire key proprietary assets from SHAFI, providing Braintech with a technological launching pad to accelerate its expansion into a wide–range of new markets that include aerospace, consumer, food and beverage, government, medical, pharmaceutical, plastics, and semi–conductor.

The press release went on to state that

> Braintech's eVisionFactory software has made significant advancements—including Random Bin Picking— Vision Guided Robotics (VGR) software development. We believe the integration of SHAFI's market–reliable software solutions for machine vision and robotic guidance applications promises to form a dynamic fusion of technologies.

Following Braintech's acquisition of the stock of SI and SII, SI's former owner, Adil Shafi, became the Chief Operating Officer of the combined entities.  Mr. Shafi held that position for a period of less than three months.  As the COO, Mr. Shafi had several areas of responsibility, including integration of the proprietary VGR software offered by each of the companies, spearheading sales efforts and in particular targeting new customers and industries, expanding the sales base and the creation of an office to promote the combined technology in southeastern Michigan in order to obtain additional automotive related business.

For many reasons, which are detailed in Mr. Shafi's counterclaim in this matter, the business combination did not work.  Mr. Shafi was terminated as COO of the combined companies on November 24, 2008.  Braintech filed this case, claiming it was entitled to rescission of the Stock Purchase Agreement and all related acquisition agreements.  Braintech claims Mr. Shafi made material misrepresentations in connection with the transaction.  Mr. Shafi, in turn, filed a counterclaim and added Defendant Rick Weidinger, Braintech's major shareholder and CEO, as an additional party defendant to Mr. Shafi's counterclaim.

Thus, this case primarily involves allegations of fraud and misrepresentation by both sides in connection with Braintech's acquisition of stock in SI and SII.  Braintech claims that Mr. Shafi lied about the capabilities of SI software, the nature of its

customers and the prospects for future business. On the other hand, Mr. Shafi claims that Braintech never intended to go through with the transaction and merely, through a series of misrepresentations and omissions, induced Mr. Shafi to turn over all of the valuable corporate property, including intellectual property, of SI and SII after which Mr. Shafi was promptly fired and completely disassociated from any aspect of SI, SII and Braintech.

It is important to note that absent a favorable disposition of Braintech's claims in this matter, Braintech is the sole owner of SI. **All** of the business records which have been produced in the 81 small banker's boxes to date are the business records of SI. Braintech is the owner of these records,

Braintech reneged a promise to open such an office in Michigan where the parties intended those records to be kept. By breaching that promise, Mr. Shafi is, by default, the "custodian" of SI's records. Accordingly, there has not been an indiscriminate "document dump," rather, Mr. Shafi has merely tendered all of the business records of SI to its rightful owner, Braintech.

Mr. Shafi may be more familiar with those business records, but those business records are necessarily owned by Braintech and it is equally burdensome on either side to force Mr. Shafi to cull from Braintech's records particular documents which may be responsive to the "contention document requests" subject to this discovery motion. Braintech's motion effectively demands the Court order Adil Shafi to pull responsive documents from Plaintiff's records to support allegations in the counterclaim.

## II. SPECIFIC RESPONSES TO DOCUMENT REQUESTS

Out of the gate, on Document Request No 1, Braintech raises an issue with is completely irrelevant and has no bearing on whether one party or the other made misrepresentations to induce the other into closing the August 12th transaction.  Plaintiff complains that "it is completely proper to request any documents that Shafi possesses which support this allegation…" "in Paragraph 12 of the Second Amended Counterclaim that SI and Braintech were competitors in the marketplace of VGR software."

First of all, whether or not Braintech and SI were competitors prior to the August 12, 2008 transaction is not germane to any issue.  This is what makes it so patently a contention discovery request.  Moreover, this request is not focused on any documents which are "related" to the allegation that SI and Braintech were competitors.  The actual document request is phrased as seeking documents that "support, refute or relate in any way" to the allegation.  Mr. Shafi's objections are proper and appropriate.

First, Mr. Shafi asserts that this document request is extraordinarily burdensome.  There is no genuine issue of material fact in dispute as to whether SI and Braintech were competitors.  Mr. Shafi can relate several instances prior to 2008 where SI and Braintech met head-to-head in the VGR software marketplace, competed for business among specific customers and either won or lost contracts.  For example, in 2004/2005, both SI and Braintech were involved in presenting proposals for VGR software for Chrysler Corporation's PMMK Platform at Chrysler's Sterling Stamping Plant.  Chrysler had a long-standing relationship with a particular robotic manufacturer but, prior to 2004, had a falling out and was looking for a new robotic manufacturer.  As a result, Chrysler awarded a large robot order to ABB.  ABB is a European robot manufacturer

5

with whom Braintech had an exclusive relationship through the end of 2008.[1]   Despite its exclusive contract with Braintech, ABB specifically contacted SI and requested SI to deliver a proposal for VGR software to run the robots ABB was building for Chrysler. Making a proposal necessarily included understanding and fully specing out of the applications required of the robots to be installed and the part installation process at the Chrysler facility.   After specing out all of the applications and providing the same to ABB, ABB turned to its exclusive supplier Braintech and Braintech got the order to supply VGR software to the Chrysler PMMK Program.[2]

In another example, SI was asked to quote VGR software for an application developed by Gudel, Inc. for the United States Air Force.  Gudel was selected by the USAF to create a huge robot designed tolift the next generation of USAF fighter aircraft (F-33's), move them inside a hanger and place the aircraft on a pylon for various types of flight and radar testing.  Following the testing, the same robot would remove the aircraft from the pylons and return it to the beginning spot.  This application saved USAF enormous amounts of money, manpower and logistics in moving these sophisticated future generation aircraft through their testing routines.  SI learned through the course of its own proposal in the timeframe of 2006/2007 that Gudel had also sought a proposal from Braintech.  In the end, Gudel chose SI's proposal over

_____

[1] Prior to Braintech's acquisition of SI, Braintech was more focused on Research and Development and exclusively sold VGR software to support ABB robots.  As a result of its exclusive contract with ABB, Braintech was precluded from offering VGR software which would run on competing robot manufacturing platforms.

[2] As it turns out, this Program was a complete disaster for Chrysler, ABB and Braintech.  Neither the VGR software supplied by Braintech or the robots supplied by ABB could perform to the standards required by Chrysler. This led to a complete severance of any further relationship between Chrysler on the one hand and ABB and Braintech on the other hand.  This is an instance where documents related to SI's work on the Chrysler PMMK Program relate to the allegation that SI and Braintech were competitors.

Braintech.  Thus, SI files related to its relationship with Gudel might be "related" to the claim that SI and Braintech were competitors.

In the same vein, very early on in the discussion between Mr. Shafi and Mr. Weidinger, Mr. Shafi made a comment in an e-mail that two companies had been in the past "competitors."

As the COO of Braintech, Mr. Shafi became a party to an Employment Contract. One of the provisions of the Employment Contract was a Covenant Not To Compete. There is a substantial amount of e-mail exchanged between Mr. Weidinger and Mr. Shafi discussing the terms of the Covenant Not To Compete.  Once again, the e-mail and the Employment Contract may "relate" to the fact that Braintech and SI were competitors.

The foregoing represents specific examples.  There are many many more generic examples that may give rise to the inference that Braintech and SI were competitors.  SI's business records contain hundreds of files related to customer prospects and sales of SI's proprietary RELIABOT software.  Those files show that SI was attempting to and in fact marketed and sold VGR software, the same type of software marketed and sold by Braintech.  SI maintains many files with respect to its RELIABOT VGR software products, training manuals and related material.  All of these files may also give rise to an inference that Braintech and SI were competitors.   One could argue that generally all of the business records of SI relate to the fact that SI was a competitor of Braintech prior to the August 12, 2008 transaction since all of those

business records demonstrate and support the fact that SI was in the same general

VGR software market as Braintech.[3]

Nevertheless, the ultimate question must be posed, what relevance does the

foregoing shed on whether one party or the other made misrepresentations to induce

the other party into the August 12, 2008 transaction in which Braintech required SI and

SII.    Neither party makes a claim that the other made a representation that the two

parties were competitors (or not competitors) and that  the representation was false.

Neither party relied upon the fact that the other was a competitor (or not) in order to

enter into the August 12, 2008 transaction.    This discovery request is not calculated

reasonably to lead to any admissible, relevant or even germane information with respect

to the claims pending in this court.  On the contrary, it is designed to force Adil Shafi to

expend the maximum amount of attorney's fees and cull through hundreds of thousands

of documents and pull out documents that "relate" "refute" or "support" to a fact that is

not even in contention.

The next document request is no less vague or burdensome.  Request No. 2

states:

> 2.    Produce all documents that support, refute or relate in any
> way to the allegation in Paragraph 12 of your Second Amended Counter-
> Claim that:  "As of the beginning of 2008, SI had a completely diversified
> customer base and its VGR software was compatible with multiple brands
> of robots and multiple brands of vision systems."

This is a background allegation that is not germane to the issue of whether one

side or the other fraudulently induced the other party into the transaction.  Contrary to

---

[3] One might also argue that Braintech and SI were not really competitors.  SI operated with a different
business model and focused on multiple applications, multiple robotic manufacturers and multiple vision system
manufacturers.  Braintech on the other hand exclusively sold its VGR software to ABB at the time of the business
combination.

Braintech's assertion that Mr. Shafi merely engaged in a document dump, all 81 boxes of documents were categorized by content and further subdivided into files within each box.    Box numbers 1 through 26 and 29 through 34 were identified as software customer boxes and contained all documentation related to customers, prospects, robot companies, end users, vision companies and integrators.    Within each box, the software customer files were broken down by name of the entity in alphabetical order.    Further, box numbers 40 through 50 and 70 through 78 contain hard computational programming documents (made up of underlying mathematical, geometrical, vision, robot, kinematics, algorhythms, techniques and user interface) which demonstrate the diversification and multiple brands.    Box numbers 74, 75 and 76 contain videos of SI software in actual use running on different robots.    Box 77 contains diskettes and CD's containing duplicate copies of actual software sold to customers.    59 of 81 boxes of documents are responsive to this incredibly vague request.

Document Request No. 3 is no less vague.    It is vague because it is based upon an allegation that is unrelated to a particular set or category of documents.    Request No. 3 sought:

> 3.    Produce all documents that support, refute or relate in any way to the allegation in Paragraph 12 of your Second Amended Counterclaim that:  "SI had dozens of different types of applications solutions, in multiple industries, with over 300 customer installations."

Request No. 4 is even vaguer.    Request No. 4 sought:

> 4.    Produce all documents that support, refute or relate in any way to the allegation in Paragraph 12 of your Second Amended Counter-Claim that:  "SI operated with a flexible business model which allowed for flexibility of choice of industry, system integrator, robot, vision system and applications solutions in virtually every sale."

Once again, these are background allegations that do not support or relate to the main context of the Counter-Claim, that Weidinger and Braintech made fraudulent misrepresentations to Adil Shafi in order to induce him to turn over valuable corporate property of SI and SII.  Adil Shafi is prepared to testify that there is no single document which "will support, refute, or relate in any way" that the "business model" under which SI operated was a "flexible business" model.  Indeed, this is just a general allegation of the business philosophy developed by Adil Shafi through years of operating SI as its Principal and sole Shareholder.  Braintech, by applying the principles of contention interrogatories to its document requests has turned its document requests into requests that are incomprehensible and vague.  This particular information is much more suitable to deposition questioning than requiring Shafi to cull through hundreds of thousands of documents in the search for a needle in a haystack.

Document Request No. 5 represents a different type of problem.

5.    Produce documents that "support, refute or relate in any way" to the allegation what Weidinger approached Shafi in 2008 "in order to discuss a business combination between Briantech and SI."

Shafi's response objected to this request in part based upon the following:

There is no single document which directly addresses the identified allegation, but rather a combination of testimony and indirectly documents through which the allegation will be proved.

To the best of Adil Shafi's recollection, in March 2008, Rick Weidinger placed a telephone call to Mr. Shafi which began the discussions of a business combination.  The single point of this allegation is that the initial contact which led to the business transaction, was initiated by Weidinger.  However, the thoughtless and rote manner in which Braintech's contention discovery requests were drafted completely overlooks the

possibility that in fact, there are not any documents related to this allegation. This allegation makes no reference to any business record or document. It simply refers to a phone call. Picture two men having a brief conversation on a telephone where they agreed to have a further discussion. With that mental picture, it is completely inapposite that such scenario would result in either the creation or the existence of a document (unless there are notes and there are no notes made by Mr. Shafi). Therefore, simply associating document requests to allegations in the counterclaim renders such document requests vague, burdensome and completely incapable of any logical response.

The same goes for Document Request No. 6. Document Request No. 6 relates to Paragraph 16 of Shafi's Second Amended Counterclaim. Paragraph 16 of the Second Amended Counterclaim prefaces the factual allegation with the fact that the information within the allegation came from direct discussions between Weidinger and Shafi (not e-mail or correspondence). The allegation relates an oral observation made by Weidinger regarding a business combination between SI and Braintech. Once again, the mechanical pairing of a document request with allegation in the counterclaim simply leads to an incomprehensively vague document request and when considered in its proper context, i.e., a verbal expression of interest on the part of Braintech as to what a business combination might result in, there simply is no logical path to the existence of any documents which "support, refute or in any way relate" to this verbal expression made by Weidinger to Shafi in one of their initial conversations.

The rote mechanical association of a document request to an allegation in the Second Amended Counter-Claim applies to Request Nos. 7, 8, 9 and 10.  Each of these Requests seek documents related to allegations that:

- SI had a diversified position in the market for VGR software.

- SI had a proven track record of success with multiple robot and vision systems, many applications solutions, and [a] diversified customer lists.

- SI had an established presence in the State of Michigan and a strong relationship with many automotive suppliers.

- SI was known in the automotive industry as the industry leader for vision-guided robotic software.

- At the time of the sale of stock in SI to Braintech, rely about was the standard in the industry and was far more versatile than any other Braintech products because of its ability to communicate with robots and vision systems for multiple manufacturers.

- SI's financial difficulties had nothing to do with its technology or products.

 In support of its objections to these Requests, SI pointed out that:

> There is no single document which directly addresses the identified allegation, but rather a combination of testimony and indirectly documents through which the allegation will be proved.

The reality is, the full complement of the business records of SI more than likely "relates" to the foregoing allegations.  There is no single document which is going to show that SI was a leader in the VGR software market.  Nor is there a comprehensive set of documents which could be collated from the business records which would show this.  In fact, this type of allegation will more be proved by the testimony of Adil Shafi and the testimony of other relevant witnesses who know of SI's presence in the VGR software market.

Request No. 15 is yet another example of how mere mechanical association of a document request to an allegation in the complaint renders the document request nonsensical.   Request 15 refers to an allegation contained in Paragraph 43 of the Second Amended Counter-Claim.  The excerpted part of the allegation in Paragraph 43 in the Document Requests is as follows:

> 43.    Shafi also learned from Weidinger that Braintech was lacking leadership in sales and marketing and Weidinger expressed that he lacked confidence in the existing Braintech sales organization to promote and sell the limited VGR software products which Braintech was capable of supporting.

This allegation is contained in a section of the Second Amended Counter-Claim entitled "The Representations of Weidinger and Braintech."  To the best of Shafi's recollection, the allegation set forth in Paragraph 43 was an oral representation.  It is noteworthy that during the discussions leading up to the August 12, 2008 transactions, all of Mr. Shafi's discussions were strictly limited between Mr. Shafi and Mr. Weidinger.  As to the allegation contained in Paragraph 43 implies, the information imparted by Weidinger was done so in verbal communications.

The next Document Request mechanically applies production request to the very next allegation. Paragraph 44 of the Second Amended Counterclaim alleged:

> Weidinger persisted in making a series of representations to Shafi as to how specifically Shafi would personally benefit from a business combination between Braintech, SI and SII.

The next allegation in the counterclaim, Paragraph 45, identifies the single document where Weidinger made the representations referred to in Paragraphs 43 and 44 of the Second Amended Counterclaim.  An email sent to Mr. Shafi by Weidinger

dated May 28, 2008 contained the representations.   In the e-mail, and as alleged in Paragraph 45, Weidinger asserted that:

> "An acquisition with Braintech assuming your business debt and buying your stock, all BRHI [Braintech] stock upfront to you, big leadership contract for you with monthly payments for 2.5 years of agreement, cash deposit at execution and certain of IP back to you after 2.5 years would be best transaction for all."

Finally, the next Document Request, No. 17, asks for Shafi to produce the specific May 28, 2008 e-mail, and "all e-mails, notes or correspondence related in any way thereto", that is referenced in Paragraph 45 of your Second Amended Counter-Claim.  The May 28, 2008 e-mail refers broadly to the transaction in which Braintech acquired the stock of SI and SII.   Arguably, any "related" e-mail would constitute all of the e-mail exchanged by Weidinger and Shafi before the August 12, 2008 transaction and either simultaneously with this Memorandum or within a day or two of its filing, all such e-mails will be produced electronically for counsel for Braintech.

Request No. 18 demonstrates yet again how the mechanical association of a document request with an allegation in the Second Amended Counterclaim results in an absurd document request.  Request No. 18 relates to an allegation found in Paragraph 48 of the Second Amended Counterclaim.  In Paragraph 48, Shafi alleged:

> 48.    Shafi fully disclosed the financial circumstances of SI and frankly informed Weidinger that SI was in default on certain loans, behind in its obligations to creditors and unable to make its payroll despite having laid off many employees in the preceding months.

The extensive exchanges of information and due diligence conducted by both parties prior to the transaction belies Braintech's purportedly innocent assertion that this is a legitimate document request.  There was an excel spreadsheet which identified all SI debt exchanged by the parties on numerous dates beginning in June, 2008 and

ending with the final version on August 12, 2008.  The document is entitled "Shafi, Inc. Expected Debt Payments" and there are no less than 7 electronic and hard-copy versions of the document exchanged by the parties.  This is an extensive list of all debts and the status of said debts owed by SI to all SI creditors.  It was periodically updated as discussions continued and the final version of the document was specifically referred to in the Share Purchase Agreement as "Braintech Accepted Debt.".   The same document and all iterations of the same document were the subject of an extensive set of Requests to Admit and Braintech has already admitted that it is in possession of every iteration of the document.  In fact, Braintech has admitted that every iteration of the document was maintained by its employee, Heather Greenlay.

Mr. Shafi is prepared to proceed with this same analysis with each and every Request for Documents through the end.  The problem is no planning or forethought went into the drafting of the Document Requests.   Rather, just like contention interrogatories, the drafter of the Document Requests routinely and mechanically applied a document request to each of the substantive allegations in the Counterclaim. This results in nonsensical document requests and the pairing of allegations that have nothing to do with documents or categories of documents.  This is why the Document Request is burdensome and results in vague document requests.

### III.  THE INTERROGATORY RESPONSES

Although the actual Interrogatories number 19, with the addition of the so-called Instruction No. 4, the number of Interrogatories is actually tripled and, in reality, there are 57 Interrogatories.    Instruction No. 4 impermissibly adds two follow-up Interrogatories to each of the 19 Interrogatories.   The follow-ups from Instruction 4

require Shafi to identify any documents which support any contention and any witnesses and provide a description of any expected testimony from witnesses when evidence identified in response to an interrogatory will be derived from witness testimony.  Thus by virtue of the simple addition of Instruction No. 4, each Interrogatory is followed by two follow-up Interrogatories which require Shafi to identify documents and witnesses and witness testimony.

As with the Document Requests, the Interrogatories are "contention interrogatories."  "To the extent that [overly burdensome] requests unduly broaden the scope of discovery, rejecting them saves significant costs to the parties, the court and other litigants.  To the extent the requests unduly increase the parties' cost of compliance, rejecting them will result in more equitable and more efficient discovery management and will discourage further abuse."  *Chudasma v Mazda Motor Corporation*, *123 F.3d 1353, 1370 (11th Cir. 1997)*.

Some courts frown on contention interrogatories.  "Contention interrogatories which 'systematically track all of the allegations in an opposing party's pleadings, and that ask for each and every fact and application of law that support the party's allegations are an abuse of the discovery process because they are overly broad and unduly burdensome.'"  See *Miles v Shanghai Zhenhui Port of Mach. Co., 209 U.S. DIST. LEXIS 112183 (D.WASH.)*  In the Sixth Circuit, contention interrogatories are a permissible form of discovery.  *Starcher v Corr. Med. Sys., 144 F.3d 418, 421, N.2 (6th Cir. 1998).*  One court within the Sixth Circuit has noted that there is "considerable authority for the view that the wisest general policy is to defer propounding and

answering contention interrogatories until near the end of the discovery period."  See *Schweinfurth v Motorola, Inc., 2007 U.S. DIST. LEXIS 98182 (N.D. Ohio).*

Contention interrogatories are subject to the general rules of discovery. Contention interrogatories "must be specific, intelligible, and narrowly tailored for the case …"  See *7-33 Morris Federal Practice – Civil, Section 3378.*  To respond to the Interrogatories propounded by Braintech in this case would be an unduly burdensome task since it would require Mr. Shafi to produce veritable narratives of his entire case, identify and describe the scope of any and all witnesses and their expected testimony and identify and connect every relevant document to every piece of information set forth in the expansively drafted Interrogatories.  "To the extent [the requests] ask for every fact and every application of law to fact which supports the identified allegation, the court finds them overly broad and unduly burdensome.  An interrogatory may reasonably ask for the material or principal facts which support a contention."  See *IBP, Inc. v Mercantile Bank, 179 F.R.D. 316, 321 (D. Kan. 1998)(*"a laborious, time-consuming analysis, search, and description of incidental, secondary, and perhaps irrelevant and trivial details" is beyond the scope of the discovery rules).  *IBP, Inc., supra,* also noted that "[o]ther discovery procedures, such as depositions and production of documents, better address whatever need there be for that kind of secondary detail."

As to the specific Interrogatories, Braintech complains that the answers are insufficient, but Braintech is simply wrong.  Interrogatory No. 8 refers to Paragraph 122 of Shafi's Second Amended Complaint.  Paragraph 122 alleges that the representations "as alleged herein" were false when made ….  The specific representations referred to

in Paragraph 122 are elucidated in Paragraphs 117 (which in turn refers Paragraphs 45, 50, 57, 60 and 63), 118, 119 and 120.  Therefore, Interrogatory No. 8 is not a single interrogatory but rather an interrogatory directed at 9 different and discrete allegations of representations made by Rick Weidinger in connection with the Braintech acquisition of SI and SII.  If this court is going to compel an answer, Shafi would literally be required to 9 separate interrogatories regarding each separate representation referred to in Paragraph 122 of the counterclaim.

Here, it should also be noted that Shafi's initial Complaint did not contain the level of detail and the specific description of each and every representation supporting the claims.  Many of the representations are set forth in written e-mails and the date of the e-mail is also provided in the allegation.  The fact is, requiring Mr. Shafi to simply recite another verbal narrative similar to the allegations set forth in the 9 distinct paragraphs referred to in Paragraph 122 of the Counter-Claim is unduly burdensome and will result in a completely duplicative effort since the specific representations are outlined with great specificity in the Complaint.

The same goes for Interrogatory No. 9.  Interrogatory No. 9 makes reference to Paragraph 126 of Shafi's Second Amended Counter-Claim.  Paragraph 126 is the first general allegation in Shafi's Count IV, Violation of Section 10 B. of the Exchange Act.  Paragraph 126 simply describes the overall scheme and plan carried out by Braintech and Weidinger in which they intended to defraud and deceive Shafi into turning over the valuable corporate property of SI and SII.  The 9 discrete paragraphs which follow Paragraph 126 (129 through 137) specifically identify the omissions and misrepresentations which were part of the scheme described in Paragraph 126.  It is

18

burdensome and unreasonably duplicative to require Shafi to repeat the narrative found in the 9 paragraphs following Paragraph 126 then provide all of the detail (documents, witnesses and descriptions of witnesses' testimony) for each of the 9 discrete descriptions of omissions and misrepresentations.  This in effect requires answers to 9 separate interrogatories.

To make this even more burdensome, Paragraph 126 of the Complaint is substantively identical to Paragraph 89 of the Complaint.  Interrogatory No. 1 refers to Paragraph 89 of the Complaint.  In response to Interrogatory No. 1, Shafi provided a four-page, single-spaced, bullet-point narrative of all of the facts and circumstances, including specific reference to e-mail, which supported the allegation that Braintech and Weidinger "intended to induce Shafi to turn over control of SI, its assets, its intellectual property, goodwill and customer lists, use Shafi to implement an effective marketing program and gain access to markets Braintech had no previous access to, but Braintech had no intention of performing and honoring its promises beyond a period of 90 days after it acquired the complete control of the assets and obtained a complete company-wide marketing plan developed by Shafi known as Access and Acceleration."  Interrogatory No 1 is therefore substantively identical to Interrogatory No 9 and Shafi's answer to No 1 provides the answer to No 9..

The foregoing theme pervades every single Interrogatory at issue.  Shafi should not be required to repeat and reassert mountains and mountains of minutia in response to boilerplate interrogatories that are poorly drafted, vague and unspecific to begin with. The discovery requests in this case the obvious result of a mere mechanical matching of boilerplate document requests and interrogatories to allegations in the counterclaim

where little or no human thought went into crafting a careful and specific discovery request within the spirit and application required by the Federal Rules.

## IV. CONCLUSION

Defendant Shafi respectfully requests that his objections to the discovery at issue be sustained

Respectfully submitted,

BERRY MOORMAN P.C.

By:   s/James P. Murphy
      James P. Murphy (P36728)
      Attorneys for Defendant
      535 Griswold, Suite 1900
      Detroit, Michigan 48226
      (313) 496-1200
      murph@berrymoorman.com

Dated:  January 6, 2010

## CERTIFICATE OF SERVICE

STATE OF MICHIGAN )
                         )ss
COUNTY OF WAYNE  )

     I hereby certify that on the 6[h] day of January, 2010, a copy of the foregoing Memorandum of Law in Opposition to Plaintiff's Motion to Compel Supplemental Responses to Discovery was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

                         Respectfully submitted,

                         BERRY MOORMAN P.C.

                         By:   s/James P. Murphy
                              James P. Murphy (P36728)
                              Attorneys for Defendant
                              535 Griswold, Suite 1900
                              Detroit, Michigan 48226
                              (313) 496-1200
                              murph@berrymoorman.com