UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC., a Nevada corporation,

    Plaintiff/Counter-Defendant,

v.                                                                                  Case No. 09-10454

ADIL SHAFI, an individual,                                      Hon. Victoria A. Roberts

    Defendant/Counter-Plaintiff/
    Third-Party Plaintiff,

v.

FREDERICK WEIDINGER, an individual,

    Third-Party Defendant.
_____/

## DEFENDANT'S AMENDED MOTION FOR PROTECTIVE ORDER REGARDING THIRD PARTY DISCOVERY

    Defendant Adil Shafi, through his attorneys, Berry Moorman P.C., moves, pursuant to Rule 26(b)(2)(c) for a protective order.  The discovery at issue arises from two subpoenas to nonparties seeking a host of information which has absolutely no bearing on any issue in the case.

    I certify, pursuant to local rule, that I have attempted to confer with the party serving the discovery (Braintech) but no response whatsoever was made to an email communication sent November 2, 2010, outlining Defendant's concerns and seeking to discuss limitations on the discovery.

        Respectfully submitted,

        BERRY MOORMAN P.C.

        By:  s/James P. Murphy
             James P. Murphy (P36728)
             Attorneys for Defendant
             535 Griswold, Suite 1900
             Detroit, Michigan 48226
             (313) 496-1200
             murph@berrymoorman.com

Dated:  November 10, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC., a Nevada corporation,

    Plaintiff/Counter-Defendant,

v.                                                                                          Case No. 09-10454

ADIL SHAFI, an individual,                                         Hon. Victoria A. Roberts

    Defendant/Counter-Plaintiff/
    Third-Party Plaintiff,

v.

FREDERICK WEIDINGER, an individual,

    Third-Party Defendant.
_____/

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF**

**MOTION FOR PROTECTIVE ORDER**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES…………………………………………………………...…iii

I.   ISSUES PRESENTED FOR DECISION…………………………………………..…1

II.  MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT…………………...…1

III. INTRODUCTION…………………………………………………………………….1

    A.  The Subjects of the Subpoenas……………………………………………….2

    B.  The Period of Time Covered in the Subpoenas and the
       Information Sought………………………………………………………….... 2

IV.  POSTURE OF THIS CASE AND BRAINTECH………………………………..……3

V.   SHAFI'S CLAIMS IN THE COUNTERCLAIM……………………………….……5

    A.  Breach of the Employment Contract………………………………..………5

    B.  The Fraud and Securities Based Claims……………………………………. 6

VI.  THE DISCOVERY SUBJECT TO THIS MOTION IS IRRELEVANT……………….. 6

    A.  Mitigation Has No Bearing on the Contract Claim……………………..….8

    B.  Mitigation is Irrelevant to Any Claim of Unlawful Competition…………..10

    C.  Mitigation is Irrelevant to Shafi's Post Braintech Activities…………..……11

    D.  Software Code Developed Post Braintech is Irrelevant……………………11

VII. CONCLUSION……………………………………………………………………12

# INDEX OF AUTHORITIES

Cases

*Eerdmans v Maki*, 226 Mich. App. 360, 366 (1997)……………………….………1, 6

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148 (2008)… 6

*Dopp v. Capitol Bancorp Ltd.*, 1997 Mich. App. LEXIS 541 (1997)…………………….1, 9

*Dahl v. UHS, Inc.*, 1990 U.S. Dist. LEXIS 8737 (E. D. Mich. 1990)…………...………. 9


Rules

Fed. R. Civ. Pro. 26(b)(2)(C)……………………………………………………………….. 1

Fed. R. Civ. Pro. 26(c)………………………………………………………………………… 1

Defendant, Adil Shafi ("Shafi"), through his attorneys, Berry Moorman P.C., submits the following Memorandum of Law in Support of his Motion for a Protective Order.

## I. ISSUES PRESENTED FOR DECISION

1. Whether third party subpoenas served on Aptura Machine Vision Solutions and Advenovation Inc., should be reviewed under Fed. R. Civ. Pro. 26(b)(2)(C) to determine if the subpoenas seek any relevant, discoverable information or will lead to the discovery of relevant or admissible information.

2. Whether a protective order should enter under Fed. R. Civ. Pro. 26(c) limiting or completely foreclosing the discovery from being undertaken by Counterclaim Defendant Braintech Inc.

## II. MOST APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

Fed R. Civ. Pro. 26(c).

*Eerdmans v Maki*, 226 Mich. App. 360, 366 (1997).

*Dopp v. Capitol Bancorp Ltd.*, 1997 Mich. App. LEXIS 541 (1997).

## III. INTRODUCTION

On October 29, 2010, Defendant Braintech Inc. ("Braintech") served third-party subpoenas on:

1. Aptura Machine Vision Solutions/David Dechow (subpoena attached as Exhibit 1).

2. Advenovation, Inc. (subpoena attached as Exhibit 2).

1

### A. The Subjects of the Subpoenas

Aptura Machine Vision Solutions is a company owned by David Dechow. Advenovation is a company owned by Defendant Adil Shafi. Since leaving Braintech, Mr. Shafi formed his new company, Advenovation, in order to offer services and products for the vision guided robotic software industry. This is an industry in which Mr. Shafi has worked and achieved success for over 20 years. His prior company, Shafi Inc., was sold to Braintech as part of the transaction at issue in this case. Since forming Advenovation, Mr. Shafi has corroborated on projects with Mr. Dechow and Aptura Machine Vision Solutions in particular to write new software code for exploitation in the vision guided robotics software market. Mr. Shafi also acts as a sales representative for Aptura Machine Vision Solutions since his termination from Braintech.

### B. The Period of Time Covered in the Subpoenas and the Information Sought

Mr. Shafi sold his companies to Braintech in exchange for worthless stock in Braintech on August 12, 2008. As part of that transaction, Mr. Shafi became the Chief Operating Officer of Braintech pursuant to a written employment agreement. Three months later on November 19, 2008 Mr. Shafi was terminated.

After spending several months deciding what to do with his future after selling his life's work in Shafi Inc., in exchange for stock which turned out to be worth nothing, he decided to form a new venture with Advenovation. Mr. Shafi recently testified that he began operating Advenovation in February 2009, three months after his termination from Braintech.

Part of Mr. Shafi's work in Advenovation has involved subcontracting the writing of software code to Aptura Machine Vision Solutions/David Dechow. The discovery

2

sought via subpoena seeks information related to this corroboration since February, 2009.[1] The subpoenas also seek records of compensation paid to Mr. Shafi, the production of software code, and any evidence of corroboration between Mr. Shafi, his company, Advenovation and Aptura Machine Vision Solutions/David Dechow. All of the information sought post dates the issues and transactions at the center of this case, have nothing to do with any pending issues, are not relevant and are not intended to lead to discoverable or admissible evidence.

### IV. POSTURE OF THIS CASE AND BRAINTECH

On June 3, 2010, this Court dismissed Braintech's complaint in its entirety due to the withdrawal of Braintech's counsel and Braintech's failure to have new counsel appear on its behalf. Despite the dismissal of the complaint, this Court allowed attorneys Susan Koval, Esq. and Anne Widlak, Esq. to file appearances on behalf of Braintech, solely for the purpose of *defending* the counterclaim filed by Defendant Shafi in this case.

Braintech no longer exists. In March 2010, Weidinger resigned as its CEO, walked out of its office and never returned. Before his resignation, Weidinger arranged for secured financing for Braintech through Silicon Valley Bank. It was a complicated transaction but publically disclosed in various 8K and 10K filings with the Securities and Exchange Commission before Braintech's demise. According to such fillings, Weidinger and other shareholders of Braintech pledged personal assets in order to obtain financing for Braintech through Silicon Valley Bank. Shortly after Weidinger's

---

[1] The subpoenas seek information beginning as early as January 1, 2008, but that date was arbitrarily selected by counsel in an effort to lend some legitimacy to the subpoenas in terms of a relevant time line.

3

resignation, Silicon Valley Bank declared a default and executed on the personal assets of Weidinger and others.

As part of the financing transaction with Silicon Valley Bank and in exchange for pledging their personal assets in order to obtain the loan, Weidinger and others were granted all asset liens on Braintech assets. Accordingly, after Silicon Valley Bank, took the pledged assets, Weidinger and his shareholder group foreclosed on the assets of Braintech. Weidinger formed a new company RoboticVisionTech and transferred the foreclosed assets of Braintech into the new company. All of this occurred in 2010 long after Mr. Shafi's departure from Braintech. Weidinger confirmed this in his deposition.

> Q. What happened to the business records of Braintech after Silicon Valley Bank foreclosed on it?
>
> A. You'd have to ask Braintech that. I resigned in March. And the foreclosure was in May.
>
> Q. Where was the Braintech corporate headquarters prior to your resignation?
>
> \*   \*   \*
>
> A. 1750 Tysons. Right next-door.
>
> Q. What suite number?
>
> A. 350.
>
> Q. Who is in that suite today?
>
> A. I have no idea.
>
> Q. Was that where the business records of Braintech were kept?
>
> A. Correct.
>
> Q. So when you resigned, you walked out of there and you never returned?

> A. That's correct.
>
> Q. You recently had -- or you were involved in some way a foreclosure of the assets of Braintech, right?
>
> A. Correct.
>
> Q. And the new company's name is Robotic VISION Tech, correct?
>
> A. Yes.

Weidinger Tr. pp. 161-162.  The details of Weidinger's involvement in the transaction were made part of a confidential record – but there is no reason to believe that Braintech or Weidinger will dispute the foregoing facts and so the confidential record is not offered at this time.

### V.  SHAFI'S CLAIMS IN THE COUNTERCLAIM

    A.  <u>Breach of the Employment Contract</u>

Shafi's claims against Braintech break into two categories.  The first is for breach of Shafi's Employment Agreement.  Mr. Shafi's Employment Agreement is annexed as Exhibit 3.  This is a simple and straightforward claim.  Shafi asserts in Count II of the counterclaim that he was terminated without good cause entitling him to a severance payment as provided in the Employment Agreement.  "Good cause" is defined in the Employment Agreement and equates to termination for lack of cause.  The sole issue related to the claim for breach of the Employment Agreement is whether or not Shafi was terminated for good cause.  Shafi alleges that he was not terminated for good cause (or if terminated for good cause, he was never notified of what the cause of his termination resulted from).  It is important to note that Shafi's claim for breach of the employment contract is not a "wrongful termination" tort.

5

### B. The Fraud and Securities Based Claims

Shafi's remaining claims against Braintech are the fraud and securities fraud claims. Essentially, Shafi contends that Braintech, through and in concert with its then CEO, Counterclaim defendant Frederick Weidinger ("Weidinger"), fraudulently induced Shafi to sell his businesses, Shafi, Inc. and Shafi Innovation, Inc., to Braintech in exchange for fraudulent promises of compensation, allegedly valuable stock in Braintech and other benefits. That transaction took place on August 12, 2008, and in exchange for selling his companies, Shafi was given allegedly valuable stock, an allegedly lucrative Employment Agreement and other alleged benefits never actually received.

To establish a cause of action for fraud or misrepresentation, a plaintiff must prove (1) that the defendant made a material representation; (2) that the representation was false; (3) that when the defendant made the representation, the defendant knew that it was false, or made it recklessly without knowledge of its truth or falsity; (4) that the defendant made it with the intent that the plaintiff would act on it; (5) that the plaintiff acted in reliance on it; and, (6) that the plaintiff suffered injury. *Eerdmans v Maki*, 226 Mich. App. 360, 366 (1997). Proof of securities fraud under Rule 10b-5 is similar with a greater emphasis on scienter, the purchase of a security and loss casuation. *See*, *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008).

### VI. THE DISCOVERY SUBJECT TO THIS MOTION IS IRRELEVANT

For lack of a better term, the discovery at issue in this motion is a fishing expedition. All of the discovery relates to Mr. Shafi's post Braintech activities; his post Braintech employment, his post Braintech involvement in robotics vision guidance

software, his post Braintech income and expenses.  In the recent third installment of his deposition, Shafi was questioned extensively on current and post Braintech debts he personally owes, including credit cards and mortgages.  When asked what possible relevance this information had to the claims in this case, Braintech's counsel asserted that such questions had to do with "mitigation."  The following exchange took place between counsel regarding the "relevance" of Shafi's post Braintech debts and other activities.

> Q. Do you have a mortgage on your home?
>
> A. Yes.
>
> Q. What's the balance?
>
> A. I believe about $70,000, $80,000.
>
> Q. Do you know what the home's worth?
>
> MR. MURPHY:
>
> What in the world is this relevant to?
>
> MS. KOVAL:
>
> Oh, I'm sorry.  I thought your client was requesting damages in this case.
>
> MR. MURPHY:
>
> He is.  So what's the relevance of the value of his home?
>
> MS. KOVAL:
>
> All of this goes to mitigation.
>
> MR. MURPHY:
>
> The value of his home?

7

MS. KOVAL:

I want to know where he's putting his money.

MR. MURPHY:

Good grief.

Q. (Continuing by Ms. Koval):  I'm sorry, sir, I didn't hear your answer because your attorney interrupted.  What's the value of your home, what you believe it to be?

A. It's about -- I have two homes.  One is in Brighton and one is at Houghton.  The value of -- Well, I'd have to give you an explanation to give you an answer.  I can't just say yes or a number.

Shafi Tr. pp. 504-505.  The information and documents sought by the subpoenas are identical to the "mitigation" theme pursued in his deposition which was a pointless and irrelevant waste of time.

    A.    <u>Mitigation Has No Bearing on the Contract Claim</u>

Mitigation is emphatically not at issue in this case.  Shafi is not seeking damages from Braintech for "wrongful termination."  Rather, Shafi's employment termination claim arises directly from the Employment Agreement, a contract, which provides for a "severance" payment to be made by Braintech in the event Shafi was terminated without good cause.  As such, Shafi had no duty to find suitable replacement employment and otherwise "mitigate" his damages.

The Employment Contract contains a clear and unambiguous severance provision.  It provides:

> (g) <u>Severance Pay</u>.  In the event of a termination of this Agreement by the Company without Good Cause, due to Total Permanent Disability or due to the death of the EXECUTIVE, or by the EXECUTIVE for Good Reason, then the EXECUTIVE or the EXECUTIVE heirs will be entitled to:

> i. unpaid compensation and benefits described hereunder earned up to the termination date to be paid within 10 business days of termination; and
>
> ii. *a lump sum payment (less all deductions required by law such as income taxes) equal to the remainder of the then Base Salary remaining in the three year employment term set out in paragraph 5 to be paid within 20 business days after the Termination Date.* The EXECUTIVE agrees that after the Termination Date, but prior to payment of the severance pay and any outstanding bonus monies called for herein, EXECUTIVE shall execute a release, in the form of a severance agreement, of any and all claims he may have against the Company and its officers, employees, directors, parents and affiliates. EXECUTIVE understands and agrees that the payment of the severance pay and bonus called for by this paragraph are contingent on his execution of the previously described release of claims. For avoidance of doubt, if severance is paid to EXECUTIVE then non-compete will be effective. [emphasis supplied]

There is no set off of the severance obligation. Termination without good cause is a "trigger event" entitling Mr. Shafi to the severance benefit. Michigan Court's will enforce such a clause – without offset as long as long as the severance is not an illegal penalty. The Michigan Court of Appeals upheld a similar provision in *Dopp v. Capitol Bancorp Ltd.*, 1997 Mich. App. LEXIS 541 (1997).

   Viewed in the context of the transaction as a whole, this provision was intended to compensate Mr. Shafi in the event his employment was terminated through no fault of his own. Shafi was hired to be a high level, executive employee reporting to the Braintech's Chief Executive Officer, Weidinger. Whether viewed as severance or liquidated damages, Mr. Shafi has no obligation to mitigate damages. See also *Dahl v. UHS, Inc.*, 1990 U.S. Dist. LEXIS 8737 (E. D. Mich. 1990)("In the absence of mistake, fraud or some other legally recognized ground, however, courts may not relieve parties of what prove to be unfair bargains…. It is simply inappropriate for [a] court to invalidate

9

the unambiguous terms of those contracts made between competent parties…to limit the [p]laintiff's recovery under the agreement to an amount the reviewing court believes to be more fair."). Thus, wherever Mr. Shafi is "putting his money" is an irrelevant fishing expedition.

      B.    <u>Mitigation is Irrelevant to Any Claim of Unlawful Competition</u>

It is worth noting that part of the focus of counsel for Braintech in the third installment of Mr. Shafi's deposition was whether Mr. Shafi is now in competition with Braintech. The subpoenas also seek information intended to show Mr. Shafi is now in competition with Braintech. To be clear, as part of his "employment" with Braintech, Shafi executed a Covenant Not to Complete (annexed as Exhibit 4). However, the severance was directly addressed in the Covenant Not to Compete. Section 3 of the Covenant Not to Compete removed any restriction on competition if the severance was *not* paid. It is undisputed that the severance was not paid.

Section 3 of The Covenant Not to Compete provided:

> 3.    Early Termination of Restricted Period. If, and only if, Seller's employment with Buyer pursuant to that certain Employment Agreement between Buyer and Seller, dated of even date herewith (the "<u>Employment Agreement</u>"), is terminated by Buyer without "Good Cause" (as defined in the Employment Agreement) in either case as contemplated by Section 12(g) thereof, and Buyer fails to satisfy its obligations to pay the severance pay required under said Section 12(g), the Restricted Period shall end on the date that is thirty (30) days after the effective date of such termination.

Braintech has no claim for enforcement of the Covenant Not to Compete and any evidence that Mr. Shafi has actively competed with Braintech is not only irrelevant but a complete waste of time and resources. Even if Braintech had a claim to enforce the Covenant Not to Compete, the dismissal of the complaint precludes litigation of any issue related to the Covenant Not to Compete.

10

### C. Mitigation is Irrelevant to Shafi's Post Braintech Activities

In addition, the subpoenas seek to gather information related to the operations of Advenovation, the company formed by Mr. Shafi following his departure from Braintech. In his recent deposition, Shafi testified that after he was terminated from Braintech, he formed a new company, Advenovation, Inc. Like the company he formerly owned, Shafi, Inc., and Braintech, Advenovation is in the business of robot vision guided software. The claims in this case relate to the sale of Mr. Shafi's then owned businesses to Braintech and the circumstances of the termination of his employment. What Mr. Shafi has done with his life following his separation from Braintech has no relevance to any issue in this case.

### D. Software Code Developed Post Braintech is Irrelevant

The subpoenas also seek production of proprietary software code owned by Advenovation. Any such software code came into existence after Mr. Shafi's separation from Braintech. Questioning at Mr. Shafi's recent deposition clearly telegraph that Braintech may believe that Shafi has continued to make use of software code owned by Shafi, Inc. which subsequently became the property of Braintech.[2] However, as with the other claims, they are simply not relevant to any issue pending in this case. Braintech no longer exists. Weidinger foreclosed on the assets of Braintech as a secured creditor of Braintech. Weidinger formed a new company, RoboticVisionTech, for the purpose of foreclosing on the assets of Braintech. RoboticVisionTech is a

---

[2] Given that Braintech no longer exists and the entity formerly known as Braintech is being defended by an insurance company that only provides cost of defense it certainly makes for an odd metaphysical reality that there is no "stakeholder" present in this litigation to advocate that Shafi may be violating some restrictive covenant that is not at issue in this case. It seems a pointless waste of time and resources to devote subpoenas and discovery to such a non-issue.

competitor of Advenovation.  There is no *legitimate* reason in this case to force Advenovation or Aptura to produce software code which will be revealed to a competitor.

### VII.  CONCLUSION

It appears that the sole point in pursuing these subpoenas is to harass Mr. Shafi and needlessly increase the cost of this litigation.  Braintech has no offensive claim in this case.  Shafi has no obligation to mitigate his damages.  There is no defense called "mitigation" to a fraud claim.  Information and documents sought by the subpoenas is not even remotely relevant to the issues in this case.  As a matter of fact, the information sought was not even relative to the now-dismissed complaint, which only sought rescission.  Accordingly, Shafi requests that this Court enter a protective order such that the discovery sought by third-party subpoenas not be had at all.

                                       Respectfully submitted,

                                       BERRY MOORMAN P.C.

                                       By:   s/James P. Murphy
                                                James P. Murphy (P36728)
                                                Attorneys for Defendant
                                                535 Griswold, Suite 1900
                                                Detroit, Michigan 48226
                                                (313) 496-1200
                                                murph@berrymoorman.com

Dated:  November 10, 2010