## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BRAINTECH, INC.,
Plaintiff/Counter-Defendant,

v.

ADIL SHAFI,
Defendant/Counter-Plaintiff/
Third-Party Plaintiff,

v.

FREDERICK WEIDINGER AND
BRAINTECH, INC.,
Third-Party Defendant/Counter-Defendant.

Case No: 09-10454
Honorable Victoria A. Roberts

## BRAINTECH, INC.'S AND FREDERICK WEIDINGER'S
## JOINT MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

Braintech, Inc., and Frederick Weidinger, by and through counsel, hereby respectfully move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter summary judgment in their favor because, as set forth more specifically in the attached Brief in Support, there are no genuine issues of material fact and Braintech and Weidinger are entitled to judgment as a matter of law.

Pursuant to E.D. Mich. LR 7.1(a), prior to filing this Motion, counsel for Braintech communicated with Shafi's counsel to request concurrence in the relief sought in this Motion but concurrence was denied.

WHEREFORE, Braintech, Inc., and Frederick Weidinger respectfully request that this Honorable Court grant their Motion for Summary Judgment and enter an Order a) dismissing Shafi's Second Amended Counterclaim with prejudice, and b) awarding Braintech and Weidinger their attorneys' fees and costs incurred in defense of the second amended counterclaim.

Respectfully submitted,

NEMETH BURWELL, P.C.

By:      s/Susan D. Koval
         Anne Widlak (P35763)
         Susan D. Koval (P59297)
         Attorneys for Braintech, Inc.
         200 Talon Centre Drive, Suite 200
         Detroit, Michigan 48207
         (313) 567-5921
         awidlak@nemethburwell.com
         skoval@nemethburwell.com


PILLSBURY WINTHROP SHAW PITTMAN LLP

By:      s/with consent of Geoffrey J. Greeves
         Geoffrey J. Greeves
         Attorney for Frederick Weidinger
         2300 N Street, N.W.
         Washington, DC 20037-1122
         (202) 663-9228
         geoffrey.greeves@pillsburylaw.com

November 19, 2010

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC.,
Plaintiff/Counter-Defendant,

v.                                                    Case No: 09-10454
                                                      Honorable Victoria A. Roberts

ADIL SHAFI,
Defendant/Counter-Plaintiff/
Third-Party Plaintiff,

v.

FREDERICK WEIDINGER AND
BRAINTECH, INC.,
Third-Party Defendant/Counter-Defendant.

---

**BRAINTECH, INC.'S AND FREDERICK WEIDINGER'S
JOINT BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED ........................................................................ ii

INDEX OF CONTROLLING AUTHORITIES ....................................................................... iv

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

STANDARD OF REVIEW ...................................................................................................... 15

ARGUMENT ............................................................................................................................ 16

    I.      BRAINTECH IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II BECAUSE BRAINTECH DID NOT BREACH THE EMPLOYMENT CONTRACT ......................................................................... 17

    II.     BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT III BECAUSE SHAFI CANNOT ESTABLISH FRAUD OR FRAUD IN THE INDUCEMENT ............................. 18

    III.    BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT IV BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT ............................................................ 21

    IV.    BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT V BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF MICHIGAN'S SECURITIES ACT ...................................... 25

    V.     BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS VI AND VII BECAUSE SHAFI CANNOT ESTABLISH CLAIMS FOR CONVERSION OR UNJUST ENRICHMENT ............................................................................................ 28

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

I.   WHETHER BRAINTECH IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II BECAUSE BRAINTECH DID NOT BREACH THE EMPLOYMENT AGREEMENT WHERE THE AGREEMENT PERMITTED BRAINTECH TO TERMINATE SHAFI FOR ANY REASON AND ONLY REQUIRED A SEVERANCE PAYMENT IF HE WAS TERMINATED FOR OTHER THAN GOOD CAUSE WHICH HE WAS.

II.  WHETHER BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT III BECAUSE SHAFI CANNOT ESTABLISH FRAUD OR FRAUD IN THE INDUCEMENT DUE TO THE FACT THAT PRECLOSING STATEMENTS WERE NEGOTIATIONS, WHICH DO NOT CONSTITUTE FRAUD.

III. WHETHER BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT IV BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT BECAUSE HE FAILED TO PLEAD OR PRODUCE EVIDENCE THAT BRAINTECH/WEIDINGER ACTED WITH *SCIENTER*, OR THE INTENT TO DEFRAUD OR RECKLESSNESS, AND BECAUSE REGISTRATION OF SHAFI'S SHARES WAS NOT REQUIRED BECAUSE OF RULE 144'S SAFE HARBOR PROVISION.

IV.  WHETHER BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT V BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF MICHIGAN'S SECURITIES ACT WHERE HE HAS PRODUCED NO EVIDENCE IDENTIFYING THE ALLEGEDLY MATERIAL INFORMATION THAT BRAINTECH/ WEIDINGER FAILED TO DISCLOSE TO HIM AND THE WEIDINGER'S ALLEGED PRECLOSING MISREPRESENTATIONS DID NOT RELATE TO PAST OR EXISTING FACTS AND DID NOT CONSTITUTE FRAUD.

ii

V.   WHETHER BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS VI AND VII BECAUSE SHAFI CANNOT ESTABLISH CLAIMS FOR CONVERSION OR UNJUST ENRICHMENT BECAUSE WEIDINGER DID NOT RECEIVE ANYTHING FROM SHAFI, SI OR SII; BRAINTECH LAWFULLY ACQUIRED SHAFI I AND II IN THE SHARE PURCHASE AGREEMENT; NO ONE OTHER THAN SHAFI WAS ENRICHED BY THE DEAL; THE EXISTENCE OF THE SHARE PURCHASE AGREEMENT BARS THE UNJUST ENICHMENT CLAIM; AND SHAFI ADMITS HE HAS NO EVIDENCE THAT BRAINTECH/WEIDINGER BENEFITTED FROM THE ACQUISITION.

## INDEX OF CONTROLLING AUTHORITIES

Cases                                                                                      Page

*Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998) ...............................16

*Aero Taxi-Rockford v. General Motors Corp.*,
   2006 WL 1479915 (Mich. App. May 30, 2006) ..............................................................19

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 256 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ...............................................16

*A.P.J. Assocs., Inc. v. North American Philips Corp.*,
   2001 WL 279760 (E.D. Mich. Jan. 30, 2001) ...............................................................20

*Aron Alan, LLC v. Tanfran, Inc.*, 2007 WL 1837843, *3 (6th Cir. Jun.25, 2007) ......................20

*Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003) .......30

*Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir 2007) ...................................24

*Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) ...................................................................16

*Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) ...............................................................16

*D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003) ...............................22

*Diamond Computer Systems, Inc. v. SBC Communications, Inc.*,
   424 F.Supp.2d 970, 984 (E.D.Mich.2006) ...................................................................20

*Fisher v. Winnie*, 2004 WL 594951, at *15 (Mich. App. March 25, 2004) ...............................19

*Foremost Ins., Co., v. Allstate Ins., Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992) ..............22

*Graham v. Myers*, 333 Mich. 111, 52 N.W.2d 621 (1952) ........................................................20

*Haque Travel Agency, Inc., v. Travel Agents International, Inc.*,
   808 F. Supp. 569, 572 (E.D. Mich. 1992) ...................................................................27

*Hayes Construction Co v. Silverthorn*, 343 Mich. 421, 72 N.W.2d 190 (1955) .........................20

*Higgins v. Lawrence*, 107 Mich.App. 178, 184, 309 N.W.2d 194, 197 (1981) ...........................19

*Hi-Way Motor Co. v. International Harvester Co.,*
    398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976) ......................................................19,27

*In re Comshare,* 183 F.3d 542, 549 (6th Cir) ..................................................................22

*Intrastate Distributors, Inc. v. NBTY Mfgs., LLC,*
    2005 WL 3501079 (Mich. App. Dec. 22, 2005) ...........................................................19

*Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) .....................................16

*Michaels v. Amway Corp.,* 206 Mich. App. 644, 652 (1994) ............................................27

*Morris Pumps v. Centerline Piping, Inc.,*
    273 Mich.App. 187, 199, 729 N.W.2d 898 (2006) ....................................................28-30

*Murry Hill Publications Inc. v. ABC Communications, Inc.,*
    264 F.3d 622, 636 (6th Cir. 2001) ..............................................................................28

*PR Diamonds,* 364 F.3d 671, 689 ...................................................................................22

*Prince v. Heritage Oil Co.,*
    109 Mich App 189, 203 (1981) (citing *People v. Cook,* 89 Mich App 72 (1979)) ..........25

*Rockford v. GM Corp.,* 2006 WL 1479915 (Mich. App. May 30, 2006) .....................................19

*Sherwood Brands, Inc. v. Levie,* 2006 WL 827371 (D.Md. at *19) ...............................................24

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) ...........................................16

*Van Tassel v. McDonald Corp.,*159 Mich.App. 745, 407 N.W.2d 6 (1987) ................................20

*Walker v. Amoco Oil Company,* 837 F.Supp. 232 (E.D. Mich 1993) ...........................................18

*Windham v. Morris,* 370 Mich. 188, 121 N.W.2d 479 (1963) .......................................................20

<u>Statutes</u>

15 U.S.C. § 78u-4(b)(1) .................................................................................................21

15 U.S.C. § 78u-4(b)(2) .................................................................................................21

MCL 451.501 ...............................................................................................................25

MCL 451.810(a)(2) ...................................................................................................25

MCL 451.2702 .........................................................................................................25

MCL 451.2703(1) ....................................................................................................25

<u>Rules and Regulations</u>

17 C.F.R. §230.144(d)-(f) .......................................................................................23

Fed.R.Civ.P. 9(b) ...................................................................................................26

Fed.R.Civ.P. 56(c) .................................................................................................16

## INTRODUCTION

In August 2008, in a stock for stock transaction, Braintech, Inc. acquired 100% of the outstanding shares of SHAFI, Inc. ("SI") and 80% of the shares of SHAFI Innovation, Inc. ("SII") from Adil Shafi ("Shafi") pursuant to a Share Purchase Agreement ("SPA") (Ex. A).  In connection with the execution of the SPA, Braintech entered into a three year employment agreement with Shafi, pursuant to which Shafi was to serve as Braintech's Chief Operating Officer ("COO").

Within weeks after the deal was finalized, Braintech was permitted to inspect and evaluate the Reliabot technology for the first time. Braintech learned that the SI "flagship" product, Reliabot, was not revenue ready as represented, the customer base SI touted during negotiations did not exist, and Shafi refused to perform his duties as COO. In November 2008, Braintech offered to rescind the SPA, but Shafi refused to respond to the offer.

In February 2009, Braintech brought suit to rescind the agreements that it entered into with Shafi, SI and SII based on numerous material false and fraudulent misrepresentations that Shafi made to Braintech to induce the transaction.[1] In retaliation, Shafi filed a counterclaim, first against Braintech only. Shafi shortly thereafter filed a first amended counterclaim, adding Braintech's former Chief Executive Officer, Frederick Weidinger, as a party ("Weidinger"). Pursuant to the Court's July 6, 2009 Order, Shafi filed a second amended counterclaim.[2]

---

[1] Braintech's Complaint was dismissed after it ceased operating and after its assets were put up for auction.

[2] There are 7 causes of action: Declaratory Judgment (Count I - Braintech only); Breach of Employment Contract (Count II - Braintech only); Fraud/Fraud in the Inducement (Count III); Violation of Section 10(b) of the Exchange Act (Count IV); Violation of the Michigan Uniform Securities Act, (Count V); Conversion (Count VI); and Unjust Enrichment (Count VII).

Although Shafi contends that the agreements involved in the transaction were long, convoluted and confusing and that he was pressured into signing them, he readily acknowledges that he was represented by a team of three attorneys and financial experts during the several months of negotiations leading up to the closing of the transaction between SI and Braintech. Similarly, although Shafi contends that Weidinger and Braintech misrepresented the financial condition of Braintech prior to the transaction closing date, the public SEC filings made by Braintech during the time period in question clearly disclose the financial predicament of Braintech, including a history of losses, a significant debt, the loss of its main customer ABB, and an expressed substantial doubt about its ability to continue as a going concern. Shafi testified he is unaware of any false statements in Braintech's SEC filings.

Shafi testified and represented in the SPA that he reviewed and understood specific 2007 and 2008 SEC filings made by Braintech. More importantly, the SPA includes an integration clause in which the parties agreed that they were not relying on any representation, warranty, covenant, obligation or agreement not expressly stated in the SPA and related agreements. Finally, in the SPA, Shafi released all claims he may have had up until the moment of closing.

The transaction documents, signed by Shafi after being approved by his legal team, admissions he made during his deposition, and lack of any evidence of fraud or misconduct compel summary judgment in favor of Braintech and Weidinger.

## STATEMENT OF MATERIAL FACTS

### A. The Parties

Braintech was a publicly traded robotic vision guided robotics software technology company with hundreds of shareholders and a Board of Directors. Braintech's eVisionFactory

2

software enabled vision recognition and robot guidance processes in manufacturing, logistics, material handling, automation, situation awareness, security and reconnaissance. Braintech was subject to the reporting requirements of the Securities Exchange Act of 1934 and timely filed all SEC forms and maintained its registered status during the 2008 and 2009 time periods.

In November 2007, Mr. Weidinger became Braintech's Chief Executive Officer. (Ex. B; Weidinger at 22-23)  Weidinger was also a Braintech director and the single largest Braintech shareholder, but at all pertinent times owned substantially less than 50% of Braintech's shares.

Prior to August 12, 2008, Shafi was the President and sole owner of SI, a private Michigan corporation with its principal place of business in Brighton, Michigan, and SII, also a private Michigan corporation with its principal place of business in Brighton, Michigan. SI and SII allegedly provided simplified revenue-ready software solutions for vision guided robotics.

### B. Braintech's Publicly Stated Financial Problems

Before its introduction to Shafi and SI, Braintech's public filings with the SEC revealed that it had a history of losses and significant debt, which raised substantial doubt about its ability to continue as a going concern. Specifically, Braintech's 2007 10-K, filed with the SEC in March 2008, identified, *inter alia*, the following risk factors:

1. We may require additional funds to achieve our current business strategy. Our inability to obtain such financing will inhibit our ability to expand or even maintain our business operations.
2. We have a history of losses and have a significant deficit, which raises substantial doubt about our ability to continue as a going concern.
3. A majority of our assets, one of our directors and two of our officers are located outside the United States, which may make it difficult for investors to enforce any judgments obtained against us or any of our directors or officers in the United States.
4. Because we can issue additional common shares, purchasers of our common stock may incur immediate dilution and may experience further dilution.

3

5.  We may lose our competitiveness if we are not able to protect our proprietary technology and intellectual property rights against infringement, and any related litigation may be time-consuming and costly.

6.  Currently, we rely on a single channel partner to distribute and generate sales of our products. If our channel partner is unsuccessful in distributing and generating sales of our products, or if the relationship with our channel partner is terminated and we are unable to find a suitable replacement, our business may fail and investors may lose their entire investment.

7.  We have revised our business strategy to include new employees, new markets, new technologies, and new products. If we are unsuccessful in penetrating new markets, developing new technologies and products, our business may fail and investors may lose their entire investment.

8.  A decline in the price of our common stock could affect our ability to raise further working capital and adversely impact our ability to continue operations.

9.  Our common stock is illiquid and the price of our common stock may be negatively impacted by factors which are unrelated to our operations.

10. We operate in a highly competitive industry. Many of our competitors have greater financial, technical, sales and marketing resources, better name recognition and a larger customer base than ours. Our failure to compete effectively in the areas of hiring qualified personnel, product line and price may adversely affect our ability to generate revenue.

11. The sale of a substantial number of shares of our common stock into the public market may result in significant downward pressure on the price of our common stock and could affect the ability of our stockholders to realize the current trading price of our common stock.

12. Rapid technological changes in the machine vision and vision guided robotics industry could render our products non-competitive or obsolete and consequently affect our ability to generate revenues, causing us to go out of business and investors to lose their entire investment.

13. We do not intend to pay dividends and there will be less ways in which you can make a gain on any investment in Braintech Inc.

14. Trading of our stock may be restricted by the SEC's penny stock regulations, which may limit a stockholder's ability to buy and sell our stock.

15. NASD sales practice requirements may also limit a stockholder's ability to buy and sell our stock. (Ex.C; SEC Form 10-KSB)

Shafi does not allege in this case that Braintech was untruthful in any of its public filings.

In fact, Shafi testified he had no evidence that Braintech's disclosures were untruthful. (Ex. D

Shafi at 82-85).

As disclosed in its public filings, Braintech relied primarily on a single customer (ABB Inc.) to purchase its products and distribute them to end users. (Ex.D; Shafi at 104). In Braintech's May 2008 quarterly report, Braintech reported that in the three months ended March 31, 2008, 100% of its sales revenue was generated from ABB. (Ex. E; SEC Form 10-Q, 5/08). Moreover, Braintech's exclusive contract with ABB was set to expire on December 31, 2008. (Ex.D; Shafi at 229-231). Shafi admitted he knew on or about June 4, 2008 (two months and one week before the closing) that ABB, Braintech's only customer, was not going to renew Braintech's contract. (Ex.F; Shafi 6/4/08 email to Tishkoff).  Shafi testified that the only way Braintech was going to be able to pay SI's debts was with "pipeline" revenue Shafi represented would be forthcoming from the merger. (Ex.D; Shafi at 367:12-25).

Under Weidinger's leadership, Braintech was transitioning to a new direction in which it was looking to develop and implement a new business plan that redefined its Company's markets, best utilized its technology and created optimal operating leverage. Braintech refocused the Company's efforts from a pure research and development company with a single customer in one niche market to a company driven by marketing and sales and business development in several vertical markets with a focus basically on the commercialization of its technology among a broad spectrum of machine vision customers. (Ex.B; Weidinger at 28-29). Braintech's new mission was to "touch the customer" by establishing relationships with new and existing customers in order to better understand their problems and solve them most efficiently. (Ex. C SEC Form 10-KSB).

### C. The Letter of Intent

To that end, Braintech was looking for persons and/or companies that could help it

develop new business in the industrial, government, and consumer markets. Weidinger learned from Babak Habibi, Braintech's Chief Technology Officer, that Adil Shafi had expressed interest to him in the past about discussing potential cooperation between Braintech and Shafi. (Ex.G; Shafi/Babak 2/22/08 email w/proposal) (Ex.B; Weidinger at 26). Weidinger was introduced to Shafi, and they engaged in a series of meetings and email communications about the possibility of a business venture.

On April 8, 2008, Shafi sent a partnership proposal to Weidinger in which Shafi represented that his companies possessed a fully functional, market-revenue-ready product, a strong, fully-trained channel network of dozens of integrators capable of executing the product in the field,[3] had access to the market to build new sales, and could create short term and fast new sales growth for Braintech. (Ex.H; Shafi 4/8/08 email). Initially, Shafi was requesting a sizeable cash payment as part of the deal. However, Weidinger made clear to Shafi from the outset that Braintech did not have the cash that Shafi was requesting. (Ex.I; Weidinger email 4/17/08).

From February to June 2008, the emails reflect moments of trust and mistrust with Shafi, as well as expressions of gratitude, endearment and sometimes accusations and anger. After considerable back and forth discussions about the proposal, Weidinger reiterated his concerns about Shafi's partnership proposal and emphasized that Braintech preferred an acquisition of Shafi I and II. (Ex.J; Weidinger email 6/3/08). The following day, Shafi expressed his interest in an acquisition arrangement. (Ex.K; Shafi email 6/4/08).

---

[3] An integrator "is a company that puts a turnkey system together, which means they buy a robot, they buy a vision system, they buy software like Reliabot, and they put together a whole system that will do something for an end user like a Ford Motor Company or General Motors or M&M Mars." (Ex.D; Shafi at 290-291).

6

Thereafter, discussions and negotiations ensued. On June 5, 2008, before any formal agreement was reached, Weidinger wired $50,000 from his personal bank account to SI <u>for payment of SI business debt</u>. (Ex.L; Weidinger email 6/5/08) There was no written agreement between the parties at this time, but it was clear the Weidinger payment was for business debt, not personal debt. Weidinger wired the money to Shafi on trust alone. (Ex.D; Shafi at 324). Unbeknownst to Weidinger at the time, Shafi paid himself $7,500 of the Weidinger funds. (Ex.D; Shafi at 130-133).

After two more weeks of negotiations, Shafi, in his individual capacity, and in his capacity as President of SI and SII, and Braintech entered into a Letter of Intent ("LOI") (Ex.M). Upon execution of the LOI, Shafi received another $50,000 cash payment for the payment of Shafi I debt. This time, Shafi paid himself $17,500.

For nearly two months, Shafi and his team of attorneys and financial experts negotiated the formal agreement with Braintech. On August 12, 2008, Braintech entered into six agreements with Shafi in his individual capacity and as President of SI and SII: (1) Share Purchase Agreement, which included a number of schedules, (2) Lock-Up Agreement, (3) Employment Agreement, (4) Non-Competition Agreement, (5) Letter Agreement regarding Indebtedness of SI and SII, and (6) Promissory Note (collectively referred to as the "Company Sale Agreements").

**D. The Share Purchase Agreement**

Pursuant to the Share Purchase Agreement, Braintech agreed to acquire all of the outstanding stock of SI and 80% of the outstanding stock of SII. (Ex.A; SPA 2.2). The purchase price consisted of 3,000,000 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria. Id.

Shafi's representations and warranties span 20 pages of the SPA. (Ex.A; SPA, Art. 3, §3.1-3.28, pp. 2-22)  In contrast, Braintech's representations and warranties are set forth in two pages in Article 4. (Ex.A; SPA, Art.4,§4.6, pp.22-23)  Shafi testified that he has no evidence that Braintech breached any of its representations and warranties. (Ex.D; Shafi at 76-85)

Importantly, in SPA 3.28, Shafi makes various representations related to his receipt of Braintech's shares, his review of Braintech's SEC filings, and the restrictive nature of the shares he would be receiving. For example, in SPA 3.28(e), Shafi represents that he understands that he is receiving restricted shares which have not been registered (and Buyer has no obligation to register) and will bear a restrictive legend. The legend is set forth in SPA 3.28(e) and expressly advises Shafi that registration is not required if an opinion of counsel is obtained which states that the shares are not required to be registered. Shafi conceded he had no evidence his shares were different from the shares awarded to other Braintech employees. (Ex.D; Shafi at 457-458).

Moreover, SPA 6.12.1 requires Braintech to prepare and file a registration statement covering the resale of any and all of the purchase shares of its common stock received by Shafi that cannot be sold pursuant to Rule 144 under the Securities Act.  Shafi testified during his deposition that he never made any efforts to sell his shares under Rule 144, and he never requested a legal opinion from Braintech or otherwise, or sought Braintech's assistance in selling the shares under Rule 144. (Ex.D; Shafi at 441-461).

Additionally, in the Covenants portion of the SPA, Shafi agreed to release Braintech from any claims he had or may have had up until immediately preceding the closing. (Ex.A; SPA, §6.1, p.27). The SPA covenants further provide that Braintech would cause SI to pay certain Braintech accepted indebtedness from revenue based on revenue pipeline commitments

8

generated by SI. (Ex.A; SPA, §6.3, p.29). This structure provided that Braintech would net out the revenue from Shafi's revenue commitments against certain Shafi obligations. (Ex.B; Weidinger at 69, 101-106).

Importantly, Braintech did not assume the Braintech Accepted Debt as a liability for Braintech but, instead, merely stated it would cause SI to satisfy the Braintech Accepted Debt. The only consideration was stock for stock: 100% of SI stock and 80% of SII stock was exchanged for 3,000,000 shares of Braintech stock. Shafi also agreed that he would not contact any of the creditors related to the Braintech Accepted Debt or attempt to negotiate or settle any of the Braintech Accepted Debt. (Ex.A; SPA, 6.14).

Finally, the SPA includes the following integration clause:

> 9.2 Entire Agreement. Unless otherwise herein specifically provided, this Agreement, including the preamble, recitals. Schedules and Exhibits, and the documents and instruments and other agreements among the Parties as contemplated by or referred to herein constitute the entire agreement among the Parties with respect to the subject matter hereof, and supersede all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, including the Letter of Intent. Each Party acknowledges that, in entering this Agreement and consummating the Closing, such Party is not relying on any representation, warranty, covenant, obligation or agreement not expressly stated in this Agreement or in the certificates of or agreements among the Parties contemplated by or referred to herein. (Ex.A; 9.2)

During his deposition, Shafi admitted that he was relying on pre-closing representations in his fraud claim. (Ex.D; Shafi at 100-102).

### E. The Letter Agreement Regarding Indebtedness of SI and SII

Braintech and Shafi also entered into a Letter Agreement dated August 12, 2008 regarding the indebtedness of SI and SII ("Letter Agreement")(Ex. N). The Letter Agreement outlined the responsibilities of each party with respect to the indebtedness of SI and SII at the

date of closing. Shafi covenanted and agreed to fully and finally satisfy any excess debt.

### F. The Promissory Note And Other Shafi Obligations

Shafi also entered into a Promissory Note to pay the $100,000 that Braintech advanced to SI and SII prior to the closing (Ex.O; Promissory Note). Pursuant to the Promissory Note, "[t]he principal amount together with all interest accrued and unpaid to date, if not sooner paid, shall be due and payable upon by demand by [Braintech]." See id. at ¶2. Braintech demanded repayment from Shafi, but he did not repay the $100,000.

### G. Lock-Up Agreement

In connection with the SPA, the parties also entered into a Lock-Up Agreement (Ex. P). The Lock-Up Agreement generally provides that for a period of six (6) months, Shafi will not sell, transfer or otherwise dispose of, or contract to dispose of the Braintech stock he received pursuant to the SPA. Following the expiration of the six (6) month lock-up period, Shafi would be free to sell or otherwise transfer his shares, provided that the aggregate price or such transfer does not exceed $25,000 in any one calendar week period. Id.

### H. The Employment Agreement

In connection with the SPA, Braintech also entered into an Employment Agreement with Shafi which provided that Shafi would serve as Braintech's Chief Operating Officer for a three-year term, with a base salary of $180,000.00. (Ex.Q; Employment Agreement). Pursuant to the Employment Agreement, Shafi had several critical duties including, without limitation, management of technology, production and submission of the sales generation and commission plan, revenue generation, market access and business acceleration, and the hiring, managing and directing of employees. (Ex.Q at 4 a-e). The Employment Agreement specifically provided that

Braintech can terminate the agreement for any reason. Additionally, if Shafi was terminated for good cause, he was entitled to no additional compensation.

"Good Cause" is specifically defined in the Employment Agreement as follows:

(a) "Good Cause" shall mean:
i. the willful and continued failure by the EXECUTIVE to substantially perform his duties hereunder (other than due to incapacity from physical or mental illness);

ii. gross misconduct which is or could reasonably be expected to become materially injurious to BRAINTECH or its business or reputation, including, without limitation, fraud, or misappropriation of Company property or unauthorized disclosure and/or non-disclosure of confidential information; and

iii. dishonesty resulting, or intending to result, directly or indirectly, in gain or personal enrichment at the expense of the Company. Id.

### I. Braintech Discovers Shafi's Misrepresentations

Following the closing, Shafi was issued three separate stock certificates, each for one million shares. (Ex.R; stock certificates) The certificates bore the restrictive legend as required. Braintech also reported the transaction and Shafi's employment in its SEC filings. (Ex.S; SEC Form 8-K, 8/18/08) (Ex.T; SEC Form 10-Q, 9/30/08).

In the fourth quarter of 2008, and after the Company Sale Agreements were executed, Braintech learned that Shafi made material misrepresentations to induce Braintech to enter into the Company Sale Agreements. Shafi did not allow Braintech to review the Reliabot technology or speak with customers before closing. (Ex.B; Weidinger at 275:19-276:11). Braintech learned after the closing that various representations regarding the Reliabot technology and the number of integrators, including without limitation, the representations outlined above, were untrue when made. Indeed, instead of finding that the Reliabot was market-revenue-ready, Braintech learned that it was inadequate, not market-revenue-ready, and had no pipeline of revenue. (Ex.U;

11

Reliabot Report) Similarly, Braintech discovered that SI and SII were not supported by a large number of integrators already in the field marketing and selling the products, as represented. (Ex.B; Weidinger at 277:10-19). Shafi was given an opportunity to rebut the report about his product, but he refused to do so. (Ex.D; Shafi at 172-180).

Braintech also learned that Shafi, both before and after execution of the SPA, was contacting and falsely informing creditors that Braintech had assumed all of the Shafi company liabilities, the debts were now Braintech liabilities, and that all amounts would be paid in full. Braintech also discovered that the SI checking accounts had been closed because they were overdrawn.

After l earning the revenue commitments from the pipeline were not being realized, Braintech had a series of conversations with Shafi both regarding the misrepresentations and Shafi's performance or lack thereof. For example, on October 1, 2008, Braintech instructed Shafi to cease informing creditors that Braintech had assumed SI's liabilities. (Ex.V; Weidinger email, 10/1/08).

### J. Shafi Fails to Perform Under the Employment Contract

In addition to Shafi's misrepresentations and interference with SI creditors, he repeatedly failed to fulfill his responsibilities under the Employment Agreement and blatantly refused to take actions he was required to take. Shafi made numerous admissions in his deposition demonstrating that he failed to fulfill most of his job duties under the Employment Agreement, including failing to generate any revenue whatsoever, refusing to produce and submit critical sales, hiring, and technology plans, refusing to travel in connection with his responsibilities, refusing to recruit and hire employees, refusing to attend critical Board and other meetings, and

refusing to perform a number of other job responsibilities as set forth below.

During his deposition, Shafi admitted that the Employment Agreement accurately sets forth his job duties as Chief Operating Officer (COO). (Ex.D; Shafi at 278). At Paragraph 4 of the Employment Agreement, he agreed to:

> "...perform such duties as required for the position and carry out the policies, procedures and projects independently or as assigned by the CEO, including without limitation (but with the exception of legal and financial management roles): (a) (m)anage overall technology of combined company...(b) (create) (m)arket access and business acceleration...(c) (d)evelop and enhance processes and practices needed to accomplish the company's goals for doing business with Industrial End Users, Consumer End Users, Government End Users, System Integrators, Channel Partners and Robot Manufacturers...(d) (d)evelop and commercialize enhanced product offering...(e) hire, manage and direct employees as required to support the business objectives associated with all technical activities. (Ex.Q).

Shafi testified that there were never any written or oral amendments to the Employment Agreement. (Ex.D; Shafi at 277-278). As COO, he reported directly to Rick Weidinger, CEO. (Ex.D; Shafi at 278) (Ex.Q; ¶3). Shafi admitted that one of his top priorities as COO was to generate revenue and that during his employment at Braintech he did not generate any revenue at all. (Ex.CC; Weidinger 10/7/08 email)(Ex.D; Shafi at 279-280, 290, 294). Shafi also agreed in his deposition that, on October 20, 2008, Weidinger questioned him in an email for not having produced any revenue to date even though Shafi had represented and committed that he had revenue pipeline for the months of August, September, October, November and December of 2008 that totaled some $260,000.00. (Ex.D; Shafi at286-288)(Ex.W; Weidinger 10/20/08 email).

Shafi also admitted that he unilaterally decided not to travel more than 50 miles from his home on Braintech business. (Ex.D; Shafi at 280-281). In addition he conceded that he refused to extend employment offers/hire prospective employees because he "already had enough on his

plate." (Ex.D; Shafi at 281-285). Shafi also admitted that he refused to continue efforts to work on the market access and business acceleration plan until Weidinger paid his travel expenses (although business expenses were all paid in compliance with Company policy and nothing in the Employment Agreement makes the payment of those expenses a condition precedent to Shafi performing his job duties as set forth in Paragraph 4(b) of the Employment Agreement). (Ex.D; Shafi at 285-286).

Shafi admitted that he unilaterally reduced the number of hours he was willing to work and set his own schedule, even though he was a salaried employee. (Ex.D; Shafi at 286-287. In addition, when asked in his deposition to identify the names of integrators/engineers he had contacted to carry out his contractual responsibility to develop and enhance the company's goals to do business with End Users as described in Paragraph 4(c) of the Employment Agreement, he was unable to name a single person. (Ex.D; Shafi at 292).

After Shafi failed to attend previously scheduled meetings, Weidinger sent Shafi an email on November 10, 2008 directing him to set aside all other activities and plan to attend a Board of Directors meeting on November 12, 2008 to review and approve a third quarter audit and to attend a Sales Plan Presentation on November 14, 2008. (Ex.X; Weidinger 11/10/08 email). Shafi declined to attend the meetings. (Ex.D; Shafi at 298-300). Weidinger questioned Shafi for his failure to attend the meetings and other performance deficiencies in an email dated November 13, 2008. (Ex.Y; Weidinger 11/13/08 email).

On November 19, 2008, Shafi met with Jeff Milton, Braintech's counsel, and Rick Weidinger. During the meeting, they advised Shafi that Braintech sought to rescind the entire transaction between the parties and further sought to accomplish the rescission with the consent

and cooperation of both parties.  The meeting was memorialized in a letter from Weidinger to Shafi which also expressly stated that, although the company sought to unwind the Employment Agreement as part of a mutual rescission, it expressly reserved the right to "…terminate your Employment Agreement based upon Good Cause as it exists today…We do not waive any basis to terminate it and, moreover we do not accept any further performance from you under that agreement." Shafi was placed on administrative leave with pay and benefits. (Ex.Z; Weidinger 11/19/08 letter).  Shafi testified that he never responded to that letter. (Ex.D; Shafi at 516-517).

Shortly thereafter, Shafi began destroying company e-mails and other documents, and deleting employee computer files, thus causing further harm to the company. (Ex.AA; Shafi Response to Request to Admit Nos. 62&63).

**K.     Braintech's Rescission Offers to Shafi**

As a result, on November 24, 2008, Braintech moved Shafi's status to administrative leave without pay and benefits. (Ex.BB; Milton 11/21/08 letter & 11/24/08 email). Braintech reiterated its decision to rescind the agreements. Despite this notice and demand, Shafi failed to return the consideration, attempted to sell his stock, failed to place Braintech in the position it was prior to execution of the Company Sale Agreements, and never even responded to Braintech's letter, email, and telephone calls. Thereafter, Braintech initiated its complaint for declaratory judgment, rescission, and other appropriate relief.

## <u>STANDARD OF REVIEW</u>

Summary judgment is proper "if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c). As recognized by the Supreme Court, summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986).

Once a moving party produces credible evidence establishing lack of a genuine issue of material fact, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250 (6th Cir. 1998); *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). The non-moving party must present specific evidence such that a reasonable juror could find in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a party's case requires proof of an element by clear and convincing evidence, then that burden must be met by that party at the summary judgment stage to avoid dismissal. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989).Although inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, a plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of a scintilla of evidence in support of a plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson*, 477 U.S. at 252.

## **ARGUMENT**

Shafi cannot establish the essential elements of the claims alleged in his second amended counterclaim and cannot demonstrate that there is a genuine issue as to any material fact which would preclude judgment as a matter of law.

16

## I.   BRAINTECH IS ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II BECAUSE BRAINTECH DID NOT BREACH THE EMPLOYMENT AGREEMENT.

In Counts I and II, Shafi seeks a declaratory judgment and damages for breach of the Employment Agreement. Shafi alleges that Braintech terminated Shafi's employment without good cause and failed to pay a severance required if dismissal was without good cause.

Shafi's claims under the Employment Agreement should be dismissed with prejudice because he has failed to raise a triable issue of fact about the legitimacy of Braintech's decision to terminate the Employment Agreement for Good Cause. The Employment Agreement expressly provides that Braintech had the authority to terminate Shafi's employment for any reason. The only issue is whether Braintech had good cause to terminate and, therefore, was not required to pay Shafi a severance in connection with the termination.

The answer is simple. It is undisputed that Shafi willfully failed to substantially perform his duties, which constitutes Good Cause as that term is defined in the Employment Agreement. (Ex.Q, ¶ 12(d)).

As set forth in more detail in the Statement of Material Facts herein, Shafi as Braintech's COO was responsible for the fundamental operation and growth of the combined entities.  He was expected to generate revenue by recruiting and deploying salespeople and other market specialists to contact Shafi's existing customers. Shafi was cautioned over and over that his primary responsibility was **"revenue, revenue, revenue and now."** (Ex.CC) He was also expected to identify new customers in an effort to forge new relationships that had been unavailable to Braintech, the so-called market access and business acceleration. Shafi was further expected to participate in the actions of the Board of Directors and to recruit and hire employees

17

to support the business activities associated with all of Braintech's technical activities.

*By his own admission,* Shafi did not generate one penny of revenue the entire time he worked at Braintech. He petulantly refused to travel more than 50 miles from home for work even though potential customers were located all over the country. Although there was an urgent need for new employees, Shafi refused to discharge his duty to recruit and hire them, claiming he "already had too much on his plate." Although a salaried employee, he unilaterally reduced his hours to the equivalent of an hourly worker. He also abdicated his responsibility to oversee the market access and business acceleration plan because Shafi believed that Weidinger had not reimbursed him for travel expenses rapidly enough. In short, there is no evidence to contradict the fact that Shafi simply refused or failed to perform the duties of COO because he admitted to the conduct and that Good Cause existed to terminate the contract.

This Court has held that summary judgment is proper under Michigan law when the evidence demonstrates that the plaintiff admitted the conduct for which he or she was fired and that the employer properly terminated the employee for just cause. *Walker v. Amoco Oil Company,* 837 F.Supp. 232 (E.D. Mich 1993). Accordingly, Braintech respectfully requests that this Court dismiss Counts I and II of the second amended counterclaim with prejudice.

## II.   BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT III BECAUSE SHAFI CANNOT ESTABLISH FRAUD OR FRAUD IN THE INDUCEMENT.

In Count III of the second amended counterclaim, Shafi accuses defendants of "promissory fraud" —that the SPA was never going to be performed and was merely a ruse by which Braintech and Weidinger were able to acquire the "valuable" assets of SI and SII. This is much easier pleaded than proved because at the summary judgment stage plaintiff must provide

"clear and convincing evidence showing that, at the time of and just prior to the assignment, defendants were intentionally misrepresenting the nature of their planned future conduct in order to induce plaintiff to execute the assignment." *Fisher v. Winnie*, 2004 WL 594951, at *15 (Mich. App. March 25, 2004) (Ex.DD). <u>Failure to back these assertions with concrete evidence mandates dismissal.</u> *Aero Taxi-Rockford v. General Motors Corp.*, 2006 WL 1479915 (Mich. App. May 30, 2006)(emphasis added) (affirming trial court's dismissal of plaintiff's fraud claim) (Ex.EE). There is no direct or even circumstantial evidence in the record to support this conclusion. Michigan law recognizes that promissory statements that one will do a particular act in the future, as opposed to misstatements of past or existing facts, generally are not misrepresentations, but are contractual in their nature, and do not constitute fraud. *Aero Taxi-Rockford v. GM Corp.*, 2006 WL 1479915 (Mich. App. May 30, 2006) (Ex.EE). A very narrow exception exists where a promise is made in bad faith without intent to perform. *See, e.g., Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976).; *Higgins v. Lawrence,* 107 Mich.App. 178, 184, 309 N.W.2d 194, 197 (1981). At bottom, "intent is a mental condition, which is determined not so much by what one says as it is by what one does," *Intrastate Distributors, Inc. v. NBTY Mfgs., LLC*, 2005 WL 3501079 (Mich. App. Dec. 22, 2005) (Ex.FF). There is no inferential proof of any intent never to perform the SPA, and there is no direct evidence of it either. The undisputed evidence in this case is that Braintech performed the SPA for several months after it was signed, and undertook to pay SI's debts until it was no longer able to make those payments from revenue produced by SI. There is certainly no dispute that (1) SI produced no revenue for Braintech; and (2) Braintech never sold Reliabot to anyone. Thus, the claim that the SPA was a scheme designed to separate Shafi from his

19

technology is implausible because Braintech never used Shafi's technology or derived any revenue from it.   The pleadings painted a rosy post-merger picture that "Braintech and Weidinger have advanced their plan to diversity and gain access to new markets" (Paragraph 90). However, at Deposition, Mr. Shafi acknowledged that, post-merger, Braintech became unable to pay its debts as they came due and ceased operating. (Ex.D; Shafi at 361:10-15). A mere change in circumstances after the promise was made, or the non-performance of a promise does not constitute fraud." *A.P.J. Assocs., Inc. v. North American Philips Corp.*, 2001 WL 279760 (E.D. Mich. Jan. 30, 2001) (Ex.GG).

## There Were No Representations That Could Have Induced Reasonable Reliance

Shafi has failed to proffer any clear evidence of misrepresentations. Nor could he justifiably have relied on a series of pre-closing emails.   Although it is an arguably unsettled point of Michigan law, the federal courts have assumed that the Michigan Supreme Court will require reasonableness of reliance. *Aron Alan, LLC v. Tanfran, Inc.*, 2007 WL 1837843, *3 (6th Cir. Jun.25, 2007) (Ex.HH); *Diamond Computer Systems, Inc. v. SBC Communications, Inc.*, 424 F.Supp.2d 970, 984 (E.D.Mich.2006).   In Michigan, salesmanship, puffery and opinions cannot support a claim for fraud. *Van Tassel v. McDonald Corp.*,159 Mich.App. 745, 407 N.W.2d 6 (1987); *Windham v. Morris,* 370 Mich. 188, 121 N.W.2d 479 (1963) (action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing); *Hayes Construction Co v. Silverthorn,* 343 Mich. 421, 72 N.W.2d 190 (1955); *Graham v. Myers,* 333 Mich. 111, 52 N.W.2d 621 (1952). The emails attached to the second amended counterclaim on which Shafi says he relies contain no "facts" but rather set forth a series of predictions, salesmanship, opinions and negotiating positions. These types of statements

20

are not actionable as they do not to constitute "representations" which can be relied on in court.

### III. BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT IV BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT.

### SCIENTER IS LACKING IN PLEADING OR PROOF

In order to state a Rule 10b-5 claim for securities fraud, a plaintiff must plead that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with *scienter,* that is, with the intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires an exacting level of intent buttressed by detailed pleading and then evidence. None of these touchstones is present here. As with the principles of fraud, above, the statements made in connection with the SPA negotiations were not facts, but rather prospective opinions, expectations and salesmanship.

Contrary to Mr. Shafi's rife speculation, a complaint sounding in securities fraud under Rule 10b-5 must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is made." 15 U.S.C. § 78u-4(b)(1). When alleging that a defendant acted with a particular state of mind, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Each defendant's state of mind must individually be pleaded in detail and no "group pleading" is permitted as to state of

mind.  *See D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719 (E.D. Mich. 2003).

Throughout the Complaint, Plaintiff alleges nothing more than that Braintech and Weidinger had

an ulterior motive for entering into the SPA and saw an opportunity for fraud when negotiating

with Shafi. This is not sufficient. In *In re Comshare,* the Sixth Circuit explained that a plaintiff

who pleads only motive and opportunity to commit securities fraud does not satisfy the scienter

requirement of a Section 10(b) and Rule 10b-5 action: "[P]laintiffs may plead scienter ... by

alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely

establishing that a defendant had the motive and opportunity to commit securities fraud." 183

F.3d 542, 549; *see also PR Diamonds,* 364 F.3d 671, 689 (discussing how pleading motive and

opportunity alone does not establish scienter for liability under Section 10(b) and Rule 10b-5).

Shafi has failed to plead or offer proof of scienter and there is none in the record.  This mandates

dismissal of his securities fraud claims.

## REGISTRATION OF SHAFI'S SHARES WAS NOT REQUIRED<br>BECAUSE OF RULE 144'S SAFE HARBOR

Evan assuming he could show a scintilla of evidence to prove intent, his claims fall flat

on the facts.  The principal securities-related claim alleged in this matter is that Mr. Shafi

received "worthless stock" which he was subsequently unable to sell. (Ex.D; Shafi at 66:7-12).

The truth is that Shafi received the same securities that everyone else in the company received,

including Mr. Weidinger. (Ex.D; Shafi at 457-459). At the closing, Shafi admits he received the

"Purchase Price Shares" -- a total of 3,000,000 shares of Braintech common stock.  At that time,

he agreed that the Braintech shares would bear a restrictive legend, would be unregistered, and

also agreed that "the Company has no obligation to so register the Purchase Price Shares".

(Ex.A; SPA 3.28(e)).  Mr. Shafi admitted that he was subject to a six month lock-up period under the SPA during which he was not free to sell his shares. (Ex.D; Shafi at 63:17-18). That lock up period expired after six months, in mid-February 2009.

Braintech was subject to the reporting requirements under the '34 Act and was publicly traded on the OTC bulletin board. (Ex.C&E; SEC Filings). As such, Braintech was required timely to file forms such as SEC Form 10-Q and to keep "current information" available about itself.  Because of this, Shafi could have freely offered his securities for sale under SEC Rule 144's safe harbor after six months, *regardless of their registration status*.  It was made abundantly clear in the SPA (and on the face of the shares certificates themselves) that the only circumstance under which Braintech might ever be required to register Mr. Shafi's shares was if he was <u>first</u> unable to sell shares under the "safe harbor" in Rule 144 of the Securities Act. (Ex.A; SPA 6.12.1).  However, the record evidence shows Mr. Shafi never attempted to sell the shares in compliance with Rule 144's safe harbor provisions.

The safe harbor provisions allow the sale of unregistered securities to the public when a few minimal preconditions are met: (1) a six month holding period prior to sale; (2) issuer has complied with the '34 Act reporting requirements; (3) potential volume limitations; (4) potential manner of sale requirements; and (5) the <u>seller</u> files SEC Form 144.  See 17 C.F.R. §230.144(d)-(f).  All of these were easily accomplished, if they had been pursued.  According to a widely available government publication on the subject prepared by the SEC, "*To begin the process, an investor should contact the company that issued the securities, or the transfer agent of the company's securities, to ask about the procedures for removing a legend.*" (emphasis added). See SEC Investor Publication at <u>http://www.sec.gov/investor/pubs/rule144.htm</u>. (Ex.II; SEC

Investor Publication) Like countless members of the public, there is no reason to think Mr. Shafi would have had difficulty obtaining a routine opinion letter from a lawyer to supply to the transfer agent removing the restrictive legend.   At deposition, Shafi testified that he never attempted to obtain an opinion letter and never contacted Braintech in connection with any potential sale of his shares. (Ex.D; Shafi at 448:16-18, 454:6-10). Thus, for this simple reason, he was unsuccessful when he allegedly presented his shares to a local Michigan brokerage house for sale.   ("I just was told to go to a brokerage firm after these -- the six-month period has expired"). (Ex.D; Shafi at 452:14-19). Under these circumstances, dismissal is appropriate. *See Sherwood Brands, Inc. v. Levie*, 2006 WL 827371 (D.Md. at *19 (dismissing securities fraud claim and reasoning that "Eleanor Levie was likely eligible to sell her shares under SEC Rule 144 (Ex.JJ). *See* SEC Rule 144, 17 C.F.R. § 230.144(d)-(f). In simplified terms, SEC Rule 144 provides a "safe harbor" for resales in the public market of restricted securities without registration under the Securities Act of 1933 after those restricted securities are held for a one-year period. *See id.* Indeed, Rule 144 is discussed in the Registration Rights Agreement and Sherwood, upon the request of a Seller, was required to assist the Seller by providing a written statement indicating that certain requirements had been met. There was no evidence that Eleanor Levie ever requested for Sherwood to issue such a written statement in relation to a potential Rule 144 sale.").

Shafi also has failed to demonstrate any "loss causation" in connection with two categories of his alleged damages: (1) the inability to sell Braintech stock and (2) the repayment of personal debts. Loss causation requires a causal connection between the material misrepresentations and the loss. Loss causation is akin to proximate cause. *See Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir 2007).   At deposition, Mr. Shafi

admitted that any losses attributable to his "worthless" stock were not caused by Mr. Weidinger

or Braintech:

Q. "Is it fair to say that Braintech's stock is worthless?
A. I would say so.
Q. Would your stock still be worthless if it was registered?
A. It would be yes. (Ex.D; Shafi at 96:20-23).

Secondly, as to his personal debts, Braintech never became a guarantor of any of Mr. Shafi's

personal debt. The undertaking in the SPA was nothing more than to cause SI to pay debts of

Shafi if money from the generation of revenue in the Shafi pipeline was available to pay them.

Shafi testified that he knew he would remain legally responsible for the payment of his personal

debts if SI had no money to pay them. (Ex.D; Shafi at 361-369).

### IV.   BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT V BECAUSE SHAFI CANNOT ESTABLISH A VIOLATION OF MICHIGAN'S SECURITIES ACT.

Shafi alleges in Count V of the second amended counterclaim that Braintech and

Weidinger made untrue statements of material fact and omitted to state material facts necessary

to make the statements not misleading in connection with the sale of Braintech stock in violation

of the Michigan Uniform Securities Act, MCL 451.810(a)(2)(the Act).[4]  A material misstatement

or omission of fact within the meaning of this statute has been defined as one that a reasonable

investor might have considered important to his investment decision.  *Prince v. Heritage Oil Co.,*

109 Mich App 189, 203 (1981) (citing *People v. Cook,* 89 Mich App 72 (1979)).

---

[4] The Michigan Uniform Securities Act, MCL 451.501 et seq. was repealed effective October 1, 2009.  MCL 451.2702.  Pursuant to MCL 451.2703(1) "(t)he predecessor act exclusively governs all actions, prosecutions, or proceedings that are pending or may be maintained or instituted on the basis of facts and circumstances occurring before the effective date of this act..."  As set forth earlier in this Brief, all of the events relating to Plaintiff's claims occurred prior to October 1, 2009 and the claim herein is therefore governed by the predecessor statute.

However, Plaintiff has failed to identify any admissible evidence that would create a genuine issue of material fact regarding the alleged violation of the Act and summary judgment should be granted as to Count V.  Shafi alleges[5] that Weidinger and Braintech "...omitted to disclose material information concerning any lack of any intention to carry out any of the contractual commitments beyond a period of 90 days and that their plan to acquire the assets of SI and SII was an elaborate fraud."  Paragraph 108.  However, Shafi has produced no evidence whatsoever that identifies what that allegedly "material" information was.    A party alleging fraud is required to state with particularity the circumstances constituting fraud.  Fed.R.Civ.P. 9(b).    The conclusory allegation that Braintech and Weidinger made a material omission, unsupported by evidence, is insufficient to survive summary judgment.

Shafi further alleges in his claim under the fraud provision of the Act that Braintech and Weidinger made several misrepresentations concerning future conduct under the parties' agreements, e.g., that they promised that they would hire skilled sales employees and software engineers (Paragraphs 109, 110), provide Shafi with Braintech's intellectual property and software code Paragraphs 111, 112), open a sales office in Michigan (Paragraph 113) and perform other acts in the future. (Paragraphs 114, 115).  However, Shafi has failed to create a genuine issue of material fact because Michigan courts have long held that in an action alleging fraudulent misrepresentations, the claim must be predicated upon a statement relating to a past or

---

[5] Although Count V of the Second Amended Counterclaim refers to Paragraphs 108 to 115 as setting forth the alleged misrepresentations and omissions, those Paragraphs do not contain that information.  However, Paragraphs 108 to 115 of the First Amended Counterclaim do contain those allegations and Braintech and Weidinger will assume that the faulty reference was a typographical error in the Second Amended Counterclaim.  All references herein to the subject Paragraphs will refer to the First Amended Counterclaim.

an existing fact.  Future promises are contractual and do not constitute fraud. *Hi-Way Motor Company v. International Harvester Company,* 398 Mich. 330, 336 (1976)(citing *Boston Piano and Music Co. v. Pontiac Clothing Co.,* 199 Mich. 141 (1917). Indeed, Shafi admitted in his deposition that the only evidence he relies upon in support of his fraud claim is that of Braintech and Weidinger's alleged nonperformance of the promises of future conduct that they made to him.  As noted above, such evidence does not constitute proof of fraud; rather, it states an alleged breach of contract. (Ex.D;  Shafi at 139-141).

Shafi may argue that his claims come within the ambit of the "bad-faith" exception to the general "past or existing facts" rule.  Under that exception, a promise of future performance can qualify as a misrepresentation only if Shafi can produce evidence that indicates that the statements or conduct "at the very time of making the misrepresentations, or almost immediately thereafter" show  that the promisor had no intention of fulfilling the promises.  *Id.* at 338-339. However, where, as here, Shafi has produced no evidence of such contemporaneous conduct by Braintech and/or Weidinger, the "bad faith" exception will not apply and his claim should be dismissed with prejudice because the claim relates only to promises of future conduct. *See also, Haque Travel Agency, Inc., v. Travel Agents International, Inc.,* 808 F. Supp. 569, 572 (E.D. Mich. 1992)(franchisor's agent's statements to a potential franchisee agency owner about  capital investment needed, gross profits after the business was established, the franchisor's role in the operation, and absentee ownership held to be future representations/promises and did not constitute fraud); *Michaels v. Amway Corp.,* 206 Mich. App. 644, 652 (1994)(summary disposition proper where broken promise is neither fraud nor evidence of fraud).  Accordingly, Count V of Shafi's second amended counterclaim should be dismissed with prejudice.

## V.   BRAINTECH AND WEIDINGER ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS VI AND VII BECAUSE SHAFI CANNOT ESTABLISH CLAIMS FOR CONVERSION OR UNJUST ENRICHMENT.

In Counts VI and VII of the second amended counterclaim, Shafi alleges as follows:

As part of an elaborate and complicated scheme to commit theft of corporate property, Weidinger and Braintech made a series of fraudulent misrepresentations and omissions to state material facts in order to induce Shafi to sell his interests in SI and SII. (2nd Amd Counterclaim, ¶155, 161)

Shafi further alleges that, in reliance upon the fraudulent misrepresentations and omissions, he turned over his interests in SI and SII to Weidinger and Braintech and that Weidinger and Braintech unlawfully converted such corporate property to their own use (2nd Amd Counterclaim, ¶¶156-158, 162) Finally, Shafi alleges that Weidinger and Braintech retained and benefited from the corporate assets of SI and SII, and were unjustly enriched at Shafi's expense. (2nd Amd Counterclaim, ¶ 163.)

To prove a conversion claim, Shafi must prove a "distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Murry Hill Publications Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 636 (6th Cir. 2001). Indeed, the "gist of a conversion claim is that the defendant has interfered with the plaintiff's control and use of its property." *Id.* at 637.

Similarly, under Michigan law, to prevail on a claim of unjust enrichment, Shafi must prove "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 195, 729 N.W.2d 898 (Mich.Ct.App.2006) appeal denied, 480 Mich. 928, 740 N.W.2d 299 (2007) (citing *Barber v. SMH (US), Inc.*, 202 Mich.App. 366, 509

28

N.W.2d 791 (1993)).

### A. The Transaction Documents Irrefutably Demonstrate That Weidinger Did Not Personally Receive Anything From Shafi, SI, Or SII.

As demonstrated in the transaction documents, Weidinger did not personally receive anything from Shafi, SI, SII, or from the Company Sale Agreements. An analysis of the transaction documents confirms that none of Shafi's property was transferred to Weidinger. (Ex.A; SPA, p. 1). In other words, all consideration provided by Shafi through the transaction documents went directly to Braintech, and not Weidinger. (Id.) Because receipt of another's property is an essential element of both a conversion and an unjust enrichment claim, Shafi's claims in this regard fail as a matter of law as they relate to Mr. Weidinger because he did not personally receive anything from Shafi whatsoever.

### B. Braintech Acquired Shafi I and II in the Share Purchase Agreement and There is No Claim That Braintech Breached the Share Purchase Agreement.

Common law conversion consists of the wrongful assertion of dominion over another's personal property in denial of or inconsistent with the owner's rights. *Foremost Ins., Co., v. Allstate Ins., Co.*, 439 Mich. 378, 391, 486 N.W.2d 600(1992) *aff'd*, 439 Mich. 378, 486 N.W.2d 600 (1992). A party cannot convert his or her own property. *Foremost*, 439 Mich at 391. Here, Braintech and Shafi entered into a Share Purchase Agreement which extended Braintech certain rights to Shafi I and II assets. There is no claim in this lawsuit for breach of the SPA.

### C. The Existence of the Share Purchase Agreement Bars Shafi's Unjust Enrichment Claim.

The existence of an express contract bars a quantum meruit claim. *Morris Pumps v.*

*Centerline Piping, Inc.*, 273 Mich.App. 187, 199, 729 N.W.2d 898 (2006). *Belle Isle Grill Corp.*

*v. City of Detroit*, 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003).   Unquestionably, the SPA

and related agreements are enforceable contracts which bar a claim for unjust enrichment.

### D.  Shafi Admits He Has No Evidence That Braintech or Weidinger Benefitted From The Acquisition.

Shafi   must   prove   that   Braintech   and/or   Weidinger   benefitted   from   the   alleged

wrongdoing. Shafi admitted that he has no such evidence:

Q. So it's, I guess, your testimony that they really haven't gained from anything here that they did to you?
A. I'm saying it's not for me to make that statement or not.  That's Braintech.  Ask Braintech. Don't ask me.
Q. Are you aware of whether they're using any of your what we'll call the Shafi IP customers, goodwill, any of that?
A. I have no idea, because I have no access to that property anymore.  I have no access to their people.  I have no idea what they're doing or not doing.  I have no idea.
Q. So you have no level of awareness at all about what they're doing?
A. No, I don't. (Ex.D; Shafi at 142-143).

Unquestionably, there is no proof of enrichment to any person.

Accordingly, Braintech and Weidinger are entitled to summary judgment on all claims.

Respectfully submitted,

NEMETH BURWELL, P.C.

By:    s/Susan D. Koval
        Anne Widlak (P35763)
        Susan D. Koval (P59297)
        Attorneys for Braintech, Inc.
        200 Talon Centre Drive, Suite 200
        Detroit, Michigan 48207
        (313) 567-5921
        awidlak@nemethburwell.com
        skoval@nemethburwell.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
By:   s/with consent of Geoffrey J. Greeves
        Geoffrey J. Greeves
        Attorney for Frederick Weidinger
        2300 N Street, N.W.
        Washington, DC 20037-1122
        (202) 663-9228
        geoffrey.greeves@pillsburylaw.com

November 19, 2010

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2010, I electronically filed the foregoing paper (*Motion for Summary Judgment and Brief in Support*) with the Clerk of the Court using the ECF system, which will send notification of such filing and service of such documents to all parties via their counsel of record at the e-mail addresses disclosed on the Notice of Electronic Filing receipt.

s/Susan D. Koval
Susan D. Koval (P59297)
NEMETH BURWELL, PC
Attorney for Braintech, Inc.
200 Talon Centre Drive, Suite 200
Detroit, Michigan 48207
(313) 567-5921
skoval@nemethburwell.com
P59297