# EXHIBIT B

1

```
           UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF MICHIGAN
                  SOUTHERN DIVISION

------------------------------------------:
BRAINTECH, INC., a Nevada corporation,    :
                                          :
     Plaintiff/Counter-Defendant,         :
                                          :
           vs.                            :   Case No.
                                          :
ADIL SHAFI, an individual,                :   09-10454
                                          :
     Defendant/Counter-Plaintiff,         :
                                          :
           vs.                            :
                                          :
FREDERICK WEIDINGER, an individual,       :   Volume 1
                                          :
     Counterclaim Defendant.              :
------------------------------------------:
```

McLean, Virginia

Monday, September 13, 2010

Deposition of:

FREDERICK WEIDINGER

called for oral examination by counsel for Adil Shafi, pursuant to notice, at the Law Offices of Pillsbury Winthrop Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Vicky Reiner, RMR, CRR of Capital Reporting, a Notary Public in and for the Commonwealth of Virginia, beginning at 10:00 a.m., when were present on behalf of the respective parties:

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

**Page 2**

```
 1         APPEARANCES
 2  On behalf of Plaintiff/Counter-Defendant
    SUSAN D. KOVAL, ESQUIRE
 3  Nemeth Burwell, P.C.
    200 Talon Centre Drive
 4  Suite 200
    Detroit, Michigan 48207
 5  (313) 567-5921
    skoval@nemethburwell.com
 6
 7  On behalf of Defendant/Counter-Plaintiff
    JAMES P. MURPHY, ESQUIRE
 8  Berry Moorman, P.C.
    535 Griswold, Suite 1900
 9  Detroit, Michigan 48226
    (313) 223-1605
10  murph@berrymoorman.com
11
12  On behalf of Counterclaim Defendant
    GEOFFREY J. GREEVES, ESQUIRE
13  Pillsbury Winthrop Shaw Pittman, LLP
    2300 N Street, N.W.
14  Washington, D.C. 20037
    (202) 663-9228
15  geoffrey.greeves@pillsburylaw.com
16
17  ALSO PRESENT:
    Adil Shafi
18
19
20
21
22
```

**Page 3**

```
 1              CONTENTS
 2  EXAMINATION BY:                    PAGE
 3   Counsel for Adil Shafi              6
 4
 5   Confidential Session: 163-169
 6
 7  DEPOSITION EXHIBITS: *              PAGE
 8   1  Schedule 3.5.1 of closing package   52
 9   2  Exhibit to share purchase agreement 57
10   3  Schedule 3.20.3                     60
11   4  Side letter executed between Braintech and
        Shafi, Inc.                         64
12
     5  Schedule 7.2.9(a)                   88
13
     6  Schedule 3.11                       92
14
     7  Side letter                         99
15
     8  Compilation of documents           110
16
     9  30(b)(6) Notice of Deposition      150
17
    10  E-mail from Adil Shafi to Rick Weidinger  187
18
    11  Attachment to e-mail marked Exhibit 10   189
19
    12  E-mail string on June 19th         193
20
    13  E-mail                             195
21
    14  E-mail dated May 29, 2008          196
22
```

**Page 4**

```
 1  DEPOSITION EXHIBITS: *              PAGE
 2   15  E-mail regarding Siemens         203
 3   16  E-mail                           207
 4   17  Document                         208
 5   18  E-mail, dated May 30, from Adil Shafi to
         Rick Weidinger                   216
 6
     19  E-mail from Adil Shafi           223
 7
     20  E-mail to Rick Weidinger from Adil Shafi
 8       dated May 30, 2008               232
 9   21  E-mail to Rick Weidinger from Adil Shafi
         dated April 8, 2008              236
10
     22  Document that was an attachment to
11       Exhibit 21                       238
12   23  E-mail dated April 16            241
13   24  Compilation of several e-mails around
         October 16 and 17                242
14
     25  Partnership document             245
15
     26  E-mail from Rick Weidinger to Adil Shafi  249
16
     27  E-mail from Rick Weidinger responding to
17       Adil Shafi's May 30 e-mail about a wire
         transfer                         259
18
     28  E-mail to Rick Weidinger from Mr. Shafi
19       on or about May 30               264
20   29  E-mail from Rick Weidinger to Adil Shafi
         responding to Exhibit 28         268
21
     30  E-mail dated May 31              274
22
```

**Page 5**

```
 1  DEPOSITION EXHIBITS: *              PAGE
 2   31  E-mail                           279
 3   32  E-mail from rick@weidingerfamily.com to Adil
         Shafi dated June 1, 2008         281
 4
     33  Chart A                          282
 5
     34  Technical Corroboration, attachment to
 6       Exhibit 32                       284
 7   35  Document                         285
 8   36  Document sent to Adil Shafi from Rick
         Weidinger on June 1, 2008        286
 9
     37  Document showing Rick Weidinger as the author
10       of Exhibit 36                    292
11   38  Closing schedule proposed in connection with
         partnership discussions          297
12
     39  Document                         298
13
     40  E-mail from Rick Weidinger to Adil Shafi
14       dated June 1, 2008               300
15   41  Attachment to an e-mail from Rick Weidinger
         to Adil Shafi around June 1, 2008  301
16
     42  Excel spreadsheet                311
17
     43  E-mail from Mr. Dara             312
18
     44  E-mail from Rick Weidinger to Adil Shafi
19       dated June 1, 2008               313
20
21  (*Exhibits retained by attorney for Adil Shafi.)
22
```

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

**22**

1 company was involved in in the A1 racing?
2   A  Yes, sir.
3   Q  Did you -- was your involvement in the A1
4 racing through a company that you created?
5   A  Yes, it was. It was --
6   Q  What's the name of the company?
7   A  TR Racing LLC.
8   Q  Were you the sole owner of TR Racing?
9   A  Yes.
10   Q  And what was the nature of the litigation?
11   A  We had executed a business contract with
12 Sheikh Maktoum, who was the largest shareholder of the
13 series, and the series and some other people. And in
14 2008, we basically -- we were removed from the series.
15 And the series brought in the Andretti group because
16 they found that my contract with them no longer served
17 their purposes. So we filed a lawsuit. And we gained
18 a consent judgment against them, the series and
19 certain individuals.
20   Q  Is the series still in operation today?
21   A  No, sir. No.
22   Q  In November of 2007, you became the CEO of

**23**

1 Braintech, true?
2   A  True. Correct.
3   Q  How did you come to be the CEO of Braintech?
4   A  I was contacted by the founder and owner of
5 Braintech and asked if I would consider it.
6   Q  Who was the founder and owner?
7   A  Owen Jones.
8   Q  Where was Mr. Jones located at the time?
9   A  Vancouver, B.C.
10   Q  Did you know Mr. Jones prior to that
11 inquiry?
12   A  I had. Also sometime before -- before I got
13 involved in my racing, which took me around the world,
14 I was on his board, the board of directors of
15 Braintech and also a shareholder.
16   Q  How much stock did you own in Braintech in
17 November of 2007?
18   A  I don't recollect offhand.
19   Q  At some point you became up to about a 42,
20 43 percent shareholder, true?
21   A  No. Not true.
22   Q  What was the highest percentage of ownership

**24**

1 that you had?
2   A  I'm not sure. But a lot of the -- a lot of
3 the ownership I had was in the form of milestones, and
4 they were escrowed. And a lot of those milestones
5 were based on revenue achievement which unfortunately
6 Braintech never hit, so I never got actually
7 possession of those shares. So it's significantly
8 less than that. I'm not sure what it is. We can go
9 to the records.
10   Q  Is it more than 30 percent?
11   A  No. I think it was less than 30 percent
12 actually.
13   Q  Were you the single largest shareholder of
14 Braintech at any time?
15   A  I think -- I think the answer to that is
16 yes. But I think Owen and I went back and forth, back
17 and forth.
18   Q  Between you and Owen, did you have more than
19 50 percent control?
20   A  I think it was just a little less than
21 50 percent. Yeah. I would have to check the figures
22 for you. I'm willing to do that. But, yeah, I think

**25**

1 my recollection is less than.
2   Q  Was your share ownership significantly less
3 in November of 2007 before you became CEO?
4   A  Yes, because I got -- like I said, I got,
5 you know, my -- my -- my employment contract was
6 structured where they put a number of shares into an
7 escrow. And as I hit milestones, they took shares out
8 of the escrow and delivered them to me. And so some
9 of the milestones that I had hit through my employment
10 and through my achievements with Braintech as CEO, my
11 shares were greater than when I first started, yes.
12   Q  In November of 2007, ABB was virtually the
13 only customer of Braintech, true?
14   A  True.
15   Q  In 2008, ABB was responsible for 99 percent
16 of revenue at Braintech, true?
17   A  True.
18   Q  And that contract with ABB was scheduled to
19 come to an end in December of 2008, true?
20   A  Yes, sir.
21   Q  In the 2008 10-K there's a statement, and
22 I'm going to read it, it's a short statement: "Since

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

---

26

1 his appointment as our chief executive officer in
2 November of 2007, Mr. Weidinger has developed and
3 implemented a new business plan that redefines the
4 company's markets in order to better utilize its
5 technology and create operating leverage."
6     Is that an accurate statement?
7  A  Yes.
8  Q  How much of that plan was put together
9 before February 2008?
10 A  Not -- not much. I mean, not much. An
11 important part of that plan was actually our
12 acquisition of Shafi.
13 Q  And how did it come to be that you got in
14 contact with Mr. Shafi?
15 A  Babak expressed to me in a staff meeting
16 that Adil had expressed interest in what we were
17 doing. I said I would love to meet him. When you get
18 a chance, call him.
19 Q  And this is Babak Habibi?
20 A  Yes.
21 Q  Can you spell his name for the court
22 reporter, please.

---

27

1  A  Can I?
2  Q  Yes.
3  A  I can try. B-A-B-B-A-K, H-A-B-B-I-B-I.
4     Is that right? He might know better than I.
5 Sorry.
6  Q  And Braintech was a publicly held company,
7 true?
8  A  True.
9  Q  And your role as chief executive officer was
10 to make sure that the company met all of its reporting
11 obligations, true?
12 A  True.
13 Q  Among other things?
14 A  Among other things.
15 Q  In the 2008 10-K filed with the Securities
16 and Exchange Commission, there is an expression of
17 doubt as to the going concern business of Braintech.
18 Do you agree with that?
19     MR. GREEVES: Object to the form of the
20 question.
21     THE WITNESS: Do I answer?
22     MR. MURPHY: Yeah.

---

28

1     MR. GREEVES: Yes.
2     THE WITNESS: Okay. That was the 2008 K?
3 BY MR. MURPHY:
4  Q  10-K.
5  A  10-K. That was a description put in our
6 10-Ks after diligent review of the company by our
7 auditors.
8  Q  So that statement is there?
9  A  That statement is there, yes.
10 Q  And the reality was, in 2008, there was
11 concern about whether Braintech would continue to
12 exist?
13 A  There was concern from our auditors that
14 Braintech would -- could exist.
15 Q  Did you --
16 A  Correct.
17 Q  -- personally have any concerns outside of
18 what was expressed by the auditors?
19 A  Yeah. I mean, we had to -- we had to
20 commercialize our technology. We had to generate
21 revenue.
22 Q  What do you mean by commercialize the

---

29

1 technology?
2  A  I mean, that's one of the reasons why I was
3 attracted to Adil Shafi is that what -- one thing that
4 Braintech had is they had world class technology.
5 Even today, this day, there's technology in the market
6 but they didn't know how to commercialize this because
7 they never had to do that before. They had one
8 customer which was a channel partner. They didn't
9 have to commercialize it. They didn't have to sell it
10 to any third party. It was under a contract.
11     So --
12 Q  So by commercialize, you mean moving beyond
13 the one customer and finding additional customers to
14 purchase the software?
15 A  Correct.
16 Q  Prior to November 2007, what experience did
17 you have in the vision guided robotics software
18 business?
19 A  I -- I had experience with it as a board
20 member, Braintech, previous board member, and previous
21 shareholder.
22 Q  When did you join the board of Braintech?

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

---

**Page 66**

1  existed as of June 19, true?
2     A   Yeah. It says the 23rd of June on my copy.
3        MR. GREEVES: Sorry. Just to eliminate the
4  confusion. Exhibit A within RW 4. Is that what
5  you're speaking of?
6        MR. MURPHY: Yes.
7        MR. GREEVES: Thank you.
8        THE WITNESS: I'm sorry, the question.
9  BY MR. MURPHY:
10    Q   It contains a copy of whatever iteration of
11 the employment agreement existed on or about June 19,
12 true?
13    A   It has an attachment called Exhibit A, which
14 is titled "Employment Agreement." It's dated the 23rd
15 of June.
16    Q   But it's not signed, true?
17    A   It's a marked-up copy. It shows that it's a
18 work in progress.
19    Q   Was the letter of intent signed by you on
20 June 19, 2008?
21    A   The date of the letter is June 19th. It
22 looks like the date of the fax is June 19th.

---

**Page 67**

1     Q   By the way, you were -- on June 19, 2008,
2  you were staying at the Ameristar Casino?
3     A   That's incorrect. I was staying at my lake
4  home, which is about 30 minutes from Ameristar Casino
5  where we go often to eat dinner.
6     Q   So you happened to go to the Ameristar
7  Casino to fax a copy of this document to Mr. Shafi?
8     A   Because the fax, as Adil well knows, the
9  fax -- he burned out my fax copy at the lake home. So
10 I had to go someplace to make sure that he got this
11 when he needed it.
12    Q   We'll get through this a lot faster if you
13 can just stick to my questions and answer my
14 questions.
15    A   I'm sorry about that.
16    Q   So you went to Ameristar Casino and you
17 faxed it on June 19, 2007, true?
18    A   That's what it says up at the top.
19    Q   That's the same date that you signed it,
20 true?
21    A   I think so, yeah. I think so. I'm not sure
22 what day he signed it.

---

**Page 68**

1     Q   Now, where I got this from was the closing
2  package. Is it your recollection that a complete
3  version of the letter of intent was included in the
4  closing package?
5        MR. GREEVES: Object to the form.
6        THE WITNESS: I don't know if this was
7  included in the closing package or not. We can go
8  through the closing package. I'm sure we have all the
9  closing documents somewhere in this room. We can go
10 through them.
11       Is that what you're asking me? Do I know if
12 this was attached to the closing documents?
13 BY MR. MURPHY:
14    Q   No. Do you have a recollection that a
15 complete copy of the letter of intent with exhibits
16 was made a part of the closing package?
17    A   I don't know. I don't know. That's
18 something we can certainly find out easily.
19    Q   These pages are unnumbered. I apologize for
20 that. If you could move forward to Exhibit B.
21    A   Exhibit B.
22    Q   Can you tell me what your recollection of

---

**Page 69**

1  Exhibit B represents.
2     A   I don't have any recollection of this.
3     Q   Do you have any recollection that part of
4  the deal was that Braintech would assume $1 million
5  worth of debt owed by Shafi to his creditors?
6        MR. GREEVES: Object to the form of the
7  question. Go ahead.
8        THE WITNESS: Well, two things. One is that
9  debt number always kept changing. And number 2, it
10 wasn't BT, Braintech assuming the debt, it was Shafi
11 Inc. maintaining the debt.
12 BY MR. MURPHY:
13    Q   Why don't you go back to page 3 of the
14 letter of intent.
15    A   Okay. Page 3. Paragraph 3 or what?
16    Q   Page 3.
17    A   Page 3.
18    Q   Paragraph D. I'm going to read this.
19    A   Uh-huh.
20    Q   "Braintech will acquire the stock subject to
21 the indebtedness, obligations and other liabilities
22 not to exceed $1 million owed by Shafi and set forth

---

98

1  understanding that Shafi was going to go ahead and
2  pursue this on his own and he would be responsible for
3  this because it was his defense.
4  BY MR. MURPHY:
5    Q   The question, Mr. Weidinger, is you were
6  aware that JMP sought at least $60,000 from Shafi,
7  Inc. before the closing. True or false?
8    A   I'm not sure that I specifically had the
9  understanding of the number 60,000 that you keep
10 talking about. I knew there was activity between --
11 that there was a lawsuit that JMP Engineering was
12 filing against Shafi for monies owed.
13   Q   I'm talking about the $60,000 because it's
14 referenced in the fourth line of subparagraph 2.a.i.,
15 correct?
16   A   I see that, yes.
17   Q   Then on the next page, subparagraph b.,
18 there is two entries for threatened litigation. True?
19   A   True.
20   Q   And you were aware of those threatened
21 claims before the closing, true?
22   A   If they were on the debt schedule, yes. It

99

1  would be interesting to reconcile this with the debt
2  schedule.
3         (Deposition Exhibit Number 7 was marked for
4         identification.)
5  BY MR. MURPHY:
6    Q   I'm showing you what we've marked Exhibit
7  Number 7.
8    A   Thank you.
9    Q   Earlier before we broke, we were talking
10 about a side letter. Do you recall that?
11   A   Yes.
12   Q   Does Exhibit 7 or what we've marked as
13 Exhibit 7 appear to be the side letter?
14        MR. GREEVES: You shouldn't really write on
15 that.
16        THE WITNESS: Okay. Well, give me a copy
17 again. I'll just switch you.
18        MR. GREEVES: That's got the tag on it. You
19 wrote on that one, too.
20        THE WITNESS: Oh. Okay.
21        Sue, do you have --
22        MS. KOVAL: Which one?

100

1        MR. GREEVES: 7. Here. I'll tell you what,
2  you can --
3        MR. MURPHY: Do you need a fresh sticker?
4        THE WITNESS: No. We got it.
5        So why don't you read this one and give that
6  one to Sue.
7        MR. GREEVES: Okay.
8        THE WITNESS: Sorry. I'm a rookie.
9        Okay. Thank you.
10 BY MR. MURPHY:
11   Q   This is the side letter that you referred to
12 earlier?
13   A   I'm not sure if this is -- it doesn't say
14 side letter anywhere. I don't know where we came up
15 with the term "side letter."
16   Q   Look on page 3, in the middle of the page.
17   A   Oh, signature page to side letter agreement.
18 Thank you.
19   Q   What does this letter have to do with?
20   A   Well, it's got a couple of important
21 provisions in it. It's basically that the seller is
22 personally liable for any excess debt.

101

1    Q   Describe for me what your understanding of
2  Braintech accepted debt is.
3    A   That's the debt that is reflected in
4  section 6.3, I believe, of the SPA, where Braintech
5  says it will ensure the payment of this debt by SI.
6    Q   "Braintech accepted debt" is a defined term
7  in the side letter; true or false?
8    A   Yeah. Well, it says any company
9  indebtedness -- would you like me to read the
10 definition or --
11   Q   No. The question is it's a defined term in
12 the document. True or false?
13   A   I don't know if that's the full definition
14 of it. I think we should probably go into the SPA and
15 maybe glean it from there. I don't know.
16   Q   For the purpose of the side letter, is the
17 definition of "Braintech accepted debt" supposed to be
18 something else than what's set forth?
19   A   No, but the definition actually may be
20 parked in the SPA document, not a side letter.
21 Because I think the SPA, J.P., speaks to the Braintech
22 accepted debt in numerous places, including, I think

102

1   my recollection is 6.3.
2        Do you have 6.3?
3        MR. GREEVES: He'll give it to you.
4        THE WITNESS: I would like to see it.
5        MR. MURPHY: If you would like to, I have
6   Exhibit 1 from Mr. Shafi's deposition, which includes
7   the share purchase agreement. If you need to refer to
8   that.
9        MS. KOVAL: You want him to look inside it
10  and find it? Is that what you're asking the witness
11  to do?
12       MR. MURPHY: I'm not asking the witness --
13  I'm just asking the witness if there's some other
14  definition of "Braintech accepted debt" set forth in
15  Exhibit 7 beyond what Exhibit 7 says.
16       MR. GREEVES: It's on page 29.
17       THE WITNESS: Yeah. That's the -- I mean,
18  the definition of that is I think the debt off the
19  debt schedule that Braintech will cause Shafi, Inc. to
20  satisfy.
21       I think, you know, typically, in
22  transactions and documents, you have to kind of

103

1   connect the dots.
2   BY MR. MURPHY:
3   Q    So what I'm trying to understand is --
4   A    Yes, sir.
5   Q    -- for the purpose of the side letter, which
6   is Exhibit 7, is the definition of "Braintech accepted
7   debt" accurate or not?
8   A    I'm trying to answer your question, right.
9   I don't know if the definition of "Braintech accepted
10  debt" is in the side letter or if it's in the stock
11  purchase agreement document. I don't know which
12  definition is where.
13       I see what it says here. And I think I just
14  explained to you what it meant to me.
15  Q    Who drafted the side letter?
16  A    Well, one of the attorneys. Either
17  Greenberg from our side or I think Glen Smith from
18  Shafi's side.
19  Q    Who drafted the share purchase agreement?
20  A    I think -- well, typically the buyer does,
21  right? I mean, of all the transactions I've been
22  involved in, 18-plus as a buyer, we -- the lawyers

104

1   draft the initial set of the stock purchase agreements
2   for the transaction documents.
3        So I will tell you that Braintech lawyers
4   drafted the first set of the documents.
5   Q    Is it fair for me to assume that Braintech
6   lawyers drafted the first draft of the side letter?
7   A    You know, I don't know if I want to assume
8   that one, because this is kind of a -- this is kind of
9   a special, very important paper here. I -- I -- I
10  don't know. I mean, we can -- I don't know how we
11  even check. We can look through e-mails to see who
12  sent what to what -- to who.
13  Q    There was a schedule associated with the
14  side letter; is that your recollection?
15  A    A schedule?
16  Q    Yes.
17  A    I don't see a schedule.
18  Q    It was a schedule associated with the
19  closing.
20  A    A closing schedule?
21  Q    No.
22  A    Let's just go to it. I mean it's here,

105

1   right? So let's just go to what you're referring to.
2   And I can be responsive.
3   Q    I'll ask the questions.
4   A    I'm sorry.
5   Q    Your signature is on Exhibit 7, true?
6   A    Yes, sir.
7   Q    There had been discussions prior to the
8   closing of your interest in having some sort of
9   netting effect of Shafi revenue against payments that
10  were going to be made on the Shafi debt, true?
11  A    Yes.
12  Q    And it was your expectation in those
13  discussions that income or revenue coming in from
14  Shafi would be used to pay the Shafi debt identified
15  in Exhibit 7?
16  A    That was --
17       MR. GREEVES: Objection to the form.
18       THE WITNESS: That was a very important
19  tenet and aspect to the whole transaction, number 1.
20  Number 2, that's why we spent so much time in this
21  debt schedule. And that's why we spent so much time
22  with Shafi to identify his Shafi revenue pipeline.

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

106

1  BY MR. MURPHY:
2   Q   So was the payment --
3   A   So the in process.
4   Q   Was the payment of Shafi accepted -- or let
5  me back up and make this a good question.
6       Was the payment of Braintech accepted debt
7  as defined in Exhibit 7 conditioned on revenue coming
8  in from Shafi sales?
9   A   Well, I don't see a schedule of this
10 Braintech accepted debt in this side letter, so I'm
11 not sure. All that I can tell you for sure, J.P., is
12 if we go to the debt schedule, which is a document,
13 which is a schedule in the stock purchase agreement,
14 it was all outlined right there. We had the debt
15 payments monthly, and they were associated with the
16 Shafi pipeline revenue. Right on the face of the
17 document. And that was a very important aspect to
18 this whole transaction.
19      And we talked about it numerous -- I mean,
20 there is, I don't know how many umpteen e-mails
21 between the parties talking about this.
22  Q   Was the payment of Braintech accepted debt

107

1  as defined in Exhibit 7 conditioned on revenue coming
2  in from Shafi sales?
3   A   I don't know what -- I don't know what this
4  schedule -- if this is -- let me answer it this way,
5  please. If this Braintech accepted debt as it refers
6  to in this side letter is the same debt in the debt
7  schedule, the answer to your question is yes.
8   Q   Okay. Exhibit 7 says that the Braintech
9  accepted debt would not exceed $900,000. True?
10  A   That was the -- that was the ceiling for the
11 debt on the debt schedule.
12  Q   Actually, the ceiling was a million dollars,
13 but you had already paid out $100,000 with the LOI
14 deposits; is that accurate?
15  A   Well, there was a couple of things going on
16 in that number, J.P. There was the $100,000 that we
17 already funded up front, which, once again, went
18 towards business expenses, not anybody's pocket,
19 right? The hundred thousand. Then there was also
20 excess debt beyond that which Adil Shafi was
21 personally responsible for.
22  Q   So --

108

1   A   And the netting -- I'm sorry.
2   Q   Go ahead.
3   A   And the netting of all that was the 900,000,
4  I believe. But if I had the debt schedule document in
5  front of me I think I can answer your questions
6  conclusively.
7   Q   There were three components of the Shafi
8  debt in this whole transaction. The first component
9  was the $100,000 paid for the letter of intent. The
10 second component was the $900,000 Braintech accepted
11 debt. And the third component was the amount of debt
12 that Mr. Shafi would undertake to pay personally. Is
13 that an accurate restatement?
14      MR. GREEVES: Objection to the form.
15      THE WITNESS: Like I said, if I can see the
16 debt schedule, I can respond. What I don't know is
17 whether the 100,000 up front was on top of the 900,000
18 or below it. That I don't remember. But we can
19 simply go to a debt schedule and answer that.
20 BY MR. MURPHY:
21  Q   But do you agree with me that there's
22 nothing -- no language in Exhibit 7 that makes payment

109

1  of the Braintech accepted debt conditional upon
2  receipt of Shafi, Inc. revenue?
3   A   The purpose of this Exhibit 7 was to express
4  that any excess debt was the responsibility of Adil
5  Shafi personally. That's the purpose of this, as you
6  call it, side letter.
7   Q   Is there anything in Exhibit 7 that makes
8  payment of Braintech accepted debt conditional upon
9  receipt of revenue from Shafi, Inc. business?
10      MS. KOVAL: Asked and answered.
11      THE WITNESS: So do I answer?
12      MR. GREEVES: Uh-huh.
13      MR. MURPHY: Sure.
14      MR. GREEVES: You can answer.
15      THE WITNESS: You know, once again, if this
16 is the same debt that's outlined in the debt schedule,
17 right, that's tied to the Shafi pipeline revenue, the
18 answer is yes.
19      I don't see a schedule of this accepted
20 debt.
21 BY MR. MURPHY:
22  Q   So your --

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

273

1  Q  Okay. On the second page of your e-mail to
2  Mr. Shafi --
3  A  Yes, sir.
4  Q  -- the very last line, "Please channel all
5  your questions and calls through me regarding
6  Braintech and this partnership."
7     Did I read that accurately?
8  A  Yes, you did.
9  Q  And what did you mean by that?
10 A  You know, at this -- May, I mean, we were
11 trying to accomplish a lot at Braintech, you know, and
12 Adil was absorbing -- this comment was a result of
13 Babak's comment to me actually. Protect me, Rick.
14 He's absorbing so much of my time if you want me to be
15 focused on this. So I try to protect my people and
16 their time and their resources.
17 Q  That's it? So based upon that, you wanted
18 all communications regarding this deal to go between
19 you and Mr. Shafi?
20 A  And if they were technical, I would then
21 delegate them on to Babak. If they were sales, so and
22 so. If they were -- you know, correct.

274

1     (Deposition Exhibit Number 30 was marked for
2     identification.)
3  BY MR. MURPHY:
4  Q  I'm showing you what we're going to mark as
5  Exhibit 30.
6  A  30. Thank you. We're still in May.
7  Q  And you're still using weidingerfamily.com.
8  A  I'm sorry.
9  Q  You don't have to apologize.
10    MR. GREEVES: We have moved one day forward.
11    THE WITNESS: What?
12    MR. GREEVES: We have moved one day forward.
13 And thankfully there are only 31 days in May.
14    THE WITNESS: Jesus criminy.
15 BY MR. MURPHY:
16 Q  I just -- I'm not going to go through detail
17 about this. But this is --
18    MR. GREEVES: Take your time.
19 BY MR. MURPHY:
20 Q  There's a lot of communications going on
21 during these couple of days. And it appears to me
22 reading the e-mails that you're at a breaking point, a

275

1  possible breaking point, and you may just decide to go
2  your own way. Is that a fair statement?
3     MR. GREEVES: You mean before or after he
4  read Mr. Shafi's -- we already talked about the 29th
5  e-mail. Now we have Mr. Shafi's e-mail.
6  BY MR. MURPHY:
7  Q  Well, you -- there's an understanding --
8  there's comments in the e-mails that this may be
9  unraveling. But there's continuing discussions here.
10 Do you agree with that?
11 A  Well, there's e-mails going back and forth.
12 Yes, I agree with that.
13 Q  Here is where Mr. Shafi informs you that he
14 didn't want to show you everything about Reliabot. In
15 the very last paragraph of his e-mail.
16 A  Yeah. I mean --
17 Q  And that -- that issue held true all the way
18 through the closing? That never changed?
19 A  Right. We never -- we never -- yeah, we
20 never saw the technology until a month after closing.
21 Q  And you waived --
22 A  To the best of my knowledge.

276

1  Q  If you had any interest in seeing the
2  technology, you waived it or decided it wasn't
3  important to close the transaction; true?
4  A  Not true.
5  Q  You closed without seeing --
6  A  We were not allowed by Adil to even get near
7  it. He coveted it. He hid it in his basement.
8  Q  And you closed the transaction on August 12
9  without access to it; true or false?
10 A  Based on his representations of what that
11 software was, correct.
12 Q  Representations in the share purchase
13 agreement?
14 A  Yes. Yes. Yeah.
15 Q  Any representations about Reliabot software
16 anywhere else than the share purchase agreement?
17 A  Probably -- I'll think about that question.
18 Many e-mails back and forth. Many conversations back
19 and forth. But certainly in the acquisition
20 documents.
21 Q  But as we sit here today, can you identify
22 any other representations other than what I'm going to

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

277

1 find in the share purchase agreement?
2   A   Other than what he said, other than what
3 he's written, other than what the group has discussed,
4 other than what we've agreed to in joint meetings
5 together after closing, before closing.
6   Q   Okay.
7   A   His Web site.
8   Q   Okay. What other representations did
9 Mr. Shafi make in writing about Reliabot software?
10   A   Oh, he made a lot of representations.
11 Number 1, he represented he was the architect of
12 Reliabot, which we found after the fact was not -- we
13 found that out from his ex-employees. You know, that
14 it was revenue ready. We found out after the fact
15 that it was based on 1998 Visual 6 language that is
16 outdated and no longer supported by Microsoft. I
17 mean, there is a whole litany of things that were
18 represented to us about his technology that we found
19 out after the fact were incorrect.
20   Q   And what representations to that effect were
21 made in writing?
22   A   We should go through the document, the

278

1 transaction document rep by rep, and his Shafi
2 pipeline revenue forecast where it represented that
3 his technology was revenue ready.
4   Q   If the share purchase agreement contains a
5 clause that says all of the representations and
6 negotiations up to this point are merged into the
7 share purchase agreement, is it appropriate for you to
8 rely on representations that are not found in the
9 share purchase agreement?
10       MR. GREEVES: Objection. It's hypothetical.
11       THE WITNESS: Can you ask me that again,
12 please. I'm sorry. I didn't catch that.
13 BY MR. MURPHY:
14   Q   Are you saying that you relied upon
15 representations about Reliabot software that were
16 found outside of the share purchase agreement?
17   A   I think those representations were mainly in
18 the share purchase agreement. But there were many
19 e-mails going back and forth and Adil representing his
20 technology. His Web site was one of them.
21   Q   Well, you wouldn't expect him to have
22 proprietary code information on his Web site, would

279

1 you?
2   A   No, no, no. But there were certain
3 statements about his technology on his Web site that
4 our scientists in Vancouver found to be untrue.
5   Q   But you closed anyway?
6   A   I think that they discovered all this after
7 they were able to do -- a month after closing when
8 they were able to do their evaluation of the software
9 once they received the software.
10       (Deposition Exhibit Number 31 was marked for
11       identification.)
12 BY MR. MURPHY:
13   Q   I'm showing you what we've marked as Exhibit
14 Number 31.
15   A   Okay. Thank you.
16       MR. GREEVES: Thanks.
17       THE WITNESS: May, still.
18 BY MR. MURPHY:
19   Q   Still in May. I'm sorry.
20   A   Wow.
21   Q   I can apologize to you.
22   A   That's cool.

280

1       MR. GREEVES: You guys should be apologizing
2 to us.
3       MR. MURPHY: Okay. I apologize to everybody
4 in the room, including Madam Court Reporter.
5 BY MR. MURPHY:
6   Q   I just want to ask you, you reiterate, and I
7 think it's in blue on your copy, I'm not sure, under
8 the heading "Commercial," the very last bullet point,
9 beginning at the right side of the first line.
10   A   Uh-huh.
11   Q   "Please channel all your questions and calls
12 through me."
13       Actually, I'm sorry. This was Mr. Shafi
14 responding to your request to do that?
15   A   Uh-huh.
16   Q   And so Mr. Shafi expressed his agreement to
17 that, right?
18   A   Yes. Was this before or after his problem
19 number 1 and problem number 2 e-mail? This is
20 dated -- oh, this is after. So after he sent that
21 e-mail, he said 90 percent of.... gees.
22       MR. GREEVES: Any other questions about

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

328

1  CERTIFICATE OF NOTARY PUBLIC

2  I, VICKY REINER, the officer before whom the

3  foregoing deposition was taken, do hereby certify that

4  the witness whose testimony appears in the foregoing

5  deposition was duly sworn by me; that the testimony of

6  said witness was taken by me in stenotypy and

7  thereafter reduced to typewriting under my direction;

8  that said deposition is a true record of the testimony

9  given by said witness; that I am neither counsel for,

10 related to, nor employed by and of the parties to the

11 action in which this deposition was taken; and,

12 further, that I am not a relative or employee of any

13 counsel or attorney employed by the parties hereto,

14 nor financially or otherwise interested in the outcome

15 of this action.

16

17

18           VICKY REINER
          Notary Public in and for the
19          Commonwealth of Virginia

20
   My commission expires:
21 December 31, 2011
   Registration No. 7117657
22