# EXHIBIT D



# TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of **ADIL SHAFI**

**Date:** July 29, 2010
**Volume:** I

**Case:** BRAINTECH v. SHAFI

Printed On: November 19, 2010

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRAINTECH, INC.,                                    CASE NO: 09-10454

        Plaintiff/Counter-Defendant,

v

ADIL SHAFI,

        Defendant/Counter-Plaintiff/
        Third-Party Plaintiff,

v

FREDERICK WEIDINGER AND
BRAINTECH, INC.,

        Third-Party Defendant/Counter-Defendant.
_____/


The Deposition of ADIL SHAFI,

taken before me, Susan M. Hans, CER 8085, on July 29, 2010, at 535

Griswold, Suite 1900, Detroit, Michigan, commencing at or about

9:50 a.m.

APPEARANCES:

BY:  JAMES P. MURPHY, ESQUIRE
BERRY MOORMAN
535 Griswold, Suite 1900
Detroit, Michigan  48226
Appearing on behalf of the Plaintiff.

BY:  GEOFFREY J. GREEVES, ESQUIRE
PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
2300 North Street, NW
Washington, DC  20037
Appearing on behalf of the Defendant, Frederick Weidinger and
Braintech, Inc.

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 2

BY:  ANNE WIDLAK, ATTORNEY AT LAW
SUSAN D. KOVAL, ATTORNEY AT LAW
NEMETH BURWELL, PC
200 Talon Centre Drive, Suite 200
Detroit, Michigan  48207
313-567-5921
awidlak@nemethburwell.com
skoval@nemethburwell.com
Appearing on behalf of the Defendant, Braintech, Inc.

---

Page 4

1    INDEX OF EXHIBITS
2  EXHIBIT          DESCRIPTION          PAGE
3  Exhibit 19       E-Mail        258
4  Exhibit 20       E-Mail        260
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1                  INDEX
2  WITNESS          EXAMINED BY          PAGE
3  ADIL SHAFI       Mr. Greeves           7
4
5                  * * * *
6            INDEX OF EXHIBITS
7  EXHIBIT      DESCRIPTION            PAGE
8  Exhibit 1    Transaction Documents    51
9  Exhibit 2    Shafi Response          170
10 Exhibit 3    E-Mail                  184
11 Exhibit 4    E-Mail                  188
12 Exhibit 5    Initial Disclosures     154
13 Exhibit 6    E-Mail                  189
14 Exhibit 7    E-Mail                  192
15 Exhibit 8    E-Mail                  196
16 Exhibit 9    E-Mail                  203
17 Exhibit 10   E-Mail                  206
18 Exhibit 11   E-Mail                  210
19 Exhibit 12   E-Mail                  216
20 Exhibit 13   E-Mail                  218
21 Exhibit 14   E-Mail                  223
22 Exhibit 15   E-Mail                  228
23 Exhibit 16   E-Mail                  245
24 Exhibit 17   E-Mail                  249
25 Exhibit 18   E-Mail                  254

---

Page 5

1                July 29, 2010
2               Detroit, Michigan
3                  10:00 a.m.
4
5
6              * * ** ** ** **
7            ADIL SHAFI,
8  was thereupon called as a witness herein and, after having
9  been first duly sworn to tell the truth, the whole truth and
10 nothing but the truth, was examined and testified as follows:
11             * * ** ** ** **
12           MR. GREEVES:  Good morning, Mr. Shafi.  My name
13 is Geoffrey Greeves.  I represent Rick Weidinger who is a
14 Defendant in a lawsuit that originated as a counterclaim that
15 you brought in this case in the Eastern District of Michigan
16 District Court.  With me today are Counsel for the other
17 Defendant, if you want to identify yourselves.
18           MS. WIDLAK:  Sure.  Anne Widlak on behalf of
19 Braintech.
20           MS. KOVAL:  Susan Koval on behalf of Braintech.
21           MR. GREEVES:  Mr. Shafi, you and I have not met
22 before today, right?
23           THE WITNESS:  That's right.
24           MR. GREEVES:  Can you give us your address,
25 sir, your home address?

Tri-County  Court Reporters
248-608-9250

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

## Page 62

1      letter, when that colloquial dialogue is used about a
2      document, that this is not what it's referring to?
3   A   It depends on what's intended to be meant by "side letter."
4      There could be several side letters. There could be one. I'm
5      not sure which one this refers to. It doesn't say "side
6      letter" on it.
7   Q   Could you turn to the third page, which is marked page 4-of-5
8      there, sir.
9   A   Uh-huh.
10   Q   And you'll see below the signature it says, "Signature Page to
11      Side Letter Agreement."
12   A   Yes.
13   Q   Does that refresh your recollection now --
14   A   Yes.
15   Q   -- that this is, in fact, the side letter?
16   A   Yes.
17   Q   Are you aware of any other side letter besides this one?
18   A   I don't think so.
19   Q   And you understand that to be the complete side letter and
20      signatures of the parties?
21   A   Right.
22   Q   All right. Sir, if you'll flip forward you'll see page
23      2-of-4, just ahead of where we were.
24   A   Okay.
25   Q   Are you able to identify that document for the record today?

## Page 63

1   A   This is a promissory note made by Shafi, Inc. to -- Well, it's
2      a promissory note.
3   Q   You signed this as president of Shafi, Inc. and Shafi
4      Innovation, Inc.?
5   A   Yes.
6   Q   On the day of the closing?
7   A   Yes.
8   Q   And that is your signature, correct?
9   A   Right.
10   Q   Okay. Flipping forward again, sir, to page 2-of-5. This
11      should be in the next pack.
12   A   Yes.
13   Q   You'll see something called a lockup agreement. Are you able
14      to identify that?
15   A   Yes.
16   Q   And what is it, sir?
17   A   It's a lockup agreement to hold the shares that were given to
18      me for six months prior to my ability to sell them.
19   Q   And that has your signature on it?
20   A   Yes.
21   Q   And Mr. Weidinger countersigned it?
22   A   Yes.
23   Q   You recognize his signature?
24   A   Yes.
25   Q   Going forward to page 2-of-12, sir.

## Page 64

1   A   Yes.
2   Q   You'll see something that's called "Employment Agreement."
3      Are you able to identify that for us?
4   A   Yes.
5   Q   What is that?
6   A   Employment agreement.
7   Q   Between who and who?
8   A   Between "Executive," which is me, and Braintech, the company.
9   Q   Is it your understanding that you became an employee of
10      Braintech as of the date of the closing?
11   A   Correct. My employment began on August 16th. The agreement
12      was signed on August 12.
13   Q   You'll see, if you flip forward there to page 10-of-12,
14      hopefully you'll recognize your signature on that page?
15   A   Yes, I do.
16   Q   Do you recognize this to be final version, the execution
17      version of the document?
18   A   It appears to be so.
19   Q   If you look to the preceding page, page 9-of-12, you'll see
20      Mr. Weidinger's countersignature on there?
21   A   Yes.
22   Q   Now, flipping forward, Mr. Shafi, to page 2-of-9.
23   A   Yes.
24   Q   You'll see a document called "Noncompetition Agreement."
25   A   Yes.

## Page 65

1   Q   Are you able to identify that document for us today?
2   A   Yes. The noncompetition agreement appears to be the one I
3      signed.
4   Q   And that is your signature and your address there written in
5      on page 8-of-9?
6   A   Yes.
7   Q   And then Mr. Weidinger countersigned that on page 9-of-9?
8   A   Yes.
9   Q   Let's take a look at -- Let me just ask you. Mr. Shafi, do
10      you have your own copy somewhere of the closing binder, as it
11      were --
12   A   Yes.
13   Q   -- related to this transaction?
14   A   Yes.
15   Q   And are you aware of any -- We went through what I think are
16      most of the germane documents, but are you aware of anything
17      that you believe relates to your claim from the closing binder
18      documents that we did not go through just now?
19   A   It does not appear so.
20   Q   Okay. Let's take a look at -- If you could open your set back
21      up to the first part, Mr. Shafi. Could you turn to page
22      8-of-47, sir? This is within the share purchase agreement.
23   A   Yes.
24   Q   Under Article 2 at the bottom of the page -- Do you have
25      Article 2 at the bottom of the page?

17 (Pages 62 to 65)

Electronically signed by Susan Hans (201-320-999-0764)      2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 66

1  A  Yes.
2  Q  Okay. Sorry. I'm just trying to make sure we're there. You
3     see 2.2, Purchase Price?
4  A  Yes.
5  Q  Could you take a look at that and tell me if, in fact, you did
6     receive the purchase price with regard to this transaction?
7  A  I received three certificates for one million shares each and
8     they are a worthless piece of paper because they were never
9     registered with the SEC. I was never paid a single cent for
10    the value of my companies through these shares. These shares
11    were never registered with the Securities and Exchange
12    Commission of the United States of America.
13  Q  Okay. Mr. Shafi, with regard to 2.2, Purchase Price can you
14    tell me; did you receive the 2,999,700 shares of Buyer's
15    common stock?
16  A  I'm telling you I received three pieces of paper that are
17    worthless.
18  Q  So you're telling me that you did receive 2.2A?
19  A  It says that I have these shares, but they're worthless.
20  Q  My question is; did you actually receive what it says you were
21    to receive, the 2.99 --
22  A  Did I receive the purchase price? No. Did I receive pieces
23    of paper? Yes. That's what I'm answering.
24  Q  Is there --
25  A  I received three documents that purport to be this purchase

Page 67

1     price, but I'm also telling you, under oath, that this is not
2     what was tendered to me. This is a worthless piece of paper.
3     It has absolutely no value in the market. Even after six
4     months it has no value. So if you ask me if this is the
5     correct value, no. I didn't get anything out of it. But I
6     got three pieces of paper.
7  Q  Let me ask it this way since we seemed to be hung up on the
8     word "value." Do you see the word "value" in section 2.2A?
9     Do you see that word?
10  A  Yeah, I see the word "value."
11  Q  You see the word "par value", right?
12  A  Yeah.
13  Q  Is that what you got?
14  A  My meaning of value was some consideration, real
15    consideration, paid to me for the sale of my companies. The
16    answer is, no, I did not get any value for the sale of my
17    companies. I got not a single cent for it. That's what I'm
18    telling you. Are you asking me did I receive --
19        MR. MURPHY: You already answered the question.
20  Q  (Continuing by Mr. Greeves): So Mr. Shafi, let me just make
21    sure I understand where we are. When we call you at the trial
22    of this matter and you're up in front of the jury and I ask
23    you if you received three million shares of Braintech stock
24    what is your answer going to be at that time?
25  A  My answer would be that I received three eight-and-a-half by

Page 68

1     eleven-inch documents that say that they are shares of
2     Braintech. I will also say that they're completely worthless,
3     that there is no value in them. That's what I will say in
4     front of the jury at the trial.
5  Q  Thank you, sir.
6  A  You're welcome.
7  Q  Now, you'll see, if we begin on the same page there carrying
8     over, which is denominated page 9-of-47 at the top, sir.
9  A  All right.
10  Q  Article 3, "Representations and Warranties --
11  A  Yes.
12  Q  -- of each company and Seller." That's you?
13  A  Yes. That's visible.
14  Q  That was Shafi, Inc.?
15  A  Yes. It's visible. I can see it.
16  Q  I mean, the Seller in this transaction was Shafi, Inc., right?
17  A  Yes.
18  Q  Could you just breeze through those and tell me if, to your
19    understanding -- They begin on page 9-of-47 and they end on
20    page 29-of-47.
21  A  All right.
22  Q  And tell me whether that is a complete list, as you understand
23    it, of the representations that your companies were making as
24    the seller in this transaction.
25  A  It appears to be so.

Page 69

1  Q  And were all the representations, sir, that were made in here
2     truthful and accurate?
3  A  Yes. I believe so.
4  Q  So as of the date of the closing of the transaction, Shafi,
5     Inc. and Shafi Innovations, Inc. were in compliance with all
6     the representations and warranties?
7  A  Yes.
8  Q  Did there ever come a time, to your understanding, that your
9     companies were not in compliance with the representations and
10    warranties in here?
11  A  I do not believe so.
12  Q  Let's take a look at page 25-of-47. Sir, we're going to be
13    looking at 3.22, "Intellectual Property." Are you familiar,
14    generally, with your companies, Shafi and Shafi, Inc., that
15    they had a banking arrangement with Comerica?
16  A  Yes.
17  Q  And as part of that did Comerica have a lien or an assignment
18    for its benefit of any of the IP or other property rights that
19    Shafi, Inc. owned?
20  A  I do not recall that provision, but I do know that I also had
21    a personal guarantee in it.
22  Q  Okay. So you don't recall that Comerica had -- basically, was
23    required to be notified in the event that you desired to sell
24    the intellectual property or the companies to another party?
25  A  I do not recall. But I do recall that I informed both

Tri-County  Court Reporters
248-608-9250

Page 74

```
1    finish. Okay?
2         There is a debt schedule that went along with
3    this document that we'll look at and it lists all the law
4    firms that you worked with, right?
5    A   Yes.
6    Q   There is more than one law firm on there?
7    A   Yes.
8    Q   Several?
9    A   Okay.
10   Q   Did they work on this document? Did they draft this stock
11       purchase agreement for you?
12   A   They assisted in modifications to the document. The original
13       document was provided by Mr. Weidinger and GT Law. The
14       original draft of this SPA, share purchase agreement, was
15       supplied by Mr. Weidinger and GT Law.
16   Q   Your lawyers charged you tens of thousands of dollars,
17       including this law firm, right?
18   A   Yes.
19   Q   To do this work?
20   A   Yes.
21   Q   And you paid it?
22   A   Braintech paid it and I paid some, personally. I don't recall
23       the exact details but, yes, payments were made to them. In
24       fact, one of those obligations was Braintech's obligation to
25       pay Mr. Peter Long of Berry Moorman, and it's on the debt
```

Page 75

```
1    schedule, and he was never paid by Braintech. That's one of
2    them. Bruce Rukkila was also owed money. It's on the debt
3    schedule, and he was never paid.
4    Q   Okay. So with regard to the stock purchase agreement it's
5        clear that you had many lawyers assisting you in this process.
6        You weren't, in other words, an unsophisticated person trying
7        to draft legal documents by yourself, were you?
8    A   I'm not sure what your definition of "many" is. I know that
9        there was more than one. I don't recall the exact total
10       number.
11   Q   And you were very satisfied with their efforts; yes?
12   A   Yes. They worked hard.
13   Q   And you insisted that they be paid promptly after the closing,
14       didn't you?
15   A   Yes, I did.
16   Q   Within two days?
17   A   It may be possible. I don't know the exact phraseology, but I
18       do know that several of these professionals were promised
19       payment by Mr. Weidinger and Braintech and to this date, more
20       than two years later, almost two years later, they have not
21       received any payment from Braintech nor Mr. Weidinger in the
22       debt schedule as spelled out, which is a part -- This is an
23       exhibit of this SPA. An integral part of this agreement was
24       to pay those people. They were never paid.
25   Q   Mr. Shafi, if you can stick to the questions that I'm asking
```

Page 76

```
1    and your lawyer --
2    A   I'm answering your questions.
3    Q   Your lawyer will have plenty of opportunity to ask you
4        questions if he wants to when we're done today. If we can try
5        to focus on the questions that I'm asking it will help. Okay?
6    A   Okay.
7    Q   Now, let's take a look starting on page 29-of-47, sir. You'll
8        see these are the Buyer's representations and warranties.
9    A   Okay.
10   Q   Where do they begin and end, sir?
11   A   What is your question?
12   Q   My question is; you're able to see where the representations
13       and warranties of the Buyer begin, on page 29-of-47?
14   A   Yes. It's visible to me.
15   Q   Where do they end in the document?
16   A   The next page.
17   Q   So your company, as the Seller, has made 20-some pages of
18       representations, and the Buyer made a page worth of
19       representations; is that right?
20   A   That's correct. And this is how the Buyer supplied the draft.
21       The Buyer supplied this draft in the first place. That's how
22       they structured it. They provided these representations and
23       they put those excess pages as the seller's representations.
24       This was Braintech's doing.
25   Q   Well, did your Counsel ever advise you that there were not
```

Page 77

```
1    enough representations by Braintech in this transaction?
2    A   I don't recall that.
3    Q   Did your Counsel run out of time to make changes in this
4        document?
5    A   No. They did not run out of time.
6    Q   Well, were there any representations and warranties that
7        Braintech, you wanted them to make that they didn't make in
8        this document?
9    A   Mr. Greeves, there are five inches worth of agreements that we
10       have here. There were a lot of commitments made by Braintech
11       and Mr. Weidinger over a span of several documents and several
12       agreements and hundreds and thousands of e-mails. So I did
13       not dwell on the fact that this particular section has two
14       pages and another section has 29 pages. I did not dwell on
15       that.
16   Q   So it wasn't a concern to you that Braintech was not making
17       very many warranties and representations, but that you were?
18   A   I felt that Braintech made many, many promises, many, many
19       representations, induced me to sell my companies in many, many
20       ways, and there was nothing but a set of breaches and about-
21       faces and broken promises. Now, you can dwell on two pages
22       here or 29 pages there, but I'm telling you that the substance
23       of the whole agreement, the package deal, as I call it, is
24       consisted of debt assumption, employment, shares tendered for
25       my companies. A lot of that was just totally breached by
```

20  (Pages 74 to 77)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 78

1    Braintech.
2  Q  Okay. Let's focus on Article 4, if we could. That's where
3     you are, right? Let's look at the first one, 4.1. Why don't
4     you tell me if, in your estimation, sir, as the Plaintiff in
5     this case, these representations and warranties in section 4.1
6     were honored by the company? Let's start with that one. It
7     won't take us long, hopefully.
8  A  So you're asking me if 4.1 was honored by Braintech?
9  Q  Correct, sir.
10 A  It appears to be so.
11 Q  Okay. What about 4.2?
12 A  Appears to be so.
13 Q  What about 4.3?
14 A  I will go back to 4.2. If the representation was that they
15    were going to give me shares that were valid and had value
16    behind them for the sale of my companies, I will say they
17    misrepresented it. Now, I will let my Counsel state that
18    better than me, because I'm not a professional lawyer, but I
19    will tell you that it appears that they made good
20    representations and I know that they breached them afterwards.
21 Q  Okay. That's a lot that you just threw out there, Mr. Shafi.
22    Let's back up and make sure we cover all of that.
23 A  Okay.
24 Q  We'll start with your statement it appears that they made
25    representations and then breached all of it. Are you

Page 79

1     referring to any of the representations here in 4.1 through --
2  A  I think it would be better for my Counsel to answer that than
3     me, because I'm not a professionally trained lawyer. I took
4     these as good-faith statements on the part of Braintech. I
5     know that they breached a lot of what they promised me, broke
6     promises in a very substantive way; not just one or two, but
7     dozens of breaches. Now, does this legal language allow me to
8     answer correctly your question? I don't know. I would rather
9     Mr. Murphy answer this in proper legal context. I'm not a
10    professional lawyer here. I do not want to put on the record
11    here that I fully understand or fully am able to answer these
12    legal questions. That's why Mr. Murphy is here. So I don't
13    know what to tell you.
14 Q  Well, we obviously are not going to go through the shenanigan
15    of putting your lawyer under oath to answer the questions that
16    you, as the Plaintiff, have the responsibility to answer. So
17    rather than try to throw us off track why don't we stick to
18    the track that we're on, which is; can you tell me if
19    Braintech ever was in default, as far as you know, with regard
20    to section 4.2, its authority to enter into this agreement?
21 A  Yeah. Appears to be so.
22 Q  What do you mean it appears to be so?
23 A  I just answered your question. It appears to represent what
24    Braintech was saying here.
25 Q  So to your knowledge, Braintech did not breach that

Page 80

1     representation?
2  A  As best as I can say, yes, it appears so.
3  Q  Let's move to 4.3. Same question with regard to 4.3, and the
4     question is; did Braintech ever misrepresent or breach its
5     warranty with regard to section 4.3?
6  A  Again, I'm not a professional lawyer and I cannot say with
7     definition that this is correct, but it appears to be their
8     representation.
9  Q  And that they honored it, right?
10 A  I don't know that.
11 Q  Okay. So you're not able to tell us whether or not they
12    honored this section?
13 A  Correct.
14 Q  What facts would you need to be in a position to be able to
15    tell us that? Not legal principles. What facts would you
16    need to be in a position to tell us factually whether or not
17    they did or did not do what they said they were going to do?
18 A  Pertaining to 4.3?
19 Q  Yes, sir.
20 A  The language is so legal in nature that I cannot answer it.
21    But I will tell you that Braintech breached its overall
22    promises to me. Now, is section 4.3 legally correct or not?
23    I cannot tell you.
24 Q  Well, sitting here today, though, you have no reason to think
25    that that provision was breached by Braintech, do you?

Page 81

1  A  Or vice versa. I just don't know.
2  Q  I understand. You understand you're the person that has to
3     prove your case, not me?
4  A  Right.
5  Q  So sitting here today, what proof do you have that they
6     breached anything in 4.3? That's my question. It's a very
7     simple question.
8  A  I cannot answer that right now.
9  Q  All right. What about with regard to section 4.4; same
10    question?
11 A  Again, same thing. It appears to be correct, but I'm not a
12    legal person so I cannot definitively say this is accurate.
13 Q  When you say it appears to be correct that's the kind of thing
14    that's very vague and won't translate well in the transcript,
15    so what do you mean? It appears to you that they did not
16    breach section 4.4?
17 A  I don't know.
18 Q  Well, do you have any evidence, today, at your disposal that
19    suggests that they did?
20 A  I might. But I'm just telling you legally I don't know if I
21    can answer that properly.
22 Q  What facts would you need to be in a position to tell us
23    whether or not the factual statements in there are correct or
24    not correct, that you don't have in front of you now?
25 A  Facts about what?

21  (Pages 78 to 81)

Electronically signed by Susan Hans (201-320-999-0764)          2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 82

1  Q  About the representations that were made here.
2  A  What representations?
3  Q  In 4.4, that, "No finder, broker, agent, financial adviser or
4     other intermediary acted for the Buyer in connection with the
5     negotiation of the agreement"?
6  A  My answer is it appears that that is correct, but I cannot
7     tell you for sure, legally.
8  Q  So sitting here today, you don't have any evidence to the
9     contrary, right?
10 A  I may or I may not.  I'm just telling you I can't tell you.
11 Q  Would you have to look through the 83 boxes to be able to tell
12    us that?
13 A  That may or may not be the right place.  Perhaps it's
14    Mr. Murphy's place to make that determination for me.  I don't
15    know.  I'm not a legally-trained person.  I can't answer this
16    to you, legally.
17 Q  Okay.  So with regard to section 4.5, the Buyer SEC reports,
18    do you find anything in there that tells you that there is a
19    breach or a misrepresentation regarding statements that were
20    made by Braintech in section 4.5?
21 A  Again, I don't know.  I cannot answer.  I don't know,
22    personally.
23 Q  What additional facts, not legal training, what additional
24    facts would you need to be able to make that determination?
25 A  I don't know if I need facts or if I need additional legal

Page 83

1     training or both, but I just cannot answer your question.
2  Q  So you're not going to be able to tell us whether or not
3     Braintech was honest or lived up to the warranty it made in
4     section 4.5?
5  A  Or not.
6  Q  If you can't tell us, sir, who is going to be able to tell us
7     that?
8  A  Mr. Murphy will represent that for me.
9  Q  Mr. Murphy is going to tell the jury at your trial about that?
10 A  This legal interpretation, I'm not qualified to answer your
11    question.
12 Q  You're not qualified to tell us whether Braintech made any
13    untrue statements?
14 A  Oh, I can tell you that Braintech made a lot of untrue
15    statements.
16 Q  With regard to the matters in section 4.5?
17 A  I don't know how to answer that properly for you, legally.
18 Q  So sitting here today, though, you have no evidence about any
19    breaches, misrepresentations or things that were not honored
20    with regard to section 4.5?
21 A  I have tons of evidence of Braintech's breaches, we do.
22    There's a lot of material that we have and more.  Now, that's
23    not facts and that's not answering the legality of this
24    statement.
25 Q  Are you going to be able to give us an answer to those, sir,

Page 84

1     today?
2  A  I'm trying to answer your question.
3  Q  Are you aware of even one untrue statement that was made in
4     the form 10Q or the form 10K?
5  A  I'm telling you I cannot tell you properly because I'm not
6     legally trained.
7  Q  You're aware that you brought a case against Braintech for
8     securities fraud, correct?
9  A  Yes, yes.
10 Q  Those are very serious allegations.
11 A  Of course.
12 A  They're companion to criminal allegations in some cases.
13 A  Absolutely.
14 Q  What is your evidence, sir, that there was any breach of
15    section 4.5 of the warranty that was made with regard to the
16    truth of the statements in those SEC-filed forms?
17 A  I could tell you, as a legally untrained person, that I don't
18    know how to answer 4.5.  But I can tell you that I was given
19    supposedly bona fide shares of Braintech at the time of this
20    sale, and I know and I can tell you that even after the lockup
21    period those shares were never registered.  They're worthless.
22    My company was sold for nothing.  I never received any payment
23    for it.  I can tell you that's a breach.  I can tell you that
24    that's a fraud.  I can tell you that that is subject to
25    criminal prosecution and everything else that goes with it.

Page 85

1     Now, does that mean that I have answered 4.5 correctly or not?
2     I don't know, because I'm not a legally-trained person.  And
3     that's the best I can do for you to answer this.  I don't know
4     exactly what this language means, but I know there is a
5     breach.  I know that those shares are worthless, and I know
6     that I was told that they would be worth something.  That's
7     all I can tell you.
8  Q  Okay.  So whether or not Braintech complied with section 4.5
9     in your view is dependent upon whether the shares were worth
10    something or whether they ended up being worthless?
11 A  There may be other connotations to this language, and that's
12    exactly what I'm trying to convey, that I don't know all the
13    legal connotations, and I don't want to characterize my answer
14    as I comprehend this.  I don't.  I just know what happened.
15 Q  Are you telling us you don't comprehend the document, sir --
16 A  I --
17 Q  -- by which you sold your company?
18 A  I understand the general gist of it.  I just don't know the
19    exact ramifications of the phraseology in section 4.5.
20 Q  Well, based on the general gist of it what are you able to
21    tell us about whether 4.5 ever became inaccurate?
22 A  It appears to be so, but I can't tell you for sure.  That's
23    what I've been saying all along is it appears to be that it is
24    a representation, I just am not legally trained to tell you
25    that I know for sure that I can say that it's right or wrong.

22  (Pages 82 to 85)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 94

1   A   Yes. This was a part of the arrangement. I, after the
2       closing, hosted Mr. Jim Dara with my old office manager, Donna
3       Burr, with my former landlord at that office. It was ready to
4       be wired. It was ready to go. It was available. It was
5       wired for ten robots, which is not a common thing you can find
6       in any building. It was a very specially-prepared place to do
7       robot sales. I took Mr. Dara. I informed Mr. Weidinger that
8       this office was available. Let's go open it up. Let's put
9       some robots in there, train people, start doing sales, and he
10      breached all that. He wanted a different office, and that
11      office was not really open till ever after my termination. I
12      left -- I was terminated in November of 2008. This office
13      that finally was opened was not even opened till January,
14      2009, or February. So this is a major breach, you're right.
15      I say yes.
16  Q   So it's your understanding that there was no agreement even to
17      consider it? The issue was never brought up?
18  A   I brought this up.
19  Q   Right.
20  A   And there is an e-mail record of all this.
21  Q   And you took Mr. Dara there?
22  A   Yes.
23  Q   For what purpose?
24  A   To set up -- To consider this office to help us with our
25      market access and acceleration plan.

Page 95

1   Q   And he did that, didn't he?
2   A   He went to the office and it was available and it was ready to
3       enter in, but Mr. Weidinger refused to open this office.
4   Q   They refused to open it. They didn't refuse to consider it,
5       did they?
6   A   They considered it and they declined.
7   Q   Thank you, sir. Now, with regard to the next page, 6.12,
8       "Required Registration."
9   A   Yes.
10  Q   Can you tell me what it is that you believe Buyer did not do,
11      that it was required to do, with regard to 6.12 of this
12      agreement?
13  A   I will need to look at it.
14  Q   Yes. Please, sir. Take your time.
15          (At or about 12:29 p.m., a short break was taken off
16          the record, and the deposition resumed at or about
17          12:30 p.m.)
18          THE WITNESS: The answer to your question is,
19      again, I'm not legally trained to say this is legally accurate
20      or not or what Braintech did was legally yes or no. I know
21      that Braintech was supposed to register those shares that they
22      gave me as part of my sale of SII to Braintech. But those
23      shares that they gave me were never registered, so they were
24      worthless, not worth a single cent.
25  Q   (Continuing by Mr. Greeves): So where is it here that you

Page 96

1       think Braintech defaulted in its responsibility, sir, by
2       reference to the language in 6.12.1?
3   A   Sir, I'm telling you that I'm not legally trained to answer a
4       specific phrase or to say it's in breach or not. I'm not
5       legally trained. I do know that the overall commitment here
6       is to register those shares that were given to me, and I know
7       that they were never registered. They're worthless.
8   Q   Let's assume, for the moment, that Braintech had registered
9       your shares.
10  A   Okay. Let's assume.
11  Q   How much would they be worth today?
12  A   It depends on the market situation.
13  Q   Are you aware of the market situation that's trading in
14      Braintech right now?
15  A   Yes, I do.
16  Q   What are stocks trading for in Braintech these days?
17  A   Braintech is in very deep trouble. In fact, it's more or less
18      insolvent. The IP of Braintech has been transferred to
19      Robotic Vision -- Robot Vision or Robotic Vision Tech.
20  Q   Is it fair to say that Braintech's stock is worthless?
21  A   I would say so.
22  Q   Would your stock still be worthless if it was registered?
23  A   It would be, yes. But I will put on the record that I --
24  Q   There is no question pending, sir.
25  A   Let's take a look at page 37, I think we're still there, at

Page 97

1       the top of it.
2   A   Okay.
3   Q   It says, 6.7, "Certain Hires."
4   A   Yes.
5   Q   "Following the closing Buyer will consider the hiring of a
6       business development employee, administrative assistant to
7       Seller and director of government and international programs
8       of SII recommended by Seller, subject to final approval by
9       Buyer's chief executive officer." Do you see that language,
10      sir?
11  A   Yes, I do.
12  Q   Anything there that wasn't done by Braintech that should have
13      been done?
14  A   There are two places where this occurs. In this section, or
15      this small paragraph, which is not full of legal language, it
16      does say that Braintech will consider. Braintech did
17      consider. However, this also appears in the revenue condition
18      number one in my employment agreement. I had to have these
19      hirings take place in order to produce revenue. That was not
20      done despite a very difficult set of communications with
21      Mr. Weidinger. He was supposed to hire these people to allow
22      me to execute, and he did not. He had 60 days to breach the
23      cure. Towards the end of that period I told him, "You're
24      running out of time to hire people. You're going to blow away
25      your milestones." And it was a very difficult set of

25  (Pages 94 to 97)

Electronically signed by Susan Hans (201-320-999-0764)   2672d99d-361d-4ea4-bcc8-6a6792038bb6

## Page 98

1  communications. He changed his stance on what commitments he
2  made, and this never happened. And this is, yet, another one
3  of those breaches that I keep referring to, many, many
4  breaches that were caused by him. So, yes, this -- Did he
5  consider it? Yes, he did. Did he actually do it? No, he did
6  not. Did he actually realize that this was a condition to
7  execute and operate and succeed? Yes, it was, but he never
8  did it.
9  Q  Did you realize that it was a condition to succeed?
10  A  Oh, yes, of course. And I informed him about it.
11  Q  But it didn't make its way into the stock purchase agreement,
12  right?
13  A  It's not here.
14  Q  Did your lawyers ever propose to have that language changed to
15  reflect your desire to have this commitment to hire --
16  A  I don't recall.
17  Q  -- commitment to hire these individuals?
18  A  See, it wasn't one document that had to contain everything.
19  There were seven or eight or 10 different agreements, and most
20  of these representations were spread around different
21  documents. Everything was not supposed to be in the share
22  purchase agreement. Other representations were placed in
23  other documents, in other agreements that we all signed, and
24  they were not made.
25  Q  Is any part of your claim dependent upon a breach of section

## Page 99

1  6.7 of this agreement, sir?
2  A  Yes., I would believe so.
3  Q  Let's turn to page 40-of-47, Mr. Shafi.
4  A  40?
5  Q  Yes, sir. Page 40-of-47.
6  A  Okay.
7  Q  You can see at the very bottom there the last two lines,
8  section 7.2.10, called "Indebtedness"?
9  A  Yes.
10  Q  And you'll see it says "Neither company shall have
11  indebtedness except as expressly set forth on the Creditor and
12  Payment Schedule."
13  A  Yes.
14  Q  "Neither company" being Shafi, Inc. and Shafi Innovations,
15  Inc. Do you understand that?
16  A  I suppose so.
17  Q  Well, did Braintech submit a debt schedule regarding its
18  creditors and payments?
19  A  No.
20  Q  Okay. So the only creditor and payment schedule you're aware
21  of was the one that your companies were submitting?
22  A  That's right.
23  Q  Isn't it true that there was debt that wasn't disclosed on
24  those documents?
25  A  No.

## Page 100

1  Q  So your sworn testimony here today, under oath, is that all of
2  the debt was disclosed on those documents and no more debt
3  ever came to pass?
4  A  Yes.
5  Q  Let's turn to page 44-of-47. Mr. Shafi, we were talking
6  before about how you said there was this like composite of
7  different documents that said different things and they all
8  kind of worked together. The A&A was part of the stock
9  purchase agreement. Do you remember when we were talking
10  about all that?
11  A  Yes.
12  Q  When you were talking about all that; yes? Section 9.2 of
13  this agreement is entitled, "Entire Agreement." Do you see
14  that language, sir?
15  A  Yes.
16  Q  And it says, "Unless otherwise herein specifically provided
17  this agreement, including the preamble, recital, schedules and
18  exhibits and the documents and instruments and other
19  agreements among the parties, contemplated by or referred to
20  herein constitute the entire agreement among the parties with
21  respect to the subject matter hereof."
22  A  Yes.
23  Q  "And supersede all other prior agreements and understandings,
24  both written and oral, between the parties with respect to the
25  subject matter hereof, including the letter of intent."

## Page 101

1  You're familiar with the letter of intent?
2  A  Yes.
3  Q  It goes on, "Each party acknowledges that, in entering this
4  agreement and consummating the closing, such party is not
5  relying on any representation, warranty, covenant, obligation,
6  or agreement not expressly stated in this agreement or in the
7  certificates of or agreements among the parties contemplated
8  by or referred to herein." Do you understand what that means,
9  sir?
10  A  Again, I'm not legally trained to -- It appears to be so, but
11  I'm not legally trained to say that, yes, this is it or, no,
12  this is not. So just like I answered your other paragraphs 4
13  and 6, I will say the same thing; it appears to be correct,
14  but I don't know since I'm not legally trained to answer that
15  yes or no.
16  Q  We'll look at them in a little bit, Mr. Shafi, but you refer
17  in your complaint to a series of pre-transaction e-mails in
18  which you claim Mr. Weidinger made certain representations to
19  you?
20  A  Yes.
21  Q  Do you understand that those simply cannot be part of the
22  claim because of the language here in 9.2?
23  A  I'm not legally trained to be able to say yes or no.
24  Q  Okay. So where the agreement here says that you're not
25  relying on representations not expressly stated in this

Tri-County  Court Reporters
248-608-9250

Electronically signed by Susan Hans (201-320-999-0764)        2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 102

1  agreement, any reason to think that that's not true?
2  A  I don't know if it is valid or not, this phraseology is valid
3    or not, in the overall context of what's going on.
4  Q  Do you believe this language is invalid?
5  A  All I'm saying is I don't know if I can say yes or no.  I'm
6    not legally trained to answer that yes or no.
7  Q  Is it fair to say that all those e-mails that you relied on in
8    your complaint from Mr. Weidinger they're not expressly stated
9    in the stock purchase agreement?
10 A  I don't know if they apply or not.
11 Q  Are they expressly stated in the stock purchase agreement?
12 A  It doesn't appear to be so, but I don't know if they matter or
13    not.  I'm not legally trained.
14 Q  Okay.  Were any changes ever made to this document after it
15    was prepared and signed at the closing as an execution
16    version?
17 A  I do not recall.
18      MR. GREEVES:  Let me confer with my colleagues
19    here for a second and then maybe we'll take a lunch break if
20    that's okay.
21      MR. MURPHY:  That's fine.
22      (At or about 12:40 p.m., a short break was taken off
23    the record, and the deposition resumed at or about
24    1:43 p.m.)
25      MR. GREEVES:  We'll go back on the record with

Page 103

1  regard to the deposition of Mr. Shafi.
2  Q  (Continuing by Mr. Greeves):  Mr. Shafi, when we finished up
3    we were discussing the stock purchase agreement.  I'd like to
4    now turn your attention to a few other of the documents in the
5    closing materials here.  If you could turn to page 46-of-65,
6    that would be the first page of the market access and
7    acceleration document.  Have you had a chance to turn to that
8    page, sir?
9  A  Yes, I did.
10 Q  I think you testified before that this is kind of the final
11    market access and acceleration document, but it was kind of a
12    living document, I guess, the rest, both before and after the
13    closing.  Does that sound generally accurate as a summary?
14 A  Yes.
15 Q  Okay.  Who had the responsibility for preparing what we're
16    looking at here, this part of the closing schedule?
17 A  Myself.
18 Q  All right.  So when you say yourself was it Shafi and Shafi,
19    Inc. -- Or Shafi, Inc. and SII were responsible for delivering
20    what was to be the final market access and acceleration
21    document?
22 A  Yes.  In cooperation with Braintech, because this was
23    contemplated to be done as an officer of Braintech in a
24    combined role.
25 Q  What was to be the purpose of this document after its

Page 104

1  creation, sir?
2  A  It was to help the combined companies, Braintech, Shafi, Inc.,
3    SI, as we called it, or Shafi Innovation, Inc., SII, really
4    there were three companies that were coming together.  The
5    intention of this document was to prepare a sales and revenue
6    plan.
7  Q  What would be done with that sales and revenue plan?
8  A  Our intention was to visit these customers and inform them of
9    our combination and seek to obtain their business.
10 Q  Okay.  So the customers that are listed here, I guess
11    throughout the pages, were they, at that time, customers to
12    whom Braintech was already familiar?  Or are these new
13    customers that were going to be introduced to Braintech who
14    Shafi had relationships with?
15 A  For the most part these were companies that Shafi, Inc. and
16    Shafi Innovation, Inc. had relationships with.  Braintech
17    really just had one customer, ABB, and they had one small
18    government contract, and that was about it.  And that was
19    their motivation to have me come onboard because I had
20    extensive market knowledge of many robot companies, many
21    vision companies, many integrators and these types of end
22    users.  So the intention was to go and meet these companies
23    through my relationships and help grow the revenue of the
24    combined companies.
25 Q  Okay.  So this is kind of, I guess, if you will, the blueprint

Page 105

1  for how you were going to go about performing your job
2    responsibilities?
3  A  Yes.
4  Q  Were you, as the COO of Braintech, as of the date of the
5    closing, the person in charge of integrating the three
6    companies?
7  A  What do you mean "integrate"?
8  Q  Well, there are three disparate companies that came together
9    as a result of this transaction, correct?
10 A  Yes.  Let me clarify.  My job was threefold.  One was to
11    manage the overall technology of the combined companies.
12    Secondly, it was to oversee the sales relationships of all the
13    combined companies, and third, the operations.  I was
14    specifically excluded from handling legal and financial
15    representations in my employment agreement.  So my job was to
16    help oversee the sales, help oversee the technology of the
17    combined companies, and direct overall operations.
18 Q  Okay.  Did the company, at the time, after the transaction was
19    completed, August 12th of 2008, did the company have a chief
20    technology officer at that time?
21 A  Yes.
22 Q  Who was that?
23 A  His name was Babak Habibi, B-A-B-A-K, H-A-B-I-B-I.  He was
24    also a cofounder of Braintech.
25 Q  Okay.  So if Mr. Habibi was the chief technology officer, how

27 (Pages 102 to 105)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 130

1  Q  Did you receive a $15,000.00 signing bonus?
2  A  It was called that, but it was really, because of my financial
3     condition, some extra money give to me up front as my salary
4     and then my later paychecks were smaller because of this. It
5     was really -- Let's say the salary is $1,000.00 per paycheck.
6     So he essentially gave me three or four thousand dollars up
7     front because I had financial issues, and then later on I
8     didn't get those $1,000.00 payments because he said, "Well,
9     I'll take this money from future paychecks and pay you more up
10    front." It wasn't like on top of my salary. It was just like
11    more money given up front and then less money given later.
12 Q  It was $15,000.00, though, right?
13 A  Yes.
14 Q  Did Mr. Weidinger tell you what you had to spend that on?
15 A  No, he didn't.
16 Q  What did you spend it on?
17 A  I spent it on personal expenses.
18 Q  That was solely your decision, wasn't it?
19 A  Yes. At that point I was an employee. I was free to use my
20    paycheck as I wished.
21 Q  How about the $7,500.00 in partial loan reimbursement you paid
22    yourself out of the $15,000.00; what did you do with that?
23 A  I don't recall.
24 Q  How much of the $100,000.00 that you received in advance was
25    used either on you to pay loan reimbursement or to pay

Page 131

1     professionals who you hired to do the deal with Braintech?
2  A  I don't recall. I would have to look at the exhibits. I
3     don't know what page you're looking at.
4  Q  Could you look at page 63-of-65? It's a little further into
5     the tabbed section there, Mr. Shafi.
6  A  Okay. What is your question?
7  Q  My question is how much of the $100,000.00 was used to pay
8     professional fees or to pay, basically, yourself?
9  A  It's all spelled out here.
10 Q  Yeah. Can you add it up for me?
11 A  You want me to add these numbers up?
12 Q  It's not difficult. I can do it for you, if you'd like, but
13    you're the witness. It would make more sense if you did it.
14 A  Well, if you add these numbers they add up to that total down
15    below.
16 Q  Let's just do it this way then, Mr. Shafi. You used $9,000.00
17    of it to pay your own taxes, right?
18 A  Yes.
19 Q  Okay. You added $7,500.00 to that to Tishkoff, we're going up
20    from the bottom there, professional fees, right? Do you see
21    that; $7,500.00 Tishkoff, second payment?
22 A  You're looking at page 64 now?
23 Q  No, I'm looking at page 63, sir, reading up from the bottom.
24    We started with the $9,000.00 tax bill, right?
25 A  That's in the middle of the page, not at the bottom.

Page 132

1  Q  Right. But we're reading up from there.
2  A  Okay.
3  Q  Do you see that?
4  A  Yeah, I see the 9,000.
5  Q  All right. So you used 9,000 of it to pay your -- I guess
6     that's quarterly taxes or back taxes?
7  A  I don't recall.
8  Q  All right. A tax obligation that you had, right?
9  A  Yes.
10 Q  You, personally?
11 A  I don't recall. I don't recall if they were for me or for
12    Shafi, Inc.
13 Q  Okay. $7,500.00 to professional Tishkoff, second payment?
14 A  Yes.
15 Q  What were those fees for?
16 A  I believe they were to help with the debt payment plans that I
17    had created with Shafi, Inc. His primary engagement was to
18    help with the debt alleviation, payment plan agreements with
19    various vendors and such.
20 Q  So the payment, though, the 7,500 was to pay his fees. It
21    wasn't to be used to pay people who he was striking deals
22    with?
23 A  That's right. This was his fee.
24 Q  Then you reimbursed yourself for $7,500.00, partial loan
25    reimbursement, right?

Page 133

1  A  I don't recall for sure, but I believe these are personal
2     payments I had made into Shafi, Inc. that were being repaid
3     back to me. I think that's what it was. I don't recall
4     exactly.
5  Q  So then you paid $3,000.00 to one of your professionals,
6     Rukkila?
7  A  Rukkila.
8  Q  That's the first one I've gotten right. Rukkila, your
9     accountant, right?
10 A  Yes.
11 Q  Was that work that he had already done or work that he was
12    going to do?
13 A  I don't recall.
14 Q  Glenn Smith; he was another lawyer?
15 A  Yes.
16 Q  And you paid him $5,000.00?
17 A  Right.
18 Q  And then Tishkoff you paid another $7,500.00 to?
19 A  Yes.
20 Q  So that doesn't leave very much out of the 50,000, does it? I
21    mean, that's almost 40 or so thousand out of the 50,000?
22 A  Correct.
23 Q  What was that money supposed to be used for?
24 A  For the financial obligations that I had in front of me,
25    personally and professionally.

34  (Pages 130 to 133)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

## Page 138

```
1      Controls, to the professionals, and word got out that
2      Braintech doesn't honor its agreements.
3    Q   Shafi doesn't honor its agreements, right?
4    A   That's not the point. The point is Braintech took on these
5      debt obligations. We're talking about the side letter here.
6      There is a debt schedule that they agreed to. There were
7      agreements in that debt schedule that they were obligated to
8      pay after the closing, month by month, amount by amount,
9      creditor by creditor. It was all laid out very explicitly.
10   Q   Right.
11   A   It's in the schedules. And Braintech decided, and it wasn't
12     my call. If I was responsible for the financial payments of
13     Braintech I would have done it. But I was told specifically
14     in the agreement that I would be kept out of legal and
15     financial decisions and operations. All I had to do was
16     execute the sales strategy and the technical strategy. And
17     even that was stymied. Even that was taken away from me. So
18     when I got there and I started to try to do something I felt
19     powerless. I was given so much authority on paper, and it did
20     not exist once I got into Braintech.
21   Q   So your contention -- I think I had this right, based on
22     reading the complaint, which we're going to look at, is that
23     Braintech did all this stuff, made all these agreements and
24     whatnot, with the intention never to honor them?
25   A   That's right.
```

## Page 139

```
1    Q   Never to pay off the creditors to Shafi, Inc., right?
2    A   That is our contention.
3    Q   How -- Well, first of all, what evidence do you have that
4      allows you to look into the mind of the people of Braintech
5      before you got there that tells you, Mr. Shafi, that they
6      never intended to honor those commitments?
7    A   I was induced by Weidinger that he would take care of paying
8      the debt. He would employ me and pay me this salary. He
9      would give me stock. This was a package deal. He was going
10     to do all these things, and I had to do my part. I got there
11     and I found out that he had absolutely no intention. Now, I
12     cannot speak because I'm not in his brain. My brain is not in
13     his brain. Therefore, I cannot think like him. I don't know
14     what he's thinking. I can just tell you facts. I can tell
15     you the facts that he induced me, brought me into this, gave
16     me a package deal, said, "You do all these things." We agreed
17     to all this stuff, and I got there and blow by blow, agreement
18     by agreement, so much was taken away.
19   Q   And my question to you is what facts do you have that you're
20     going to share with us today that are going to tell us that
21     you knew, back when all this stuff was being done, that
22     Mr. Weidinger intended not to honor any of it? That's the
23     fact I want to know.
24   A   I did not have any indication at the time of the closing that
25     he was going to breach all this. I did not have any facts at
```

## Page 140

```
1      the time. I relied on his inducement. I relied on his word.
2      I relied on the representations he made. I relied on all
3      these due diligence periods. I relied on all these
4      agreements. I relied on all the things he said he would do.
5      And at the end of the day, after the closing, I found out that
6      my reliance was sorely misplaced. Everything that he had
7      agreed to do he dismantled. He took away my authority. He
8      wouldn't pay small bills. He wouldn't enable me to do the
9      sales. I mean, he was out to wreck the whole place, and he
10     did. He did a very good job. He did an excellent job of
11     wrecking the company.
12   Q   So your testimony is at some point after the closing you
13     learned that it was his grand plan all along to wreck the
14     company?
15   A   I knew right away after the closing. I mean, I'll tell you
16     one thing I recall, and that is right after I joined the
17     company and we went to Vancouver he said, "I don't want you to
18     use your titles anymore." And I had an argument with him
19     within a week of joining Braintech, a serious heated argument.
20   Q   My question, again -- And I understand what you're saying,
21     sir. I fully comprehend it. My question is very simple,
22     which is when, if ever, did you learn facts after the closing
23     that suggested to you -- by which you learned or otherwise
24     have knowledge that Braintech, when it was doing all this
25     machination, I think you said it was five inches of paper,
```

## Page 141

```
1      they created this elaborate ruse, what evidence do you have,
2      other than your speculation, what evidence do you have that
3      they set out to do this?
4    A   I did not know before the closing that they were going to do
5      this. But when I closed the deal with them and I started to
6      see what was happening, the proof I have, the evidence I have,
7      is the nonperformance. They did not perform on the debt
8      schedule. They did not perform on my employment requirements.
9      They did not perform on the employee cooperation I needed.
10     They did not perform on the office. They did not -- I mean,
11     that's the proof I have, which is facts.
12   Q   So their nonperformance you translate to they were never going
13     to do any of this stuff to begin with?
14   A   It was clear. I mean, I can see if one or two things are
15     breached and there is an issue. You know, you can fool some
16     of the people all the time. You can fool all the people some
17     of the time. But you can't fool everybody all the time, and
18     that's what it was. I mean, there was a systematic breakdown
19     of all these understandings; systematic, broad-based,
20     agreement by agreement. I mean, one would be hard-pressed to
21     see what he did honor.
22   Q   Just drawing your analogy a little bit further, wouldn't this
23     just have been a case then of Braintech fooling itself? I
24     mean, what would it have possibly to gain if it gave you all
25     these inducements to get something that turned out to be
```

36 (Pages 138 to 141)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 142

1   completely worthless because all they were going to do is tank
2   the company anyway?
3   A   I can't conjecture for Braintech because I'm not Braintech.
4   All I can tell you is what I experienced.
5   Q   And your experience of nonperformance is what leads you to
6   infer that they never wanted to do any of this stuff anyway or
7   they were never planning to carry out that?
8   A   Right. Exactly. I mean, I have no idea, leading up to this
9   acquisition, that they had bad intentions. We had agreed to
10  all these things over time and made a grand plan to go do all
11  these things with all these requisites and all these
12  arrangements and all these details. And then when I got there
13  I found out that Braintech was not going to do these things.
14  Q   So please tell me then how Braintech has benefitted from any
15  of this wrong conduct that you allege.
16  A   I can't answer that. I'm not -- I can't answer for Braintech.
17  I can answer for myself, but I don't know why he did that. I
18  know that it caused a lot of damage to me. I know it caused a
19  lot of problems for me. But I can't speak for Braintech when
20  you ask, how did they benefit by it? I don't know if they
21  benefitted or not.
22  Q   Well, you read the financials that Braintech has, right?
23  A   Yeah. So what?
24  Q   You got three million shares of Braintech stock?
25  A   Hm-hmm.

Page 143

1   Q   You don't ever read about the SEC filings the company has?
2   A   I do, from time to time. But that's Braintech's decisions.
3   I'm not the person dealing with that.
4   Q   Right. So it's, I guess, your testimony that they really
5   haven't gained from anything here that they did to you?
6   A   I'm saying it's not for me to make that statement or not.
7   That's Braintech. Ask Braintech. Don't ask me.
8   Q   Are you aware of whether they're using any of your what we'll
9   call the Shafi IP customers, goodwill, any of that?
10  A   I have no idea, because I have no access to that property
11  anymore. I have no access to their people. I have no idea
12  what they're doing or not doing. I have no idea.
13  Q   So you have no level of awareness at all about what they're
14  doing?
15  A   No, I don't.
16  Q   We're not going to go through these in order, but I'm going to
17  show you what has been marked as Shafi 5 and ask you to take a
18  look at that. Let's just go through these. Starting on page
19  2, Mr. Shafi, Jim Dara. Have you had any conversations with
20  Mr. Dara since you left the company?
21  A   No.
22  Q   How about Mr. Habibi; have you had any conversations with him
23  since you left the company?
24  A   No.
25  Q   How about Donna Burr?

Page 144

1   A   Yes.
2   Q   What conversations have you had with Donna Burr?
3   A   She was terminated the same day I was. Prior to Braintech she
4   had been my office manager for 10 years, close to 10 years,
5   and she basically was a one-man or one-woman army. She did
6   all my administration work, so she was a very close colleague.
7   And yes, I did meet her afterwards and we just shared our
8   experiences at Braintech. That was it.
9   Q   Did you tell her you were suing the company?
10  A   Oh, yeah. She's aware of it.
11  Q   Is she aware because you told her?
12  A   She was aware even before that.
13  A   She was aware that you were going to sue the company before
14  you sued it?
15  A   No. She knew that there was litigation going on. I don't
16  know exactly what date I met her, but she knew that there was
17  a lawsuit in place.
18  Q   How many times have you met with her since you both left the
19  company on the same day?
20  A   I don't recall. I don't recall exactly how many times.
21  Q   Does she live near where you live?
22  A   Yes, she does.
23  Q   Is she a neighbor?
24  A   I wouldn't say she's a neighbor.
25  Q   Is it more than 10 times that you've talked since you left the

Page 145

1   company?
2   A   I don't recall.
3   Q   More than 30?
4   A   I don't recall.
5   Q   More than a hundred?
6   A   I don't recall.
7   Q   More than a thousand?
8   A   I don't recall.
9   Q   Okay. You can't really narrow it down at all? Is this
10  someone you speak to every day?
11  A   I'm sorry?
12  Q   Do you speak with her every day?
13  A   No, I don't.
14  Q   But you can't recall whether you talked to her a thousand
15  times or one time or somewhere in between?
16  A   I don't.
17  Q   Does she work with your new company?
18  A   I'm sorry?
19  Q   Does she work with your new company?
20  A   No, she does not.
21  Q   What does she do for employment?
22  A   I don't know.
23  Q   How about Heather Greenlay?
24  A   Yes. What about her?
25  Q   Have you spoken with her since you left the company?

37 (Pages 142 to 145)

Electronically signed by Susan Hans (201-320-999-0764)          2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 170

```
1            (At or about 3:23 p.m., a brief recess was had off
2        the record, and the deposition was resumed at or
3        about 3:31 p.m.)
4    Q   (Continuing by Mr. Greeves):  Mr. Shafi, I'm showing you what
5        has been marked as Shafi 2.  If you could please take a look
6        at that.
7            MR. GREEVES:  Counsel, here is a copy for you.
8    Q   (Continuing by Mr. Greeves):  Mr. Shafi, I just want to go
9        through a few of these with you.  If you could, sir, referring
10       to Shafi 2, if you could please turn to page 18 of those
11       request for admissions.  And just to identify these for the
12       record, is it your understanding these are discovery responses
13       that were prepared by your Counsel in response to Braintech's
14       first request for admissions?
15   A   Yes.
16   Q   Did you participate in the drafting of this document?
17   A   I believe so.
18   Q   All right.  Looking at page 18, request to admit number 62, do
19       you have that in front of you, sir?
20   A   Yes.
21   Q   It says, "Admit that you have deleted Braintech e-mails," and
22       your response is "Admitted."  Do you see that?
23   A   Yes.
24   Q   What Braintech e-mails is it that you have deleted?
25   A   Any spam.  Spam e-mails.
```

Page 171

```
1    Q   So other than spam e-mails, are you referring to anything
2        other than those?
3    A   No.
4    Q   So you presently have somewhere all the e-mails that you ever
5        had when you were with Braintech?
6    A   Yes.
7    Q   Where are those?
8    A   They're on my laptop.  I have backups.
9    Q   So you have a laptop that has a folder or something of
10       Braintech e-mails on it?
11   A   Yes.  And many subfolders.
12   Q   Were those documents produced in this litigation?
13   A   Yes.  They're in the discovery disclosures.  We gave a list of
14       dozens of e-mail folders organized by dates, organized by
15       employees, before LOI, at LOI, after LOI, at closing, after
16       closing, leading up to my termination.  I've kept a very
17       elaborate e-mail record.
18   Q   Now, on request to admit number 63, it asks you to admit that
19       you have deleted SI or SII e-mails, referring to your prior
20       companies.  And the response, again, is "Admitted"; is that
21       correct, sir?
22   A   Yes.
23   Q   What are you referring to there?
24   A   Spam e-mails.
25   Q   Is that the only thing you're referring to when you say
```

Page 172

```
1        "Admitted" with regard to those responses?
2    A   Yes.
3    Q   Let's turn to request to admit number 72.  "Admit that the
4        RELIABOT software source code was not delivered to Braintech
5        until after August 12 of 2008," and your response, again, is
6        "Admitted," sir; is that correct?
7    A   Correct.
8    Q   Why is it that the software source code was not delivered to
9        Braintech until after the closing date?
10   A   Two reasons.  Number one, there was no obligation to deliver
11       source code, because it was the intellectual property of
12       Shafi, Inc., and there was no obligation to give Shafi, Inc.'s
13       intellectual property to Braintech until the deal was closed.
14       The second reason is I was never asked to.  And even if I had
15       been asked I would have said, "No, I'm not going to give over
16       source code until the agreement is completed."
17   Q   Because that just wasn't required by the agreement, right?
18   A   Yes.
19   Q   So you were honoring the letter of the agreement then?
20   A   Yes.
21   Q   Are you aware of the many problems Braintech encountered after
22       you turned over the source code to it?
23   A   Define problems.
24   Q   Well, by define, I mean the RELIABOT eVF comparison and
25       evaluation that Dr. Boca performed that basically showed that
```

Page 173

```
1        the software was worthless.
2    A   I completely and want to put it on the record vehemently deny
3        those charges.  I completely disagree with this report.  I
4        contend that RELIABOT code was better than eVF ever was.  All
5        the eVF ever did was work with one robot, ABB, and all it ever
6        did was work with some engines and piston heads.  That's the
7        bulk of what they had.  They had one customer.  They had no
8        exposure beyond that.  RELIABOT, on the other hand, had worked
9        with hundreds of companies, many different markets, several
10       different countries.  RELIABOT source code was much, much more
11       superior to eVF.  But Braintech's engineers did not want to
12       believe that because their own baby was not so good as
13       RELIABOT.
14           Braintech had kept -- Weidinger had kept
15       Braintech employees and engineers out of the picture until the
16       deal was completed.  And so when I joined Braintech and
17       RELIABOT was disclosed they saw how extensive it was, how many
18       different robots it worked with, how many different solutions
19       it could do, and there was even a customer -- I mean, an
20       employee who documented how extensive RELIABOT's code was.  So
21       I believe that -- I totally disagree with the conjecture or
22       the contention that eVF was superior.  eVF was inferior.
23   Q   Okay.  How were you made aware of the findings of Dr. Boca
24       when he undertook to examine the software?
25   A   Well, it was brought up in discussions that this had been
```

44  (Pages 170 to 173)

Electronically signed by Susan Hans (201-320-999-0764)                2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 174

1    performed and I realized I am the COO --
2  Q  In what? It was brought up in discussions of what? I didn't
3    understand.
4  A  It was brought up in discussions that a report had been
5    prepared by Braintech engineers about RELIABOT. I was not
6    aware of that. Even though I was COO, Weidinger and the other
7    engineers did not make me aware that they were preparing a
8    report like that. I had to actually ask Babak Habibi for this
9    report, and he finally sent it to me. And I looked at it and
10   I totally disagreed with this. Now, this is at a time when we
11   were supposed to work together and combine a product, combine
12   product of the two companies. But all Weidinger created was
13   this contention that RELIABOT and all this stuff that he did
14   was, in his view, worthless. That's why I refer you to box
15   83. I mean, how can you say that hundreds of companies over
16   17 years prospered from RELIABOT, put equipment worth hundreds
17   of millions of dollar at work? How can you say that that's
18   worthless? Look across the river. You'll see Chrysler
19   assembly plant, Windsor assembly plant. The stow-and-go
20   minivans are made there. Those stow-and-go minivans right now
21   are being made inside that building with RELIABOT software.
22   Two thousand vans have to be made every day at a starting
23   street value of $20,000.00 per van. Forty million dollars
24   worth of responsibility in that building, minivans that you
25   see on the streets every day are put together with the

Page 175

1    RELIABOT software, and there is no backup plan. If my
2    software doesn't work the whole plant shuts down and all the
3    supplier plants shut down. And, yet, Chrysler's senior VP,
4    Frankie Ewasyshyn, decided that he would go to Shafi, Inc. and
5    buy this software. F-35 fighter jet aircrafts, $64,000,000.00
6    planes, are tested in Texas with RELIABOT software.
7          There is no way you can say, in front of the
8    jury, that this stuff is worthless. I would point out to the
9    hundreds of purchase orders, millions of dollars worth of
10   purchase orders, placed by all these companies in box 83 and
11   you would not be able to tell that I fooled all these
12   companies, that they all bought worthless stuff.
13         Now, ABB, on the other hand, and Braintech had
14   one thing and it worked with engines, and that's all eVF
15   really did. That was the bulk of their offering. So RELIABOT
16   was far superior in robots, in customers, in markets, in
17   responsibility per day that these plants had to produce.
18   Forty million a day responsibility relied on RELIABOT in that
19   building right now. It's been running for seven years.
20  Q  Do you believe that there is a market for selling or licensing
21   RELIABOT based products to others in the market right now?
22  A  Well, that's a question I will answer as follows. The
23   algorithms and the solutions are world-class. Now, it's been
24   three years and companies offer new hardware products. The
25   hardware in many offerings from Sony, from other robot

Page 176

1    companies, vision companies, has changed. RELIABOT is not
2    that applicable now because it has not been updated in three
3    years. But the product, itself, is breakthrough. I mean,
4    there's a lot of things that many companies could not do.
5    Shafi, Inc. solved the first of its kind on a routine basis.
6    We constantly solved things that nobody else in the industry
7    did.
8          When I was a 19-year-old person I wrote a
9    program to solve a Rubik's cube and a copy right from
10   the Library of Congress. There were only three programs in
11   the world at that time. Apple Computer Company had a program,
12   Ohio State had one and mine was one. I have a registered copy
13   from the Library of Congress. I'm that kind of a person. I
14   don't mean to brag here, but I have some of the most
15   innovative products in the robotics industry, and that's what
16   RELIABOT was.
17         But Braintech refused -- Their engineers had
18   this ivory tower mentality sitting in Vancouver. They had
19   just dealt with one customer. Weidinger told me Braintech is
20   a one-horse customer, one-horse company. They have one
21   customer called ABB and that's all they sold to. They had no
22   market exposure. They didn't work with different robots.
23   There was nothing but one thing that they really did, and
24   that's why he came to me and he said, "My agreement is running
25   out. I need somebody to help me get into other markets." And

Page 177

1    that was the whole point. So the contention that RELIABOT was
2    useless is utterly, utterly worthless.
3  Q  Well, the contention there that RELIABOT is useless and
4    worthless to Braintech has been borne out, hasn't it?
5    Braintech has never sold RELIABOT to anybody.
6  A  Because they never invested in anything. They did not want to
7    do training. I put them in touch with my former employees to
8    help them train. Not only did Braintech not set up an office,
9    they refused to train on it. They refused to learn it. They
10   refused to put it on some demo robot so we could show
11   something to the world. I actually took Braintech, Jim Dara
12   and Dan Bultman (ph), another employee, to a plant in Ohio. I
13   showed them RELIABOT running in action before the sale. So it
14   wasn't any surprise that this stuff didn't work. I mean,
15   hundreds of companies have benefitted from it. I have more
16   than a hundred robots running at Ford Motor Company on
17   RELIABOT.
18  Q  Are you aware of any revenue Braintech has made off of
19   RELIABOT?
20  A  I don't know because I'm not in their offices and I don't look
21   at their accounting books. I don't know.
22  Q  Do you think Dr. Boca had an agenda in preparing this -- doing
23   this comparison and evaluation?
24  A  I can't speak for him because he did it without my
25   instruction, without my knowledge. He was close to

45  (Pages 174 to 177)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

## Page 178

1     Mr. Weidinger. I don't know the nature of those discussions.

2    I can't represent them or characterize them. I can just tell

3    you that I flatly disagree with that report that was put out.

4  Q  Can you just take a look at this, and your Counsel can look at

5    it, too. I just want you to confirm. We're not going to mark

6    it. But is this the report in question that we're talking

7    about?

8  A  It might be, because it has been a long time since I saw it,

9    and I utterly disagree with this document.

10  Q  So it might be, it might not be. You don't know?

11  A  I know that this is wrong.

12  Q  Well, you told that to Mr. Weidinger, didn't you, "This is

13    wrong"?

14  A  Yes.

15  Q  What did he say?

16  A  He's not a technical person at all. He doesn't know a gantry

17    robot from an articulated robot. I mean, these are common

18    terms. I asked him two weeks before, "Hey, Rick, do you know

19    anything about gantry robots?" "I never heard of it." He was

20    a total outsider to this industry. He just sailed in, screwed

21    up a few companies, and has gone away. Nobody really knew

22    him. He did not know anything about this. You could give him

23    a diametrically opposite report and he wouldn't know the

24    difference. He doesn't know what this stuff means.

25  Q  So you had to talk him through this?

## Page 179

1  A  I didn't go over this document because I flatly disagreed with

2    it. I didn't sit down with him and say, "Rick, this is wrong,

3    this is right, this is wrong," no. I just told him this is

4    all wrong.

5  Q  He asked you to do that, though, didn't he?

6  A  Asked me?

7  Q  Yes, sir.

8  A  No. He didn't ask me to tell him about this report.

9  Q  No, no. Sorry. That was a poor question. Mr. Weidinger

10    asked you, or said to you, "If you feel that way, Mr. Shafi,

11    why don't you prepare a response to this to give to Dr. Boca."

12  A  I don't recall that.

13  Q  So you don't recall any conversation after you told Rick that

14    this report is terrible and inaccurate where he told you, in

15    response, "If you think it's terrible and inaccurate, why

16    don't you rebut it?"

17  A  I don't recall. I don't recall the nature of the discussions

18    after this report was revealed to him. I do know that I told

19    him that I disagreed with it.

20  Q  Did you ever take any steps beyond telling him that you

21    disagreed with it?

22  A  No.

23  Q  You never sought to undermine the work -- That's not the right

24    word. You never sought to rebut the work that Dr. Boca had

25    done in this report?

## Page 180

1  A  No. I felt no need to because it was counterproductive. I

2    was the COO. My job, my assigned job, was to combine RELIABOT

3    and eVF and try to make something better out of the combined

4    technologies, a new hardware platform, look for new customers.

5    But I was not given a chance to execute that. I was not given

6    Braintech's code. I was not given authority to manage these

7    engineers. They ran their own jobs. They did not listen to

8    me. They were 3,000 miles away. All I could do was do a

9    phone call with them, and a lot of times they just flat out

10    did not listen to me.

11  Q  Do you think this document made it harder for you to do your

12    job?

13  A  This and many other things, yes.

14  Q  I'm just talking about this now.

15  A  Yes, it did. Because it basically showed to me that although

16    Braintech had, and Weidinger had, induced me to come to

17    Braintech and made all these covenants and put this in the

18    spirit that we were going to work together and we were going

19    to put something together and make something better out of

20    this whole combination, I found that this was nothing but

21    undermining me. And this was done without my knowledge,

22    without my understanding. I mean, it's one thing to sit down

23    at a table and say, "Hey, let's look at pluses and minuses in

24    our products. Let's see what we can do." None of that. This

25    was prepared behind my back just to show that my product was

## Page 181

1    not good. I totally disagree with that. And you don't have

2    to rely on my word, and the jury doesn't have to rely on my

3    word. The jury can only look at those purchase orders and

4    those customers by the dozens out there.

5  Q  The jury is going to wonder, sir, why, after you invested

6    millions of dollars and years of your life in this product and

7    somebody brought it to your attention and said it sucked that

8    you didn't do anything in response to that.

9        MR. MURPHY: Object to the characterization.

10    That report doesn't say it sucked.

11        THE WITNESS: I knew better. I knew better

12    that -- I knew better. I knew that RELIABOT was much better.

13    I knew these guys were a bunch of ivory tower people that were

14    used to their guaranteed -- They did not know how to sell on

15    the street. They had no idea. They had this agreement. They

16    got these regular checks out of ABB. They were sitting in

17    their cushy -- I mean, the first time they would ever respond

18    to a customer was at 10:00 Vancouver time, 1:00 here. That's

19    the kind of support they gave to the industry here.

20  Q  Wasn't it your job to make that better and to integrate the

21    two products?

22  A  Yes. But they did not listen to me, and Weidinger gave me no

23    support. He said he would make all that possible for me

24    before I joined the company, before the agreements. He

25    induced me. He said, "Yes, we can do this. You'll manage the

46 (Pages 178 to 181)

Electronically signed by Susan Hans (201-320-999-0764)        2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 226

1      Yes. Did I feel that we could do something together that was
2      worthwhile and would add value to the market? Yes. I did
3      feel that way. But the process, the legal process of trying
4      to do a deal with this man was so difficult and it was taking
5      so much time out of my commitments that it was a hard call.
6      And that's why I bit my tongue several times, I didn't send
7      e-mails, a couple of these e-mails, because I felt, well,
8      another day may take care of it. But I was also under a clock
9      of payment obligations, and I had to either keep working with
10     Braintech to find this money or go pursue my other options. I
11     think you understand that by now.
12 Q  Okay. So with regard to the statement you made at the bottom
13     of this e-mail, unsent e-mail, that says, "To answer your
14     question below, Shafi's IP is free and clear," is it your
15     understanding that as of June 1st of 2008 you could sell Shafi
16     IP free and clear?
17 A  Yes.
18 Q  Even without discussing the matter with your bank?
19 A  Well, the bank was -- How do I say it? The bank was not
20     foreclosing on Shafi, Inc. I was working to see and I had
21     made arrangements to mitigate that loan that they had given to
22     Shafi, Inc. And it is in the record that we made it clear to
23     Braintech that that was there and, ultimately, ended up in the
24     debt schedule. So, yes, the IP was free and clear. The bank
25     had not taken it. I mean, there was a threat that they would

Page 227

1     take it, and we had represented all that also in the
2     litigation summaries. We said, "If these things don't happen
3     we stand to lose this, this, and that."
4 Q  Did the bank have a lien on the IP as of June 1, 2008?
5 A  I don't think so.
6 Q  Did they have first priority?
7 A  I don't recall if they had first priority.
8 Q  Well, did they have a priority at all?
9 A  They had a say in it because the loan that was taken from them
10     was against the company's assets.
11 Q  They were a secured creditor, right?
12 A  Right.
13 Q  Secured by, among other things, the IP?
14 A  Yes.
15 Q  How would you be able to represent you could sell this free
16     and clear if they had a security interest on it?
17 A  Well, my intention was that if we were going to do a deal that
18     it would also go along with all these other obligations. I
19     mean, we were talking about a partnership, a joint venture, if
20     you will. And we were looking at if that was the case then,
21     you know -- I was disclosing my financial situation to them,
22     and part of the deal was that there would be a remedy to that.
23     I mean, that's the whole point of me working with them.
24 Q  So what you meant, I guess, to say is, "Assuming that somebody
25     pays my debt to the bank I could sell this asset free and

Page 228

1     clear"?
2 A  Yeah. That was the basic idea.
3 Q  All right.
4        (Whereupon Exhibit Number 15 was marked for
5        identification, at or about 5:10 p.m.)
6 Q  (Continuing by Mr. Greeves): Mr. Shafi, I've handed you what
7     was marked as Shafi 15. I would ask you to take a look at the
8     first -- We'll be dealing with the first four pages of that.
9 A  The first four pages?
10 Q  Hm-hmm.
11 A  Okay. Give me a couple minutes.
12 Q  Yes. Absolutely. Actually, why don't you go ahead and read
13     the whole thing?
14 A  Okay. Okay, I'm ready.
15 Q  You've had a chance to look at that?
16 A  Yes.
17 Q  Are you able to identify that as a series of e-mails between
18     you and Mr. Weidinger that also included, I guess, Mr. Dara?
19 A  Yes.
20 Q  Just the three of you?
21 A  Yes.
22 Q  Okay. Starting at the first e-mail, which is on page 5-of-5,
23     Mr. Weidinger here remarks that he was reviewing the revenue
24     forecast prepared by you, meaning Mr. Dara, and Adil,
25     A-D-I-L -- I guess that's a reference to you, sir, correct?

Page 229

1 A  Yes.
2 Q  And it says, "Why do we only have 1.65 million in enhanced-
3     based sales for 2009? This seems incredibly low, even lower
4     than last number presented and will not support doing this
5     partnership." Were you surprised by Mr. Weidinger's comment
6     in that regard?
7 A  Yes, I was.
8 Q  And why were you surprised by that?
9 A  Here's why. We were, at this point in time, still
10     contemplating a strategic partnership. He wanted me to help
11     grow sales for Braintech. As Braintech's deal with ABB was
12     coming to an end the end of 2008, he wanted revenue from
13     sources other than ABB. And as we know in the complaint, ABB
14     already had $6,000,000.00 worth of Braintech software they had
15     been unable to sell in the market, so he knew he was not going
16     to get another deal from ABB. Like before, he was running out
17     of time. He wanted revenue.
18        Now, in these series of e-mails I repeatedly
19     asked Rick, "What do you need to do? How much revenue do you
20     need to create?" And he kept coming at me and saying, "You
21     tell me." And it was like -- See, here was my dilemma -- And
22     I'm answering your question. My dilemma was, "Do you need to
23     make $50.00 or do you need to make $50,000,000.00?" I can put
24     a plan in place for both of those. Do you need to go to the
25     moon or do you need to go to Pluto or do you need to go to the

58  (Pages 226 to 229)

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

## Page 230

1 next galaxy? The point I was trying to ask him was, "What is
2 your need and I'll develop a plan for that?" And that plan
3 will reflect hiring, how many people we hire, what the timing
4 is, what products you sell first. He would, in this
5 partnership -- This partnership, basically, was falling apart
6 at this time, and one of the problems was, as I've mentioned
7 before, his insistence that the partnership be legally and
8 financially handled by Braintech, which I was completely
9 opposed to. But the other big problem was this revenue
10 projection thing. He wanted me to play a guessing game. I
11 said, "Rick, do you need to make five million? Do you need to
12 make 10 million? Do you need to make 50 bucks? What do you
13 want to do and I'll build a plan for you?" But he would not
14 answer that. So Dara and I -- Dara was actually a Braintech
15 employee, sitting in coffee shops we came up with a number of
16 assumptions for revenue. We had to have this or that. So we
17 laid out -- In the absence of Rick Weidinger telling us how
18 much sales he needed. And he was the guy who knew what
19 Braintech needed to keep its financial obligations sans ABB.
20 But ABB was going to go away. Rick had a very good idea what
21 it was going to take financially to keep Braintech afloat, but
22 he would not share with me what Braintech needed in revenue.
23 So he wanted me to guess at numbers and Dara and I came, at
24 one point, 6.5 million. We guessed and we said, "Here's the
25 assumptions and here's -- And he came back and he said, "Oh,

## Page 231

1 that's not going to be close." So I was like, "What do you
2 want?" And he kept saying, "You tell me what you can do." I
3 said, "Rick, I can sell 50 bucks. I can sell 50,000,000. You
4 tell me what you want to do and I'll put a plan together."
5 That was our source of frustration. Now, I don't want to jump
6 the gun, so I want to stop and I'll let you ask the next
7 question.
8 Q   Have you ever before -- I know you threw this 50,000,000
9 figure out, but had you ever, before, developed a revenue plan
10 where you're going to generate $50,000,000.00?
11 A   No. But the RELIABOT software ran on equipment worth
12 $300,000,000.00 every day. We were a small company with a
13 large footprint. $300,000,000.00 worth of equipment ran every
14 day from Japan to France to Germany to China to U.S. to
15 Detroit to Windsor on RELIABOT software. Some very key
16 companies with very critical programs relied on Shafi.
17        Realize I began this company with a thousand
18 bucks. I started this company as a graduate student with a
19 thousand dollars and I took it to sales of 1.2 million without
20 any external investors and the performance that
21 $300,000,000.00 worth of equipment ran on Shafi software. So
22 Shafi, Inc. was not a multimillion dollar company, but it had
23 begun from very humble roots, it was a thousand dollars, and
24 got me to 1.2 million dollars.
25        Now, when Weidinger came and asked me and said,

## Page 232

1 "Help me with revenue," I said, "Okay, Rick, I'll help you,
2 but tell me what you want?" And he wouldn't answer that
3 question. You'll see in the e-mails the refrain happened
4 constantly. It's a repeating theme in these e-mails around
5 this time. I kept saying, "Rick, how much money do you need
6 to make?" And he would say, "Well, you tell me." And I was
7 like, "Okay. Well, how about this?" "Well, that's no good."
8 So we were throwing numbers at him, Dara and I, his own
9 employee and I were throwing numbers at Rick and he was
10 saying, "No, that's no good. That's no good." I sense now
11 that he just didn't want this to succeed. It was just his
12 excuse to say no matter what we threw at him he would say no,
13 because he wanted this partnership to fail and he wanted to
14 switch to the acquisition discussions and that's exactly what
15 happened.
16        The reason the partnership agreements died is
17 because we could not agree on a revenue number and he said,
18 "Well, I can't do a deal," or "I will manage the legal and
19 financial aspects of this partnership," and I was not
20 agreeable to that. So that strategic partnership discussion
21 came to an end around the end of May, early June, 2008, and we
22 switched to an acquisition discussion.
23 Q   Wasn't one of the major critiques that Dr. Boca came up with
24 the fact that your product, RELIABOT, was not scalable such
25 that he could generate this kind of revenue off of it?

## Page 233

1 A   He is completely wrong. He is completely wrong because
2 RELIABOT software --
3 Q   I didn't ask you whether he was wrong. I just asked you if
4 that was a critique of his?
5 A   Yeah. He said many wrong things in that document. I don't
6 agree with that.
7 Q   That was one of the critiques he leveled on your product,
8 right?
9 A   Yes. And I disagreed with that.
10 Q   Okay.
11 A   Because we had demonstrated in the marketplace the
12 scalability. We would sell 20 licenses to Utica Enterprises,
13 and they could deploy it because it was scalable for auto
14 racking.
15 Q   I think when we talked before you said that Mr. Weidinger kind
16 of after this deal closed was very fixated on his government
17 work, right? Is that what you said?
18 A   Well, it's a whole different discussion item but, yeah, let's
19 get into government, okay.
20 Q   In this e-mail you seem to be the one pushing the government
21 work toward him; is that fair?
22 A   Yeah. Let me explain the background here so you understand.
23 Because he wanted to jumpstart government sales I felt that
24 that would be a good way to go. Here's why. Shafi, Inc. had
25 a blanket IP agreement with Michigan Tech. Now, Michigan Tech

Tri-County   Court Reporters
248-608-9250

Electronically signed by Susan Hans (201-320-999-0764)          2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 272

1    STATE OF MICHIGAN          )

2                              )    ss:

3    COUNTY OF KENT             )

4         I hereby certify that the foregoing attached pages

5    are a full and complete transcript of the proceedings held

6    on the date and at the place hereinbefore set forth.  I

7    reported electronically the proceedings held in the matter

8         hereinbefore set forth, and the testimony so reported was

9    subsequently transcribed under my direction and supervision,

10   and the foregoing is a full, true and accurate transcript of

11   my original electronic recording.

12

13                    Susan M. Hans

14                    Susan M. Hans, CER-8085

15

16

17

18

19

20   Notary Public

21   Kent County, Michigan

22   My Commission Expires:

23   July 12, 2013

24

25

Electronically signed by Susan Hans (201-320-999-0764)    2672d99d-361d-4ea4-bcc8-6a6792038bb6



TRI-COUNTY
COURT REPORTERS,
INC.

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of **ADIL SHAFI**

**Date:** July 30, 2010
**Volume:** II

**Case:** BRAINTECH v. SHAFI

Printed On: November 19, 2010

Page 273

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC.,

                                         CASE NO: 09-10454

            Plaintiff/Counter-Defendant,

v

ADIL SHAFI,

            Defendant/Counter-Plaintiff/
            Third-Party Plaintiff,

v

FREDERICK WEIDINGER AND
BRAINTECH, INC.,

            Third-Party Defendant/Counter-Defendant.
_____/

        Volume II of the Deposition of ADIL SHAFI,

taken before me, Susan M. Hans, CER 8085, on July 30, 2010, at 535

Griswold, Suite 1900, Detroit, Michigan, commencing at or about

9:15 a.m.


APPEARANCES:


BY:  JAMES P. MURPHY, ESQUIRE
BERRY MOORMAN
535 Griswold, Suite 1900
Detroit, Michigan  48226
Appearing on behalf of the Plaintiff.


BY:  GEOFFREY J. GREEVES, ESQUIRE
PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
2300 North Street, NW
Washington, DC  20037
Appearing on behalf of the Defendant, Frederick Weidinger and
Braintech, Inc.

Page 274

BY: ANNE WIDLAK, ATTORNEY AT LAW
SUSAN D. KOVAL, ATTORNEY AT LAW
NEMETH BURWELL, PC
200 Talon Centre Drive, Suite 200
Detroit, Michigan  48207
313-567-5921
awidlak@nemethburwell.com
skoval@nemethburwell.com
Appearing on behalf of the Defendant, Braintech, Inc.

Page 276

1       INDEX OF EXHIBITS
2    EXHIBIT           DESCRIPTION          PAGE
3    Exhibit 38        E-Mail               344
4    Exhibit 39        E-Mail               350
5    Exhibit 40        E-Mail               355
6    Exhibit 41        E-Mail               370
7    Exhibit 42        E-Mail               373
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 275

1                INDEX
2    WITNESS          EXAMINED BY         PAGE
3    ADIL SHAFI       Ms. Widlak          277
4                     Mr. Greeves         309
5                     ****
6
7             INDEX OF EXHIBITS
8    EXHIBIT           DESCRIPTION          PAGE
9    Exhibit 21        E-Mail               279
10   Exhibit 22        E-Mail               280
11   Exhibit 23        E-Mail               281
12   Exhibit 24        E-Mail               285
13   Exhibit 25        E-Mail               286
14   Exhibit 26        E-Mail               288
15   Exhibit 27        E-Mail               290
16   Exhibit 28        E-Mail               296
17   Exhibit 29        E-Mail               297
18   Exhibit 30        E-Mail               298
19   Exhibit 31        E-Mail               298
20   Exhibit 32        E-Mail               302
21   Exhibit 33        LinkedIn Information 306
22   Exhibit 34        E-Mail               309
23   Exhibit 35        Letter of Intent     313
24   Exhibit 36        E-Mail               328
25   Exhibit 37        E-Mail               333

Page 277

1                July 30, 2010
2              Detroit, Michigan
3                 9:15 a.m.
4
5
6              ** ** ** ** **
7         ADIL SHAFI,
8    was thereupon called as a witness herein and, after having been
9    first duly sworn to tell the truth, the whole truth and nothing but
10   the truth, was examined and testified as follows:
11          MS. WIDLAK:  Good morning, Mr. Shafi.  I'm Anne
12      Widlak.  We met yesterday afternoon or yesterday morning.  As
13      you know, I represent Braintech in this matter and I'm going
14      to be asking you a few questions this morning.
15          The same provisions apply that Mr. Greeves
16      explained to you.  Be sure to speak audibly, to let me finish
17      my question, and I will do everything in my power to let you
18      finish your answer so we have a nice, clean record.
19              ** ** ** ** **
20           EXAMINATION
21   BY MS. WIDLAK:
22   Q   I'm going to hand you -- I'm not going to mark this -- the
23      employment agreement that has already been marked as Shafi
24      Exhibit 1 and appears at tab five of Shafi Exhibit 1.  But for
25      your convenience, and your Counsel's convenience, you did

Page 278

1   identify this document yesterday as signed by you and
2   Mr. Weidinger; is that correct?
3   A   Yes.
4   Q   All right. After this document was executed by you and
5       Mr. Weidinger, were there ever any amendments, whether written
6       or verbal, to this document?
7   A   I don't believe so.
8   Q   You don't believe so? Or no?
9   A   I'm pretty sure it's no, but I would just say I don't believe
10      so. I don't think so.
11  Q   Okay. And I direct your attention to paragraph three on the
12      first page, and it indicates that you, identified as the
13      executive, shall report directly to Braintech's chief
14      executive officer. That would be Rick Weidinger; is that
15      correct?
16  A   Yes.
17  Q   All right. Did that change at any time?
18  A   No.
19  Q   And then if you go to the next page, paragraph four,
20      specifically subparagraphs A through E, do those paragraphs
21      accurately set forth your job duties in your position as chief
22      operating officer of Braintech while you were employed?
23  A   Yes.
24  Q   Okay.
25          MS. WIDLAK: Why don't we mark that, please?

Page 279

1          (Whereupon Exhibit Number 21 was marked for
2          identification, at or about 9:17 a.m.)
3   Q   (Continuing by Ms. Widlak): I'm going to hand you what has
4       been marked Shafi 21 and ask you to read particularly just the
5       first page, please, and then identify it for us.
6   A   Okay.
7   Q   You've had an opportunity to look at Shafi 21?
8   A   Yes.
9   Q   Do you recognize it?
10  A   Yes.
11  Q   What is it?
12  A   It's an e-mail that was written on October 7th by Rick
13      Weidinger to several people inside Braintech outlining some
14      projects that he was directing us to work on.
15  Q   Okay. And you are one of the people to whom the e-mail was
16      sent, correct?
17  A   Yes.
18  Q   Okay. And you'd agree that Mr. Weidinger wrote in this
19      e-mail -- And just so the record is clear, this is October 7th
20      of 2008, correct?
21  A   Yes.
22  Q   All right. He writes, quote, "Following are nine projects in
23      possible priority that we are currently engaged in. No matter
24      the priority, these are all important projects." And this is
25      in bold, "The goal is revenue, revenue, revenue and now." Did

Page 280

1   I read that correctly?
2   A   Yes.
3   Q   You would agree with me that one of the top priorities for
4       both Braintech and your performance as COO, in October of
5       2008, was to generate revenue?
6   A   Yes.
7   Q   Okay.
8          (Whereupon Exhibit Number 22 was marked for
9          identification, at or about 9:22 a.m.)
10  Q   (Continuing by Ms. Widlak): I'm going to hand you what has
11      been marked Shafi Exhibit 22. Please take your time and take
12      a look at that.
13          (Whereupon at or about 9:22 a.m., a short break was
14          taken off the record, and the deposition resumed at
15          or about 9:23 a.m.)
16          THE WITNESS: Yes.
17  Q   (Continuing by Ms. Widlak): Okay. So you've had a chance to
18      read Exhibit 22. Could you identify that, please?
19  A   It's an e-mail from me to Rick Weidinger, copied to Jim Dara,
20      Pete Manias, dated October 16th.
21  Q   Of what year?
22  A   2008.
23  Q   Okay. Great. Turn to the second page which contains the
24      e-mail, itself. You write, quote, "Rick, due to your
25      reluctance on spending on travel dollars and pay expenses back

Page 281

1   promptly, I have scaled back on travel plans. Currently there
2   are no plans to travel beyond a 50-mile radius of Brighton
3   until mid-November." Did you write that?
4   A   Yes.
5   Q   Did you, in fact, not travel beyond a 50-mile radius of
6       Brighton during this period of time?
7   A   I believe so.
8   Q   Okay. Thank you.
9          (Whereupon Exhibit Number 23 was marked for
10         identification, at or about 9:23 a.m.)
11  Q   (Continuing by Ms. Widlak): I'm handing you Shafi Exhibit 23.
12      Please review it.
13  A   Yes. I'm familiar with this.
14  Q   Okay. Could you identify it for the record, please?
15  A   It's an e-mail written from me to Rick Weidinger, both his
16      personal and company e-mail addresses, copied to Ted White,
17      dated October 20th.
18  Q   Of what year?
19  A   2008.
20  Q   Okay. And you wrote, I direct you to the paragraph directly
21      above your signature, writing to Mr. Weidinger, "Therefore,"
22      quoting, "in light of your request to me to write employment
23      offers, Braintech employment offers should be written by
24      people other than me." Did you write that?
25  A   Yes.

## Page 282

1  Q   Did you, in fact, refuse to make hiring proposals to
2  prospective employees?
3  A   Define that more clearly.  What do you mean?
4  Q   Did you make any job offers to people you were trying to hire
5  for Braintech?
6  A   I was making recommendations, but I was not writing formal,
7  legal offers.
8  Q   Okay.  So you refused to make job offers to prospective
9  employees?
10  A   If you define that as the act of writing an actual legal
11  write-up, no, I did not.
12  Q   Did you make any written offers?  I mean, to take it out of
13  your characterization, any -- Did you submit any writing to a
14  prospective employee regarding potential employment with
15  Braintech?
16  A   Listen.  I was tasked to hire or identify people that would be
17  good for us to work with.
18  Q   Okay.  Please answer the question.
19  A   I'm trying to answer your question.  And so as part of that I
20  was identifying people who would be good to hire.  Therefore,
21  I was explaining to Rick a lot of times which people needed to
22  be hired.  Realize several other aspects of these documents.
23  Number one, I am not required to do legal work.  I would refer
24  to the record, paragraph four of my employment, at the top it
25  says, "Executive agrees to perform such duties as required for

## Page 283

1  the position and carry out the policies, procedures and
2  projects."  It goes on.  And in parentheses it says, "With the
3  exception of legal and financial management roles."  It was
4  not my job, and we had agreed at the outset, that I would not
5  write legal proposals, and I was being asked to by the CEO.
6  It was a direct contradiction to what my job role was, and
7  therefore, I was not going to do what I had not signed up to
8  do.  And that's what this e-mail --
9  Q   Okay.
10  A   I'm answering your question.  I'm telling you why I wrote
11  this, and that's basically because it was not my job to write
12  legal offers.
13  Q   All right.
14  A   It was my job to identify people, but it was not my job to
15  write legal offers.
16  Q   So if I understand your answer, you, at no time, submitted any
17  writing to a potential employee regarding employment at
18  Braintech; is that correct?
19  A   He asked me --
20  Q   Is it "yes" or "no"?
21  A   I --
22  Q   "Yes" or "no"?
23  A   I'm not going to give you a "yes" or "no" answer.  You have to
24  listen to me.  I told you that I have had an opportunity -- Or
25  he asked me to write a specific offer to Donna Burr.  I

## Page 284

1  relented and I did that.  However, as this continued and he
2  kept asking me to do this I said, "Look, my employment
3  agreement tells me not to write legal offers."  I already had
4  enough on my plate and I had enough to do and I was not going
5  to write legal offers.  This is very symptomatic of what the
6  employment experience was.  And realize this is well beyond
7  two months into my employment at Braintech and we're still not
8  connected on what my role is.
9  Q   All right.  I'd like you to turn back to the employment
10  agreement, if you would, in the job duties, paragraph 4E.
11  A   Yes.
12  Q   On the second page at the bottom of the page.
13  A   Yes.
14  Q   I'm quoting from the top, "Duties:  Executive agrees to
15  perform such duties as required for the position and carry out
16  the policies, procedures and projects independently or as
17  assigned by the CEO, including without limitation, E; hire,
18  manage and direct employees as required to support the
19  business objectives associated with all technical activities.
20  In this role the executive shall, with approval from
21  Braintech's CEO, hire, manage and direct employees as required
22  and allowed by Braintech's cash flow," et cetera.
23            Did you ever personally hire an employee for
24  Braintech?
25  A   Well, you have to define what "hire" is.  Is hiring

## Page 285

1  identifying somebody?  Or is hiring the act of writing a legal
2  offer?  Please clarify that for me.
3  Q   No.  I think you've answered my question.
4            (Whereupon Exhibit Number 24 was marked for
5            identification, at or about 9:29 a.m.)
6  Q   (Continuing by Ms. Widlak):  Mr. Shafi, I'm going to hand you
7  what has been marked Exhibit 24.  Please take a look at that.
8  A   I'm familiar with this e-mail exchange.
9  Q   Okay.  Could you just identify to whom it's from, to whom it's
10  written, and the date, please?
11  A   It's from me to Rick Weidinger, copy Jim Dara, Pete Manias,
12  Heather Greenlay, dated 20th October, 2008.
13  Q   Okay.  Thank you.  Now, I'll direct your attention to the
14  bottom of the front page.  As I understand it, the small font
15  that's not in bold was written by Mr. Weidinger; is that
16  correct?
17  A   That's correct.
18  Q   All right.  And your comments are in larger font that is in
19  bold, correct?
20  A   Correct.
21  Q   Okay.  At the very bottom of this page Mr. Weidinger writes,
22  "The A&A schedule," is that the access and acceleration
23  schedule?
24  A   Yes.
25  Q   All right.  "Is a material document to the transaction,

Tri-County  Court  Reporters
248-608-9250

Page 286

```
 1        bargained for and is expected to be followed and carried out
 2        by you. This is not happening." And you wrote back, quote,
 3        "It won't happen until I am paid my travel expenses, which is
 4        the breach that started this. I can start planning travel
 5        again after this expense payment is received." Do you
 6        remember writing that?
 7   A    Yes.
 8   Q    Okay. So you would agree that you refused to continue your
 9        efforts to work on the access and acceleration schedule until
10        Mr. Weidinger paid your travel expenses?
11   A    Yes.
12            (Whereupon Exhibit Number 25 was marked for
13            identification ,at or about 9:32 a.m.)
14   Q    (Continuing by Ms. Widlak): I'm handing you Shafi Exhibit 25,
15        and it's a number of pages, but we'll be concentrating just on
16        the front page. But feel free to read the whole document.
17   A    Which pages did you want to concentrate on?
18   Q    Just the front page. But if you're more comfortable, take
19        your time and read the whole document.
20   A    Okay. Go ahead.
21   Q    All right. This was written by you, correct?
22   A    The top portion of this page was written by me, yes.
23   Q    Okay. Fair enough. And the portion written by you at the top
24        is dated October 20, 2008, correct?
25   A    Correct.
```

Page 287

```
 1   Q    And you're directing this to your boss, Mr. Weidinger?
 2   A    Correct.
 3   Q    And the e-mail, just below your entry is, once again, in a
 4        smaller font, not in bold; is that correct?
 5   A    Correct.
 6   Q    And that was written by Mr. Weidinger?
 7   A    Correct.
 8   Q    All right. I direct your attention to the second paragraph of
 9        the e-mail on this first page, and I'm quoting from
10        Mr. Weidinger to you. "You are correct, it is all about
11        revenue, but I'm wondering where all your revenue is after two
12        months into the transaction. Your Shafi revenue pipeline
13        commitment for August was $10,500.00, your September was
14        $14,500.00, for October is $75,000.00, for November is
15        $75,000.00, and December is $85,000.00, et cetera, et cetera,"
16        still quoting. "Today we have received zero and still
17        patient, and our understanding is that this is, quote 'in
18        process,' close quotes, pipeline orders as detailed in
19        schedules." Do you remember Mr. Weidinger writing you this?
20   A    Yes.
21   Q    And your response is, "Rick, you wait several days to respond
22        and then write at 10:00 p.m. the previous night expecting me
23        to respond at 8:30 a.m. the next day. This is not reasonable.
24        I suggest we discuss this in a day or two, possibly 8:30 a.m.
25        tomorrow, on Tuesday. And in the meantime I'll respond to
```

Page 288

```
 1        this e-mail and also write another e-mail about the damage
 2        done to my motivation through your management style. See my
 3        related e-mails about asking me to write legal offers,
 4        business dinner expense denied, and travel expenses
 5        reimbursement ignored for weeks. Full-time work is legally
 6        defined as 40 hours per week. I have been putting in 80 to
 7        100 hours per week until now. As of this e-mail I've scaled
 8        back to 60 hours per week and will continue to monitor the
 9        working climate at Braintech."
10            Do you remember writing that to your boss?
11   A    Yes.
12   Q    Okay. Where in your employment agreement does it limit your
13        workweek to 40 hours?
14   A    That's a legal definition of full-time work in the state of
15        Michigan.
16   Q    Okay. Were you a salaried employee at Braintech?
17   A    Yes.
18   Q    So you would agree to me that you were, in this e-mail, pretty
19        much setting your own schedule?
20   A    Yes.
21            (Whereupon Exhibit Number 26 was marked for
22            identification, at or about 9:37 a.m.)
23   Q    (Continuing by Ms. Widlak): Mr. Shafi, I'm handing you Shafi
24        Exhibit 26. It's, once again, a rather lengthy series of
25        e-mails, but I will be concentrating on the e-mail exchange on
```

Page 289

```
 1        the front page.
 2   A    I'm familiar with this e-mail.
 3   Q    Okay. And it's from you, correct?
 4   A    Yes.
 5   Q    And dated October 30, 2008?
 6   A    Yes.
 7   Q    And it's to Mr. Weidinger and a number of others?
 8   A    Yes.
 9   Q    Just so the record is clear, is the top portion in bold was
10        that written by you?
11   A    Yes.
12   Q    And who wrote the portion on the front page that is not in
13        bold but it's the same font?
14   A    Also, me. This is my drafting style when usually I write
15        things like that. If I'm not writing a fully-worded sentence
16        I write points, and this was written by me.
17   Q    Okay. So let's look at what you wrote to your boss. "Rick,"
18        and I'm quoting, "today I would like you to know about similar
19        damage being done to my motivation to work at Braintech and
20        some of the decisions I'm now making to cope with this. I
21        remain committed to work hard and above normal legal levels of
22        commitment, but not as much as I was before. You'll see
23        specifics in my e-mail below." And then you write,
24        "Employment offers, working on weekends, number of hours;
25        legal 40, before 80 to 100, now 60 as of Monday, October
```

5 (Pages 286 to 289)

## Page 290

1    20th." We discussed your October 20th e-mail.  Did you limit
2    the number of hours you worked at Braintech, your duties at
3    Braintech, from October 20th on?
4  A  Yes.
5  Q  What revenues had you brought in to Braintech as of October
6    30th of 2008?
7  A  None.
8        (Whereupon Exhibit Number 27 was marked for
9        identification, at or about 9:42 a.m.)
10 Q  (Continuing by Ms. Widlak):  I'm handing you Shafi Exhibit 27.
11   We will be covering much of this, so if you'd please look at
12   the whole document and then identify it for the record.
13 A  "Much of this" means the entire document?
14 Q  I think we'll be covering material on the first three pages --
15 A  The first three pages.
16 Q  -- of a five-page document.  Yes.
17 A  Okay.  I'm prepared to refute much of this, almost all of this
18   e-mail.
19 Q  Okay.  First I'd like you just to identify it.
20 A  It's an e-mail dated November 4, 2008 from Jim Dara to me,
21   copy Rick Weidinger.
22 Q  Okay.  Great.  We're not going to read it out loud, but I just
23   want to ask you a few questions.  In the third full paragraph
24   it makes reference to integrators with regard to the access
25   and acceleration schedule.  Can you briefly describe what an

## Page 291

1    integrator is?
2  A  Yes.  An integrator is a company that puts a turnkey system
3    together, which means they buy a robot, they buy a vision
4    system, they buy software like Reliabot, and they put together
5    a whole system that will do something for an end user like a
6    Ford Motor Company or General Motors or M&M Mars.
7  Q  Okay.  After the closing, when you were hired as COO of
8    Braintech, did you identify engineers who could assist the
9    company in rolling out the access and acceleration schedule?
10 A  I believe so.
11 Q  Okay.
12 A  There are many e-mails --
13 Q  Okay.  Could you identify who those people were?
14 A  I cannot just give you names, because I have to look back at
15   e-mails and specify clearly, but I will give you some classes
16   of --
17 Q  No.  I'd really like names.
18 A  No.  I'm not going to give you names.  You're not going to get
19   them.  Basically, there were former employees who were needed
20   to conduct the training and a person at Braintech was assigned
21   to work out with them, specifically Kevin North and John
22   Neilson, to train Braintech.  Also, possibly, David Dechow.
23   That's one class of engineers.  A second class of engineers
24   that I was working with, or attempting to work with, but my
25   authority was undermined, was people like Simona Pescaru to do

## Page 292

1    additional future planning.  Then there were specific tasks
2    that we were looking to do to get ready to make sales.  And
3    this was -- I have to very clearly stress this point to you.
4    It wasn't that if you do one thing everything will happen or
5    dollars will start rolling in the door.  We had to have an
6    office.  I had to have these people travel with me in the
7    access and acceleration plan.  I had to have training done.
8    We had to have an office, and we needed to convey to customers
9    that we were a growing concern, that we had local presence,
10   local support, local expertise, and the ability to support
11   projects.  This whole planning that took place before the
12   closing was systematically dismantled, marginalized, and made
13   irrelevant by the management style of Rick Weidinger.
14 Q  Okay.  Let me interrupt you just for a minute.  So if I
15   understand your answer, at this time you cannot identify by
16   name any of the engineers that you identified, allegedly, to
17   help roll out the access and acceleration?
18 A  That is laid out in various e-mails in the record.
19 Q  Okay.  But today you can't recall --
20 A  I don't, off the top of my head, have all those names in an
21   organized way for you.  I do know what I was asking various
22   people to do, but I'm not going to give you a representation
23   that you want to put on the record to say it's accurate.
24 Q  Okay.
25 A  The accurate way to go is the e-mail record.

## Page 293

1  Q  Mr. Shafi, as Mr. Greeves said yesterday, this is my
2    opportunity to ask you questions.  And I would ask you to
3    listen to my question, give your best honest answer, and then
4    stop.
5  A  You have also --
6  Q  Mr. Shafi, your Counsel is gesturing for you to stop talking.
7    Do you understand that?
8  A  Okay.
9  Q  Now, you just mentioned David Dechow?
10 A  Yes.
11 Q  All right.  Who was David Dechow at Braintech?
12 A  He is not an employee of Braintech.
13 Q  Who is he?
14 A  He is an independent company owner.  His company is called
15   Aptura Machine Vision Solutions, and he was a partner and knew
16   about Reliabot and could support customers and could do
17   training.
18 Q  Okay.  Did he ever do any training?
19 A  I do not believe so.
20 Q  Okay.  Did he ever talk to any customers about Reliabot while
21   you were employed at Braintech?
22 A  I do not believe so.
23 Q  Okay.  Mr. Dechow is now one of your business partners; isn't
24   he?
25 A  Yes.

6  (Pages 290 to 293)

Page 294

1  Q   Now, focusing back on this exhibit, the e-mail, the last of
2      which is dated November 4, 2008; as of November 4, 2008 you
3      would agree that you had not created a sales plan, sales
4      incentive plan, or an integrator program as of that date,
5      correct?
6  A   I disagree.  I had created a plan and it was disregarded by
7      these people.
8  Q   Okay.  But you would agree that as of November 4, 2008 you
9      still had not produced any revenue?
10 A   Yes.
11 Q   Okay.  And you would also agree that as of November 4, 2008
12     you had not conducted any Reliabot training?
13 A   It was never authorized.  It was never funded.  I was never
14     allowed to do it.  It was --
15 Q   So your answer is you agree that as of November 4, 2008 you
16     had not conducted any Reliabot training?
17 A   It was not allowed.  It was not allowed.  I asked for it and
18     it was not allowed.  It was not funded.  It was not supported.
19     It was not allowed.  So yes, I will say it was not done.
20 Q   Please turn to the second page of this exhibit, and this is
21     Mr. Dara writing to you.  And looking at the bottom of the
22     page, second to last paragraph, he writes, "Regarding Reliabot
23     training, I naturally view this as your responsibility, and if
24     so, why has it not yet happened?  Is this in any way related
25     to the fact that all but 2D Reliabot code remained in your

Page 295

1      basement until a few weeks ago?"  Did, in fact, that material
2      remain in your basement until just prior to November 4, 2008?
3  A   No.  I disagree with this paragraph completely.  For example,
4      it was my responsibility to help get this training done, but
5      it was never allowed.  The people that I identified, Kevin
6      North, John Neilson, David Dechow, they were never allowed to
7      come to Vancouver over small procedural hurdles that Rick
8      Weidinger placed to not allow this training to happen.
9  Q   Okay.  Let me ask you a question before I forget.  At the time
10     you were hired, and particularly August 12th of 2008 through
11     the last day of your employment, was Braintech still
12     headquartered in Vancouver, British Columbia?
13 A   Well, it depends on how you define the headquarters.
14 Q   Just --
15 A   I don't -- There were several divisions created of Braintech.
16     There was a headquarter being defined in Virginia.  It's a
17     Nevada corporation or a Delaware corporation.  There is a
18     Braintech Canada.  There was a Shafi, Inc.  I was not
19     responsible --
20 Q   Let me make my question a little clearer.
21 A   Yes.
22 Q   From August 12th of 2008 till your last date of employment,
23     how many times did you physically travel to Vancouver?
24 A   I don't have the exact number at the tip of my head, but I
25     believe it was either two or three times.

Page 296

1  Q   Okay.  Could it have been one?
2  A   No.  It was definitely more than once.
3  Q   Okay.  Do you have records that would show your travel?
4  A   Of course.  I keep all the e-mail records.  It's all reflected
5      in there.
6  Q   You would agree that during your employment at Braintech the
7      research and development function of Braintech was
8      headquartered, or located, in Vancouver?
9  A   The eVF portion, yes.
10 Q   Okay.  And that was part of your responsibility to integrate
11     eVF with Reliabot, correct?
12 A   Yes.
13 Q   Okay.
14 A   But I was not given time to travel and my authority was
15     undermined.
16         (Whereupon Exhibit Number 28 was marked for
17         identification, at or about 9:55 a.m.)
18 Q   (Continuing by Ms. Widlak):  I'm handing you a one-page
19     exhibit, Shafi 28.  Please take a look at it.  I'm handing one
20     to your lawyer, too.
21 A   Yes.
22 Q   Okay.  And this is an e-mail from you to Mr. Weidinger dated
23     November 10, 2008, correct?
24 A   Yes.
25 Q   All right.  And Mr. Weidinger wrote to you, "Adil, plan to

Page 297

1      attend the following meetings this week with me.  These
2      meetings take priority over anything else you do this week."
3      And then he identifies meetings on Tuesday, November 11th,
4      Wednesday, November 12th, Friday, November 14th, and he
5      indicates that he tried to reach you via e-mail and phone last
6      Thursday and Friday without response.  And you wrote back to
7      your boss, "Okay.  I sent you an e-mail this morning about
8      health insurance, daughter's medical test bill, work plans.  I
9      should be able to accommodate your request below.  I'll write
10     e-mails sporadically today between rests.  Adil."  Do you
11     remember writing that?
12 A   Yes.
13         (Whereupon Exhibit Number 29 was marked for
14         identification, at or about 9:56 a.m.)
15 Q   (Continuing by Ms. Widlak):  I'm handing you Shafi Exhibit 29.
16     Please take a look at it and identify it for the record.
17 A   This is an e-mail dated November 11, 2008 from me to Rick
18     Weidinger and a few other people.
19 Q   Okay.  I'm sorry.  I wasn't listening.  It's dated November
20     11, 2008, correct?
21 A   Correct.
22 Q   All right.  And you write to Mr. Weidinger, I'm going down to
23     the seventh line, quoting, "I am still sick today but have
24     some energy and will go to PackExpo knowing that I will get
25     worse when I come back on Wednesday or Thursday."  Still

7 (Pages 294 to 297)

## Page 298

1 quoting, "But all calls that you have requested this week are
2 cancelled. We can continue after you reinstate your promises.
3 You need to learn to keep your promises. This is a repeat of
4 the time when you ignored my travel expenses for weeks. Also,
5 I will be very sick by the time I get back, so I will not come
6 to Virginia on Friday. We can resume after these two bills
7 are paid, probably next week." Do you remember writing that?
8 A   Yes.
9       (Whereupon Exhibit Number 30 was marked for
10       identification, at or about 9:58 a.m.)
11 Q   (Continuing by Ms. Widlak): And this is Shafi Exhibit Number
12 30. If you could identify that, please, after you've reviewed
13 it.
14 A   It's from Weidinger to me dated 11th November, 2008.
15 Q   Okay. And do you remember receiving this?
16 A   Yes.
17 Q   Mr. Weidinger wrote to you, "Adil, please use the company
18 credit card in your possession for any doctor appointments
19 necessary that would otherwise be covered by your health
20 insurance coverage. Rick." Did I read that correctly?
21 A   Yes.
22       (Whereupon Exhibit Number 31 was marked for
23       identification ,at or about 9:59 a.m.)
24 Q   (Continuing by Ms. Widlak): I'm handing you Shafi Exhibit 31.
25 Please read the whole document. It's a two-page e-mail

## Page 299

1 stream.
2 A   Okay.
3 Q   If you direct your attention to the portion that appears to
4 have been written by Mr. Weidinger that begins, "Adil," one-
5 third of the way down the page. It looks as though you missed
6 the board of directors meeting that was on or about
7 November 13th of 2008; is that correct?
8 A   Correct.
9 Q   And you also missed the executive staff meeting that was held
10 around the same time?
11 A   I believe so. The executive --
12 Q   Okay.
13 A   No. Let me clarify. A lot of these meetings were scheduled
14 by Weidinger, cancelled by him at the last minute. There was
15 actually a joke going on among the executive team that he had
16 to pay two cents or a dollar every time he missed a meeting or
17 delayed a meeting. These meetings were very sporadic in
18 nature, and they were called for, but then he would get eight
19 people on the phone and make them wait and never show up.
20 That happened several times. The regularity and the
21 seriousness of these meetings was severely compromised by
22 Weidinger's management behavior. He did not have the
23 commitment a lot of times to show up and everybody else waited
24 on him. That's the pattern he set from the outset, that he
25 was way too important for the rest of us to be there. And if

## Page 300

1 he called a meeting and had us attend meetings, he did not
2 commit himself to come to these meetings a lot of times, just
3 flat out refused. That's just his personality. And he felt
4 that he was above all of us and could do that. Therefore, the
5 seriousness with which you took these meetings was not serious
6 after a while. I conclude.
7 Q   Okay. Thank you. Mr. Weidinger writes to you, and this is
8 the first paragraph of this e-mail, quoting, "It is
9 unfortunate that you missed our board of directors meeting
10 this afternoon. I sent you notice of the conference call last
11 Saturday, November 9, 2008, and Ted White sent you the board
12 materials on Tuesday, November 11, 2008. We approved the
13 third quarter financial results and the company's 10Q SEC
14 filing. Both are very important board responsibilities for a
15 public company. Additionally, it is regrettable that you also
16 missed the executive staff meeting yesterday. As you know,
17 another important responsibility as COO of the company is to
18 attend these weekly meetings." Do you admit that Mr. White
19 sent you the board materials in November of 2008?
20 A   I believe so.
21 Q   Okay. Mr. Weidinger also writes to you, "I would think that
22 you would have a greater appreciation for revenue generation
23 given the financial results in Shafi, Inc. As you well know,
24 the expected revenue from Shafi, Inc. per the debt schedule
25 (Schedule 3.9 of the share purchase agreement), has been

## Page 301

1 nonexistent for August, September, October, and mid-November
2 inhibiting the payment of Shafi, Inc. debt obligations listed
3 on that schedule." And he goes on to allude to the fact that
4 you missed the sales meeting that past Friday. Do you recall
5 missing that sales meeting?
6 A   It would be in the e-mail records. I don't recall because
7 there were so many meetings that were planned and scheduled
8 and cancelled or delayed.
9 Q   But you have no evidence today to dispute the fact that you
10 missed that sales meeting?
11 A   I can't confirm nor deny it.
12 Q   Okay. And then if you turn to the second page of this,
13 Mr. Weidinger closes this memo by saying, quote, "Your failure
14 to attend this meeting," and he's alluding to the fact that
15 there was a sales meeting scheduled for Friday, November 14th
16 in the Virginia office, and he offers you alternate dates of
17 Monday, November 17th or Tuesday, November 18th, and he ends
18 with, "Your failure to attend this meeting on one of these
19 three dates may have," quote, "for good cause consequences.'"
20 Did you understand that reference to refer to your employment
21 agreement?
22 A   State your question more clearly.
23 Q   At the end of this memo Mr. Weidinger says that your failure
24 to attend this meeting on one of these three dates may have,
25 quote, "for good cause consequences." Did you understand

Page 322

1    name was Kevin Geshel, G-E-S-H-E-L. I had Kevin fly from
2    Wisconsin, meet Weidinger --
3    Q  Again, sir --
4    A  I'm --
5    Q  You're not answering my question. All I've asked you to do is
6       identify the ones that you think are false.
7    A  Okay.
8    Q  I know you think you have a mountain of evidence to support
9       that they're false, but all I want to know is which ones you
10      think are false. If they're false, that doesn't matter what
11      the evidence is because you said they're not true.
12   A  I understand. 5H, "You will be indemnified and held harmless
13      by Braintech from and for the Shafi obligations and any
14      associated personal guarantees." That was a major problem
15      later.
16          I think that's the bulk of what you asked for.
17   Q  You think that's the bulk of it? Or do you see nothing else
18      in here that you're relying on?
19   A  I think that's the bulk of it.
20   Q  Thank you for taking the time to do that, Mr. Shafi. That's
21      very helpful. Mr. Weidinger did make the wire to you,
22      correct?
23   A  Yes.
24   Q  And that wire was done -- Do you recall when that was done?

Page 323

1    A  I don't know the exact date, but it was on or around --
2    Q  Take a look at this document. We won't mark it, but does that
3       refresh your recollection that it was on or about June 5th?
4    A  Are you asking me about this e-mail?
5    Q  No, sir. All I'm asking you is; does that document refresh
6       your memory, where it says right there, "Rick instructed to
7       wire you on June 5th"? What I'm asking you is if that
8       refreshes your memory that on June 5th you got a wire from
9       Rick? You see right in the middle of the page in the little
10      writing there?
11   A  Yes, I do. Okay.
12   Q  Okay. Having read that, does that refresh your memory, sir?
13   A  I recall this e-mail now, yes.
14   Q  No, no. I'm not asking you if you recall the e-mail. What
15      I'm asking you is now that you've looked at that document,
16      whatever it is, does it refresh your memory that you received
17      a wire for $50,000.00 on June 5th?
18   A  Yes.
19   Q  Okay. So that predated the signing of the letter of intent
20      two weeks later?
21   A  Yes.
22   Q  Okay. Was Mr. Weidinger or you obligated to do anything
23      between June 5th and June 19th?
24   A  What do you mean obligated to do anything?
25   Q  What I mean is he sent you $50,000.00 on June 5th, right? Did

Page 324

1    you have a commitment with him at that point?
2    A  We did not have a written agreement.
3    Q  On what basis did Mr. Weidinger give you this $50,000.00?
4    A  That we would potentially go forward with an acquisition
5       agreement.
6    Q  So he sent you $50,000.00 on the basis of trust alone?
7    A  Yes.
8    Q  What did you do in exchange for that?
9    A  I worked to make this deal possible.
10   Q  But you weren't committed to do anything, right?
11   A  I was not, but it did happen.
12   Q  When you're saying that Mr. Weidinger is a bad man, are you
13      saying that he's a bad man because he gave you $50,000.00
14      without so much as anything other than his trust in you to
15      complete what you said, as a gentleman, you were going to do?
16   A  He gave me the $50,000.00, and I appreciated that. I told him
17      thank you for that. But the broader, bigger deal was much
18      bigger than $50,000.00. He was talking about 20 years of very
19      hard work that I did to build this company and extremely long
20      hours over 20 years, many personal sacrifices, financial,
21      time, all these different things. He took away all that and
22      demolished it into nothing and I got nothing out of it.
23      That's why I think he's a bad man. Because, initially, he
24      made himself appear to be a good man. He made some small
25      gestures. In the big scheme of things $50,000.00 was nothing.

Page 325

1    Q  $50,000.00 was nothing?
2    A  Nothing. It was a very small amount compared to what we're
3       talking about. $3,000,000.00 is what the total deal was. So
4       it was a small gesture on his part and it was a small cash up
5       front to induce me to make this massive goodwill of software,
6       intellectual property, customers. He gave a very small cash
7       up front. Hundred thousand dollars is one-thirtieth -- It's
8       three percent of the total deal. He gave me three out of a
9       hundred dollars and made himself look like a good man. But I
10      found out later that he was not a good man, that he defrauded
11      me, that he breached his contracts, and ultimately, stole from
12      me.
13   Q  How much money did you have in your bank account before that
14      wire came in?
15   A  Very little. I was under financial duress.
16   Q  You've got to let me finish my question. How much money was
17      in your bank account before Mr. Weidinger's $50,000.00 reached
18      your account?
19   A  Very small amount. I don't recall the exact number.
20   Q  Was there enough money in your bank account to cover your
21      financial obligations?
22   A  No.
23   Q  Were you considering filing bankruptcy if Mr. Weidinger's
24      money didn't come through?
25   A  I had other options, as I mentioned to you yesterday.

14  (Pages 322 to 325)

Page 358

1  Q   Again, sir, you represented that you read all the financial
2      documents that Braintech had. Are you aware of whether --
3  A   I did not represent --
4  Q   Mr. Shafi, you're going to have to let me finish my question.
5      Are you aware of whether or not Braintech had the financial
6      resources to make these $900,000.00 payments?
7  A   They appeared to. They appeared to because they had a
8      contract with ABB which was still bringing in money.
9      Weidinger represented to me that he will take care of this
10     payment of this debt several times in writing, he did, as part
11     of the inducement that brought me to the table to work with
12     them.
13 Q   Did you undertake or have any of your financial advisers, your
14     hired advisers in this transaction, did you have any of them
15     look to satisfy you that Braintech would have the financial
16     wherewithal to pay off the commitments that you believed you
17     were handing to them to pay off?
18 A   My accountant, Bruce Rukkila, looked at Braintech, and his
19     understanding was that Braintech had an arrangement with ABB
20     and that Braintech would be able to pay our debts. In fact,
21     there were several conference calls conducted between
22     Weidinger, Bruce Rukkila, and Braintech's own accountants.
23     And all this was discussed. This was not a mystery. This was
24     all discussed and understood that there would be payments made
25     by Braintech. There were several calls between accountants.

Page 359

1      There were several engagements about the debt schedule and the
2      details of the timing and monies and so forth, so this was not
3      an accidental thing. This was put together through a lot of
4      due diligence.
5  Q   I understand. And where we ran off the track there is -- I
6      completely understand the debt schedule, sir, and I understand
7      what you're saying. Apart from what the commitment was to pay
8      off the debts, are you aware, did you do any due diligence to
9      find out, whether or not Braintech would be in a position to
10     pay, with current revenue it already had, those debts down?
11 A   Yes. I mean, Braintech represented to me that they would be
12     able to pay these things. And I looked at Braintech and I
13     looked at the ABB agreement, which was in the millions of
14     dollars, and it was there. I mean, the revenue was there.
15 Q   All right. So based on your analysis if Braintech had no
16     future revenue coming in from the transaction it was doing
17     with you, Braintech would have enough money to pay the
18     $900,000.00?
19 A   That was my understanding. That's what Weidinger represented
20     to me. I mean, that's -- Part of our claim is that he
21     represented to me that he could pay this. He represented to
22     me --
23 Q   Personally? Or the company could pay?
24 A   You can call it whatever. I have e-mails from him that are
25     part of this case that state -- in which he states his ability

Page 360

1      to pay this thing, and I relied on that.
2  Q   And from your own due diligence that you were permitted to do,
3      did you test, or undertake to examine in any way, that
4      representation?
5  A   Yeah. I looked at some public documents. I looked at some of
6      Braintech's overall characterizations in the public, and it
7      appeared that they were able to do so.
8  Q   Have you learned anything since you left Braintech's
9      employment, since you were fired, have you learned anything to
10     suggest that your due diligence was inaccurate?
11 A   Well, I will say that most public companies make forward-
12     looking statements. Most public companies, almost all of
13     them, disqualify their ability to perform financially no
14     matter how good they are. No matter how good they're doing
15     they always lay out -- And Braintech was no different.
16     Braintech was just like any other public company that had
17     these public disclosures and said, "We're doing this and this
18     is great and that's all happening," but they always put
19     disclaimers and say, "Our forward-looking statements are based
20     on." And you know better than me, as an attorney, all those
21     caveats they usually put in that language that actually spell
22     out the inability of that company. So I mean, I just looked
23     at it like that. I was not a lawyer and I was not an
24     accountant, I was an engineer, still am. And so I just looked
25     at it and said, "Look, it appears that they are viable. It

Page 361

1      appears that Mr. Weidinger, with all his knowledge and
2      resources and business deal savvy, he will be able to carry
3      the company forward." That's what he was portraying with his
4      own face and his own opening letter to the shareholders on the
5      Braintech website. I mean, there was all these
6      representations on Braintech -- I mean, if you looked at the
7      Braintech web site in those days, it was Mr. Weidinger smiling
8      and writing a letter to shareholders saying that they were
9      going to take care of all these issues.
10 Q   All I asked you, Mr. Shafi, was whether you're now aware of
11     information that suggests that Braintech concealed from you
12     its ability to pay back this debt?
13 A   Braintech is obviously not a going concern now and it is
14     unable to pay and it's more or less insolvent, if that's a
15     correct characterization. I relied on what Mr. Weidinger told
16     me to do this. I relied on his ability to do this stuff and
17     his representations, and that's what the agreement said.
18 Q   Again, I'll ask because you've said a lot of things. I
19     appreciate that, but you haven't answered my question, which
20     is; are you aware of whether or not Braintech concealed from
21     you its ability in any way to repay the debt that it agreed to
22     undertake to pay off from Shafi and Shafi Innovations?
23 A   I don't know. See, I don't know what they concealed, what
24     they did not conceal. I don't know because I was not privy to
25     the checkbook. I was not privy to the bank account. I had no

23  (Pages 358 to 361)

Page 362

```
 1      access to Braintech's bank account. I had no access to
 2      Braintech's financial records. I had no access to their
 3      e-mail servers. I mean, I had no access to the corporate
 4      computers. I mean, I may be called COO, but my role was
 5      extremely limited, and what was made available to me as a
 6      Braintech employee was extremely limited. I mean, I had no
 7      access to what Ted White was -- what the checkbook balance was
 8      in the company.
 9   Q  So you're not aware of whether or not Braintech hid anything
10      from you, to this very day, in connection with its ability to
11      repay the monies?
12   A  That's correct. I don't know what they had and what they did
13      not have.
14   Q  Isn't it equally plausible that Braintech wasn't able to pay
15      down its debt because it didn't have any revenue coming in
16      after the transaction?
17   A  It certainly is possible.
18   Q  Can you exclude that possibility?
19   A  What do you mean exclude it?
20   Q  I mean, couldn't that be the reason that they were unable to
21      pay the debt?
22   A  That's not my problem. See, it's not for me to make that call
23      and answer you. It's a commitment they took on. That was
24      their problem. I don't have to guess, sitting here, whether
25      they were supposed to pay or not pay based on whether income
```

Page 363

```
 1      was coming in or not. It was not my problem. In my
 2      employment agreement financial and legal involvement of the
 3      company was excluded. I had no input or visibility -- nor
 4      visibility in the company's financial operations. I had no
 5      idea, financially, what they were doing, what they were
 6      paying, what was coming in, what the dollar amounts were, what
 7      the timing was. You know, I had absolutely no visibility,
 8      sir; okay?
 9   Q  Okay.
10   A  Therefore, I can make no statements on the record here, under
11      oath, that I knew anything about their ability to pay or not
12      pay. All I know is that they said they would pay, and there
13      was an elaborately, carefully laid out payment plan executed
14      by Mr. Weidinger, himself, personally, right up to the
15      closing, in which he represented that, from his knowledge of
16      the financial situation of Braintech, that he could clearly
17      make these payments.
18   Q  You had a financial adviser working on this transaction for
19      you, right?
20   A  Yes.
21   Q  You were paying him to do this transaction?
22   A  Yes.
23   Q  You had lawyers?
24   A  Yes.
25   Q  Did either of those individual sets of professionals tell you
```

Page 364

```
 1      that they were not given access to any financial information
 2      that they requested from Braintech?
 3   A  I don't know how to answer that question, because I was not
 4      involved with all the details. I did not know everything that
 5      was disclosed and not disclosed. I don't know what they
 6      needed to know that they did not get. I don't know what they
 7      got that they did not need to know. I'm just answering --
 8   Q  My question is much more simple.
 9   A  I don't know. I don't know.
10   Q  So you don't know whether or not they ever told you that they
11      needed more information and Braintech told them that they
12      can't have --
13   A  No, no. That's not what I said. I said that I don't know if
14      they received the proper amount of information from Braintech.
15   Q  Are you aware of whether they ever told you that they needed
16      more and couldn't get it?
17   A  I don't recall. I would have to look at the e-mail record.
18   Q  So you understood that the personal debt of yours was going to
19      be paid down as part of this transaction, right?
20   A  Tell me what personal debt you're talking about.
21   Q  It's your claim here that $250,000.00 of debt that Braintech
22      should have paid on your behalf, but didn't, right?
23   A  I need to clarify. I think I need to clarify. The debt
24      schedule constitutes several secured creditors of Shafi, Inc.,
25      my old company, including the IRS, state of Michigan and some
```

Page 365

```
 1      business loans taken from customers, partners or banks. Now,
 2      when that debt was not paid by Braintech those creditors
 3      asserted and claimed that I was -- Since Braintech did not pay
 4      them, or Braintech stonewalled them in paying, that I would
 5      become personally liable.
 6   Q  All right.
 7   A  Now, in the previous realm, prior to the sale, Shafi, Inc. was
 8      responsible for those debts. But these creditors assumed or
 9      made the -- took the position, for example, Comerica Bank,
10      that because Braintech did not honor its obligations of Shafi,
11      Inc., that I, Adil Shafi, personally, would be responsible for
12      Shafi, Inc.'s debts, and that's what happened.
13   Q  Had that possibility, what you just told me, had any of that
14      ever occurred to you that it might come to pass? In other
15      words, if Braintech hadn't paid, or defaulted, had that notion
16      that was brought to your attention later ever occurred to you
17      before the closing?
18   A  Yes, it did.
19   Q  Okay. When did it occur to you?
20   A  I don't recall the exact date.
21   Q  Given that you were aware of the possibility that you could be
22      held responsible for this debt, what steps did you undertake,
23      did you have your legal team undertake, to determine whether
24      or not Braintech was creditworthy enough to be given the
25      responsibility to pay off your debt?
```

Page 366

1   A   That's what represented this agreement.  That's the whole
2       basis of our claim, is that Braintech made certain
3       representations --
4   Q   Right.
5   A   -- induced me to enter into this agreement, stated an ability
6       to take care of this, or to defray these costs, and then ended
7       up not doing so.  Now, we relied, me and my professional team,
8       relied on these assertions.
9   Q   You relied solely on Braintech's assertions?
10  A   Yeah.  I mean, we did some due diligence of our own, but we
11      relied a lot on months of months of e-mails and phone calls
12      and representations that Braintech was going to be able to
13      take care of this debt.  We relied on it, and that's what
14      happened.
15  Q   Before the closing, certainly, you knew that the Braintech
16      revenue stream from ABB was coming to an end, right?
17  A   There were several representations made to me that money was
18      still coming, that they would be able to take care of these
19      things --
20  Q   That's not what I asked.
21  A   Okay.
22  Q   What I asked you -- And we spent some time yesterday on this.
23      Before the closing it was known to you, Mr. Shafi, "Oh, my
24      gosh, the ABB contract is not going to be renewed."
25  A   Correct.

Page 367

1   Q   Okay.  Now, you knew that before you closed the deal?
2   A   Yes.
3   Q   You also knew that Braintech had to pay your debts?
4   A   Yes.
5   Q   How was Braintech going to be able to pay your debts -- Or did
6       you consider how Braintech, without the ABB revenue, was going
7       to be able to pay off this massive amount of debt?
8   A   We looked at also -- We were also going to try to do sales.
9   Q   Yeah, but you weren't working on sales up until the time of
10      the closing, right?
11  A   Correct.
12  Q   Okay.  So there's a period of time after the transaction when
13      you knew money wasn't going to be coming in because of the
14      holidays you spoke about and all that stuff.  So ABB is
15      ending, right?  You knew that?  You have to speak audibly.
16  A   Yes.
17  Q   There is nothing in the pipeline, except maybe receivables
18      that Shafi already had, correct?
19  A   Correct.
20  Q   No new work being done?
21  A   Correct.
22  Q   Had you formed an impression, as of that time, how this
23      massive debt load, that you were shifting off to Braintech,
24      was going to be paid?
25  A   I relied on the representation of Braintech to be able to do

Page 368

1       this.
2   Q   Did any of the professionals that you worked with raise any
3       kind of alarm or red flag with you about that issue?
4   A   They relied, also, on Braintech's representations.
5   Q   I understand.  But did they ever raise a concern about
6       Braintech's ability to repay the debt with you?
7   A   We were all concerned about many things, and that's why we
8       took so long, in Weidinger's mind, to do this deal.  We were
9       all concerned about many things.
10  Q   Has --
11  A   Not just the debt.  We were also concerned about several other
12      things which are in the e-mail record.
13  Q   All those other things to the side, only focusing on the debt,
14      did anybody on your side of the transaction table ever bring
15      to you a concern about Braintech's financial wherewithal to
16      repay the debt?
17  A   It's possible.  I would have to look at the e-mail record.  I
18      don't recall specific conversations or specific e-mails.  It's
19      all there.  You don't have to rely on my memory at this point
20      in time to convey to you a fact when it's already there in the
21      e-mail record.
22  Q   So if there is something that exists in the world about this
23      issue, it would be written down somewhere?
24  A   Quite possibly.
25  Q   You don't recall, sitting here today, anybody orally telling

Page 369

1       you, "Mr. Shafi, I've got a concern.  Braintech is broke and
2       it can't pay back the debt that you're shifting off to it"?
3   A   It's possible that it's in the e-mail record.
4   Q   Okay.  But it's not oral, right?
5   A   I don't recall.
6   Q   I mean, other than what's in your head, you can tell us today
7       we're not going to hear from somebody else?
8   A   I can't say that for sure because I don't know.  I don't
9       recall.
10  Q   Have you ever, from your own investigation before filing this
11      suit, ascertained whether or not that was the case, whether or
12      not this concern was raised by anyone?
13  A   I don't recall.
14  Q   Did you assume that Braintech would be able to pay this money
15      back because it was a public company?
16  A   Of course.  I relied on Braintech's assertion and just by the
17      nature of the fact that they were taking so much attention and
18      due diligence and painstaking work to go dollar by dollar,
19      creditor by creditor, column by column, month by month, they
20      laid out such an elaborate way.  It wasn't like, "Okay, we'll
21      take $200,000.00 and spend it in the next three months."  No,
22      it was laid down right down to every creditor, every month.
23      It was all laid out.
24  Q   All right.
25  A   And it was done by Braintech.  I relied on that.  I relied on

1    STATE OF MICHIGAN          )

2                              )    ss:

3    COUNTY OF KENT            )

4         I hereby certify that the foregoing attached pages

5    are a full and complete transcript of the proceedings held

6    on the date and at the place hereinbefore set forth.  I

7    reported electronically the proceedings held in the matter

8    hereinbefore set forth, and the testimony so reported was

9    subsequently transcribed under my direction and supervision,

10   and the foregoing is a full, true and accurate transcript of

11   my original electronic recording.

12

13   _____

14                    Susan M. Hans, CER-8085

15

16

17

18

19

20   Notary Public

21   Kent County, Michigan

22   My Commission Expires:

23   July 12, 2013

24

25



# TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (248)608-9252

www.tri-countycourtreporters.com

Transcript of the Testimony of **Adil Shafi**

**Date:** October 22, 2010
**Volume:** III

**Case:** Braintech v. Shafi, et al.

Printed On: November 19, 2010

Page 378

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

BRAINTECH, INC.,

      Plaintiff/Counter-Defendant,

                    CASE NO:09-10454

vs

ADIL SHAFI,

      Defendant/Counter-Plaintiff/
      Third-Party Plaintiff,

vs

FREDERICK WEIDINGER AND BRAINTECH, INC.,

      Third-Party Defendant/Counter-

      Defendant.

_____/

                Volume III of the deposition of ADIL

SHAFI, taken before me, Lauri A. Sheldon, CSR 4045, RPR,

on October 22, 2010, at 535 Griswold, Suite 1900,

Detroit, Michigan, commencing at or about 1:35 p.m.

APPEARANCES:

    BERRY MOORMAN
    BY:  JAMES P. MURPHY, ESQUIRE
    535 Griswold, Suite 1900
    Detroit, Michigan  48226
    Appearing on behalf of the Plaintiff.

Electronically signed by Lauri Sheldon (001-336-738-9633)
82ffdfd7-078e-4382-96cf-6d28b563e04a

**Page 379**

PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
BY: GEOFFREY J. GREEVES, ESQUIRE
2300 North Street, NW
Washington, DC 20037
    Appearing on behalf of the Defendant Frederick Weidinger
and Braintech, Inc.

NEMETH BURWELL, P.C.
BY: SUSAN D. KOVAL, ATTORNEY AT LAW
200 Talon Center Drive, Suite 200
Detroit, Michigan 48207
313-567-5921
    Appearing on behalf of the Defendant Braintech, Inc.

ALSO PRESENT: FREDERICK WEIDINGER

INDEX

WITNESS: ADIL SHAFI            PAGE

Re-Examination by Mr. Greeves         382

Re-Examination by Ms. Koval           490

* * * * *

INDEX OF EXHIBITS

EXHIBIT  DESCRIPTION              PAGE

No. 43   Advenovation Website       427

No. 44   Website printout           434

**Page 380**

1           October 22, 2010
2           Detroit, Michigan
3              1:35 p.m.
4
5
6
7
8           ADIL SHAFI,
9   was thereupon called as a witness herein and, after having
10  been first duly sworn to tell the truth, the whole truth and
11  nothing but the truth, was examined and testified as follows:
12           *     *     *
13           RE-EXAMINATION
14  BY MR. GREEVES:
15  Q   Good afternoon, Mr. Shafi. We're here in connection with
16      the third episode of taking your deposition in the matter
17      of Braintech versus Shafi, case number 09-10454. Do you
18      understand that?
19  A   Yes.
20  Q   And you understand you're under oath today?
21  A   Yes.
22  Q   Okay, sir. Is there anything about day one or day two of
23      your deposition at this time that you would like to
24      change or correct for the record?
25  A   Not at this time.

**Page 381**

1   Q   And you don't recall having a different recollection of
2       any of those matters than you had the last time you were
3       here; am I correct about that?
4   A   Not at this point.
5   Q   Okay. How long have you been working for the company
6       known as Advenovation?
7   A   Advenovation.
8   Q   Okay.
9   A   Since early part of 2009.
10  Q   Okay. And I'll ask you just to keep your voice up.
11      You'll recall from last time it's a little bit noisy in
12      the room here and from last time also that the court
13      reporter needs to take down everything that you say, and
14      that's the record that we'll have today.
15  A   Can you hear me?
16  Q   And I need to hear you, too.
17          MS. KOVAL: Just a little -- Just a little
18      louder.
19          MR. GREEVES: Yeah.
20          MS. KOVAL: Excuse me. So I can hear down
21      here.
22  Q   (Continuing by Mr. Greeves): So you've been working for
23      the new company since --
24  A   Since the early part of 2009.
25  Q   Okay. And in connection with your new venture, you told

**Page 382**

1       us last time that you had a few business partners; is
2       that correct?
3   A   Yes.
4   Q   Are the individuals that you mentioned last time still
5       associated with your firm?
6   A   Yes.
7   Q   Are there any new individuals who have come on board
8       since the company started? You had mentioned a few
9       people, shareholders. Are there any additional
10      shareholders since the last time we discussed this
11      matter?
12  A   No.
13  Q   All right. Now, who are the clients that this company is
14      currently performing work for?
15  A   I don't have a full list with me, as I was not expecting
16      to come with a full list of people, but the ones that I
17      mentioned last time are still there. I'm always looking
18      for new sales.
19  Q   Okay. Now, am I correct that you're the CEO of this
20      company?
21  A   Correct.
22  Q   Do you hold any other titles in the company?
23  A   I basically call myself president and CEO.
24  Q   President of the company. Is there anybody who is more
25      knowledgeable about the company than you are?

Tri-County  Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 439

1   A   Can I explain the circumstances that surround it to
2       answer your question or should I just give you yes, no,
3       and I can't answer it?
4   Q   I'd like you to answer my question.
5   A   Then you need to give me the right to give an
6       explanation.
7   Q   During the process of formulating the plan to sell Shafi,
8       Inc., did you tell Mr. Weidinger that this is an
9       opportunity you wanted Braintech to pursue?
10  A   Yes, but some of the work was already done before
11      Braintech approached me.
12  Q   And Braintech bought that work, didn't it, when it bought
13      your company?
14  A   Yes.
15  Q   And then once the sale closed what, if anything, did you
16      do to try to bring that opportunity to fruition?
17  A   Well, there was nothing much one could do because the
18      applications I made in February or March of the year and
19      the federal government doesn't even respond until the end
20      of the year. There's usually a nine -- eight- or
21      nine-month lapse before they do anything. It's not like
22      a company like ours could go and do anything. They don't
23      even want that. There's a whole lapse of time and there
24      are circumstances that require an explanation to properly
25      answer your question, but the short answer is no, we

Page 440

1       didn't do anything because there was nothing to do.
2   Q   Okay. And when did you begin pursuing this earmark
3       opportunity for Advenovation?
4   A   In the following fiscal year when this opportunity brings
5       itself again.
6   Q   Okay. Can you just give us a date? I understand what
7       all that is, but what is the date?
8   A   I believe -- I don't have the exact dates, but I believe
9       it's the early part of the year every year that a
10      financial fiscal -- You see, in federal government the
11      fiscal year begins in October, but these submissions have
12      to be made in February or March of any given year. So
13      these submissions are made a good six or seven months
14      prior to the beginning of the fiscal year, and they sit
15      there for months and months before the federal government
16      even decides to review them.
17  Q   Okay. So when did you begin work on that opportunity for
18      Advenovation?
19  A   Around the time those submissions are due, which are,
20      like I said, are around February or March.
21  Q   Of what year, sir?
22  A   Of the year that we're talking about. See, the fiscal
23      year is 2010 here. Then the submissions are required the
24      early part of that year, calendar year, so I would say
25      February or March of the previous year.

Page 441

1   Q   Okay. Thank you. And so where it says Adil Shafi on
2       page -- Exhibit 44, that's you, right?
3   A   Yes.
4   Q   And those are comments that you wrote?
5   A   Yes.
6   Q   Okay. And you stand by those comments?
7   A   Yes.
8   Q   Mr. Shafi, at the time of the closing you obtained three
9       million restricted shares of Braintech stock, correct?
10  A   They were never registered with the SEC, but yes --
11  Q   Okay.
12  A   -- I did receive paper.
13  Q   Correct. You received three million unrestricted -- Oh,
14      sorry. Three million restricted shares of Braintech?
15  A   I received three pieces of paper that said that there
16      were three million shares, but there really were not,
17      because they were never registered. They were not worth
18      a single cent in American currency. They were pieces of
19      paper. They were never registered with the SEC, and so
20      Braintech purchased my companies for absolutely no
21      compensation, absolutely no compensation, by giving me
22      those pieces of paper.
23  Q   Okay. And so after you received the three million
24      restricted shares of Braintech what steps did you take to
25      try to register the stock?

Page 442

1   A   It was not my place. First of all, there was a six-month
2       period called lockout period before I could even do
3       anything with those shares, so they were basically pieces
4       of paper -- I wouldn't call them shares. They were just
5       pieces of paper that meant absolutely nothing. They were
6       worth absolutely nothing -- that were given to me as a
7       fraudulent inducement to purchase my companies, which was
8       broadcast as a stock-for-stock transfer, but the stock
9       given to me in consideration for my companies was utterly
10      useless, worthless, valueless.
11  Q   All right. So you received these shares, and thereafter
12      is it fair to say you did nothing for the first six
13      months --
14  A   Well, I --
15  Q   -- to register them?
16  A   I wouldn't call them shares, because they were given to
17      me as pieces of paper.
18  Q   Mr. Shafi, I understand what you're saying.
19  A   Okay. Good.
20  Q   This would be a lot easier if you just answered the
21      questions rather than waste time with these long-winded
22      explanations.
23  A   I'm glad you understand. Okay. Then secondly, I was not
24      allowed through this agreement called a lockout
25      agreement, which I executed as part of my sale of my

17 (Pages 439 to 442)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 443

```
 1    companies to Braintech, there was a six-month lockout
 2    period in which I was not allowed to do anything with
 3    these shares, which was represented to me as, you know,
 4    Braintech policy.  Now, at the conclusion of those six
 5    months I did take these pieces of paper to credible
 6    securities houses, and I was told that those pieces of
 7    paper were worthless, they were never registered with the
 8    Securities and Exchange Commission of the United States
 9    of America, they were utterly worthless, they had
10    absolutely no value.  I went to two brokerage firms.  I
11    went to Edwards Jones first and I talked to them and I
12    said, "Can I sell these shares now?"  And they said,
13    "These shares are not even registered."  Then I went to Fidelity
14    Instruments.  I got involved with the securities division
15    in New York City in Manhattan.  Actually had the
16    originals sent over there.  They did some investigation
17    in New York City and looked at if these were bona fide
18    shares or not, and the conclusion that they drew was also
19    that these pieces of paper are utterly worthless.  And
20    so today they're back in my possession, but they are
21    utterly worthless, there's absolutely zero value
22    associated with these pieces of paper, and they were a
23    major part of the transaction that took place to induce
24    me to sell my companies to Braintech.
25  Q   Okay.  Mr. Shafi, why don't we break this down and little
```

Page 444

```
 1    bit.  In what month did you take these actions that you
 2    took to present these shares to Edward Jones or Fidelity?
 3  A   Okay.  Let's add six months.  Do some basic math.  Let's
 4    add six months to the time the shares were given to me.
 5    These shares were given to me around August of 2008, and
 6    if you add six months to this date you get February of
 7    2009.  So on or around the middle of February 2009,
 8    that's when I approached the securities houses, because
 9    that was the conclusion of the six-month lockout period.
10  Q   Okay.  You approached Edward Jones.
11  A   Yes.
12  Q   And you approached Fidelity Securities?
13  A   Investments, I said.  Fidelity Investments.
14  Q   Okay.  So you had these restricted shares, and who told
15    you to go to Edward Jones or Fidelity to try to do this
16    registration?
17  A   It was my own decision.  It was my accord.  I didn't have
18    to go to anybody to ask.  I simply had these shares, and
19    I thought they were bona fide compensation for the sale
20    of my companies, but they were not.  They were useless
21    compensation.
22  Q   Okay.  Again, if you're going to start going down this
23    road, Mr. Shafi, where you feel like you have to, you
24    know, every answer you give has to state that these are
25    all worthless and whatever it is, we're going to have to
```

Page 445

```
 1    do something else.
 2  A   Okay.  They are worthless.
 3  Q   It's just not helpful.
 4  A   Okay.
 5  Q   And it's not -- It's not answering my question.  It's not
 6    going to frankly permit us to get done today if you're
 7    going to keep doing that.
 8  A   Okay.
 9  Q   So you didn't follow -- Nobody told you to take the
10    shares to Edward Jones or to Fidelity Investments,
11    correct?
12  A   Nobody had to.
13  Q   Gosh.
14  A   Nobody did.  Nobody had to.
15  Q   Did you seek advice of counsel in connection with any
16    attempt to register these shares?
17           MR. MURPHY:  I'm going to object, because
18    I think that that implicates the privilege.  You can
19    answer yes or no as to whether you sought advice of
20    counsel, but don't go any further.
21           THE WITNESS:  Yes, I did seek advice of
22    counsel.
23  Q   (Continuing by Mr. Greeves):  Okay.  And when did you seek
24    that advice?
25  A   At the time I told you, which is add six months to August
```

Page 446

```
 1    of 2008.  Around February of 2009 I talked to Mr. Murphy.
 2  Q   Okay.  So you talked to Mr. Murphy in connection with
 3    registering the shares?
 4  A   Yes.
 5           MR. MURPHY:  I'm --
 6           MR. GREEVES:  I'm not going to get into
 7    the sum -- Please, let me answer -- let me ask my
 8    questions.  I'm not going to allow your witness to invade
 9    his own privilege, okay?  I wouldn't do that to you.
10  Q   (Continuing by Mr. Greeves):  Did Mr. Murphy give you
11    advice about that?
12           MR. MURPHY:  About what?
13           MR. GREEVES:  About registering the
14    shares.
15           MR. MURPHY:  No, no, no, no.
16           MR. GREEVES:  Don't tell me if he -- Don't
17    tell what advice he gave you, but did he give you advice
18    about it?
19           MR. MURPHY:  Not that I think it matters
20    and not that I think it's relevant to anything in this
21    case, but I think it is privilege, and I'm going to tell
22    him not to answer.
23  Q   (Continuing by Mr. Greeves):  Okay.  Outside of speaking
24    with Mr. -- By the way, we'll take that issue up, but
25    outside of speaking with Mr. Murphy, did you consult with
```

18  (Pages 443 to 446)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 447

1    anyone else about registering these shares of restricted
2    Braintech stock?
3    A   I don't recall.
4    Q   Did you speak with any nonlawyers about it?
5    A   I don't recall.
6    Q   Are you aware of the rescision action that the company
7        brought against you in November of 2008, the lawsuit it
8        filed?
9    A   Yes.
10   Q   So at the time that you attempted to register these
11       shares, or not -- Strike that.
12              At the time that you undertook these
13       actions in 2009, the lawsuit was pending against you to
14       get these shares back, correct?
15              MR. MURPHY:   Object to the question.
16       There's a foundation problem issue here, because this
17       lawsuit was not filed in November of 2008.
18   Q   (Continuing by Mr. Greeves):   Well, I'll just ask him,
19       then.   At the time that you sought to do something with
20       these shares with Edward Jones and Fidelity Investments,
21       was there a lawsuit that was filed against you in
22       connection with rescinding this stock purchase?
23   A   I don't recall the exact date that the Braintech lawsuit
24       was filed or if it was before or after February of 2009.
25   Q   Okay.   But Braintech had already offered to take the

Page 448

1        shares back and to give you back everything that you sold
2        to Braintech, right?
3    A   Yes.
4    Q   And that was not an acceptable resolution to you?
5    A   It was completely ridiculous.   It was completely
6        unacceptable to me.   It was utterly ridiculous to even
7        have the gumption to say that.
8    Q   All I asked was whether it was acceptable to you or not,
9        sir.
10   A   No.   And oh, no.
11   Q   Are you generally aware of the requirements that you have
12       to follow in order to register these unregistered
13       securities under Section 144 of the Exchange Act?
14   A   I'm not generally aware of these terms that you just
15       spoke of.
16   Q   Are you aware that there is an exemption by which these
17       shares automatically become registered after six months?
18   A   I did not know that.
19   Q   Did you ever undertake to find out about that?
20   A   It was represented to me that after six months I could go
21       try to sell these shares.   That's what was told to me
22       when these were tendered to me, so I don't dabble in
23       Securities and Exchange Commission types of things as a
24       career, but I just went to these exchange houses and
25       looked to see if I could get money out of these -- these

Page 449

1        pieces of paper.
2    Q   Okay.   And so which one did you go to first?
3    A   I told you.
4              MR. MURPHY:   Objection.   Asked and
5        answered.
6              THE WITNESS:   I told you.   I already went
7        to -- I first went to Edward Jones.
8    Q   (Continuing by Mr. Greeves):   All right.
9    A   Said, "I have these pieces of paper.   Can I get money out
10       of them?"
11   Q   You went to Ed -- And where was the office that you went
12       to?
13   A   In Brighton, Michigan.
14   Q   So you went to the street broker in Brighton, Michigan,
15       presented them with the share certificates?
16   A   Yes.
17   Q   And who did you present these share certificates to?
18   A   To the person who was running the office there.   I don't
19       recall the name, but I went through the Edwards Jones
20       office -- Edwards Jones maintains a bona fide office in
21       Brighton, Michigan, and I went to them and I said,
22       "Here's three pieces of paper I have that purport to say
23       that they're a million shares each, and so I'd like to
24       start selling them to make money."
25   Q   And what did Edward Jones tell you?

Page 450

1    A   They said, "These are not" --
2    Q   As best you can recall.
3    A   They said, "They're worthless."   They said, "They're
4        worthless.   You can't do anything with them.   Please take
5        them back."   That's what they told me.
6    Q   So you handed these shares to Edward Jones and they
7        handed them right back to you and said "They're
8        worthless."   I mean is this a simultaneous thing?
9    A   They took a day or two -- They took -- They did some due
10       diligence of their own and they said, "Please come back
11       and we'll tell you," and so, you know, I think it was a
12       day or two or maybe three days, something like that, and
13       they came back and said, you know, "Mr. Shafi, we're
14       sorry, but these things are worthless.   You can't do
15       anything with them."
16   Q   Well, did they tell you what you could do with them to
17       make them not worthless?
18   A   No.   They just said, "These are not registered with the
19       SEC.   We can't do anything with them."   I said, "Is there
20       anything I could do?"   They said, "No, we don't know of
21       anything you can do with them."   So I took them back and
22       I took them to another brokerage house after that, which
23       was Fidelity Investments in Novi, Michigan.   I went
24       there, and they offered to send these to their New York
25       office who specializes in these types of shares, and they

19  (Pages 447 to 450)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 451

1    said, "Let's have our internal department do this," and
2    they did. Sent them all the way to New York City. And I
3    engaged in some conference calls with them after that,
4    and they said, "No. These are useless. They're
5    worthless. You can't do anything with them." I asked
6    them if there was anything I could do with them, and they
7    said, "No, you can't." And so I had to take them back as
8    useless paper.
9    Q    Were any of the shares in escrow at the time?
10   A    There might have been through our agreements, but the
11   basic tenet was that after six months I was allowed, and
12   that was the compensation given to me -- part of my
13   compensation given to me -- for the sale of my companies.
14   Q    Okay. So are you aware of -- I may have already asked
15   you this, and I apologize. I'm not sure you answered it.
16   Do you know if there was a lawsuit pending at the time
17   you tried to sell these shares?
18   A    Right. That's what I just said. I don't recall if the
19   lawsuit was already in place at that time or if it came
20   after that mid February of 2009 time frame. I don't
21   recall exactly the date that the Braintech lawsuit was
22   filed. I'm sure that can be checked and verified.
23   Q    Well --
24   A    It's a public record. This federal lawsuit is a public
25   record thing, so I'm sure that can be verified.

Page 452

1    Q    Did that factor into a decision that you would have made
2    about this, whether or not there was a lawsuit pending
3    about this issue? Did you care?
4    A    These were shares given to me for the sale of my
5    companies. I had sold my companies. It was publicly
6    advertised as represented by Braintech that this
7    transaction had taken place, so I went ahead and looked
8    to see if I could get money out of these pieces of paper.
9    Q    Has anyone ever made you aware of the minimal
10   requirements that are in place to effect registration of
11   these unregistered shares under Section 144?
12   A    No, I'm not an expert in these matters. I'm not.
13   Q    I'm not asking you to be an expert, sir. My question was
14   very clear. Has anyone made you aware of the
15   requirements --
16   A    No.
17   Q    -- to register unregistered shares?
18   A    No. I just was told to go to a brokerage firm after
19   these -- the six-month period has expired.
20   Q    Did you ever receive an opinion -- Well, you're aware
21   that Braintech had an in-house lawyer, right?
22   A    Braintech had several in-house lawyers.
23   Q    Right. Did you ever ask them about the registration of
24   securities?
25   A    Yeah, I talked to this person here and I talked to, you

Page 453

1    know -- I mean I was basically told that at the
2    conclusion of the six-month period I would be able to go
3    sell these shares as compensation. There was a limit of,
4    I think, $25,000 per week that I could sell these shares
5    for, and that was attractive to me, and I was finally
6    after six months looking to get that revenue. I'm not an
7    expert at these matters. I'm just, you know, I'm a good
8    engineer and I basically took that at face value as the
9    inducement given to me for my companies, sale of my
10   companies, that I could go after six months and do
11   exactly that, go to a credible brokerage firm, offer
12   them -- tell them I had these shares. I mean if I need
13   to sign a piece of paper or so, I would, but I needed to
14   sell these shares now, and I could not. It was a huge
15   disappointment.
16   Q    And here's my question.
17   A    To say the least. It was a huge disappointment to sit
18   there for six months and after all this 20 years of hard
19   work that my companies had created, all the work that we
20   had created, all the solutions we had provided to the
21   industry and such, and the sale was a stock-for-stock
22   transfer, it was all these shares that were paid in
23   exchange for that value, and I found out six months after
24   the transaction that these are utterly useless pieces of
25   paper. In essence, Braintech stole my companies, Shafi,

Page 454

1    Shafi Innovation, Inc. Braintech stole these companies.
2    It was a highway robbery, because the shares tendered to
3    me were utterly useless.
4    Q    My question was a very simple question, sir.
5    A    Okay.
6    Q    After the six-month period played itself out did you ever
7    contact Braintech -- Let me finish. Did you ever contact
8    Braintech to enlist their help in registering these
9    securities?
10   A    I did not contact Braintech.
11   Q    And you were aware, were you not, that Braintech had an
12   in-house counsel, correct?
13   A    Well, they came and went, but I basically knew that these
14   were -- I mean I was not on good terms with Braintech,
15   and I didn't have to contact Braintech to do that. I was
16   told these shares are bona fide shares.
17   Q    Okay.
18   A    Or pieces of paper.
19   Q    Mr. Shafi, all I want is factual information. Did you
20   ever -- You knew that Braintech had an in-house lawyer
21   who dealt with securities, right?
22   A    At the last time of my interaction with Braintech was in
23   November of 2008. I didn't know if Braintech had fired
24   lawyers or hired more in 2000 -- in February of 2009. I
25   was not inclined to contact Braintech because of the

Tri-County   Court Reporters
248-608-9250

Electronically signed by Lauri Sheldon (001-336-738-9633)                                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 455

1    nature of my termination, so I didn't contact Braintech.

2  Q  Well, were you afraid to contact Braintech because you

3    thought they wouldn't help you?

4  A  I was not afraid. I was not -- Can't say -- No, I

5    just . . . You know, Braintech was a dishonest company.

6    Why should I contact somebody like that? These shares

7    were supposed to be good and bona fide for the sale of my

8    companies, and they were not, so I went to a brokerage

9    firm who would have to execute this, and they said it was

10    worthless.

11  Q  And you gave up at that point?

12  A  What else could I do? I went to two brokerage firms,

13    reputable firms. They're well known in the financial

14    industry. If they couldn't help me, what else could I

15    do?

16  Q  Well, I mean -- I'm asking you what else you did do.

17  A  I didn't do anything after that. I was told that they

18    were worthless.

19  Q  Did you ever ask Braintech or any lawyer for Braintech to

20    give you the opinion that you would need to register

21    these securities?

22  A  No.

23          MR. MURPHY: Objection. Asked and

24    answered.

25          THE WITNESS: No.

Page 456

1  Q  (Continuing by Mr. Greeves): And did you ever receive

2    advice from a lawyer that these were unregisterable

3    shares?

4          MR. MURPHY: Objection. Asked and

5    answered, but go ahead and answer.

6          THE WITNESS: I contacted Mr. Murphy and

7    then, like I said --

8          MR. MURPHY: Objection. That's it.

9          THE WITNESS: I won't say anything more

10    than that.

11  Q  (Continuing by Mr. Greeves): Okay. Why don't we mark

12    that one and we'll take that up with the court, because

13    frankly, J.P., if he -- if he didn't -- if he took steps

14    to get advice about this issue, that's an important

15    consideration and something that's really not privileged,

16    and if he didn't, that's something that we should be able

17    to know about as well, so I guess it's fair to say -- Let

18    me ask you, would you --

19          MR. MURPHY: Braintech's complaint has

20    been dismissed. What's the point of any of this?

21          MR. GREEVES: Well, that's -- that's

22    irrelevant, so let me ask you this: Would you object to

23    any questions that I ask your client with regard to

24    advice that he sought in connection with the registration

25    of these securities?

Page 457

1          MR. MURPHY: Yes.

2          MR. GREEVES: Why don't we take a

3    one-minute break. Be right back.

4          (Whereupon a recess was take at or about

5    the hour of 3:43 p.m., and the deposition was resumed at

6    or about the hour of 3:48 p.m.)

7  Q  (Continuing by Mr. Greeves): Mr. Shafi, are you aware

8    that the Braintech restricted securities that you got are

9    the exact same securities that Braintech gives to

10    everybody?

11  A  I don't.

12  Q  Did you ever endeavor to find that out; in other words,

13    if what you got was different than what everyone else was

14    getting?

15  A  I took them at face value as to what they said.

16  Q  Not -- Again, that's not my question, sir. My question

17    is did you ever undertake to find out if what you got

18    from Braintech was somehow different than what, let's

19    say, Mr. Weidinger got in terms of the shares that he was

20    issued?

21  A  It was not my place to do so. I just got shares as bona

22    fide shares as compensation for my companies, and that

23    was what was represented to me. I was under no

24    obligation to go comparing with the rest of the world.

25    It was not my job. It was not asked -- I was not asked

Page 458

1    to do so. I was not asked to go and compare my shares

2    with this person or that person or a fourth person. That

3    wasn't my responsibility, nor my job, nor my expectation,

4    nor told to me that I should go. The answer's no.

5  Q  Okay. Do you believe that you were defrauded -- Is your

6    theory that you were defrauded because somehow Braintech

7    gave you shares that were different than the shares that

8    it was giving to everybody else in the world?

9  A  I was defrauded on many, many fronts. I was defrauded on

10    many, many fronts. This is just one of them.

11  Q  Okay. So you believe that you were defrauded because the

12    shares you got were somehow different than what other

13    people got?

14  A  I got shares that were worthless, or I got pieces of

15    paper that were supposed to be shares that ended up being

16    worthless. That's what I got.

17  Q  Okay. And what I'm asking you, sir -- I'm not trying to

18    complicate this, but my question is is your claim that

19    the fraud was that you got -- somehow got these different

20    shares than other people got?

21  A  Okay. The -- What I have claimed is obviously written in

22    my counter complaint, so you could easily reference

23    exactly what the counts are. On the matter of shares,

24    I've told you very clearly I'm not an expert in these

25    matters. I received shares in exchange for my 20 years

21  (Pages 455 to 458)

Electronically signed by Lauri Sheldon (001-336-738-9633)          82ffdfd7-078e-4382-96cf-6d28b563e04a

1    of work at Shafi, Inc., and the companies and software
2    that they held. After six months, which was a lockout
3    period, I engaged in looking for cashing those or getting
4    money, and I basically didn't receive anything.
5  Q   Okay. And because that happened you believe that fraud
6      was committed on you?
7  A   Yes. I mean as part of several other aspects of the
8      fraud, this was one of them.
9  Q   Now, the information that you received back from Edward
10     Jones and Fidelity Investments, was that in writing?
11     That was communicated to you in writing, do you know?
12  A   I don't think it was in writing. It was verbal, to the
13     best of my recollection. We did engage in at least two
14     conference calls with Fidelity Investments. I believe
15     that's on their record.
16  Q   Who's we?
17  A   Fidelity Instruments and me.
18  Q   Okay. Just the two. Mr. Murphy wasn't a part of those
19     conversations?
20  A   No.
21  Q   Okay.
22  A   But basically the short answer is that I tried to see if
23     I could cash my shares or pieces of paper as shares, and
24     I found out that they were worthless.
25  Q   Okay. You're aware that every officer, director, and

1      person at Braintech who got stock got the same exact
2      stock as you?
3  A   Again, I told you I was not asked to compare, nor was it
4      my obligation, nor was it my responsibility, to go see
5      who all at Braintech, office holders or board of
6      directors were and what their shares were and what
7      their -- nature of their arrangement was with Braintech
8      and mine and come up with a report and a summary and an
9      analysis as to how mine was different than theirs. I was
10     under no such obligation, sir. I was totally given the
11     shares and told that I could sell them after six months.
12  Q   And did you ever make a demand of Braintech to do
13     anything in connection with the shares after the six
14     months was over?
15  A   I don't believe so.
16  Q   But your intent at that time was to sell all three
17     million shares when you went to the --
18  A   Well, I was -- The deal was that I could sell up to
19     $25,000 worth the shares. Whether they were 25,000 or
20     500,000 didn't matter, but there was a dollar limit per
21     week of selling these shares, and the stock was
22     continuously declining since the closing. At the closing
23     it was about 29 or 30 cents and it just kept plummeting,
24     so at the time February or -- February or March of 2009,
25     these shares had declined in value, but I still had a

1      substantial number of -- numbers of shares purported in
2      those documents, on those pieces of paper, and so I felt
3      that I could go and sell 25,000 a week, and I was relying
4      on that. I was relying -- I was -- I needed that, and
5      this was yet another disappointment, another piece of
6      fraud, another piece of misrepresentation, another
7      injustice done to me that showed consistently fraudulent
8      manner in the way my deal was handled.
9  Q   Had you ever heard of any other person at Braintech that
10     had difficulty registering their restricted stock?
11  A   No. And it was not my business.
12  Q   Sir, I'm just asking you if you --
13  A   I just answered your question saying no.
14  Q   Okay.
15  A   No, I didn't. It wasn't my business. I did not.
16  Q   So as far as you know, you're the only person who ever
17     had this problem?
18  A   I don't know. I don't keep track of other people's
19     business. It's not my responsibility. It's not my job.
20     I don't have any fiduciary responsibility to keep track
21     of all Braintech shareholders and see how they're making
22     out. It's not my job.
23  Q   All right. So let's go back to the debt. Do you recall
24     that part of the agreement or the transaction was that
25     certain debt was to be assumed --

1  A   Yes.
2  Q   -- by Braintech?
3  A   Yes. That's correct.
4  Q   So to date can you tell us here how much of that debt you
5      have personally paid?
6  A   Substantial amount of the breaches, especially some of
7      the secured debt that Braintech had. I mean the
8      spreadsheet says Braintech accepted debt, and since
9      Braintech failed to --
10  Q   My question was really simple. It was how much of it
11     have you paid? I don't need to hear the whole --
12  A   A lot.
13  Q   -- lawsuit recitation.
14  A   I paid more than a hundred thousand dollars' worth of
15     that through loans I have had to take personally from
16     people, friends and family, to take care of those things.
17     It's been a very difficult process in the last two years,
18     I must tell you.
19  Q   So the hundred thousand dollars -- You think it's about a
20     hundred thousand dollars --
21  A   It could be more. I mean I -- again, I don't --
22  Q   You've got to let me my finish question.
23  A   Okay. Finish your question.
24  Q   I want to get out of here. A hundred thousand dollars is
25     what you approximate is debt that you believed Braintech

22  (Pages 459 to 462)

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 515

```
 1   Q   -- my question at all.
 2   A   Yeah. It's -- I'm a very busy person. I do --
 3   Q   I understand that.
 4   A   -- a lot of different things and you, you know, things
 5       like you're asking are, you know, are there, but they're
 6       not a majority of my focus.
 7   Q   Is it fair to say that regardless of who would have
 8       approached you, you would have turned them down because
 9       your focus is on building up Advenovation and running
10       your own company versus working for someone else?
11   A   Well, I worked with somebody else and I saw what I got,
12       so I wasn't going to do that again.
13   Q   So it's true what I said, right?
14   A   Possibly. I mean possibly. I mean it's not like -- You
15       cannot characterize, and I want to put this on the
16       record, you cannot characterize me and put me in a box to
17       say this is your sole thing and this is the sole thing
18       you did and you only did this, but you didn't do that.
19       You know, it's a gray area out there. There's a lot of
20       activities that I'm involved with, and some may have
21       transpired into offers. Some may have transpired into
22       this or that, but you can't just say, oh, you just did
23       this or you testified in your deposition, you just did
24       that. You know, it's erroneous of you to do that.
25   Q   You're not looking to become an officer in another
```

Page 516

```
 1       corporation at this point in time; you're satisfied with
 2       running Advenovation; is that true?
 3   A   By enlarge. I mean if somebody offered me a billion
 4       dollars to run some other big company, I would consider
 5       it.
 6   Q   Do you think that's likely to happen?
 7   A   Probably not, but, you know, there are people who are
 8       interested in my skills, and so these types of things do
 9       come up and, you know, I deal with them on a day-to-day
10       basis.
11   Q   Sir, I'm handing you Exhibit 1 from the first deposition,
12       and you'll see I have two tabs. You don't need to look
13       through the entire document. If you will just look at
14       tab one -- Not tab one, but the first yellow that I have.
15       You've got it. You've got it. You did it exactly right.
16       And I don't want to get into the substance of this
17       letter. If you want to review it very quickly there just
18       to refresh your recollection as to what it is, this is --
19       I'm going to identify it for the record just for
20       quickness here -- is a letter addressed to Mr. Adil Shafi
21       dated November 19, 2008, signed by Rick Weidinger. You
22       recall receiving that letter, do you not?
23   A   Okay. Yeah, I recall it.
24   Q   All right. I have not seen it, and I think I've looked
25       fairly carefully through all of the documents that have
```

Page 517

```
 1       been exchanged in this case, but can you confirm for me
 2       that there is no document from you responding to this
 3       letter of Mr. Weidinger?
 4   A   I believe that's correct.
 5   Q   All right. If you'd go to the second tab. For the
 6       record, this appears to be an email from Jeff Milton to
 7       Adil Shafi dated Monday, November 24, 2008, and it's two
 8       pages.
 9   A   Okay. I recall this.
10   Q   And the same question as I asked with the other document.
11       I have not seen it and I would like you to confirm for me
12       that there is no written document from you responding to
13       the email from Mr. Milton.
14   A   I believe that's correct.
15   Q   Did you have any verbal communication with Mr. Milton
16       after this email was sent to you?
17   A   I don't recall. We may have left voice messages. I know
18       there was some emails exchanged after this, which I have
19       on record. I believe it's part of our discovery
20       material. It's in -- on the record and in our discovery
21       material, the emails that were exchanged with Milton, but
22       I don't recall. I know we did not -- I did not make
23       any -- It was utterly unacceptable to me.
24   Q   Sir, the question: Any verbal communication with Mr.
25       Milton after this email?
```

Page 518

```
 1   A   I don't recall.
 2   Q   Okay. It's possible, but you would have no idea of what
 3       was said?
 4   A   I don't recall.
 5   Q   But what I said is true; at this point in time you have
 6       no recollection of what was said if there was a verbal
 7       communication?
 8   A   There -- Yeah, I don't -- I don't remember what --
 9       what exactly we did.
10   Q   Going back to the letter from Rick Weidinger, any verbal
11       communication with Rick Weidinger after this letter was
12       sent to you?
13   A   I do not believe so.
14   Q   Okay. Is Advenovation solvent at this point in time?
15   A   It's Advenovation. Yes, I believe so.
16           MS. KOVAL: I need to confer for just a
17       few minutes and . . .
18           (Whereupon a recess was taken at or about
19       the hour of 5:10 p.m., and the deposition was resumed at
20       or about the hour of 5:16 p.m. )
21   Q   (Continuing by Ms. Koval): Mr. Shafi, the PC and laptop
22       that you used when working for Braintech, that was the
23       same PC and laptop you used when you worked and did work
24       on behalf of Shafi, Inc., and Shafi Innovations, right?
25   A   Yes.
```

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 521

1

2

3    STATE OF MICHIGAN       )
                             )        ss:
4    COUNTY OF MACOMB        )

5

6

7         I hereby certify that the foregoing attached

8    pages are a full and complete transcript of the

9    proceedings held on the date and at the place

10   hereinbefore set forth.  I reported stenographically

11   the proceedings held in the matter hereinbefore set

12   forth, and the testimony so reported was

13   subsequently transcribed under my direction and

14   supervision, and the foregoing is a full, true and

15   accurate transcript of my original stenotype notes.

16

17              _Lauri A. Sheldon_

18              Lauri A. Sheldon CSR-4045, R

19

20   Notary Public
     Macomb County, Michigan
21   My Commission Expires:
     February 8, 2015
22

23

24

25

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a