# EXHIBIT M

June 19, 2008

VIA EMAIL and FAX

<u>CONFIDENTIAL</u>

Adil Shafi
President
Sole Owner
SHAFI, Inc.
SHAFI Innovation, Inc.

Re:   <u>Proposal to Purchase Stock of SHAFI, Inc. and SHAFI Innovation, Inc.</u>

Dear Adil:

This letter ("Letter of Intent") sets forth the proposal from Braintech, Inc. ("Braintech") to purchase from Adil Shafi (references herein to "you" and "your" shall refer to Adil Shafi) all of the outstanding capital stock of SHAFI, Inc. ("SI") and 80% of the outstanding capital stock of SHAFI Innovation, Inc. ("SII", and together with SI, "SHAFI") (such potential purchase, the "Transaction").

This Letter of Intent is not intended to be and does not create any legally binding obligations on either party except as expressly provided below. No legally binding obligations will be created (except as expressly provided below), implied or inferred unless and until mutually-agreeable definitive transaction documents in final form (the "Definitive Agreements") are executed and delivered by the parties. Without limiting the generality of the foregoing, it is the parties' intent that, except as expressly provided below, until the execution of the Definitive Agreements, if any, no agreements shall exist between them and there shall be no obligations whatsoever based on such things as parol evidence, extended negotiations, "handshakes," oral understandings, or courses of conduct (including reliance and changes of position).

1.    <u>Acquisition of SHAFI Stock.</u>  Braintech would purchase all of the outstanding capital stock of SI and 80% of the outstanding capital stock of SII (the SI and SII stock to be so purchased, collectively, the "Stock"), and, as a result, each of SI and SII shall be operating subsidiaries of Braintech. The parties' tax advisors will work out a mutually beneficial tax structure for the Transaction, which may include a Section 338(g)(11) election under the Internal Revenue Code (and corresponding election under state, local and foreign tax laws)(such Section 338(g)(11) and corresponding elections, a "Tax Election").

TGO 357447440v12 113286.010000

*Rick We*

Confidential Letter of Intent
June 19, 2008
Page 2

2.   <u>Proposed Purchase Price for the Stock</u>.

The consideration for the purchase of the Stock ("Purchase Price") is to be as follows:

- $50,000 refundable deposit already paid to SI on behalf of SHAFI ("Pre LOI Deposit");

- $50,000 refundable deposit upon execution of this Letter of Intent to be paid to SI on behalf of SHAFI ("LOI Deposit");

- 3,000,000 shares of Braintech's $0.01 common stock from its stock bonus pool (such $30,000 ($0.01 x 3,000,000) to be paid by Braintech) issued at Closing; and

- 1,000,000 shares of Braintech's $0.01 common stock from its stock bonus pool (such $10,000 ($0.01 x 1,000,000) to be paid by Braintech) issued at Closing and placed into escrow to be earned by you post Closing during the first year of employment at 250,000 shares per quarter when you meet the quarterly milestones as contained in the Assess and Amortization schedule that has been jointly developed by you and Braintech and will be included in your Employment Agreement described below.

3.   <u>Definitive Agreements</u>.  The transaction contemplated in this Letter of Intent shall be set forth in mutually agreeable Definitive Agreements which shall include, among other agreements and documents, a Stock Purchase Agreement providing for the sale and purchase of the Stock ("Stock Purchase Agreement").  The Stock Purchase Agreement will include representations, warranties, covenants, indemnities and other terms typical for transactions of this nature, including your indemnity with respect to SHAFI indebtedness that exceeds $1,000,000.  Braintech will be responsible for preparing the initial draft of the Stock Purchase Agreement and other Definitive Agreements.

4.   <u>Closing Conditions</u>.  Consummation of the Transaction will be subject to the satisfaction of customary and appropriate conditions to be set forth in the Stock Purchase Agreement, including each of the following:

(a)    The receipt of all necessary governmental or third-party consents and approvals to the Transaction.

(b)    The Stock, when sold and delivered in accordance with the Stock Purchase Agreement, will be duly and validly issued, fully paid and non-assessable, and free and clear of all liens, encumbrances and restrictions on transfer other than restrictions on transfer under the Agreement and under applicable securities law.

(c)    Execution of a mutually agreeable 3 year employment agreement with you substantially similar to the form attached hereto as <u>Exhibit A</u> ("Employment Agreement") to serve as Braintech's Chief Operating Officer, with an annual salary of $180,000, full benefits, eligibility for annual cash bonus of not less than 25% and not more than 50% of your annual salary, annual raises of at least 10%, 1,000,000 employee stock options initially with eligibility

TCO 357447440v12 113286.010000

Confidential Letter of Intent
June 19, 2008
Page 3

for future stock options, accompanied by a reasonably acceptable non-competition and non-solicitation agreement.

     (d)    Braintech will acquire the Stock subject to the indebtedness, obligations and other liabilities, not to exceed $1,000,000, owed by SHAFI and set forth on the Creditor and Payment Schedule attached hereto as Exhibit B ("SHAFI Obligations"). Braintech will covenant and agree with you that it will ensure the complete satisfaction of the SHAFI Obligations. Other than the SHAFI Obligations, SI and SII shall have no other indebtedness.

     (e)    The absence of any material adverse change in the financial and/or operating performance of SHAFI. The absence of any material adverse change in the business of Braintech that would materially impair the value of the Transaction to Braintech.

     (f)    Delivery at Closing by SHAFI to Braintech of the following:

     (i)    Market Access schedule;

     (ii)    Revenue and contract pipeline;

     (iii)    Current balance sheet; and

     (iv)    List of agreements and settlements;

which documents shall not be materially adversely different from the Market Access Schedule, Revenue and Contract Pipeline, Current Balance Sheet and List of Agreements and Settlements attached hereto as Exhibits C, D, E and F, respectively (collectively, the "SHAFI Information").

     (g)    The uses and proposed uses of the Pre LOI Deposit and the LOI Deposit, respectively, shall have been in accordance with the uses and proposed uses set forth on Exhibit G attached hereto.

5.    Other Covenants.

     (a)    You shall be the President of SII as of the Closing. Additionally you will create a Board of Directors for SII and agree that one member be the CEO of Braintech.

     (b)    SII would begin a market presence in Houghton, MT in July 2009, with HubZone planning and registering Braintech for preferred government status to commence no later than Closing.

     (c)    Without limiting the generality of the last sentence of Section 4(d) above, SHAFI shall have no obligations with respect to the indebtedness, in the approximate principal amount of $498,876, between you and SHAFI. You shall be entitled to all automotive market revenue (non-ABB) of SHAFI from the date of Closing through September 2009. ~~To the extent allowed~~ RW ~~by law, SHAFI shall assign to you any net operating loss carry forwards or other tax benefits as of Closing.~~

TOO 357447440v12 113286.010000

Confidential Letter of Intent
June 19, 2008
Page 4

(d)   You will agree as of Closing that the Braintech common stock paid as Purchase Price for the Transaction shall be subject to a lock-up agreement for six (6) months, and thereafter sales or other transfers of such common stock shall be limited to $25,000 per week; in connection with these stock sale/transfer restrictions, you will be treated consistent with other major stockholders of Braintech.

(e)   As Chief Operating Officer of Braintech, Braintech Vancouver's Research & Development operations will report to you, and you will develop a U.S. based engineering group starting with the hiring of two engineers, who will report directly to you, as well as the other employees discussed below.

(f)   Braintech will hire Donna Burr as your assistant, reporting to you, upon mutually acceptable terms to include annual compensation of $67,000 with full benefits plus minimum annual raises of $5,000, and Elsie White, reporting to you, as SII's Director of Government and International Programs, who will continue to reside in Houghton, MI to satisfy HubZone qualification requirements, upon mutually acceptable terms to include annual compensation of $67,000 with full benefits plus minimum annual raises of $5,000. The parties will discuss and agree on a starting date for such employees.

(g)   Braintech will potentially hire a business development employee to be recommended by you with final approval by Braintech's Chief Executive Officer.

(h)   Consider using SHAFI Brighton office to support robot demos for sales, and to serve as Chief Operating Officer and sales office, at a lease rate of approximately $2,500 per month.

(i)   You will actively assist Braintech's Vice President of Sales, who shall be responsible for actual sales and revenue performance, for 12 months following Closing with market contacts, relationships, integrator program development, web training and market knowledge (collectively referred to as "Market Access").

(j)   You will, simultaneously with Closing, be elected to Braintech's Board of Directors and Braintech shall take such actions, to the extent not precluded by its current charter, bylaws and corporate governance policy to maintain your membership on the Board for the entire term of your employment contract.

(k)   You will be indemnified and held harmless by Braintech from and for the SHAFI Obligations and any associated personal guarantees.

(l)   At the termination of your employment contract, there will be a mutual option to renew that employment contract for not less than one (1) year and not more than three (3) years.

(m)   The parties agree to mutually develop a SHAFI IP "recovery clause" for you,

TCO 357447440v12 113286.010000

06-19-'08 20:30   FROM-Ameristar Casino        7123963113              T-199   P005/014 F-963

Confidential Letter of Intent
June 19, 2008
Page 5

personally, with you personally having the first right to purchase at existing market value, if
Braintech becomes insolvent.          June 1, 2008                          PW 

6.    Closing.  Braintech intends that the consummation of the Transaction (the "Closing")
will occur not later than ~~June 23, 2008~~, or on such later date as is agreed upon by the parties
("Closing Date"), at a location to be mutually determined.

7.    Due Diligence Review; Availability of Information and Cooperation.  SHAFI shall
permit Braintech to conduct such due diligence investigation as reasonably requested by
Braintech.  SHAFI will afford Braintech and its respective officers, directors, employees,
auditors, legal counsel, and other authorized representatives of SHAFI and the opportunity to
inspect, investigate, and review the assets, liabilities, contracts, documents, operations, employee
matters, customer matters, supplier matters, business matters, and other financial, and legal
matters relating to SHAFI; provided, however, that Braintech will not contact customers,
vendors, suppliers, banks and employees of SHAFI without the prior consent of SHAFI.

8     Conduct of Business.  You and SHAFI will use commercially reasonable best efforts
prior to the consummation of the Transaction to preserve SHAFI's business organization intact,
and to preserve its goodwill and the confidentiality of its business know-how, to preserve for
SHAFI the relationships between SHAFI and its customers, vendors and others having business
relations with SHAFI.  Without limiting the foregoing, prior to the consummation of the
Transaction: (i) the business of SHAFI shall be conducted only in the usual and ordinary manner,
consistent with past practice, and the character of the business shall not be changed; and (ii) no
change shall be made in the equity ownership of SHAFI and SHAFI will not make any
distributions to its equity holders.

9.    Exclusive Dealing.  In consideration of the time and expense Braintech will expend in its
due diligence examination of SHAFI, you and SHAFI agree that during the period commencing
on the date of this letter and ending on Closing, or the termination or expiration of this Letter of
Intent, you and they shall not (and will not permit yours or their representatives to), directly or
indirectly, through any representative or otherwise, provide information to, solicit or entertain
offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal
of any other person or entity relating to the acquisition of the Stock or of any of the assets of
SHAFI or any of its subsidiaries (except in the ordinary course of SHAFI's business), in whole
or in part, whether through direct purchase, merger, consolidation, sale of stock or other business
combination or joint venture.  Further, you and SHAFI will (and will cause yours and their
representatives to) terminate or cause to be terminated immediately all existing discussions or
negotiations with any persons conducted heretofore with respect to, or that could be reasonably
expected to lead to, any such direct purchase, merger, consolidation, sale of stock or other
business combination or joint venture.  You and SHAFI will immediately notify Braintech
regarding any contact between SHAFI, you or any of your or their representatives and any other
person or entity regarding any such offer or proposal or any related inquiry.  If the Stock
Purchase Agreement is executed, it will contain a similar exclusive dealing provision.

ICO 36/44/440Y12 113288.010000

Rick We

Confidential Letter of Intent
June 19, 2008
Page 6

10.   Confidentiality.  The parties hereto acknowledge that the Non-Disclosure Agreement between the parties, dated March 3, 2008, remains in effect and that this Letter of Intent shall be deemed Confidential Information, as defined therein.

11.   Expenses.  Except as otherwise set forth in Exhibit B, each party shall bear its own expenses (including legal fees), in connection with this Letter of Intent and/or relating to the Transaction regardless of whether the Transaction is consummated.

12.   Representation by Counsel; Interpretation.  The parties hereto acknowledge and agree that:  (i) each party and its counsel reviewed and negotiated the terms and provisions of this Letter of Intent and have contributed to its revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Letter of Intent; and (iii) the terms and provisions of this Letter of Intent shall be construed fairly as to the parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Letter of Intent. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.

13.   Counterparts; Facsimile.  This Letter of Intent may be executed and delivered in counterparts and by facsimile transmission, each of which shall be deemed an original and all of which taken together shall constitute one and the same document.  Each party agrees that the delivery of this Letter of Intent by facsimile transmission shall have the same force and effect as delivery of original signatures and that each party may use such facsimile signatures as evidence of the execution and delivery of this Letter of Intent to the same extent that an original signature could be used.

14.   Amendment.  Any provision of this Letter of Intent may be amended or waived if, but only if such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Letter of Intent, or in the case of a waiver, by the party against whom the waiver is to be effective.

15.   Non-Binding Nature of Letter of Intent; Governing Law.  THIS LETTER OF INTENT IS INTENDED TO CONSTITUTE A NON-BINDING EXPRESSION OF THE MUTUAL INTENT OF THE PARTIES REGARDING THE SUBJECT MATTER HEREOF.  Except as set forth in the second introductory paragraph and in paragraphs 7 through 16 hereof (inclusive) and any defined terms referred to in such paragraphs, all of which paragraph and definitions shall be binding on the parties, neither Braintech nor SI, SII or you have any legally binding obligations, rights or liabilities of any nature whatsoever to any party hereto or to any other persons, whether pursuant to this Letter of Intent or relating in any manner to the Transaction or the consideration thereof.  Notwithstanding anything in this Letter of Intent to the contrary, this Letter of Intent shall not constitute an obligation or commitment of any person to enter into the Definitive Agreements, enter into the Transaction or pay any of the Purchase Price set forth in paragraph 2. This Letter of Intent shall be governed by and construed in accordance with the laws of the Defending Party State, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than the Defending Party State.  The "Defending Party State" shall be Michigan in any litigation,

06-19-'08 20:32   FROM-Ameristar Casino          7123963113          T-199   P007/014 F-963

Confidential Letter of Intent
June 19, 2008
Page 7

arbitration or mediation relating to this Letter of Intent initiated by Braintech, and shall be
Nevada in any such litigation, arbitration or mediation initiated by any of SI, SII or you.

16.   Termination.   Except for paragraphs 10 through 15 (inclusive) hereof, this paragraph 16
and any defined terms referred to in such paragraphs, each of which will survive any termination
or expiration of this Letter of Intent, this Letter of Intent will terminate automatically and be of
no further force and effect upon the earliest of: (i) the execution and delivery of the Definitive
Agreements; or (ii) the date Braintech notifies you, or you notify Braintech, in writing that this
Letter of Intent is terminated. Notwithstanding the immediately preceding sentence, the
termination of this Letter of Intent shall not affect any rights that either party has with respect to
any breach of this Letter of Intent by the other party prior to such termination. Break-Up Fee:
Except as set forth in the last sentence of this paragraph, notwithstanding anything herein to the
contrary, if (a) you terminate this Letter of Intent, (b) you notify Braintech of your unwillingness
to continue negotiating the Definitive Agreements, or (c) Braintech becomes aware during the
term of this Letter of Intent that the SHAFI Information is not true and complete in all material
respects as of the date hereof or that the SHAFI Obligations on Exhibit B are not a materially
complete list of all indebtedness of SI as of the date hereof, SI and SII, jointly and severally,
agree to promptly refund to Braintech, without deduction or offset, the entirety of the Pre LOI
Deposit and the LOI Deposit and to promptly pay to Braintech an additional amount of $20,000
(such additional amount, the "Break-Up Fee"), in each case within 15 business days.
Conversely, except as set forth in the last sentence of this paragraph, notwithstanding anything
herein to the contrary, if Braintech terminates this Letter of Intent or notifies you of its
unwillingness to continue negotiating the Definitive Agreements (in each case other than because
of the conditions set forth in clauses (b) or (c) above in this paragraph), Braintech agrees that SI
will be entitled to keep an amount equal to the Break-Up Fee from the Pre LOI Deposit and the
LOI Deposit, and SI and SII, jointly and severally, agree to promptly refund to Braintech the
remainder of the Pre LOI Deposit and LOI Deposit within 15 business days. SI and SII shall
secure their obligations to make the refunds and pay the Break-Up Fee as set forth herein with
the assets of SI and SII pursuant to that certain Security Agreement to be executed in connection
with this Letter of Intent. The parties hereto agree that the Break-Up Fee is a good faith
determination of the damages that would be suffered by the parties upon the happening of the
specified events and not a penalty. If, through no fault of any party hereto, an event occurs or
condition arises that makes the satisfaction of the Closing conditions set forth in paragraph 4
hereof unable to be met despite the commercially reasonable efforts of the parties, Braintech or
you may terminate this Letter of Intent upon notice to the other and SI and SII, jointly and
severally, agree to promptly refund to Braintech (within 15 business days), without deduction or
offset, the entirety of the Pre LOI Deposit and the LOI Deposit and no party hereto shall be
obligated to pay the Break-Up Fee.

[Remainder of page intentionally left blank; signatures on next page]

06-19-'08 20:32  FROM-Ameristar Casino        7123963113            T-199  P008/014 F-963

Confidential Letter of Intent
June 19, 2008
Page 8

If the terms of our understanding have been correctly set forth, please confirm this by signing
and returning to us the enclosed copy of this Letter of Intent to us no later than close of business
June 19, 2008.  If we have not received an executed copy (by facsimile or otherwise) by that time
and date, this Letter of Intent will expire and shall be of no further effect.

Very truly yours,

Braintech, Inc.

By: _Rick We_____
Name: Rick Weidinger
Title: CEO & Chairman

Acknowledged and, as to
Paragraphs 7 through 16 (inclusive),
AGREED AND ACCEPTED
this 19th day of June, 2008:

SHAFI, Inc.

By: _____
Name: Adil Shafi
Title:  President

SHAFI Innovation, Inc.

By: _____
Name: Adil Shafi
Title:  President

_____
ADIL SHAFI

STATE OF MICHIGAN
COUNTY OF LIVINGSTON

THIS INSTRUMENT WAS ACKNOWLEDGED BEFORE ME ON JUNE 19, 2008 BY
ADIL SHAFI.

NOTARY

KATHY L WITT
Notary Public - Michigan
Livingston County
My Commission Expires Feb 7, 2016
Acting in the County of _____

TCO 357447440v12 113266.010000

*Exhibit A*

**BRAINTECH,**
**Inc.**

## Employment Agreement                    CONFIDENTIAL

THIS AGREEMENT dated the        23rd  day of        June , 2008.

BETWEEN: Adil Shafi

                                                  (the "EXECUTIVE")

AND:

**BRAINTECH, INC.**

                                            ("BRAINTECH")

WHEREAS:

A.     BRAINTECH is a robotic vision technology company that is publicly traded on the NASD Over-The-Counter Bulletin Board;

B.     The business objectives for BRAINTECH include growing and diversifying its existing customer base and market coverage.

C.     In order to achieve the business objectives BRAINTECH wishes to engage the EXECUTIVE to serve as Chief Operating Officer of Braintech and President of Braintech's subsidiary, SHAFI Innovation, Inc. on the terms and conditions set forth in this Agreement.

IN CONSIDERATION of the mutual promises contained herein, the parties agree as follows:

1.     EMPLOYMENT: BRAINTECH hereby employs EXECUTIVE to perform the duties and render the services customarily required for the position hereinafter set forth, and EXECUTIVE hereby accepts said employment and agrees faithfully to perform said duties and render said services, subject to the terms and conditions of this Agreement.

2.     TERM: The EXECUTIVE employment with BRAINTECH is for a three year term and will continue as such until or unless terminated as provided in this Agreement.

3.     REPORTING: The EXECUTIVE shall report directly to BRAINTECH's Chief Executive Officer (hereinafter referred to as the "CEO").

4.     DUTIES: THE EXECUTIVE agrees to perform such duties as required for the position and shall be familiar with and carry out the policies, procedures and projects independently or as assigned by the CEO, including, without limitation:

    (a) [Manage overall technology of combined company]

    (b) [Market access and business acceleration]

    (c) [Develop and enhance processes and practices needed to accomplish the company's goals for doing business with Industrial End Users, System Integrators, Channel Partners and Robot Manufacturers].

    (d) [Develop and commercialize enhanced product offering].

    (e) [Hire, manage and direct employees as required to support the business objectives associated with all technical activities].

5.    BASE SALARY: [LOI language] BRAINTECH shall pay the EXECUTIVE, in consideration for the Services an annual base salary of US$180,000, which shall be increased annually by a minimum of 10% and additional possible increase adjusted at the end of each year of employment at the discretion of the CEO, based on performance above and beyond achieving certain milestones.

6.    SIGNING BONUS: Upon execution of this Agreement, BRAINTECH shall pay a US$10,000 signing bonus to the EXECUTIVE, which in return the EXECUTIVE shall apply the US$10,000 signing bonus to the purchase of 1,000,000 shares in the common stock of BRAINTECH at a purchase price of US$0.01 per share in accordance with the terms of the Bonus Stock and Bonus Stock Option Incentive Plan (the "Bonus Plan") approved by the Board of Directors on October 22, 2007

7.    BONUS STOCK COMPENSATION: The EXECUTIVE shall also be entitled to bonuses, based on achieving certain milestones, which will be provided in the form of issued restricted Common Stock (the "Bonus Stock") of the Company and options to purchase Common Stock (the "Bonus Stock Options") of the Company, in accordance with the Bonus Stock and Bonus Stock Option Incentive Plan (the "Bonus Plan") approved by the Board of Directors on October 22, 2007. The milestones and level of incentive compensation are detailed in the EXECUTIVE Bonus Securities Compensation Structure as set forth in Appendix I of this Agreement. [this is 1,000,000 shares].

8.    BONUS CASH INCENTIVE: [LOI language] The EXECUTIVE is eligible to earn an annual cash bonus each calendar year during the term of this Agreement (the "Bonus"). EXECUTIVE'S Bonus opportunity shall not exceed 50% of EXECUTIVE'S annual salary based upon the extent to which revenues goals of BRAINTECH are achieved. [Note: consider 409A issues]

EXECUTIVE'S bonus in each year shall be subject to upward or downward adjustment based upon achievement of any strategic goals or contract sales set by the CEO and approved by the Board of Directors (the "Board').

9.    BENEFITS: The EXECUTIVE shall be entitled to the following benefits:

    (a) Leave. Thirty (30) days of paid leave per year. This Leave may be used as vacation, personal leave or short-term sickness. The (30) days of leave is vested immediately upon signed execution of the EXECUTIVE Employment Agreement [Note: use or lose];

    (b) Holidays. Ten (10) paid holidays, which correspond with the US Federal Government Holidays;

    (c) Medical/Group Life Insurance.

    i.  BRAINTECH shall both provide to the EXECUTIVE and pay the full premium for a comprehensive family health insurance policy provided under the Company's existing family health and group life insurance plan.

    ii.  BRAINTECH agrees to provide group life insurance and accidental death & dismemberment (AD&D) coverage in the amount of US$300,000.

10.   <u>EXPENSE REIMBURSEMENT</u>: EXECUTIVE shall be entitled to reimbursement for all reasonable expenses, including travel and entertainment, incurred by EXECUTIVE in the performance of EXECUTIVE'S duties. EXECUTIVE will maintain records and written receipt as required by the Company policy and reasonably requested by the CEO to substantiate such expenses. All such expenses are to be reimbursed as soon as administratively practicable after submission.

11.   <u>OTHER EXPENSE</u>:  The EXECUTIVE shall be entitled to  reimbursement of following expenses:

  (a) <u>Cell Phone/Data Services.</u>  The EXECUTIVE shall be entitled to reimbursement of actual expenses incurred for cell phone and data services used to conduct business.

  (b) <u>Professional Organizations Dues</u>. The EXECUTIVE shall be entitled to attend and participate in appropriate professional meetings at the local, state, and national levels with the reasonable expenses for such attendance to be borne by BRAINTECH, including membership fees and dues. The EXECUTIVE may hold offices or accept responsibilities in these professional organizations provided that such responsibilities are applicable to the EXECUTIVE position or do not interfere with the performance of his duties as stated herein.

12.   <u>TERMINATION</u>:  Termination shall mean the cessation of EXECUTIVE employment by BRAINTECH (other than as a result of EXECUTIVE death or permanent disability) which is not promptly followed by re-employment of the EXECUTIVE by  BRAINTECH or any subsidiary of the Company.

  (a) "Good Cause" shall mean:

    i.  the willful and continued failure by the EXECUTIVE to substantially perform his duties hereunder (other than due to incapacity from physical or mental illness);

    ii.  gross misconduct which is or could  reasonably be expected to become materially injurious to BRAINTECH or its business or reputation, including, without limitation, fraud, or misappropriation of Company property or unauthorized disclosure of confidential information; and

    iii.  dishonesty resulting, or intending to result, directly or indirectly, in gain or personal enrichment at the expense of the Company;

  (b) "Good Reason" shall mean:

    i.  any material reduction of the duties or responsibilities of the EXECUTIVE or assignment of any duties inconsistent with EXECUTIVE position as Chief Operating Officer; or

    ii.  any material adverse change in EXECUTIVE compensation or employment benefits and failure by BRAINTECH, without EXECUTIVE consent, to pay to EXECUTIVE any portion of his earned compensation within ten (10) business days of the date such compensation is due or other breach by BRAINTECH of any of its obligations hereunder;

    iii.  any material change in the Bonus Stock and Bonus Stock Option Incentive Plan which forms part of this Agreement;

    iv.  any mandatory change in the geographic location of EXECUTIVE principal place of business without EXECUTIVE's consent; or

    v.  any requirement for the EXECUTIVE to relocate outside of the MI area without EXECUTIVE's consent;

(c) "Change in Control" shall mean the consummation of any of the following events:

    i.  a sale, lease or disposition of all or substantially all of the assets of the Company, or

    ii.  a sale, merger, consolidation, reorganization, recapitalization, sale of assets, stock purchase, contribution or other similar transaction (in a single transaction or a series of related transactions) of the Company with or into any other corporation or corporations or other entity, or

    iii.  any other corporate reorganization, where the stockholders of the Company immediately prior to such event do not retain (in substantially the same percentages) beneficial ownership, directly or indirectly, of more than fifty percent (50%) of the voting power of and interest in the successor entity or the entity that controls the successor entity, provided, however, that no Change in Control shall be deemed to have occurred due to the conversion or payment of any equity or debt instrument of the Company which is outstanding on the date hereof.

(d) Termination By BRAINTECH. BRAINTECH may terminate the employment of the EXECUTIVE without notice (or payment in lieu thereof) for Good Cause. In such event, the EXECUTIVE or the EXECUTIVE heirs will be entitled to all unpaid compensation and benefits, allowances and perquisites hereunder up to the termination date. In the event BRAINTECH terminates EXECUTIVE's employment without Good Cause, EXECUTIVE shall be entitled to keep all Bonus Stock for which the milestone conditions have been satisfied, free of all restrictions, escrows or other conditions and to all Bonus Stock Options which are vested as of such time and such Bonus Stock Options may be exercised at any time within twenty-four (24) months of such termination.

(e) Termination By The EXECUTIVE. The EXECUTIVE may terminate this Agreement for any reason by giving CEO 30 day's prior written notice. The EXECUTIVE will be entitled to treat his employment as having been terminated by BRAINTECH without Good Cause in the event of any Good Reason, provided EXECUTIVE has given notice of such Good Cause event or condition to BRAINTECH and if such event or condition is capable of being cured, BRAINTECH has failed to do so within 10 business days after receipt of such notice.

(f) Termination Due To Total Permanent Incapacity. Notwithstanding any other provision in this Agreement, the Company may terminate the employment of the EXECUTIVE without notice (or payment in lieu thereof) in the event of total permanent disability or death of the EXECUTIVE. For the purposes of this section, "Total Permanent Disability" means any physical or mental incapacity, disease or affliction as determined by a legally qualified medical practitioner, which prevents the EXECUTIVE from performing his obligations as set out in this Agreement and which incapacity persists for a continuous period of six months or more. This provision will also be subject to any duty to accommodate or human rights laws imposed by any government authority and which supersede any terms agreed to between the parties.

(g) Severance Pay. In the event of a termination of this Agreement by the Company without Good Cause, due to Total Permanent Disability or due to the death of the EXECUTIVE, or

by the EXECUTIVE for Good Reason, then the EXECUTIVE or the EXECUTIVE heirs will be entitled to:

    i.   unpaid compensation and benefits described hereunder earned up to the termination date to be paid within 10 business days of termination; and

    ii.   a lump sum payment (less all deductions required by law such as income taxes) equal to the then current Base Salary set out in paragraph 6 multiplied by 0.5 for the equivalent of six-months salary to be paid within 10 business days after the Termination Date. The EXECUTIVE agrees that after the Termination Date, but prior to payment of the severance pay and any outstanding bonus monies called for herein, EXECUTIVE shall execute a release, in the form of a severance agreement, of any and all claims he may have against the Company and its officers, employees, directors, parents and affiliates. EXECUTIVE understands and agrees that the payment of the severance pay and bonus called for by this paragraph are contingent on his execution of the previously described release of claims.

(h)  Severance Pay Following a Change in Control. In the event a Change in Control occurs and, within one (1) year thereafter, the employment of the EXECUTIVE is terminated by the Company for a reason other than for Good Cause or by the EXECUTIVE for Good Reason, then the Company shall pay to the EXECUTIVE severance pay herein.

(i)  Bonus Stock and Bonus Stock Option. Despite anything to the contrary set out in The Bonus Stock and Bonus Stock Option Incentive Plan (Schedule "A"), in the event of termination of EXECUTIVE's employment hereunder, other than by BRAINTECH for Good Cause or by EXECUTIVE without Good Reason:

    i.   all restrictions, including escrow restrictions, satisfaction of milestones on Bonus Stock issued to the EXECUTIVE will cease and the EXECUTIVE will have clear title to the Bonus Stock subject to no further restrictions or contingencies, and

    ii.   all Bonus Stock Options granted as of the date of termination will immediately vest in the EXECUTIVE (and all milestones shall be deemed satisfied), and may be exercised on any date between the date of termination and a date which is 36 months from the date of termination.

13.   CONFIDENTIALITY: The EXECUTIVE agrees to keep the terms and conditions of this Agreement confidential and BRAINTECH reserves the right to terminate the Agreement if the EXECUTIVE publicly discloses any of the terms and conditions contained herein without the specific written consent of BRAINTECH. In consideration of the execution of this Agreement, the EXECUTIVE shall execute a Non-disclosure and Confidentiality Agreement in the form provided by BRAINTECH, with respect to, BRAINTECH, Inc., and any subsidiaries and affiliates thereof.

14.   BEST EFFORTS: The EXECUTIVE will, at all times, faithfully, industriously and to the best of his or her ability, experience and talents, perform the Services provided herein or any other duties required of or from him or her pursuant to the express and implied terms set forth in this Agreement, to the reasonable satisfaction of BRAINTECH.

15.   NON-COMPETITION AND NON-SOLICITATION.

(a)     BRAINTECH, EXECUTIVE and certain other parties named therein are a party to that certain Stock Purchase Agreement, dated June ___, 2008 ("Stock Purchase Agreement"), pursuant to which BRAINTECH has acquired from EXECUTIVE 100% and 80%, respectively, of the capital stock of SHAFI, Inc. and SHAFI Innovation, Inc. (together, the "SHAFI Companies"). The SHAFI Companies are engaged in the Machine

Vision Software industry (the "Business"). As a condition to the consummation of the purchase of such stock under the Stock Purchase Agreement, the parties have agreed that EXECUTIVE would agree to the non-competition, non-solicitation and other restrictive covenants set forth in this Paragraph 15.

(b)     For a period commencing upon the date hereof and ending upon the later of three (3) years from the Closing Date and one (1) year from the date EXECUTIVE's employment with BRAINTECH is terminated (the "Restricted Period"), EXECUTIVE shall not directly or indirectly (whether as an employee, operator, agent, independent contractor, consultant, owner, director, officer, shareholder, investor, general or limited partner, joint venturer, guarantor or any other relationship similar to the foregoing, except for Passive Investments), anywhere in North America or Europe:

  (1)     engage in or assist any other person or entity to engage in any business which competes with the Business or any business in which BRAINTECH is engaged at any time during the twelve (12) months prior to the termination of EXECUTIVE's employment with BRAINTECH (collectively, the "Restricted Business"); or

  (2)     provide to any other entity that was a client or prospective client of any of the SHAFI Companies or BRAINTECH as of the date of termination of EXECUTIVE's employment with BRAINTECH or during the twelve (12) months prior to such termination, products or services directly or indirectly competitive with the Restricted Business;

provided, however, that EXECUTIVE may purchase or otherwise acquire up to two percent (2%) of any class of the securities of any Person (but may not otherwise participate or assist in the activities of such Person) engaged in the Restricted Business if such securities are listed on any national or regional securities exchange or have been registered under Paragraph 12(g) of the Securities Exchange Act of 1934 ("Passive Investments").

(c)     Unless otherwise agreed in writing, during the Restricted Period EXECUTIVE shall not directly or indirectly engage in the following:

  (1)     Solicit or knowingly encourage any employee or independent contractor of BRAINTECH or any of its subsidiaries or affiliated companies to leave such employment or service (except for the termination of employees or independent contractors in the performance of EXECUTIVE's duties to BRAINTECH) provided that any general solicitation of employment or service, directly or indirectly by EXECUTIVE through newspapers, periodicals, or trade publications not specifically directed at any employee or independent contractor of BRAINTECH or any of its subsidiaries or affiliated companies shall not constitute a breach of his non-solicitation obligation under this clause (c)(1); or

  (2)     Knowingly hire any person within less than one (1) year after that person has voluntarily terminated his employment or service as an independent contractor with BRAINTECH.

(d)     If the final judgment of a court of competent jurisdiction declares that any term or provision of this Paragraph 15 is invalid or unenforceable, the parties agree that this Paragraph 15 shall be automatically amended consistent with the final judgment of such court to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Paragraph 15 shall be enforceable as so modified.

(e)     EXECUTIVE acknowledges and agrees that the covenants and undertakings contained in this Paragraph 15 relate to matters that are of a special, unique and extraordinary character, and agrees that a violation of any of the terms of this Paragraph 15 may cause irreparable injury to BRAINTECH, and acknowledges that the amount of monetary damages resulting from such injury will be difficult, if not impossible, to estimate or determine.  Therefore, EXECUTIVE acknowledges that if he breaches, or threatens to breach, this Paragraph 15, BRAINTECH shall be entitled, in addition to all other rights and remedies available under this Agreement and applicable law, as a matter of course, to an injunction, restraining order or other equitable relief from any court of competent jurisdiction, restraining any violation or threatened violation by EXECUTIVE of any of the terms of this Paragraph 15.

(f)     EXECUTIVE acknowledges and agrees that, in view of the transactions contemplated by the Stock Purchase Agreement, along with EXECUTIVE's knowledge of the proprietary information and trade secrets of the SHAFI Companies and the knowledge he will acquire regarding the proprietary information and trade secrets of BRAINTECH, the foregoing restrictions in this Paragraph 15 are both reasonable and narrowly tailored to protect the legitimate business interests of BRAINTECH and/or the SHAFI Companies.

16.   SEVERABILITY: Should any provision of this Agreement be declared or held void, unenforceable or illegal for any reason, such invalidity shall not affect the validity or enforceability of the remainder of the Agreement, and the Agreement shall continue in full force and effect and be construed as if such Agreement had been executed without the void, unenforceable or illegal portion.

17.   SUCCESSORS; BINDING AGREEMENT: BRAINTECH may require any successor;

(a) whether direct or indirect, by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of BRAINTECH to expressly assume and agree to perform this Agreement in the same manner and to the same extent that BRAINTECH would be required to perform it if no such succession had taken place.  BRAINTECH as hereinbefore defined and any successor to its business and/or assets as aforesaid which executes and delivers the agreement provided for in paragraph 20 or which otherwise becomes bound by all the terms and provisions of this Agreement by operation of law.

(b) This Agreement and all rights of the EXECUTIVE hereunder shall inure to the benefit of and be enforceable by the EXECUTIVE'S personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.  If the EXECUTIVE should die while any amounts are payable to him hereunder all such amounts unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to

the Executive's devisee, legatee, or other designee or, if there be no such designee, to the Executive's estate.

18. <u>GOVERNING LAW:</u>  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of Delaware, Province of British Columbia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

19. <u>PARAGRAPH HEADINGS:</u>  The titles to the paragraphs of this Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of the provisions of this Agreement.

20. <u>COMPLETE AGREEMENT:</u>    This Agreement (including the Non-Disclosure and Confidentiality Agreement referenced herein) contains the complete agreement concerning the employment arrangement between the parties and shall, as of the effective date hereof, supersede all other agreements between the parties.  The parties stipulate that neither of them has made any representation with respect to the subject matter of this Agreement or any representation including the execution and delivery of this Agreement except such representations as are specifically set forth in this Agreement and each of the parties acknowledges that [he or she] or it has relied on its own judgment in entering into this Agreement.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED THIS AGREEMENT ON

THE _____ DAY OF _____ 2008.


**BRAINTECH, Inc.**


Per:   _____
        Frederick Weidinger,  CEO


Per:   _____

Appendix I

## BONUS SECURITIES COMPENSATION STRUCTURE

This Appendix details the Bonus & Incentive Compensation the EXECUTIVE will be entitled to as described in paragraph 7 of the Employment Agreement (the "Agreement") between the EXECUTIVE and BRAINTECH dated       , 2008.

Bonus Stock grants and Bonus Stock Option grants (the "Bonus Securities") are subject to the terms and conditions of the Bonus Stock and Bonus Stock Option Incentive Plan (the "Bonus Plan"), attached hereto as Schedule 1.

Each of the share certificates for any Bonus Stock grants subject to Milestones will be held by the Treasurer of the Company for a maximum of thirty (30) days within which time a designated escrow agent will be appointed.

**1,000,000 Bonus shares and 1,000,000 stock options:**

Milestone 1:   250,000

Milestone 2:   250,000

Milestone 3:   250,000

Milestone 4:   250,000

Milestone 5:   500,000 options

Milestone 6:   500,000 options

## INCENTIVE BONUS SUMMARY

|  | Bonus Stock | Bonus Stock Options |
|---|---|---|
|  |  |  |
|  |  |  |
| Milestone 1 | 250,000 |  |
| Milestone 2 | 250,000 |  |
| Milestone 3 | 250,000 |  |
| Milestone 4 | 250,000 |  |
| Milestone 5 |  | 500,000 |
| Milestone 6 |  | 500,000 |
|  |  |  |
| Total | 1,000,000 | 1,000,000 |

Document comparison by Workshare Professional on Thursday, June 19, 2008 3:06:59 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://TCO-DMS1/TCO/357455833/4 |
| Description | #357455833v4<TCO> - Braintech-Shafi Employment Agreement Draft |
| Document 2 ID | interwovenSite://TCO-DMS1/TCO/357455833/5 |
| Description | #357455833v5<TCO> - Braintech-Shafi Employment Agreement Draft |
| Rendering set | GT-1 |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | Count |
|---|---|
| Insertions | 6 |
| Deletions | 0 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 6 |

Shafi, Inc.
Shafi, Inc - Debt

Exhibit B

**Secured Debt Payments**

| | | |
|---|---|---:|
| Internal Revenue Service | $ | 170,000 |
| State of Michigan - SUW | | 44,023 |
| Lasalle Bank | | 106,509 |
| Comerica | | 74,500 |
| | $ | 395,032 |

| | | |
|---|---|---:|
| Past Employee Wages | $ | 124,189 |
| Old Vendor Payables | $ | 145,239 |
| Professional fees | $ | 54,844 |

**Loans Repayments - Joint Ventures**

| | | |
|---|---|---:|
| JMP Engineering | $ | 100,000 |
| CEC Controls (7.0%;7Payments) | $ | 80,000 |
| Motoman (7.0%; 7 Payments) | $ | 100,000 |
| Total Third Party Debt | $ | 280,000 |
| | $ | 999,303 |

*Sales price is assumed to be amount of debt assumed

Shaft, Inc.
Shaft, Inc. Debt

NP - Negotiation Pending
TBN - To Be Negotiated
SPP - Settlement of Payment Plan

| Old Vendor Payables | | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Paid | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aegis : Sony SiC for Maksmah | $ 3,500.00 | NP | | | | | | | | | | | | | | | | | | | | | | |
| AP Vistering | 640.00 | TBN | | | | | | | | | | | | | | | | | | | | | 3,752.48 | |
| Aladdin | 3,232.45 | SPP | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 252.45 | | | | | | | | | | | | | | | |
| APU Allwyn Park Group | 4,000.00 | SPP | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | 333.33 | | | | | | | | | | | |
| Arbor Springs | 176.45 | SPP | 176.45 | | | | | | | | | | | | | | | | | | | | | |
| Arcadia | 8,126.00 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Bank of America John Matios | 765.00 | SPP | | 255.00 | 255.00 | | | | | | | | | | | | | | | | | | | |
| Bank of America Adil Shaft | 2,100.00 | SPP | | 700.00 | 700.00 | 700.00 | | | | | | | | | | | | | | | | | | |
| Bank of America Bob Tarletos | 1,278.00 | SPP | | 426.00 | 426.00 | 426.00 | | | | | | | | | | | | | | | | | | |
| Bank of America Mark Prilneve | 1,155.00 | SPP | | 385.00 | 385.00 | 385.00 | | | | | | | | | | | | | | | | | | |
| Banura | 455.00 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Beckhof Automation | 2,246.83 | SPP | 561.72 | 187.24 | 187.24 | 187.24 | 187.24 | 187.24 | 187.24 | 187.24 | 187.24 | | | | | | | | | | | | 2,246.88 | 0.00 |
| Big PDQ | 549.15 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| B & H ; France | 5,428.50 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Bliss McGlynn | 182.25 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Brighton Cove / First Holding | 3,130.00 | NP | | | | | | | | | | | | | | | | | | | | | | |
| CDGS | 41.67 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| COW | 607.71 | NP | | | | | | | | | | | | | | | | | | | | | | |
| CitiCards / Pro Consulting | 2,260.71 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Cora. Energy (8069) | 42.32 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Cora. Energy (9070) | 144.00 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Cora. Energy (Br Cova) | 508.22 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Dell | 14,515.29 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Dis – Stu – Co | 829.40 | SPP | 829.40 | Over due/Payable Now | | | | | | | | | | | | | | | | | | | | |
| DHL | 1,422.11 | NP | | | | | | | | | | | | | | | | | | | | | | |
| DHL | 350.27 | SPP | | | | | | | | | | | | | | | | | | | | | | |
| DHL Interest | 13.73 | NP | | | | | | | | | | | | | | | | | | | | | | |
| DTE ( AllianceOne (5095) | 733.10 | NP | | | | | | | | | | | | | | | | | | | | | | |
| DTE/Kensington Ct | 346.15 | NP | | | | | | | | | | | | | | | | | | | | | | |
| DTE/Kensington Ct | 120.00 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Fetzer/Weinstock & O'Malley | 564.41 | SPP | 194.80 | 194.80 | 154.80 | | | | | | | | | | | | | | | | | | | |
| Gallagher | 0.00 | SPP | Paid off per Donna | | | | | | | | | | | | | | | | | | | | | |
| Green Oak Taxes Lelo | 245.21 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Home Depot | 92.20 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Mabio | 3,627.70 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| McClain Plant | 11,942.43 | SPP | | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | 945.87 | | | | | | | | | | |
| McLeod Internet/Brown & Joseph | 5,055.97 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| McNaughton McKay | 15,024.12 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Michigan Insurance | 0.00 | | | | | | | | | | | | | | | | | | | | | | | |
| Michigan Peralan | 0.00 | | | | | | | | | | | | | | | | | | | | | | | |
| Midwest Optical | 364.65 | SPP | | 30.39 | 30.39 | 30.33 | 30.39 | 30.39 | 30.39 | 30.33 | 30.39 | 30.39 | 30.28 | 30.33 | 30.39 | | | | | | | | | |
| Niff Engineering | 10,784.12 | SPP | | 2,696.03 | 2,696.03 | 2,696.03 | 2,696.03 | | | | | | | | | | | | | | | | | |
| Norweb Burwell | 353.60 | SPP/1153 | | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | 29.47 | | | | | | | | | |
| Ohio Taxes | 2,316.42 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| On Time Trucking / GE Capital | 500.00 | SPP | | 166.67 | 166.67 | 166.67 | | | | | | | | | | | | | | | | | | |
| OPPG | 6,105.60 | NP | | | | | | | | | | | | | | | | | | | | | | |
| Rizzo's Commercial Cleaning | 849.00 | SPP | | 424.96 | 198.30 | | | | | | | | | | | | | | | | | | | |
| Robohand | 1,106.55 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| RIA ; Robotic Industries Association | 1,500.00 | SPP | | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | | | | | | | | | |
| Rosamont / Vicos Michaela Lee | 4,961.25 | SPP | 887.26 | 413.38 | 413.38 | 413.38 | 413.35 | 413.38 | 413.38 | 413.38 | 413.35 | 413.38 | | | | | | | | | | | | |
| Sunrise Promotional Products | 100.00 | Paid off per Donna | 100.00 | | | | | | | | | | | | | | | | | | | | | |
| Techyty | 10,735.51 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Tocar Solutions | 67.84 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| UIA | 1,541.29 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Unlimited Conferencing | 2,384.19 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| UPS | 738.69 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| US Life | 0.00 | | Cancelled Per Donna | | | | | | | | | | | | | | | | | | | | | |
| Verizon (Old Employee Group) | 3,534.66 | TBN | | | | | | | | | | | | | | | | | | | | | | |
| Personal Property Tax - estimated | 750.00 | | | | | | | | | | | | | | | | | | | | | | | |
| Past employee Reimb Expenses | 9,454.28 | | | | | | | | | | | | | | | | | | | | | | | |
| Misc/Control | 593.25 | | | | | | | | | | | | | | | | | | | | | | | |
| Total Old Vendors | 143,232.54 | | | | | | | | | | | | | | | | | | | | | | | |

Current Professional Consultants
Estimated Fees:
 Will Tkchoff, Attorney
   Current | 6,774.05
   Estimated Additional Fees | 12,000.00
 Peter A. Long, Attorney

| | |
|---|---|
| Current | 3,000.00 |
| Estimated Additional | 7,000.00 |
| Glenn Smith, Attorney | |
| Current | 6,500.00 |
| Estimated Additional | 6,500.00 |
| Bruce PLANA, CPA | |
| Current | 10,568.84 |
| Estimated Additional | 5,000.00 |
| | |
| Total Professional Payables | 54,843.62 |

| State of Michigan : L & W : Net   State of Michigan : L & W : Net | | Total | April-08 | May-08 | Jun-08 | Jul-08 |
|---|---|---|---|---|---|---|
| | | | $      - | | | |
| Per Spreadsheet | | $   57,764.85 | $      1,586.30 | $   1,586.30 | $   1,586.30 |
| | | | | | | |
| Donna Burr | | 1,711.16 | | 1,711.16 | | |
| Elsie White | | 11,848.60 | | 4,000.00 | 4,000.00 | 3,848.60 |
| | Subtotal | 71,324.61 | | | | |
| | Rate | | | | | |
| Social Security Tax | 7.65% | 5,456.33 | | | | |
| Est Federal Unemployment Tax | 0.80% | 300.00 | | | | |
| State Unemployment | 1.20% | 500.00 | | | | |
| Tax on Past Employee Comp | | 5,756.33 | | | | |
| | | | | | | |
| Marc Raymond $5000/mo starting in Aug | | 47,107.99 Per Jen's Latest SS | | | 5,000.00 | 5,000.00 |
| | | | | | | |
| Totals | | $ 124,188.94 | $      7,297.46 | $ 10,586.30 | $ 10,434.90 |

| | Aug-08 | | Sep-08 | | Oct-08 | Nov-08 | Dec-08 | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | - | $ | - | $ | - | 3,282.28 | 3,282.28 | 3,282.28 | 3,282.28 | 3,282.28 | 3,282.28 | 4,758.89 |
| | 5,000.00 | | 5,000.00 | | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| $ 5,000.00 | | $ 5,000.00 | | $ 5,000.00 | $ | 8,282.28 | $ 8,282.28 | $ 8,282.28 | $ 8,282.28 | $ 8,282.28 | $ 8,282.28 | $ 9,758.89 |

| | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | |
|---|---|---|---|---|---|---|---|---|
| | 4,758.89 | 4,758.89 | 4,758.89 | 4,758.89 | 4,758.89 | | $ 53,005.94 | |
| | | | | | | | 1,711.16 | |
| | | | | | | | 11,848.60 | |
| | | | | | | | 60,000.00 | |
| $ 4,758.89 | $ 4,758.89 | $ 4,758.89 | $ 4,758.89 | $ 4,758.89 | $ - | $ - | $ 126,565.70 | $ - |

| Employee | Annual S: | Pay Period | Pay Date | Check # | Gross Wa | Hrs Per P: | Net Wage: | Months 1-6 | Months 7-1: | Months 13-18 |
|---|---|---|---|---|---|---|---|---|---|---|
| John Lukowski | $80,000/Yi | 10/30/06-11/12 | 11/12/2006 | 7515 | 438.36 | | 371.67 | | | |
| | | 5/28/07-6/10/07 | 6/10/2007 | 8403 | 3,068.49 | 80 | 2143.19 | | | |
| | | 7/9/07-7/22/07 | 7/22/2007 | *8405 | 3,068.49 | 80 | 2143.18 | *Ch # 8296 Voided & replaced with 8405 | | |
| | | 7/23/07-8/5/07 | 8/5/2007 | 8354 | 3,068.49 | 80 | 2143.18 | | | |
| | | 8/6/07-8/19/07 | 8/19/2007 | 8386 | 3,068.49 | 80 | 2143.18 | | | |
| | | 8/20/07-9/2/07 | 9/2/2007 | 8424 | 1,753.43 | | 1309.01 | | | |
| | | 9/3/07-9/16/07 | 9/16/2007 | 8447 | 438.36 | | 371.83 | 295.15 | 590.29 | 885.44 |
| Total Amounts | | | | | 14,904.11 | | 10625.24 | 1770.9 | 11.74/Six Mo | 12.6/Six Mo |

| Employee | Annual S: | Pay Period | Pay Date | Check # | Gross Wa | Hrs Per P: | Net Wage: | Months 1-6 | Months 7-1: | Months 13-18 |
|---|---|---|---|---|---|---|---|---|---|---|
| Andreas Lundberg | $62,000/Yi | 8/6/07-8/19/07 | 8/19/2007 | 8385 | 2,378.08 | 80 | 1,742.61 | | | |
| | | 8/20/07-9/2/07 | 9/2/2007 | 8426 | 2,378.08 | 80 | 1,742.59 | | | |
| | | 9/3/07-9/16/07 | 9/16/2007 | 8448 | 2,378.08 | 80 | 1,742.61 | 145.22 | 290.43 | 435.65 |
| Total Amounts | | | | | 7,134.24 | | 5,227.81 | 871.32/Six Mo | 2.58/Six Mo | 3.90/Six Mo |

| Employee | Annual S: | Pay Period | Pay Date | Check # | Gross Wa | Hrs Per P: | Net Wage: | Months 1-6 | Months 7-1: | Months 13-18 |
|---|---|---|---|---|---|---|---|---|---|---|
| Bob Tarleton | $80,000/Yi | 7/23/07-8/5/07 | 8/5/2007 | 8434 | 3,068.49 | 80 | 2403.37 | | | |
| | | 8/6/07-8/19/07 | 8/19/2007 | 8393 | 3,068.49 | 80 | 2403.38 | | | |
| | | 8/20/07-9/2/07 | 9/2/2007 | 8426 | 3,068.49 | 80 | 2403.39 | | | |
| | | 9/3/07-9/16/07 | 9/16/2007 | 8451 | 3,068.49 | 80 | 2403.37 | 267.04 | 534.08 | 801.13 |
| Total Amounts | | | | | 12,273.96 | | 9613.61 | 1602.24/Six Mo | 4.48/Six Mo | 6.79/Six Mo |

| Employee | Annual S: | Pay Period | Pay Date | Check # | Gross Wa | Hrs Per P: | Net Wage: | Months 1-6 | Months 7-1: | Months 13-18 |
|---|---|---|---|---|---|---|---|---|---|---|
| John Nielson * | $75,000/Yi | 3/5/07-3/18/07 | 3/18/2007 | 7896 | 2,876.71 | 80 | 2,021.55 | | | |
| | $105,000/ | 8/6/07-8/19/07 | 8/19/2007 | 8388 | 4,027.40 | 80 | 2,723.34 | | | |
| | | 8/20/07-9/2/07 | 9/2/2007 | 8426 | 4,027.40 | 80 | 2,973.34 | | | |
| | | 9/3/07-9/16/07 | 9/16/2007 | 8449 | 4,027.40 | 80 | 2,973.33 | 299.99 | 593.98 | 890.96 |
| Total Amounts | | | | | 14,958.91 | | 10,691.56 | 1781.84/Six Mo | 3.88/Six Mo | 6.76/Six Mo |
| | | | | | | | | 36 | 2 | |
| Bill Francis | | | | | | | 6,838.84 | 189.97 | 379.94 | 569.90 |
| C Blzek | | | | | | | 1,830.13 | 50.84 | 101.67 | 152.51 |
| Dawn Rojas | | | | | | | 1,685.66 | 46.83 | 203.35 | 140.49 |
| Jea Willingham | | | | | | | 1,374.85 | 38.19 | 76.38 | 114.57 |
| Mark Pilbeam | | | | | | Total | 9,218.88 | 256.08 | 512.16 | 768.24 |
| | | | | | | | | 1,586.30 | 3,262.26 | 4,756.89 |
| * key Futre Employee | | | | | | | 20,948.56 | | | |
| | | | | | | | | 9,517.83 | 19,693.67 | 26,553.36 | 57,764.85 |

Exhibit C
Market Access & Acceleration
Dated : Jun 19, 2008

---

**Qualifications : If a potential target is not successful, it will be replaced by a suitable replacement at Adil Shafi's market knowledge and discretion.**

1) **Target Markets & Accounts (Bolded Items are Initial 60 Day contacts)**

- **Automotive**
  - Braintech to operate "as is" to avoid Conflict with ABB agreement that expires in 2008.
  - Promote Braintech Sales to all customers beginning January 1, 2009.
    - North America : **GM, Ford, Chrysler, Honda, Toyota, Nissan, BMW**
    - Europe : South German automation market, PSA France, Renault, Puegeot, Comau, Fiat and others based on channel partnerships.
    - Asia : End User sales investigation tour in India, Korea, China leveraging channel partnerships and preliminarily targeting Tata, Mahendra, Hyundai, KIA.
    - Japan : End User sales Investigation tour in leveraging channel partnerships (e.g., Yaskawa, Nachi Fujikoshi, Kawasaki, KEC, UNIMEC) and preliminarily targeting Toyota, Honda, Nissan, Daihatsu, Suzuki, Isuzu, Mazda, Mitsubishi and Subaru.
- **Non – Automotive**
  - Government & Defense
    - Through Channel Partners and/or Agency End User Sales Investigation tours e.g., **TARDEC / TACOM, Applied Research Associates (ARA)**, Department of Transportation (DOT), Department of Defense (DOD), National Science Foundation (NSF) and in particular through SBIR/STTR solicitation programs.
  - Food / Beverage
    - Through Channel Partners and/or End User Sales Investigation tours e.g., **General Mills**, Kelloggs, Kraft, **Schreiber Foods, M&M / Masterfoods**, Pepperidge Farm, Hershey.
  - Consumer Robotics
    - Through Channel Partners and/or End User Sales Investigation tours e.g., **General Electric**, Whirlpool, Steelcase, etc.
  - Electronic Assembly / Semiconductor
    - Through Channel Partners and/or End User Sales Investigation tours e.g., Intel, Honeywell, etc.
  - Medical / Pharmaceutical
    - Through Channel Partners and/or End User Sales Investigation tours e.g., Abbott Labs, **Bayer, Pfizer**, General Electric, **SIEMENS**.
  - Plastics : Secondary Operations
    - Rubbermaid, Husky, **North America! Lighting**, Visteon Sandusky.
- **Target Partners**
  - Robot Companies
    - **Motoman**, Adept, **Nachi, Staubli**, Kawasaki, **KUKA**, Panasonic, Stanley, IAI, AGFM, Epson, Kiefel, **ABB**, Denso, **Rixan/Mitsubishi**, Precise Automation

- Vision Companies
    - **SIEMENS, PPT, Cognex, Sony, National Instruments, Adept,** SICK, Tyzx
- Bundling Partners
    - **HTE, Electromatic, McNaughton – McKay,** USS
- Systems Integrators
    - Non Automotive:
        - Government & Defense : **ARA, TARDEC, TACOM,** GS Engineering, Keeweenaw Research Center, REL, **Gudel,** Spectrum Engineering Services
        - Food and Beverage : **Matrix Technologies, AIDCO,** Abbott Labs (internal engineering group), RA Jones, Applied Vision, Flexicell, MATEC, Waltonen Engineering
        - Consumer Robotics : ATS, Rixan Associates, Oral B (internal engineering group)
        - Electronic Assembly / Semiconductor : Panasonic, Universal Tool, Aptura Machine Vision Solutions, Cox Automation, ESI, Heitkamp and Thumann, Honeywell (internal engineering group), Hewlett Packard, Hutchinson
        - Medical / Pharmaceutical : Mafu, Hu – Friedy, Pall, Bayer, Pfizer
        - Plastics : Secondary Operations : Husky, Rubbermaid, Lamson & Sessions, Nishikawa, Parker, **Rimrock,** Engel/Straber, VITEC
    - Automotive : To Be Determined in December 2008. **CEC Controls, Indicon, Spectrum Engineering, PDSI,** USS, **ICI,** Vulcan, GUDEL, PARI.

**2) Access & Acceleration Calendar [subject to minor changes due to meeting coordination, travel schedules]**

| Weeks in 2008 | Activity | | Responsible |
|---|---|---|---|
| Week Jun 30 | Mon | Press Release to the World | RW, AS, JD |
| | Mon | Detroit Meetings : Motoman + Nachi | RW, AS, JD |
| | Tue | Detroit Meetings : ABB + SIEMENS | RW, AS, JD |
| | Wed | Detroit Meetings : Kawasaki + GUDEL | RW, AS, JD |
| | Thu | Detroit Meetings : KUKA + CEC Controls | RW, AS, JD |
| | Fri | Detroit Meetings : Indicon + Spectrum | RW, AS, JD |
| Week Jul 7 | Mon | Cognex, SIEMENS : Boston Area | RW, AS, JD |
| | Tue | SONY : Park Ridge New Jersey | RW, AS, JD |
| | Wed | Electromatic | JD, PM |
| | Thu | HTE, McNaughton -- McKay | RW, AS, JD |
| | Fri | USS | RW, AS, JD |
| Week Jul 14 | Mon | Customer/Partner Support Press Release | RW, AS, JD |
| | Tue | MN : Packaging Integrator (Dimension,RytWay, Automation, Inc) | RW, AS, JD |
| | Wed | MN : Anderson Windows Kraft New Ulm | RW, AS, JD |
| | Thu | MN : PPT, General Mills, Honeywell | RW, AS, JD |
| | Fri | TARDEC / TACOM, ARA | RW, AS, JD |
| | **BVL 2D and Autocal developed by Vancouver and available to RELIABOT** | | AS, BH |
| Week Jul 21 | Mon | OHIO : Toledo : Matrix + Dayton : PDSI | RW, AS, JD |
| | Tue | OHIO : Motoman + Rixan | RW, AS, JD |
| | Wed | OHIO : AIDCO : Cincinnati, ATS Ohio | RW, AS, JD |
| | Thu | OHIO : Cleveland : Parker Hannifin, | RW, AS, JD |
| | Fri | OHIO : Eveready, Nestle, Stanley | RW, AS, JD |
| Week Jul 28 | Mon | Dara Off / Adil Shafi does Technical Track | AS, BH |
| | Tue | Dara Off / Adil Shafi does Technical Track | AS, BH |
| | Wed | Dara Off / Adil Shafi does Technical Track | AS, BH |
| | Thu | Dara Off / Adil Shafi does Technical Track | AS, BH |
| | Fri | Dara Off / Adil Shafi does Technical Track | AS, BH |
| Week Aug 4 | Mon | Office Move-in / Adil Off | ALL |
| | Tue | Office Move-in / Adil Off | ALL |
| | Wed | Office Move-in / Adil Off | ALL |
| | Thu | Office Move-in / Adil Off | ALL |
| | Fri | Office Move-in / Adil Off | ALL |
| Week Aug 11 | Mon | Robot Power Up Detroit Office | AS, DB, LK |
| | Tue | Robot Power Up Detroit Office | AS, DB, LK |
| | Wed | Robot Power Up Detroit Office | AS, DB, LK |
| | Thu | MN : PaR BAE | JD, TBD |
| Aug 15 | Fri | MN : PaR BAE | JD, TBD |
| | **Integration into RELIABOT complete.** | | AS, BH |
| Week Aug 18 | Mon | Open House Invitations | RW, AS, JD |
| | Tue | Open House Invitations | RW, AS, JD |
| | Wed | Motoman Follow-up | JD, PM |

**Calendar Year 2008**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shafi "In Process" Non Auto Revenues: | | $  - | | | | $  - | $ 25,000 | $ 25,000 | $ 25,000 | $ 75,000 | $ 75,000 | $ 85,000 | $ 310,000 |
| Shafi "In Process" Auto Revenues: | | | $  - | | | $  - | | | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 100,000 |
| | $  - | $  - | $  - | $  - | $  - | $  - | $ 25,000 | $ 25,000 | $ 50,000 | $ 100,000 | $ 100,000 | $ 110,000 | $ 410,000 |

**Calendar Year 2009**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shafi "In Process" Non Auto Revenues: | $ 30,000 | $ 30,000 | $ 35,000 | | | $  - | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 920,000 |
| Shafi "In Process" Auto Revenues: | | | $ 40,000 | $ 100,000 | $ 150,000 | $ 150,000 | | | | | | | $ 440,000 |
| | $ 30,000 | $ 30,000 | $ 75,000 | $ 100,000 | $ 150,000 | $ 150,000 | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 137,500 | $ 1,360,000 |

**Calendar Year 2010**

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shafi "In Process" Non Auto Revenues: | | $  - | | | | $  - | $ 90,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 590,000 |
| Shafi "In Process" Auto Revenues: | | | $  - | | | $  - | | | | | | | $  - |
| | $  - | $  - | $  - | $  - | $  - | $  - | $ 90,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 590,000 |

| | | | |
|---|---|---|---|
| | Thu | Staubli Visit | AS, JD |
| | Fri | Kuka Follow-up | |
| Week Aug 25 | Mon | Open House Preparation | ALL |
| | Tue | Open House Preparation | |
| | Wed | Open House Preparation | |
| | Thu | Open House Preparation | |
| | Fri | Open House Preparation | |
| Week Sep 1 | Mon | Labor Day **Formal Launch and sale of joint enhanced product. Enhanced Egg Rollout & PR** | AS, BH, RW |
| | Wed | Enhanced Egg Rollout | |
| | Thu | New Office Open House | RW, AS, JD |
| | Fri | New Office Open House | RW, AS, JD |
| Week Sep 8 | Mon | IMTS : Rick Anderson | RW, AS, JD |
| | Tue | IMTS : Mars, FlexiCell | RW, AS, JD |
| | Wed | IMTS : Abbott | RW, AS, JD |
| | Thu | IMTS : RIC, PPT, NI | RW, AS, JD |
| | Fri | IMTS : JETRO | RW, AS, JD |
| Week Sep 15 | Mon | Follow-ups / Internal Organization | |
| | Tue | Follow-ups / Internal Organization | |
| | Wed | Follow-ups / Internal Organization | |
| | Thu | Follow-ups / Internal Organization | |
| | Fri | Follow-ups / Internal Organization | |
| Week Sep 22 | Mon | South : ICI, Hackett | RW, AS, JD |
| | Tue | South : Staubli, Adv Auto,    ATE: Babak | RW, AS, JD |
| | Wed | South : Nordson, SIEMENS ATE: Babak | RW, AS, JD |
| | Thu | South : Vulcan, Adv Auto,   ATE: Babak | RW, AS, JD |
| | Fri | South : | RW, AS, JD |
| Week Sep 29 | Mon | ICVGR : Novi : | RW, AS, JD |
| | Tue | ICVGR : Novi : | RW, AS, JD |
| | Wed | ICVGR : Novi : | RW, AS, JD |
| | Thu | ICVGR : Novi : | RW, AS, JD |
| | Fri | ICVGR : Novi : | RW, AS, JD |
| Week Oct 6 | Mon | Hardware Bundling Partnership Meetings | RW, AS, JD |
| | Tue | Follow-ups / Internal Org / Fabtech | RW, AS, JD |
| | Wed | Follow-ups / Internal Org / Fabtech | RW, AS, JD |
| | Thu | Follow-ups / Internal Org / Fabtech | RW, AS, JD |
| | Fri | Follow-ups / Internal Org / Fabtech | RW, AS, JD |
| Oct 15 | | **BVL 3D and AutoTrain developed by Vancouver and available to RELIABOT.** Announce Press Release | AS, BH AS, RW, JD |
| Week Oct 20 | Mon | Europe | TBD |
| | Tue | Europe | |
| | Wed | Europe | |
| | Thu | Europe | |
| | Fri | Europe | |
| Nov 15 | Mon | **November 17, 2008: Integration into RELIABOT complete** | AS, BH |
| Dec 1 | | **Formal Launch and sale of joint enhanced** | ALL |

| | SC3D, SR3D and AutoTrain product. | |
|---|---|---|
| Dec 15 | SL3D product available | AS, BH |
| Jan 15 (2009) | RBP product available | AS, BH |

## 3) SHAFI Milestones

Q1 ending September 30, 2008:
- Successful receipt of Customer, Partner and Vision Provider Support for Partnership in terms of Press Release to be issued on or around July 15th 2008.
- Consignment receipt of and communications with three industrial robot manufacturers by September 30, 2008: Motoman, Staubli, Kuka
- Consignment receipt and communication with top three Vision Provider Packages by September 30, 2008: Siemens, Cognex, PPT

Q2 ending December 31, 2008:
- Plant Visits and development of at least 10 sales proposals to Non Automotive End Users by October 1, 2008, and 25 (units) by January 1 2009.
- Introduction to at least 10 System Integration partners by October 1, 2008 and development of at least 25 (units) sales proposals through System Integration Partners by January 1, 2009
- Certification of at least 6 System Integrators (such that they can independently order, install and service our products) by January 1, 2009.

Q3 ending March 31, 2009:
- Cumulative $500,000 in Shafi initiated Non Automotive, Non Governmental Purchase orders since closing

Q4 ending June 30, 2009:
- Cumulative $500,000 in Shafi initiated Governmental Purchase orders since closing

Ex E

## ACCOUNTANT'S COMPILATION REPORT

Board of Directors
Shafi, Inc.
Brighton, Michigan

We have compiled the accompanying balance sheet of Shafi, Inc. (a C corporation) as of May 31, 2008, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The have been prepared on the accounting basis used by the Company for income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying balance sheet and, accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the disclosures required by generally accepted accounting principles. If the omitted disclosures were included in the financial statement, they might influence the user's conclusions about the Company's financial position. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Bruce A. Ruhkila, CPA, PC*
CERTIFIED PUBLIC ACCOUNTANTS

June 18, 2008

**Shafi, Inc.**
**Balance Sheet**
**May 31, 2008**

## ASSETS

| | | |
|---|---|---:|
| **Current Assets** | | |
| 1000 · Checking Accounts | $ | (15,958.26) |
| 1310 · Due from Employees | | 799.99 |
| **Total Current Assets** | | (15,158.27) |
| **Fixed Assets** | | |
| 1600 · Furniture and Fixtures | | 4,501.86 |
| 1610 · Equipment | | 5,300.00 |
| 1620 · Office Equipment | | 56,496.67 |
| 1690 · Accumulated Depreciation | | (63,028.57) |
| **Total Fixed Assets** | | 3,269.96 |
| **Other Assets** | | |
| 1900 · Trademark | | 2,460.02 |
| **Total Other Assets** | | 2,460.02 |
| **TOTAL ASSETS** | $ | (9,428.29) |

## LIABILITIES & EQUITY

| | | |
|---|---|---:|
| **Liabilities** | | |
| **Current Liabilities** | | |
| 2000 · Accounts Payable | $ | 177,951.35 |
| 2050 · Credit Cards Payable | | 19,812.39 |
| 2100 · Payroll Liabilities | | 210,366.09 |
| 2220 · Accrued Wages | | 124,188.94 |
| 2250 · Accrued Interest | | 50,978.07 |
| 2270 · Accrued Single Business Tax | | 8,600.00 |
| 2300 · Line of Credit - Comerica | | 74,500.00 |
| 2350 · Line of Credit - LaSalle Bank | | 106,509.09 |
| 2360 · Line of Credit-Adil Shafi | | 295,471.96 |
| 2365 · Due to Shafi Innovation, Inc. | | 1,850.00 |
| 2370 · Motoman Loan | | 100,000.00 |
| 2380 · Due to CEC Controls | | 80,000.00 |
| 2385 · JMP Engineering Loan | | 60,000.00 |
| **Total Current Liabilities** | | 1,310,227.89 |
| **Total Liabilities** | | 1,310,227.89 |
| **Equity** | | |
| 3100 · Common Stock | | 1,000.00 |
| 3900 · Retained Earnings (Deficit) | | (1,320,656.18) |
| **Total Equity** | | (1,319,656.18) |
| **TOTAL LIABILITIES & EQUITY (DEFICIT)** | $ | (9,428.29) |

| Creditor | Total Amount Owed | Status |
|---|---|---|
| LaSalle Bank | $106,509.00 | Settled at $106,609.03.  Progressive payments: $1,000 paid June-Aug. 2008, $1,500 paid Sept.-Nov. 2008, $2000 from Dec. 2008 until paid in full |
| JMP Engineering | $93,000 | Lawsuit pending. Discovery on-going. |
| AF Ushering | 949.50 | Made initial contact with offer.  AdIt did not want to commit until BT deal finalized (see 5/14/2008 email from AdIt) |
| APG Allison Park Group | 4,000.00 | Settled for $4,000.00 (from $7,026.86) to be paid in 12 monthly installment payments of $333.33 beginning March 2008 |
| Bank of America John Nickson | 3,642.84 | Settled for $765.00 to be paid in 3 monthly installment payments of $255.00 beginning in May 2008 |
| Bank of America Adil Shafi | 12,491.20 | Settled for $2,100.00 to be paid in 3 monthly installment payments of $700.00 beginning in May 2008 |
| Bank of America Bob Tarkilos | 5,787.82 | Settled for $1,278.00 to be paid in 3 monthly installment payments of $426.00 beginning in May 2008 |
| Bank of America Mark Pilbeam | 5,175.61 | Settled for $1,155.00 to be paid in 3 monthly installment payments of $385.00 beginning in May 2008 |
| Beckhoff Automation | 2,249.93 | Settled for $2,249.93 (from $4,499.85) to be paid in 12 monthly installment payments of $187.24 beginning in Feb. 2008 |
| Brighton Cove / First Holding Management | 3,130.00 | Settled for $2,998 to be paid in 12 monthly installment payments of $249.83 beginning Feb. 2008. Lawsuit dismissed. |
| CDW | 537.71 | No settlement agreement. Signed but cridt agreement to pay full amount in two monthly installment payments of $313.85 beginning in May 2008 |
| CitiCards / Pro Consulting | 2,290.17 | Negotiations attempted.  ProConsulting cannot approve more than two installment payments. |
| Cons. Energy (9060) | 42.22 | We received a demand letter, does not match last bill provided to us.  Asked to forward all Consumers bills.  Not received as of yet. |
| Cons. Energy (9070) | 144.06 | We received a demand letter, does not match last bill provided to us.  Asked to forward all Consumers bills.  Not received as of yet. |
| Cons. Energy (Br Cove) | 100.22 | We received a demand letter, does not match last bill provided to us.  Asked to forward all Consumers bills.  Not received as of yet. |
| Dell | 14,513.39 | No current settlement. Lawsuit has been threatened. Letter received from Dell attorney |
| Da – Sta – Co | 609.45 | Settled for $629.40 (from $1,105.89) to be paid in nree installments: $207.36 in Feb. 2008 and $311.03 in March and April 2008 |
| DHL | 330.27 | Settlement letter sent to AdIt from approval.  Settled for $330.27, $30.67 paid in May to prevent removal from agency, $149.60 to be paid in two installment payments beginning in June 2008. |
| DTE / AllianceOne (8000) | 733.19 | Settled for $733.19 (from $977.59) to be paid in 3 monthly installments of $244.40 beginning in May 2008. Signed settlement letter not received from AllianceOne. |
| DTE/Kensington Ct | 348.15 | Payment plan agreed; $48.15 to be paid May 30, 2008, then 3 $100.00 monthly installment payments made beginning June 30, 2008 |
| DTE/Kensington CL | 131.02 | Settled for a one-time payment of $120.00 to be made in May 2008 |
| Fedex/Weinstock & O'Malley | 566.41 | Settled for $584.41 to be made in 3 monthly installment payments of $194.80 beginning in April 2008 |
| McClain Rent | 11,392.42 | Settled. Payment plan in place for 12 monthly installment payments of $948.67 to be paid beginning April 2008 |
| McLeod Internet / Brown & Joseph | 1,005.97 | Made initial contact with offer.  AdIt did not want to commit until BT deal finalized (see 5/14/08 email from AdIt) |
| McNaughton McKay | 14,323.87 | AdIt has been in talks here.  No settlement agreement finalized. |
| Midwest Optical | 364.66 | Settled for $364.66 (from $729.25) to be paid in 12 monthly installments of $30.39 |
| Neff Engineering | 10,764.12 | Settlement letter sent to AdIt for approval.  Payment plan of 4 monthly installment payment of $2,694.03 beginning in May 2008 negotiated. Lawsuit threatened if payment not received in May 2008. |
| Reese's Commercial Cleaning | 595.00 | Settled for $565.00, to be paid in three payments of $154.33 from March - May 2008 |
| Rosemont / Voss Michaels Lea | 4,961.75 | Settled for $4,961.75 (from $9,923.50), pay $413.16/month beginning in Feb. 2008 to Feb. 2009. |
| Staples | 2,260.17 | This is the same as the CitiCards debt, above.  Please see comments there. |
| Verizon (Old Employee Group) | 3,334.64 | AdIt forwarded this to me in early May.  Did not contact at this time due to hold for BT deal (see 5/14/08 email from AdIt). |
| | | |
| Total | 306637.73 | |

*The Bank account was approx 400 overdrawn when the 50k was received.*

|  |  | 1st 50K |  |  |  | 2nd 50K |  |
|---|---|---|---|---|---|---|---|
| Check # | Vendor | Amount | Status |  | Vendor | Amount | Status |
| Wire | Tishkoff 1st Pay't | 7,500.00 |  |  | Peter Long | 1,500.00 |  |
| Wire | Glenn Smith | 5,000.00 |  |  | Glenn Smith | 5,000.00 |  |
| Wire | Rukkila | 3,000.00 |  |  | Rukkila | 5,000.00 |  |
| Wire | Adil | 7,500.00 |  |  | Aptura | 5,500.00 |  |
| Wire | Tishkoff 2nd Pay't | 7,500.00 |  |  | Adil | 19,740.00 |  |
| 1199 | LaSalle Bank | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1200 | McClain | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1201 | Voided Check Number | 0.00 |  |  |  | 0.00 |  |
| 1202 | First Holding (Brighton Cove) | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1203 | Rosemont Exposition | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1204 | Reese's Cleaning | 0.00 | Stop Payment |  | Reese's Cleaning | 198.33 |  |
| 1205 | APG | 333.33 | Check Cleared After 2nd Try |  |  | 0.00 |  |
| 1206 | GE Capital | 166.66 | Check Cleared |  |  | 0.00 |  |
| 1207 | Fedex | 0.00 | Stop Payment |  | Fedex | 194.80 |  |
| 1208 | Alliance One (DTE) | 0.00 |  |  | Alliance One | 244.40 |  |
| 1209 | DTE | 0.00 |  |  | DTE Energy | 46.15 |  |
| 1210 | DTE | 0.00 |  |  | DTE Energy | 120.00 |  |
| 1211 | Beckhoff | 187.24 | Check Cleared |  |  | 0.00 |  |
| 1212 | Bank of America | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1213 | Bank of America | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1214 | Bank of America | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1215 | Bank of America | 0.00 | Stop Payment/Reissued |  |  | 0.00 |  |
| 1216 | Midwest Optical | 30.39 | Stop Payment |  | Midwest Optical | 30.39 |  |
| 1217 | IRS | 9,000.00 | Check Cleared |  |  | 0.00 |  |
| 1218 | State of Michigan | 0.00 |  |  | State of Mich | 1,500.00 |  |
| 1219 | Comerica Bank Loan Pay't | 0.00 | Void This check |  |  | 0.00 |  |
| 1220 | Adil Shafi | 0.00 | Voided Check |  |  | 0.00 |  |
| 1221 | Cash for Postage | 300.00 | Cashed |  |  | 0.00 |  |
| 1222 | Aptura Machine | 0.00 | Voided |  |  | 0.00 |  |

EX
G

| | | | | | |
|---|---|---|---|---|---|
| 1223 | Miller, Canfield etc. | 0.00 | Stop Payment | Miller Canfield | 691.25 |
| 1224 | Bensinger, Cotant & Menkes | 0.00 | Voided | | 0.00 |
| 1225 | Aladdin | 0.00 | Not Mailed | Aladdin | 500.00 |
| 1226 | BC/BS | 0.00 | Stop Payment/Reissued | | 0.00 |
| 1227 | Tishkoff | 0.00 | Voided | | 0.00 |
| 1228 | DTE | 0.00 | Stop Payment | DTE | 100.00 |
| 1229 | CDW | 313.85 | Check Cleared | | 0.00 |
| 1230 | Neff Engineering | 0.00 | Stop Payment | Neff Eng'g | 2,696.03 |
| 1231 | Donna Burr | 1,806.94 | Check Cashed | | 0.00 |
| 1232 | Comerica 941 Taxes | 0.00 | To Be Deposited | 941 Taxes | 642.38 |
| 1233 | State of Mich. SUW | 0.00 | Due 6/20/08 | SUW Taxes | 103.14 |
| 1234 | BC/BS | 2,154.00 | Reissued | | 0.00 |
| 1235 | Cash for Bank of America | 1,766.00 | Paid at the Bank with Cash | | 0.00 |
| 1236 | Donna Burr Exp Reimb | 344.23 | Check Cashed | | 0.00 |
| 1237 | Rosemont | 413.48 | Reissued | | 0.00 |
| 1238 | First Holding (Brighton Cove) | 749.49 | Reissued | | 0.00 |
| 1239 | APG | 0.00 | Void/1st Check Cleared | | 0.00 |
| 1240 | LaSalle Bank | 500.00 | Reissued | | 0.00 |
| | Estimate of Bank Charges for NSF/S | 1,000.00 | | | 0.00 |
| Wire | Mcclain | 946.87 | Certified Check Given | | 0.00 |
| | | 50,512.48 | Excess Carryover in 2nd 50K | State of Ohio | 2,314.27 |
| | | | | Big PDQ | 500.00 |
| | | | | Cons En | 144.06 |
| | | | | Cons En | 42.22 |
| | | | | Verizon | 300.00 |
| | | | | Dell | 0.00 |
| | | | | DHL | 118.51 |
| | | | | Green Oak | 400.00 |
| | | | | i3 Logic | 600.00 |
| | | | | Dept of Labor | 50.00 |
| | | | | DOL Bob. T | 267.04 |
| | | | | DOL John L. | 295.15 |
| | | | | DOL Andreas | 145.22 |
| | | | | Carryover | 512.48 |
| | | | | Esti Taxes DOL | 500.00 |
| | | | | | 49,995.82 |