UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADIL SHAFI, an individual,

      Defendant/Counterclaim Plaintiff

v.                                               Case No. 09-10454

BRAINTECH, INC, a Nevada corporation,      Hon. Victoria A. Roberts

      Counterclaim Defendant,

and

FREDERICK WEIDINGER, an individual,

      Additional Counterclaim Defendant.
_____/

**DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES………………………………………………………………iv, v

I.   INTRODUCTION……………………………………………………………..………1

   A.  Overview……………………………………………………………………………1

   B.  Adil Shafi ………………………………………………………………..……2

   C.   Rick Weidinger and Braintech…………………………………….……..3

   D.  Shafi Inc.…………………………………………………………………………4

II.   BACKGROUND AND FACTS……………………………………………………5

   A.  The Initial Discussions Regarding a Partnership……………………………5

   B.  The Negotiations Reveal the Circumstances of Each Company……………..……7

   C.  The Negotiations Turn to an Outright Acquisition of Shafi Inc……………………8

   D.  The Significance of Market Access and Acceleration…………………………10

III.  THE WRITTEN REPRESENTATIONS………………………………………………13

   A.  Payment of Shafi Inc. Debt……………………………………………..……13

   B.  The Employment Agreement……………………………………………...…16

   C.  Other Written Representations to Support Shafi Sales Efforts Relied Upon
      By Shafi………………………………………………………………………19

IV.  ARGUMENT…….……………………………………………………………………21

   Point 1 – Braintech Fails to Demonstrate Termination or Cause For
       Termination…………………………………………………..……21

   Point 2 - Shafi States A Claim Under 10b-5 And Has Sufficiently Alleged
       Scienter………………………………………………………………26

   Point 3 - Rule 144 Offered No Help To Shafi In Terms Of The Ability To Sell
       The Worthless Braintech Stock…………………………………..………35

   Point 4 - Weidinger And Braintech Fraudulently Induced Shafi To Enter Into
       An Agreement That Weidinger And Braintech Never Intended
       To Honor…………………………………………………..………38

Point 5 - Shafi Has Viable Claims Under The Michigan Uniform Securities
Act……………………………………………………………..……41

Point 6 - Shafi Has Valid Claims for Conversion and Unjust Enrichment……….42

## INDEX OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page</u>

*Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 2009 Del. LEXIS 234 (Del Sup. Ct. 2008)……………………………………………………………………………..24

*Gary v. Beazer Homes USA, Inc.*, 2008 Del. Ch. LEXIS 72  (2008)……………………..26

*Hoffman v. Comshare*, *Inc.* (*In re Comshare Inc. Sec. Litig.*), 183 F.3d 542, 548-549, 551 (6th Cir. 1999)…………………………………………………..…..26, 34

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)…..27

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-548, 550 (6th Cir. 2001) (en banc) (citing 15 U.S.C. § 78u-5(i)(1))……………………………………………….…31, 34

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996)…………………………………………….………..32

*Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1283 (9th Cir. 1982)…………….33

*Spatz v. Borenstein.* 513 F. Supp. 571, 582 (N.D. Ill. 1891)………………….…………33

*Vaughn v. Teledyne, Inc.,* 628 F.2d 1214, 1220 (9th Cir. 1980)………………….………33

*Merck & Co., Inc. v. Reynolds* at 130 S. Ct. 1784 (2010) (quoting *Tellabs, Inc. v. Maker Issues & Rights, Ltd.,* 551 U.S. 308, 319)……………………………..………34

*Custom Data v. Preferred Capital*, 274 Mich. App. 239, 242-243 (2006)……...……38, 40

*Foreman v. Foreman*, 266 Mich. App. 132 (2005), *app. den.* 475 Mich. 863 (2006)…..39

*Crowley v Langdon,* 127 Mich 51, 58-59 (1901)………………………………………40

*Danto v Charles C Robbins, Inc,* 250 Mich 419, 425 (1930) ………………………..40

*Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330 (1976)……...………40

*Van Tassel v. McDonald Corp.*, 159 Mich. App. 745 (1937)………………………..41

*Am. Inst. for Preventive Med., Inc. v. Oakstone Publ'g, LLC*, 2010 U.S. Dist. LEXIS 19968, *23 (E.D. Mich. 2010)……………………………………….………41

*Brock v. Consolidated Biomedical Labs*, 817 F. 2d 24,25 (6th Cir. 1987)………..…...43

*Foremost Insurance Co. v Allstate Ins. Co.*, 439 Mich. 378 (1992)…………..………..43

*Belle Isle Grill Corp v. City of Detroit*, 256 Mich. App. 463 (2003)…………………….44

<u>Rules</u>

Rule 56(c)(C)(2)………………………………………………………………….………27

Rule 144…………………………………………………………………………35-38

17 CFR 230.114 (a)(1), (b)(1), (e)(1)(i) through (iii)……………………..………..……36

<u>Statutes</u>

MCL 600.2919a…………………………………………………………..…………………43

## I.   INTRODUCTION

A.   Overview

The "big picture" presented by Braintech and Weidinger is based upon slanted advocacy, unsupported references to deposition testimony and unsupported references to various exhibits which are material and relevant to this case.  Sweeping statements are made to the effect that Shafi Inc. proprietary software was not "revenue ready" and its customer base did not exist.  Braintech and Weidinger offer no evidence to support such assertions except their own conclusory and entirely self serving statements.  Shafi Inc. had hundreds of software installations around the world and has produced hundreds of purchase orders evidencing sales of its software.

Shafi does not have to prove the viability of the software products owned by Shafi Inc.  Since Braintech's complaint has been dismissed, any claims regarding the validity of Shafi Inc. software or the existence of its customer base are no longer relevant to this matter.  Rather, the focus of this case is on the misrepresentations and omissions made by Weidinger and Braintech in order to induce Shafi to sell his companies to Braintech in exchange for Braintech stock.   All of Braintech and Weidinger's unsupported and un-provable allegations regarding the business of Shafi or the liability of its software are specious.

Braintech and Weidinger would have this Court believe that Shafi Inc. was merely an elaborate ruse to obtain money from Braintech.  This could not be farther from the truth.  Adil Shafi built Shafi Inc. into a world leader of vision guided robotic software capable of multiple processes and able to run on many different robot platforms.  Representatives of Braintech witnessed Shafi software in operation in at

least one plant.  Braintech engineers knew of Shafi and his company's reputation in the vision guided robotics software industry.  Shafi has produced hundreds of thousands of records relating to its business, its sales of software, its customer base, none of which has ever been challenged by either Braintech or Weidinger.

      B.   <u>Adil Shafi</u>

Adil Shafi formed Shafi Inc. in 1993.  Shafi's passion lies in creating software solutions for robot driven vision systems.  Most of Shafi's adult life has been spent developing software enabling robots to "see" processes being performed and controlling precision movements and activity critical to functionality of robots in industrial settings.  Over the years, Shafi gradually expanded his company, but in 2007/2008 suffered from over expansion combined with a downturn in the market and the economy.

Mr. Shafi knew many people in the vision guided software business and also knew various people associated with Braintech over the years.  Shafi Tr. pp. 29-31.[1]  In 2007, Shafi encountered two Braintech employees at a robotics show in 2007.  Shafi Tr. p. 29.  One of the Braintech folks mentioned that the two companies might be able to do something together.  Shafi Tr. p. 28.  This was before Weidinger's appointment as CEO of Braintech.  Nothing came of that brief encounter.  In early 2008, Babak Habibi, a Braintech engineer, reached out to Shafi by a phone call or email.  Shafi Tr. p. 29.  Habibi suggested a formal discussion concerning a potential business combination.  Shafi Tr. p. 29.  This contact led to the negotiations that resulted in the acquisition of Shafi Inc. by Braintech.

---

[1] Shafi's transcript is an Exhibit to the joint motion for summary judgment at Docket 66-6, p. 1-46. References to Exhibits already in the record as part of the Joint Motion will be referred to by Docket No. and Page.

C.   <u>Rick Weidinger and Braintech</u>

In November 2007, Weidinger was appointed the new CEO of Braintech. Weidinger Tr. p. 22.[2]  At the time, Braintech had one customer, ABB, Ltd., (a robot manufacturer based in Zurich, Switzerland) which represented 99% of its revenue stream in 2007 and 2008.  Weidinger Tr. p. 25.  The exclusive contract which created the revenue stream with ABB  was scheduled to expire at the end of 2008.  Weidinger Tr. p. 25.  In addition, Braintech's proprietary software, unlike Shafi Inc. software, only ran on ABB robots.  Unless Braintech found other customers, other robot platforms on which to run its software and other sources of revenue, it would not survive long after the end of 2008.

As disclosed in an SEC  filing, Weidinger put a plan in place to resuscitate the company.

> Since his appointment as our Chief Executive Officer in November of 2007, Mr. Weidinger has developed and implemented a new business plan that redefines the company's markets in order to better utilize its technology and create operating leverage.

Weidinger Tr. p. 26.  By early 2008, the sole focus of Weidinger's business plan was to acquire Shafi Inc. and hire Mr. Shafi as the Chief Operating Officer of Braintech.

At the time of his appointment as CEO of Braintech, Weidinger had served two intermittent periods as a member of the Board of Directors of Braintech.  Other than as an outside director, Weidinger had no experience in the vision guided robotics software business.   Weidinger Tr. p. 32.   Weidinger had no experience in technology or manufacturing either.  Weidinger acknowledged that in 2008, the financial statements for Braintech disclosed that there was doubt as to whether Braintech could continue as

---

[2] Weidinger's Deposition Transcript is annexed as Exhibit 1.

a going concern.  Weidinger Tr. pp. 27-28.  Weidinger testified that unless Braintech

could find a way to "commercialize" its product, Braintech might not continue to exist.

> I mean, that's one of the reasons why I was attracted to a deal Shafi is
> that what – one thing that Braintech had is they had world-class
> technology.  Even today, this day, there's technology in the market but
> they didn't know how to commercialize this because they never had to do
> that before.  They had one customer [ABB] which was a channel partner.
> They didn't have to commercialize it.  They didn't have to sell it to any third
> party.  It was under contract.

Weidinger Tr. p. 29.

        D.    <u>Shafi Inc.</u>

Braintech was attracted to Shafi, not the reverse.  Shafi Inc. software ran on

multiple robot platforms, where Braintech software ran on a single platform.  Shafi Inc.

was incorporated by Shafi in 1993 and sold trademarked proprietary software under the

name Reliabot:

> Reliabot has many, many features in it.  It's a world – leading product.
> Reliabot enjoyed the number one position in the world, in the world, by
> Google for three years, top ranking in the world for vision, and robotics.  I
> have experience and understanding of that product because it was
> developed under my direction.

Shafi Tr. p. 23.

However, Shafi Inc. was in difficult financial circumstances in 2008.  The

downturn in the economy in 2008 combined with an ambitious expansion plan

embarked upon by Shafi Inc. in 2007 created a cash drain which was causing Shafi Inc.

to hemorrhage in 2008.  Shafi suffered from negative cash flow, was behind with its

creditors, owed significant sums to taxing authorities and was unable to pay past-due

wages to its current and former employees.  None of this mattered to Weidinger or

Braintech.

Braintech's courtship of Shafi and his company began in earnest in March, 2008. The execution of a Non-Disclosure Agreement, on March 12, 2008 sparked a series of negotiations that would entail thousands of e-mails, meetings across the country, interaction between numerous Braintech personnel and Shafi, lawyers for both parties exchanging drafts and documents, due diligence largely undertaken by Braintech, all of which culminated in a closing on August 12, 2008 whereby Braintech acquired Shafi Inc.[3]

## II.   BACKGROUND AND FACTS

### A.   The Initial Discussions Regarding a Partnership

At the beginning, the business combination was intended to be a partnership. On page 6 of their brief, Weidinger and Braintech claim that Shafi represented Reliabot software to be "fully functional, market revenue ready, fully trained channel network of integrators, access to market to build new sales – create short term and fast sales growth."  This was not a representation at all.  Rather, it came from a jointly created document (see Exhibit 2) which Weidinger testified was the result of a  "joint effort." Weidinger Tr. p. 239. (Weidinger testified, "I can't even recollect the author of this was. I think it was probably a joint effort.").  Weidinger and Braintech knew well of Shafi Inc.'s reputation in the vision guided robotics software market.  To make reference to the jointly created partnership summary as a Shafi representation is disingenuous and untrue.

With the structure of the deal proposed as a partnership, Weidinger lured Shafi into believing that the value of the acquisition was $1.85 million in cash and $1.15

---

[3] Braintech also acquired 80% of the outstanding stock of a second company owned by Shafi, Shafi Innovation Inc.

million in stock which Braintech, for a total of $3 million, was willing to pay.  In the jointly created partnership summary (Exhibit 2) the $3 million was the value assigned to Shafi Inc.  However, by the middle of May, 2008, Weidinger was backtracking on paying a large sum of cash.  In response to this, Shafi wrote in an e-mail on May 12, 2008:

> … That change in proposal of cash from $1.85 million-$400,000 (100 K down and six payments of 50 K) resends a serious problem in keeping me focused ahead on new sales with Braintech versus looking back to find other ways to resolve my debts.

See, e-mail dated May 12, 2008 from Shafi to Weidinger, at Exhibit 3.  Shafi was prepared to walk away.  In response, Weidinger proposed the $1.85 cash portion become a mix of cash and stock.  Weidinger represented "we can carry the $50,000 [monthly payments] out further [then six months] as long as you are 'accessing and accelerating' and we are signing contracts."  See, e-mail dated May 12, 2008 from Weidinger to Shafi at Exhibit 4.  Contrary to the claims made in the summary judgment motion, these are not forward-looking projections or salesman's puffery, these are present tense statements regarding actual cash benefits Shafi would be receiving by proceeding with the transaction.  What followed in Weidinger's e-mail "I think this is a win for both parties…" is the salesman's puffery.

Although this exchange of e-mail was an indication that the deal had changed significantly, Shafi approached it with renewed interest because the cash component would have been sufficient to allow him to discharge the Shafi Inc. debt which attached to him personally, a critical component of the deal for Shafi (as expressed in the May 12, 2008 e-mail excerpted above).  Shafi continued to work on what the parties termed the Access & Acceleration Agreement (the "A&A), the technical corroboration, sales and

revenue projections for the combined business entities. The A&A would become the centerpiece of the transaction. The A&A is discussed in greater detail below.

>    B.    The Negotiations Reveal the Circumstances of Each Company

Later, the deal would change again. But before a discussion of the final iteration that became the deal which closed on August 12, 2008, it is important to understand what the parties learned about each other prior to closing. Well in advance of the closing, Weidinger became aware of the following:

- Shafi Inc. had no revenue whatsoever in all of 2008, up to and including the closing date. Weidinger Tr. pp. 54-57.
- Shafi suffered losses of almost $1,000,000 in 2007. Financial Statements at Schedule 3.5.1, SPA (Docket 66-2, p. 78)
- Shafi Inc. was in serious trouble with its creditors, owed tens of thousands of dollars in tax obligations, was in default with it secured creditors and had sustained several judgments against it by general unsecured creditors. Weidinger Tr. pp. 69, 71-72 ("I don't think that he was able to make payments to his creditors in June 2008. That's why I agreed to advance some $50,000 from my own bank account.")
- Shafi Inc. owed tens of thousands of dollars to former employees for unpaid wages. Weidinger Tr. p. 96.
- Shafi Inc. financial statements showed a company operating in the red with negative equity. The financial statements were attached to the SPA at schedule 3.5.1 (Docket 66-2, p. 76-78, Docket 66-3, pp. 2-3, showing "net income" in 2008 of negative $56,776.24)
- Shafi had only one projected actual receivable in 2008, valued at $25,000 as 100% collectible prior to closing. Weidinger Tr. p. 441.
- Shafi had spent the months of May through August, 2008 drafting sales and technical blueprints for the future combined operations of Braintech and Shafi, a fact also acknowledged in the closing schedules, on the last page of the A & A (Docket 66-3, p. 61) ("the Shafi acquisition closing delay has caused attention away from sales").

In addition, the state of affairs at Braintech was just as dire:

- Braintech had no other customers but ABB and that contract was scheduled to expire at the end of 2008. Weidinger Tr. p. 25.

- Braintech had no other sales efforts going on other than what was being directed by Shafi.
- Weidinger admitted, although not in so many words, that the combined entities after the closing were basically a new startup entity. Weidinger Tr. p. 321. (essentially agreeing, Weidinger termed it a "restart.")
- Weidinger, not Braintech, personally funded $50,000 of the $100,000 down payment for the letter of intent signing. Weidinger Tr. p. 377.
- Weidinger had no experience, other than as a board member, in the vision guided robotics software business. Weidinger Tr. p. 29. For approximately one to two years in the early 2000's, Weidinger attended quarterly board meetings as a director of Braintech. Weidinger Tr. pp. 31, 319, 321-322.
- Weidinger's plan to expand the business of Braintech, branch out into other markets and diversify was solely dependent on the efforts of Shafi and the A & A. Weidinger Tr. p. 51.

   C.   <u>The Negotiations Turn to an Outright Acquisition of Shafi Inc</u>.

By the end of May, the partnership discussions were off and Weidinger and Shafi pursued acquisition discussions. By this time, Shafi had spent most of the prior two months working on the blueprint for success of the combined entities, the A&A and other collaboration documents. Because of this, Shafi neglected his own business and Shafi Inc., was completely out of cash. Shafi turned to Braintech for interim cash needs.

On May 28, 2008, Shafi expressed an immediate need to Weidinger for $100,000 to pay bills. In response, Weidinger again changed the deal. First, Weidinger informed Shafi that no money would change hands until an agreement was executed. Second, any cash component beyond a $100,000 deposit now disappeared. The majority of the consideration would be assumption of debt issuance of stock and a "lucrative" employment agreement and not cash. Weidinger wrote in an e-mail dated May 28, 2008 "I still believe an acquisition with Braintech, assuming your business debt and buying your stock, all [Braintech] stock up front to you, big leadership contract for you

with monthly payments for 2.5 years of agreement, … would be best transaction for all." See Weidinger e-mail at Exhibit 5.

By withholding funding Weidinger knew was necessary to keep Shafi Inc. afloat, and now controlling payment to Shafi creditors, Weidinger would coax Shafi into continuing to update, revise and massage all of the Braintech business planning in the A&A and other collaboration documents Shafi had been working on for months.  At this point, Shafi was an unpaid business consultant for Braintech.  Weidinger was implementing his "commercialization" of the software products for the combined entities by making representations to Shafi to keep him in the picture, pay his creditors and got him to diligently prepare the business plan without regard fulfillment of the representations and promises being made.

The series of representations outlined in the Complaint at paragraphs 45, 50, 57, 61, 63, 118, 119, 120, 133, 134, 135, 136 and 137 were all made in connection with a transaction involving the sale of securities (3 million shares of Braintech stock in exchange for 100% of the stock in Shafi Inc.).  However, those representations were also made in order to induce Shafi to create the final version of the A&A document and other business planning for Braintech which would serve as the sales/business blueprint for Braintech after the closing.

On at least three occasions prior to the closing of the deal, Shafi was fed up and ready to walk away.  On those occasions, Weidinger made fact specific (as opposed to forward-looking) statements including the allegations detailed in paragraph 45 of Shafi's Complaint:

> 45. On May 28, 2008 in an e-mail Weidinger implored Shafi to proceed stating that "an acquisition with Braintech assuming your business

> debt and buying your stock, all BRHI [Braintech] stock upfront to you, big leadership contract for you with monthly payments for 2.5 years of agreement, cash deposit at execution and certain cf ip back to you after 2.5 years would be best transaction for all [emphasis supplied].

On at least two other occasions, after May 28, 2008, also at times when Shafi was prepared to walk away from the transaction, Weidinger made similar representations.  See Complaint paragraph 50 (concerning similar statements made on June 18, 2008) and paragraph 57 (concerning statements made on August 2, 2008). As alleged in paragraphs 45, 56 and 57, the assumption of Shafi Inc. debt was a critical component of the transaction for Shafi.

D.    The Significance of Market Access and Acceleration

In Weidinger's words, the A&A "was one of the tenets of the acquisition for Braintech."  Weidinger Tr. p. 51.  The A&A went through many variations between May and August, 2008.  Weidinger Tr. p. 75.  The A&A contained a series of sales, customer contact activities, internal planning and milestones for certain actions and placed the initials of each of the Braintech executives who would be responsible for such activities. See Exhibit 6.   The A&A had Weidinger playing a key role in most customer contact/sales opportunities.  Weidinger Tr. p. 78.

According to Weidinger, the A&A was the "whole reason why Braintech was acquiring [Shafi's] company."

> Q.    What was -- who came up with the term "access and acceleration"?
>
> A.    I did.
>
> Q.    What did you mean when you first communicated the idea of access and acceleration to Mr. Shafi?
>
> A.    Access -- and he knew that this was very important to this whole reason why Braintech was acquiring his company.  We needed

> revenue, revenue, revenue. We thought the quickest way to do that, as he represented his products as being revenue ready, is accessing his installed base, his customers. That was the access. And if we were able to do that, then we would accelerate our business plan.
>
> Q.   And so you relied on Mr. Shafi to create the access and acceleration agreement?
>
> A.   I think -- originally, yes. But as we went down the road, Jim Dara, my chief sales officer, got very involved in creating it with him.

Weidinger Tr. pp. 75-76.  All told, Shafi spent countless (and uncompensated) hours drafting, redrafting, tweaking and finalizing the A&A to the personal satisfaction of Weidinger. It was a sales blueprint for the combined companies.[4]  It outlined specific tasks on a daily basis and assigned responsibility for those asks to various executives at Braintech including Shafi and Weidinger.  Yet immediately after the closing, Shafi discovered that Weidinger would not support or participate in any of the planned activities to which he had been assigned.

Many of the representations made by Weidinger prior to closing confirmed and reiterated the support and infrastructure Shafi would be given to execute the sales plan and start up plan set forth in the A&A.  These representations were material and relied upon by Shafi in connection with the sale of his business and the acquisition of stock in Braintech.  See paragraph 119, Shafi Second Amended Counterclaim.  From Shafi's perspective, execution of the details of the A&A, as he understood it prior to the closing, would only enhance the value of the stock he was to receive in Braintech.  For his part, Weidinger naïvely (or more accurately, recklessly), believed all he needed to do was slot Shafi in as COO of Braintech and sales and revenue would magically occur. Despite Weidinger's approval and understanding of his important role in the execution

---

[4] The early drafts were so detailed and specific (up to 50 pages long) that Weidinger insisted on an abbreviated version for closing.

of the details of the A&A, after the closing Weidinger would all but abandon any participation in the specific tasks assigned by the A&A.  Not only did Weidinger refuse to personally participate in sales contacts, but specific milestones such as the opening of a Detroit Michigan office, acquiring demonstration robots for that office and hiring appropriate sales and engineering staff would also be completely abandoned.

Shafi testified as to his extreme frustration which resulted from Weidinger's refusal or neglect to carry out the A&A.

> Q.   Why would, in your estimation, the company enter into an agreement under those circumstances where it would gain no revenue?
>
> A.   All Braintech had to do was meet its obligations and I could have delivered, but they never enabled me.  They didn't open an office.  They didn't hire the people I needed.  We didn't have any training.  In this access and acceleration you'll see  the initials "RW" all over these dates.  If you start on page  49 and go to page 50, page 51, page 52, look at how many  "RW's" there are.  Rick Weidinger was supposed to go with me  to these companies and go with me and represent that he was  the new combiner of these companies. I had the market  knowledge.  But he only went to two companies.  He told me after the deal was closed he was not going to visit these companies.  He flat-out breached his commitment to go to these customers.  And Dara would go work with ABB, so I was left alone to go visit these customers.  Now, the access and  acceleration clearly has everybody's initials as to who's responsible to go to these meetings.  These people did not accompany me, so there was no reason for me -- There was no way that these companies would look at me and say, "You can do this."  I mean, it's flat out here.
>
> Q.   Why would the companies say that there was no way you could do them on your own if you went alone?
>
> A.   Well, they knew that I represented Braintech, and they knew that Rick Weidinger had orchestrated this deal.  He put out a big press release all over the map in the industrial world talking and touting about this agreement.  And it was clear from the first three or four meetings that I went to these people would say, "So do you have an office?"  I said, "No, we don't have an office.  We're working out of coffee shops.  We're working out of McDonald's."  "So do you have

> any robots?" "No, we don't." "In Michigan?" "No." "So where is your support?" "It's in Vancouver, three-hour time difference away, 3,000 miles away." "So do you have any trained engineers on your products?" "No, we don't." "Where is the rest of your team at Braintech?" "They're not with me." I mean, there was absolutely no support. So how can you expect any company, let's say you're the customer, to cut a purchase order to me when you can clearly see that I'm by myself, I have no robots, I have no office, I'm working out of a coffee shop. You're not going to want to give me a $10,000.00 order. That's what happened.

Shafi Tr. pp. 121-123. Given the complete lack of support provided to Shafi, it is not difficult to understand why the plan was doomed to failure.

## III.   THE WRITTEN REPRESENTATIONS

### A.   Payment of Shafi Inc. Debt

The most material aspect of the transaction was Braintech's promise to pay certain "Braintech Accepted Indebtedness" after the closing. Braintech and Weidinger claim without any basis that payment of Shafi Inc. debt was contingent upon and would be funded by "revenue pipeline commitments generated by Shafi Inc." Joint Memorandum, pp 8-9. Here, Braintech and Weidinger refer to Section 6.3 of the SPA. Contrary to the claims of Braintech and Weidinger, Section 6.3 of the SPA contains no condition that such Shafi Inc. indebtedness would be paid from any revenue pipeline attributable to Shafi Inc. Section 6.3 provides as follows:

> 6.3   **Company Indebtedness**. Buyer covenants and agrees with Seller that from and after Closing, Buyer will cause SI to satisfy the Braintech Accepted Debt; provided, however, nothing herein shall prevent Buyer from negotiating or attempting to negotiate the terms of any such Braintech Accepted Debt; provided, further, that Buyer may modify or cause the modification of the repayment terms (including, without limitation, the amount paid, to be paid or not paid in any specific month and the timing of any payments) of any Braintech Accepted Debt for which no written settlement thereof has been entered into between SI and the applicable creditor as of the date hereof; provided further that Seller's obligations to satisfy Excess Debt shall not be reduced in any way as a

result of the negotiated reduction of any Braintech Accepted Debt or settlement of Braintech Accepted Debt for less than the amount shown on the Creditor and Payment Schedule.

In addition to Section 6.3 of the SPA, the parties also executed what is termed in the closing documents as a "side letter."  Similar to Section 6.3 of the SPA, the side letter contained no condition that Shafi Inc. debt was only to be paid out of Shafi Inc. pipeline revenue.  A complete copy of the side letter is annexed as Exhibit 7.  The side letter provides:

> "Braintech Accepted Debt" is any [Shafi Inc.] indebtedness expressly set forth on the Creditor and Payment Schedule in the column thereon entitled "Braintech Accepted Debt (remaining balance)" in the amount set forth in such column.  Braintech Accepted Debt shall not exceed $900,000 in the aggregate.

The Creditor and Payment Schedule is found in Section 3.9 of the SPA.  Although entitled "Accounts Receivable", the cover page for this Schedule provides:

> There are no Accounts Receivable as of June 30, 2008. Revenue and costs are reflected in the creditor and payment schedule (the "debt schedule") attached hereto.

The schedule which follows in Section 3.9 of the SPA (Docket 66-3, p. 7) as part of the moving parties papers is unreadable.  A readable version is attached to this memorandum as Exhibit 8.  And is plainly seen, the highlighted column entitled "Braintech Accepted Debt" committed Braintech to unconditionally pay the sum of $900,000 to Shafi Inc. creditors.  There is no offset, nor is there any condition set forth in Exhibit 8, which requires Shafi Inc. revenue to offset the payments.[5]  In the first

---

[5] For clarification, this schedule shows that the first payments on Shafi Inc. debt would be made in July, 2008.  However, at the very top of the first page there is a list of updates showing the last date of the update.  The last update of this document occurred immediately before the closing on August 12, 2008.  Although the first payment is designated as July, the parties intended that the first payment would either be August or September.

month after the closing, Braintech was scheduled to pay $66,496.  In the second month, Braintech was scheduled to pay $61,185.  In the third fourth and fifth months, Braintech would be paying approximately $43,000 per month.  Thereafter, continuing into 2009, Braintech committed to pay almost $25,000 per month to Shafi Inc creditors.

In his deposition, Weidinger squirmed and obfuscated attempting to explain how the payment of Shafi Inc. debt was contingent upon Shafi Inc. generating revenue for Braintech.  See Weidinger Tr. p. 101-110.  Yet, when pressed as to whether such a condition was included anywhere in the SPA, Weidinger could not identify any such contingency:

> Q.   Your testimony is that we will find the condition that there has to be Shafi revenue before Braintech pays Braintech accepted debt in something other than Exhibit 7?
>
> A.   Well, I don't know – I mean, I'm not a lawyer. And I don't know – you know, I can't tell you – I can't speak to the legalities of what you're asking me. All I know is we can simply go to the debt schedule and it's all right there. It shows that the two are very, very importantly and very, very carefully tied together. I don't know, J. P., Legally how that – a tenet of this transaction, how that relates to this Exhibit 7. I can't – I'm not trained to tell you.[6]

Weidinger Tr. p. 110.  There simply was no such contingency anywhere in the SPA or the side letter that debt payments to Shafi Inc. creditors was contingent on revenue from Shafi Inc. sales.  Braintech committed to pay the debt in writing in the SPA without any condition whatsoever.  As admitted by Weidinger, within one month or less after the closing, Braintech ceased paying of Shafi Inc. debts.  This was a written promise, material to Shafi and relied upon by Shafi, which Braintech and Weidinger failed to fulfill

---

[6] Weidinger may not be a practicing attorney but he has a law degree from Creighton University. Weidinger Tr. p. 8.

almost immediately after the closing.   The materiality of this commitment cannot be overstated.

Weidinger knew that the payment of the "Braintech Assumed Debt" was material to Shafi because of numerous pre-closing representations made to Shafi that assumption of the debt by Braintech would alleviate Shafi from dealing with the prior debt problems and allow Shafi to focus on generating sales post closing.   See paragraph 57, Shafi's amended counterclaim.   See also Exhibit 9, 8/02/08 Composite Email (underlined material written by Weidinger).   Weidinger made these representations because he knew that Shafi was personally liable for hundreds of thousands of dollars of the "Braintech Assumed Debt."   That debt was made up of, in part, over $170,000 owed to the Internal Revenue Service for trust fund liability, $74,500 personally guaranteed to Comerica bank, $169,776 owed in has to wages to former employees for which Shafi was personally liable.

In addition, since Braintech was only covering $900,000 of Shafi Inc. debt, Shafi would still be burdened by an additional $171,000 of Shafi debt which Shafi agreed to personally pay.   This is why Shafi's Employment Agreement became so vital. Weidinger implored Shafi on multiple occasions to go forward with the deal because of the lucrative employment contract. See paragraph 45, Shafi Amended Counterclaim ("big leadership contract for you with monthly payments for 2.5 years of agreement"). Weidinger knew that income to be earned by Shafi through his Employment Agreement was critical to Shafi's ability to pay off Shafi's portion of Shafi Inc. debt.

      B.   <u>The Employment Agreement</u>

The Employment Agreement itself, is almost as complicated as the SPA.   But first, it is important to note that there is no base level of revenue which Shafi was required to

produce in connection with his Employment Agreement.  Weidinger testified that Shafi was required to create "revenue, revenue, revenue" but there was no such requirement written into the Employment Agreement.  Weidinger omitted to disclose that there was any immediate requirement to create revenue.  It was certainly everyone's goal to sell product, but without the infrastructure and support promised in the A&A, Shafi's ability to sell product was severely curtailed.

Nevertheless, there were certain "revenue related conditions"  made a part of the Employment Agreement.  See Appendix 1 of the Employment Agreement (incorporated in Section 7 of the Employment Agreement) (Docket 66-19, p. 11).  In revenue related condition number 1, Braintech committed to: "Hiring by Braintech of Elsie White and Donna Burr on or about September 1, 2008."  As both Weidinger and Shafi testified, Elsie White was never hired.  Shafi Tr.  p. 237. Weidinger Tp. p. 206.  Both Weidinger and Shafi knew that Elsie White would be critical to obtaining certain government contracts.  Without Ms. White, Shafi had no ability to obtain revenue from government contracts.  Shafi Tr. p. 237.

Section 9 of the Employment Agreement provided certain  "benefits" for Shafi. Among those benefits was health insurance. This was another critical and material aspect of the transaction for Shafi.  Shafi needed health insurance for himself, his wife and their two children. Health insurance was supposed to be provided to Shafi immediately upon his employment.

> Braintech shall provide to the executive and pay the full premium for a comprehensive family health insurance policy provided under the company's existing family health and group life insurance plan. Braintech shall pay for third party family health insurance utilized by executive until Braintech's formal health insurance policy becomes effective after the start of executive employment.

See Section 9, Employment Agreement (Docket 66-19, p. 4).  Following the transaction, Braintech at no time provided for health insurance for Shafi or his family.  Initially, on his employment, Shafi understood there was a 90 day waiting period before Shafi could join Braintech's health insurance plan.  Nevertheless, in the meantime, Braintech (as set forth in the above Section 9) was required to reimburse Shafi for any existing health insurance maintained by he and his family during this 90 day period.  Yet Braintech refused to do so during the 90 day period.  Shafi Tr. p. 128.

Braintech committed in Section 10 of the Employment Agreement to provide Shafi with a company credit card for "all reasonable expenses approved in advance by CEO, including travel and entertainment, incurred by executive in performance of executive's duties."  Braintech and Weidinger not only failed to provide a credit card, Braintech refused to reimburse Shafi for legitimate travel/business expenses.  Immediately following his employment, Shafi took two trips and paid for them with his own funds.  Braintech and Weidinger refused to reimburse Shafi for these small travel bills.  Shafi Tr. p. 127.  Three months later, these expenses would remain un-reimbursed.  *Id*.

It is no wonder that Shafi refused to travel more than 50 miles from his residence to conduct Braintech business.  He and his family had no health insurance and Braintech was refusing to reimburse the most basic of expenses.  This was the state of affairs as of October 16, 2008.[7]  Shafi had spent the better part of 2008 developing the A&A  marketing/business plan for Braintech and Weidinger.  He had agreed to sell a company which represented his life's work in the vision guided robotics software

---

[7] In fact, Shafi's refusal to travel more than 50 miles was not an unwillingness to work.  It was merely a change in plans due to unreimbursed expenses. See e-mail dated 10/16/08, attached as Exhibit 10.

industry for $100,000 cash that was paid to Shafi In. creditors.  There was no other present consideration.  Weidinger made a series of pre-closing written representations concerning the benefits Shafi would receive in connection with the transaction.  Most of the pre-closing representations were restated in the SPA and the Employment Agreement.

Yet immediately following the closing, *every single material promise was breached*.  Shafi found himself and his family without health insurance.  Shafi was spending his own money and not getting reimbursed in connection with Braintech business.  Shafi had utterly no support or buy in from anyone at Braintech to execute the A&A.[8]  None of the promised infrastructure was provided.  No training, no robots, no office was provided in Detroit.  Shafi found himself alone, operating out of coffee shops, with no credibility and no ability to even get something as simple as a promotional dinner reimbursed.

C.   Other Written Representations to Support Shafi Sales Efforts Relied upon by Shafi

Weidinger and Braintech claim that Shafi failed to perform his Employment Agreement and failed to generate pipeline revenue following the closing on August 12, 2008.  Here again,  Braintech and Weidinger made a series of written representations in the SPA which they failed to perform following the closing.   Like the creditor and payment schedule discussed above, the version of the schedule containing written commitments to support Shafi sales efforts under the SPA and attached to the moving papers is unreadable.

---

[8] With Weidinger refusing to participate in the A&A, it was a foregone conclusion that other Braintech executives who owed allegiance to Weidinger would also refused to participate in the A&A.

The Shafi Inc. revenue projections are found on the last page of Schedule 3.26 "certain documents and information."  (Docket 66-3, pp. 53-70).  The last page of this Exhibit contains "Shafi in process" revenue *projections*.  Here, the focus is on the information provided in the box at the very bottom of the page.  As Shafi repeatedly explained to Weidinger during the negotiation phase of the transaction, in order to generate revenue in the amounts as set forth in the projections, there were certain conditions which had to be in place to generate the *projected* revenue.  The assumptions are forth in the bottom box of the last page of the A&A.  (Exhibit 6)  The critical "assumptions"[9] were as follows:

- Hub zone achieved by Shafi Innovation
- ARA  government plus up contract awarded to Shafi Innovation
- Opening of Metro Detroit sales/engineering office by 8/01/2008
- Timely acquisition of necessary hardware for Metro Detroit office (robots, vision hardware, demos)
- Shafi to acquire necessary robots for communications and demonstration purposes
- Shafi to hire Elsie While for GMD revenue development

Along with the Michigan office, robots were supposed to be available in that office as of the date of move-in, September 10, 2008, for demonstration purposes. Weidinger testified that the Braintech Michigan office was not opened until either December, 2008 or January, 2009.[10]  Weidinger Tr. pp. 212-213.  During Shafi's tenure,

---

[9] Typical of Weidinger's "selective" memory, Weidinger recalled these same assumptions being material "at my level" but only as they related to the discussion regarding the partnership. Weidinger testified that he could not recall whether the same list of assumptions were "then rolled in or not rolled in…" to the final transaction which was the acquisition, not a partnership. See, Weidinger Tr. p. 211.

[10] In fact, Weidinger pushed for the transaction to be closed as soon as possible and initially hoped to close the transaction in early July, 2008. Weidinger knew that one of the first steps following the closing would be the opening of the Detroit Michigan office. Yet knowing this, and representing this to Shafi, Weidinger took absolutely no steps to have the Michigan office ready for opening after the closing. Immediately following the closing, Shafi located suitable space, pre-wired for up to 10 robots. Shafi Tr. p. 94.  Weidinger rejected this out of hand.  Instead, Weidinger waited until long after the closing to pursue

there was no Michigan office and there were no robots located in Detroit as promised in writing.  Weidinger claimed as an excuse that it took time to negotiate the lease and build out the space, Weidinger Tr. p. 213, but neither Weidinger nor Braintech ever disclosed to Shafi that they intended to delay the opening of a Detroit office until early 2009.  This misrepresentation made it impossible for Shafi to generate sales activity.

## IV.   ARGUMENT

### Point 1

### Braintech Fails to Demonstrate Termination or Cause For Termination

Shafi's "employment" lasted for a period of 90 days. The Employment Agreement, which incidentally is governed by Delaware law, not Michigan law, set forth in detail his duties. Contrary to the suggestion in Braintech's summary judgment papers, there was no required benchmark of "revenue, revenue, revenue and now" which Shafi was required to meet.  Weidinger testified that "the objective of this transaction was revenue, revenue, revenue, ASAP."  Weidinger Tr. p. 362. In fact, Weidinger put these three words together on multiple occasions during his deposition but never in reference to the Employment Agreement.[11]  It certainly was a goal, but was never promised.

With the understanding that the combined entities were basically a "start up" operation, there is no doubt that Shafi set about to earn his keep and generate sales and revenue. However Weidinger seemed to be at a fundamental misunderstanding as to how to generate revenue. The sales plan blueprint found in the A&A was intended to produce revenue. However, early in the discussions, Shafi made it clear to Weidinger

---

the opening of a Michigan office and in fact it did not happen until after Shafi's employment was effectively terminated.

[11] Shafi's "role was revenue, revenue, revenue." Weidinger Tr. p. 51. "We needed revenue, revenue, revenue." Weidinger Tr. p. 75. "And the important thing was everybody knew that the reason for this transaction with the deal was revenue, revenue, revenue." Weidinger Tr. p. 126.

that to generate certain levels of revenue, "a sales and demo + support execution infrastructure" was required. See e-mail dated May 16, 2008 from Shafi to Weidinger Exhibit 11.  In addition, similar assumptions regarding infrastructure were built into the Shafi revenue projections. See Exhibit 6, and discussion at pages 31-32 below.

While the negotiations proceeded in 2008, Shafi spent more and more of his time creating sales, technology and infrastructure planning for the combined entities. Weidinger knew well the financial status of Shafi Inc. By late may, 2008, Weidinger was aware that Shafi Inc. was essentially operating as a one-man (Mr. Shafi) operation. Shafi Inc. had laid off all of its sales and technological employees in 2007. It was known to both Shafi and Weidinger that Shafi Inc. had not generated a single sale 2008. Moreover, during the period of intense negotiations in July and August, 2008, Shafi spent virtually all of his time not only negotiating the terms of the transaction, but also putting in place the business technological and infrastructure plans for the combined organization without compensation.

Once the transaction closed, with great fanfare, Weidinger announced to the public, and particularly the vision guided robotics industry, the business combination and the hoped-for synergy which would be created. Now a part of a supposedly larger organization, Shafi believed that going back into the vision guided robotics software marketplace with the new infrastructure behind him, that he could generate sales. However, once slotted in as the COO of Braintech, in charge of sales and technology, Shafi found himself once again as a one-man operation. Shafi had no Michigan office, no robots to perform demonstrations for potential customers, no local technological support (and what technological support he did have was separated by a three-hour

time difference making such support unavailable until at the earliest midday, Detroit time) and no cooperation from Shafi's new boss, Weidinger.

Braintech alleges that Shafi "petulantly" refused to travel more than 50 miles for work. Yet during this period, Braintech refused to reimburse the most basic business and other employment related expenses. *Shafi could not get Braintech to pay a $100 bill for a medical x-ray for his daughter.* Shafi Tr. p. 127. Shafi could not obtain reimbursement for travel and entertainment expenses. Braintech refused to pay for a dinner with a sales colleague. Shafi Tr. p 127. As Shafi testified, the sales plan "broke down." The reality is that Braintech failed to perform virtually all of the prerequisite commitments set forth in the Employment Agreement and the SPA. Shafi's hands were completely tied. Braintech, not Shafi breached the Employment Agreement.[12]

Braintech asserts that Shafi was terminated for cause. However, Shafi was never "terminated." The meeting which occurred on November 19, 2008 did not involve any "termination." The letter which followed the meeting did not purport to "terminate" Shafi, rather, the letter "placed [Shafi] on administrative leave with pay and benefits until further notice." (Docket 66-28, p. 2). This was in no sense a termination. One week later, Shafi received a second letter changing his status to "administrative leave without pay."

Shafi's Employment Agreement was governed by Delaware law. (Docket 66-19, p. 8).

> In analyzing disputes over the language of a contract, we give priority to the intention of the parties. We start by looking to the four corners of the contract to conclude whether the intent of the parties can be determined from its express language. "In interpreting contract language, clear and

---

[12] The claim that Shafi deleted or destroyed Braintech records is simply false. Shafi deleted email spam. Shafi Tr. p. 171. Shafi never had any access to Braintech servers and was never given an @braintech.com email address.

> unambiguous terms are interpreted according to their ordinary and usual meaning.

(footnotes omitted) *Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 2009 Del. LEXIS 234 (Del Sup. Ct. 2008).  Turning to the Employment Agreement, Section 12 (d) provided that "Braintech may terminate the employment of the executive with 30 day notice for any reason."  Thus it is clear that the parties agreed and intended that "notice" was required to be provided to Shafi in the event of termination. The Employment Agreement had no provision for administrative leave, with or without pay. The plain and inescapable fact is, Shafi has never been provided with "notice" of termination of his employment.

Moreover, "good cause" for termination which removes any claim for severance is defined in Section 12 of the Employment Agreement. (Docket 66-19, p. 5).  Even if Braintech had "good cause" to terminate Shafi, Braintech failed to exercise and or provide notice of the same.  The correspondence placing Shafi on "administrative leave with pay" simply asserted that "we specifically reserve our rights to terminate your employment agreement based upon good cause."  Thus, giving the contract terms their plain and ordinary meaning, as of November 19, 2008, Shafi was not terminated for "good cause." Rather, Braintech reserved the right to take some future action to terminate for "good cause."

For reasons Braintech fails to explain, it elected not to terminate Shafi for "good cause." It deferred any such termination rights to a future date after placing Shafi on "administrative leave without pay."  Braintech never returned to the issue of termination. To this day, Shafi has never been informed or given "notice" of any termination for "good cause."  Braintech fails to inform the Court that it made a business judgment not

to terminate Shafi.   Had Braintech terminated Shafi, Braintech would have lost any purported rescission rights.   Accepting the benefits of the Employment Agreement and enforcing one's rights under a termination provision is legally inconsistent with the remedy of rescission.   Braintech deferred termination in order to preserve its claims for rescission.   Accordingly, there was never any termination.

Shafi was also given termination rights in the Employment Agreement. Shafi could terminate the Employment Agreement for "good reason." Included in the definitions of "good reason" was "any material adverse change in executive compensation or his employment benefits." Braintech's repeated failure to reimburse the most basic business and healthcare expenses constituted a breach of Shafi's Employment Agreement and gave ample "good reason" for Shafi to terminate pursuant to Section 12 (e).

"In the event of a termination of this agreement by the company without good cause…" Shafi was entitled to severance pay as provided in section 12 (g).  Importantly, this included "a lump sum payment… equal to the remainder of the then base salary remaining in the three year employment term set out in paragraph 5 to be paid within 20 business days." Shafi is entitled to be awarded this severance benefit.  Administrative leave with "good cause" termination rights "reserved" is effectively termination for no cause.   Clearly, Braintech has not carried its burden to establish that Shafi was terminated for "good cause."  Given the lack of any "notice" of any cause or any formal termination, there is a genuine issue of material fact as to whether the severance benefit is available to Shafi.

Shafi's entitlement to the severance is strictly based upon contract interpretation. Braintech's decision to place Shafi first on administrative leave with pay and later on administrative leave without pay, while specifically reserving any termination rights does not amount to termination for "good cause."   There is ample evidence in this record that Braintech first breached the Employment Agreement. Thus there is a genuine issue of material fact in dispute related to whether or not cause existed for Shafi's termination. Under these circumstances, Shafi is entitled to challenge the claim that he was terminated for "good cause" under Delaware law.  See, *Gary v. Beazer Homes USA, Inc.*, 2008 Del. Ch. LEXIS 72  (2008).

## Point 2

## Shafi States A Claim Under 10b-5 And Has Sufficiently Alleged Scienter

In *Hoffman v. Comshare, Inc.* (*In re Comshare Inc. Sec. Litig.*), 183 F.3d 542 (6th Cir. 1999), the Sixth Circuit observed "the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud  case but instead changed what a plaintiff must plead in his Complaint in order to survive a motion to dismiss." *Id,* at 548-549.  Thus, Shafi is not required to make any greater showing at the summary judgment stage than was necessary in response to a Rule 12(b) motion.

Here, it is important to note that Braintech and Weidinger moved to dismiss the Complaint on the same basis which is now argued in their summary judgment motion. However, the Court disposed of that motion by requiring Shafi to submit a Second Amended Complaint. Following submission of the Second Amended Complaint, Weidinger and Braintech withdrew their motion to dismiss.  As a threshold matter, the

arguments seeking dismissal of the securities fraud claims have already been disposed of by this Court.

Moreover, the summary judgment motion fails to establish the threshold which shifts the burden to the non-moving party to set forth specific facts showing there is a genuine issue for trial.  Rather than referencing, interpreting or referring to supporting materials as required by Rule 56(c)(C)(2), the moving parties simply make one sweeping statement: "Shafi has failed to plead or offer proof of scienter and there is none in the record."  The few pages of discussion early in the brief regarding "material facts" fail to refer to or reflect on the vast amounts of evidence in this case, including thousands of e-mails (including those specifically referenced in the Complaint), thousands of pages of testimony and hundreds of exhibits introduced in depositions. The moving parties have failed to carry their burden of showing entitlement to summary judgment under the trilogy of cases ending in *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  Nevertheless, Shafi will address the merits of the claim that Shafi has not established scienter.

Prior to the transaction at issue, Braintech had an exclusive one source contract to sell vision guidance software to ABB.  Braintech's contract with ABB was scheduled to terminate in December, 2008.  Weidinger confirmed that if there were no other customers generating revenue when the ABB contract came to an end, the situation would be terminal to Braintech.  Weidinger Tr. pp. 322-323.

Weidinger became CEO of Braintech in November, 2007.  Following his appointment as CEO, Weidinger was at times the largest single shareholder of

Braintech.  Weidinger Tr. p. 24.  Weidinger initially invested $750,000 in the form of a letter of credit pledged to Braintech's secured lender, the Royal Bank of Canada.

Weidinger's goal as the new CEO of Braintech was to "commercialize" Braintech's vision guidance software. This meant moving beyond the single customer model (ABB) and "finding additional customers to purchase the software."  Weidinger Tr. p. 29.  It was no secret that Braintech faced difficulties surviving.  In its 2008 10-K Report filed with the Securities and Exchange Commission, there is an expression of doubt as to the continued existence of Braintech.  Weidinger confirmed that there was doubt as to whether Braintech could continue to exist in 2008.  Weidinger Tr. p. 28.

Despite this, Weidinger made a series of promises to Shafi in order to induce Shafi to sell his company to Braintech in exchange for Braintech stock.  The reality was that Braintech was less interested in Shafi Inc., or its software, but more interested in revenue that might be generated from Shafi's A&A and Shafi running the combined enterprises.  But, prior to becoming CEO of Braintech, Weidinger had no experience in the vision guided software market except as a former director of Braintech.  Weidinger Tr. p. 29.  Without any understanding of what it takes to sell vision software solutions in the field of robotic vision systems, Weidinger lacked the ability to understand the promises he was making were material and needed to be honored.

The series of representations outlined in the Complaint at paragraphs 45, 50, 57, 61, 63, 118, 119, 120, 133, 134, 135, 136 and 137 were all made in connection with a transaction involving the sale of securities (3 million shares of Braintech stock in exchange for 100% of the stock in Shafi Inc.).  However, those representations were also made in order to induce Shafi to create the final version of the A&A which would

serve as the sales/business blueprint for Braintech after the closing.  In Weidinger's words, the A&A "was one of the tenets of the acquisition for Braintech."  Weidinger Tr. p. 51. The A&A went through many variations between May and August, 2008. Weidinger Tr. p. 75.  The A&A contained a series of sales and customer contact activities and placed the initials of each of the Braintech executives who would be *responsible* in such activities.  The A&A had Weidinger playing a key role in most customer contact/sales opportunities.  Weidinger Tr. p. 78.

Yet nowhere in the record, the SPA or its schedules is there any requirement of any level of revenue production.   Section 3.5.2 of the SPA (Docket 66-2 p. 12) "Revenues" provides: "neither of the companies received any revenues or cash payments during the period commencing on June 1, 2008 through the date hereof." In addition, Schedule 3.9 (Docket 66-3, p. 6) confirms the lack of any Accounts Receivable.  This is a critical omission never disclosed to Shafi by Weidinger and one on which Shafi reasonably relied.

The record also reflects that Weidinger knew that there was little chance of any immediate revenue which would come from sales of Shafi Inc. products.  In connection with the negotiations, Weidinger became informed of the following facts regarding the financial circumstances of Shafi Inc.:

- Shafi Inc. had no revenue whatsoever in all of 2008, up to and including the closing date.  Weidinger  Tr. pp. 54-57.
- Shafi Inc. was in serious trouble with its creditors, owed tens of thousands of dollars in tax obligations, was in default with it secured creditors and had sustained several judgments against it by general unsecured creditors. Weidinger Tr. pp. 69, 71-72 ("I don't think that he was able to make payments to his creditors in June 2008.  That's why I agreed to advance some $50,000 from my own bank account.").

- Shafi Inc. owed tens of thousands of dollars to former employees for unpaid wages.  Weidinger Tr. p. 96.
- Shafi Inc. financial statements showed no accounts receivables booked for Shafi Inc. as of the date of the closing.  Weidinger Tr. pp. 186-187.
- Shafi had only projected one actual receivable, valued at $25,000 as 100% collectible.  Weidinger Tr. p. 441 and Shafi e-mail to Weidinger dated July 27, 2008 at Exhibit 12.

Weidinger knew full well that generating revenue from Shafi Inc. sales after the closing would be a significant challenge.  If he did not act with scienter, he certainly acted recklessly.  Weidinger repeatedly pushed Shafi to work on, revise, and tweak the A&A sales blueprint. The fact that sales did not occur and revenue did not come in does not demonstrate the lack of scienter on Weidinger's part.  Rather, the lack of sales and revenue were the direct result of Weidinger's and Braintech's failure to deliver on promises and representations made to Shafi in connection with the transaction. Weidinger and Braintech:

- failed to open a Michigan based office by September, 2008 as required by the A&A,
- failed to acquire robots in order to run demonstrations for customers making use of reliable software, as required by the A&A,
- failed to hire appropriate staff at levels promised by Weidinger in A&A  and Employment Agreement to support both sales and technology issues,
- failed to provide health insurance as required by Shafi's Employment Agreement,
- failed to reimburse the most basic business expenses incurred by Shafi in connection with his efforts at creating sales as required by the Employment Agreement,
- failed to provide Shafi with a company credit card as required by his Employment Agreement,
- failed to pay "Braintech assumed debt" to Shafi Inc. creditors almost immediately following the transaction as required by the SPA.

For his part, Weidinger failed to participate in meaningful sales contacts as provided for in the A&A schedule, a fact he readily acknowledged in his deposition.

Despite his expected inclusion in multiple sales calls, Weidinger admitted that he only attended "half a dozen" (Weidinger Tr. p. 146) and then claimed he had no intention of attending anymore "because my job is not to go to all these customer meetings and sell our product." Weidinger Tr. pp. 146-147. Essentially, Weidinger slotted Shafi into the position of COO and then abandoned him under the reckless notion that regardless of whether Braintech honored its promises, sales and revenue would come into existence..

Not only was Shafi given no support, but one of his principal duties under the Employment Agreement was to manage the overall technologies of the combined companies. See Section 4(a) , Shafi Employment Agreement (Docket 66-19, p. 3). Yet immediately after the transaction, Shafi was virtually locked out of any access to Braintech technology. Shafi testified: "Braintech, after the closing, never shared their source code with me, never shared their key technology with me, and that was a major breach." Shafi Tr. p. 106. When he complained to Weidinger regarding the lack of support, Weidinger failed to respond. Shafi Tr. p. 107.

On the one hand, Weidinger and Braintech claim that "revenue projections" of Shafi, none of which were guaranteed, and all of which were simply projections, amount to fraudulent representations which induced Weidinger and Braintech to complete the transaction. Yet, the revenue projections provided by Shafi which accompanied the debt schedule are just the type of future economic benefits which are safe-harbor statements excused from "liability [as] projections, statements of plans and objectives, and estimates of future economic performance." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc) (citing 15 U.S.C. § 78u-5(i)(1)). By contrast, the representations attributable to Weidinger and Braintech (both in pre-closing e-mail

exchanges and in actual written representations in the SPA and its exhibits) are material present sense statements regarding actual economic benefits to be enjoyed by Shafi by proceeding to the closing of the transaction, actual benefits and compensation to be received and actual infrastructure support to generate sales . They were not statements of opinion or optimism. *See, San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996).

Representations of Weidinger and Braintech were false when made because each of them was contingent on an undisclosed condition that Shafi as the COO of the combined entities was required to generate "revenue, revenue, revenue." Weidinger admitted as such when he claimed in deposition testimony that payment obligations for Shafi debt was contingent upon the generation of revenue sufficient to cover that debt. Yet when pressed, Weidinger could not identify any specific language in either the side letter or the SPA which set up the so-called netting effect. Moreover, Weidinger claimed that the revenue "projections" which accompanied the debt payment schedule were supposed to net. However, even if true, the Shafi Inc projected revenue was far less than payments going out to Shafi Inc. creditors. Weidinger admitted on deposition that payments to Shafi creditors were stopped almost immediately because "[t]here was no revenue from Shafi pipeline coming in to net against it." Weidinger Tr. p. 160. This was contrary to the written agreement and contrary to every representation on the subject. Weidinger's post closing conduct demonstrates to a certainty that he and Braintech had absolutely no intention of honoring any representation made in either the pre-closing e-mail or the SBA itself and its exhibits, at any time.

Generally, if an inference of scienter can be drawn from the evidence, summary judgment against a Rule 10b-5 plaintiff is inappropriate. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1283 (9th Cir. 1982). This rule is liberal because the issue of intent, a subjective state of mind, is peculiarly inappropriate for disposition by summary judgment. See *Spatz v. Borenstein.* 513 F. Supp. 571, 582 (N.D. Ill. 1891). For an inference of intent to be drawn, however, probative evidence relevant to the issue of intent must be offered by plaintiff. *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980).

In this case, Shafi's evidence goes well beyond conclusory allegations.  The complaint could not be clearer in demonstrating the who, where, how and when of the fraud committed in this case.   Moreover, Weidinger had actual knowledge of the misrepresentations and omissions. Weidinger negotiated all of the material aspects of the SPA and exhibits. Weidinger signed the SPA and accordingly signed off on the exhibits as the CEO of Braintech. Weidinger cannot escape the fact that all of the written representations detailed above were contained in the SPA and all of its exhibits. The written representations in the SPA and the exhibits merely repeated many of the same material representations (and omissions) found in the e-mails exchanged between the parties.

Certainly, Weidinger knew that if Braintech expended the financial resources which it promised to do in the SPA and the exhibits, Weidinger's personal investment as a shareholder of Braintech would be that much further diluted. As such, Weidinger had no intention of subjecting Braintech to the cash drain that would have required the infrastructure support for Shafi's sales efforts, full health insurance coverage for Shafi,

reimbursement of appropriate business expenses for Shafi and other promises as detailed herein.  By the time the transaction closed, Weidinger had invested enough of his own money and would invest no more, nor allow his investment to be diluted by spending Braintech cash.  Weidinger's commercialization plan was to leverage Shafi for as long as he could in the desperate and reckless hope that revenue would materialize.

The closeness in time between the written representations in the SPA and its exhibits and the immediate failure to honor those representations combined with the failure to disclose that none of those commitments would be made absent "revenue, revenue, revenue" provides strong evidence of scienter. "While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind." *Helwig,* 251 F.3d at 550. "Facts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred, and may. on occasion, rise to the level of creating a strong inference of reckless or knowing conduct." *Comshare,* 183 F.3d at 551 (internal quotation and citation omitted).   It is "'at least as likely as' not" that the Weidinger acted with knowledge or intent to deceive Shafi in order to obtain substantial financial benefits without any cash outlay and to shift the risk of loss to Shafi. *Merck & Co., Inc. v. Reynolds at* 130 S. Ct. 1784 (2010) (quoting *Tellabs, Inc. v. Maker Issues & Rights, Ltd.,* 551 U.S. 308, 319).

Knowing Braintech had little or no cash resources, Weidinger masterfully managed and manipulated the transaction with Shafi from a $3 million transaction with $1.85 million in cash to a $3 million transaction with $100,000 in cash, $900,000 in assumption of debt which he never intended to pay, $1 million worth of worthless stock,

and an employment contract worth a minimum of $750,000 plus bonuses and other incentives he never intended to pay absent revenue.  In exchange, Weidinger received a comprehensive business, technology and sales plan that he could execute with or without Shafi at a cost of $100,000.  After payment of the cash portion of $100,000, Weidinger shifted all risk associated with the transaction to Shafi.  By offering to assume $900,000 worth of Shafi Inc. debt, Weidinger and Braintech controlled when and how much (if any) monies would be paid to Shafi Inc. creditors.  In practice, this is exactly what he did. The record in this case demonstrates that Weidinger and Braintech had no intention of spending anything more than $100,000 in order to slot Shafi in, transfer all risk to Shafi to make sales and generate revenue.  If the plan did not work out, Braintech and Weidinger could simply walk away from $2.9 million worth of financial obligations to Shafi in connection with the acquisition of Shafi Inc.  This is exactly what they did. This was the undisclosed plan, this is clear and convincing evidence of scienter.

**Point 3**

**Rule 144 Offered No Help To Shafi In Terms Of The Ability To Sell The Worthless Braintech Stock**

The simple, conclusory and entirely self-serving contention that Shafi could have merely sold his Braintech stock in the marketplace pursuant to Rule 144's safe harbor provisions belies the reality as well as provisions of the closing documentation.  The mere recitation of the "minimal preconditions" of sale pursuant to Rule 144's safe harbor provisions overlooks additional restrictions set forth in the Lock-Up Agreement.  The Lock-Up Agreement restricted any sale of the securities for a period of six months.  Thus, Shafi could not sell the stock until at least February 12, 2009.  The "potential

volume limitations" suggested by Braintech and Weidinger on page 23 of their brief entirely understates the problem of "volume limitations."

First of all, in connection with the transaction, Shafi executed a Lock-Up Agreement which imposed additional restrictions beyond Rule 144. The Lock-Up Agreement restricted sales of Braintech stock up to an aggregate price not exceeding $25,000 in any one calendar week period.  (Docket 66-18, p. 2).  Even assuming Shafi could sell up to $25,000 of his Braintech stock each week, it would take 120 weeks to dispose of all of the stock.

Nevertheless, Rule 144 imposed additional restrictions on the sale of Braintech stock.  First, during his employment, Shafi would be deemed an affiliate of the issuer under 17 CFR 230.114 (a)(1).  A person who is deemed an affiliate of the issuer may not sell restricted securities as a "non-affiliate" until "one year has elapsed since the latter of the date the securities were acquired from the issuer or an affiliate of the issuer".  *Id*, at (b)(1).  Thus the reality under Rule 144 was that Shafi would not have been permitted to sell his stock until at least August 12, 2009.

Once able to sell his Braintech stock under Rule 144, Shafi was subject to additional restrictions.  *Id*, at (e)(1)(i) through (iii).  This provision allowed Shafi to sell stock, in three-month intervals, in amounts which did not exceed the greater of; 1% of all of the outstanding common stock in the company, or, the average weekly reported volume of trading in Braintech stock, or, the average weekly volume of trading in such securities reported pursuant to an effective transaction reporting plan.  Braintech failed to attach its 2009 10K.  Nevertheless, it's 2009 10K (annual report) indicated outstanding common shares in the amount of 53 million shares. Thus, theoretically,

within one three-month period Shafi could have sold 530,000 shares of stock beginning in August 2009.  However, there are additional restrictions on the sale of Braintech stock beyond Rule 144.

Braintech stock is what is known in the industry as "penny stock." All of Braintech's annual reports contain disclosures of the "penny stock" restrictions. For example, see Docket 66-5, p. 14.  In its "penny stock" discussion, Braintech indicates: "Our securities are covered by the penny stock rules, which impose additional sales practice requirements on brokered – dealers who sell to persons other than established customers and 'accredited investors'."  This discussion goes on to describe that an "accredited investor" refers to institutions with assets in excess of $5 million for individuals with a net worth exceeding $1 million, thus limiting the pool of qualified buyers.

Finally, there is one additional layer of restrictions also disclosed in the same discussion as the "penny stock" restrictions.  Here, Braintech indicates that NASD sales practices impose additional limitations on a stockholders ability to sell the stock.  As disclosed in Braintech's annual report, before a broker–dealer may recommend an investment in Braintech stock, that broker–dealer must have "reasonable grounds for believing that the investment is suitable for that customer."  Before making such a recommendation, said broker–dealer must investigate "the customer's financial status, tax status, investment objectives and other information."

 The foregoing represents the legal and regulatory restrictions applicable to the Braintech stock issued to Shafi.  But there is more, the marketplace imposed additional obstacles to the sale of Braintech stock.  In its discussion of "risk factors" related to its

stock, Braintech discloses that it's common stock is "illliquid" and that trading "of our stock through the OTC Bulletin Board is frequently thin and highly volatile.

This is completely contrary to the representations made by Weidinger and Braintech concerning the value of Braintech stock sold to Shafi in connection with the sale of his company to Braintech.  Notwithstanding Rule 144, the possibility of selling Shafi's 3 million shares in Braintech at any time was and is virtually nil.  The academic discussion offered by Braintech and Weidinger concerning the potential of sales under Rule 144, while accurate, completely belies the reality that the stock issued to Shafi which was worthless at the time of the issue, worthless at any time Shafi attempted to sell it and worthless as of today.[13]

**Point 4**

**Weidinger And Braintech Fraudulently Induced Shafi To Enter Into An Agreement That Weidinger And Braintech Never Intended To Honor**

Fraud in the inducement is actionable where; "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Custom Data v. Preferred Capital*, 274 Mich. App. 239 (2006). "[F]raud can be inferred from acts and

---

[13] Parenthetically, at the end of Weidinger and Braintech's academic discussion of Rule 144, they note that Shafi has failed to establish loss causation. Here, Weidinger and Braintech suggest that Braintech "never became a guarantor of any of Mr. Shafi's personal debt." Here again, Weidinger and Braintech push the argument that payment of Shafi Inc. debts was tied to Shafi Inc. "pipeline" revenue. There is absolutely no evidence on this record before this Court that Shafi Inc. revenue was a condition to Braintech's assumption and agreement to pay Shafi Inc. creditors.

circumstances, and it need not be directly shown." *Foreman v. Foreman*, 266 Mich. App. 132 (2005), *app. den.* 475 Mich. 863 (2006).

The representations made by Braintech and Weidinger to fraudulently induce Shafi into selling his company, acquiring stock in Braintech and becoming employed as the COO of Braintech were false when made and were part of a scheme and artifice to acquire valuable corporate assets of Shafi Inc. and Shafi Innovation Inc. and the A&A. Shafi reasonably believed he was entering into a valid arms-length agreement whereby he would enjoy the future benefits of all of his years of hard work invested in the creation, evolution and value of Shafi Inc. and Shafi Innovation Inc.. As a result of the fraudulent misrepresentations made by the plaintiff, Shafi has been damaged by the loss of his business from Shafi Inc. and Shafi Innovation Inc., the receipt of worthless stock in Braintech, and debt that was to be paid by plaintiff as a form of compensation but instead defaulted on.

This case is somewhat unique in the world of fraudulent inducement. Precisely the same pre-contract representations and omissions made it into the SPA. Further, this case is distinguished from a garden-variety breach of contract case. All of the misrepresentations and omissions concern matters on which Braintech would have been required to expend money immediately after the closing. Clearly, the failure to honor any of the representations (except paying Shafi a salary), not only shows scienter, but also demonstrates that Weidinger and Braintech never intended to honor any of the representations that would cause an expenditure of cash.

Weidinger and Braintech contend that the failure to honor the promises/representations in the SPA and the exhibits constitute breach of contract, but

not fraud.  Weidinger and Braintech overlook a line of Michigan cases which create an exception to the rule that future promises do not constitute fraud but rather amount to breach of contract.  This is Michigan's "bad faith" exception as held in  *Crowley v Langdon,* 127 Mich. 51, 58-59 (1901).  As the court held in *Danto v Charles C Robbins, Inc,* 250 Mich. 419, 425 (1930), "evidence of fraudulent intent, to come within the exception, must relate to conduct  of the actor "at the very time  of making the representations, or almost immediately thereafter."  Weidinger and Braintech rely upon *Hi-Way Motor Co. v. International Harvester Co.,* 398 Mich. 330 (1976) in arguing that at best Shafi has a breach of contract claim.

In  *Hi-Way  Motor  Co.,*  the  evidence  offered  by  plaintiff  to  prove  the misrepresentations was a letter written three years after the transaction at issue in the case.  In this case, we have the conduct of Braintech and Weidinger immediately following the closing of the transaction.  Weidinger admitted that he was not going to expend Braintech's money unless cash came in from phantom pipeline revenue attributable to Shafi.  Thus, we have conduct which immediately follows the written contract and which demonstrates that Weidinger and Braintech had absolutely no intention of honoring any of the promises.  This clearly makes this case fall within the "bad faith" exception to the rule related to future promises.

In addition, the Michigan Court of Appeals in *Custom Data*, *supra*, explained that fraud in the inducement is not limited to past or existing facts, even promissory or forward looking statements are actionable:

> In general, actionable fraud must be predicated on a statement relating to a past or an existing fact.  However, Michigan also recognizes fraud in the inducement which occurs where a party materially misrepresents future

conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon.

*Custom Data*, 274 Mich. App. at 242-243.   Plaintiff's assertion that Shafi is limited to statements made by Plaintiff predicated on past or existing facts at the time of the agreement is unsupported by Michigan law.

Finally, Weidinger and Braintech attempt to disguise Weidinger's statements as mere salesmanship and puffery.  Although, "[a]n action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing," *Van Tassel v. McDonald Corp.*, 159 Mich. App. 745 (1937) statements made by Weidinger simply do not fall into this category.  Braintech's promise to pay off Shafi Inc. debt on which Shafi was personally obligated (that included a detailed schedule of the debt to be paid off) as a form of compensation to Shafi is not puffery.  Statements like  "sales will shoot through the roof and we'll be able to pay off the debt in no time" would constitute puffery.  In this situation we have something completely different.  The written material promises discussed in Point 2 above are not statements that are "insufficiently concrete to rise beyond conjecture about future events."  *Am. Inst. for Preventive Med., Inc. v. Oakstone Publ'g, LLC*, 2010 U.S. Dist. LEXIS 19968, *23 (E.D. Mich. 2010).  These are definite in nature and were designed to induce Shafi to enter into the agreement with Braintech.

### Point 5

### Shafi Has Viable Claims Under The Michigan Uniform Securities Act

Similar to the contentions made by Weidinger and Braintech in response to Shafi's securities fraud claims, Weidinger and Braintech raise no new issues.  This Court has already required Shafi to re-plead the allegations of fraud in response to

Braintech's initial motion to dismiss.  Following Shafi's second amended counterclaim, Braintech's motion to dismiss for failure to plead fraud with specificity was withdrawn.  In addition, Weidinger and Braintech make the same unsupported contention that any and all representations made to Shafi were "forward-looking" statements or future promises.

In fact, Shafi's claims for fraud, misrepresentation and omission fall within the "bad faith" exception to the rule that fraudulent statements may only relate to past or presently existing facts.  As set forth in Point 2 above, Weidinger and Braintech's failure to honor their written representations in the SPA occurred within weeks of the commencement of Shafi's employment as the COO of Braintech.   See also Argument under Point 2.

**Point 6**

**Shafi Has Valid Claims for Conversion and Unjust Enrichment**

Due to the overwhelming evidence of fraud, including fraud in the inducement, Shafi's claims are not grounded in contract.  All of the claims asserted by Shafi, except the claim for severance under the employment agreement are tort-based claims.  Conversion is also a tort and is a cumulative remedy. The claim of unjust enrichment is also particularly appropriate. As discussed in the fraud and securities fraud sections above, this transaction was in fact an elaborate plan to acquire the expertise, sales and business acumen of Shafi for a mere $100,000.  Furthermore, the $100,000 cash portion was not a down payment in the traditional sense.  Weidinger knew that Shafi Inc. creditors would be paid out of the down payment and such funding was necessary on an interim basis to keep Shafi in the mix in order to ultimately close the transaction.

Michigan law is well settled that an action in tort requires breach of a duty separate from breach of a contract. *Brock v. Consolidated Biomedical Labs*, 817 F. 2d 24,25 (6th Cir. 1987).  Since Shafi was fraudulently induced to turn over his business to Weidinger and Braintech, Shafi has sufficiently pleaded a claim for conversion. Conversion is simply a cumulative remedy for the same tort of fraudulent inducement. MCL 600.2919a.  The tort of conversion is "any distinction act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights thereon." *Foremost Insurance Co. v Allstate Ins. Co.*, 439 Mich. 378 (1992).  Consistent with the scienter discussion above, this was exactly the plan executed by Weidinger and Braintech.

Intending for Shafi to believe the transaction was valued at approximately $3 million, Weidinger and Braintech obtained all of the benefits associated with the transaction for $100,000 in cash and 90 days worth of salary to Shafi.  When Weidinger and Braintech determined that the benefits they planned to receive were not forthcoming, they simply walked away from the deal.  Yet before they walked away, despite promises to pay well over $150,000 in that 90 day period to Shafi Inc. creditors, they paid little or nothing.  Thus, there was a complete failure of consideration.  Viewed in this context, it is a simple case of corporate theft.

Now, Weidinger and Braintech seek to escape from the burden of the transaction by claiming that Shafi Inc. was worthless and Mr. Shafi generated zero revenue in 90 days.  These two points are Braintech and Weidinger's Monday morning quarterback analysis.  He claim that Shafi Inc. was worthless is not a defense.  It strains credibility to believe that a sophisticated businessman such as Weidinger, with an MBA and a JD,

and banks of lawyers behind him in connection with the transaction could not figure out that Shafi Inc. was supposedly worthless.  The fact is, from the beginning of the transaction, although they valued Shafi Inc. at $3 million, to Weidinger and Braintech, Shafi Inc. was essentially worthless.  It was not Shafi Inc. that they wanted, it was the elaborate planning, sales plan, infrastructure plan and execution by and through Shafi that they wanted.  And, they planned to get it without paying for it. This is the essence of the transaction, and it fits well within the theory of the tort of conversion.

The same argument is made for unjust enrichment.  Traditionally, under Michigan law, claims for unjust enrichment are invalid when there is an existing contract.  As a result of the fraud in the inducement claims, there is no valid enforceable contract in this case (except the employment contract and the severance benefits there under).  Under Michigan law, if the plaintiff establishes the receipt of a benefit and resulting inequity, then "the law will imply a contract in order to present unjust enrichment." *Belle Isle Grill Corp v. City of Detroit*, 256 Mich. App. 463 (2003).  This is exactly what Shafi asks the Court to do in this case.  The initial valuation of Shafi Inc. was (jointly) decided to be $3 million. The SPA and all of its exhibits were merely an elaborate fraud carried out with the intent to obtain the full benefit of Shafi Inc. and all of the work performed by Shafi prior to the closing without paying for it. Shafi simply asks, and there is sufficient evidence in this case, for the Court to imply a contract and require payment for the jointly agreed value of what Weidinger and Braintech received.

Respectfully submitted,

BERRY MOORMAN P.C.

By:   s/James P. Murphy
          James P. Murphy (P36728)
          Attorneys for Defendant
          535 Griswold, Suite 1900
          Detroit, Michigan 48226
          (313) 496-1200
          murph@berrymoorman.com

Dated:  December 23, 2010

## CERTIFICATE OF SERVICE

STATE OF MICHIGAN )
                                      )ss
COUNTY OF WAYNE  )

I hereby certify that on the 23rd day of December, 2010, a copy of the foregoing Defendant's Response to Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Respectfully submitted,

BERRY MOORMAN P.C.

By:   s/James P. Murphy
          James P. Murphy (P36728)
          Attorneys for Defendant
          535 Griswold, Suite 1900
          Detroit, Michigan 48226
          (313) 496-1200
          murph@berrymoorman.com