# Exhibit 1

# Part B

205

1  go to.
2      Q    Before or after the closing?
3      A    I don't -- I would assume after.
4      Q    Was there any --
5      A    I don't think --
6      Q    Was there any representation about Siemens'
7  revenue beyond the $25,000 that you talked about
8  repeatedly?
9      A    Yeah, I mean, I was -- my recollection, our
10  meetings, we were -- Adil was pretty bullish on the
11  fact that he thought that we could sell our technology
12  into Siemens.  Looking -- I don't think that I -- like
13  I said, I will check my calendar but I don't think I
14  attended this June 26th open house.
15      Q    But other than the $25,000, you're not aware
16  of any other Siemens purchase orders?
17      A    Correct.
18      Q    Do you recall having discussions with
19  Mr. Shafi about hiring certain personnel to work for
20  the combined entities after the closing?
21      A    Yes.
22      Q    Who was Elsie White?  Who is, I should say.

206

1  Sorry.
2      A    I believe that's a woman from, and I can
3  never pronounce this correctly, so excuse me, Hooton,
4  Hoeton, Houghton, Michigan who Shafi, Adil was just
5  panicked over hiring.  And I thought -- I think that
6  she was going to be involved in our government
7  business.
8      Q    Did she ever get hired by the combined
9  entity?
10      A    I don't believe so because -- and I'm not
11  sure whether we made her an offer or not.  I would
12  have to check the record, J.P.  But my recollection is
13  this, that we offered her the job in Detroit because
14  we didn't have any employees out in upper Michigan.
15  And so I -- I believe we offered her a position and a
16  job in Detroit.  And I think that she insisted that it
17  be elsewhere.
18      And so in talking with the team that she
19  would work with, I think the consensus was that it
20  really didn't make sense to spend precious resources
21  to hire someone that was going to be 3 hours away or
22  however many hours away it was.

207

1      Q    Did she have a particular specialty that you
2  were aware of?
3      A    I think government.  But she didn't want to
4  commute.
5      (Deposition Exhibit Number 16 was marked for
6      identification.)
7  BY MR. MURPHY:
8      Q    I'm showing you what's been marked as
9  Exhibit 16.
10      A    Thank you.
11      Q    You knew that around this time frame, and
12  I'm talking about late May 2008, that Adil was
13  communicating on a regular basis with Jim Dara?
14      A    Is that a question?
15      Q    Yes.
16      A    I mean, I don't -- I don't know that
17  specifically.  I don't know how often they
18  communicated.  They were both trying to figure out
19  their own sales, his, Shafi, and Jim, Braintech's.
20      Q    And I thought you testified earlier that
21  there was a lot of interaction between Mr. Dara and
22  Mr. Shafi regarding sales of the combined --

208

1      A    Yeah, but this goes all the way back to May.
2  This, what you just handed me, Exhibit 16.  I don't
3  know at that point.  I mean, I just....
4      I know for a while they were joined at the
5  hip.  And Jim has an excellent November e-mail that
6  memorialized his experience with Adil.
7      (Deposition Exhibit Number 17 was marked for
8      identification.)
9  BY MR. MURPHY:
10      Q    This may have been marked as a part of
11  another exhibit, but it was attached to the e-mail
12  that was marked Exhibit 7 -- Exhibit 16.
13      A    Uh-huh.
14      Q    And in fact I asked you questions about
15  what's your understanding of a forecast.
16      A    You did.
17      Q    I also asked you questions about assumptions
18  and discussion points.
19      Did you understand that, in order to obtain
20  government contracts, that Shafi would have to
21  undertake some review process by the appropriate
22  governmental entities before it could be awarded a

209

1  government contract?
2      A   I don't even know what that means, what you
3  just said.
4      Q   What is your understanding of HubZone
5  status?
6      A   Yeah, I think we had a HubZone status right
7  here.  You want me to define it for you?  I don't know
8  if I can.
9      Q   No.
10     A   Thank you.
11     Q   Let's skip over that.  Did Mr. Shafi ever
12  make representations to you that the achievement of
13  HubZone status or location of Braintech in a HubZone
14  area would help him make sales?
15     A   It -- yes.  He did represent that.
16     Q   And wasn't that a condition or an assumption
17  to many of the forecasts that he gave you?
18     A   Our obligation, clearly articulated in our
19  transaction documents, our obligation to be up there
20  in Houghton, upper Michigan, was not until I think it
21  was late 2009.
22     Q   My question was different.

210

1      A   I'm sorry.
2      Q   My question was, was location in a HubZone
3  status one of the assumptions behind the sales
4  forecast?
5      A   You'd have to --
6          MR. GREEVES:  This sales forecast or just
7  generally?
8          MR. MURPHY:  Generally.
9          THE WITNESS:  You would have to ask Jim
10  and/or Adil what they put -- what they assumed when
11  they produced their sales forecasts.
12  BY MR. MURPHY:
13     Q   So you have no knowledge or understanding of
14  what sort of requirements Adil Shafi and Jim Dara
15  would need to achieve the forecasts as represented in
16  various documents regarding Shafi revenue?
17     A   Well, as they were -- I mean, as they were
18  careful to delineate here in this exhibit that you are
19  referring to, Exhibit 17, they put assumptions and
20  discussion points.
21          I don't know which of these assumptions they
22  put into the forecast.  I'm not the author of this

211

1  document.  Or do I -- I don't -- maybe some of these
2  are discussion points that aren't included that they
3  would like to discuss.
4      Q   So none of this was material at your level?
5      A   I think the resulting forecast was material
6  at my level, yes.  I think that's why they were doing
7  this.
8      Q   The forecasts but not the assumption?
9      A   No.  The assumptions.  The assumptions, too.
10  I'm just saying, J.P., I don't know if the listed --
11  these 15 line items, I -- not being the author of this
12  schedule, I don't know of those 15 items which one of
13  them are rolled into this content and which of them
14  are just discussion points to discuss and then rolled
15  in or not rolled in.  I can't speak to that.
16     Q   Did you ever come to a determination as to
17  which one of these points were rolled into the final
18  forecast and which were not?
19     A   I don't -- you know, I don't -- I don't -- I
20  don't recollect offhand, you know, if we had a
21  conference call about this.  Once again, this is a
22  forecast for the partnership.  All right?  We

212

1  dismissed that structure.  And we started down the
2  path of acquisition.  And that's the transaction
3  certainly that we closed on.
4      Q   But weren't these assumptions and discussion
5  points always relevant to any forecast, regardless of
6  the form of the transaction?
7      A   No.  I think the -- I think the -- I think
8  the -- you know, specifically to answer your question,
9  I don't know.  But partnership, the contributions were
10  very different.
11     Q   Well, under the -- in this iteration of the
12  forecast, there was an assumption that there would be
13  a metro Detroit sales engineering office by July 1,
14  2008.  Do you remember that aspect of it?
15     A   I know that we -- I mean we were fully
16  engaged in -- I mean, we had -- we made big efforts to
17  open up a Detroit office.
18     Q   When was that office opened?
19     A   I think it was under a lease in December of
20  '08, and we moved in.  And we hired all the
21  salespeople, I think, in January '09.  I signed our
22  lease in November or December in '08 and we moved --

# Capital Reporting Company
## Weidinger,  Frederick - Volume I 09-13-2010

213

1 anytime, you know, you rent a space for these
2 purposes, it's going to take a while to negotiate the
3 lease and also build out the space for our robotic
4 laboratory, which is what our Michigan office is all
5 about.
6     So, you know, I would have to check the
7 record, but sometime in the fall of '08 we signed the
8 lease.  And then we spent time building the
9 laboratory.  And then we spent time hiring sales
10 executives.  And that was all under the control of Jim
11 Dara.
12    Q    In the final evolution of the acquisition of
13 Shafi, it's true that that office was supposed to be
14 opened in September of 2008, correct?
15    A    I think that was -- you know, that was the
16 intent.
17    Q    Well, that was stated in writing; true or
18 false?
19     MR. GREEVES:  Object to the form of the
20 question.  It assumes facts.
21     THE WITNESS:  I mean, I don't know -- you
22 know, I don't know how it was stated or whatever you

214

1 want to color it, but that was clearly the intent.
2 BY MR. MURPHY:
3    Q    Two items down, or actually the next item,
4 "timely acquisition of necessary hardware for metro
5 Detroit office."  That would have coincided with an
6 opening of a metro Detroit office, correct?
7    A    Which number are you on?
8    Q    Right below opening of a metro Detroit sales
9 office.
10    A    I mean, we already had ABB robots, right?
11 So I don't know what it means about timely
12 acquisition.  We had -- we had four robots in
13 Vancouver that we moved to Detroit.
14    Q    But they didn't --
15    A    So I don't --
16    Q    But they didn't come to Detroit at any time
17 during Mr. Shafi's employment, did they?
18    A    No.  Because unfortunately we didn't have an
19 office space open.  But we had them all up in
20 Vancouver.
21    Q    What action were you undertaking in
22 September of 2008 to open an office in Detroit?

215

1    A    That was the responsibility of Adil and Jim
2 to do.
3    Q    Who signed the lease --
4    A    Location --
5    Q    -- when it was signed in December of 2008?
6    A    I'll have to check that.  It was either
7 myself or Jim Dara.
8    Q    You knew that Shafi's software did not run
9 on ABB robots; true or false?
10    A    Can I -- can I go back one question, J.P.?
11    Q    Yeah, sure.
12    A    What date -- what date did you say we signed
13 the lease?
14    Q    You said it was signed in December of 2008.
15    A    I thought it was fall of 2008.  Okay.  I
16 thought you just spouted a date and I missed it.
17 Okay.  We can check that record.  I'm sorry.
18 Question?
19    Q    You knew that Shafi Reliabot software didn't
20 run on ABB robots; true or false?
21    A    No.  We were led to believe that Reliabot
22 software runs on every robot.  And that's well

216

1 documented in several places.
2     (Deposition Exhibit Number 18 was marked for
3     identification.)
4 BY MR. MURPHY:
5    Q    I'm showing you what we've marked as
6 Exhibit 18.
7    A    Thank you.
8    Q    This is another one of many e-mails that you
9 received from Mr. Shafi.  Do you recall it?
10    A    Do you have my response to this?
11    Q    I get to ask the questions today.
12    A    Okay.  Thank you.
13    Q    Before I ask about Number 18.
14    A    Yes.
15    Q    During Mr. Shafi's entire tenure as the COO,
16 there was never an office opened in Detroit; true or
17 false?
18     MR. GREEVES:  Object to the form of the
19 question.
20     THE WITNESS:  True.  But that -- what does
21 that matter?
22 BY MR. MURPHY:

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

217

1    Q   I get to ask the questions.
2    A   Okay.
3    Q   During the entire time of Mr. --
4    A   He --
5    Q   -- Shafi's --
6        MR. GREEVES:  Let him ask his question.
7   BY MR. MURPHY:
8    Q   I'll start over.
9    A   Sorry.
10   Q   During the entire time Mr. Shafi was COO at
11  Braintech, there was never any equipment available in
12  the United States for him to run Reliabot software on
13  for purposes of demonstration; true or false?
14   A   False.
15   Q   Where was that equipment located?
16   A   At ABB.
17   Q   Was Mr. Shafi --
18   A   I think there was also at Kawasaki -- there
19  were a couple of installations he could have easily
20  gone to or brought customers to.
21   Q   During the entire period of Mr. Shafi's
22  tenure as chief operating officer, there was never any

218

1   training made available for Reliabot software?
2    A   Well, two things there.  We trained on --
3    Q   Yes or no?
4        THE WITNESS:  I --
5        MR. GREEVES:  These are not fill in the
6   blank answers, counsel.
7        THE WITNESS:  Two, we did plenty of training
8   on eVF.  And through evaluation reports and a lot of
9   information once we got ahold of the technology, it
10  was told to me that you can't train anybody in
11  Reliabot.  And I will leave the experts to address
12  that.
13  BY MR. MURPHY:
14   Q   Who would be addressing that on behalf of
15  Braintech?
16   A   Dr. Boca.  And Babak.
17   Q   Do you recall Mr. Shafi telling you in the
18  May 30 e-mail, which is marked Exhibit 18, that
19  government sales might be a big source of revenue for
20  the combined entities in the future?
21       MR. GREEVES:  Object to the form of the
22  question.  I don't think there were going to be

219

1   combined entities at this point in time.
2        THE WITNESS:  Yeah, I, too, I mean, I think
3   I had mentioned this before.  I mean, there was a
4   $900,000 government order that was looming over our
5   head, number 1.  And number 2, you know, I'm not
6   sure -- this was May 30th, 2008.  We hadn't even
7   signed our -- we hadn't even signed our LOI yet.  So
8   why is he -- I mean, why is he sending me stuff like
9   this?  I mean, I can't -- I can't manage his business
10  for him at this point.  This is his business, not
11  mine, to manage.  I didn't have any authority to make
12  decisions.  For this reason we need so-and-so in the
13  HubZone?  That's not my decision.
14  BY MR. MURPHY:
15   Q   Whose decision would it be?
16   A   This is -- J.P., this is May 30, 2008, we
17  haven't even signed a letter of intent yet.
18   Q   Wasn't this part of the discussions as to
19  what Mr. Shafi needed to support a sales effort?
20   A   We were talking -- at this time we were
21  talking about the partnership and the enhanced egg.
22       And in June, it was decided that that was

220

1   way too complicated and the parties mutually decided
2   it wasn't in the best interest of both.  And we then
3   turned our attention to the acquisition.
4        But I mean I have no standing to make any
5   decisions for Adil as to who he hires at this time.
6    Q   Mr. Shafi had already delivered multiple
7   copies of the access and acceleration agreement,
8   correct?
9    A   By May 30th?
10   Q   Yeah.
11   A   I know that was a very dynamic schedule.
12  And I know that it got updated and changed regularly.
13  So, at this point of our partnership conversations, I
14  don't -- I can't even recollect what the draft of it,
15  even if there was a draft of the A&A schedule, what it
16  was.  No.
17   Q   So this was not even -- as far as you're
18  concerned, this is not even a negotiation as to what
19  Mr. Shafi needed to support sales and revenue?
20   A   Well, I -- I mean I read this quickly just
21  now, all right?  And I -- I mean, it -- he's sending
22  me resumes.  And for this reason this person needs to

# Capital Reporting Company
## Weidinger,  Frederick - Volume I 09-13-2010

221

1  be hired.  But this is his business.  May 30th, 2008,
2  I don't -- I don't own Shafi.  At this point we were
3  just talking about a partnership, which in fact it was
4  kind of cratering because we realized that technically
5  speaking, it ain't going to happen.
6       All I can say to you is I had no standing to
7  make any decisions at this point regarding his
8  business.
9    Q   So your understanding is that this had
10 nothing to do with the -- the future of Braintech and
11 Shafi?  This -- Mr. Shafi was just talking about his
12 own business here?  And this was irrelevant to any
13 concern that you had at the time?
14   A   I'm not sure I understand your question.
15   Q   Mr. Shafi suggests that, quote, middle of
16 the page, "For this reason we need Elsie White to be
17 in a HubZone working from her home and filing
18 appropriate papers to get HubZone, SmartZone and 8(a)
19 designations in 2008 so that we can get orders in
20 2009."
21      Did I read that accurately?
22   A   That's what it says.

222

1    Q   And you believed that Mr. Shafi was just
2  talking about his own business, not the future entity
3  involving both Shafi and Braintech?
4    A   I mean, he -- I don't know what he was
5  talking about.  You -- he's the author.  You can ask
6  him.
7       All I'm telling you is that, at this point
8  in time, I had nothing to do with these decisions.  I
9  had my own business to take care of.  This is all
10 about his business.
11   Q   Well --
12   A   I mean --
13   Q   -- at some point in time his business became
14 your business; true or false?
15   A   August 12th.
16   Q   Okay.
17   A   And this is May.
18   Q   You were negotiating as to what form that
19 combination would take as of May, right?
20   A   Right.  But I was very careful not to make
21 decisions for him during this whole negotiating and
22 closing process.

223

1    Q   You knew that he was spending all his time
2  on this deal and not spending time on running Shafi
3  and getting sales; true or false?
4    A   False.  I had no idea what he was spending
5  his time on.
6       (Deposition Exhibit Number 19 was marked for
7       identification.)
8  BY MR. MURPHY:
9    Q   I'll show you what we've marked as
10 Exhibit 19.
11   A   Thank you.
12   Q   I'll ask you to take a quick look at that.
13   A   Uh-huh.
14   Q   After you've done that, give me a sign, and
15 I'll ask a question.
16   A   Okay.
17   Q   Now, is this similar to the prior exhibit
18 where Mr. Shafi is just talking about his own business
19 and not the future entity where Shafi is going to be
20 related to Braintech?
21   A   You know, a couple things here.  I mean, I
22 think -- you know, this to me appears irrelevant.

224

1  Because this has to do with the partnership, J.P., not
2  the acquisition, number 1.  And this is Shafi's
3  business.  I can't make these hiring decisions for
4  him.  I don't have anything to do with Shafi, Inc. or
5  Shafi, Inc. Innovations at this point.  We haven't
6  even signed a letter of intent.
7    Q   And --
8    A   So....
9    Q   -- the hiring of people after the entities
10 come together in some format is completely irrelevant?
11   A   No.  Once we come together, right, and we
12 close in August the 12th, there are documents that
13 say, you know, this is the access and acceleration,
14 this is the thrust of the business and this is who we
15 would like to hire based on cash flow ability.  As
16 simple as that.
17   Q   You knew that you were getting revenue
18 forecasts from Mr. Shafi and Mr. Dara for the entity
19 that would have a combination of Shafi and Braintech;
20 true or false?
21   A   The Shafi revenue, pipeline revenue, was
22 from his installed base.  It was $250 million of

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

225

1  capital working every day on his technology.
2      Q   So you were getting those forecasts for what
3  reason?
4      A   So we could justify the acquisition and we
5  could plan for the future.
6      Q   And you're telling me that you had no idea
7  that in order to support that forecast, Mr. Shafi
8  needed the combined entity to hire Elsie White, Donna
9  Burr, two engineers, and two more engineers?
10      MR. GREEVES:  Object to the form of the
11  question.  I'm not getting that from this document.
12  But go ahead and answer.
13      THE WITNESS:  Donna Burr was administrator.
14  She was Adil's personal secretary for years and years
15  and years.  We hired her, right?  Adil said hire her.
16  We hired her.
17      Elsie White was up in northern Michigan.
18  And her sales effects didn't even take place until
19  deep into 2009.
20      We already had engineers up the yazoo in
21  Vancouver, and two application engineers in Michigan.
22      We attributed -- contributed two excellent

226

1  sales executives under Shafi's direct responsibility.
2  Jim Dara, our chief sales officer, and Pete Manias,
3  our chief marketing officer, dealt with him every day.
4  And the revenue that Shafi represented in forecasts
5  for us was out of his own installed base.
6  BY MR. MURPHY:
7      Q   So you're telling me that you had no idea
8  that in order to support the forecasted revenue,
9  Mr. Shafi needed the hires that are mentioned on
10  Exhibit 19?
11      MR. GREEVES:  Objection to the form of the
12  question.  Assumes facts.
13      THE WITNESS:  Once again, Adil was not a
14  revenue -- Donna was not a revenue maker.  She was an
15  administrative assistant.  Kind of like your secretary
16  up in Detroit.  Very valuable, but I would guess that
17  she does not get clients for you.  Right?  Maybe she
18  does.  I don't know.  But she was an administrator.
19      Elsie was in government sales just like it
20  says, right?  Her revenue was way out, right?  I think
21  we mentioned summer, autumn, fall, '09.  We had the
22  engineers.  Dan Beaudoin, excellent application

227

1  engineer of ours, was assigned to Shafi, and so was
2  Lou Kondek.
3      So my opinion is he had everything he
4  needed.
5  BY MR. MURPHY:
6      Q   So did you -- you just ignored these
7  e-mails?
8      A   Well, J.P., I'm saying that I was -- at the
9  time of May 30th, I was CEO of Braintech.  I had no
10  authority or anything to do with Shafi, Inc.  I had no
11  authority to give the approval to hire these people.
12      Q   Why didn't you write back and say --
13      A   Who am I?
14      Q   Why didn't you write him back and say I have
15  nothing to do with this?
16      A   What did I just ask you 20 minutes ago?  Do
17  you have my response to one of the exhibits you gave
18  me.  And you said I'll ask the questions.  That's why
19  I was asking you for that.
20      Q   I've got all your responses.
21      A   Okay.  I would like to see my response.
22      Q   I'm not going to argue with you.

228

1      A   I don't want to argue with you either.  But
2  that's why I asked you the question earlier, what was
3  my response to all of these.  What am I supposed to do
4  with this?  I can't tell Adil to go hire these people.
5  I have nothing to do with this company at this point.
6      Q   You know that Shafi had no revenue coming in
7  in 2008; true or false?
8      MR. GREEVES:  Object to the form of the
9  question.
10      THE WITNESS:  I don't know what he was paid
11  the first 6 months of 2008.  I do know that in 2007,
12  it was about five or 600,000.  And the year before
13  that it was over a million.
14      And he tells me he has 200 installations.
15  So that's a lot of revenue.  I don't know if that was
16  accounted for properly in all of his tax returns and
17  everything else.  But that money went somewhere.
18  That's -- that's what I know.
19  BY MR. MURPHY:
20      Q   Well, we spent a lot of time this morning
21  going over records to demonstrate that Shafi, and you
22  admitted, that Shafi had an inability to pay its

229

1  creditors in the ordinary course.
2      Do you remember that testimony from this
3  morning?
4      MR. GREEVES:  Object to the form.  We're not
5  going to just go through all the -- I mean, if you
6  have a question, let's ask a question.  If we've
7  already done it, then we don't need to do it again.
8      THE WITNESS:  So do I answer or not?
9      MR. GREEVES:  I mean, do you remember your
10 testimony from this morning?
11     THE WITNESS:  Well, I remember talking about
12 Shafi's creditors and how he owed a lot of people a
13 lot of money.  And J.P. showed me financial statements
14 that showed that.
15 BY MR. MURPHY:
16     Q   And you knew that at the time; true?
17     A   I knew that Shafi owed money because that's
18 why he was so panicked to close this deal so quickly
19 and, you know, every other week request that I wire
20 transfer from my personal bank accounts to his
21 account.  He was panicked.  He was underwater.
22     Q   And so you knew that Shafi had absolutely no

230

1  ability to hire four engineers, an administrator, and
2  another sales support person?
3      A   I didn't know what -- what accounts he was
4  collecting.  I didn't know what -- you know, I
5  didn't -- I didn't know who was currently paying him.
6  I didn't -- the only thing I knew was historically
7  what I could tell.  And it took a long time for them
8  to produce the 2008 6-month financial statements is my
9  recollection.  So I really didn't know what was going
10 on.  But I did know --
11     Q   So on the one hand you knew that Shafi
12 couldn't pay its creditors?
13     A   I knew Shafi wasn't paying his creditors.
14     Q   And lawyers were negotiating payment
15 agreements that you became aware of?
16     A   Correct.
17     Q   And you didn't realize that the e-mail that
18 we've marked as Exhibit 19 was Mr. Shafi's suggestion
19 as to the level of support he needed to generate the
20 revenue that had been circulating in the forecasts for
21 the combined entity?
22     A   But what am I supposed to do about that?  I

231

1  have no authority to approve this expenditure for his
2  company.
3      Q   Well --
4      A   I don't -- at this point, we're just
5  negotiating a partnership arrangement which
6  subsequently failed.
7      Q   Well, okay --
8      A   Right?
9      Q   The partnership failed.  But there was
10 always an understanding that support people were going
11 to be hired in the combined entity?
12     A   Which was reflected in his employment
13 agreement.  And it was based on a cash flow
14 availability, a cash flow ability.
15     Q   So one of the negotiating points for the
16 partnership was that Mr. Shafi needed this kind of
17 employment support.  True or false?
18     A   But, J.P., this is May 30th, 2008.  I have
19 nothing to do with this.
20     Q   You're negotiating a partnership.
21     A   But I can't tell him the people who he can
22 hire, where, and how much.

232

1      Q   Okay.
2      A   I mean....
3      MR. MURPHY:  Let's take a break and let me
4  just re-sort where I am.
5      MR. GREEVES:  Okay.
6      (Whereupon, a recess was taken between
7      3:40 p.m. and 4:04 p.m.)
8      (Deposition Exhibit Number 20 was marked for
9      identification.)
10 BY MR. MURPHY:
11     Q   Mr. Weidinger, I'm showing you what's been
12 marked Exhibit 20.  For the record, it's an e-mail
13 addressed to you from Adil Shafi dated Friday, May 30,
14 2008.  Do you agree?
15     A   Yeah.  It's dated May 30th, correct.
16     Q   It's sent to your weidingerfamily address?
17     A   Uh-huh.
18     Q   Do you have any recollection of receiving
19 this around that time?
20     A   I think I do remember this and was
21 wondering -- very confused by it.
22     Q   Does this appear to you to be a discussion

233

1 of how the first $50,000 was going to be spent?
2       MR. GREEVES:  Object to the form of the
3 question.
4       THE WITNESS:  Okay.  I'm sorry.  What's the
5 question?
6 BY MR. MURPHY:
7   Q   Does this appear to you to be a discussion
8 of how the first $50,000 advance would be spent?
9   A   No.  Not at all.
10   Q   Do you recall receiving this?
11   A   I don't -- I'll have to check to see if and
12 when I did receive this.  But I don't -- I mean, this
13 is May 30th.  We didn't have any agreement to do
14 anything May 30th.  So I don't even know what this is
15 about.
16   Q   You don't recall having a discussion about a
17 $50,000 down payment being made in May?
18   A   I think the $50,000 payment was made in
19 June.  And it was based on a list of terms and
20 conditions that we had just then agreed to.  I mean,
21 there's nothing that supports anything for a payment
22 that I see.  I was -- he did this kind of stuff all

234

1 the time.  I mean, this just baffled me.  Out of the
2 blue, you know, please, you know -- so he's
3 instructing Donna that, you know, to overnight these,
4 and that I'm going to wire money to him tomorrow.
5       I think I responded to this.  And I would
6 like to see the response.
7   Q   Is it your understanding that there was no
8 discussion about $100,000 cash component of a
9 partnership deal that was going to be paid to
10 Mr. Shafi?
11   A   You know, I -- you know, that partnership
12 arrangement went -- swirled around so many different
13 iterations.  I'm not sure.
14       All that I can do is go back to when it was
15 actually paid and what were the terms and conditions
16 that its payment was based on.
17   Q   And you had no -- you have no recollection
18 of any discussions about whether it would be paid or
19 what use would be made of the payment any time prior
20 to the payment?
21   A   Well, I -- I know when I made the payment in
22 June that it was -- it was earmarked for business

235

1 expenses.  And it was also based on a term sheet that
2 I think that I proposed to Adil at the time.
3       You know, I -- you know, like I said, J.P.,
4 I would really love to see my response to this e-mail.
5   Q   Let me make sure I understand.  Do you
6 recall receiving that e-mail?
7   A   That's why I'm asking, I would like to see
8 my response.
9   Q   So you can't remember?
10   A   Like you said, there were hundreds and
11 hundreds of e-mails between Adil and I going back and
12 forth, back and forth.
13       I don't specifically remember this
14 regurgitation of his payables.
15   Q   And is there an entry on the fifth line down
16 as to --
17   A   The fifth line?
18   Q   Fifth bullet point.
19   A   It says "Adil reimbursement for 12,500."
20   Q   And you had no further discussions with
21 Mr. Shafi about whether he would get a portion of the
22 first $50,000 to reimburse him for expenses?

236

1   A   I made --
2       MR. GREEVES:  Objection to the form of the
3 question.  It assumes facts and lacks foundation that
4 there was a discussion.  But....
5       THE WITNESS:  Yeah, I made it very clear to
6 Adil that the wire transfers were for business
7 expenses, not his own personal expenses.
8 BY MR. MURPHY:
9   Q   And so --
10   A   That was -- I think -- I think there's an
11 e-mail record that's pretty clear about that, J.P.  We
12 can produce it.
13   Q   By the way, since you have the e-mail
14 servers, if there's something I'm leaving out of the
15 picture here, I assume that you will bring it up at
16 trial.
17   A   Yeah.  Yeah.
18   Q   And I'm going to hold you to that.
19   A   Yeah.  Yeah.  Please.
20       (Deposition Exhibit Number 21 was marked for
21       identification.)
22 BY MR. MURPHY:

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

237

1    Q   I'm showing you what we've marked as Exhibit
2  Number 21.
3         MR. GREEVES:  May we have a copy of 21?
4         THE WITNESS:  Oh, sorry.
5         MR. GREEVES:  Oh.  Thanks.
6  BY MR. MURPHY:
7    Q   This is a little earlier in time.  It's an
8  April 8 e-mail that you got from Mr. Shafi, correct?
9    A   That's what it appears to be, yes.  Trip to
10 Pittsburgh.
11   Q   And Mr. Shafi is attaching a draft of
12 something.
13        MR. GREEVES:  Sorry, counsel, what?
14        MR. MURPHY:  Mr. Shafi is attaching a draft
15 of something?
16        MR. GREEVES:  Where do we see that?
17        MR. MURPHY:  On Exhibit 21.
18        MR. GREEVES:  Are you talking about on the
19 second page?
20        MR. MURPHY:  No.  I'm --
21        THE WITNESS:  It's coming?
22        MR. MURPHY:  It's coming.

238

1         MR. GREEVES:  Oh.  Okay.  Sorry.
2         THE WITNESS:  I think he said Shafi will
3  attach.
4         (Deposition Exhibit Number 22 was marked for
5            identification.)
6  BY MR. MURPHY:
7    Q   I'm showing you what we've marked as
8  Exhibit 22.  Do you recall getting this document along
9  with the April 8 e-mail or thereabouts?
10   A   This was in April you're saying?  These two
11 are attached?
12   Q   I'm asking you.  If you don't remember,
13 we'll move on.
14   A   I -- I don't know specifically that this was
15 attached to that, if that's your question.
16   Q   I'm representing to you that I have the
17 e-mail in native format with the attachment.  And
18 Number 22 was attached to Number 21.
19   A   21.
20   Q   Okay.  If you care to dispute that based
21 upon your look at the Braintech servers, you're free
22 to do that.

239

1         MR. GREEVES:  Did you have a question about
2  it?
3  BY MR. MURPHY:
4    Q   Do you recall receiving this in early April?
5    A   I -- I remember some form of Exhibit 22,
6  yes.  Whether it was attached to this e-mail -- I
7  don't think the e-mail that you say it's attached to
8  were -- even references it.  I mean, you have a piece
9  of paper that's stapled.  But there's no -- there's no
10 attachment on the headline of the e-mail.  So, you
11 know, I don't know.
12        But this -- if you're asking me if I'm
13 familiar with the Exhibit 22, yeah, I believe I've
14 seen this before.
15   Q   And in fact several drafts of this were
16 circulated.  And this has to do with the partnership
17 that never came to fruition, true?
18   A   I believe so.  I'm -- I can't even recollect
19 who the author of this was.  I think it was probably a
20 joint effort.  But this was one of the swirls of the
21 partnership conversations.
22   Q   Tell me what you understood about the value

240

1  component on the right-hand side in the second box,
2  1.85 million in cash with agreement.
3    A   I think that's something that Shafi just --
4  that Adil just threw down.  I'm not sure what the -- I
5  mean we made it pretty clear that this wasn't going to
6  be a cash deal.  That it had to be -- that it had to
7  be a stock deal.
8    Q   Well, didn't the --
9    A   So, I mean -- I'm sorry.
10   Q   Didn't the partnership discussions evolve
11 over about six more weeks?
12   A   Like I say, I don't know what the date of
13 this is.  But the partnership discussions evolved
14 until, I think right up until June, the end of May.
15   Q   So they evolved for the months of April and
16 May?
17   A   I think we started talking in February.  We
18 spent a lot of time and resources and efforts
19 discussing partnership.  Mutually agreed that it
20 wasn't going to work.  I think we then flipped over
21 into acquisition conversations the first part of June.
22 That's my recollection.

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

241

1    Q   While the partnership discussions were under
2  way, you paid a visit to Houghton, Michigan, true?
3    A   Houghton.  That's it.  Yes, I did.  I'm not
4  sure when, but I can check my calendar.
5    Q   Mr. Shafi, as part of that visit, lined up
6  meetings with several important people in Houghton,
7  true?
8    A   Important people to him, yes.
9    Q   Important people to him personally or to his
10  business?
11    A   I think probably to him.
12    Q   Now, while you were negotiating the
13  partnership agreement, did you do any due diligence on
14  Mr. Shafi personally?  I don't mean you personally.  I
15  mean his personal qualifications.
16    A   No, sir.
17      (Deposition Exhibit Number 23 was marked for
18        identification.)
19  BY MR. MURPHY:
20    Q   I'm showing you what we've marked as
21  Exhibit 23.  Do you remember getting a copy of this
22  e-mail?

242

1    A   No, I don't.  And as part of the materials
2  to properly submit to the SEC as part of the
3  transaction, I had to ask Adil for his background and
4  his -- his CV and his bio.  So I don't --
5    Q   There's a "regarding" line that says
6  "Experience and profile for access and acceleration."
7      By this time, in April, that's April 16th,
8  had you already been discussing the access and
9  acceleration process with Mr. Shafi?
10    A   I -- I don't remember.  I don't know what
11  the -- what the reason for him sending me this is.  I
12  don't know, maybe he was pounding his chest.  I don't
13  know.
14      (Deposition Exhibit Number 24 was marked for
15        identification.)
16  BY MR. MURPHY:
17    Q   I'm showing you what we've marked as
18  Exhibit 24.
19    A   Thank you.
20    Q   And it's a compilation of several e-mails
21  right around October 16th and 17th.  Do you recall
22  having this exchange with Mr. Shafi?

243

1    A   Well, I think I already answered that I
2  don't have any recollection of this April 16th one
3  where he's sharing with us his proud background.
4      MR. GREEVES:  Is there a question pending?
5  BY MR. MURPHY:
6    Q   Do you have any recollection of receiving
7  it?
8    A   You know, there are several hundred e-mails
9  going back and forth between Adil and I.  This may or
10  may not be several of them.
11    Q   Okay.  On the third page of Exhibit 24,
12  there appears to be an attachment.
13    A   Third page.  Yeah, to me, J.P., that looks
14  like it's clipped and pasted on.  That does not -- I
15  mean, I don't -- usually in e-mails the attachment is
16  like in the subject heading or in the salutation.  I
17  mean -- I don't know.
18    Q   You're used to using Outlook software for
19  your e-mail, correct?
20    A   I use Outlook software, yes.
21    Q   Do you know if Mr. Shafi uses Outlook
22  software?

244

1    A   I do not know.
2    Q   Do you know that he uses a different
3  application for, I'm sorry, for e-mail than Microsoft
4  Outlook?
5    A   I know he's got several e-mail addresses and
6  he does, you know, different funny things with all of
7  it.  But I don't know what e-mail service or server he
8  uses, no, I don't.
9    Q   So if he uses something other than Microsoft
10  Outlook, you might not see things that you're used to
11  seeing on Microsoft Outlook?
12    A   Yeah.  And I'm just saying, I'm just making
13  a point, I don't usually see an attachment this way,
14  so it's, it's foreign to me.
15    Q   But you have no reason to believe there
16  wasn't an attachment to this e-mail?
17    A   Right.  Why don't we just print out the
18  attachment that you're saying is to this e-mail?
19      Is it Exhibit 22?
20      MR. GREEVES:  No.  I think he's going to
21  give it to you.
22      THE WITNESS:  If he's asking me a question

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

245

1 about the attachment, I should probably see the
2 attachment, huh?
3      MR. GREEVES:  Hopefully that's what you're
4 going to get.
5      (Deposition Exhibit Number 25 was marked for
6      identification.)
7 BY MR. MURPHY:
8      Q    Well, I'm handing you what we've marked as
9 Exhibit 25.
10     A    25.  Okay.
11     Q    Now, the attachment language says:
12 "Braintech Shafi partnership, dash, two pdf."
13     A    Uh-huh.
14     Q    That to me indicates that this is the second
15 version of the partnership document.  Does that
16 indicate the same to you?
17     A    I'm sorry, what did you just refer to?
18     Q    What you thought was cut and pasted on the
19 third page.
20     MR. GREEVES:  Wait a minute.  Wait a minute.
21     THE WITNESS:  I'm sorry.
22     MR. GREEVES:  With reference to Defendant's

246

1 24, counsel, you're noting the third page where it
2 says "Braintech Shafi partnership 2 pdf"?
3      MR. MURPHY:  Yeah.
4      THE WITNESS:  Okay.  How do I know this is
5 that?
6      MR. GREEVES:  You're taking it on faith.
7      THE WITNESS:  Okay.  I'll take it on faith.
8      MR. GREEVES:  That's counsel's
9 representation, that that is --
10     THE WITNESS:  Okay.  But I'm really confused
11 here, because what does this have to do with our
12 acquisition?  Because this is a partnership that the
13 parties mutually decided was not beneficial for either
14 of them, for mostly technical reasons, and therefore
15 we dismissed and we started up with the acquisition.
16     So I don't mind answering your questions.
17 But can you....
18 BY MR. MURPHY:
19     Q    The 1.85 million in cash component is still
20 in this partnership document, which is Exhibit 25;
21 true?
22     A    Yes.  And I'll tell you, I mean, that's what

247

1 it says.  And this is a -- I think -- I think -- I
2 would like to know who the author of this was.
3      Q    Well, did you get this and have a discussion
4 with Mr. Shafi about it?  Or did you not get it?
5      MR. GREEVES:  Well, why don't we just stick
6 to whether he knows if he got it or not.
7      THE WITNESS:  I mean, you know, if we're
8 taking him on his word and it was attached to an
9 e-mail that I got --
10     MR. GREEVES:  It's not a memory test.  So
11 the answer, if you know, if you can recall, if you
12 have a present recollection sitting here right now as
13 to whether or not you got that.  That's the question.
14     THE WITNESS:  Thank you.  I recall an
15 exhibit like this.  What I don't recall is who is the
16 author, where the numbers came from, and if I had a
17 in-depth conversation regarding this document.
18 BY MR. MURPHY:
19     Q    Okay.  If you look --
20     A    But I've got to tell you it's irrelevant.
21     Q    If you look at page 2 of Exhibit 25?
22     A    Two of 25?

248

1      Q    Page 2.
2      MR. GREEVES:  Exhibit 25 on page 2.
3      THE WITNESS:  Oh, okay.
4 BY MR. MURPHY:
5      Q    At the top of the page it begins, "Timeline,
6 milestones, and payments."  Do you see that?
7      A    A Timeline, yes, I see that.
8      Q    Now, bearing in mind that this was talking
9 about a partnership that didn't come to fruition, the
10 first component of the cash was $100,000; true or
11 false?
12     A    Well, that's what this says.  But this is
13 Adil Shafi throwing words and numbers on a piece of
14 paper himself.
15     Q    This was a proposal being made to you by
16 Shafi, Inc. for a partnership, true?
17     A    If you say so.
18     Q    You don't remember Mr. Shafi making a
19 partnership proposal that called for $100,000 down?
20     A    You know, J.P., we talked about so many
21 different structures and so many different areas of
22 compensation and integration and employees.  And I

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

249

1  mean, it was like -- I tried to describe it to you as
2  a big swirl.  Until we finally were able to put
3  something definitive into a letter of intent in June
4  and then structure it.
5      Q   And then this proposal provided for $100,000
6  down and monthly payments of $218,000.  Do you see
7  that?
8      A   I -- those -- those were not -- I was not
9  the author of this.
10      Q   I'm not saying you were the author.
11      A   Okay.
12      Q   I'm just asking if you got this and you
13  recall that Mr. Shafi made a proposal with that cash
14  component?
15      A   You know, I remember the -- top exhibit.
16  I don't remember all these numbers and cash and stock
17  and options.  I mean, I don't remember ever
18  discussing, you know, the cash components other than
19  the 100,000 up front and the stock and the options.  I
20  mean, that -- that's all subject to negotiation,
21  finalization and memorialization.
22          (Deposition Exhibit Number 26 was marked for

250

1          identification.)
2  BY MR. MURPHY:
3      Q   I'm showing you what we've marked as Exhibit
4  Number 26.
5      A   Okay.  Thank you.
6      Q   You start out writing to Mr. Adil -- by the
7  way, you're writing back to Mr. Shafi at the
8  weidingerfamily.com e-mail address, true?
9      A   You know what I do, I mean, it's a bad
10  habit, I just click on "reply."  So if he sent it to
11  me at Rick Weidinger at family.com, I just hit reply.
12      Q   So you're using that address to reply to
13  Mr. Shafi, true?
14      A   I'm using the address that he sent it to me
15  and I'm replying from that address.
16      Q   Now, you reference, "Sorry it took so long
17  to acknowledge receipt of your document."  Do you have
18  any recollection that the document you're talking
19  about is what we just looked at as Exhibit 25?
20      A   That's why I asked you when you presented it
21  to me what my response was.  Right.  So the original
22  was sent to me at 6:45 a.m.  And I think I got a

251

1  chance to respond to it at, was that 10:32 p.m., I
2  guess that is.
3      Q   So this would show that you got Exhibit 25,
4  you considered it, and you wrote a fairly long
5  response with six separate points.
6      A   I think -- well, it says -- no, I think I
7  responded quickly to it.  Because it said "I will look
8  over in much more detail tomorrow."
9      Q   Fair enough.
10          MR. GREEVES:  I think we can all agree on
11  what the document says.  So....
12  BY MR. MURPHY:
13      Q   Is this -- are you negotiating with
14  Mr. Shafi about the terms of a partnership between
15  Braintech and Shafi, Inc.?
16      A   Can I read it, please?
17      Q   Sure.
18      A   Okay.  Question?
19      Q   What's going on here with the couple of
20  e-mails that we just saw?  This is an ongoing
21  negotiation regarding the potential partnership deal;
22  true or false?

252

1      A   This is in April.  And I think our only
2  conversations with doing some type of transaction
3  together related to the partnership.
4      Q   So what we have here as Exhibit 26 is
5  another step in the evolving negotiations.  This is
6  your response to Exhibit 25.  True?
7      A   25 being?  25 is the -- this?
8          MR. GREEVES:  Yep.
9          THE WITNESS:  Well, it's my response to --
10  yeah, because I mentioned 218 a month is much too --
11  much too much.
12          Yeah, so I mean, in this e-mail we're
13  talking about the hundred thousand cash payment.
14  We're talking about how the netting effect, the cash
15  is -- the cash payment is based upon the achievement
16  of access and acceleration.  That's Shafi revenue.
17          It talks about the 218.  The numbers in here
18  are too much.
19  BY MR. MURPHY:
20      Q   Where is the term netting effect in this
21  document?
22      A   Achieving X, compensation Y gets paid.

# Capital Reporting Company
## Weidinger,  Frederick - Volume I 09-13-2010

253

1   Q   Okay.  So here is the -- in the negotiation,
2   in the evolution of the negotiations, you're prepared
3   at this point in time to make a $100,000 down payment
4   on the execution of a nonbinding letter of intent.  Is
5   that true?
6   A   Well, there -- my -- I mean, my knowledge is
7   letters of -- there are no binding letters of intent.
8   When is a letter of intent binding?  I don't know of
9   one that is.
10   Q   I'm not asking whether or not it was
11   binding.
12   A   Well, you said --
13   Q   I'm asking you whether or not you committed
14   to a $100,000 down payment when a letter of intent was
15   executed?
16   A   I think what this is, and I think you even
17   mentioned it before, I think this is another throw in
18   many throws of negotiating some type of structure that
19   made sense to both parties.
20   Q   And by --
21   A   And as you know from doing transactions,
22   these elements change by the minute, by the day.  I

254

1   mean, until you sign a definitive document, none of
2   this is relevant.
3   Q   The $100,000 cash down payment component was
4   consistent all the way up until June 19th when it was
5   paid in part; true or false?
6   A   False.  The original -- the first $50,000
7   payment was made on or about June 5th based on an
8   e-mail that I sent to Adil Shafi that very carefully
9   and very clearly outlined the basis of which I'm
10   sending that money to him personally.
11       It wasn't based on the millions of minutiae
12   that occurred before I wired that.
13   Q   But the fact is, under the deal that was
14   closed on October 10 --
15   A   October 10?
16       MR. GREEVES:  August 12.
17       MR. MURPHY:  August 12.  Sorry.  Thank you.
18       MR. GREEVES:  That's okay.
19   BY MR. MURPHY:
20   Q   There was a $100,000 cash component; true or
21   false?
22       MR. GREEVES:  Object to the form of the

255

1   question.  But you can answer.
2       THE WITNESS:  Prior to August 12th, we sent
3   Adil Shafi $100,000 in the form of --
4   BY MR. MURPHY:
5   Q   As part of the deal --
6   A   In the form of a loan.  I'm sorry.
7   Q   As part of the deal that closed on
8   August 12th?
9   A   As part of the deal that closed on August --
10   I guess so, yeah.
11   Q   It was part of the compensation for the deal
12   that closed on August 12th, right?
13   A   It was a form of a loan, right.  I mean,
14   Shafi signed it as a loan.  Right.
15   Q   It was treated as payment of the sales price
16   in the share purchase agreement, true?
17   A   In the form of a loan.  He signed a
18   promissory note for that $100,000.
19   Q   It was considered part of the consideration
20   for the transaction; true or false?
21       MR. GREEVES:  Object to the form of the
22   question.

256

1       THE WITNESS:  It was in the form of a loan
2   to Shafi of $100,000, which was part of the
3   acquisition.
4   BY MR. MURPHY:
5   Q   So going all the way back from August 12,
6   2008 to April 17, 2008, on April 17th, 2008, the
7   proposal that ultimately closed -- I'm sorry.  Let me
8   start over.
9   A   Sure.
10   Q   Going all the way back to August -- to
11   April 17th --
12   A   Yes, sir.
13   Q   -- you decided on April 17 that part of this
14   deal would include $100,000 cash?
15       MR. GREEVES:  Object to the form of the
16   question.  I'm not sure what deal we're talking about.
17   But....
18       THE WITNESS:  Absolutely not.  I mean, there
19   was no deal here.  There was not any deal until the
20   first $50,000 was wired to Adil Shafi based on certain
21   terms and conditions that are very -- laid out very
22   clearly in an e-mail.  And then 48 hours after that,

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

257

1  Adil, after he had already confirmed that he received
2  my wire, he started changing very material terms in
3  that.
4  BY MR. MURPHY:
5    Q   Look --
6    A   We can --
7    Q   -- I don't want to argue with you.
8    A   I'm not arguing. I'm just trying to answer
9  your question.
10       MR. GREEVES:  Let him finish, and then you
11  finish. That way the argument will be well preserved
12  for the record.
13       THE WITNESS:  I don't like to argue.
14  BY MR. MURPHY:
15    Q   We can get through this really a lot
16  quicker.
17    A   Okay. Carry on.
18    Q   There was -- Adil Shafi said he needed
19  $100,000 cash in the partnership negotiations. And
20  you responded to that. And to you $100,000 cash was
21  an acceptable part of a partnership. True or false?
22    A   What I don't understand is the $100,000 that

258

1  was agreed to was part of an acquisition transaction.
2       The $100,000 that you're referring to in
3  this e-mail dated April the 17th was part of a
4  partnership. They are very, very different, with
5  different economics, different values, different
6  results, et cetera, et cetera, et cetera. Number 1.
7       Number 2, this partnership arrangement, it
8  was mutually decided by the parties going in -- late
9  May, going into June, that it wasn't beneficial for
10  either, and so we terminated it.
11       So I'm just, you know, I love answering your
12  questions, but I just don't understand the reasoning
13  for them, I guess is what I'm trying to say.
14    Q   Do you remember visiting Houghton, Michigan
15  on April 24, 2008?
16    A   I remember visiting Houghton, yes.
17    Q   Do you remember meeting with Dr. Dale
18  Tahtinen, T-A-H-T-I-N-E-N?
19    A   I'm not sure who the gentleman -- I think we
20  met a couple of individuals from Michigan Tech.
21    Q   Do you remember having personal off-line
22  discussions where only you and Mr. Shafi participated?

259

1    A   At Michigan Tech?
2    Q   Yeah.
3    A   Do I remember whether I had --
4       MR. GREEVES:  Just think about it.
5       THE WITNESS:  I mean, I spoke to Adil during
6  that visit with and without other people. We had
7  dinner together, it was just he and I.
8  BY MR. MURPHY:
9    Q   Were you negotiating any terms of any
10  partnership?
11    A   I think we were always talking about how we
12  could do things together.
13       (Deposition Exhibit Number 27 was marked for
14       identification.)
15  BY MR. MURPHY:
16    Q   I'm showing you what's been marked as
17  Exhibit Number 27.
18    A   Thank you. Yeah. This is my response.
19    Q   So we now have the e-mail where you
20  responded to Mr. Shafi's May 30 e-mail about a wire
21  transfer?
22    A   Correct.

260

1    Q   This is your response given on the same day,
2  May 30, correct?
3    A   It appears to be so, yes.
4    Q   So can I assume for the purpose of this
5  record that you in fact received the list of May 30
6  payables in the e-mail that you are responding to?
7    A   It looks like that's what I was responding
8  to. I mean, I think my words are very clear.
9    Q   Well, did you have any --
10    A   Can I read them?
11    Q   Did you express any objection to any of the
12  specifically designated amounts as to how Mr. Shafi
13  proposed to spend the first 50,000?
14       MR. GREEVES:  Are you asking apart from this
15  e-mail? I think we can all read the e-mail and see
16  what it says for ourselves.
17       MR. MURPHY:  In the e-mail. I'll start with
18  in the e-mail.
19       MR. GREEVES:  Okay.
20       THE WITNESS:  You know, I think, J.P., I was
21  so shocked at reading how he is giving instructions to
22  Donna to cut checks tomorrow because I'm going to be

261

1  wiring transfer money tomorrow.
2      I was so shocked at that.  And that's why I
3  said, you know, we haven't agreed on any wire transfer
4  tomorrow.  What are you talking about?  I'm very
5  concerned regarding your tactics.
6      I probably didn't even read this list.  I
7  mean, it -- it wasn't relevant.  It wasn't pertinent.
8  I mean, I never agreed to any wire based on anything.
9  And, you know, who knows what reason he was, out of
10 the blue, sending this to me.
11 BY MR. MURPHY:
12    Q   And so your recollection is that there was
13 no discussion about a $100,000 cash payment was going
14 to be made by wire transfer at any time prior to when
15 it was actually made?
16    MR. GREEVES:  Object to the form of the
17 question.
18    THE WITNESS:  Right.  Because I go on, "We
19 have been clear all along what needs to be completed
20 before deposit.  I laid this out for you as recently
21 as 3 hours ago."
22      And there was a lot of things.

262

1      MR. GREEVES:  Let's give it -- when you're
2  quoting from that, the court reporter is writing down
3  everything you say, so you went from like a part of a
4  quote to not.  It would be important to --
5      THE WITNESS:  I'm sorry.
6      MR. GREEVES:  When you're reading, make sure
7  she's ascertaining you're quoting from the document as
8  opposed to, you know, for the record.  I'm just trying
9  to help.
10 BY MR. MURPHY:
11    Q   Well, now I've got you making statements in
12 the record and writing in an e-mail talking about a
13 deposit.  What did you mean by deposit?
14    A   I viewed this 50 plus 50 equals 100,000 as a
15 deposit on the transaction.  That's why it was in the
16 form of a loan.  It was --
17    Q   So --
18    A   It was a deposit on the transaction.
19    Q   So you were discussing that deposit as early
20 as April 17 in the earlier e-mails?
21    A   Yeah, I mean, J.P., as I know you well know,
22 before someone gives someone a deposit, there has to

263

1  be at least some terms and conditions that go to that.
2  Although, I tell you I was very lax in my initial
3  personal $50,000 deposit to Shafi.  I did that on good
4  faith.  I still did it based on my June 5th e-mail,
5  saying these are the terms that I'm sending you this
6  $50,000, that I've instructed this wire for $50,000.
7      You just don't send people money freely like
8  Adil expected us to.
9    Q   I'm not talking about the terms and
10 conditions.  I'm just asking about the negotiated
11 aspect of the deposit.  It came into existence in
12 April.  And it was something that there was a meeting
13 of the minds on in terms of the amount.  Not the
14 conditions.  The amount.
15    A   But -- but it -- well, the deposit came in
16 two forms, 50 plus 50, not 100.
17    Q   What does 50 plus 50 equal?
18    A   100,000.  They came in two tranches.  Right?
19 And I got to tell you, I mean, you're chuckling, but
20 the first 50 was based on the terms and conditions I
21 sent Adil.  Between that and the second 50, he changed
22 those terms.  He already had the money in his pocket.

264

1  And he then changed the terms that he had accepted
2  that $50,000 wire.  You talk about bad acts.
3    Q   I'm going to object to your comments on the
4  record that are unresponsive.
5      (Deposition Exhibit Number 28 was marked for
6      identification.)
7  BY MR. MURPHY:
8    Q   I'm showing you what we've marked as Exhibit
9  Number 28.
10    A   Thank you.  Still in May.
11    Q   Still in May 30.
12      Now, you talked about, in your last answer,
13 the partnership discussion unraveling?
14    A   Yeah.  Swirling.
15    Q   Isn't this e-mail that you got from
16 Mr. Shafi on or about May 30 the beginning of the
17 unraveling?
18    A   Let me -- can I read it, please?
19    Q   Sure.
20    A   And do you have my response to this?
21    Q   If you want to take my deposition, you can
22 have your attorney notice it up and ask me any

## Capital Reporting Company
### Weidinger,  Frederick - Volume I 09-13-2010

265

1 questions you want.
2    A   Okay.  Okay.
3       MR. GREEVES:  Promise?
4       MR. MURPHY:  Promise.
5       THE WITNESS:  Okay.  I'm sorry, J.P.  Your
6 question?
7 BY MR. MURPHY:
8    Q   Do you remember this e-mail?
9    A   What I remember is that I think -- I think
10 Adil and Babak were tasked with trying to make sense
11 out of this very technical partnership.  And, yeah, I
12 mean, there were -- there were major problems
13 surfacing, as I think Babak and Adil dug into it.  And
14 it started, as you put it, unraveling.
15    Q   And I'm not going to go into the details of
16 why.  But I just -- I want to see if you recall that
17 Adil wrote to you, beginning at the bottom of this
18 Exhibit 28, quote, "I hope this is not right, but if
19 it is, then it is a change in the trust we have
20 enjoyed, and it will be an unraveling of our
21 understandings and, therefore, the end of our
22 engagement."

266

1       Did I read that accurately?
2    A   Yes, you did.  But every time anybody --
3    Q   No.  That's my question.  You've answered
4 it.
5    A   -- disagreed with Adil, he said it was a
6 change in trust.
7    Q   The very next line says, quote, "Rick, I may
8 need money, but I never compromise on principles no
9 matter what and no matter who."
10       Did I read that accurately?
11    A   You did.
12    Q   And at this point did you understand
13 Mr. Shafi was prepared to walk away from this deal?
14    A   I'm -- I heard what you just read me.
15 Whether he was prepared to walk away from it or not,
16 you have to ask him.
17    Q   You don't recall Mr. Shafi communicating
18 that he was prepared to walk away from the deal?
19    A   Well, you know --
20       MR. GREEVES:  Apart from this e-mail,
21 counsel?
22       MR. MURPHY:  Yes.

267

1       THE WITNESS:  5 days later he accepted a
2 $50,000 wire transfer.  So, you know....
3       You ask your client what his intent was.
4 BY MR. MURPHY:
5    Q   That's your answer to the question?
6    A   I'm sorry.  What -- what was your question
7 again?
8    Q   Did you understand that Mr. Shafi was
9 prepared to walk away from the deal on May 30, 2008?
10    A   My understanding is both parties were
11 getting frustrated by trying to make this thing --
12 this technical thing really work.
13    Q   So the answer --
14    A   And I don't think that he and Babak really
15 came eye to eye on anything.
16    Q   So the answer is yes?  You were prepared to
17 walk away as well?
18    A   Well, I mean, I -- yeah.  I was prepared to
19 walk away several times, which is clearly in the
20 record, too.
21    Q   And by this e-mail, you understood that
22 Mr. Shafi was prepared to walk?

268

1    A   Well, you know, walk -- I mean, he didn't.
2 So was he preparing to?  Maybe.  We were frustrated.
3 Everybody was frustrated at this point, J.P., without
4 a doubt.
5    Q   And as of May 30, not a single dollar had
6 been paid to or deposited to or loaned to Shafi, Inc.
7 by Braintech, true?
8    A   True.  I don't think that happened until
9 June 5th.
10       (Deposition Exhibit Number 29 was marked for
11       identification.)
12 BY MR. MURPHY:
13    Q   I'm showing you what we've marked as
14 Exhibit 29.  And 29 appears to be your same-day
15 response?
16    A   Yes, sir.  Appears to be.
17    Q   To the prior -- actually the next day.
18    A   On Saturday, I responded, correct.
19    Q   And, again, you responded from
20 weidingerfamily.com?
21    A   Yes, sir.  I think, again, I hit the reply
22 button.

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

269

1   Q   I haven't seen any e-mails that we've gone
2   through today addressed to you at Braintech.com.  And
3   I -- so I'm asking you to be on the lookout.
4   A   Okay.
5   Q   Because I've got several more e-mails to go.
6   A   Okay.  Lookout for what, Braintech e-mails?
7   Q   Yeah.
8   A   Okay.  Thank you.
9       MR. GREEVES:  Wait a minute.  I don't know
10  if that --
11      THE WITNESS:  From me, I think, right?
12      MR. GREEVES:  What do you mean you expect us
13  to be on the lookout?  Do you mean when you're handing
14  us a document you expect us to tell you that?
15      MR. MURPHY:  I'll be on the lookout, too.
16      MR. GREEVES:  Okay.  All right.  I got it.
17      THE WITNESS:  Yeah, it's a habit.  I get
18  lazy and just hit reply.
19  BY MR. MURPHY:
20  Q   What did you mean when you wrote the second
21  sentence, and I'm going to read it, quote, "The really
22  unfortunate thing about all of this is that you have

270

1   put undue pressure on what otherwise could have been
2   an awesome combination of businesses."
3       MR. GREEVES:  Objection.  That's not proper.
4   That's not what it says.
5       THE WITNESS:  I didn't read it accurately?
6       MR. GREEVES:  No, you didn't.
7   BY MR. MURPHY:
8   Q   I'll pass on reading.  What did you mean by
9   this could be an awesome combination of businesses?
10  A   Well, I felt that it could have been an
11  awesome combination of businesses.  But, you know,
12  Shafi was introducing -- and I'm trying to recall this
13  to the best of my recollection.  He was introducing
14  all kinds of minute technical problems and, you know,
15  who sells what and, you know, is the Shafi the
16  integration solution and Braintech Technologies the
17  egg that's wrapped around it.
18      I mean, it was like -- and Babak, who
19  understands these things far more than I do, was very,
20  very confused.  And I don't -- I think it's fair to
21  say that he and Adil never really saw eye to eye from
22  a technical perspective.

271

1       So that's what I was saying.  Undue pressure
2   is you're complicating something that could be pretty
3   easy.  But --
4   Q   And that has to do with why the business
5   combination would be awesome?
6   A   Yeah.  I'm saying if we can get through the
7   ego of whose technology is better than the other's, we
8   could have an excellent combination here.
9       But both Adil thought his was bigger, Babak
10  thought his was bigger, and it was very cumbersome
11  trying to get the two of them to agree on anything.
12  Q   So --
13  A   And I'm just saying, you know, there's been
14  a lot of -- maybe -- you know, I apologize.  Maybe it
15  wasn't the best choice of words.
16  Q   You don't have to apologize to me at any
17  time for any purpose, okay?
18  A   Thank you.
19  Q   I'm not going to go through the rest of the
20  e-mail.  But it's safe to say that these were very
21  technical issues, as you said.  And those issues hung
22  up Mr. Shafi as he wrote that he was -- that the

272

1   understandings were possibly going to unravel.  And
2   this is your response to that?
3   A   In his --
4       MR. GREEVES:  Wait a minute.  That was not a
5   question.  So I'll object to that until such time as
6   it has a question mark on the end of it, counsel.
7   I don't know if you were planning to --
8       MR. MURPHY:  There's a question mark here.
9       MR. GREEVES:  I don't know if you were
10  planning to question mark that.
11  BY MR. MURPHY:
12  Q   All right.  Let me ask a better question.
13  You get an e-mail from Mr. Shafi, you may not like my
14  terminology, but Mr. Shafi suggests that this may be
15  an unraveling of the engagement, and you write back
16  and you say that this could be an awesome business
17  combination.  True?  You don't want Mr. Shafi to go
18  away at this point, true?
19  A   No.  I mean, if he couldn't agree to what
20  Babak's insistent on how the enhanced egg got together
21  or how we integrated the two technologies, then I
22  didn't want to do the transaction either.

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

273

1   Q   Okay.  On the second page of your e-mail to
2   Mr. Shafi --
3   A   Yes, sir.
4   Q   -- the very last line, "Please channel all
5   your questions and calls through me regarding
6   Braintech and this partnership."
7       Did I read that accurately?
8   A   Yes, you did.
9   Q   And what did you mean by that?
10  A   You know, at this -- May, I mean, we were
11  trying to accomplish a lot at Braintech, you know, and
12  Adil was absorbing -- this comment was a result of
13  Babak's comment to me actually.  Protect me, Rick.
14  He's absorbing so much of my time if you want me to be
15  focused on this.  So I try to protect my people and
16  their time and their resources.
17  Q   That's it?  So based upon that, you wanted
18  all communications regarding this deal to go between
19  you and Mr. Shafi?
20  A   And if they were technical, I would then
21  delegate them on to Babak.  If they were sales, so and
22  so.  If they were -- you know, correct.

274

1       (Deposition Exhibit Number 30 was marked for
2       identification.)
3   BY MR. MURPHY:
4   Q   I'm showing you what we're going to mark as
5   Exhibit 30.
6   A   30.  Thank you.  We're still in May.
7   Q   And you're still using weidingerfamily.com.
8   A   I'm sorry.
9   Q   You don't have to apologize.
10  MR. GREEVES:  We have moved one day forward.
11  THE WITNESS:  What?
12  MR. GREEVES:  We have moved one day forward.
13  And thankfully there are only 31 days in May.
14  THE WITNESS:  Jesus criminy.
15  BY MR. MURPHY:
16  Q   I just -- I'm not going to go through detail
17  about this.  But this is --
18  MR. GREEVES:  Take your time.
19  BY MR. MURPHY:
20  Q   There's a lot of communications going on
21  during these couple of days.  And it appears to me
22  reading the e-mails that you're at a breaking point, a

275

1   possible breaking point, and you may just decide to go
2   your own way.  Is that a fair statement?
3       MR. GREEVES:  You mean before or after he
4   read Mr. Shafi's -- we already talked about the 29th
5   e-mail.  Now we have Mr. Shafi's e-mail.
6   BY MR. MURPHY:
7   Q   Well, you -- there's an understanding --
8   there's comments in the e-mails that this may be
9   unraveling.  But there's continuing discussions here.
10  Do you agree with that?
11  A   Well, there's e-mails going back and forth.
12  Yes, I agree with that.
13  Q   Here is where Mr. Shafi informs you that he
14  didn't want to show you everything about Reliabot.  In
15  the very last paragraph of his e-mail.
16  A   Yeah.  I mean --
17  Q   And that -- that issue held true all the way
18  through the closing?  That never changed?
19  A   Right.  We never -- we never -- yeah, we
20  never saw the technology until a month after closing.
21  Q   And you waived --
22  A   To the best of my knowledge.

276

1   Q   If you had any interest in seeing the
2   technology, you waived it or decided it wasn't
3   important to close the transaction; true?
4   A   Not true.
5   Q   You closed without seeing --
6   A   We were not allowed by Adil to even get near
7   it.  He coveted it.  He hid it in his basement.
8   Q   And you closed the transaction on August 12
9   without access to it; true or false?
10  A   Based on his representations of what that
11  software was, correct.
12  Q   Representations in the share purchase
13  agreement?
14  A   Yes.  Yes.  Yeah.
15  Q   Any representations about Reliabot software
16  anywhere else than the share purchase agreement?
17  A   Probably -- I'll think about that question.
18  Many e-mails back and forth.  Many conversations back
19  and forth.  But certainly in the acquisition
20  documents.
21  Q   But as we sit here today, can you identify
22  any other representations other than what I'm going to

277

1 find in the share purchase agreement?
2     A   Other than what he said, other than what
3 he's written, other than what the group has discussed,
4 other than what we've agreed to in joint meetings
5 together after closing, before closing.
6     Q   Okay.
7     A   His Web site.
8     Q   Okay.  What other representations did
9 Mr. Shafi make in writing about Reliabot software?
10    A   Oh, he made a lot of representations.
11 Number 1, he represented he was the architect of
12 Reliabot, which we found after the fact was not -- we
13 found that out from his ex-employees.  You know, that
14 it was revenue ready.  We found out after the fact
15 that it was based on 1998 Visual 6 language that is
16 outdated and no longer supported by Microsoft.  I
17 mean, there is a whole litany of things that were
18 represented to us about his technology that we found
19 out after the fact were incorrect.
20    Q   And what representations to that effect were
21 made in writing?
22    A   We should go through the document, the

278

1 transaction document rep by rep, and his Shafi
2 pipeline revenue forecast where it represented that
3 his technology was revenue ready.
4     Q   If the share purchase agreement contains a
5 clause that says all of the representations and
6 negotiations up to this point are merged into the
7 share purchase agreement, is it appropriate for you to
8 rely on representations that are not found in the
9 share purchase agreement?
10        MR. GREEVES:  Objection.  It's hypothetical.
11        THE WITNESS:  Can you ask me that again,
12 please.  I'm sorry.  I didn't catch that.
13 BY MR. MURPHY:
14    Q   Are you saying that you relied upon
15 representations about Reliabot software that were
16 found outside of the share purchase agreement?
17    A   I think those representations were mainly in
18 the share purchase agreement.  But there were many
19 e-mails going back and forth and Adil representing his
20 technology.  His Web site was one of them.
21    Q   Well, you wouldn't expect him to have
22 proprietary code information on his Web site, would

279

1 you?
2     A   No, no, no.  But there were certain
3 statements about his technology on his Web site that
4 our scientists in Vancouver found to be untrue.
5     Q   But you closed anyway?
6     A   I think that they discovered all this after
7 they were able to do -- a month after closing when
8 they were able to do their evaluation of the software
9 once they received the software.
10        (Deposition Exhibit Number 31 was marked for
11        identification.)
12 BY MR. MURPHY:
13    Q   I'm showing you what we've marked as Exhibit
14 Number 31.
15    A   Okay.  Thank you.
16        MR. GREEVES:  Thanks.
17        THE WITNESS:  May, still.
18 BY MR. MURPHY:
19    Q   Still in May.  I'm sorry.
20    A   Wow.
21    Q   I can apologize to you.
22    A   That's cool.

280

1        MR. GREEVES:  You guys should be apologizing
2 to us.
3        MR. MURPHY:  Okay.  I apologize to everybody
4 in the room, including Madam Court Reporter.
5 BY MR. MURPHY:
6     Q   I just want to ask you, you reiterate, and I
7 think it's in blue on your copy, I'm not sure, under
8 the heading "Commercial," the very last bullet point,
9 beginning at the right side of the first line.
10    A   Uh-huh.
11    Q   "Please channel all your questions and calls
12 through me."
13        Actually, I'm sorry.  This was Mr. Shafi
14 responding to your request to do that?
15    A   Uh-huh.
16    Q   And so Mr. Shafi expressed his agreement to
17 that, right?
18    A   Yes.  Was this before or after his problem
19 number 1 and problem number 2 e-mail?  This is
20 dated -- oh, this is after.  So after he sent that
21 e-mail, he said 90 percent of.... gees.
22        MR. GREEVES:  Any other questions about

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

281

1 that?
2        MR. MURPHY: No. There was no question
3 pending either before that statement was made.
4        THE WITNESS: I'm sorry. I was talking to
5 myself.
6        MR. GREEVES: That was 31.
7        MS. KOVAL: But it was marked and no
8 questions about it.
9        MR. GREEVES: I didn't hear any questions.
10        THE WITNESS: He asked me about the blue
11 lettering.
12        MR. GREEVES: Yeah.
13        MS. KOVAL: Oh.
14        (Discussion off the record.)
15        (Deposition Exhibit Number 32 was marked for
16        identification.)
17 BY MR. MURPHY:
18     Q   I'm showing you what we've marked as
19 Exhibit 32.
20     A   June. Wow.
21     Q   This is an e-mail from you at
22 weidingerfamily.com to Mr. Shafi dated June 1, 2008,

282

1 true?
2     A   This is not the complete. There's a
3 blacked-out mark, too. I don't know what that is.
4        MR. GREEVES: You're talking about the
5 e-mail or the attachments or --
6        MR. MURPHY: The e-mail.
7        MR. GREEVES: I think he's just referring to
8 the first page.
9        THE WITNESS: Okay.
10 BY MR. MURPHY:
11     Q   Is this an e-mail you sent on June 1, 2008?
12     A   It looks like it.
13     Q   And it attached --
14     A   It's from me to --
15     Q   -- several documents. True?
16     A   Yes, it says 1, 2, 3, 4 and 5.
17        (Deposition Exhibit Number 33 was marked for
18        identification.)
19 BY MR. MURPHY:
20     Q   Okay. I'm handing you what we've marked
21 Exhibit 33. And tell me if that was chart A?
22     A   I know. This is why it got so complex and

283

1 so confusing. I tried to make sense of this myself,
2 for myself, because I'm not as smart as these
3 technical guys.
4     Q   Is Exhibit 33, chart A, associated with the
5 e-mail?
6     A   It says chart A. I don't see a chart A up
7 here. But....
8        MR. GREEVES: Is that your handwriting?
9        THE WITNESS: Yes, this is my handwriting,
10 yeah.
11 BY MR. MURPHY:
12     Q   Did you prepare this?
13     A   With information that I was given from I
14 think Adil and Babak and Remus.
15     Q   Well, Exhibit 33 was the schematic, if you
16 will, of what you were talking about the business
17 combination would be at the time?
18     A   The partnership.
19     Q   Yes.
20     A   Yep.
21     Q   And then you identify five other documents
22 where signatures were required for signoff. What did

284

1 you mean by that?
2     A   I'm not sure.
3     Q   Did you want Mr. Shafi to sign off on those
4 documents and get back to you?
5     A   Well, I mean, you're referring to the little
6 footnote down here, which says -- at the bottom of
7 this June 1 e-mail, it says "signatures required for
8 signoff," which J.P. referred me to. And by each one
9 of these it has names for signoff.
10        I think it was -- I think what we were
11 requiring is that everybody involved with these
12 certain subjects sign off on them.
13     Q   In other words, everybody had a meeting of
14 the minds, an agreement? Yes?
15     A   Yep. But we never got through the first
16 one.
17        I kind of like this. I should have framed
18 it.
19        (Deposition Exhibit Number 34 was marked for
20        identification.)
21 BY MR. MURPHY:
22     Q   I'm showing you Exhibit 34.

285

1      A    Okay.
2      Q    And, again, I'll represent to you that this
3   was the attachment to the e-mail marked as Exhibit 32
4   in its native format.
5      A    Okay.
6      Q    Does Exhibit 34, called "Technical
7   Corroboration," look familiar?
8      A    I know that Adil and Babak were working on
9   the technical aspects of this partnership.  I'm not
10  sure who produced this document.
11     (Deposition Exhibit Number 35 was marked for
12        identification.)
13  BY MR. MURPHY:
14     Q    I'm showing you what we've marked as
15  Exhibit 35.
16     A    Thank you.
17     Q    If the document originated or the document
18  was sent with your e-mail, and Exhibit 35 shows that
19  the author was Mr. Habibi, do you have any reason to
20  quarrel with the fact that it originated with
21  Braintech?
22     MR. GREEVES:  Sorry, counsel.  I just have

286

1   to think about this for a second.  So are you saying
2   35 tells you who authored 34?
3      MR. MURPHY:  Yep.
4      MR. GREEVES:  Okay.  Thank you.  That's the
5   question I think he's put to you.
6      THE WITNESS:  Right.  I'm not sure who took
7   the pen on this first.  I mean, it wouldn't surprise
8   me that Babak took the pen first.  But I think what
9   this was, it was a joint effort between Adil and
10  Babak.  This is way over my pay grade.
11     I did understand this (indicating).
12     (Deposition Exhibit Number 36 was marked for
13        identification.)
14  BY MR. MURPHY:
15     Q    I'm showing you what we marked as
16  Exhibit 36.
17     A    36.  Thank you.
18     MR. GREEVES:  Thanks.
19  BY MR. MURPHY:
20     Q    Was this your description of the partnership
21  at that time?
22     MR. GREEVES:  Objection.  Foundation.

287

1      THE WITNESS:  It's got the title of being
2   the partnership.  And it also has the title of it's a
3   work in progress.  This is the swirling.
4   BY MR. MURPHY:
5      Q    So the question is, is this your description
6   of the partnership at the time that you sent it to
7   Mr. Shafi on June 1, 2008?
8      MR. GREEVES:  Same objection.  Foundation.
9      THE WITNESS:  I think this was a work in
10  progress.  I think it was, like I said, the structure
11  and the terms and everything was continually swirling.
12  BY MR. MURPHY:
13     Q    Yeah.  But as of the date of this document,
14  June 1, the writing on this document is fixed; true or
15  false?
16     A    False.  Because at the very top, J.P., it
17  says clearly, "work in progress," which means that
18  this is still progressing, this is still moving, this
19  is still swirling.
20     Q    Is this your description of where the
21  discussions were as of June 1, 2008?
22     A    There may have been another offering later

288

1   on that day.  You know, this is, like I said, a work
2   in progress.  It was -- this thing moved constantly.
3      MR. GREEVES:  So just so I'm clear, because
4   I'm becoming clueless now, which probably doesn't
5   surprise anybody, with regard to RW 36, counsel, are
6   you suggesting that RW 36 is the document that is
7   referred to as 4 among the attached best and final
8   documents in RW 32?
9      MR. MURPHY:  Actually, I don't know.
10     THE WITNESS:  That's a good question.
11     MR. MURPHY:  I think it's actually the term
12  sheet, item number 3.  But I'll pose that question to
13  Mr. Weidinger.
14     MR. GREEVES:  Well, the term -- sorry.  Not
15  to interrupt.  But the term sheet that's referred to
16  under number 3, signatures required for, on 32, but
17  it's also referred to as number 4, term sheet for
18  transaction, work in progress, if all -- whatever.
19     So I mean, is -- what is it that you're
20  trying to -- that this is part of the e-mail that was
21  sent in 32?  Is that what you're suggesting?
22     MR. MURPHY:  I'll make a statement for the

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

289

1 record --
2        MR. GREEVES:  Okay.
3        MR. MURPHY:  -- that I have the e-mail in
4 native format, and it's got Exhibit 36 attached to it.
5        MR. GREEVES:  Okay.  Thank you.  That's
6 helpful.  I appreciate that.
7        THE WITNESS:  So we don't know which one it
8 is either.
9 BY MR. MURPHY:
10      Q   So understanding that it's a work in
11 progress, this is your description of the progress to
12 date as of June 1, 2008; true or false?
13      MR. GREEVES:  Object to the form.
14 Foundation.
15      THE WITNESS:  Once again, it's a work in
16 progress.
17 BY MR. MURPHY:
18      Q   What exactly is it?  In number 9 where you
19 talk about Shafi consideration, do you see the sum of
20 $100,000 for a deposit?
21      A   I see that.  But I mean, these aren't any of
22 the terms and conditions that we ended up agreeing

290

1 to --
2      Q   I'm not asking you --
3      A   -- in the form of an acquisition.  So it's
4 not -- I think you're pressing me on is this a final
5 document.  Right on the top of it, it says "work in
6 progress."
7      Q   No.  Let's get that off the table.  I'm not
8 pressing you whether or not it's a final document.
9 I'm simply asking you whether this was your
10 understanding of acceptable terms as of June 1, 2008?
11      A   No.
12      Q   So --
13      A   Acceptable terms would not have been made
14 until we signed on the dotted line --
15      Q   I understand.
16      A   -- and there was a transfer.  Okay.  Okay.
17      I was very clear in my June 5th e-mail that
18 it was associated with my wire transfer what the
19 acceptable terms and conditions would be.
20      Now you're asking me to back up and say work
21 in progress on a completely different transaction, a
22 completely different structure as something that I

291

1 agreed to, an acceptable deal?  No.
2      Q   So this was not you making a proposal of the
3 terms you were willing to commit to as of June 1,
4 2008?
5      A   No.  This was a work in progress.
6      Q   What did you mean by -- in the e-mail which
7 we've marked as 32 --
8      A   Uh-huh.
9      Q   -- you say, and I'll read it, "We all need
10 all, 1 through 5, of the above reviewed and agreed to
11 prior to partial deposit with some sort of business
12 security on Tuesday, June 3rd, 2008."
13      Did I read that accurately?
14      A   Oh, you -- yes.  Yes.  I assume you did.  I
15 wasn't following.  I was trying to find out what
16 paragraph you were at.  I just found it.  Yes.  I
17 assume you read it accurately.
18      Q   Okay.  So as of the date of this e-mail, if
19 the attached documents were acceptable to all parties,
20 this was your proposal as to how the partnership would
21 proceed, true?
22      A   But these aren't acceptable terms until

292

1 they're agreed to in writing --
2      Q   I'm not asking --
3      A   -- and they're signed.
4      Q   I'm assuming --
5      A   Oh, I'm sorry.
6      Q   They weren't agreed to.
7      A   They weren't.
8      Q   Are you making a proposal or were you just
9 writing stuff on a page that had nothing to do with
10 any transaction?
11      A   Well, these papers went back and forth, back
12 and forth.  His comments, our comments.  You know, the
13 whole team's comments.  Right.
14      MR. GREEVES:  Yep.  Not to -- I'm confused
15 about who wrote --
16      THE WITNESS:  I'm sorry.
17      MR. GREEVES:  -- who wrote 36.  Have you --
18 did you ask -- maybe I missed it.  Did you ask
19 Mr. Weidinger if he wrote 36?
20      MR. MURPHY:  No, I haven't.  But maybe it
21 will help if I do.
22      (Deposition Exhibit Number 37 was marked for

## Capital Reporting Company
### Weidinger, Frederick - Volume I 09-13-2010

293

1      identification.)
2  BY MR. MURPHY:
3     Q   I'm showing you what we've marked as
4  Exhibit 37.
5     A   Uh-huh.  37.
6     Q   And the little window box there that comes
7  up that shows Rick as the author obscures some of the
8  document.  But --
9     A   It could be Rick anybody.
10    Q   I'm sure it could be.
11       Now, do you have any reason to dispute that
12  you prepared this document and sent it to Mr. Shafi on
13  June 1, 2008?
14       MR. GREEVES:  This document being 36?
15       MR. MURPHY:  36.
16       THE WITNESS:  No, I don't.  I mean, it would
17  be like me to put "work in progress" on something
18  that's swirling around like this.
19  BY MR. MURPHY:
20    Q   And was this intended by you to be an offer
21  as to what the terms of the partnership would be in
22  your view as of June 1, 2008?

294

1     A   No.  I think -- I mean, we were just trying
2  to -- you know, there were so many pieces swirling
3  around.  I mean very complicated pieces.  And I think
4  what we were trying to -- attempting to do is try to
5  put them in each respective group, right?  Put
6  something that was coherent on paper so we could all
7  then examine it and see if we could all agree to it.
8       And, you know, unfortunately, fortunately,
9  whatever, we couldn't.  So that's why this type of
10  structure, J.P., never happened.  So I wouldn't -- I
11  wouldn't label this as an offer.
12    Q   Well, looking at paragraph 9 of Exhibit 36,
13  we have the mysterious return of the $100,000 which
14  was proposed as a deposit well prior to June 1, 2008,
15  true?
16    A   It says here $100,000 plus 750,000 shares at
17  a penny plus 250,000 stock options priced at closing
18  on the date of execution, correct.
19    Q   And when you wrote that, you weren't --
20  that -- you weren't contemplating making a $100,000
21  deposit?  You're just putting it on the table for --
22  because it had been discussed?

295

1     A   No.  But I think as I tried to articulate
2  before, in these transactions, there's a lot of moving
3  parts.  And they are very complicated.  And one
4  depends on the other depends on the other.
5       So I don't -- I think it's really an
6  injustice to take one number out of a very complicated
7  transaction, say, okay, you agreed to that, when
8  that's really not the case.
9       If there's 10 or 15 or 20 or 50 or 100
10  elements in a transaction, really, you've got to have
11  a meeting of the minds on all of them.
12    Q   So when you use the term at the top of the
13  page "agreed-to business terms," you didn't really
14  mean to indicate that what followed were terms that
15  you believed had been agreed to as of June 1?
16    A   No.  Because it says "work in progress"
17  right underneath it.  These were the terms that we
18  were trying to come to an understanding, right, and
19  have them all kind of settle and deposit on a piece of
20  paper.  So as a group we could all huddle around them,
21  consider them, think about them and to decide as a
22  group whether this makes sense for us to go forward or

296

1  not.
2       Unfortunately or fortunately that happened
3  and the group mutually decided no, that this
4  arrangement is not going to work for him, and it's not
5  going to work for us.  So let's -- if we want to
6  continue on, then let's talk about an acquisition.
7     Q   So despite the language in 9b, you never
8  made a proposal where Braintech would pay $50,000 a
9  month to Shafi as long as access and acceleration was
10  successful and continuing?
11    A   Correct.  Because we never agreed to this
12  structure --
13    Q   But in your negotiations --
14    A   -- which is a partnership structure.
15    Q   But in your negotiations, you never even
16  offered that?
17    A   Well, I mean, offered?  I mean, we -- you
18  know, like I -- you know -- I'm trying to be as clear
19  as I can.
20       Like I said, there were many elements of
21  this thing swirling around all the time.  They would
22  change.  And, you know, we would find out more.  And,

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

297

1 technically, this couldn't work.  And then Adil was
2 getting upset because, all of a sudden, we were losing
3 his trust because we were, you know, uncovering more
4 about things, and we had to change things.  And we had
5 to discuss different things.
6     I mean, it was -- it was a swirl.  That's
7 the best I can describe it.
8     Q    Here is a yes or no question.
9     A    Okay.  I'm sorry.
10    Q    Braintech offered to make $50,000 monthly
11 payments for a period of 12 months as of June 1, 2008;
12 yes or no?
13    A    No, they did not, because this is based on a
14 partnership arrangement, which the parties agreed not
15 to pursue.  And this is a work in progress.
16    Q    Assuming the partnership deal came to
17 fruition, Braintech offered, as part of that deal,
18 $50,000 monthly payments for a period of 12 months,
19 assuming successful and continuing access and
20 acceleration.  True or false?
21    A    False.  Many more elements to consider.
22    (Deposition Exhibit Number 38 was marked for

298

1     identification.)
2 BY MR. MURPHY:
3     Q    We've marked Exhibit 38.  And while we're at
4 it, let's mark 39, too.
5     A    Is this the schedule we looked at before?
6 Yep.
7     (Deposition Exhibit Number 39 was marked for
8     identification.)
9 BY MR. MURPHY:
10    Q    38 --
11    A    Rick.
12    Q    -- is the closing schedule that you were
13 proposing in connection with the partnership
14 discussions; true or false?
15    And, you know, the way it comes out, you
16 actually have to --
17    A    Yeah.  Put it side by side, yeah.  But isn't
18 this the closing schedule you showed us earlier, in an
19 earlier question?
20    Q    Let me just say for the record, and you know
21 this, that these documents were continuously being
22 changed and updated and revised.

299

1     A    I call them swirling, yes.
2     Q    Whatever you want to call them.  So there
3 may have been a prior iteration of this.  But I don't
4 think that you've seen this before.
5     A    Oh, okay.
6     Q    You can take that for what it's worth.
7     So was this the closing schedule that you
8 were proposing as of June 1 on the basis of the
9 partnership discussions?
10    MR. GREEVES:  I object to the form.
11    THE WITNESS:  I'm going to construct it.
12    MS. KOVAL:  How are we going to line these
13 up?  I'm sorry.  What are you asking him to do with
14 these documents?
15    THE WITNESS:  While you line it up, can I
16 have 2 minutes to use the bathroom?
17    MR. MURPHY:  Sure.
18    (Whereupon, a recess was taken between
19    5:26 p.m. and 5:31 p.m.)
20    MR. GREEVES:  What was the pending question?
21    MR. MURPHY:  I'll repeat it.
22    MR. GREEVES:  Yes.

300

1 BY MR. MURPHY:
2     Q    Exhibit 38 was the closing schedule that you
3 were proposing as of June 1 on the basis of the
4 partnership discussions.  True?
5     A    It appears so, yes.  And these closing
6 schedules are very dynamic documents, too.
7     Q    And based upon Exhibit 39, do you take issue
8 with what appears to be the fact that you prepared
9 Exhibit 38?
10    A    It says "Rick."  I guess that's me.
11    MR. GREEVES:  That's 39.
12    THE WITNESS:  Oh, I'm sorry.  I missed that.
13 I'm sorry.
14    (Deposition Exhibit Number 40 was marked for
15    identification.)
16 BY MR. MURPHY:
17    Q    I'm showing you what we've marked
18 Exhibit 40.  This is an e-mail from you at
19 weidingerfamily.com to Mr. Shafi the same date,
20 June 1, 2008.  True?
21    A    Yeah.  I don't know what this forecast is.
22 But, yeah, it appears to be.

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

301

1   Q   And you're asking Mr. Shafi to sign off on a
2   revenue forecast?
3   A   His revenue forecast, correct.  It says here
4   the Braintech Shafi partnership forecast.  I think
5   it's a document that we --
6   Q   We'll mark a new one.
7   A   Okay.
8      (Deposition Exhibit Number 41 was marked for
9      identification.)
10  BY MR. MURPHY:
11  Q   I'm showing you Number 41.  Do you remember
12  sending this to Mr. Shafi around June 1, 2008?
13  A   If you say this was attached in my e-mail.
14  Q   Do you have any reason to believe that it
15  wasn't attached to your e-mail?
16  A   No, I don't.  I mean, if you say this was
17  attached to my e-mail that I sent to Adil, then I
18  guess it was.
19  Q   Okay.
20  A   I don't --
21  Q   At the bottom, it's got the same list of
22  assumptions and discussions that we've had some

302

1   questions and answers on that I'm not going to repeat.
2   A   Uh-huh.
3   Q   Do you see that?
4   A   Was there 15 there?  15.  Yep.  And there
5   was 15 in the other one.
6   Q   And right above the assumptions and
7   discussions, there's something that we hadn't seen.
8   "Shafi Innovation headcount."  And it has the
9   number 5.  Since this came from you, I'm assuming that
10  you were signing off on five employee headcount at
11  Shafi under the partnership deal?
12  A   No.  I was not the author of this schedule.
13  Nor was I the author of the content of this schedule.
14  And I was forwarding this to Adil and asking him to
15  sign off on this, his revenue forecast.
16  Q   What was your expectation of what would
17  happen after Mr. Shafi signed off on the revenue
18  forecast?
19  A   I don't know if I had an expectation.  I
20  mean, what do you mean by that?
21  Q   Well, under the partnership iteration of the
22  deal, back -- going back to Exhibit 32, you needed

303

1   five specific things to be signed off on prior to a
2   partial deposit.
3   A   Okay.  As of June 1, right?
4   Q   Yes.  And then you sent this revenue
5   forecast separately and you asked Mr. Shafi to -- you
6   asked Mr. Shafi that -- you told Mr. Shafi that he
7   needed to sign off on the revenue forecast?
8   A   Okay.
9   Q   So is it appropriate for me to understand
10  and assume that you had already approved of this
11  revenue forecast, you just needed Mr. Shafi's signoff,
12  and then you were ready to proceed to the partnership
13  deal?
14      MR. GREEVES:  Objection to the form of the
15  question.
16      THE WITNESS:  No.  This was not my revenue
17  forecast.
18  BY MR. MURPHY:
19  Q   I'm not asking you if this was your revenue
20  forecast.
21  A   But you just said that --
22  Q   I'm asking you if you asked Mr. Shafi to

304

1   sign off on the revenue forecast as part of a
2   partnership deal that you were negotiating with
3   Mr. Shafi on June 1, 2008?
4   A   My e-mail that you just handed me says
5   "Adil, I need you to sign off on revenue forecast."
6   Q   So if Mr. Shafi signed off on it and said
7   that it was acceptable, what happened next?
8      MR. GREEVES:  Objection.  That calls for
9   speculation.  But go ahead.  You can answer.
10     THE WITNESS:  I mean, you know, I'm not sure
11  what -- what lawyery -- lawyering -- law -- how do you
12  say it?
13     MR. GREEVES:  Lawyering.
14     MS. KOVAL:  Lawyering.
15     THE WITNESS:  Route you're taking.  But we
16  didn't, as you know, we didn't do this partnership
17  arrangement.  There were very -- there were very
18  critical, very significant, very material technical
19  reasons why we couldn't do that.
20     So I'm really confused about your line of
21  questioning when you ask me, okay, if he did this,
22  then what?  I mean, I don't know then what.

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

305

1  BY MR. MURPHY:
2      Q    Well --
3      A    For very good critical -- and this is my
4  point I think I was trying to articulate that I just
5  botched, and I apologize for wasting your time.  But
6  there were very significant, critical and very
7  important technical reasons why we couldn't pursue the
8  partnership.  And that was mutually agreed to between
9  the partners --
10     Q    Is anything --
11     A    -- the parties.
12     Q    -- in the revenue forecast which is
13 Exhibit 48 related to technical issues?
14         MR. GREEVES:  48?
15         MR. MURPHY:  41.  Sorry.
16         THE WITNESS:  Well, I mean, it has to do --
17 it's got everything to do with technical reasons.
18 BY MR. MURPHY:
19     Q    It's --
20     A    It's a revenue forecast that's based on
21 technology, the sale of technology.
22     Q    So --

306

1      A    The sale of technology that's been
2  represented and presumed revenue ready.
3      Q    So why are you sending this to Mr. Shafi if
4  it has nothing to do with anything?
5      A    Because I think, J.P., at this time we were
6  trying to get -- it was a work in progress.  We were
7  trying to get a meeting of the minds of this
8  partnership arrangement.  Right?  So we were trying to
9  put the pieces together.  Like I said before, there
10 were several pieces.  They were very complicated.  It
11 was swirling around.  So we were trying to get them
12 all set, all reviewed and all agreed to.
13         That's what we were trying to do.
14     Q    And so --
15     A    But we could never get the pieces finally
16 together in a partnership arrangement.
17     Q    And so your e-mail asking Mr. Shafi to buy
18 in on it doesn't indicate that you're okay with this
19 and you needed him to be okay with it?
20         MR. GREEVES:  Objection to the form of the
21 question.
22         THE WITNESS:  Well, I mean, all the

307

1  parties -- there were -- you know, there are four or
2  five parties involved in this.
3  BY MR. MURPHY:
4      Q    Okay.
5      A    Making sense of the pieces.
6      Q    Looking at Exhibit 40 --
7      A    40.
8      Q    -- and tell me who else needed to sign off
9  on the revenue forecast.
10     A    I think that was Adil and Jim.
11         MR. GREEVES:  Exhibit 40?  You're looking at
12 32, Rick?
13         THE WITNESS:  No, I'm looking at 40.
14         MR. GREEVES:  Okay.
15         THE WITNESS:  Adil needs to sign off on
16 revenue.  I think both Adil and Jim needed to sign off
17 on the revenues.  They were the ones responsible for
18 the revenue.  Adil from his installed base revenue
19 ready, and Jim from Braintech.  Right?
20 BY MR. MURPHY:
21     Q    You didn't include Mr. Dara in your e-mail.
22     A    Right.  Because -- right.  Good observation.

308

1  These were Adil's revenue forecasts.  Why would Jim
2  sign off on his revenue forecast?  Jim had nothing to
3  do with his forecast.  Adil's forecasts were his
4  forecasts.
5      Q    I'm trying to understand, Mr. Weidinger --
6      A    Yes.
7      Q    -- why -- what was in your head when you
8  said you needed Adil to sign off on the revenue
9  forecast.  What was the purpose of needing Mr. Shafi's
10 signoff on the revenue forecast?
11     A    Okay.  You and I may be disconnecting with
12 each other again.  It's pretty simple.  Adil was
13 submitting his -- submitting and representing his
14 revenue forecast, right?  And we were just asking him
15 to sign off on it, as this exhibit that you gave us,
16 32, says signatures required for signoff.
17         Part of that signoff was Adil's revenue
18 forecast.  And I'm asking Adil, this is your revenue
19 forecast from your installed base.  This is your
20 pipeline.  Please sign off on it.
21     Q    Why did you need him to sign off on it?
22     A    Because I said we were trying to put the

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

309

1 pieces of this very complicated partnership together.
2 And this is one of the pieces.
3   Q   If Mr. Shafi signs off on this, does that
4 mean there's agreement on both sides because it came
5 from you?
6   A   No.  Because there were multiple pieces.
7 And I think, you know --
8   Q   I'm not talking about the multiple pieces.
9   A   Oh.
10   Q   I'm talking about one piece.  I'm talking
11 about --
12   A   On the revenue.
13   Q   -- the revenue forecast?
14   A   Well, this is his revenue forecast, J.P.
15 And if he signed off on it, then I would be okay with
16 it.  Is that what you're asking me?
17   Q   That's exactly what I'm asking you.
18   A   Okay.  Thank you.
19   Q   So it originated from you, you were okay
20 with it, you sent it to him?
21   A   It didn't -- I'm sorry.  I interrupted you.
22 I'm sorry.

310

1     MR. GREEVES:  Objection to the form.  He's
2 testified that --
3 BY MR. MURPHY:
4   Q   You had it in your possession.  You e-mailed
5 it to Mr. Shafi?
6   A   Earlier you said this was my forecast.  It
7 wasn't my forecast.
8   Q   I didn't say it was your forecast.
9   A   Okay.  Well, it clearly wasn't my forecast.
10 It was Shafi's forecast --
11   Q   You've made a fine record that this is not
12 your forecast.
13   A   You just -- okay.
14   Q   On June 1 --
15     MR. GREEVES:  No question pending.
16 BY MR. MURPHY:
17   Q   -- you sent an e-mail which attached the
18 forecast to Mr. Shafi, true?
19   A   Yes.  True.
20   Q   Indicating that you needed Mr. Shafi's
21 signoff on it, true?
22   A   True, correct.

311

1   Q   And assuming Mr. Shafi signed off on it for
2 this particular item, the revenue forecast --
3   A   One piece of the puzzle.
4   Q   -- there was an agreement?
5   A   Well, agreement.  Agreement on his own
6 revenue forecast?  He signed off on his own revenue
7 forecast, correct.
8     (Deposition Exhibit Number 42 was marked for
9     identification.)
10 BY MR. MURPHY:
11   Q   And I'm showing you what we've marked
12 Exhibit 42.
13   A   42.
14   Q   Again, like I have, I'll represent that I
15 have Exhibit 41 in native format in Excel, Microsoft
16 Excel.
17   A   Uh-huh.
18   Q   And I clicked on the properties screen.  And
19 do you see that representation on 42?
20   A   Yes.
21   Q   It appears that Mr. Dara of Braintech is the
22 author of the document.  Do you have any reason to

312

1 dispute that?
2     MR. GREEVES:  Objection to form.
3     THE WITNESS:  I have every reason to dispute
4 that.  This was -- this was Adil Shafi's content.  And
5 Jim Dara may have organized it into an Excel
6 spreadsheet for him, because I'm not sure whether Adil
7 was proficient at that or not.
8     (Deposition Exhibit Number 43 was marked for
9     identification.)
10 BY MR. MURPHY:
11   Q   I'm showing you what we've marked
12 Exhibit 43.
13   A   Okay.  Thank you.
14   Q   The e-mail from Mr. Dara --
15   A   Uh-huh.
16   Q   -- references your e-mail to both Mr. Shafi
17 and Mr. Dara regarding an issue you had with revenues
18 for 2009.  Is that an accurate statement?
19   A   Yes.
20   Q   And you see that Mr. Dara then asks
21 Mr. Shafi how to respond?
22   A   Right.  Because they were his revenue

# Capital Reporting Company
## Weidinger,  Frederick - Volume I 09-13-2010

313

1  forecasts.  Correct.
2      Q    And your point is that revenue under this
3  enhanced egg of 1.65 million will not justify the cost
4  of the partnership?
5          MR. GREEVES:  Objection to the form of the
6  question.
7          THE WITNESS:  What's that?
8          MR. GREEVES:  I said objection to the form
9  of the question.
10         THE WITNESS:  Well, from all -- I think it
11 germinated from all previous conversations.  The
12 number that we discussed was much greater than that.
13 I think I was just surprised at how low it was.
14         (Deposition Exhibit Number 44 was marked for
15          identification.)
16 BY MR. MURPHY:
17     Q    I'm showing you what we've marked Exhibit
18 Number 44.
19     A    Uh-huh.  We're still on June 1.
20     Q    Now, you send the same message that was
21 previously sent but now it's in caps with three
22 exclamation points, "Do not contact Braintech

314

1  employees."
2      A    Uh-huh.
3      Q    Do you remember sending that?
4      A    I remember discussing with Shafi to not
5  contact all our Brain -- any of our Braintech
6  employees.  I mean, we hadn't closed.  We hadn't
7  signed a letter of intent.  And it was quite awkward
8  that he would be picking up the phone and talking to,
9  you know, this person, that person, without at least
10 me knowing of it.  I mean, these people were busy.
11 They had jobs to do.  And they have responsibilities.
12 And they were constantly being called and badgered by
13 him.
14         It's not like me to just put my comment in a
15 heading like that.  Usually I write something below.
16     Q    But you understood that Mr. Shafi was
17 working very closely, and you described it earlier as
18 joined at the hip, with respect to the forecasting and
19 the access and acceleration, true?
20     A    And he continued to be, correct.
21     Q    So --
22     A    And he continued to be, yes.

315

1      Q    Despite the command, do not contact
2  Braintech employees, you expected that Mr. Shafi would
3  continue to talk to Mr. Dara?
4      A    What I expected him to do is to at least
5  notify me of his conversations with our employees so I
6  could somehow manage this so we could do our job.
7      Q    Where does --
8      A    I wasn't sure --
9      Q    Where does it say in your e-mail that you
10 wanted him to do something other than not contact
11 Braintech employees?
12     A    Well, see, that's what I'm saying.
13 Typically I have -- you know, I don't know if this is
14 the entire e-mail.
15         MR. GREEVES:  Counsel, are you proffering
16 that this is a sent e-mail?
17         MR. MURPHY:  Yeah.
18         MR. GREEVES:  Okay.
19         THE WITNESS:  Typically --
20         MR. GREEVES:  And you're not going to --
21         MR. MURPHY:  I have it in electronic format.
22         THE WITNESS:  I mean typical --

316

1          MR. GREEVES:  Hold on.  Don't say anything.
2  You're not going to show us the next document like
3  another attachment to this or some other thing to it,
4  right?  You're proffering this is a stand-alone --
5          MR. MURPHY:  Yeah.
6          MR. GREEVES:  -- sent e-mail from
7  Mr. Weidinger to Mr. Shafi?
8          MR. MURPHY:  Yeah.
9          MR. GREEVES:  All right.  Thank you.
10         THE WITNESS:  But typical to Shafi, he
11 didn't listen to me.  He contacted Braintech employees
12 anyways.
13 BY MR. MURPHY:
14     Q    Well, this was a big issue for you, was it
15 not?
16     A    Well, I -- I mean -- and I think if you
17 think about it, it should be.  I mean, I have a -- I
18 had a finite set of employees that had a lot of work
19 to get done and a lot to achieve.  And, at this point,
20 June 1, J.P., we didn't know where this transaction
21 was.  It sure -- it sure looked like it wasn't going
22 to be in the form of a partnership.  And I don't think

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

317

1 at this time Adil and I really have engaged in an
2 acquisition conversation.
3     So in my mind, this transaction was probably
4 dead at the time. And, yet, Adil was still taking it
5 upon himself to call every day my employees. And they
6 had jobs to do. And this was probably a result of Jim
7 Dara calling me saying uncle. Or Pete Manias calling
8 me and saying uncle.
9   Q  And the only --
10   A  Or Babak calling me and saying uncle.
11   Q  And the only information that you chose to
12 express to Mr. Shafi was the simple instruction, "do
13 not contact Braintech employees," true?
14   A  Well, what's the matter with that?
15   Q  I'm not --
16   A  I was having almost constant dialogue with
17 Adil Shafi myself, right? It was such a distraction
18 for myself.
19   Q  Listen, I'm not going to argue with you.
20   A  I'm just trying to answer your question.
21   Q  The question is --
22     MS. KOVAL: Let's not interrupt the witness.

318

1 I believe he was still in the midst of his answer
2 before you interrupted.
3 BY MR. MURPHY:
4   Q  The question is the only piece of that --
5   A  I've forgotten the question.
6   Q  The only piece of all of those issues that
7 you talked about, with all of the employees spending
8 time talking to Mr. Shafi, the only thing you put in
9 that e-mail was do not contact Braintech employees,
10 true?
11   A  I don't know. I don't know. Like I said --
12 like I just said, typically, I have dialogue below
13 that. It's very rare that I send out just a subject
14 heading. I mean I -- but even if that's the case,
15 what's wrong with that? I'm the CEO of a company
16 trying to protect my employees from continuing
17 badgeration of Adil Shafi.
18     And you keep shaking your head over there.
19 You can -- you can -- you can depose them.
20   Q  Why didn't you terminate the deal and walk
21 away?
22   A  That is a very, very good question.

319

1   Q  The fact is --
2   A  Very, very good. Because I -- because
3 Braintech needed Adil Shafi. I needed someone who
4 understood how to commercialize this technology. He
5 represented he could. He represented he was the
6 architect of this technology. I trusted him. I
7 believed that. I needed revenue from an installed
8 base that was already commercialized. I needed Shafi
9 pipeline. I needed Shafi customers. I needed Shafi
10 technology. And I needed a leader in my organization
11 who could commercialize and sell this technology. And
12 I thought it was him.
13   Q  What's the typical lead time in the vision
14 guided robotic software between a request for a quote
15 and a purchase order?
16   A  It depends on what application you're
17 talking about, J.P. If it's an application that
18 you've already done, then it's -- if you have the
19 software platform that you can scale -- which Reliabot
20 doesn't, and we can get into that tomorrow -- it
21 depends on what application you're talking about. And
22 if it -- it requires -- and whether it requires

320

1 another science project or not.
2     We found out from Reliabot that it does. In
3 our software, there's -- we have AccuTest and --
4 AccuCalibrate and AccuTrain. So there's some
5 platforms that you can scale and they repeat the same.
6 We didn't find that in Reliabot.
7   Q  During this time --
8   A  And I'm not saying this, but the -- the four
9 or five Ph.D.s that examined his technology a week
10 after -- or a month after closing, they discovered
11 this.
12   Q  During this time period, another of
13 Mr. Shafi's complaints was that he was spending all of
14 his time on developing the access and acceleration
15 agreement, and he was not devoting any time to Shafi,
16 Inc. business.
17     Do you recall him making that statement to
18 you?
19   A  I remember him saying that he was spending a
20 lot of time on this transaction, as we all were. And
21 that's why I was trying to protect my employees. I
22 was trying to insulate them from being subject to the

321

1  same, you know, crunching time.
2       I was okay with it, right?  I was spending
3  an inordinate -- inordinate amount of time on this
4  thing.  Over 6 months.  And I spent a lot of resources
5  trying to close this.
6       Q   Why was it that $1.6 million in enhanced egg
7  forecasted revenue didn't justify the partnership?
8       A   With his past experience and all the
9  applications and solutions he sold, and with us
10 ramping up our industrial side of our business coming
11 out from underneath our one channel partner agreement,
12 I thought, you know, one plus one equaled three.  And
13 to me three meant more than 1.65 for revenue for 2009.
14      Q   Essentially, when this deal did close, this
15 was a start-up business; true or false?
16      A   Well, that's one of the -- that was one of
17 our attractions to Adil.  I mean we were coming --
18 when I came to this company, it had one customer and
19 one channel, with no commercialization.
20      Q   And --
21      A   And then that terminated by its terms in
22 December of 2008.  And so I called it a restart.

322

1       Q   You have no issue with -- I mean restart or
2  start-up, that's really what was going on here?
3       A   Well, it was more than a start-up because we
4  also had 15 years of technology that we owned and the
5  company had spent historically over $20 million on
6  that technology, the eVF technology.  So it was a
7  little bit more than a start-up.  But that's why I
8  described it, J.P., as hitting the reset button.
9       Q   If you took away ABB revenue and you didn't
10 generate any other revenue, what was the expected life
11 expectancy of Braintech?
12      MR. GREEVES:  Objection.  It assumes facts,
13 and hypothetical.
14      THE WITNESS:  I -- I was hoping that it
15 would carry on, because we had two things.  We had a
16 government contract, and I had a group of supportive
17 shareholders.  The LC providers, if you will.  They
18 kept funding the company.
19 BY MR. MURPHY:
20      Q   If there were no other customers around
21 after ABB came to an end, the situation would be
22 terminal to Braintech, correct?

323

1       A   It -- it ended up that way.  It ended up to
2  be that way, yes.  At least Silicon Valley Bank
3  thought that.
4       Q   You knew, while you were negotiating these
5  various permutations of the deal with Mr. Shafi, of a
6  deal with Mr. Shafi, that if revenue didn't come in,
7  Braintech's existence would come to an end?
8       A   No, I didn't.  Like I said, I didn't expect
9  Braintech's existence to come to an end.  I had a very
10 supportive LC shareholder base.  I had a government
11 contract, right?  And I had every hope in Adil Shafi
12 and his pipeline and his technology and his
13 leadership.
14      MR. MURPHY:  I think this is probably a good
15 place to stop.
16      MR. GREEVES:  Okay.
17      Why don't we leave it on until we figure out
18 what we're going to do for tomorrow, so I have a
19 better understanding about that.
20      What's your plan?  I mean, when are you
21 available to come back tomorrow to finish?
22      MR. MURPHY:  What time do you guys want to

324

1  start?
2       THE WITNESS:  How much time do we have left?
3       MR. GREEVES:  Yeah.
4       MR. MURPHY:  3 hours.
5       MR. GREEVES:  Do you want to start at 9:00?
6       THE WITNESS:  Can we just finish tonight?
7       MR. MURPHY:  (Shaking head.)
8       THE WITNESS:  If I can talk her into
9  staying, will you?
10      MR. MURPHY:  No.
11      THE WITNESS:  Okay.
12      MR. GREEVES:  So tomorrow morning.  Is
13 Mr. Shafi going to be available to us tomorrow?
14      MR. MURPHY:  He will be here.
15      MR. GREEVES:  Okay.  I get this chameleonic
16 answer now three times.  When I get the third "he'll
17 be here," I have to ask, what reason would it be that
18 he would not be available to resume and complete his
19 own deposition tomorrow?
20      MR. MURPHY:  I haven't made a final decision
21 on that yet.  Our deal was if I needed extra time, we
22 would consider giving you extra time.

325

1      MR. GREEVES:  Is that what we said?
2      MR. MURPHY:  Yeah.  And I'll go back and
3  review the transcript.
4      MR. GREEVES:  I have it here.  Why don't we
5  do that before you leave for tonight.  Because if --
6  if your deal is going to change, my deal might change.
7  Since I have it here, we'll just take a look at it.
8      This is where we left it.  This is what you
9  said on the record, the last statement you made:
10  "It's my understanding that we've reached the point
11  where Mr. Greeves has to go due to timing
12  considerations, and I'm going to reserve any redirect
13  questions that I have of Mr. Shafi.  And if necessary,
14  we'll reconvene this deposition at a later date.  And
15  we have agreed to reasonable timing.  For example, if
16  I take a half an hour for redirect, we'll allow an
17  hour for recross.  We've also agreed that we might
18  make Mr. Weidinger's deposition subject to the same
19  sort of agreement.  That if I reach a point where I
20  get to 10 hours or so and I need a little more time,
21  we may revisit this agreement and impose the same
22  agreement on Mr. Weidinger."

326

1      And then we kind of said that's fine.
2      So I kind of had assumed that we were going
3  to have a little bit more time with your client
4  tomorrow.
5      MS. KOVAL:  Well, and I just want to add I
6  think that came after Mr. Shafi agreeing in his
7  deposition that he would return for additional
8  questions.
9      MR. GREEVES:  That's a good point.
10      So I mean, I'm happy to give you 3 hours
11  tomorrow, or frankly whatever you need.  But I feel
12  like in exchange for that, since Mr. Shafi is here,
13  either one of two things is going to happen.  We're
14  going to finish up with him tomorrow or you're going
15  to bring him back down here again and we're going to
16  finish up with him then.
17      MR. MURPHY:  I'm going to think about it.
18      MR. GREEVES:  Can you let me know tonight so
19  I can tell you what we're going to do tomorrow?
20      MR. MURPHY:  What are you going to do, not
21  produce Mr. Weidinger?
22      MR. GREEVES:  I'm going to think about it.

327

1      MR. MURPHY:  I'll be here at 9:00 a.m.
2      MR. GREEVES:  Okay.  Hopefully we'll hear
3  from you before then.
4      (Whereupon, at 6:00 p.m., the deposition of
5  FREDERICK WEIDINGER was adjourned to be
6  reconvened at 9:00 a.m. on Tuesday,
7  September 14, 2010.)
8              * * * * *

328

1           CERTIFICATE OF NOTARY PUBLIC
2      I, VICKY REINER, the officer before whom the
3  foregoing deposition was taken, do hereby certify that
4  the witness whose testimony appears in the foregoing
5  deposition was duly sworn by me; that the testimony of
6  said witness was taken by me in stenotypy and
7  thereafter reduced to typewriting under my direction;
8  that said deposition is a true record of the testimony
9  given by said witness; that I am neither counsel for,
10  related to, nor employed by and of the parties to the
11  action in which this deposition was taken; and,
12  further, that I am not a relative or employee of any
13  counsel or attorney employed by the parties hereto,
14  nor financially or otherwise interested in the outcome
15  of this action.
16
17
                    _____
18                  VICKY REINER
                Notary Public in and for the
19               Commonwealth of Virginia
20
  My commission expires:
21  December 31, 2011
  Registration No. 7117657
22

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010

329

1 A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3  I, FREDERICK WEIDINGER, do hereby acknowledge I
4  have read and examined the foregoing pages of
5  testimony, and the same is a true, correct and
6  complete transcription of the testimony given by me,
7  and any changes or corrections, if any, appear
8  in the attached errata sheet signed by me.
9
10
11
12
13
14
15
16
17
18  _____     _____
    Date              FREDERICK WEIDINGER
19
20
21
22

331

1  Capital Reporting Company
   1821 Jefferson Place, N.W.
2  Third Floor
   Washington, D.C. 20036
3  (202) 857-3376
4
5         E R R A T A   S H E E T
6  Case Name:  Braintech, Inc. vs. Shafi vs. Weidinger
7  Witness Name:  FREDERICK WEIDINGER
8  Deposition Date:  September 13, 2010
9  Page No.   Line No.      Change
10
11
12
13
14
15
16
17
18
19
20
21  _____     _____
22  Signature              Date

330

1  Geoffrey J. Greeves, Esq.
   Pillsbury Winthrop Shaw Pittman, LLP
2  2300 N Street, N.W.
   Washington, D.C. 20037
3
4  IN RE:  Braintech, Inc. vs. Shafi vs. Weidinger
5  Dear Mr. Greeves:
6      Enclosed please find your copy of the
7  deposition of FREDERICK WEIDINGER, along
8  with the original signature page.  As agreed, you
9  will be responsible for contacting the witness
10 regarding signature.
11     Within 21 days of receipt, please forward
12 errata sheet and original signed signature page to
13 counsel for Adil Shafi, James P. Murphy.
14     If you have any questions, please do not
15 hesitate to call.  Thank you.
16 Yours,
17
18
   Vicky Reiner, RMR, CRR
19 Reporter/Notary
20
   cc:  James P. Murphy, Esq.
21     Susan D. Koval, Esq.
22

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 1

| $ | |
|---|---|
| **$1** 69:4,22 | |

**$1.6** 321:6

**$100,000**
107:13,16 108:9
234:8 248:10,19
249:5 253:3,14
254:3,20
255:3,18
256:2,14
257:19,20,22
258:2 261:13
289:20
294:13,16,20

**$106,509.09** 94:7

**$135,000** 55:17

**$14** 13:20

**$145,000** 71:11

**$187.24** 97:9

**$2.5** 33:12

**$20** 322:5

**$20,000** 89:9

**$2-1/2** 33:8

**$218,000** 249:6

**$25,000** 79:11
124:13 141:16
204:15 205:7,15

**$250** 224:22

**$3.4** 48:9

**$4.6** 42:2 46:13

**$40** 16:20 17:3

**$43,949** 125:6

**$50,000** 72:9
84:3,6,11,16,20,
22 86:8 89:4
138:10,19
191:8,10 192:2

195:13
233:1,8,17,18
235:22 254:6
256:20 263:3,6
264:2 267:2
296:8 297:10,18

**$500** 175:6

**$544,000** 42:8

**$544,106** 44:3

**$550** 174:21
180:13 181:1

**$56,000** 56:14

**$60,000** 97:18
98:6,13

**$61,185** 124:1

**$7** 54:18

**$750,000** 34:8 35:5

**$900,000** 107:9
108:10 118:20
141:15 203:17
219:4

**$925,000** 141:19

**$947,434** 54:12

**$999,303** 70:11

| 0 | |
|---|---|

**08** 71:16 212:20,22
213:7

**09** 212:21 226:21

**09-10454** 1:6

| 1 | |
|---|---|

**1** 1:9 3:8
5:3,8,14,15,19
31:10 52:6,17
102:6 105:19
116:18,21
117:10 119:10

121:2 125:21
127:19 131:20
132:11 138:3
140:10 150:21
152:6,17,18
153:10 184:17
212:13 219:5
224:2 258:6
277:11 280:19
281:22
282:11,16 284:7
287:7,14,21
289:12 290:10
291:3,10
293:13,22
294:14 295:15
297:11 299:8
300:3,20 301:12
303:3 304:3
310:14 313:19
316:20

**1.5** 48:12

**1.55** 41:1,6,14

**1.65** 313:3 321:13

**1.85** 240:2 246:19

**1.a** 93:10

**1:45** 149:14

**1:58** 150:2

**10** 3:17,18 33:20
41:2,4
127:10,12,15,17
153:16
157:20,21
187:11,15 189:9
190:2 191:19
254:14,15 295:9
325:20

**10,500** 124:13

**10.5** 124:17

**10:00** 1:21

**10:32** 251:1

**100** 157:9 177:1
263:16 295:9

**100,000** 83:22
108:17 249:19
262:14 263:18

**10-K** 25:21 27:15
28:4,5

**10-Ks** 28:6

**11** 3:18 96:15,18
130:1 145:12
153:18 158:2
189:15,19,22
190:22
191:12,19
192:21,22
193:4,5

**11:36** 91:22

**11:43** 91:22

**110** 3:15

**12** 3:19 52:10 97:9
114:6,8 115:20
118:6 138:4
143:12
147:18,22
176:22 184:2,13
193:12,15
254:16,17 256:5
276:8 297:11,18

**12,500** 196:15
235:19

**12:11** 114:18

**12:13** 114:18

**12:57** 149:13

**124,000** 182:4

**12-month** 138:5

**12th** 71:21 78:9

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

Page 2

| | | | |
|---|---|---|---|
| 89:20 116:3 143:1,14 154:7 222:15 224:12 255:2,8,12 | **18-plus** 103:22 | **2.5** 36:11 41:5 | 92:17 94:6 115:20 116:3 118:6 124:4 |
| **13** 1:13 3:20 48:5 195:3,7,10 331:8 | **19** 4:6 66:1,11,20 67:1,17 71:19 72:5 188:10 193:18,22 223:6,10 226:10 230:18 | **2.a.i** 98:14 | 132:11 154:7 155:20 176:22 184:3,13 188:18 189:12 191:20 |
| **14** 3:21 150:21 196:19 197:1 203:2 327:7 | | **2:51** 196:12 | |
| | | **2:57** 196:12 | 196:15 197:5 198:13 207:12 |
| **15** 4:2 7:16 203:22 204:4 211:11,12 295:9 302:4,5 322:4 | **19,740** 89:4 | **20** 4:7 16:11 147:7 227:16 232:8,12 295:9 | 212:14 213:14 214:22 215:5,14,15 219:6,16 |
| | **1900** 2:8 | | 221:1,19 |
| | **193** 3:19 | **200** 2:3,4 16:6 17:13 228:14 | 228:7,11 230:8 231:18 232:14 |
| **150** 3:16 | **195** 3:20 | **200,000** 182:13,14 | 256:6 258:15 |
| **16** 4:3,12,13 207:5,9 208:2,12 | **196** 3:21 | **2000** 21:6 30:7 31:4 | 267:9 281:22 282:11 287:7,21 |
| **163-169** 3:5 | **1998** 277:15 | **2000s** 32:3 | 289:12 290:10 291:4,12 |
| **1650** 1:18 | **19th** 3:19 66:21,22 71:13 72:13 74:20 114:5 195:1 254:4 | **2001** 30:2 31:4 | 293:13,22 294:14 297:11 |
| **16th** 242:7,21 243:2 | | **2003** 21:7 | 300:20 301:12 304:3 321:22 |
| **17** 4:4,13 191:12,20 192:8 208:7 210:19 256:6,13 262:20 | _____ 2 _____ | **20036** 331:2 | |
| | **2** 3:9 7:13 10:10,18,20 15:4 20:14 31:9 36:13 43:8,13 44:13 54:8,9 56:11 57:7,11 58:5,8,10,14,22 69:9 97:12 105:20 112:1,9,12,13,15 113:22 114:21 119:15,18 120:6 121:3,22 123:17 127:19 140:10 150:19 152:15 153:10 219:5 246:2 247:21 248:1,2 258:7 280:19 282:16 299:16 | **20037** 2:14 330:2 | **2009** 36:21 39:6 40:6 41:16 42:1,8,12 44:2,20 45:10 46:5,13 48:9,21 49:6,15 70:17 148:19,22 209:21 221:20 225:19 312:18 321:13 |
| | | **2004** 21:7,17 | |
| **170,000** 183:9 | | **2005** 21:8,18 | |
| **1750** 161:8,10 | | **2006** 32:18 | |
| **17th** 189:12 242:21 256:6,11 258:3 | | **2007** 22:22 23:17 25:3,12 26:2 29:16 30:6 32:17 54:2,16,21 55:16 67:17 157:13,14 228:11 | |
| **18** 4:5 15:15,17 16:1 18:9 216:2,6,13 218:18 | | **2008** 3:21 4:8,9 5:3,8,14,15,19 21:21 22:14 25:15,19,21 26:9 27:15 28:2,10 42:3 46:4,9,12,22 48:12,20 49:6 52:10 56:5,14 66:20 67:1 71:19 72:8,13 75:2 79:9,22 80:8,16 | **2010** 1:13 44:11,22 45:1,3 49:15 327:7 331:8 |
| **1821** 331:1 | | | **2011** 328:21 |
| **187** 3:17 | | | **202** 2:14 331:3 |
| **189** 3:18 | | | **203** 4:2 |
| **18-month** 19:11 | **2.1** 13:16,17 | | |

# Capital Reporting Company
## Weidinger, Frederick - Volume I 09-13-2010
### Page 3

**207** 4:3

**208** 4:4

**21** 4:9,11 236:20 237:2,3,17 238:18,19 330:11

**216** 4:5

**218** 252:10,17

**22** 4:10 238:4,8,18 239:5,13 244:19

**223** 4:6

**223-1605** 2:9

**23** 4:12 132:15 241:17,21

**2300** 2:13 330:2

**232** 4:8

**236** 4:9

**238** 4:11

**23rd** 66:2,14 130:22 131:2 132:22 133:2

**24** 4:13 48:3 173:21 242:14,18 243:11 246:1 258:15

**241** 4:12

**242** 4:13

**245** 4:14

**249** 4:15

**25** 4:14 94:6 124:17 245:5,9,10 246:20 247:21,22 248:2 250:19 251:3

252:6,7

**250,000** 294:17

**259** 4:17

**25-plus** 180:1

**26** 4:15 92:17 204:19 249:22 250:4 252:4

**264** 4:19

**268** 4:20

**26th** 205:14

**27** 4:16 259:13,17

**274** 4:21

**279** 5:2

**28** 4:18,20 264:5,9 265:18

**281** 5:3

**282** 5:4

**284** 5:6

**285** 5:7

**286** 5:8

**29** 3:21 4:20 102:16 197:5 268:10,14

**292** 5:10

**297** 5:11

**298** 5:12

**29th** 275:4

**2-minute** 114:14

**2-year** 11:3 31:10 32:2

---

**3** 3:10 15:4 17:1 53:20 60:17,21 69:13,15,16,17

96:11 100:16 128:18,22 129:21 130:9 132:9 153:10 160:13,16 173:17,20 174:3 179:6 184:12 206:21 261:21 282:16 288:12,16 324:4 326:10

**3.11** 3:13 92:8

**3.20.3** 3:10 61:17

**3.5.1** 3:8 52:19

**3.9** 118:13 119:19

**3:40** 232:7

**30** 4:5,8,17,19,21 16:11 24:10,11 39:19 40:3 67:4 88:3 124:17,18 196:15 218:18 219:16 232:13 259:20 260:2,5 264:11,16 267:9 268:5 274:1,5,6

**30(b)(6** 3:16 149:4,5

**300** 5:14

**301** 5:15

**30th** 78:9 219:6 220:9 221:1 227:9 231:18 232:15 233:13,14

**31** 4:21 5:2 274:13 279:10,14 281:6 328:21

**311** 5:16

**312** 5:17

**313** 2:5,9 5:19

**32** 5:3,6 281:15,19 285:3 288:8,16,21 291:7 302:22 307:12 308:16

**33** 5:4 282:17,21 283:4,15

**34** 5:5 284:19,22 285:6 286:2

**35** 5:7 285:11,15,18 286:2

**35.5** 124:18

**350** 161:13

**36** 5:8,10 286:12,16,17 288:5,6 289:4 292:17,19 293:14,15 294:12

**37** 5:9 292:22 293:4,5

**38** 5:11 297:22 298:3,10 300:2,9

**39** 5:12 298:4,7 300:7,11

**3rd** 291:12

---

4

**4** 3:11 64:9,13 65:2,21 66:4 74:11,13 88:19 89:17 97:7 153:10 171:20,22 172:1 182:2,20 184:13 282:16 288:7,17

**4.6** 46:4

Capital Reporting Company
Weidinger,  Frederick - Volume I 09-13-2010
Page 4

**4:04** 232:7

**40** 5:13 188:17
300:14,18
307:6,7,11,13

**41** 5:15 301:8,11
305:15 311:15

**42** 5:16 23:19
311:8,12,13,19

**43** 5:17 23:20
312:8,12

**44** 5:18 313:14,18

**44,023** 183:19

**45** 39:19

**450** 36:15

**475** 36:15

**48** 256:22
305:13,14

**48207** 2:4

**48226** 2:9

**4th** 44:11

_____ 5 _____

**5** 3:12 88:5,9,13
89:3,18 97:11
134:10,11,20
136:6,10 153:10
154:4 267:1
282:16 291:10
302:9

**5:26** 299:19

**5:31** 299:19

**50** 24:19,21 88:19
89:11 262:14
263:16,17,20,21
295:9

**50,000** 83:20,21
85:6,7 86:13,17

87:7 153:21
193:1 194:5
260:13

**500** 21:8

**500,000** 46:4,14
47:18

**52** 3:8

**535** 2:8

**544** 44:4 45:13

**550** 175:9

**567-5921** 2:5

**57** 3:9

**570** 36:17

**5th** 44:11 254:7
263:4 268:9
290:17

_____ 6 _____

**6** 3:3,13 18:19,22
20:15 80:16
92:1,6,8 96:3
133:21 137:21
138:4 153:11
155:3,4 228:11
277:15 321:4

**6.3** 101:4 102:1,2
115:8

**6/1/2008** 130:16,20

**6:00** 18:20 327:4

**6:30** 18:20

**6:45** 250:22

**60** 3:10 40:2

**60,000** 98:9

**600,000** 228:12

**64** 3:11

**663-9228** 2:14

**6-month** 230:8

**6-months** 19:4

_____ 7 _____

**7** 3:14 56:22
99:3,7,12,13
100:1 102:15
103:6 105:5,15
106:7 107:1,8
108:22 109:3,7
110:1,5,15
139:2,5 140:7
142:3,21
148:19,22
153:12 155:9
208:12

**7,500** 88:19

**7.2.9(a** 3:12
88:9,16

**7117657** 328:21

**74,500** 173:5
174:11

**74.5** 174:17

**750** 33:15 41:6

**750,000** 33:16
294:16

_____ 8 _____

**8** 3:15 4:9
110:16,19,20,22
111:3 114:21
116:3 119:18
122:1 123:18
153:13 155:16
171:22 174:2
237:8 238:9

**8(a** 221:18

**8/12/2008** 117:1

**80** 177:2

**8-1/2** 129:22

**85** 10:6

**857-3376** 331:3

**86** 10:4,9

**87** 10:4

**88** 3:12

**8-K** 44:10

_____ 9 _____

**9** 3:16 143:15,16
150:3,14 153:15
156:18,21
289:18 294:12

**9:00** 324:5 327:1,6

**90** 40:2 280:21

**900,000** 108:3,17

**92** 3:13 12:13

**96** 12:2

**99** 3:14 14:20
20:13 25:15

**9b** 296:7

_____ A _____

**A&A** 220:15

**a.m** 1:21 91:22
250:22 327:1,6

**A1** 21:9,18,19
22:1,3

**A1GP** 21:11

**ABB** 25:12,15,18
46:7,8,11,21
47:4 214:10
215:9,20 217:16
322:9,21

**ability** 199:22
224:15 230:1

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010

Page 5

231:14

**able** 72:7 75:20
137:18 141:7
151:20 199:15
249:2 279:7,8

**absolutely** 78:18
114:15 181:9
229:22 256:18

**absorbing**
273:12,14

**accelerate** 75:21
141:9

**acceleration**
51:7,9,18,19
74:16,19 75:9,12
76:1,6,14 77:2
78:15 81:2
141:10
143:18,21
144:9,12,21,22
145:13 146:11
153:14 199:17
203:20 220:7
224:13 242:6,9
252:16 296:9
297:20 314:19
320:14

**acceptable** 257:21
290:10,13,19
291:1,19,22
304:7

**accepted**
101:2,6,17,22
102:14 103:6,9
106:4,6,10,22
107:5,9 108:10
109:1,8,19 110:4
118:20 119:4
120:14 175:8
264:1 267:1

**access**

51:7,9,18,19
52:2 74:15,19
75:9,12,14,20
76:1,6,14 77:1
78:15,18 81:2
136:16,18
137:1,4,6,9
141:7,9
143:18,21
144:9,11,20,22
145:13 146:10
153:14 199:17
203:20 220:7
224:13 242:6,8
252:16 276:9
296:9 297:19
314:19 320:14

**accessing** 75:19

**accompanying**
43:9

**accomplish** 273:11

**account** 72:10
84:22 85:8,11
229:21

**accountant** 53:13
83:3

**accountants** 45:18
187:5

**accountant's** 56:5
81:10

**accounted** 228:16

**accounting** 14:15
55:11,12 81:3
87:7 113:10
191:7 192:22
193:8

**accounts** 81:10
179:14 186:15
187:1 229:20
230:3

**AccuCalibrate**
320:4

**accurate** 26:6
41:17
42:3,6,9,11
46:16 57:18
65:13 78:4 97:1
103:7 107:14
108:13 197:5
312:18

**accurately** 70:3,8
94:8 179:11
221:21 266:1,10
270:5 273:7
291:13,17

**AccuTest** 320:3

**AccuTrain** 320:4

**achieve** 210:15
316:19

**achievement** 24:5
209:12 252:15

**achievements**
25:10

**Achieving** 252:22

**acknowledge**
250:17 329:3

**acquire** 64:16
69:20

**acquired** 11:5 12:5
20:11 57:19
58:13 60:9
136:12

**acquiring** 12:21
13:1 75:16

**acquisition** 13:11
19:16 26:12
49:21 50:12,16
51:12,17 60:22
61:14 71:15

131:10 132:3
134:16 143:14
154:21 212:2
213:12 214:4,12
220:3 224:2
225:4 240:21
246:12,15 256:3
258:1 276:19
290:3 296:6
317:2

**acquisitions** 11:16

**across** 73:12

**action** 181:4
214:21
328:11,15

**activities** 7:21
30:20 77:19

**activity** 32:18
77:10 78:4 98:10

**acts** 264:2

**actual** 50:11
186:22

**actually** 7:9 8:7
14:20 24:6,12
26:11 33:21
38:9,11 43:14
44:19 45:8 50:14
55:17 65:12
70:13 78:11 82:6
84:5 85:5 87:6
88:10 90:9 95:19
101:19 107:12
112:15 116:5
117:9 119:20
126:15,20
127:21 135:14
136:5 141:20
142:22 146:16
147:6,8 187:5
195:10 202:16
214:3 234:15

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 6

261:15 268:17
273:13 280:13
288:9,11 298:16

**actuals** 80:2

**add** 122:9 326:5

**adding** 124:19

**addition** 58:21

**additional** 29:13
33:19 35:12
40:15 326:7

**address**
197:8,11,12,13
218:11 232:16
250:8,12,14,15

**addressed** 232:13
269:2

**addresses** 244:5

**addressing** 218:14

**adds** 57:1

**Adil** 1:6,16 2:17
3:3,17
4:5,6,7,9,15,17,20
5:3,8,13,15,18,21
6:6 26:16 29:3
51:6 67:8
76:11,18 77:11
86:14 91:2 94:5
107:20 109:4
113:20 122:15
126:4,6,9,10
127:2 131:5
136:15,21
137:13
140:12,19
144:1,10,14
145:4 146:9
147:4,21 148:10
150:9 154:14,17
155:1 157:8

175:15 178:20
181:18 192:2,16
193:1 195:13
196:8 202:14,20
204:22 205:10
206:4 207:12
208:6 210:10,14
215:1 220:5
225:15 226:13
228:4 232:13
235:2,11,19
236:6 240:4
242:3 243:9
248:13 250:6
254:8 255:3
256:20 257:1,18
259:5 263:8,21
265:10,13,17
266:5 270:21
271:9 273:12
276:6 278:19
283:14 285:8
286:9 297:1
301:17 302:14
304:5
307:10,15,16,18
308:8,12,18
312:4,6
317:1,4,17
318:17 319:3
321:17 323:11
330:13

**Adil's** 6:14 60:7
62:22 85:14,21
127:6 136:15
137:4 225:14
308:1,3,17

**adjourned** 327:5

**administration**
8:16

**administrative**
48:5 226:15

**administrator**
225:13 226:18
230:1

**admitted** 228:22

**advance** 72:9
196:16 233:8

**afloat** 90:20

**AFTERNOON**
150:1

**against** 7:12,21,22
22:18 93:2,17
98:12 105:9
119:2 160:11
170:5 177:3,8
178:20 179:2

**agent** 149:3

**ago** 7:15,16 138:16
227:16 261:21

**agreed** 72:9 96:22
118:19 155:1
181:8 233:20
240:19 258:1
261:3,8 277:4
291:1,10 292:1,6
295:7,15 296:11
297:14 305:8
306:12
325:15,17 330:8

**agreed-to** 295:13

**agreeing** 289:22
326:6

**agreement** 3:9
39:21 52:13,15
57:12 64:22
65:7,14,22
66:11,14 76:1,7
94:5 97:8 100:17
102:7 103:11,19
106:13 116:7
119:8 143:18

147:12 152:18
170:19,21 171:1
179:18 181:20
185:22 220:7
231:13 233:13
240:2 241:13
255:16
276:13,16 277:1
278:4,7,9,16,18
280:16 284:14
309:4 311:4,5
320:15 321:11
325:19,21,22

**agreements** 104:1
230:15

**ahead** 35:19
59:4,19 69:7
81:5 98:1 108:2
119:22 139:8
151:10 152:5
225:12 304:9

**ahold** 218:9

**ain't** 221:5

**Alexander** 95:8

**allow** 141:17
202:14 325:16

**allowed** 127:19
137:10 276:6

**allows** 139:22

**already** 79:7 91:17
107:13,17
192:10 200:10
214:10 220:6
225:20 229:7
242:8 243:1
257:1 263:22
275:4 303:10
319:8,18

**alternative** 38:14

**am** 124:22 131:14

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 7

171:13 191:2
227:13 228:3
230:22 232:4
328:9,12

**America** 34:20
35:2

**Ameristar**
67:2,4,6,16
188:10

**among** 27:13,14
288:7

**amount** 34:8 35:4
36:4,9 41:5 44:3
86:7 94:16
108:11 124:16
173:4 184:11,22
185:13
263:13,14 321:3

**amounts** 73:16
179:15 182:15
260:12

**and/or** 193:20
210:10

**Andreas** 73:10

**Andretti** 22:15

**Anne** 149:10

**annual** 42:1

**answer** 6:22 24:15
27:21 47:7 48:14
50:4 59:4 62:15
64:5,6 65:16
67:13 70:20
87:19 90:22
94:14 103:8
107:4,7 108:5,19
109:11,14,18
115:15 122:9
124:12 131:17
142:15 152:5
153:2 170:7

173:11 176:7,20
181:12 183:12
184:8 185:6
186:11
188:15,21
194:19 200:7
212:8 225:12
229:8 247:11
255:1 257:8
264:12
267:5,13,16
304:9 317:20
318:1 324:16

**answered** 88:4
109:10 119:6
120:17 186:20
192:10 243:1
266:3

**answering** 181:17
246:16 258:11

**answers** 218:6
302:1

**anybody** 37:15
51:14 200:13
202:22 218:10
266:2 288:5
293:9

**anybody's** 107:18

**anyone** 140:12

**anything** 58:4
109:7 122:9
142:18 199:3
224:4 227:10
233:14,21 261:8
267:15 271:11
305:10 306:4
316:1

**anytime** 213:1

**anyway** 279:5

**anyways** 316:12

**anywhere** 100:14
160:13 276:16

**apart** 260:14
266:20

**apologize** 68:19
111:7 271:14,16
274:9 279:21
280:3 305:5

**apologizing** 280:1

**appear** 42:9 73:16
99:13 125:13
135:9,17 232:22
233:7 329:7

**appears** 73:19
134:19 150:18
173:4 197:2
223:22 237:9
243:12 260:3
268:14,16
274:21
300:5,8,22
311:21 328:4

**application** 225:21
226:22 244:3
319:16,17,21

**applications** 321:9

**appointment** 26:1

**appreciate** 289:6

**appropriate**
155:16
197:13,17,19
200:3 208:21
221:18 278:7
303:9

**approval**
175:18,20
227:11

**approve** 121:19
231:1

**approved** 178:7
303:10

**approving** 121:4

**approximate** 32:1

**approximately**
7:15 33:11 36:16
60:12

**April** 4:9,12 71:16
79:18 237:8
238:9,10 239:4
240:15 242:7
243:2 252:1
256:6,11,13
258:3,15 262:20
263:12

**Aptura** 124:16

**architect** 277:11
319:6

**area** 13:10 209:14

**areas** 248:21

**aren't** 211:2
289:21 291:22

**argue** 227:22
228:1 257:7,13
317:19

**arguing** 257:8

**argument** 257:11

**argumentative**
47:6 80:18

**arrangement** 36:1
41:3 132:13
138:22 177:9
180:22 231:5
234:12 258:7
296:4 297:14
304:17 306:8,16

**arrangements**
34:11 180:6

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 8

**articulate** 122:20
126:12 295:1
305:4

**articulated** 209:18

**articulating**
122:14

**ascertaining** 262:7

**aside** 137:22

**aspect** 105:19
106:17 154:15
212:14 263:11

**aspects** 285:9

**assets** 38:1
57:14,19
58:13,21
59:10,15,16
90:14 162:1
171:2,3
175:16,20
177:11 178:7
181:6 201:15

**assigned** 184:1
227:1

**assignment** 17:21

**assistant** 226:15

**associated** 21:2
71:8 77:20 81:7
90:5 91:12 92:7
104:13,18
106:15
114:11,21
115:5,7 116:14
117:1 120:22
125:16 147:15
156:10 160:7
177:14 283:4
290:18

**Associates** 92:15

**association**

21:12,15,19 30:5
32:16 136:15

**assume** 6:22 46:19
69:4 71:12 91:16
104:5,7 159:2
200:22 205:3
236:15 260:4
291:14,17
303:10

**assumed** 91:2
210:10 326:2

**assumes** 64:4 76:9
134:21 139:9
159:9 176:6
191:14 213:20
226:12 236:3
322:12

**assuming** 46:16
69:10 119:18
174:13 183:18
200:16 292:4
297:16,19 302:9
311:1

**assumption** 16:9
17:13 119:21
135:14,22
209:16 211:8
212:12

**assumptions**
135:4,12 208:17
210:3,19,21
211:9 212:4
301:22 302:6

**attach** 238:3

**attached** 56:18
57:5,16 62:13
68:12 70:1,14
72:1 92:9,14
93:4 110:1
114:12
115:1,9,10 116:2

172:11 173:10
174:13 183:19
208:11
238:11,15,18
239:6,7 247:8
282:13 288:7
289:4 291:19
301:13,15,17
310:17 329:8

**attaching**
237:11,14

**attachment** 3:18
4:10 5:5,15 61:8
66:13 89:19 96:8
189:8,22
191:12,19 192:9
238:17 239:10
243:12,15
244:13,16,18
245:1,2,11 285:3
316:3

**attachments** 282:5

**attack** 146:10

**attempted** 118:21

**attempting** 294:4

**attend** 204:19

**attended** 146:16
205:14

**attending** 18:15

**attention** 33:5
172:4 220:3

**attorney** 5:21
44:19 63:7 186:4
264:22 328:13

**attorneys** 103:16
180:5

**attorney's** 82:21

**attracted** 29:3

147:5

**attractions** 321:17

**attractive** 147:5

**attributable** 46:11

**attributed** 225:22

**auctioned** 171:2
201:16

**audit** 45:19

**auditors**
28:7,13,18 45:18

**August** 52:10
71:15,21 72:19
74:2 75:2 78:9
89:20 114:6,8
115:20 116:3
118:6 124:1,4
143:1,12,14
148:19,21,22
154:7 174:20
176:22
184:2,7,13
222:15 224:12
254:16,17
255:2,8,9,12
256:5,10 276:8

**author** 5:9 112:22
113:5 139:15
144:1 182:22
210:22 211:11
222:5 239:19
247:2,16
249:9,10 285:19
293:7 302:12,13
311:22

**authored** 140:9
142:6 143:7
286:2

**authority** 219:11
227:10,11 231:1

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 9

Auto 79:4
Automation 97:4
autumn 226:21
availability 231:14
available 217:11
218:1 323:21
324:13,18
awarded 33:19,20
34:1 208:22
aware 56:16 82:12
83:7,11 85:17
90:7,9 95:20
96:1 97:17
98:6,20 153:21
180:4 183:22
186:22 204:14
205:15 207:2
230:15
away 55:12 138:17
206:21,22
266:13,15,18
267:9,17,19
272:18 318:21
322:9
awesome
270:2,9,11 271:5
272:16
awkward 314:7

**— B —**

B.C 23:9 184:20
Babak 26:15,19
51:1 147:20
148:10 155:7
170:6,17 218:16
265:10,13
267:14 270:18
271:9 273:21
283:14 285:8

286:8,10 317:10
B-A-B-A-K 43:6
Babak's 43:6
272:20 273:13
B-A-B-B-A-K
27:3
background 16:15
242:3 243:3
backstop
33:1,14,18,21
34:3 41:3
backstopped 33:9
backstopping
40:19
bad 250:9 264:2
badgeration
318:17
badgered 314:12
baffled 234:1
balance 55:13
ballpark 16:12
bank 33:10
34:4,20 35:2,11
36:7,10,20
37:6,16,20
38:11,19,22
40:11,14,20
41:11 62:2 72:9
84:22 85:8,11
93:14,17 154:1,2
161:3 175:8
177:17 179:8,14
180:14,22
181:3,11 229:20
323:2
banker 15:2 195:8
bankers 13:18
banking 35:1

38:16 40:7 41:3
banks 34:22
38:5,8 40:10,13
base 52:2 75:19
76:18 78:19
79:16 81:1 141:7
147:10 224:22
226:5 307:18
308:19 319:8
323:10
based 24:5 57:3
71:12 119:21
127:4 131:21
134:14 224:15
231:13 233:19
234:16 235:1
238:20 252:15
254:7,11 256:20
261:8 263:4,20
273:17 276:10
277:15 297:13
300:7 305:20
basement 58:18
59:8,13 276:7
basically 22:14
41:6 51:10,19
100:21
basis 142:22
145:8,9 152:4
207:13 254:9
299:8 300:3
bathroom 114:14
299:16
bearing 248:8
beaten 122:10
Beaudoin 202:8
226:22
became 14:5
18:2,4 20:11
22:22 23:19 25:3

30:8 31:4 51:19
62:3 83:11 85:16
131:21 176:21
222:13 230:15
Beckhoff 97:4
become 18:17,18
30:22 86:2 90:7
becoming 288:4
begin 79:8
beginning 1:21
30:5 44:15
55:7,16 152:17
174:19 264:16
265:17 280:9
begins 248:5
behalf 1:22
2:2,7,12 218:14
behind 74:6 92:11
178:9 210:3
belabor 179:5
believe 9:18
10:2,4,10 21:17
31:9 36:12 42:14
52:11 63:15,16
84:1 86:4 91:15
101:4 108:4
113:18 126:14
131:9 134:17
143:7 152:7
155:7 158:3
173:7 174:9
177:1 183:10
186:6 190:11
195:2 204:15
206:2,10,15
215:21
239:13,18
244:15 301:14
318:1
believed 222:1

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 10

295:15 319:7

belt 49:10

beneficial 246:13
258:9

benefits 48:9,20

Bernie 13:8

Bernie's 13:9

Berry 2:8

besides 40:10
152:8

best 31:11 38:3
72:18 153:2,8
184:17 190:9
220:2 270:13
271:15 275:22
288:7 297:7

better 26:4 27:4
76:10 77:17
151:2 153:15
271:7 272:12
323:19

beyond 29:12 62:1
102:15 107:20
205:7

bigger 271:9,10

billion 13:20

binder 111:17
117:16 119:19

binding 253:7,8,11

bio 242:4

bit 14:11 51:8
78:20 196:7
322:7 326:3

blacked-out 282:3

blank 218:6

blew 63:21

blue 234:2 261:10
280:7 281:10

blueprint 51:10,20
52:1

board 15:3,16
17:11 23:14
29:19,20,22
30:4,5,13,17,19
31:1,5,7,22 32:3
33:20 34:1
121:4,8,13,18
127:2 147:3,6

Boca 51:2 154:11
155:7 218:16

bold 94:4

bolded 76:20
96:21

bomb 176:19

bona 200:21

bonding 126:11

booked 80:8 187:1

boot 146:6

botch 21:6

botched 305:5

bothered 84:19

bottom 54:5
55:6,20 56:11
71:10 120:8
123:20 135:5
265:17 284:6
301:21

Boulevard 1:18

box 112:21 240:1
293:6

boy 81:18 173:14
190:13

bracketed 125:11

Bradbury 13:7

Brain 314:5

Braintech 1:3 3:11
23:1,3,5,15,16
24:6,14
25:10,13,16
27:6,17 28:11,14
29:4,20,22 32:9
34:1 35:6,8
36:12 38:13
40:16 41:14,17
44:10,21 47:2
49:5,20 50:15
51:13 63:4,7
64:20 69:4,10,20
70:5 75:15 82:12
83:6
101:2,4,6,17,21
102:14,19
103:6,9 104:3,5
106:6,10,22
107:5,8 108:10
109:1,8 110:4
113:10 118:20
119:4 120:14
126:19 130:1
132:20 138:2,11
139:4 140:20
142:10 148:20
149:2 151:12
154:1,2,9,15
156:4,5,6,7
157:5,11 158:11
159:5,14,18
160:15
161:3,4,6,17
162:1 170:22
171:4,15,17
174:18 175:8
176:4,21 179:18
181:10 186:1
197:4,8,18
201:4,11,12

202:9,12 209:13
217:11 218:15
221:10 222:3
223:20 224:19
227:9 238:21
245:12 246:2
251:15 268:7
269:6 270:16
273:6,11 285:21
296:8 297:10,17
301:4 307:19
311:21 313:22
314:5 315:2,11
316:11 317:13
318:9 319:3
322:11,22 330:4
331:6

Braintech.com
269:2

Braintech's
207:19 323:7,9

brand 21:10

brand-new 132:2

break 44:16 91:20
92:5 114:14
149:12 196:5,10
232:3

break-even 16:21

breaking 274:22
275:1

Brighton
59:11,13,16
60:5,8

bring 147:6 176:3
236:15 326:15

broke 99:9 150:17

brought 22:15
40:22 112:20
157:8 217:20

Capital Reporting Company
Weidinger,  Frederick - Volume I 09-13-2010
Page 11

BT 69:10
build 213:3
building 213:8
bullet 235:18
  280:8
bullish 205:10
bunch 71:3 77:4
burned 67:9 188:6
burning 118:9
Burr 225:9,13
Burwell 2:3
business 8:16
  14:12 18:7 22:11
  26:3 27:17 29:18
  31:19,21,22
  37:22 39:3 75:21
  85:9 86:18 91:6
  107:18 109:9
  112:3 134:2
  139:1 141:9
  156:17 161:2,16
  171:3,9 194:6
  206:7 219:9,10
  221:1,8,12
  222:2,9,10,13,14
  223:18 224:3,14
  234:22 236:6
  241:10 271:4
  272:16 283:16
  291:11 295:13
  320:16
  321:10,15
businesses
  270:2,9,11
businessman
  180:1
busy 185:5 314:10
button 268:22

322:8
buy 306:17
buyer 16:3 17:22
  103:20,22
buyer's 186:7
buying 17:4

———————
C
calendar 20:9
  54:15,21 80:8
  87:15 146:18
  204:20 205:13
  241:4
Canada 33:10
  34:5 36:7 38:1,4
  41:11 154:1
capable 185:4
capital 1:19 225:1
  331:1
caps 313:21
captioned 96:11
  97:12
car 20:21
care 80:15 222:9
  238:20
cared 80:14
careful 120:20
  210:18 222:20
carefully 110:12
  254:8
carry 257:17
  322:15
cars 21:5,8
case 1:5 7:14 39:3
  93:14 94:18,21
  95:3 111:20
  195:12 295:8

318:14 331:6
cash 55:4,6,7,17
  224:15
  231:13,14 234:8
  240:2,6 246:19
  248:10
  249:13,16,18
  252:13,14,15
  254:3,20 256:14
  257:19,20
  261:13
Casino 67:2,4,7,16
catch 278:12
cause 102:19
caused 16:1
  181:10
cc 330:20
ceiling 107:10,12
  118:22
Centre 2:3
CEO 9:19 11:20
  15:20 18:15 20:1
  22:22 23:3
  25:3,10 30:22
  82:12 134:7
  149:1 171:11
  227:9 318:15
certain 7:22 22:19
  61:1,15,18 62:7
  82:15 86:15
  91:16 133:12
  134:5 193:6
  205:19 256:20
  279:2 284:12
certainly 63:21
  65:17 68:18
  143:13 212:3
  276:19
CERTIFICATE

328:1
certify 328:3
cetera 73:13 258:6
CFO 11:5 83:2
  113:14 158:15
chairman 9:19
  11:20 12:11 14:5
chalk 127:2
chameleonic
  324:15
chance 26:18
  251:1
change 46:21
  253:22 265:19
  266:6 296:22
  297:4 325:6
  331:9
changed 15:8,12
  50:9 71:13 72:20
  76:19 186:12
  220:12 263:21
  264:1 275:18
  298:22
changes 75:1
  329:7
changing 69:9
  118:16 257:2
channel 29:8 46:7
  273:4 280:11
  321:11,19
charge 11:15,16
chart 5:4 282:21
  283:4,6
check 16:11 24:21
  36:18 37:3 63:1
  64:7 73:13 79:11
  87:15 104:11
  146:17 201:3

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 12

205:13 206:12
213:6 215:6,17
233:11 241:4

**checked** 160:21

**checks** 260:22

**chest** 242:12

**chief** 9:18 17:10
26:1 27:9 76:3
83:3 140:22
141:1,3 157:2
158:10 184:9
217:22 226:2,3

**choice** 173:21
271:15

**chose** 10:3 41:2
317:11

**Chrysler** 202:7

**chuckling** 263:19

**circulated** 239:16

**circulating** 230:20

**claim** 91:13 97:17

**claims** 96:12,16
97:13 98:21
182:3,5

**class** 29:4

**clause** 278:5

**clear** 40:4 132:7
153:1 178:14
236:5,11 240:5
260:8 261:19
288:3 290:17
296:18

**cleared** 137:2,3

**clearly** 79:15
121:21 122:1
209:18 214:1
254:9 256:22
267:19 287:17

310:9

**clerk** 179:14

**click** 113:4 129:3
250:10

**clicked** 112:19
311:18

**client** 85:21 267:3
326:3

**clients** 146:11
226:17

**clipped** 243:14

**close** 36:22 61:20
62:8,11,18 63:3
78:9 136:14
157:12 178:13
224:12 229:18
276:3 321:5,14

**closed** 14:5 19:18
56:17 57:3 71:14
72:22 74:1 78:16
80:21 87:14
127:18 137:2,7,8
158:7 212:3
254:14
255:7,9,12 256:7
276:5,8 279:5
314:6

**closely** 17:11
145:1 314:17

**closing** 3:8 5:11
52:9,21
53:2,5,18
56:3,19 59:14
60:13 62:3 63:22
64:18
68:1,4,7,8,9,12,1
6 71:21,22
72:1,19 78:19
81:7 86:2
87:10,19,20

88:11 89:19
90:2,5 91:12
92:7,10 93:1,4
94:1 96:8 97:19
98:7,21
104:19,20 105:8
111:17 114:8
116:2,4
117:5,10,15
118:5,10,13,17
119:19 125:15
127:20,21
128:12,13,15,16
130:2,8,20
131:7,20
132:8,14,21
137:20
140:14,18
141:12 142:22
143:11,14
153:19 160:19
172:9,10
173:8,10
174:10,14,15
175:14,22
177:14 180:5
183:11,19
185:16 186:15
187:2 199:20
200:5,14,19
202:18 203:14
204:18 205:2,20
222:22
275:18,20 277:5
279:7 294:17
298:12,18 299:7
300:2,5 320:10

**clueless** 288:4

**code** 58:19 278:22

**COGS** 120:10

**coherent** 294:6

**coin** 47:1

**coincided** 214:5

**co-leads** 37:12

**collateral** 34:15

**colleague** 37:21

**collect** 142:1

**collecting** 230:4

**collection** 179:15

**college** 8:9 9:9

**color** 214:1

**column** 71:6,7
73:8 77:5 78:11
82:6,16 123:20
145:16 172:21

**columns** 77:8,14

**combination** 78:5
222:19 224:19
270:2,9,11
271:5,8 272:17
283:17

**combined**
51:11,20 80:22
182:13 205:20
206:8 207:22
218:20 219:1
225:8 230:21
231:11

**Comerica** 62:2
63:21 173:5
174:5,10,16
175:8,17
176:5,14,16,18
177:3,6,17
178:4,7,12,19
179:19
180:14,22
181:11,20

**comes** 293:6

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 13

298:15

**coming** 79:17
105:13 106:7
107:1 120:15
160:11 176:15
228:6 237:21,22
321:10,17

**command** 315:1

**comment** 16:16
273:12,13
314:14

**comments** 134:14
264:3 275:8
292:12,13

**Commercial** 280:8

**commercialization**
321:19

**commercialize**
28:20,22
29:6,9,12 51:14
147:8 319:4,11

**commercialized**
319:8

**commercializing**
47:3

**commission** 27:16
328:20

**commit** 291:3

**committed** 253:13

**committee** 45:19

**Commonwealth**
1:20 328:19

**communicate**
154:14,16

**communicated**
75:12 207:18

**communicating**

207:13 266:17

**communication**
190:18

**communications**
9:22 11:7,10
15:8,13 18:5
153:18 273:18
274:20

**commute** 207:4

**commuting**
19:6,11

**companies** 38:9
51:11

**company**
7:10,11,14
9:21,22 10:19
11:5,7,20
12:12,21,22 13:1
15:3,6
16:2,19,20 17:3
20:12 22:1,4,6
27:6,10 28:6
30:8,22 32:10
33:19 36:5 42:2
44:2 45:15 49:18
75:16 81:1 90:11
95:4 101:8 113:1
127:12 134:7
136:7 147:6
170:18,20 178:7
228:5 231:2
318:15 321:18
322:5,18 331:1

**company's** 26:4
162:4

**compensation**
13:15 49:5,11,13
248:22 252:22
255:11

**compiling** 187:5

**compilation** 3:15
4:13 112:4,6
242:20

**complaints** 320:13

**complete**
65:12,16,18
68:2,15 70:7
117:9 195:14
282:2 324:18
329:6

**completed** 78:5
261:19

**completely** 20:11
224:10
290:21,22

**complex** 282:22

**complicated**
131:22 220:1
294:3 295:3,6
306:10 309:1

**complicating**
271:2

**component**
108:8,10,11
234:8 240:1
246:19 248:10
249:14 254:3,20

**components** 108:7
249:18

**comport** 45:10

**compromise** 266:8

**computer** 201:9

**concern** 27:17
28:11,13 84:5,8
134:8 221:13

**concerned** 60:10
220:18 261:5

**concerning** 84:10

158:2

**concerns** 28:17

**concluded** 93:11
131:4

**conclusively** 108:6

**concrete** 122:11

**condition** 110:3
119:3 121:17
178:12,17
209:16

**conditional**
109:1,8 120:15

**conditioned** 106:7
107:1

**conditions** 35:7
233:20 234:15
256:21
263:1,10,14,20
289:22 290:19

**conference** 126:22
211:21

**confidence** 202:17

**confident** 117:16

**confidential** 3:5
162:8 170:3

**confirm** 46:15
47:21 94:13

**confirmed** 257:1

**confused** 232:21
246:10 270:20
292:14 304:20

**confusing** 110:21
111:7 283:1

**confusion** 66:4
195:22

**connect** 103:1

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 14

connected 198:16

connecting 35:9

connection 5:11
13:11 64:21
121:13 128:10
298:13

consensus 127:5
206:19

consent 8:1 22:18
61:19 62:7,11,13
64:2 92:20 93:6
177:10
178:3,13,15
179:17 181:8

consenting 177:16

consents
61:1,15,17 62:16
63:2,13,17
177:15

consider 23:5
155:16 295:21
297:21 324:22

consideration
255:19 289:19

considerations
325:12

considered 251:4
255:19

consistent 88:18
254:4

consolidated
44:12

constant 35:5
317:16

constantly 118:16
288:2 314:12

construct 299:11

consultant 156:6

consulting
170:19,21 174:2

contact 26:14
62:21 63:18
158:4,6,18 179:9
199:16
200:12,13
202:13 203:1
313:22 314:5
315:1,10 317:13
318:9

contacted 15:2
23:4 30:21
200:10,11
316:11

contacting 37:16
330:9

contacts 171:15

contain 129:1

contains 65:21
66:10 145:1,12
278:4

contemplating
294:20

content 140:11
143:8 211:13
302:13 312:4

contents 139:16

Continental 18:21

continually 287:11

continue 14:3
28:11 70:17
296:6 315:3

continued 150:9
314:20,22

continuing 139:11
140:3 179:9
275:9 296:10

297:19 318:16

continuous 8:17
133:10

continuously
15:16 142:3,9
298:21

contract 22:11,16
25:5,18 29:10
38:3 42:22
46:8,22
47:5,12,15
141:16 209:1
322:16 323:11

contracts 42:13
208:20

contributed
225:22

contribution
136:12

contributions
212:9

control 24:19 45:9
213:10

conversation
113:20 180:18
195:16 247:17
317:2

conversations 17:1
131:5 132:2
133:21 138:12
143:3 154:9,12
185:14 220:13
239:21 240:21
252:2 276:18
313:11 315:5

COO 155:12
216:15 217:10

cool 279:22

copied 199:7

copies 173:16
220:7

copy 42:19 59:22
60:8 65:13
66:2,10,17
67:7,9 68:15
92:20 99:16
116:6 117:15
119:13 149:8,9
204:6 237:3
241:21 280:7
330:6

Corp 20:15

corporate 7:8
11:15,19 151:16
161:6

corporation 1:3
9:20,21 16:4

Corporation's
18:15

correct 23:2 28:16
29:15 38:15
39:16
41:10,12,21
50:13 55:1
57:4,6 59:11
63:10 70:14
72:14 77:13
78:13 79:19 82:7
87:18 89:6,7,9
92:12,13,17
93:15,20 94:16
95:1,2,5,6,9,10,1
3,14 96:9,13,14
97:9,10,15,16,19
98:15
114:4,6,8,9
118:6,7,22
125:6,17
130:15,17,18
144:2 145:19

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 15

155:20 157:5
161:18,21
162:3,5 177:2
182:4,8,13,17
187:19 188:21
201:17 205:17
213:14 214:6
220:8 230:16
232:15 237:8
243:19 259:22
260:2 268:18
273:22 276:11
294:18 296:11
301:3 310:22
311:7 313:1
314:20 322:22
329:5

**corrections** 329:7

**correctly** 206:3

**correspond** 197:14

**corroboration** 5:5
147:12,13,14,16,
22 285:7

**cost** 120:11 313:3

**costs** 118:18

**counsel** 1:16 3:3
6:6 37:12 45:19
111:13 129:9
150:9
155:19,21,22
156:1,4 170:9,11
186:7 200:8
218:6 237:13
246:1 266:21
272:6 285:22
288:5 315:15
328:9,13 330:13

**counsel's** 152:5
246:8

**Counterclaim**

1:10 2:12

**country** 30:20
32:19

**County** 170:6

**couple** 21:7 100:20
107:15 123:17
137:11 217:19
223:21 251:19
258:20 274:21

**course** 59:5 72:13
185:2 229:1

**court** 1:1 26:21
148:7 170:6
262:2 280:4

**covenant** 70:6

**cover** 92:11

**covering** 13:11

**coveted** 276:7

**cratering** 221:4

**create** 26:5 75:22
129:10 132:1
137:13 140:19
143:5 148:10

**created** 22:4 113:6
126:18,21
139:3,13,16
140:7 144:1
147:11,21 191:9

**creating** 45:6 76:4
134:19

**creation** 113:13

**creator** 130:14

**credible** 136:18

**credit** 33:22
34:4,8,12
35:4,8,10

**creditor** 70:1 82:7

96:12 172:19
184:22 185:13

**creditors** 69:5
71:19 72:6,8,12
82:15,19,22
96:17,21 138:20
153:19
158:5,6,18
159:6,15
160:1,9,16
172:8,13,15
176:14 180:7
184:1 229:1,12
230:12,13

**Creek** 15:7,10

**Creighton** 8:14,16

**criminy** 274:14

**critical** 33:6
304:18 305:3,6

**Crowe** 13:7

**CRR** 1:19 330:18

**crunching** 321:1

**cumbersome**
189:4 271:10

**Cup** 21:11

**current** 77:22

**currently** 230:5

**customary** 186:6

**customer** 25:13
29:8,13 46:7
76:18 78:19
147:1,5,10 200:4
202:5,21 203:21
204:22 321:18

**customers** 29:13
75:19 81:1
136:18
137:7,11,14,19

145:2
146:2,12,15
198:19
199:13,16,18,22
202:13,17
203:1,11,18
217:20 319:9
322:20

**cut** 245:18 260:22

**CV** 242:4

_____

D

**D.C** 2:14 330:2
331:2

**Dale** 258:17

**Dallas** 158:1

**Dan** 202:8 226:22

**Dara** 5:17 50:22
51:3 76:3,5,13
126:19 134:19
136:20 139:3
140:7,22
144:1,10,17,19
145:2 146:9
154:11
155:6,17,18
156:22 157:21
199:4,8,11
200:3,9,15 201:4
202:2 207:13,21
210:14 213:11
215:7 224:18
226:2 307:21
311:21
312:5,14,17,20
315:3 317:7

**dash** 245:12

**date** 36:19
39:9,10,13
66:21,22 67:19

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 16

87:18 89:15
114:8 116:4
130:19 131:19
132:14 133:8
141:12 143:20
148:1 159:12
173:8 174:10
176:19
178:21,22 179:1
186:15 187:2
188:3 189:12
192:2,3 193:6
194:12,13,21
196:6 197:5
201:5 215:12,16
240:12 287:13
289:12 291:18
294:18 300:19
325:14 329:18
331:8,22

**dated** 3:21
4:5,8,9,12,21
5:3,14,19 44:20
66:14 76:20
115:19 130:16
185:18 191:11
197:4 232:13,15
258:3 280:20
281:22

**dates** 36:18 72:21
73:13 78:12,13
146:8 192:18

**day** 29:5 49:19
67:22 149:15
225:1 226:3
253:22 260:1
268:17
274:10,12 288:1
317:5

**days** 7:13 39:19
40:2,3 193:18
267:1 274:13,21

330:11

**dead** 317:4

**deal**
13:13,14,19,20
18:11 40:14
45:22 50:8 51:4
54:17 55:9 63:1
69:4 87:14 90:19
154:15 223:2
229:18 234:9
240:6,7 251:21
254:13
255:5,7,9,11
256:14,16,19
266:13,18 267:9
273:18 291:1
297:16,17
302:11,22
303:13 304:2
318:20 321:14
323:5,6 324:21
325:6

**dealing** 142:17

**dealt** 143:2,10
177:15 226:3

**Dear** 330:5

**debt** 16:9
17:13,15,21
18:3,6
69:5,9,10,11
70:11 71:22
72:20 82:5
94:2,10,12,15,17
96:9 97:22 98:22
99:1 100:22
101:2,3,5,6,17,2
2 102:14,18,19
103:7,10
105:10,14,21
106:6,10,12,14,2
2

107:5,6,9,11,20
108:4,8,11,16,19
109:1,4,8,16,20
110:4,9 113:13
114:10 115:8,18
116:1,20
117:8,17
118:8,16,20,22
119:4,20
120:2,9,14 122:7
124:20 138:20
154:18 159:3,21
160:7 172:11,22
173:9
174:5,10,13
175:8 176:1
180:8,12
182:6,10
183:2,7,14,17,18
,20 184:1,11,17
185:9 194:2,9,14

**debts** 72:12 113:17

**decaf** 44:7

**deceased** 12:7

**December** 25:19
46:9,22 54:2
157:14
212:19,22
215:5,14 321:22
328:21

**decide** 275:1
295:21

**decided** 19:2
140:17 219:22
220:1 246:13
256:13 258:8
276:2 296:3

**decision** 159:22
160:5 170:5
176:13
219:13,15

324:20

**decisions** 219:12
220:5 221:7
222:8,21 224:3

**declarative** 175:2

**declared** 38:22
39:14

**decreased** 49:8

**decreasing** 36:2

**decrees** 95:12

**deep** 178:10
225:19

**default** 39:14
181:19

**defaulted** 170:21
171:1

**Defendant** 1:10
2:12

**Defendant/
Counter-
Plaintiff** 1:7 2:7

**Defendant's** 174:2
245:22

**defense** 98:3
156:17

**deferred** 49:17

**define** 209:7

**defined** 101:6,11
106:7 107:1

**definitely** 77:11

**definition**
101:10,13,17,19
102:14,18
103:6,9,12

**definitive** 71:14
249:3 254:1

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 17

**degree**
8:9,10,13,15
9:7,12 10:5,9
46:21

**degrees** 8:12,17

**delegate** 273:21

**delineate** 210:18

**deliver** 63:13
80:22

**delivered** 25:8
220:6

**demand** 133:10

**demonstrate**
228:21

**demonstration**
217:13

**deny** 190:22
191:11,14,18
201:20 202:22

**Department** 95:11

**dependent** 119:5

**depends** 136:5
295:4 319:16,21

**depose** 152:1
318:19

**deposit** 91:18
261:20
262:13,15,18,19,
22 263:3,11,15
289:20 291:11
294:14,21
295:19 303:2

**deposited** 268:6

**deposition** 1:14
3:7,16 4:1 5:1
6:11 52:6 57:7
60:17,20 64:9
74:13 86:7 88:5

92:1 96:4 99:3
102:6 110:16
116:20
117:11,18
149:3,6,9,13
150:3 151:13,14
162:7 187:11
189:15 193:12
195:3 196:19
203:22 207:5
208:7 216:2
223:6 232:8
236:20 238:4
241:17 242:14
245:5 249:22
259:13 264:5,21
268:10 274:1
279:10 281:15
282:17 284:19
285:11 286:12
292:22 297:22
298:7 300:14
301:8 311:8
312:8 313:14
324:19
325:14,18 326:7
327:4
328:3,5,8,11
330:7 331:8

**depositions**
6:14,17 7:6,13

**deposits** 107:14

**depthly** 154:18

**describe** 101:1
249:1 297:7

**described**
58:14,21 82:16
146:20 203:2
314:17 322:8

**description** 28:5
57:18 58:2,4

97:12 286:20
287:5,20 289:11

**designated** 149:2
172:5 260:12

**designations**
221:19

**designee** 151:15

**despite** 200:12
296:7 315:1

**detail** 251:8
274:16

**details** 14:16 49:1
265:15

**determination**
211:16

**determine** 82:21
113:5

**Detroit** 2:4,9 59:22
60:4,6 145:10
206:13,16
212:13,17
214:5,6,8,13,16,
22 216:16
226:16

**develop** 51:7

**developed** 26:2
157:7 199:19

**developing** 136:21
320:14

**development** 7:8
11:15,19 94:19

**deviation** 185:13

**devolved** 142:16

**devoting** 320:15

**dialogue** 317:16
318:12

**difference** 172:18

**different** 20:12
35:21 53:10
96:16 132:4,7
173:8 174:11
180:16,17
181:13 184:2,12
191:5 209:22
212:10 234:12
244:2,6 248:21
258:4,5
290:21,22 297:5

**difficult** 131:22

**dig** 91:5

**diligence** 17:2
50:16,21 63:5
92:15 93:8 202:2
241:13

**diligent** 28:6

**dinner** 67:5 259:7

**direct** 65:5 146:1
155:11 158:17
172:4 226:1

**direction** 328:7

**directive** 85:7

**directly** 84:22 88:3
159:1 196:16

**director** 32:12

**directors** 23:14
34:1
121:4,8,13,18

**disagree** 122:12

**disagreed** 266:5

**disappeared**
142:16

**disciplined** 45:16

**disclosed**
175:14,21

**disconnecting**

Capital Reporting Company
Weidinger, Frederick - Volume I 09-13-2010
Page 18

308:11

**discovered** 72:18
174:15 175:15
184:21 279:6
320:10

**discuss** 135:21
153:15 154:17
211:3,14 297:5

**discussed** 170:9
203:19 277:3
294:22 313:12

**discussing** 148:8
240:19 242:8
249:18 262:19
314:4

**discussion** 52:5
117:22 127:14
135:4,15,21
179:3 196:18
204:10 208:18
210:20 211:2,14
212:4 232:22
233:7,16 234:8
236:4 247:3
261:13 264:13
281:14

**discussions** 5:11
37:8 50:8
105:7,13 135:12
142:4,10 147:17
203:10 205:18
219:18 234:18
235:20
240:10,13 241:1
258:22 275:9
287:21 298:14
299:9 300:4
301:22 302:7

**disingenuous**
144:15

**dismayed** 86:22

**dismissed** 7:14
212:1 246:15

**dispute** 37:2
126:17 130:12
134:18 189:7
238:20 293:11
312:1,3

**distance** 144:15

**distracted** 129:17

**distraction** 317:17

**DISTRICT** 1:1

**DIVISION** 1:2

**divisions** 111:4

**docs** 63:1 92:10
96:8

**document**
4:4,10,14
5:7,8,9,12 42:4
44:20 45:6 53:15
56:19 61:8,16
62:13 67:7
74:15,22 78:12
79:2 81:6 90:10
91:11 93:19
101:12,20
103:11
106:12,17 108:4
112:16 113:4,6
115:22 119:1,10
120:18 124:10
125:13 126:18
128:13 130:14
133:16,18
134:19 138:1
139:13,15,16,17,
18 142:2,9,15
144:4,13,21
145:10
147:13,22 174:3

186:4,10 201:22
211:1 225:11
238:8 245:15
246:20 247:17
250:17,18
251:11 252:21
254:1 262:7
269:14 277:22
278:1 285:10,17
287:13,14 288:6
290:5,8
293:8,12,14
301:5 311:22
316:2

**documentation**
118:13

**documented**
202:21 216:1

**documents** 3:15
52:12,21 64:18
68:9,12 71:15,22
72:1 81:7 86:1
89:19 93:5
102:22 104:2,4
111:20 112:4,7
129:10 173:10
174:14 177:13
183:19 186:8
209:19 210:16
224:12 276:20
282:15 283:21
284:4 288:8
291:19 298:21
299:14 300:6

**dollar** 71:6 268:5

**dollars** 54:15,21
96:2 107:12

**done** 37:21 152:2
223:14 229:7
316:19 319:18

**Donna** 225:8,13

226:14 234:3
260:22

**dots** 103:1

**dotted** 290:14

**doubled** 48:20

**doubt** 27:17 268:4

**Doug** 13:7

**download** 188:17

**downloading**
188:22

**dozen** 146:17

**dozens** 199:20

**Dr** 154:11 155:7
218:16 258:17

**draft** 65:21
104:1,6 186:7,10
202:16
220:14,15
237:11,14

**drafted** 103:15,19
104:4,6

**drafts** 53:10
239:15

**draw** 33:5 36:7

**drew** 9:16 36:10

**Drive** 2:3

**dropoff** 46:10

**due** 17:2 39:7,13
50:16,21 63:5
92:15 93:7 202:2
241:13 325:11

**dug** 265:13

**duly** 6:4 150:7
328:5

**during** 9:4,6 15:16
19:4,11 30:15