UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADIL SHAFI,
Counter-Plaintiff/ Third-Party Plaintiff,

v.                                                          Case No: 09-10454
                                                            Honorable Victoria A. Roberts
FREDERICK WEIDINGER AND
BRAINTECH, INC.,
Third-Party Defendant/Counter-Defendant.

---

**BRAINTECH, INC.'S AND FREDERICK WEIDINGER'S
JOINT REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

INDEX OF CONTROLLING AUTHORITIES ............................................................................. ii

INTRODUCTION ............................................................................................................................1

SHAFI'S RESPONSE BRIEF MISREPRESENTS THE RECORD ...............................................1

ARGUMENT....................................................................................................................................4

    I.    SHAFI IS NOT ENTITLED TO SEVERANCE PAY FROM BRAINTECH..................................................................................................................4

    II.   SHAFI HAS FAILED TO PRODUCE FACTUAL EVIDENCE TO SUPPORT A VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT, THE MICHIGAN UNIFORM SECURITIES ACT OR COMMON LAW FRAUD ........................................................................7

    III.  SHAFI HAS FAILED TO PRODUCE FACTUAL EVIDENCE THAT DEFENDANTS WRONGFULLY CONVERTED CORPORATE PROPERTY TO THEIR OWN USE ..................................................................13

    IV.  SHAFI'S UNJUST ENRICHMENT CLAIM IS BARRED BY THE SHARE PURCHASE AGREEMENT ...............................................................13

# INDEX OF CONTROLLING AUTHORITIES

<u>Cases</u>                                                                                                                    <u>Page</u>

*Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003) .......14

*Foremost Ins., Co., v. Allstate Ins., Co.*, 439 Mich. 378, 391, 486 N.W.2d 600 (1992)  ..............13

*Lorillard Tobacco Company v. American Legacy Foundation,*
    903 A.2d 728 (De;. Supr., 2006)........................................................................................5

*Morris Pumps v. Centerline Piping, Inc.*,
    273 Mich.App. 187, 199, 729 N.W.2d 898 (2006) .......................................................13, 14

*Murry Hill Publications Inc. v. ABC Communications, Inc.*,
    264 F.3d 622, 636 (6th Cir. 2001) ......................................................................................13

*Sherwood Brands, Inc. v. Levie*, 2006 WL 827371 (D.Md. at *19) ..............................................11


<u>Statutes</u>

MCL 566.132(1)(b) .......................................................................................................................10


<u>Rules and Regulations</u>

17 C.F.R. §230.144 .......................................................................................................................11

Fed.R.Civ.P. 56 ..........................................................................................................................1, 7

## INTRODUCTION

Adil Shafi's Response to Defendants' Motion for Summary Judgment ("Response") rests entirely on rambling conjecture, speculation, opinion and conclusory arguments presented as "facts" which do not meet his burden under Rule 56 of the Federal Rules of Civil Procedure. Much of Shafi's Response contains no citation to evidence in this case, and these assertions must be stricken or disregarded by the Court.

The theme of Shafi's argument is that Rick Weidinger never intended to honor the agreements because he should have known better than to get involved in a business deal with Shafi and that Mr. Weidinger never should have believed Shafi when he told him that Reliabot would generate revenue in 2008. At best, Shafi presents nothing more than his opinion that his experience was far superior than that of Weidinger and that he duped Weidinger into believing that his expertise and market access could generate revenue for Braintech. According to Shafi, Weidinger was, therefore, reckless, and Defendants are liable for fraud, securities fraud, and conversion. This illogical argument cannot serve to defeat summary judgment for Defendants.

## SHAFI'S RESPONSE BRIEF MISREPRESENTS THE RECORD

Fed.R.Civ.P. 56 prohibits Shafi from merely relying on his pleadings and requires him--by affidavit or as otherwise provided in the rule--to set out specific facts showing a genuine issue for trial. Nevertheless, Shafi refers to allegations in his second amended counterclaim as the main evidence for his tort claims. According to Shafi, his contract and tort claims rest solely upon the alleged non-performance of contractual obligations. It is plainly evident, however, that Shafi has not produced evidence of non-performance.

As noted above, most of Shafi's assertions contain no citation to admissible evidence in this case. However, even when Shafi does cite to the record, it is often a misrepresentation of the record or an outright fabrication of the record. For example:

1. **Shafi Assertion:** Immediately following the closing, every single material promise was breached. **False**
   **Actual Record:** After closing, Shafi immediately received a $15,000 signing bonus which was wired to his personal account. (Ex.KK) Shafi also admitted that he received 3 million shares of Braintech stock. Thereafter, Shafi received the entirety of his salary while he was employed at Braintech. Shafi has offered only vague references to broken promises, but he has offered no factual evidence to support.

2. **Shafi Assertion:** Shafi never had a Braintech email address or access to Braintech servers. **False**
   **Actual Record:** Shafi received a Braintech email address <u>before</u> the effective date of his employment and was given access to Braintech's hosted exchange to view the emails. (Ex.LL; Weidinger 8/15/08 email)

3. **Shafi Assertion:** Weidinger and Braintech failed to provide Shafi with a company credit card as required by his Employment Agreement. **False**
   **Actual Record:** Shafi used Rick Weidinger's company credit card until his company card was processed. (Ex.MM) Thereafter, Shafi was provided with and used his company credit card for expenses. (Ex.NN)

4. **Shafi Assertion:** Braintech at no time provided for health insurance for Shafi or his family as required by the Employment Agreement. **False**
   **Actual Record:** The Employment Agreement required Braintech to pay for third-party family health insurance utilized by Shafi until he became eligible for Braintech's group policy. (Ex.OO; EA p.3,¶9(c)(i)) Shafi selected the insurance plan, submitted invoices for insurance premiums he received from BCBS, and acknowledged that they were paid by Braintech. (Ex.PP; p.3) There was an issue with BCBS processing Braintech's November payment, but Shafi was told to use his company credit card for any payments if it was necessary. (Ex.PP; pp.1-2) The <u>only</u> issue regarding health insurance was Shafi's request for payment for a medical test that was not covered by the insurance plan that Shafi selected. (Ex.QQ) There was no obligation for Braintech to pay for medical expenses that were not covered by the insurance policy selected by Shafi.

5. **Shafi Assertion:** Weidinger and Braintech failed to hire appropriate staff. **False**
   **Actual Record:** It was Shafi's responsibility to hire, manage, and direct employees to further the objectives set forth in the Employment Agreement. (Ex.OO; EA, ¶4(e)) After closing, Weidinger immediately met with individuals Shafi proposed to hire.

(Ex.RR) Weidinger repeatedly asked Shafi to prepare offer letters to potential employees. Shafi did not prepare an offer letter for Donna Burr until 9/10/08, and Weidinger immediately approved Burr's hiring. (Ex.SS) Shafi reported to Weidinger that the hiring of others was underway and that Pete Manias was doing an excellent job. (Ex.TT, p.1; 9/13/08 email) As of 9/29/08, Shafi indicated that he would forward offer letters for other staff. (Ex.TT; p.2) Hiring of salespersons was delayed because Shafi had not developed a compensation and incentive plan that could be offered to sales support personnel. (Ex.UU)

6. **Shafi Assertion:** Weidinger and Braintech failed to open a Michigan based office. **False**
   **Actual Record:** Immediately upon closing, Weidinger began looking at selected sites for office space. Shafi demanded an office no further east than midpoint of Farmington Hills and Southfield. (Ex.VV) Shafi liked the space selected by Weidinger, but acknowledged that the lessor was slow in committing to get the place built out to requirements. (Ex.VV, p.3)

7. **Shafi Assertion:** Weidinger and Braintech failed to reimburse the most basic business expenses incurred by Shafi. **False**
   **Actual Record:** Braintech reimbursed Shafi for every single business expense which was preapproved as required by the Employment Agreement. In addition, Braintech reimbursed Shafi for all of his business expenses - even if he failed to get the required approval. (Ex.NN) Shafi has not produced as evidence in this case any business expense invoice which was not paid by Braintech.

8. **Shafi Assertion:** Weidinger and Braintech failed to acquire robots in order to run demonstrations for customers. **False**
   **Actual Record:** Shafi has produced no evidence of Braintech's inactivity with respect to robots. In fact, Braintech was doing everything it could to get Shafi to provide information about his Reliabot software and acquire robots so that the software could be analyzed. Weidinger and Braintech scientists continuously asked Shafi about the progress of supplying them with the necessary hardware and software. (Ex.WW; p.1) Finally, Shafi confessed that he could not deliver the basic Reliabot software as promised in the SPA. (Ex.WW, pp.2-3) Shafi had not arranged for the acquisition or use of any robots and admitted that he "forgot" that he had a KUKA robot that could be used. (Ex.XX; Shafi 8/29/08 email) Weidinger responded immediately and authorized Shafi to repair the existing robot and acquire a new one for the Detroit office. (Ex.XX, p.2) A month after closing Shafi still had not delivered the Reliabot hardware and software, and Weidinger made clear that he needed to do so. (Ex.WW; pp.6-8) Shafi did not deliver the products until 9/17/08, and even then, items were missing which his wife had to retrieve from her basement. (Ex.WW; p.9)

9. **Shafi Assertion:** Weidinger and Braintech failed to pay "Braintech assumed debt" to Shafi Inc. creditors almost immediately following the transaction as required by the

3

SPA. **False**

**Actual Record:** Shafi has not offered any documentary evidence to substantiate this allegation. Moreover, the actual record demonstrates that Braintech made payments in accordance with the debt schedule until it was financially unable to do so as a result of Shafi's failure to generate revenue. (Ex.YY) Under the SPA, Braintech was permitted to negotiate the payment of certain debts which it was attempting to do.

It is plainly evident that the assertions relied upon by Shafi for his breach of employment contract and his tort claims are not supported by admissible evidence in the record.

## ARGUMENT

Shafi's Response Brief does not establish a genuine issue as to any material fact on any of his claims.

### I. SHAFI IS NOT ENTITLED TO SEVERANCE PAY FROM BRAINTECH.

Shafi's entitlement to severance pay is strictly based on the express language of the Employment Agreement. Shafi's efforts to re-write the agreement must be rejected.

#### A. The Record Evidence Demonstrates That Braintech Terminated Shafi's Employment As Defined By The Employment Agreement.

Shafi's assertion that Braintech never actually terminated his employment or provided the requisite notice of same directly contradicts *Shafi's own deposition testimony*. Shafi affirmatively stated in his deposition: "I was terminated from Braintech without cause."; "…I believe that my employment was terminated without cause…" (Ex.ZZ; Shafi at 26, 508)[1]

Even if those admissions did not exist, a review of the record makes clear that Braintech properly terminated Shafi's employment in conformity with the terms of the Employment Agreement. Paragraph 12 of the contract expressly defines the word termination: "(t)ermination

---

[1] Consistent with his admissions, Shafi testified that the termination released him from his noncompetition agreement with Braintech (Ex.AAA) and allowed him to start a new company in March 2009 (Advenovation) which competed with Braintech. (Ex.ZZ; Shafi at 26-27)

shall mean the cessation of EXECUTIVE employment by Braintech … which is not promptly…followed by re-employment of the EXECUTIVE by BRAINTECH….” (Ex.OO; EA, ¶12) Although the word "cessation" is not defined in the Employment Agreement, Merriam-Webster's Collegiate Dictionary defines "cessation" as a "temporary or final ceasing (as of action): Stop." *Merriam-Webster's Collegiate Dictionary*, 203 (Eleventh Edition, 2003)[2]

Shafi's "employment" is defined in the Employment Agreement.[3] Shafi's employment was terminated when Braintech ceased paying him and instructed him to discontinue performing his job duties. Shafi admitted that the November 19, 2008 letter from Rick Weidinger was his "termination letter." (Ex.ZZ; Shafi at 304-305)[4]

### B. Shafi Has Produced No Admissible Evidence To Challenge Braintech's Showing That He Was Terminated For Good Cause.

To rebut Braintech's evidence that it had good cause to terminate his employment, Shafi makes many accusations about Braintech's alleged nonperformance under the Employment Agreement. Contrary to Shafi's unsubstantiated assertions, Braintech performed under the

---

[2] Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract. *Lorillard Tobacco Company v. American Legacy Foundation,* 903 A.2d 728 (De;. Supr., 2006).

[3] "BRAINTECH, as of August 16, 2008, hereby employs EXECUTIVE to perform the duties and render services customarily required for the position hereinafter set forth, and EXECUTIVE hereby accepts said employment and agrees faithfully to perform said duties and render said services, subject to the terms and conditions of this Agreement." (Ex.OO; EA, ¶1)

[4] As set forth in Defendants' initial brief, the November 19 letter memorialized a meeting with Shafi in which he was told that the company intended to rescind the transaction because of his failure to perform his job duties and sought his concurrence in the rescission. Braintech gave Shafi several days to consider the proposal and provided notice that it had ample grounds to terminate his employment for good cause and would not accept any further performance from him under the agreement. (Ex. Z to MSJ) When Shafi refused to discuss rescission with Braintech and started deleting emails, he was informed by Jeff Milton on November 24 that his pay and benefits would cease. (Ex. BB to MSJ)

5

employment contract by paying Shafi his signing bonus and his salary, paying for his insurance premiums, providing him a credit card, and reimbursing his expenses. Shafi has offered no evidence contradicting the documents which show Braintech's performance.[5]

### C. Shafi's Failure To Execute a Release As Required By the Employment Agreement Precludes His Claim for Severance Benefits.

Even if the Court were to find that there is a genuine issue of fact whether Braintech had good cause to terminate Shafi, Braintech is still entitled to summary judgment on Counts I and II of the second amended counterclaim because Paragraph 12(g)(ii) unambiguously required Shafi to execute a full release of claims as a prerequisite to receiving the severance payment:

> **….The EXECUTIVE agrees that after the Termination Date, but prior to the payment of the severance pay and any outstanding bonus monies called for herein, EXECUTIVE shall execute a release, in the form of a severance agreement, of any and all claims he may have against the Company and its officers, employees, directors, parents and affiliates.  EXECUTIVE understands and agrees that the payment of the severance pay and bonus called for by this paragraph are contingent on his execution of the previously described release of claims.**  (Ex.OO; EA, ¶12(g)(ii))

There is no evidence whatsoever that Shafi executed a release of claims as required by the Employment Agreement. Shafi's failure to execute a release and his filing of tort claims against Braintech and Weidinger preclude any possible right to a severance payment. On this basis alone, Braintech is entitled to summary judgment on Counts I and II.

---

[5] Although Shafi's termination was predicated on good cause regardless of the revenue issue, Shafi inaccurately asserts that the contract contains no requirement that he generate revenue as part of his job duties. To the contrary, the Agreement states on its face that "the business objectives for BRAINTECH include…revenue generation," and that "…in order to achieve the business objectives BRAINTECH wishes to engage EXECUTIVE to serve as Chief Operating Officer of Braintech … on the terms and conditions set forth in this Agreement." (Ex.OO; ¶A)

II. **SHAFI HAS FAILED TO PRODUCE FACTUAL EVIDENCE TO SUPPORT A VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT, THE MICHIGAN UNIFORM SECURITIES ACT OR COMMON LAW FRAUD.**

In response to a properly supported motion for summary judgment, plaintiff cannot rest on his pleadings, the "response must . . . set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The facts must be admissible into evidence. Rule 56(e)(1). Shafi has failed to carry this burden. For example, the following "fact" allegedly establishing Weidinger's scienter is included on page 28 of Shafi's Response: "Without any understanding of what it takes to sell vision software solutions in the field of robotic vision systems, Weidinger lacked the ability to understand the promises he was making were material and needed to be honored." No record citation is included for support. Shafi repeatedly relies on this type of conclusory assertion in attempting to satisfy the requirement of scienter.[6] This is legally inadequate to oppose summary judgment under Fed.R.Civ.P. 56(e)(2).

**The Access and Acceleration Agreement Contained Promises by Shafi – Not Defendants**

Much of Shafi's alleged fraud revolves around Braintech and Weidinger's intent not to honor the A&A agreement. Response at 28-31. However, Shafi and his companies ("Sellers" in the Share Purchase Agreement dated August 12, 2008) were the only parties who represented and warranted the truthfulness or accuracy of the A&A. See Ex. A to MSJ; SPA §3.26 (Sellers

---

[6] Other such unsupported conclusions – which are not inferential from any facts in evidence -- are located on pages 33 ("Weidinger's personal investment would be that much further diluted"); ("Weidinger had no intention of subjecting Braintech to the cash drain that would have required the infrastructure support for Shafi's sales efforts"); page 34 ("Weidinger's commercialization plan was to leverage Shafi for as long as he could in the desperate and reckless hope that revenue would materialize"); page 35 ("If the plan did not work, they could simply walk away from $2.9 million worth of financial obligations to Shafi . . . [t]his is exactly what they did."). These conclusions are no substitute for evidence concerning Defendants' state of mind.

7

Representations and Warranties) "Attached hereto are true and complete copies of the Market Access Schedule . . . each of which is current." Even Shafi admits in his Response that he was the promisor under the A&A – not Weidinger or Braintech. See Response at 28. Thus, any alleged failure to honor it cannot form the basis for a fraud, let alone a claim of securities fraud.

**The SPA Was Fully Performed By Defendants**

Apart from the A&A agreement, the SPA cannot be the genesis of any of Shafi's claims because Braintech made no promises therein that were not fully performed.[7] Braintech, as buyer in the transaction, made only the most basic representations and warranties, namely that: (1) It was in good corporate standing; (2) had authority to execute the agreement; (3) was acquiring the Shares of Shafi Inc. for investment; (4) did not pay finder's fees; (5) filed accurate SEC reporting documents; and (6) provided evidence "to sellers reasonable satisfaction" of its financial resources.

Moreover, Shafi received at closing the consideration set forth in SPA § 2.2(a) – 3 million shares of Buyer's common stock. (Ex.ZZ; Shafi at 66:5-12)  Shafi has no facts to the contrary.  In fact, Shafi admitted at deposition that he was not prepared to offer any evidence regarding the falsity of any of Braintech's warranties.  Mr Shafi also disclaimed any knowledge of any false or misleading statements in any of Braintech's SEC forms and filings. (Ex.ZZ; Shafi at 78-86)  Ironically, the "false statements" Mr. Shafi relies upon are the very transactions which

---

[7] Shafi's reliance on "promises" such as those to open an office in Michigan and hire certain personnel were belied by the language of the SPA, which specifically addressed those issues. The SPA made no promises to Shafi in that regard. See § 6.5 "The parties agree to cooperate to cause SII to have a market presence in Houghton Michigan by July 2009" see also SPA § 6.7 ("Buyer will consider the hiring of a business development employee, administrative assistant to seller, and director of government and international programs of SII recommended by Seller, subject to final approval by Buyer's CEO.") Shafi admits that these hires were considered. (Ex.ZZ; Shafi at 97:12 to 98:16. ("It does say Braintech will consider, Braintech did consider.")

have been described in great detail in Braintech's SEC filings – which are not contended by Shafi to be false.

**Mr. Weidinger Made No Promises To Pay Shafi's Debts**

It is undisputed that Braintech already was operating under a "going concern" letter from its auditors at the time of closing. Nonetheless, Shafi agreed that he was presented with satisfactory evidence of Braintech's ability to take on more debt.[8] See Ex. A to MSJ; SPA §4.6. However, Mr. Shafi at deposition admitted that Braintech was likely unable to pay its debts because it did not have any revenue. (Ex.ZZ; Shafi at 362:14-17) There is a total absence of any evidence in this case suggesting SI revenue[9] or Braintech revenue was diverted to any other person or source that otherwise would have been used to pay the debts contemplated by §6.3 ("Buyer covenants and agrees with Seller that from and after closing, Buyer will cause SI to satisfy the Braintech Accepted Debt.")[10]   For his part, it is undisputed that Mr. Weidinger never sold any Braintech shares which he owned. Moreover, SEC documents including Braintech's Form 10-Q dated November 16, 2009 disclose that Mr. Weidinger elected to forego his salary for a period of time before Braintech ceased operating.

---

[8] Mr. Shafi admitted he had no idea how Braintech would be able to pay SI's debt. (Ex.ZZ; Shafi at 357:14-17 (Q. "Did you have an understanding of how Braintech was going to come up with…$900,000 to pay off these debts.  A. That was not my problem. That was their problem."). The notion that Braintech took on Shafi debts (including debts owed to customers) so it would bankrupt itself in exchange for the opportunity to solicit these creditors is implausible.

[9] It is undisputed that SI had no revenue after the transaction.

[10] It is undisputed from Braintech's 10-Q dated November 16, 2009 that Braintech caused SI to pay down over $100,000 of the Accepted Braintech Debt. See Braintech's 10-Q ("Through September 30, 2009, Braintech, Inc. had advanced additional funds to Shafi thereby allowing SI to repay $103,882 of the $900,000 in current liabilities.")

Notwithstanding Braintech's insolvency, Mr. Weidinger never personally agreed to pay these SI debts that allegedly reverted to Mr. Shafi. Under Michigan's Statute of Frauds, Mr. Weidinger (the party to be charged) would have to agree in writing to pay Mr. Shafi's debts. MCL 566.132(1)(b). ("[a] special promise to answer for the debt, default, or misdoings of another person" is void unless the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement.). No such writing is in evidence and for that additional reason Mr. Weidinger cannot be held legally responsible for the payment of these debts as damages or otherwise.

**Failure to Attempt Proper Section 144 Sales Bars the Securities Fraud Claim.**

The presence of restrictive stock legends on Mr. Shafi's stock was no surprise – it was part of the bargained for consideration in this transaction. See SPA §3.28(e). Thus, that alone could not form the basis of a securities fraud claim. Shafi's newest argument is that he had no obligation to attempt to sell any common shares he wished to sell in conformity with Rule 144's safe harbor provision and that he was not obliged to abide by securities laws and should have been able to sell all 3 million shares he had at once in February 2009.[11] On this score, he is legally incorrect: The SPA says exactly the opposite of this: "Buyer shall prepare and file a registration statement covering the resale of any and all shares of Buyer common stock received by Seller as purchase price *that cannot be sold pursuant to Rule 144 under the Securities Act... ."* (emphasis added). Plaintiff admits that he failed to take even the first step to invoke the Rule 144 process, which starts with him requesting an opinion letter from Braintech. See, Ex.ZZ, Shafi at

---

[11] At deposition, Mr. Shafi relied exclusively on inadmissible hearsay regarding what he heard about the prospect of selling his shares – those statements are not sufficient under Rule 56 and cannot support his Opposition or get him a trial in this case.

454:6-10: "Q. Did you ever contact Braintech to enlist their help in registering these shares? A. I did not contact Braintech." This Court would not be the first to dismiss securities claims on this basis. See *Sherwood Brands, Inc. v. Levie*, 2006 WL 827371 (D. Md) at *19 (dismissing 10(b)(5) claim and reasoning that "There was no evidence that Eleanor Levie ever requested for Sherwood to issue such a written statement in relation to a potential Rule 144 sale.") (Ex.JJ)

Moreover, on page 36 of his Response, Shafi takes issue with how much stock he might be able to sell at one time under Rule 144. However, any such volume limitations merely track the trading restrictions which Mr. Shafi agreed to and was made aware of in the SPA which affected sales of his Braintech common stock under securities laws, penny stock sales, and as an insider. See Ex.A; SPA §6.12.3. Mr. Shafi was bound by these rules before he ever received any stock. While Mr. Shafi might not be sufficiently educated on the issue, as an insider he would certainly be forbidden to sell his shares at once, or during blackout periods, and would have been subject to other trading restrictions on his stock.

Shafi was free to begin selling shares under Rule 144 on or after February 12, 2009. Shafi is incorrect that Rule 144 imposes a one-year waiting period on him. Because Braintech was a reporting company, the holding period under Section 144 expired after 6 months. See 17 CFR 230.144. (http://www.sec.gov/rules/final/2007/33-8869.pdf). The SEC final rule promulgated in December 2007 reducing the holding period to six months was accompanied by this chart:

|  | **Affiliate or Person Selling on Behalf of an Affiliate** | **Non-Affiliate (and Has Not Been an Affiliate During the Prior Three Months)** |
|---|---|---|
| **Restricted Securities of Reporting Issuers** | <u>During six-month holding period</u> - no resales under Rule 144 permitted.<br><br><u>After six-month holding period</u> - may resell in accordance with all Rule 144 requirements including:<br>• Current public information,<br>• Volume limitations,<br>• Manner of sale requirements for equity securities, and<br>• Filing of Form 144. | <u>During six-month holding period</u> - no resales under Rule 144 permitted.<br><br><u>After six-month holding period but before one year</u> – unlimited public resales under Rule 144 except that the current public information requirement still applies.<br><br><u>After one-year holding period</u> - unlimited public resales under Rule 144; need not comply with any other Rule 144 requirement. |
| **Restricted Securities of Non-Reporting Issuers** | <u>During one-year holding period</u> – no resales under Rule 144 permitted.<br><br><u>After six-month holding period</u> - may resell in accordance with all Rule 144 requirements including:<br>• Current public information,<br>• Volume limitations,<br>• Manner of sale requirements for equity securities, and<br>• Filing of Form 144. | <u>During six-month holding period</u> - no resales under Rule 144 permitted.<br><br><u>After one-year holding period</u> - unlimited public resales under Rule 144; need not comply with any other Rule 144 requirement. |

Accordingly, Shafi's position is not supported by law or evidence.

**Shafi Also Failed To Meet His Burden In His Common Law Fraud And Michigan Statutory Securities Law Claims**

Shafi is required to produce clear and convincing evidence in support of his claim of common law fraud. As noted earlier, he has not provided any evidence, much less clear and convincing evidence, that the Defendants did not intend to honor the Share Purchase Agreement. Therefore, his common law fraud claim and state securities claims must be dismissed.

12

### III. SHAFI HAS FAILED TO PRODUCE FACTUAL EVIDENCE THAT DEFENDANTS WRONGFULLY CONVERTED CORPORATE PROPERTY TO THEIR OWN USE.

In Point 6 of his Response Brief, Shafi fails to cite to a single evidentiary fact in the record before the Court. In addition to offering no admissible evidence in support of his conversion claim, Shafi also elected not to address the legal arguments made by Defendants. He simply relies upon conjecture, opinion, and conclusory arguments.[12]

First, Shafi does not refute that Weidinger personally did not receive anything from Shafi, SI, SII, or from the Company Sale Agreements; thus, Weidinger is entitled to judgment on the conversion and unjust enrichment claims. Second, Shafi does not even address dispositive legal authority offered by Defendants which holds that a party cannot convert his or her own property. *Foremost Ins., Co., v. Allstate Ins., Co.*, 439 Mich. 378, 391, 486 N.W.2d 600(1992) *aff'd*, 439 Mich. 378, 486 N.W.2d 600 (1992). Braintech and Shafi entered into a Share Purchase Agreement which extended Braintech certain rights to Shafi I and II assets. Shafi has not presented admissible evidence that Defendants <u>wrongfully</u> exerted domain over property in denial of or inconsistent with the <u>owner's</u> rights. *Murry Hill Publications Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 636 (6th Cir. 2001).[13]

### IV. SHAFI'S UNJUST ENRICHMENT CLAIM IS BARRED BY THE SHARE PURCHASE AGREEMENT.

Shafi concedes that the existence of an express contract bars a quantum meruit claim. *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 199, 729 N.W.2d 898 (2006).

---

[12] That Shafi misunderstands his burden under Rule 56 is evident by his conclusion on page 43 that he has "sufficiently pleaded a claim for conversion."

[13] Even if Shafi could offer proof that Braintech was not entitled to the property, it is undisputed that Braintech offered to return the property, but Shafi refused.

*Belle Isle Grill Corp. v. City of Detroit*, 256 Mich.App. 463, 478, 666 N.W.2d 271 (2003). However, in Point 6, Shafi summarily concludes that "there is no valid enforceable contract in this case" and that "the law will imply a contract in order to present (sic) unjust enrichment." Shafi offers no legal authority to support the proposition.

Moreover, even if such authority exists, Shafi has not filed a claim for a declaratory ruling that there is no valid, enforceable Share Purchase Agreement, and there will be no such ruling in this case. The SPA bars a claim for unjust enrichment.

Finally, Shafi has not presented factual evidence that Braintech benefitted from the alleged wrongdoing. *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich.App. 187, 195, 729 N.W.2d 898 (Mich.Ct.App.2006). Of course, Shafi can offer no such evidence because it would contradict his sworn deposition testimony in which he admitted he had no such evidence. (Ex.ZZ; Shafi at 142-143).

Accordingly, Braintech and Weidinger are entitled to summary judgment on all claims and judgment should be entered in their favor dismissing all of Shafi's Counterclaims and third party claims against Braintech, Inc. and Mr. Weidinger, with prejudice.

Respectfully submitted,

| NEMETH BURWELL, P.C. | PILLSBURY WINTHROP SHAW PITTMAN LLP |
|---|---|
| By:  s/Susan D. Koval  <br> Anne Widlak (P35763) <br> Susan D. Koval (P59297) <br> Attorneys for Braintech, Inc. <br> 200 Talon Centre Drive, Suite 200 <br> Detroit, Michigan 48207 <br> (313) 567-5921 <br>  awidlak@nemethburwell.com <br>  skoval@nemethburwell.com | By:  s/with consent of Geoffrey J. Greeves <br> Geoffrey J. Greeves <br> Attorney for Frederick Weidinger <br> 2300 N Street, N.W. <br> Washington, DC 20037-1122 <br> (202) 663-9228 <br> geoffrey.greeves@pillsburylaw.com |

January 6, 2011

## CERTIFICATE OF SERVICE

I hereby certify that on January 6, 2011, I electronically filed the foregoing paper (*Braintech's and Weidinger's Joint Reply Brief in Support of Motion for Summary Judgment*) with the Clerk of the Court using the ECF system, which will send notification of such filing and service of such documents to all parties via their counsel of record at the e-mail addresses disclosed on the Notice of Electronic Filing receipt.

                    s/Susan D. Koval
                    Susan D. Koval (P59297)
                    NEMETH BURWELL, PC
                    Attorney for Braintech, Inc.
                    200 Talon Centre Drive, Suite 200
                    Detroit, Michigan 48207
                    (313) 567-5921
                    skoval@nemethburwell.com
                    P59297