

# EXHIBIT ZZ



TRI-COUNTY
COURT REPORTERS,
INC.

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of **ADIL SHAFI**

**Date:** July 29, 2010
**Volume:** I

**Case:** BRAINTECH v. SHAFI

Printed On: January 5, 2011

1   agreement.  Therefore, the boxes were kept with me.  They did

2   not want me to ship them to Vancouver because they were

3   supposed to go to this office in Michigan, which was never

4   opened.  Therefore, that material stayed with me.  After my

5   termination from Braintech I kept these documents and then I

6   turned them over to Counsel.  I did not give them to anybody

7   else.

8   Q   Sir, did you ever review, yourself, or have anybody look at

9       your noncompetition agreement to determine whether or not this

10      business that you were contemplating was an available business

11      opportunity for you?

12  A   Did I review that agreement?

13  Q   Yes.

14  A   Yes.

15  Q   And did you reach any conclusions about my question I just

16      asked you?

17  A   Yes.  I believe the noncompete agreement had an early

18      expiration clause in it.  I was terminated from Braintech

19      without cause.  There was no cause ever provided to me by

20      Braintech.  In that situation, in that circumstance, paragraph

21      12 of the employment agreement spells out a severance clause

22      of the entire three years of my employment amount to be paid.

23      Now, since I was terminated without cause and I was not paid

24      that severance in 30 days, that constituted an early

25      expiration of the no compete clause.  Therefore, I'm not bound

Page 27

1        by that.

2    Q   Okay.  Can we agree that if someone determines, unlike you, if

3        someone reaches the contrary determination, that you were

4        terminated with cause, that Advenovation would not be -- You

5        have to let me finish; would not be a permissible business

6        endeavor for you to be engaging in?

7    A   I will leave such agreements or disagreements between you and

8        my Counsel.

9    Q   But you never analyzed that point of view?

10   A   My interpretation is that agreement is null and void.

11   Q   Okay.  Let's go back.  We'll come back to this later.  I

12       appreciate you getting into that for us.

13                   When was the first time you can recall ever

14       hearing of Braintech?

15   A   I do not recall the specific date, but I can say this much,

16       that Braintech and Shafi, Inc. were known in the marketplace.

17       The companies knew about each other for several years prior to

18       the transaction that took place in 2008.  So I cannot give you

19       a specific time frame or a specific date when I first got to

20       know Braintech, but the companies knew of each other's

21       existence, competed sometimes, and knew of each other in

22       general.

23   Q   What is the first contact that you can remember having with

24       somebody at Braintech let's say in 2008?

25   A   I just told you; I don't recall an exact first date.

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 66

1    A    Yes.

2    Q    Okay.  Sorry.  I'm just trying to make sure we're there.  You

3         see 2.2, Purchase Price?

4    A    Yes.

5    Q    Could you take a look at that and tell me if, in fact, you did

6         receive the purchase price with regard to this transaction?

7    A    I received three certificates for one million shares each and

8         they are a worthless piece of paper because they were never

.9        registered with the SEC.  I was never paid a single cent for

10        the value of my companies through these shares.  These shares

11        were never registered with the Securities and Exchange

12        Commission of the United States of America.

13   Q    Okay.  Mr. Shafi, with regard to 2.2, Purchase Price can you

14        tell me; did you receive the 2,999,700 shares of Buyer's

15        common stock?

16   A    I'm telling you I received three pieces of paper that are

17        worthless.

18   Q    So you're telling me that you did receive 2.2A?

19   A    It says that I have these shares, but they're worthless.

20   Q    My question is; did you actually receive what it says you were

21        to receive, the 2.99 --

22   A    Did I receive the purchase price?  No.  Did I receive pieces

23        of paper?  Yes.  That's what I'm answering.

24   Q    Is there --

25   A    I received three documents that purport to be this purchase

1       Braintech.

2   Q  Okay.  Let's focus on Article 4, if we could.  That's where

3       you are, right?  Let's look at the first one, 4.1.  Why don't

4       you tell me if, in your estimation, sir, as the Plaintiff in

5       this case, these representations and warranties in section 4.1

6       were honored by the company?  Let's start with that one.  It

7       won't take us long, hopefully.

8   A  So you're asking me if 4.1 was honored by Braintech?

9   Q  Correct, sir.

10  A  It appears to be so.

11  Q  Okay.  What about 4.2?

12  A  Appears to be so.

13  Q  What about 4.3?

14  A  I will go back to 4.2.  If the representation was that they

15      were going to give me shares that were valid and had value

16      behind them for the sale of my companies, I will say they

17      misrepresented it.  Now, I will let my Counsel state that

18      better than me, because I'm not a professional lawyer, but I

19      will tell you that it appears that they made good

20      representations and I know that they breached them afterwards.

21  Q  Okay.  That's a lot that you just threw out there, Mr. Shafi.

22      Let's back up and make sure we cover all of that.

23  A  Okay.

24  Q  We'll start with your statement it appears that they made

25      representations and then breached all of it.  Are you

Electronically signed by Susan Hans (201-320-999-0764)                2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 79

1        referring to any of the representations here in 4.1 through --

2   A   I think it would be better for my Counsel to answer that than

3        me, because I'm not a professionally trained lawyer.  I took

4        these as good-faith statements on the part of Braintech.  I

5        know that they breached a lot of what they promised me, broke

6        promises in a very substantive way; not just one or two, but

7        dozens of breaches.  Now, does this legal language allow me to

8        answer correctly your question?  I don't know.  I would rather

9        Mr. Murphy answer this in proper legal context.  I'm not a

10       professional lawyer here.  I do not want to put on the record

11       here that I fully understand or fully am able to answer these

12       legal questions.  That's why Mr. Murphy is here.  So I don't

13       know what to tell you.

14   Q   Well, we obviously are not going to go through the shenanigan

15       of putting your lawyer under oath to answer the questions that

16       you, as the Plaintiff, have the responsibility to answer.  So

17       rather than try to throw us off track why don't we stick to

18       the track that we're on, which is; can you tell me if

19       Braintech ever was in default, as far as you know, with regard

20       to section 4.2, its authority to enter into this agreement?

21   A   Yeah.  Appears to be so.

22   Q   What do you mean it appears to be so?

23   A   I just answered your question.  It appears to represent what

24       Braintech was saying here.

25   Q   So to your knowledge, Braintech did not breach that

Electronically signed by Susan Hans (201-320-999-0764)       2672d99d-361d-4ea4-bcc8-6a6792038bb6

1        representation?

2   A   As best as I can say, yes, it appears so.

3   Q   Let's move to 4.3.  Same question with regard to 4.3, and the

4        question is; did Braintech ever misrepresent or breach its

5        warranty with regard to section 4.3?

6   A   Again, I'm not a professional lawyer and I cannot say with

7        definition that this is correct, but it appears to be their

8        representation.

9   Q   And that they honored it, right?

10   A   I don't know that.

11   Q   Okay.  So you're not able to tell us whether or not they

12        honored this section?

13   A   Correct.

14   Q   What facts would you need to be in a position to be able to

15        tell us that?  Not legal principles.  What facts would you

16        need to be in a position to tell us factually whether or not

17        they did or did not do what they said they were going to do?

18   A   Pertaining to 4.3?

19   Q   Yes, sir.

20   A   The language is so legal in nature that I cannot answer it.

21        But I will tell you that Braintech breached its overall

22        promises to me.  Now, is section 4.3 legally correct or not?

23        I cannot tell you.

24   Q   Well, sitting here today, though, you have no reason to think

25        that that provision was breached by Braintech, do you?

Electronically signed by Susan Hans (201-320-999-0764)        2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 81

1   A   Or vice versa.  I just don't know.

2   Q   I understand.  You understand you're the person that has to

3       prove their case, not me?

4   A   Right.

5   Q   So sitting here today, what proof do you have that they

6       breached anything in 4.3?  That's my question.  It's a very

7       simple question.

8   A   I cannot answer that right now.

9   Q   All right.  What about with regard to section 4.4; same

10      question?

11  A   Again, same thing.  It appears to be correct, but I'm not a

12      legal person so I cannot definitively say this is accurate.

13  Q   When you say it appears to be correct that's the kind of thing

14      that's very vague and won't translate well in the transcript,

15      so what do you mean?  It appears to you that they did not

16      breach section 4.4?

17  A   I don't know.

18  Q   Well, do you have any evidence, today, at your disposal that

19      suggests that they did?

20  A   I might.  But I'm just telling you legally I don't know if I

21      can answer that properly.

22  Q   What facts would you need to be in a position to tell us

23      whether or not the factual statements in there are correct or

24      not correct, that you don't have in front of you now?

25  A   Facts about what?

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 82

1 Q About the representations that were made here.

2 A What representations?

3 Q In 4.4, that, "No finder, broker, agent, financial adviser or

4   other intermediary acted for the Buyer in connection with the

5   negotiation of the agreement"?

6 A My answer is it appears that that is correct, but I cannot

7   tell you for sure, legally.

8 Q So sitting here today, you don't have any evidence to the

9   contrary, right?

10 A I may or I may not.  I'm just telling you I can't tell you.

11 Q Would you have to look through the 83 boxes to be able to tell

12   us that?

13 A That may or may not be the right place.  Perhaps it's

14   Mr. Murphy's place to make that determination for me.  I don't

15   know.  I'm not a legally-trained person.  I can't answer this

16   to you, legally.

17 Q Okay.  So with regard to section 4.5, the Buyer SEC reports,

18   do you find anything in there that tells you that there is a

19   breach or a misrepresentation regarding statements that were

20   made by Braintech in section 4.5?

21 A Again, I don't know.  I cannot answer.  I don't know,

22   personally.

23 Q What additional facts, not legal training, what additional

24   facts would you need to be able to make that determination?

25 A I don't know if I need facts or if I need additional legal

Electronically signed by Susan Hans (201-320-999-0764)        2672d99d-361d-4ea4-bcc8-6a6792038bb6

1        training or both, but I just cannot answer your question.

2    Q   So you're not going to be able to tell us whether or not

3        Braintech was honest or lived up to the warranty it made in

4        section 4.5?

5    A   Or not.

6    Q   If you can't tell us, sir, who is going to be able to tell us

7        that?

8    A   Mr. Murphy will represent that for me.

9    Q   Mr. Murphy is going to tell the jury at your trial about that?

10   A   This legal interpretation, I'm not qualified to answer your

11       question.

12   Q   You're not qualified to tell us whether Braintech made any

13       untrue statements?

14   A   Oh, I can tell you that Braintech made a lot of untrue

15       statements.

16   Q   With regard to the matters in section 4.5?

17   A   I don't know how to answer that properly for you, legally.

18   Q   So sitting here today, though, you have no evidence about any

19       breaches, misrepresentations or things that were not honored

20       with regard to section 4.5?

21   A   I have tons of evidence of Braintech's breaches, we do.

22       There's a lot of material that we have and more.  Now, that's

23       not facts and that's not answering the legality of this

24       statement.

25   Q   Are you going to be able to give us an answer to those, sir,

Electronically signed by Susan Hans (201-320-999-0764)                          2672d99d-361d-4ea4-bcc8-6a6792038bb6

Page 84

1         today?

2   A     I'm trying to answer your question.

3   Q     Are you aware of even one untrue statement that was made in

4         the form 10Q or the form 10K?

5   A     I'm telling you I cannot tell you properly because I'm not

6         legally trained.

7   Q     You're aware that you brought a case against Braintech for

8         securities fraud, correct?

9   A     Yes, yes.

10  Q     Those are very serious allegations.

11  A     Of course.

12  Q     They're companion to criminal allegations in some cases.

13  A     Absolutely.

14  Q     What is your evidence, sir, that there was any breach of

15        section 4.5 of the warranty that was made with regard to the

16        truth of the statements in those SEC-filed forms?

17  A     I could tell you, as a legally untrained person, that I don't

18        know how to answer 4.5.  But I can tell you that I was given

19        supposedly bona fide shares of Braintech at the time of this

20        sale, and I know and I can tell you that even after the lockup

21        period those shares were never registered.  They're worthless.

22        My company was sold for nothing.  I never received any payment

23        for it.  I can tell you that's a breach.  I can tell you that

24        that's a fraud.  I can tell you that that is subject to

25        criminal prosecution and everything else that goes with it.

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

1   Now, does that mean that I have answered 4.5 correctly or not?

2   I don't know, because I'm not a legally-trained person.  And

3   that's the best I can do for you to answer this.  I don't know

4   exactly what this language means, but I know there is a

5   breach.  I know that those shares are worthless, and I know

6   that I was told that they would be worth something.  That's

7   all I can tell you.

8 Q Okay.  So whether or not Braintech complied with section 4.5

9   in your view is dependent upon whether the shares were worth

10   something or whether they ended up being worthless?

11 A There may be other connotations to this language, and that's

12   exactly what I'm trying to convey, that I don't know all the

13   legal connotations, and I don't want to characterize my answer

14   as I comprehend this.  I don't.  I just know what happened.

15 Q Are you telling us you don't comprehend the document, sir --

16 A I --

17 Q -- by which you sold your company?

18 A I understand the general gist of it.  I just don't know the

19   exact ramifications of the phraseology in section 4.5.

20 Q Well, based on the general gist of it what are you able to

21   tell us about whether 4.5 ever became inaccurate?

22 A It appears to be so, but I can't tell you for sure.  That's

23   what I've been saying all along is it appears to be that it is

24   a representation, I just am not legally trained to tell you

25   that I know for sure that I can say that it's right or wrong.

Electronically signed by Susan Hans (201-320-999-0764)        2672d99d-361d-4ea4-bcc8-6a6792038bb6

1    Q    Okay.

2    A    Got it?

3    Q    With regard to section 4.6, Mr. Shafi, the same question.

4    A    Same thing.   Same answers.

5    Q    Have you even read it?

6    A    What's the difference?

7              MR. GREEVES:   Let the record reflect that the

8         Witness is now reading that section 4.6.

9              THE WITNESS:   I have nothing different to say.

10        It appears to be correct.   I don't know the legal

11        ramifications of this phraseology.   I cannot legally say that

12        4.6 is correct or not.   I will tell you that breaches were

13        made.   The same answers even after reading this.

14   Q    (Continuing by Mr. Greeves):   Okay.   Let's turn forward to

15        page 34-of-47, Mr. Shafi.

16   A    Okay.

17   Q    You'll see Article 6, which is called "Covenants."   Covenant

18        one, 6.1, says "Release."   Do you see that?

19   A    I do.

20   Q    And it says, quote, "Seller hereby remises, releases, and

21        forever discharges each company and their respective

22        successors and assigns of and from any and all manner of

23        action and actions, cause and causes of actions, suits, debts,

24        dues, sums of money, accounts, reckonings, funds, bills,

25        specialties, covenants, contracts, controversies, executions,

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

1          the top of it.

2    A     Okay.

3    Q     It says, 6.7, "Certain Hires."

4    A     Yes.

5    Q     "Following the closing Buyer will consider the hiring of a

6          business development employee, administrative assistant to

7          Seller and director of government and international programs

8          of SII recommended by Seller, subject to final approval by

9          Buyer's chief executive officer."  Do you see that language,

10         sir?

11   A     Yes, I do.

12   Q     Anything there that wasn't done by Braintech that should have

13         been done?

14   A     There are two places where this occurs.  In this section, or

15         this small paragraph, which is not full of legal language, it

16         does say that Braintech will consider.  Braintech did

17         consider.  However, this also appears in the revenue condition

18         number one in my employment agreement.  I had to have these

19         hirings take place in order to produce revenue.  That was not

20         done despite a very difficult set of communications with

21         Mr. Weidinger.  He was supposed to hire these people to allow

22         me to execute, and he did not.  He had 60 days to breach the

23         cure.  Towards the end of that period I told him, "You're

24         running out of time to hire people.  You're going to blow away

25         your milestones."  And it was a very difficult set of

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

```
1        communications.  He changed his stance on what commitments he
2        made, and this never happened.  And this is, yet, another one
3        of those breaches that I keep referring to, many, many
4        breaches that were caused by him.  So, yes, this -- Did he
5        consider it?  Yes, he did.  Did he actually do it?  No, he did
6        not.  Did he actually realize that this was a condition to
7        execute and operate and succeed?  Yes, it was, but he never
8        did it.
9    Q   Did you realize that it was a condition to succeed?
10   A   Oh, yes, of course.  And I informed him about it.
11   Q   But it didn't make its way into the stock purchase agreement,
12       right?
13   A   It's not here.
14   Q   Did your lawyers ever propose to have that language changed to
15       reflect your desire to have this commitment to hire --
16   A   I don't recall.
17   Q   -- commitment to hire these individuals?
18   A   See, it wasn't one document that had to contain everything.
19       There were seven or eight or 10 different agreements, and most
20       of these representations were spread around different
21       documents.  Everything was not supposed to be in the share
22       purchase agreement.  Other representations were placed in
23       other documents, in other agreements that we all signed, and
24       they were not made.
25   Q   Is any part of your claim dependent upon a breach of section
```

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

1       completely worthless because all they were going to do is tank

2       the company anyway?

3    A  I can't conjecture for Braintech because I'm not Braintech.

4       All I can tell you is what I experienced.

5    Q  And your experience of nonperformance is what leads you to

6       infer that they never wanted to do any of this stuff anyway or

7       they were never planning to carry out that?

8    A  Right.  Exactly.  I mean, I have no idea, leading up to this

9       acquisition, that they had bad intentions.  We had agreed to

10      all these things over time and made a grand plan to go do all

11      these things with all these requisites and all these

12      arrangements and all these details.  And then when I got there

13      I found out that Braintech was not going to do these things.

14   Q  So please tell me then how Braintech has benefitted from any

15      of this wrong conduct that you allege.

16   A  I can't answer that.  I'm not -- I can't answer for Braintech.

17      I can answer for myself, but I don't know why he did that.  I

18      know that it caused a lot of damage to me.  I know it caused a

19      lot of problems for me.  But I can't speak for Braintech when

20      you ask, how did they benefit by it?  I don't know if they

21      benefitted or not.

22   Q  Well, you read the financials that Braintech has, right?

23   A  Yeah.  So what?

24   Q  You got three million shares of Braintech stock?

25   A  Hm-hmm.

Electronically signed by Susan Hans (201-320-999-0764)                    2672d99d-361d-4ea4-bcc8-6a6792038bb6

1   Q   You don't ever read about the SEC filings the company has?

2   A   I do, from time to time.  But that's Braintech's decisions.

3       I'm not the person dealing with that.

4   Q   Right.  So it's, I guess, your testimony that they really

5       haven't gained from anything here that they did to you?

6   A   I'm saying it's not for me to make that statement or not.

7       That's Braintech.  Ask Braintech.  Don't ask me.

8   Q   Are you aware of whether they're using any of your what we'll

9       call the Shafi IP customers, goodwill, any of that?

10  A   I have no idea, because I have no access to that property

11      anymore.  I have no access to their people.  I have no idea

12      what they're doing or not doing.  I have no idea.

13  Q   So you have no level of awareness at all about what they're

14      doing?

15  A   No, I don't.

16  Q   We're not going to go through these in order, but I'm going to

17      show you what has been marked as Shafi 5 and ask you to take a

18      look at that.  Let's just go through these.  Starting on page

19      2, Mr. Shafi, Jim Dara.  Have you had any conversations with

20      Mr. Dara since you left the company?

21  A   No.

22  Q   How about Mr. Habibi; have you had any conversations with him

23      since you left the company?

24  A   No.

25  Q   How about Donna Burr?

Page 272

1    STATE OF MICHIGAN          )

2                              )    ss:

3    COUNTY OF KENT             )

4         I hereby certify that the foregoing attached pages

5    are a full and complete transcript of the proceedings held

6    on the date and at the place hereinbefore set forth.  I

7    reported electronically the proceedings held in the matter

8        hereinbefore set forth, and the testimony so reported was

9    subsequently transcribed under my direction and supervision,

10   and the foregoing is a full, true and accurate transcript of

11   my original electronic recording.

12

13   _____

14        Susan M. Hans, CER-8085

15

16

17

18

19

20   Notary Public

21   Kent County, Michigan

22   My Commission Expires:

23   July 12, 2013

24

25

Page 273

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC.,

                                               CASE NO: 09-10454

        Plaintiff/Counter-Defendant,

v

ADIL SHAFI,

               Defendant/Counter-Plaintiff/
               Third-Party Plaintiff,

v

FREDERICK WEIDINGER AND
BRAINTECH, INC.,

               Third-Party Defendant/Counter-Defendant.

_____/

        Volume II of the Deposition of ADIL SHAFI,

taken before me, Susan M. Hans, CER 8085, on July 30, 2010, at 535

Griswold, Suite 1900, Detroit, Michigan, commencing at or about

9:15 a.m.

APPEARANCES:

BY:  JAMES P. MURPHY, ESQUIRE
BERRY MOORMAN
535 Griswold, Suite 1900
Detroit, Michigan  48226
Appearing on behalf of the Plaintiff.

BY:  GEOFFREY J. GREEVES, ESQUIRE
PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
2300 North Street, NW
Washington, DC  20037
Appearing on behalf of the Defendant, Frederick Weidinger and
Braintech, Inc.

Page 304

1      that I destroyed was -- I never deleted their e-mails.  This

2      is an utter and complete lie.  Please write this in boldface

3      in your record that this is an utter and complete lie.  I

4      never did that.  This is a total lie.

5  Q   Mr. Shafi, please do not shout.  My question is you obviously

6      disagreed with Mr. Milton's observation about the e-mails.

7      Did you ever explain to anyone at Braintech, or did you ever

8      respond to this allegation?

9  A   No.  I had no reason to because I had no access to their

10     server.  I had no access to deleting their e-mails.  All the

11     e-mails I had were in my laptop.  I never had access to their

12     server.  I never had access to any of their materials.  I

13     never had access to their computers.  They would not give it

14     to me.  How can I ever delete any e-mails of Braintech

15     property?  And they used this reason to stop my wages.  It's

16     unbelievable.

17              MR. MURPHY:  We're going to take a short

18     timeout.

19              MS. WIDLAK:  That's fine.

20              (At or about 10:10 a.m. a short break was taken off

21              the record, and the deposition resumed at or about

22              10:15 a.m.)

23  Q   (Continuing by Ms. Widlak):  Mr. Shafi, just to identify this,

24     I'm handing a letter to you from Mr. Weidinger that appears at

25     tab seven of Shafi Exhibit 1, the big collection of documents,

1          and I just wonder if you could identify that as your

2          termination letter from Mr. Weidinger?

3     A    Yes.

4     Q    What's the date on that, please?

5     A    November 19, 2008.

6     Q    Okay.  Thanks very much.  Did you receive this letter at the

7          November 19th meeting in Virginia?

8     A    Yes.  It was put forward to me as a surprise at that time.

9          They talked to me for a few minutes and asked me what --

10         overall things about sales and then presented -- And actually

11         tried to coerce me into signing a letter about the rescission.

12         Something about a rule evidence 408 or something like that.

13         They actually forced, or tried to force me, to sign that in

14         their presence with absolutely no advice from Counsel right

15         there on the spot.  I was pushed at that meeting to sign that

16         rescission letter or rule of evidence to engage in

17         discussions.  He made this grandiose story like, "Oh, Adil, we

18         can do partnership again.  I have something much better.  We

19         will rescind this to you.  It's good for you.  Take that back

20         and we will build something new."  He painted this -- And I

21         knew him by now well enough that I told him I was not capable

22         of signing anything for him.

23    Q    Okay.  But you, in fact, did not sign anything on November 19,

24         2008?

25    A    No.  I did not sign anything on November 19th, but he did push

1       me to sign it.

2                   (Whereupon Exhibit Number 33 was marked for

3                   identification, at or about 10:17 a.m.)

4    Q    (Continuing by Ms. Widlak):  I'm handing you what has been

5         marked as Exhibit 33.  And is this the information that you

6         entered on your LinkedIn page?

7    A    I believe so.

8    Q    Okay.  Please take a look at it and make sure it looks

9         familiar, then we'll talk about it.

10   A    Okay.

11   Q    Thank you.  Sorry about that.  Do you recall entering this

12        information in Exhibit 33 on your LinkedIn page --

13   A    Yes.

14   Q    -- on the internet?

15   A    Yes.

16   Q    Okay.  So the record is clear, LinkedIn is a business-oriented

17        social networking site; would you agree?

18   A    I wouldn't call it a social networking.  I think it's more of

19        a professional networking.

20   Q    I think that's accurate.  You're right.  And it's common for

21        people to list their credentials, their experience, their

22        education, and in fact, you did that.  It shows that you went

23        to Michigan Technological University, correct?

24   A    Yes.

25   Q    And it lists some of your former jobs.  Is it fair to say that

Page 357

1          first and another debt would be paid later?

2     A    The obligation of the debt -- The short answer is no.  But the

3          debt schedule speaks for itself.  It has all the amounts.  It

4          has all the months.  It has all the payees.  I gave all the

5          information about those people.  We had conference calls with

6          Ted White, Rick Weidinger, Heather Greenlay, and myself prior

7          to the closing, going over this debt schedule, which was

8          updated by Heather Greenlay several times.  That debt schedule

9          was not something I gave Braintech.  It was something

10         Braintech updated, itself, made those commitments, and that

11         was one of the last e-mails Weidinger sent to me before we

12         closed the deal on August 12th.  So Braintech had a very

13         active role in making those commitments of payments.

14    Q    All right.  Did you have an understanding of how Braintech was

15         going to come up with the million dollars to pay off -- or the

16         $900,000.00 to pay off these debts?

17    A    That was not my problem.  That was their problem.

18    Q    I'm not asking if it was your problem, Mr. Shafi.  Please

19         listen to the question; okay?   I'm only trying to learn what

20         you know.  Did you have an understanding from anybody in the

21         world as to how Braintech was going to pay back that money?

22    A    Braintech was going to pay that money from its resources.

23    Q    Are you aware of whether or not Braintech had resources at

24         that time to pay that money?

25    A    That was not for me to know.

1          access to Braintech's bank account.  I had no access to

2          Braintech's financial records.  I had no access to their

3          e-mail servers.  I mean, I had no access to the corporate

4          computers.  I mean, I may be called COO, but my role was

5          extremely limited, and what was made available to me as a

6          Braintech employee was extremely limited.  I mean, I had no

7          access to what Ted White was -- what the checkbook balance was

8          in the company.

9     Q    So you're not aware of whether or not Braintech hid anything

10         from you, to this very day, in connection with its ability to

11         repay the monies?

12    A    That's correct.  I don't know what they had and what they did

13         not have.

14    Q    Isn't it equally plausible that Braintech wasn't able to pay

15         down its debt because it didn't have any revenue coming in

16         after the transaction?

17    A    It certainly is possible.

18    Q    Can you exclude that possibility?

19    A    What do you mean exclude it?

20    Q    I mean, couldn't that be the reason that they were unable to

21         pay the debt?

22    A    That's not my problem.  See, it's not for me to make that call

23         and answer you.  It's a commitment they took on.  That was

24         their problem.  I don't have to guess, sitting here, whether

25         they were supposed to pay or not pay based on whether income

1    STATE OF MICHIGAN          )

2                              )    ss:

3    COUNTY OF KENT            )

4        I hereby certify that the foregoing attached pages

5    are a full and complete transcript of the proceedings held

6    on the date and at the place hereinbefore set forth.   I

7    reported electronically the proceedings held in the matter

8    hereinbefore set forth, and the testimony so reported was

9    subsequently transcribed under my direction and supervision,

10   and the foregoing is a full, true and accurate transcript of

11   my original electronic recording.

12

13                      _____

14                      Susan M. Hans, CER-8085

15

16

17

18

19

20   Notary Public

21   Kent County, Michigan

22   My Commission Expires:

23   July 12, 2013

24

25

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


BRAINTECH, INC.,

      Plaintiff/Counter-Defendant,

                                CASE NO:09-10454

vs

ADIL SHAFI,

      Defendant/Counter-Plaintiff/
      Third-Party Plaintiff,

vs

FREDERICK WEIDINGER AND BRAINTECH, INC.,

      Third-Party Defendant/Counter-

      Defendant.

_____/


                Volume III of the deposition of ADIL

SHAFI, taken before me, Lauri A. Sheldon, CSR 4045, RPR,

on October 22, 2010, at 535 Griswold, Suite 1900,

Detroit, Michigan, commencing at or about 1:35 p.m.

APPEARANCES:

     BERRY MOORMAN
     BY:  JAMES P. MURPHY, ESQUIRE
     535 Griswold, Suite 1900
     Detroit, Michigan  48226
     Appearing on behalf of the Plaintiff.

Page 454

1       Shafi Innovation, Inc.  Braintech stole these companies.

2       It was a highway robbery, because the shares tendered to

3       me were utterly useless.

4   Q   My question was a very simple question, sir.

5   A   Okay.

6   Q   After the six-month period played itself out did you ever

7       contact Braintech -- Let me finish.  Did you ever contact

8       Braintech to enlist their help in registering these

9       securities?

10  A   I did not contact Braintech.

11  Q   And you were aware, were you not, that Braintech had an

12      in-house counsel, correct?

13  A   Well, they came and went, but I basically knew that these

14      were -- I mean I was not on good terms with Braintech,

15      and I didn't have to contact Braintech to do that.  I was

16      told these shares are bona fide shares.

17  Q   Okay.

18  A   Or pieces of paper.

19  Q   Mr. Shafi, all I want is factual information.  Did you

20      ever -- You knew that Braintech had an in-house lawyer

21      who dealt with securities, right?

22  A   At the last time of my interaction with Braintech was in

23      November of 2008.  I didn't know if Braintech had fired

24      lawyers or hired more in 2000 -- in February of 2009.  I

25      was not inclined to contact Braintech because of the

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 506

```
 1  A   So my wife helps me with copying and paperwork, but she
 2      doesn't receive a salary or dividend from that work.
 3  Q   You provided some testimony earlier about Edward Jones
 4      and Fidelity Investments.  Have you maintained
 5      documentation of any of the emails with those
 6      institutions on your laptop or your PC, whichever one you
 7      were using?
 8  A   I testified earlier that I did not have written records
 9      of them.  I had phone calls and conversations and
10      in-person meetings, but I did not have a written record
11      or emails with them.  I may have, but I don't recall.
12  Q   That's something that you could look for and check
13      though, correct?
14  A   Possible.
15  Q   All right.  I want to go back to November of 2008 when
16      you were informed by Braintech that your employment was
17      terminating.  What did you do for work between
18      Thanksgiving of 2008 and February and March of 2009 when
19      you started working for Advenovation?
20  A   Well, okay.  What did I do, so I'll tell you what I did.
21      Well, first of all --
22  Q   Not just what you did, sir.  What did you do for work?
23      What did you do to earn money --
24  A   Okay.
25  Q   -- during that period?
```

```
 1   A      I'll tell you.  I'll tell you.  It was an extremely
 2          unfortunate date, because it was the day before my health
 3          insurance was supposed to vest with Braintech, so on the
 4          89th day of my employment with Braintech, that's when I
 5          was -- It wasn't -- Okay.  So basically I was let go at
 6          that time.  It was the day before Thanksgiving, and as
 7          you might know in our industry here, most people stop
 8          working on new projects right around deer hunting season.
 9          By Thanksgiving and Christmas nobody's working anymore,
10          so I absolutely did no work.  I had no work to find.  It
11          was an extremely unfortunate period of the year that this
12          happened, because there was no work to be found, despite
13          my qualifications.  I actually went and sold my house
14          chairs for a hundred bucks somewhere in Detroit so I
15          could bring in a hundred dollars.  I took software that I
16          had some -- prepackaged software, some personal
17          entertainment software, sold it to a pawn shop for five
18          bucks.  I mean that's what I was doing for work.  I was
19          selling my chairs and personal belongings for very little
20          money.  I made absolutely no money until I started
21          working at Advenovation, and in the meantime my wife's
22          family stepped in and helped us at an extremely difficult
23          time.  Not only was I encumbered by my lines of credit,
24          our mortgage, lack of income, I also had these threats
25          and this JMP Engineering thing, which was $6,000 a month.
```

1    I mean I have all those records and I have a full

2    understanding of how difficult this period was for me.

3    Not only was I not making income, I was making negative

4    income.  I was making negative income because of all

5    these debts and loans and encumbrances that I had.  And

6    when Braintech failed to meet its obligations and

7    breached its obligations to me and the employment went

8    away and the reason cited was that my salary stopped

9    because I deleted some email, which is an utter

10   falsehood, I did -- I never had access to any of those

11   servers, so I did noth -- And I believe that my

12   employment was terminated without good cause, that I was

13   entitled to the severance of $700,000 or so, which is

14   spelled out in paragraph 12 of my employment contract.

15   But the answer to your question is I did not do anything.

16   I had no work.  I was -- It was a period of time when

17   there was no work to be found because the industry

18   doesn't really work around that time.  I went through

19   some extremely difficult period of time, and the only

20   people that saved us was my wife's family and some key

21   friends who stepped in and helped.

22 Q  This question is a little bit different, so listen to it

23   for me, please.  What did you do -- I understand you're

24   saying you did nothing, you did not have work.  What did

25   you do from Thanksgiving of '08 to when you started

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 516

```
 1              corporation at this point in time; you're satisfied with
 2              running Advenovation; is that true?
 3    A         By enlarge.  I mean if somebody offered me a billion
 4              dollars to run some other big company, I would consider
 5              it.
 6    Q         Do you think that's likely to happen?
 7    A         Probably not, but, you know, there are people who are
 8              interested in my skills, and so these types of things do
 9              come up and, you know, I deal with them on a day-to-day
10              basis.
11    Q         Sir, I'm handing you Exhibit 1 from the first deposition,
12              and you'll see I have two tabs.  You don't need to look
13              through the entire document.  If you will just look at
14              tab one -- Not tab one, but the first yellow that I have.
15              You've got it.  You've got it.  You did it exactly right.
16              And I don't want to get into the substance of this
17              letter.  If you want to review it very quickly there just
18              to refresh your recollection as to what it is, this is --
19              I'm going to identify it for the record just for
20              quickness here -- is a letter addressed to Mr. Adil Shafi
21              dated November 19, 2008, signed by Rick Weidinger.  You
22              recall receiving that letter, do you not?
23    A         Okay.  Yeah, I recall it.
24    Q         All right.  I have not seen it, and I think I've looked
25              fairly carefully through all of the documents that have
```

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 517

1    been exchanged in this case, but can you confirm for me

2    that there is no document from you responding to this

3    letter of Mr. Weidinger?

4    A   I believe that's correct.

5    Q   All right.  If you'd go to the second tab.  For the

6    record, this appears to be an email from Jeff Milton to

7    Adil Shafi dated Monday, November 24, 2008, and it's two

8    pages.

9    A   Okay.  I recall this.

10   Q   And the same question as I asked with the other document.

11   I have not seen it and I would like you to confirm for me

12   that there is no written document from you responding to

13   the email from Mr. Milton.

14   A   I believe that's correct.

15   Q   Did you have any verbal communication with Mr. Milton

16   after this email was sent to you?

17   A   I don't recall.  We may have left voice messages.  I know

18   there was some emails exchanged after this, which I have

19   on record.  I believe it's part of our discovery

20   material.  It's in -- on the record and in our discovery

21   material, the emails that were exchanged with Milton, but

22   I don't recall.  I know we did not -- I did not make

23   any -- It was utterly unacceptable to me.

24   Q   Sir, the question:  Any verbal communication with Mr.

25   Milton after this email?

Electronically signed by Lauri Sheldon (001-336-738-9633)          82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 518

1   A   I don't recall.

2   Q   Okay.  It's possible, but you would have no idea of what

3       was said?

4   A   I don't recall.

5   Q   But what I said is true; at this point in time you have

6       no recollection of what was said if there was a verbal

7       communication?

8   A   There -- Yeah, I don't -- I don't remember what --

9       what exactly we did.

10  Q   Going back to the letter from Rick Weidinger, any verbal

11      communication with Rick Weidinger after this letter was

12      sent to you?

13  A   I do not believe so.

14  Q   Okay.  Is Advenovation solvent at this point in time?

15  A   It's Advenovation.  Yes, I believe so.

16              MS. KOVAL:  I need to confer for just a

17      few minutes and . . .

18              (Whereupon a recess was taken at or about

19      the hour of 5:10 p.m., and the deposition was resumed at

20      or about the hour of 5:16 p.m. )

21  Q   (Continuing by Ms. Koval):  Mr. Shafi, the PC and laptop

22      that you used when working for Braintech, that was the

23      same PC and laptop you used when you worked and did work

24      on behalf of Shafi, Inc., and Shafi Innovations, right?

25  A   Yes.

Electronically signed by Lauri Sheldon (001-336-738-9633)                    82ffdfd7-078e-4382-96cf-6d28b563e04a

Page 521

1

2

3    STATE OF MICHIGAN      )
                            )    ss:
4    COUNTY OF MACOMB       )

5

6

7        I hereby certify that the foregoing attached

8    pages are a full and complete transcript of the

9    proceedings held on the date and at the place

10   hereinbefore set forth.  I reported stenographically

11   the proceedings held in the matter hereinbefore set

12   forth, and the testimony so reported was

13   subsequently transcribed under my direction and

14   supervision, and the foregoing is a full, true and

15   accurate transcript of my original stenotype notes.

16

17                    _Lauri A. Sheldon_____

18                    Lauri A. Sheldon CSR-4045, RPR

19

20   Notary Public
     Macomb County, Michigan
21   My Commission Expires:
     February 8, 2015

22

23

24

25

Electronically signed by Lauri Sheldon (001-336-738-9633)          82ffdfd7-078e-4382-96cf-6d28b563e04a