UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADIL SHAFI.,

    Counter-Plaintiff/ Third Party Plaintiff,

v.

FREDERICK WEIDINGER and
BRAINTECH, INC.,

    Third Party Defendant/ Counter-Defendant.

_____/

Hon. Victoria A. Roberts

Case No. 09-10454

### ORDER

**I.    INTRODUCTION**

This matter is before the Court on Counter Defendants Braintech, Inc.'s and Frederick Weidinger's (referred to here as "Defendant" or "Defendants") Joint Motion for Summary Judgment. (Doc. 66).

Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

**II.    BACKGROUND AND PROCEDURAL HISTORY**

This suit arises from an unsuccessful acquisition between Adil Shafi and Braintech, Inc.

Adil Shafi was President and sole owner of Shafi, Inc. and Shafi Innovation, Inc., two private Michigan corporations, specializing in vision guided robotics software. Braintech, Inc. was a publicly traded robotic software technology company.

In 2008, Shafi Inc.'s finances were in dire condition. The company had negative

cash flow, was behind with its creditors, was unable to pay past due wages to current and former employees, and owed significant tax debt.

Similarly, Braintech was then experiencing its own difficulties. In a quarterly report filed in May 2008 with the Securities Exchange Commission (SEC) for January, February, and March 2008, Braintech reported that all of its revenue was generated from a single contract. That contract was to expire on December 31, 2008.

Moreover, in its 2007 10-KSB filed in March of 2008 with the SEC, Braintech publicly disclosed its financial statements and reported several risk factors, preceded by this warning:

> An investment in our common stock involves a number of very significant risks. . . . You could lose all or part of your investment due to any of these risks.

Some of the reported risk factors include:

> We may require additional funds to achieve our current business strategy. Our inability to obtain such financing will inhibit our ability to expand or even maintain our business operations.
> . . .
> We have a history of losses and have a significant deficit, which raises substantial doubt about our ability to continue as a going concern.
> . . .
> Because we can issue additional common shares, purchasers of our common stock may incur immediate dilution and may experience further dilution.
> . . .
> Currently, we rely on a single channel partner to distribute and generate sales of our products. If our channel partner is unsuccessful in distributing and generating sales of our products, or if the relationship with our channel partner is terminated and we are unable to find a suitable replacement, our business may fail and investors may lose their entire investment.
> . . .
> Our common stock is illiquid and the price of our common stock may be

negatively impacted by factors which are unrelated to our operations.

In November of 2007, Frederick Weidinger became Braintech's director and single largest shareholder. Weidinger refocused Braintech's business strategy, hoping to commercialize its technology and gain new customers. To that end, in early 2008, Weidinger approached Shafi, and they soon began partnership negotiations. These negotiations transformed into an outright acquisition of Shafi's companies.

On August 12, 2008, Braintech and Shafi entered into six agreements: (1) Share Purchase Agreement (SPA), in which Braintech purchased all of Shafi, Inc. and 80% of Shafi Innovation, Inc.; (2) Lock-up Agreement, in which Shafi agreed not to sell, transfer, or dispose of the Braintech stock for six months, and not sell or transfer more than $25,000 of stock in any calendar week after the six month period; (3) Employment Agreement, under which Braintech hired Shafi as Chief Operating Officer for three years, with a base salary of $180,000 annually; (4) Non-Competition Agreement; (5) Letter Agreement; and (6) Promissory Note. Under the SPA, Shafi received 3,000,000 shares of Braintech stock issued at closing, with 1,000,000 additional shares promised when certain performance goals were achieved. Additionally, Braintech agreed to pay $900,000 of debt from Shafi, Inc.

Within months of signing these contracts, the deal went sour. Braintech claims that Shafi did not do his part to bring in revenue and that he misrepresented his companies' assets. Shafi claims that Braintech never intended to perform the contracts, sabotaged his ability to perform his job, breached all material provisions immediately, and defrauded him of his life's work.

On November 19, 2008, Braintech put Shafi on "administrative leave" with pay

and benefits, and notified him that Braintech wanted to rescind all the contracts. On November 24, 2008, Braintech notified Shafi that his "administrative leave" would continue, but that, as of close of business that very day, he would no longer receive pay or benefits. In this notice, Braintech also outlined its terms for a "mutually agreed" rescission; however, the parties never reached an agreement, and on February 6, 2009, Braintech filed suit against Shafi, asking the Court to rescind the acquisition.

In response, Shafi brought a counterclaim against Braintech and Weidinger for: Count I- declaratory judgment that Braintech breached Shafi's employment contract; Count II- breach of employment contract; Count III- fraud/fraud in the inducement with respect to the SPA; Count IV- securities fraud in violation of securities exchange rule 10(b); Count V- securities fraud in violation of the Michigan Uniform Securities Act; Count VI- conversion; and Count VII- unjust enrichment. Counts I & II are asserted against Braintech; all other Counts are asserted against both Braintech and Weidinger.

The Court dismissed Braintech's suit against Shafi on June 3, 2010. The only claims remaining before the Court are Shafi's counterclaims against Braintech and Weidinger.

## III.   STANDARD OF REVIEW

Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In reviewing a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden-Alimak, Inc.*, 799 F.2d

1128, 1133 (6th Cir. 1986).

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must, by affidavit or otherwise as provided by Rule 56, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

## IV.   APPLICABLE LAW AND ANALYSIS

### A.   Counts I & II- Breach of Employment Agreement

#### (1) Choice of Law

Paragraph 18 of the Employment Agreement (Agreement) states:

<u>Governing Law:</u> This Agreement is governed by and construed in accordance with the domestic laws of the State of Delaware without giving effect to any choice of law or conflict of law provision or rule (whether of Delaware, Province of British Columbia or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Defendants apply Michigan law in the Joint Motion. Shafi contends that Delaware law applies. Defendants concede this in their Reply. The Court applies

Delaware law to interpretations of the Agreement.

### (2) Breach

Shafi says that Braintech terminated him without notice or good cause, and failed to pay him a severance. He says that the Agreement did not provide for administrative leave, and that Braintech effectively terminated him by ostensibly placing him on administrative leave.

Braintech says it is entitled to summary judgment because there is no question that it had good cause to terminate Shafi. Braintech contends that Shafi willfully failed to perform his duties under the Agreement, which constituted good cause. Braintech says the notice of administrative leave was notice of termination.

"Under Delaware law, the proper interpretation of language in a contract is a question of law." *Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1030 (Del. Ch. 2006). If the language of a contract is plain and unambiguous, the Court should enforce the contract's plain meaning. *Id.* "Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties." *Id.*; *see also Citadel Holding Corp. v. Roven,* 603 A.2d 818, 822 (Del. 1992).

Paragraph 12(d) of the Agreement states, in part: "Braintech may terminate the employment of [Shafi] with 30 day notice for any reason."

Paragraph 12(g) of the Agreement entitles Shafi to a severance package if he is terminated without good cause:

In the event of a termination of this Agreement by the Company without

> Good Cause, . . . then Shafi . . . will be entitled to:
>
> i.  unpaid compensation and benefits described hereunder earned up to the termination date to be paid within 10 business days of the termination; and
>
> ii. a lump sum payment (less all deductions required by law such as income taxes) equal to the remainder of the then Base Salary remaining in the three year employment term set out in paragraph 5 to be paid within 20 business days after the Termination Date.

"Good Cause" is defined in the Agreement, and includes "the willful and continued failure by [Shafi] to substantially perform his duties hereunder (other than due to incapacity from physical or mental illness)." Employment Agreement, ¶ 12(a).

The parties agree that (1) Shafi may be fired for any reason with 30 days notice; (2) if Shafi is fired for good cause, he is not entitled to severance pay; and (3) if Shafi is fired without good cause, he is entitled to severance pay. There are genuine issues of material fact as to whether Shafi was terminated with 30 days notice and for good cause, which precludes summary judgment.  This includes, but is not limited to, whether Shafi was unable to perform his duties under the Agreement due to the actions or inactions of Defendants.

Defendants say in their reply brief that, even if there is a genuine issue of fact as to good cause, Shafi was not entitled to severance because he did not execute a full release as required by the Agreement as a prerequisite to receiving severance.  Shafi did not address this argument in his sur-reply.  However, because the issue is not clear to the Court, summary judgment is inappropriate.

Clearly, the Agreement requires Shafi to sign a release after he is terminated, and before he receives severance; however, the Agreement states the release will be

"in the form of a severance agreement." Employment Agreement, ¶ 12(g).  Generally, it is not incumbent upon an employee to draft a severance agreement, and Defendants have not argued that they presented a severance agreement with a release to Shafi, or that he declined to sign it.  Indeed, this argument appears illogical under the circumstances, as Defendants contend that Shafi is not entitled to severance.

Shafi's Employment Agreement claims will proceed.

### B.     Fraud/ Fraud in the Inducement (Count III)

Shafi says that Defendants made material fraudulent representations to induce him into entering into the SPA, so that they could the acquire valuable assets of his companies for virtually no consideration.  Defendants say that Shafi has no evidence of fraud, misrepresentations, or reasonable reliance on those misrepresentations.  Defendants contend that Shafi's claim under the SPA sounds purely in breach of contract.  The Court agrees.

According to a governing law provision in the SPA, Michigan law applies.

Under Michigan law, "[f]raud in the inducement occurs where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Serv. Inc. v. Wild Brothers,* 210 Mich. App. 636, 639 (Mich. Ct. App. 1995).  It is a defense to the formation of the contract.  *46th Cir. Trial Court v. Crawford Co.,* 266 Mich. App. 150, 160 (Mich. Ct. App. 2005).  "Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." *Begola,* 210 Mich. App. at 640.

To establish a claim for fraudulent misrepresentation, a plaintiff must show that:

"(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Belle Isle Grill Corp v. Detroit*, 256 Mich. App. 463, 477 (Mich. Ct. App. 2003).

Defendants argue that Shafi's fraud claims fail because (1) all of the alleged misrepresentations were promissory statements to act in the future and (2) Shafi could not reasonably rely upon any of the alleged misrepresentations, because they were only opinions or puffing.

### (1) Statements regarding future conduct.

A claim of fraud generally must be predicated upon a past or existing fact. *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336 (1976). "The general rule is that promissory statements that one will do a particular act in the future, as opposed to misstatements of past or existing facts, are not misrepresentations, but are contractual in nature, and do not constitute fraud." *Aero Taxi-Rockford v. General Motors Corp.,* 2006 WL 1479915 at *15 (Mich. Ct. App. May 30, 2006). However, Michigan law recognizes an exception for promises made in bad faith without intent to perform. "To fall within this 'bad faith' exception, the evidence of fraudulent intent must relate to conduct by the actor at the time the representations are made or almost immediately thereafter." *Jim-Bob, Inc. v. Mehling,* 178 Mich. App. 71, 90 (Mich. Ct. App. 1989).

Shafi says that his fraud claim falls squarely into this bad faith exception. Shafi

argues that statements made by Weidinger leading up to the signing of the SPA, and the promises made by Braintech in the SPA itself, were made fraudulently because Defendants never intended to perform.  Shafi identifies the following as evidence of this: Defendants conditioned payment of the Shafi's debt upon Shafi producing revenue for Braintech, yet omitted this condition from the negotiations and contract; Immediately after closing, Braintech breached virtually all material provisions of the contract, including provisions which required Braintech to expend money immediately after closing.  For example, Shafi claims Braintech promised, yet failed to, make payments on the debt, open a Michigan office, give Shafi access to Braintech servers, acquire robots for demonstrations, and provide any support for Shafi so that he could successfully perform his job.

For these promises identified by Shafi to be actionable in fraud, Shafi must present evidence that Braintech had no intention of performing the promises at the time they were made. This can be shown by Braintech's conduct at the time of making the promise, or its conduct almost immediately thereafter. *Danto v. Charles C. Robbins Inc.,* 250 Mich. 419, 425 (1930).  Here, Plaintiff presents only the alleged omitted condition that Shafi produce revenue, and the alleged immediate breach by Defendants; this evidence is insufficient to create a genuine issue of material fact of bad faith and lack of intent to perform.

Plaintiff points to the fact that Braintech allegedly failed to perform these promises, even though some of them required Braintech to make outlays of money soon after signing, as evidence that it never intended to perform.  First, Braintech claims that it did perform these promises, at least until it believed that Shafi had breached or

fraudulently misrepresented information about his companies.  Second, even if it is true that Braintech did not perform these promises, this alone is not evidence that Braintech made them in bad faith.  "A mere change in circumstance after the promise was made, or the non-performance of a promise does not constitute fraud." *A.P.J. Assocs., Inc. v. North American Philips Corp.,* 2001 WL 279760 (E.D. Mich. Jan. 30, 2001); *Higgins v. Lawrence,* 107 Mich. App. 178, 185 (Mich. Ct. App. 1981) (broken promise of salary plus bonuses not evidence of fraudulent intent or bad faith, but breach of contract).

Shafi also points to Defendants' belief that Shafi had to produce revenue as a condition for Braintech to pay the $900,000 debt identified in the agreements.  Shafi says the fact that Defendants omitted this material condition from the contract is evidence of bad faith and lack of intent to perform.  However, Braintech argues that Shafi was bound to produce revenue as part of his employment, and that the condition was not omitted at all.  This seems to be a dispute about the terms of the contract, not evidence of fraud.  And, even if Braintech believed during negotiations that the payment of the debt was dependent upon Shafi bringing in revenue, and failed to sufficiently make this clear or include it in the contract, this, on its own, does not evidence fraud.

There is no evidence showing an intent to defraud, or that the statements prior to the contract or the promises in the contract were made in bad faith, with no intent to perform.

### (2) Statements of opinion or puffing

Additionally, Braintech says the statements Shafi identifies are not actionable because they are mere expressions of opinion or puffing upon which Shafi could not reasonably rely.

"An action for fraud may not be predicated upon the expression of an opinion or salesmen's talk in promoting a sale, referred to as puffing." *Van Tassel v. McDonald Corp.,* 159 Mich. App. 745 (Mich. Ct. App. 1987) (holding statements persuading plaintiff to buy business, including "plaintiff could make more money owning her own business than she could at Chrysler" and the "store was a goldmine," not actionable). Puffing includes "a salesman's praise of his own property, involving matters of estimate or judgment upon which reasonable men may differ." *Hayes Const. Co. v. Silverthorn,* 343 Mich. 421, 426 (1955) (statements that furnace required little fuel or maintenance, and would "do the job" mere puffing).

Some of the alleged misrepresentations Plaintiff identifies in the Complaint are:

- "an acquisition with Braintech assuming your business debt and buying your stock, all brhi [Braintech] stock upfront to you, big leadership contract for you with monthly payments for 2.5 years of agreement, cash deposit at execution . . . *would be best transaction for all.*" ¶45.

- "we will do what is best for Braintech *which is also best for you.*" ¶50.

- "things have moved, but *not materially adverse to you.*" ¶50.

- "you are getting all stock up front." ¶50.

- "you should have confidence in me that we are *putting the best deal for both.*" ¶50.

- "you need to do this deal and I still think it will accelerate business for brhi [Braintech]. It is not perfect for either of us but *it is very good for you (sic) bottomline.*" ¶50.

The Court agrees that these statements are not actionable in fraud; they are opinion and sales talk (puffing), upon which Shafi could not reasonably rely. This is especially true, where, as here, Shafi had access to Braintech's financial statements

and reported risk factors. *See Schuler v. American Motors Sales Corp.,* 39 Mich. App. 276, 280 (Mich. Ct. App. 1972) ("There is no fraud where means of knowledge are open to the plaintiff and the degree of their utilization is circumscribed in no respect by defendant."). Any claim that Shafi relied on statements by Weidinger that Braintech was financially sound and the business venture was sure to be a success, lacks merit.

Other alleged misrepresentations that Shafi points to appear to be memorialized in the SPA. As discussed above, that promises in the contract were broken, is not evidence of fraud.

There is no evidence showing an intent to defraud. Nor is there evidence that statements made before the parties signed the SPA, or that are in the SPA, were made in bad faith, with no intent to perform.

The Court dismisses this claim.

### C. Violation of § 10(b) of the Securities Exchange Act (Count IV)

Shafi says that Weidinger's deceptions, misstatements, and omissions are a violation of the Securities Exchange Act.

Section 10(b), 15 U.S.C. §78j(b) provides that it is unlawful:

> To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 states that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a

> material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates
> or would operate as a fraud or deceit upon any person, in connection with
> the purchase or sale of any security.

17 C.F.R. §240.10b-5

To prove a federal securities fraud claim, a plaintiff must show: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) loss causation. *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 920 (6th Cir. 2007).

Defendants contend that Shafi's federal securities claims must be dismissed because Shafi cannot prove scienter or loss causation. Because the Court finds that Shafi is unable to prove loss causation, it is not necessary for the Court to address Shafi's evidence of scienter.

Loss causation requires a causal connection between the alleged material misrepresentations and the loss, much like proximate causation in tort law. *See Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 920 (6th Cir. 2007). Loss causation accounts for the reality that many factors may affect the price of securities. Thus, a falling securities price may reflect "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342-43 (2005).

> The [loss] causation requirement is satisfied in a Rule 10b-5 case only if
> the misrepresentation touches upon the reasons for the investment's
> decline in value. If the investment decision is induced by misstatements

> or omissions that are material and that were relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

*D.E. & J Ltd. P'ship v. Conaway,* 248 F.Supp.2d 719, 747 (6th Cir. 2003) (quoting *Campbell v. Shearson/ American Exp. Inc.,* 829 F.2d 38 (6th Cir. 1987)).

Therefore, for Shafi to maintain his Rule 10b-5(b) claim, he must do more than show that the securities he purchased fell in value; he must show the alleged omissions and misrepresentations were the proximate cause of his loss.

Shafi fails entirely in his response brief or sur-reply to defend against Defendants' challenge to loss causation. Shafi addresses it only in footnote 13 of his response: "Parenthetically, at the end of Weidinger and Braintech's academic discussion of Rule 144, they note that Shafi has failed to establish loss causation." Response at 38. He goes on to challenge the contention that Braintech's promise to pay his debt was conditional on Shafi producing revenue. However, this fails to demonstrate how Defendants' alleged failure to communicate this condition proximately caused Shafi's pecuniary loss.

It is clear from Shafi's papers that he considers this alleged omission critical and material. However, even if the Court accepts this as true, this only shows that if Shafi had known of the omitted condition, he may not have entered into any of the contracts with Braintech. This is insufficient to show loss causation.

It is simply not clear to the Court how Shafi intends to show that Defendants' alleged omissions and misrepresentations caused Braintech's stock price to drop or become worthless. Furthermore, it is not clear whether this is Shafi's contention. As Shafi says in his brief, the stock was "worthless at the time of the issue, worthless at

any time Shafi attempted to sell it and worthless today." Response at 38. It appears that Shafi contends that the stock was always "worthless," and had he known of this, or had he not relied on Defendants' misrepresentations and omissions, he would never have entered into the business arrangement with Braintech. This does not show loss causation, because it does not relate to the reason for the investment's decline in value; it shows only that Shafi believes he made a bad bargain.

Additionally, Shafi appears to contend that Defendants failed to take steps to register Shafi's shares of Braintech stock, and, because of this, Shafi cannot sell the stock. Shafi says these restrictions are "completely contrary to the representations made by Weidinger and Braintech concerning the value of Braintech stock sold to Shafi in connection with the sale of his company to Braintech." Shafi essentially claims that he was unable to sell the stock at any time due to these restrictions, which made the stock completely worthless.

The parties dispute when Shafi could begin to sell his stock, and under what conditions. Shafi says that one reason he could not sell the stock was because Defendants failed to take steps to register it. However, the SPA states that the shares have not been registered, and cannot be resold unless they are registered. Shafi points to no provision that obligates Defendants to take steps to register the shares. Moreover, even if Defendants misrepresented the restrictions on Shafi's stock, Shafi has not shown that this misrepresentation caused the decline in value.

At the heart of Shafi's claim is the allegation that the Braintech stock is not and was never as valuable as Defendants represented. However, "[p]rice inflation alone is insufficient [to show loss causation]; rather, a plaintiff must show that an economic loss

occurred after the truth behind the misrepresentation or omission became known to the market." *Indiana State Dist. Council of Laborers v. Omnicare, Inc.,* 583 F.3d 935, 944 (6th Cir. 2009). Shafi does not claim that the misrepresentation or omission caused any of his loss, or that it had any effect on the market.

As a matter of law, Shafi fails to present evidence of loss causation; Plaintiff's federal securities fraud claims are dismissed.

### D. Violation of Michigan Uniform Securities Act (MUSA) (Count V)

MUSA renders it unlawful to offer or sell "a security by means of any untrue statement of a material fact or any omission to state a material fact . . . . MCL §451.810(a)(2)[1].

Under MUSA, a material misstatement or omission of material fact is "one which a reasonable investor might have considered important to his investment decision." *Prince v. Heritage Oil Co.,* 109 Mich. App. 189, 203 (Mich. Ct. App. 1981).

Braintech says that, as with other actions for fraud under Michigan law, a MUSA claim must be predicated upon a statement relating to a past or existing fact; future promises are contractual and do not constitute fraud. Shafi concedes that this is a correct statement of the law. However, he argues that this claim falls into the same exception as his other fraud claims–namely, that the promises were made in bad faith, without any intention of performance.

The omission alleged here is the same discussed above– that Shafi had to

---

[1] This statute was repealed effective October 1, 2009 by MCL 451.2702. The events this claim is based upon occurred before the repeal, and the parties agree that the statute applies. *See* MCL 451.2703.

produce revenue before Braintech would pay the debts in the contracts. The misrepresentations are those prior to and included in the contract, as discussed above.

For reasons already discussed, Shafi has insufficient evidence that Defendants never intended to perform the contract, or made the promises in bad faith. This claim is dismissed.

### E. Conversion (Count VI)

Shafi also alleges that Defendants unlawfully converted his property when they acquired his companies.

Conversion is an intentional tort. *Hansman v. Imlay City State Bank,* 121 Mich. App. 424, 428 (Mich. Ct. App. 1982). Under Michigan law, "conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.,* 439 Mich. 378, 391 (1992).

Weidinger says that he did not personally receive anything from Shafi. Instead, Shafi's property went directly to Braintech.

Shafi does not address Weidinger's argument.

Braintech says that it did not wrongfully assert dominion over Shafi's property, because Shafi gave Braintech rights to his property under the SPA.

Shafi responds that fraud renders the receipt of Shafi's property by Braintech unlawful conversion.

Because Shafi's fraud claim is dismissed, his conversion claim fails.

### F. Unjust Enrichment (Count VII)

To sustain a claim of unjust enrichment, the plaintiff must prove: (1) the receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the retention by the defendant of the benefit. *Morris Pumps v. Centerline Piping, Inc.,* 273 Mich. App. 187, 195 (Mich. Ct. App. 2006).

Again, Weidinger says that he did not personally receive anything from Shafi. Instead, Shafi's property went directly to Braintech.

Shafi does not address Weidinger's argument.

Braintech says that the SPA bars Shafi's claim of unjust enrichment. Additionally, Braintech says it did not benefit from Shafi's property.

Shafi agrees that normally, under Michigan law, an unjust enrichment claim cannot be sustained where there is an existing contract. However, Shafi says that because of fraud, there is no valid and enforceable contract.

Because Shafi's fraud claims are dismissed, his unjust enrichment claim fails.

### V. CONCLUSION

The Court GRANTS Defendants' Motion in part. Plaintiff's Breach of Employment Agreement claims proceed. Plaintiff's Fraud, Securities Fraud, Conversion, and Unjust Enrichment claims are dismissed.

**IT IS ORDERED.**

                                          s/Victoria A. Roberts
                                          Victoria A. Roberts
                                          United States District Judge

Dated: April 5, 2011

> The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on April 5, 2011.
>
> s/Linda Vertriest
> Deputy Clerk