## Comparison of complaints

**1.**

6.  Plaintiff Braintech is a publicly traded robotic vision software technology company whose vision software and technologies enable vision recognition and robotic guidance processes in manufacturing, logistics, material handling, automation, situational awareness, security and reconnaissance.
    Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

15. Prior to its sale to RVT in 2010, Braintech was a publicly-traded vision-guided robotic and machine vision software technology company that designed, developed, and sold vision software and related technology and provided support and training services for vision recognition and robotic guidance technologies for manufacturing, logistics, material handling, automation, and situation security and reconnaissance applications.
    Complaint at 4, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Braintech was a publically traded robotic vision guided robotics software technology company with hundreds of shareholders and a Board of Directors.
Plaintiff's Motion for Summary Judgment at 11, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

**2.**

7.  Prior to August 12, 2008, Shafi was the President and sole owner of SHAFI, Inc. ("SI"), a Michigan corporation with its principal place of business in Brighton, Michigan, and SHAFI Innovation, Inc. ("SII"), also a Michigan corporation with its principal place of business in Brighton, Michigan.
    Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

16. Prior to August 12, 2008, Shafi was the President and sole owner of SHAFI, Inc., ("SI") and SHAFI Innovation, Inc. ("SII").
    Complaint at 4, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Prior to August 12, 2008, Shafi was the President and sole owner of SI, a private Michigan corporation with its principal place of business in

{00017644;v1 }



Brighton, Michigan, and SII, also a private Michigan corporation with its principal place of business in Brighton, Michigan.
Plaintiff's Motion for Summary Judgment at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

3.

8. SI and SII are Michigan corporations that provide simplified software solutions for vision guided robotics.
Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

17. SI and SII provided simplified software solutions for vision-guided robotics, as well as support and training services.
Complaint at 4, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

SI and SII allegedly provided simplified revenue-ready software solutions for vision guided robotics.
Plaintiff's Motion for Summary Judgment at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

4.

9. On or about June 19, 2008, Braintech and Shafi entered into a non-binding confidential letter of intent ("Letter of Intent") setting forth Braintech's proposal to purchase all of the outstanding capital stock of SI and 80% of the outstanding capital stock of SII, which would result in each company becoming operating subsidiaries of Braintech.
Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

18. On or about June 19, 2008, Braintech and Shafi entered into a non-binding confidential Letter of Intent setting froth Braintech's proposal to purchase all of the outstanding capital stock of SI and 80% of the outstanding capital stock of SII, which would result in both SI and SII becoming separate operating subsidiaries of Braintech.
Complaint at 4, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

…Shafi, in his individual capacity, and in his capacity as President of SI and SII, and Braintech entered into a Letter of Intent ("LOI") (Ex.M).
Plaintiff's Motion for Summary Judgment at 16, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

{00017644;v1 }

5.

    11. On June 5, 2008, Braintech advanced SI $50,000. Shafi represented that this $50,000 was required to keep SI operating and to satisfy its creditors regarding late payments. However, without prior disclosure to Braintech, Shafi misappropriated $7,500 from these funds for his own personal use. Shafi subsequently misappropriated an additional $19,740 for his personal use from a second advance of $50,000.
    Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

    19. On June 5, 2008, prior to the execution of the Letter of Intent, Braintech advanced $50,000 to Shafi. Shafi represented that this $50,000 was required to essentially keep the lights on at SI and to keep SI operating, and to satisfy its business creditors regarding late payments. However, without prior disclosure to Braintech, Shafi misappropriated $7,500 from these funds for his own personal use. Shafi subsequently misappropriated an additional $19,740 for his personal use from a second advance for payment to SI business creditors of $50,000 by Braintech.
Complaint at 4 - 5, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

    On June 5, 2008... Weidinger wired $50,000 from his personal bank account to SI for payment of SI business debt...Shafi paid himself $7,500 of the Weidinger funds... Upon execution of the LOI, Shafi received another $50,000 cash payments for the payment of Shafi I debt. This time, Shafi paid himself $17,500.
Plaintiff's Motion for Summary Judgment at 16, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

6.

    19. In reliance on these various material fraudulent misrepresentations, on or about August 12, 2008, Braintech was fraudulently induced to enter into a series of six agreements with Shafi in his individual capacity and as President of SI and SII: (1) Share Purchase Agreement, which included a number of schedules, (2) Lock-Up Agreement, (3) Employment Agreement, (4) Non-Competition Agreement, (5) Letter Agreement regarding Indebtedness of SI and SII, and (6) Promissory Note (collectively referred to as the "Sale Agreements").
    Complaint at 4, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

{00017644;v1 }

20. On or about August 12, 2008, Braintech entered into a series of six agreements with Shafi in his individual capacity and as President of SI and SII, collectively referred to as the "Sale Agreements":
    a. Share Purchase Agreement, which included a number of detailed schedules;
    b. Lock-Up Agreement;
    c. Employment Agreement;
    d. Non-Competition Agreement;
    e. Letter Agreement Regarding Indebtedness of SI and SII; and
    f. Promissory Note.
Complaint at 5, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

On August 12, 2008, Braintech entered into six agreements with Shafi in his individual capacity and as President of SI and SII: (1) Share Purchase Agreement, which included a number of schedules, (2) Lock-Up Agreement, (3) Employment Agreement (4) Non-Competition Agreement, (5) Letter Agreement regarding Indebtedness of SI and SII, and (6) Promissory Note (collectively referred to as the "Company Sale Agreements").
Plaintiff's Motion for Summary Judgment at 16, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

7.

20. On or about August 12, 2008, Braintech entered into the Share Purchase Agreement ("SPA") with Shafi in his individual capacity and as President of SI and SII. *See Exhibit 1, SPA*.
Complaint at 5, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

22. On or about August 12, 2008, Braintech entered into the Share Purchase Agreement with Shafi in his individual capacity as the sole owner and President of SI and SII. A copy of the Share Purchase Agreement is in Defendant's possession.
Complaint at 5, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

8.

21. Pursuant to the SPA, Braintech agreed to acquire all of the outstanding stock of SI and 80% of the outstanding stock of SII. *See Id.* at 2.2.
Complaint at 5, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

23. Pursuant to the Share Purchase Agreement, Braintech agreed to acquire all of the outstanding stock of SI and 80% of the outstanding stock

{00017644;v1 }

of SII, free and clear of all encumbrances. See Share Purchase Agreement, §§2.1 & 2.2.
Complaint at 6, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

In August 2008, in a stock for stock transaction, Braintech, Inc. acquired 100% of the outstanding shares of SHAFI, Inc. ("SI") and 80% of the shares of SHAFI Innovation, Inc. ("SII") from Adil Shafi ("Shafi") pursuant to a Share Purchase Agreement ("SPA")
Plaintiff's Motion for Summary Judgment at 10, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

9.

22. The purchase price consisted of 2,999,700 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria. *Id.*
Complaint at 5, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

24. The purchase price consisted of 2,999,700 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria. See id.
Complaint at 6, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

The purchase price consisted of 3,000,000 shares in the capital stock of Braintech to be issued at closing and 1,000,000 shares to be issued upon the achievement of specified performance criteria.
Plaintiff's Motion for Summary Judgment at 16, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

10

23. Pertinent to this dispute, Defendant specifically represented and warranted that the Creditor and Payment Schedule attached to the SPA was complete and accurate: The Creditor and Payment Schedule sets forth all of the Company Indebtedness ... and such Company Indebtedness and information related thereto all as set forth on the Creditor and Payment Schedule is true, accurate and complete. With respect to Company Indebtedness to any creditor as set forth on the Creditor and Payment Schedule, if payments relating to such creditor are made in the amounts and on the dates indicated on the Creditor and Payment Schedule, all obligations to such creditor shall have been satisfied in full; provided, however, nothing herein shall limit Buyer's right to negotiate reduced amounts or alternative payment dates with any creditor of a Company.

{00017644;v1 }

*Exhibit 1, SPA at 3.5.3 (emphasis in original).*
around October 2008 Comerica filed suit against Shafi seeking over $75,000.

      Complaint at 5, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

25.  Shafi personally and expressly warranted that certain material representations contained in the Share Purchase Agreement were true and correct, see id., Art. 3 & § 7.2.1, including, but not limited to, representations that: a. SI's intellectual property, including, but not limited to, its product known as Reliabot, had economic value, an established and continuing customer base, and was revenue ready, see, e.g., id. §§ 3.5.3, 3.26, 7.2.1, Schedule 3.9, & Schedules 3.26(a), (b), (c) & (d);
b. SI had an established revenue pipeline that could be used to pay existing SI debt identified in the Share Purchase Agreement and related schedules, (b), (c) & (d); c. SI debts identified in the Schedules to the Share Purchase Agreement were accurate; see, e.g., id. §§ 3.5.3, 7.2.1; and d. SI had an established customer base and associated good will, see, e.g., id. §§ 3.5.3, 3.26, 7.2.1, & § 3.5.3, Schedule 3.9 & Schedules 3.26(a), (b), (c) & (d).
 Complaint at 4, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

11.
  27.  The SPA further stated that Braintech would cause SI to pay, certain Braintech accepted indebtedness from revenue based on revenue commitments generated by SI. This certain indebtedness was not to exceed $900,000 of the total indebtedness listed on the Creditor and Payment Schedule ("Braintech Accepted Debt") and Shafi remained liable for any debt in excess of that amount ("Excess Debt"). This structure provided that Braintech would net out the revenue from Shafi's revenue commitments against certain Shafi obligations. The SPA provided: As of the Closing, (i) no Company will have liability for borrowed money or Taxes due and owing except for Braintech Accepted Debt, which shall not exceed an aggregate of $900,000, upon the terms set forth on the Creditor and Payment Schedule, and (ii) Seller shall fully and finally satisfy in a timely manner, without any Liability to Buyer or any Company, any and all Excess Debt.
*Exhibit 1, SPA at 3.5.3.*
      Complaint at 6, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

27.  Based on Shafi's warranties, the Share Purchase Agreement provided that Braintech would cause SI to satisfy certain accepted indebtedness of SI based on the revenue pipeline generated by SI, which Shafi warranted were accurate and existed. The SI accepted

{00017644;v1}

indebtedness that Braintech agreed to cause SI to satisfy from its revenue commitments was referred to as the "Braintech Accepted Debt." See, e.g., id. § 6.3.
Complaint at 6-7, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Additionally, in the Covenants portion of the SPA, Shafi agreed to release Braintech from any claims he had or may have had up until immediately preceding the closing. The SPA covenants further provide that Braintech would cause Braintech accepted indebtedness from revenue based on revenue pipeline commitments generated by SI.
Plaintiff's Motion for Summary Judgment at 17-18, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

12.

    10.    The Letter of Intent also set forth terms of a lucrative three-year employment agreement for Shafi to serve as Braintech's Chief Operating Officer, provided that Braintech closed on the deal.
Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

    51.    In reliance on the various misrepresentations outlined above, Braintech also entered into the Employment Agreement with Shafi on or about August 12, 2008 (the "Employment Agreement"). *Exhibit 5, Employment Agreement*
Complaint at 10, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

    30.    As part of the transaction, Shafi also became Chief Operating Officer ("COO") and a director of Braintech upon closing. See id. § 6.11; Employment Agreement Between Shafi and Braintech dated August 12, 2008, Preamble, H C, a copy of which is in Defendant's possession. However, Shafi was terminated from his position as COO and never attended a Board of Directors meeting.
Complaint at 7, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

In connection with the execution of the SPA, Braintech entered into a three year agreement with Shafi, pursuant to which Shafi was to serve as Braintech's Chief Operating Officer ("COO").
Plaintiff's Motion for Summary Judgment at 10, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

13.

{00017644;v1 }

54. Pursuant to the Employment Agreement, Shafi would have several critical duties including, without limitation, management of technology, market access and business acceleration, and the hiring, managing and directing of employees. *Id.* at ¶ 4 a-e.
    Complaint at 2, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

31. Shafi's duties as COO were expressly set forth in his employment agreement, see Employment Agreement Between Shafi and Braintech dated August 12, 2008, U4, and included, or example:
    a. Managing the overall technology of the combined companies, including the product lines and technical personnel;
    b. Using his market knowledge, contacts, and business relationships to create market access and business acceleration for Braintech;
    c. Using his integrator network to develop and enhance Braintech's sales, processes and practices needed to accomplish the company's goals for doing business with end users and systems integrators;
    d. Using his experience to develop and commercialize enhanced product offerings and create a best of breed future product line from Braintech's combined products;
    e. Hiring, managing, and directing employees as required to support Braintech's business objectives; and
    f. Working diligently to generate revenue on behalf of Braintech.
Complaint at 7-8, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Pursuant to the Employment Agreement, Shafi had several critical duties including, without limitation, management of technology, production and submission of the sales generation and commission plan, revenue generation, market access and business acceleration, and the hiring, managing and directing of employees.
Plaintiff's Motion for Summary Judgment at 18, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

14.

58. In the fourth quarter of 2008, and after the Sale Agreements were executed, Braintech learned that material representations Shafi made to induce Braintech into entering into the Sale Agreements were, in fact, false and fraudulent.
    Complaint at 11, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

32. In the fourth quarter of 2008 and after the Sale Agreements were executed, Braintech learned that numerous and material warranties Shafi made in the Sale Agreements were in fact false and fraudulent.

Complaint at 8, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

...material false and material false and fraudulent misrepresentations that Shafi made to Braintech to induce the transaction.
Plaintiff's Motion for Summary Judgment at 10, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

15.

59. Specifically, Braintech learned that various representations regarding the Reliabot and the number of integrators, including without limitation, the representations outlined in Paragraph 13 (i) – (viii) above, were untrue when made.
Complaint at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

60. Indeed, instead of finding that the Reliabot was market-revenue-ready, Braintech learned that it was inadequate and not market-revenue-ready.
Complaint at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

61. Similarly, Braintech discovered that SI and SII were not supported by a large number of integrators already in the field marketing and selling the products, as represented.
Complaint at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

33. For example, it became apparent that revenue-ready commitments and revenue pipeline account receivable schedules warranted by Shafi were fraudulently produced and materially misleading and that, in fact, neither SI, nor SII, had an established revenue pipeline and Si's intellectual property was, in fact, not market ready and scalable.
Complaint at 8, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Braintech learned that the SI flagship product, Reliabot , was not revenue ready as represented, the customer base SI touted during negotiations did not exist...
Plaintiff's Motion for Summary Judgment at 10, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

Similarly, Braintech discovered that SI and SII were not supported by a large number of integrators already in the field marketing and selling the products, as represented.

{00017644;v1 }

Plaintiff's Motion for Summary Judgment at 21, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

16.

67. Based on these discussions, Braintech also learned that Shafi, both before and after execution of the SPA, was contacting and falsely informing those creditors that Braintech had assumed all of the liabilities, that the debts were now directly Braintech liabilities, and that all amounts would be paid in full.
Complaint at 12-13, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

40. Based on these discussions, Braintech also learned that after closing of the Share Purchase Agreement, Shaft was contacting and falsely informing creditors that Braintech had assumed all of the liabilities of SI, that the debts were now directly Braintech liabilities, and that all amounts would be paid in full by Braintech.
Complaint at 10, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Braintech also learned that Shafi, both before and after execution of the SPA, was contacting and falsely informing creditors that Braintech had assumed all of the Shafi company liabilities, the debts were now Braintech liabilities, and that all amounts would be paid in full.
Plaintiff's Motion for Summary Judgment at 21, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

17.

44. Additionally, Braintech began using a Braintech checking account to pay certain SI obligations. Braintech was forced to utilize funds from its checking account because, previously unbeknownst to Braintech, SI checking accounts had been closed because they were overdrawn. These SI obligations that Braintech funded exceeded $100,000, in addition to the other expenditures and damages described elsewhere in this Complaint, which together total over $200,000.
Complaint at 9, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

41. Braintech also discovered that the SI checking accounts, from which the Braintech Accepted Debt was to be paid, had been closed because they were overdrawn. As a result, Braintech was forced to pay various amounts of Braintech Accepted Debt from its own accounts.

{00017644;v1}

Complaint at 10, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

Braintech also discovered that the SI checking accounts had been closed because they were overdrawn.

Plaintiff's Motion for Summary Judgment at 21, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

18.

70.   Shortly after learning the revenue commitments from the pipeline were not being realized, Braintech had a series of conversations with Shafi both regarding the misrepresentations and Shafi's performance or lack thereof.

Complaint at , *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

42.   Shortly after learning the revenue commitments from the pipeline were not being realized, Braintech had a series of conversations with Shafi both regarding Shafi's warranties and Shafi's performance or lack thereof in relation to the Sales Agreements.

Complaint at 10, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

19.

71.   For example, on October 1, 2008, Braintech instructed Shafi to cease informing creditors that Braintech had assumed SI's liabilities.

Complaint at 13, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

43.   For example, on October 1, 2008, Braintech instructed Shafi to cease informing creditors that Braintech had assumed SI's liabilities.

Complaint at 10, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

20.

72.   Nonetheless, Shafi continued to misrepresent that Braintech had agreed to pay certain SI obligations, including past wages of former employees.

Complaint at 13, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

44.   Nonetheless, Shafi continued to misrepresent that Braintech had agreed to pay certain SI obligations, including past wages of former employees. The effect was to immediately discredit Braintech in its marketplace and materially damage its reputation.

Complaint at 10, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

{00017644;v1 }

21.

73. Moreover, Shafi failed to appropriately fulfill his responsibilities under the Employment Agreement, including failing to provide critical reports when requested, failing to attend important meetings without justification or notice, and not keeping the CEO apprised of vital developments, such as the fact that an application expected to generate $900,000 had not been approved.

Complaint at 13, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

45. Shafi also intentionally failed to fulfill has duties as COO and director by, among other things:
    a. Refusing to attend critical Board of Directors and other meetings;
    b. Failing to make efforts to generate revenue for Braintech;
    c. Refusing to produce and submit critical sales, hiring, and technology plans or to recruit and hire appropriate employees;
    d. Refusing to work to carry out the critical Market Access and Acceleration Plan;
    e. Refusing to meet with customers and integrators on behalf of Braintech; and
    f. Refusing to travel to Vancouver in order to integrate the two separate technologies and develop and establish the technology roadmap for Braintech. Shafi held himself out to be the technical architect of, and creator of the source code for, his Reliabot technology, when he was later found out not to be.

Complaint at 10 - 11, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

…he repeatedly failed to fulfill his responsibilities under the Employment Agreement and blatantly refused to take actions he was required to take… he failed to fulfill most of his job duties under the Employment Agreement including failing to generate any revenue whatsoever, refusing to produce and submit critical sales, hiring, and technology plans, refusing to travel in connection with his responsibilities, refusing to recruit and hire employees, refusing to attend critical Board and other meetings…

Plaintiff's Motion for Summary Judgment at 22, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

22.

74. By letter dated November 19, 2008, while reserving their right to

{00017644;v1 }

terminate for the Good Cause that existed as of November 19, 2008, Braintech notified Shafi that he was being placed on administrative leave with pay and benefits. See Exhibit 7, November 19, 2008
    Complaint at 13, Braintech v. Shafi, No: 2:09-cv-10454 (ED Mich 2009).

46. By letter dated November 19, 2008, while reserving their right to terminate Shafi for good cause, Braintech notified Shafi that he was being placed on administrative leave with pay and benefits.
 Complaint at 11, Robotic Vision Tech. v. Shafi, No: 1:11-cv-00250 (ED Va 2011).

... in a letter from Weidinger to Shafi which also expressly stated that, although the company sought to unwind the Employment Agreement as part of a mutual rescission, it expressly reserved the right to "... terminate your Employment Agreement based upon Good Cause as it exists today... We do not waive any basis to terminate it and, moreover we do not accept any further performance from you under that agreement."
Plaintiff's Motion for Summary Judgment at 24, Braintech v. Shafi, No: 2:09-cv-10454
    (ED Mich 2009).

23.

75. Shortly thereafter, Shafi began destroying company e-mails and other documents, and deleting employee computer files, thus causing further harm to the company.
    Complaint at 14, Braintech v. Shafi, No: 2:09-cv-10454 (ED Mich 2009).

47. Shortly thereafter, Shafi began destroying company e-mails and other documents and deleting employee computer files, thus causing further harm to the company.
 Complaint at 11, Robotic Vision Tech. v. Shafi, No: 1:11-cv-00250 (ED Va 2011).

Shortly thereafter, Shafi began destroying company e-mails and other documents, and deleting employee computer files, this causing further harm to the company.
Plaintiff's Motion for Summary Judgment at 24, Braintech v. Shafi, No: 2:09-cv-10454
    (ED Mich 2009).

24.

76. As a result, on November 24, 2008, Braintech moved Shafi's status to administrative leave without pay and benefits. See Exhibit 8, November 24, 2008 E-mail.

    Complaint at 14, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

48. As a result, on November 24, 2008, Braintech moved Shafi's status to administrative leave without pay and benefits, thereby terminating him for good cause.
 Complaint at 11, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

 As a result, on November 24, 2008, Braintech moved Shafi's status to administrative leave without pay and benefits.
Plaintiff's Motion for Summary Judgment at 24, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

25.

57. Shafi and Braintech also entered into a Non-Competition Agreement on or about August 12, 2008 ("Non-Competition Agreement"). *Exhibit 6, Non-Competition Agreement.*
   Complaint at 11, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

50. To enable Braintech to more fully secure the benefits of the transaction and the protection and maintenance of SI and SII's good will and confidential information that was acquired by Braintech, Braintech required Shafi to enter into a Non-Competition Agreement effective August 12, 2008. A copy of the Non-Competition Agreement is in Defendant's possession.
 Complaint at 12, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

26.

60. Indeed, instead of finding that the Reliabot was market-revenue-ready, Braintech learned that it was inadequate and not market-revenue-ready.
   Complaint at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

62. Moreover, it became apparent that the Creditor and Payment Schedule was grossly understated and did not represent the actual liabilities of SI and SII. Indeed, by way of example, in or around October 2008, Comerica sued Shafi even though the payments that Shafi set forth on the Creditor and Payment Schedule were being made.
   Complaint at 12, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

82. Shafi personally and expressly warranted that certain material representations contained in the Share Purchase Agreement were true and correct, see id., Art. 3 & § 7.2.1, including, but not limited to, representations that:

a. SI's intellectual property, including, but not limited to, its product known as Reliabot, had economic value, an established continuing customer base, and was revenue ready, see, e.g., id. §§ 3.5.3, 3.26, 7.2.1, & Schedule 3.9 & Schedules 3.26(a), (b), (c) & (d);
b. SI had an established revenue pipeline that could be used to pay existing SI debt identified in the Share Purchase Agreement and related schedules, see, e.g., id. §§ 3.5.3, 3.26, Schedule 3.9, & Schedules 3.26(a), (b), (c) & (d);
c. SI debts identified in the Schedules to the Share Purchase Agreement were accurate; see, e.g., id. §§ 3.5.3, 7.2.1; and
d. SI had an established customer base and integrator network for sales, and associated good will, see, e.g., id. §§ 3.5.3, 3.26 & Schedule 3.9 & Schedules 3.26(a), (b),(c)&(d).

Complaint at 17, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

27.

73. Moreover, Shafi failed to appropriately fulfill his responsibilities under the Employment Agreement, including failing to provide critical reports when requested, failing to attend important meetings without justification or notice, and not keeping the CEO apprised of vital developments, such as the fact that an application expected to generate $900,000 had not been approved.

Complaint at 13, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

75. Shortly thereafter, Shafi began destroying company e-mails and other documents, and deleting employee computer files, thus causing further harm to the company.

Complaint at 14, *Braintech v. Shafi*, No: 2:09-cv-10454 (ED Mich 2009).

89. Shafi intentionally breached his fiduciary duties by, among other things,

a. Intentionally and fraudulently misrepresenting in the Access and Acceleration Plan that he personally, as well as his former companies, had established good will in the marketplace and that he would work with Braintech to effectuate the Access and Acceleration Plan;
b. Intentionally misrepresenting to creditors that Braintech had agreed to pay certain SI obligations, thereby immediately discrediting Braintech in its marketplace and materially damaging its reputation and the reputation of its officers and directors;
c. Intentionally destroying company e-mails and other documents and deleting employee computer files, thus causing further harm to the company;

     d. Refusing to attend critical Board of Directors and other meetings;
     e. Intentionally failing to make efforts to generate revenue for Braintech;
     f. Refusing to produce and submit critical sales, hiring, and technology plans or to recruit and hire appropriate employees;
     g. Refusing to work to carry out the critical Market Access and Acceleration Plan and failing to attend numerous customer meetings targeted in the Plan;
     h. Refusing to meet with customers and integrators on behalf of Braintech; and
     I. Intentionally holding himself out to be the technical architect of, and creator of the source code for his Reliabot technology, when he was not.

Complaint at 18 -19, *Robotic Vision Tech. v. Shafi*, No: 1:11-cv-00250 (ED Va 2011).

{00017644;v1 }