# EXHIBIT 1

# DEPOSITION TRANSCRIPT OF ADIL SHAFI (SELECTED EXCERPTS)

SHEET 1 PAGE 1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRAINTECH, INC.,            CASE NO: 09-10454

    Plaintiff/Counter-Defendant,

v

ADIL SHAFI,

    Defendant/Counter-Plaintiff/
    Third-Party Plaintiff,

v

FREDERICK WEIDINGER AND
BRAINTECH, INC.,

    Third-Party Defendant/Counter-Defendant.
_____/

The Deposition of ADIL SHAFI,
taken before me, Susan M. Hans, CER 8085, on July 29, 2010, at 535 Griswold, Suite 1900, Detroit, Michigan, commencing at or about 9:50 a.m.

APPEARANCES:

BY: JAMES P. MURPHY, ESQUIRE
BERRY MOORMAN
535 Griswold, Suite 1900
Detroit, Michigan 48226
Appearing on behalf of the Plaintiff.

BY: GEOFFREY J. GREEVES, ESQUIRE
PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
2300 North Street, NW
Washington, DC 20037
Appearing on behalf of the Defendant, Frederick Weidinger and Braintech, Inc.

SHEET 14 PAGE 50

**Page 50**

1  what I've already been saying about these different companies
2  is the same. I met with top management. E-mails were
3  exchanged. Paper was exchanged. If you want to ask specific
4  dates, I don't have them, but they are available in these
5  files. And there was no set time when we stopped. Like I
6  said, Braintech came back with the best inducement, the best
7  offer, the most, you know, glowing offer, and I went with
8  Braintech. But I also had other options, and I worked with
9  these companies. They knew me. I wasn't a stranger to them.
10  I had worked with them. They knew of my record, my company's
11  record. They had succeeded. They had made money. They had
12  given orders to Shafi, Inc. I had viable options.
13 Q  Okay. So with regard to Utica, were they a creditor of Shafi,
14  Inc. at the time of the --
15 A  Again, I don't recall the specifics. The characterization I'm
16  giving you is very consistent. What I'm telling you is a very
17  consistent story of these possible options. I'm telling you
18  what I remember, and I'm telling you that I know that there
19  were discussions. I know that there was interest. I know
20  that they were very interested. But I will tell you that I do
21  not recall exact dates. I don't recall exact documents. I
22  don't recall exact document titles. I don't know exactly what
23  spans they were, and I also cannot tell you what the last
24  communication was because I don't remember those things.
25       MR. GREEVES: Can you read back my question?

**Page 51**

1  Let's see if Mr. Shafi can answer it.
2       (Whereupon at or about 11:05 a.m. the Court Reporter
3       read back the previous question.)
4 Q  (Continuing by Mr. Greeves): That was my question; were they
5  a creditor?
6 A  I answered it. I said I don't recall.
7       MR. MURPHY: Let me just say just wait for a
8  second or two because you are overlapping the end of his
9  questions, just so we have a clean record.
10       THE WITNESS: Okay.
11 Q  (Continuing by Mr. Greeves): Did you ever enter into a letter
12  of intent or other MDA, any kind of formal what I'll call
13  documentation of this desire to enter into a transaction with
14  any of these three companies?
15 A  I do not recollect the exact titles of these documents.
16 Q  Did you ever engage legal Counsel with regard to any of these
17  opportunities?
18 A  I do not believe so.
19       MR. GREEVES: Let's go ahead and have marked
20  the transaction documents.
21       MR. MURPHY: Let's take a short break.
22       (At or about 11:07 a.m., a short break was taken off
23       of the record, Deposition Exhibit Number 1 was
24       marked for identification, and the deposition
25       resumed at or about 11:17 a.m.)

**Page 52**

1       MR. MURPHY: Mr. Shafi would like to make a
2  clarification, before we recommence, on the record.
3       MR. GREEVES: Okay.
4       THE WITNESS: There were 83 boxes. I misspoke.
5 Q  (Continuing by Mr. Greeves): Mr. Shafi, when you say you
6  misspoke, you told us you have a really good memory, right?
7 A  Hm-hmm.
8 Q  When you said 87, you meant to say 83? Or you just
9  misremembered?
10 A  I thought there were 87, but there are really 83. We know the
11  last box, and so we just verified that that last box is 83.
12 Q  Who is "we"?
13 A  Me.
14 Q  You know what the contents of the final box are. How do you
15  know that?
16 A  Because I spent considerable amount of time on that box.
17 Q  And so you always remember the last one. That box is numbered
18  83?
19 A  Yes.
20 Q  So the many occasions that you told us there were 87 boxes of
21  documents we could plow through, what you meant to say is
22  there are 83 boxes of documents --
23 A  Yes.
24 Q  -- that we can plow through? Did anybody else assist in
25  preparing the 83 boxes of documents?

**Page 53**

1 A  No.
2 Q  And what is it about box 83 that makes you remember that?
3 A  Box 83 contains a lot, if not all, of the orders that Shafi,
4  Inc. received from many customers over the years; purchase
5  orders from many reputable companies. As I mentioned before,
6  there are hundreds of purchase orders worth millions of
7  dollars in that box.
8 Q  Anything apart from that that makes you remember that as the
9  final box?
10 A  That's the key thing that makes me recall that box.
11 Q  Okay. Mr. Shafi, what has been placed in front of you has
12  been marked by the Court Reporter as Shafi 1. It is clipped.
13  It's a rather large collection of documents, and we'll be
14  spending some time looking through it. Why don't we start by
15  having you turn the page there and tell us what you're able to
16  identify of the first document that is in that collection?
17  You can see -- Before you do that, Mr. Shafi, you'll see at
18  the very top of the page it says on it, it has language, and
19  then there is a header that says, "Page 1-of-47." As we go
20  through these it will be helpful and we'll both be referring,
21  hopefully, to those pages to allow us to quickly identify the
22  page that we're talking about. Does that make sense?
23 A  Okay.
24 Q  What do you see? Not that page, but turn one page forward,
25  sir. What do you see there in front of you, and are you able

SHEET 39 PAGE 150

150

1 judgment against anybody in this case?
2 A I already told you, I gave him a three percent stake in my new
3 company in exchange for that debt. I told you earlier this
4 morning.
5 Q So beyond that, though, he has nothing to gain whether you win
6 or lose this case?
7 A No.
8 Q Okay. Thank you, sir. Have you had discussions with any
9 customers, contacts, or representatives of Shafi? If you can,
10 turn to entry number 19, sir. It says, "Various customers,
11 contacts and representatives of Shafi, Inc."
12 A Yes.
13 Q Have you had any contact with any of these people since you
14 left the company? Let's start with the first one; Cognex,
15 CPP.
16 A Yes.
17 Q What have you contacted them about?
18 A Business, in general.
19 Q Anything about Braintech?
20 A Of course. Braintech is well-known to these companies, its
21 situation, its problems, its lawsuits.
22 Q So you discussed Braintech's problems and lawsuits with
23 somebody at Cognex?
24 A Yes.
25 Q What did you discuss with them?

PAGE 151

151

1 A The lawsuits. The poor situation of Braintech. Its inability
2 to hold its agreements. Its breaches. It's common knowledge
3 out there.
4 Q Do you have any anticipation of any kind of business
5 relationship between your new company and this entity, Cognex?
6 A Possibly.
7 Q What are you talking with them about?
8 A Business opportunities, possibly.
9 Q What does "possibly" mean?
10 A "Possibly" means possibly.
11 Q Why don't you tell us definitely what it is that you've talked
12 with them about?
13 A There is a likelihood of doing business with them.
14 Q Were they on the list that you disclosed to Braintech in your
15 A&A plan?
16 A You would have to refer to that plan to see if they're
17 mentioned in there.
18 Q I'm just relying on your memory, sir.
19 A I don't want to give you a wrong answer. If it's there,
20 they're there. If they're not there, they're not there. You
21 have the document with you.
22 Q I'm just asking you from your memory, sir.
23 A Yeah.
24 Q It's not a quiz. It's just a question. About Siemens; have
25 you had any discussions with them since you left Braintech?

PAGE 152

152

1 A Siemens sold their vision interest to another company called
2 Microscan. So Siemens vision is no longer Siemens. It's a
3 different company now.
4 Q Is it the same people?
5 A The vision people are the same. Microscan, M-I-C-R-O-S-C-A-N,
6 one word.
7 Q So you refer to them here as Siemens, but you now know them to
8 be Microscan?
9 A Right. Siemens sold its vision unit to Microscan.
10 Q All right. So have you had any discussions with Microscan
11 since you left the company?
12 A I think I may have. I don't recall exactly.
13 Q In connection with anything to do with Braintech?
14 A Of course. You can ask me about any of these companies and
15 I'll give you the same answers like I gave you for Cognex.
16 All of those companies know about Braintech's breaches. I've
17 talked to all of them. They already know what's in the
18 market, public knowledge, public domain, about Braintech's
19 issues and problems. So there is no secrets here. I mean,
20 what's publicly known out there is very well-known to this
21 industry, and these are some of the people in this industry.
22 Q Do you have any expectation of doing business with this
23 company, Microscan?
24 A Possibly.
25 Q Have you had discussions with them about that?

PAGE 153

153

1 A I've had some discussions. I don't recall what the exact
2 details are. It's been some time, and I can't give you any
3 specifics.
4 Q Have you generated any revenue from them?
5 A No.
6 Q PDSI; same question. Same answer?
7 A Same answers.
8 Q You've approached them since you left the company?
9 A Hm-hmm.
10 Q Were they identified or have any knowledge of whether they
11 were one of the A&A targets?
12 A If they're on that schedule, they are. If they're not on that
13 schedule, they're not.
14 Q Okay.
15 A Plain and simple.
16 Q Would your answer basically be the same with regard to all
17 these companies?
18 A Yes.
19 Q Are you aware you signed a nondisparagement agreement as part
20 of your package when you joined the company?
21 A Yes.
22 Q Do you believe you have honored that by having conversations
23 with these companies about Braintech's breaches?
24 A Because that agreement is null and void, no.
25 Q That's your position, but I'm just asking.



**TRI-COUNTY COURT REPORTERS, INC.**

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of **Adil Shafi**

**Date:** October 22, 2010
**Volume:** III

**Case:** Braintech v. Shafi, et al.

Printed On: November 1, 2010

**Page 475**

1  A  Robotic Vision Tech is a very new thing. I don't think
2     I've talked to them about any of this. My discussion I
3     think have been before RVT was formed. And, of course,
4     there's a lot of disgruntled people about RVT, but, you
5     know, basically I didn't discuss RVT with them. That was
6     much afterwards.
7  Q  Did you ever discuss Mr. Weidinger with any of these
8     individuals?
9  A  Yes.
10 Q  And what is it that you discussed with them?
11 A  I said that I was fraudulently induced into selling my
12    companies, that I was defrauded, and that I was done a
13    great injustice, and that I fully seek to restore justice
14    to that.
15 Q  So you told Erwin or Steve or Robin that Mr. Weidinger
16    committed a fraud on you?
17 A  Yes. Yes, I told them that.
18 Q  And what did they say about it?
19 A  They didn't say anything. They just heard my side of the
20    story.
21 Q  Did you share the complaint papers with them or did you
22    just tell them that --
23 A  No.
24 Q  So can you recall -- tell me as best you can recall the
25    conversation about Mr. Weidinger that you had with him?

**Page 476**

1  A  Yeah. I just told them that I was de -- done a great
2     injustice in my career by this person, Mr. Weidinger, and
3     that, you know, I had a lawsuit against him personally
4     and his company, Braintech, which that part is no longer
5     around, but he is around as a person, and then that I was
6     fully prosecuting him to get justice.
7  Q  Okay. You told him that you were prosecuting Mr.
8     Weidinger?
9  A  Yeah. A counterclaim in federal court is a form of
10    prosecution.
11 Q  I'm just ask -- I'm just --
12 A  Yeah.
13 Q  I'm not arguing with you, sir.
14 A  Yes.
15 Q  I'm just asking for what --
16 A  Yeah. I told him I'm pursuing --
17 Q  -- as best you can recall exactly what you said.
18 A  Yeah. I told him I'm prosecuting and pursuing a lawsuit
19    against Mr. Weidinger.
20 Q  Have you had any other conversations with other business
21    people, business contacts of yours, relating to
22    Mr. Weidinger?
23 A  At ABB or other places?
24 Q  Other places.
25 A  Yeah, I have.

**Page 477**

1  Q  Okay. And where have those occurred?
2  A  I know hundreds of companies and thousands of people in
3     the industry. I don't have a full list of who all I've
4     talked to, nor do I keep a record of such things, but,
5     you know, in my daily dealings with all the people I
6     know, if this topic comes up I do explain where I was,
7     what I went through, and where I'm going today. So yeah,
8     I do share this information with people. It's public
9     knowledge. It's public, um . . . This lawsuit is a
10    matter of public record. Braintech is a public company.
11    There's nothing secret or mysterious about it.
12 Q  Right.
13 A  So it's --
14 Q  So -- But my -- This is my question, sir: Have you told
15    these people that you sued Mr. Weidinger or have you told
16    them, "Mr. Weidinger defrauded me"?
17 A  Well, there's several aspects to answer your thing.
18    First of all, Braintech filed the rescision lawsuit,
19    which I think was unfounded, which has been thrown out.
20    I countersued, with Mr. Murphy's help, a lawsuit against
21    Braintech and Mr. Weidinger personally on several counts,
22    various, and fraud is one of them.
23 Q  Hm-hmm.
24 A  There's several employment breaches. There's several
25    other breaches and there's several counts. One of those

**Page 478**

1     counts is fraud.
2  Q  Yeah. And so my question is have you told people that --
3     all of what you just said to me or have you just told
4     them that Mr. Weidinger defrauded me?
5  A  I've said some more abbreviated versions to others. I've
6     spoken in more details with others. I don't say the
7     exact same ten words to every custo -- to every person I
8     meet. Some people get a ten-word description. Other
9     people get a longer one. So, you know, it depends how
10    much time I have with such individuals. But, you know,
11    it's generally known what happened and I do share this
12    out there.
13 Q  Oak. Generally known that -- So you've told people that
14    Mr. Weidinger defrauded you?
15 A  Yes. I do.
16 Q  And so to the extent that you're not correct about that,
17    do you take any responsibility for making a false
18    statement?
19 A  That's your opinion. Not mine.
20 Q  Well, what -- Let me ask you this: If your lawsuit is
21    thrown out, what will you do to untell these people that
22    Mr. Weidinger defrauded you?
23        MR. MURPHY: I'm going to object to the
24    foundation. It's pointless.
25 Q  (Continuing by Mr. Greeves): What steps do you intend to

Page 479

1    take to fix the facts that you've given to people that
2    Mr. Weidinger defrauded you?
3  A  I haven't crossed that bridge yet, and if that comes to
4    pass, then I will consult with Mr. Murphy, my attorney,
5    so.
6  Q  Have you told people not to do business with
7    Mr. Weidinger?
8  A  No, I have not said that. I've just said what happened
9    to me. I've told them what happened to me, you know, so
10    that's -- and I've experienced it first hand, as you
11    know, so I do share that. It's public knowledge.
12  Q  Well, I mean it's knowledge that is -- You mean the
13    lawsuit is public knowledge.
14  A  Yeah. I mean the lawsuit that Braintech filed --
15  Q  Right.
16  A  -- is public knowledge. The counterclaim that I filed is
17    public knowledge. Anybody who knows where to look can
18    download the documents, the PDF files.
19  Q  Right. But you didn't give them that, right?
20  A  No, but people --
21  Q  You just told them what you thought it said.
22  A  It's a free country. It's a free world. People can go
23    and get this off the internet. Now, I have shared with
24    people what's in these documents and, you know, that's
25    basically I'm just representing that I have told people I

Page 480

1    have filed a claim, that claim does include fraud, that
2    claim does include breaches, the claim is against
3    Braintech and Mr. Weidinger.
4  Q  Hm-hmm.
5  A  You know, I share that because it's nothing different --
6    it's nothing different -- nothing different from what's
7    on the public record.
8  Q  But you've actually told people as a factual matter that
9    Mr. Weidinger defrauded you?
10  A  I tell them it's my opinion that he defrauded me.
11  Q  You tell them it's your opinion that he did that?
12  A  Yeah, of course. And I feel that way.
13  Q  You always say that?
14  A  Yeah. I say he defrauded me. You know, I believe
15    that's -- that's why I'm pursuing all this.
16  Q  All right. Okay. Let's just back up to one thing, and
17    then I'll have to pass the deponent shortly.
18        MS. KOVAL: It's 4:20. You're still good.
19        MR. GREEVES: Hm-hmm?
20        MS. KOVAL: It's only 4:20.
21  Q  (Continuing by Mr. Greeves): Let's see where we're at.
22    What is the work that your company, Advenovation, is
23    doing for Robotechnology?
24  A  We're doing, you know, same software and support work.
25  Q  And was Robotechnology previously a Shafi, Inc., client?

Page 481

1  A  No.
2  Q  Okay. Where did the opportunity come from to do business
3    with Robotechnology?
4  A  They contacted me.
5  Q  They contacted you?
6  A  Yes.
7  Q  Out of the blue?
8  A  Yes.
9  Q  How did they say they found you?
10  A  They know of my reputation.
11  Q  Okay. How did they say they -- How did they tell you
12    that they found you?
13  A  Well, there's the internet. They've heard of my work in
14    the past.
15  Q  Hm-hmm.
16  A  So they said they knew about me and that they knew I
17    knew, you know, how to work with robots and machine
18    vision, so they contacted me. Now, I didn't do, you
19    know, due diligence to say, you know, what all documents
20    did you read to kind of, you know, form an opinion to
21    contact me? I didn't. They just said --
22  Q  Mr. Shafi, I'm just asking you if they told you we found
23    you because X, Y, Z. That's it.
24  A  I'm trying to answer. I'm just trying to tell you that,
25    you know, they said, "Look, we heard about you. We've

Page 482

1    kind of saw your profile on the internet and so forth, so
2    therefore, you know, we are contacting you." Now, I
3    didn't go into, you know, great detail to say which
4    website or which link or which paper or which magazine or
5    which publication or which individual told you about me.
6    I didn't go to that. I just took their word that they
7    knew about me, heard about me, and wanted to talk to me.
8  Q  All right. How about -- And what is the volume of work
9    that you've done for Robotechnology?
10  A  So far $10,000 is a commitment they've made so far.
11  Q  They've not paid any money; they've just committed to
12    paying?
13  A  Not yet.
14  Q  And what are they getting in exchange for the $10,000?
15  A  They're getting some software and support.
16  Q  All right. And are you pursuing other business with
17    them, as well?
18  A  Yeah. I mean like I said, my -- the characterization I
19    have made in these engagements is that I'm focused on the
20    here and now and the present and I'm not polling such
21    customers for the entire breadth of what might be
22    possible with them. I'm just focused on the short term
23    to satisfy their immediate needs as they develop, and I'm
24    sure the future will take care of itself through the work
25    that I do.