**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ADIL SHAFI,

      Counter-Plaintiff,

v.                                                                    Case No: 09-10454
                                                                      Honorable Victoria A. Roberts

BRAINTECH, INC.,

      Counter-Defendant.

_____

**BRAINTECH, INC.'S RENEWED MOTION FOR JUDGMENT**
**AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL**


**BRIEF IN SUPPORT**


**PROOF OF SERVICE**


Anne Widlak (P35763)
Susan D. Koval (P59297)
Attorneys for Braintech, Inc.
200 Talon Centre Drive, Suite 200
Detroit, Michigan 48207
(313) 567-5921

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ADIL SHAFI,

      Counter-Plaintiff,

v.                                          Case No: 09-10454
                                          Honorable Victoria A. Roberts

BRAINTECH, INC.,

      Counter-Defendant.

_____

**BRAINTECH, INC.'S RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL**

      Braintech, Inc. ("Braintech" or "Defendant"), by and through its counsel, Nemeth Burwell, P.C., renews its motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure because the jury did not have a legally sufficient evidentiary basis to find for Plaintiff Adil Shafi ("Shafi") on his counterclaim that Braintech breached his employment agreement by failing to pay him severance pay after termination of employment.

      The uncontested, unrefuted, and unimpeached testimony and documentary evidence demonstrated that Shafi willfully and continually failed to substantially perform his duties as Chief Operating Officer of Braintech, engaged in gross misconduct that was harmful to Braintech, and engaged in dishonesty for personal enrichment at the expense of the company. The record evidence pointed to only one conclusion that a reasonable jury could have reached -- that Braintech had good cause to terminate Shafi's employment and he was not entitled to severance pay.

In the alternative, Braintech moves the Court pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, to set aside the verdict and grant a new trial because the evidence in this case is totally insufficient to support a finding that Braintech did not have good cause to terminate Shafi's employment. The verdict of the jury appears to have been given under the influence of passion and sympathy for inadmissible mental anguish Plaintiff claimed to be under and improperly presented to the jury.

Pursuant to Rule 7.1(a) of the Local Rules for the Eastern District of Michigan, prior to filing the instant motion, counsel for Braintech requested concurrence in the relief sought, but concurrence was denied by counsel for Adil Shafi.

WHEREFORE, Braintech respectfully requests that this Honorable Court grant its Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial and enter an Order directing the entry of judgment as a matter of law in favor of Braintech with a conditional ruling that Braintech is entitled to a new trial.

Respectfully submitted,

NEMETH BURWELL, P.C.

By:    _s/Susan D. Koval_____
           Anne Widlak (P35763)
           Susan D. Koval (P59297)
           Attorneys for Braintech, Inc.
           200 Talon Centre Drive, Suite 200
           Detroit, Michigan 48207
           (313) 567-5921
           awidlak@nemethburwell.com
           skoval@nemethburwell.com

June 21, 2013

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ADIL SHAFI,

      Counter-Plaintiff,

v.                                                          Case No: 09-10454
                                                            Honorable Victoria A. Roberts

BRAINTECH, INC.,

      Counter-Defendant.

---

## BRIEF IN SUPPORT OF BRAINTECH, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES PRESENTED ........................................................... ii

INDEX OF CONTROLLING AUTHORITIES ........................................................ iii

INTRODUCTION ...........................................................................................................1

PROCEDURAL BACKGROUND....................................................................................1

DISCUSSION OF RECORD EVIDENCE.......................................................................2

STANDARD OF REVIEW UNDER RULE 50.............................................................10

STANDARD OF REVIEW UNDER RULE 59.............................................................12

ARGUMENT .................................................................................................................13

      THE UNCONTRADICTED RECORD EVIDENCE COMPELS REASONABLE
      PERSONS TO REACH ONE CONCLUSION, THAT IS, THAT BRAINTECH
      HAD GOOD CAUSE TO TERMINATE SHAFI'S EMPLOYMENT ...........................13

      ALTERNATIVELY, BRAINTECH IS ENTITLED TO A NEW TRIAL
      PURSUANT TO RULE 59(a) OF THE FEDERAL RULES OF CIVIL
      PROCEDURE BECAUSE THE JURY'S DETERMINATION THAT
      BRAINTECH DID NOT HAVE GOOD CAUSE TO TERMINATE ADIL
      SHAFI'S EMPLOYMENT IS AGAINST THE CLEAR WEIGHT OF THE
      EVIDENCE........................................................................................................17

CONCLUSION.............................................................................................................17

## STATEMENT OF THE ISSUES PRESENTED

I.   WHETHER BRAINTECH IS ENTITLED TO JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE BECAUSE THERE IS NOT A LEGALLY SUFFICIENT EVIDENTIARY BASIS TO SUSTAIN THE JURY'S VERDICT AND A REASONABLE JURY WOULD HAVE CONCLUDED THAT BRAINTECH HAD GOOD CAUSE TO TERMINATE ADIL SHAFI'S EMPLOYMENT.

Braintech answers yes.


II.  IN THE ALTERNATIVE, WHETHER BRAINTECH IS ENTITLED TO A NEW TRIAL PURSUANT TO RULE 59(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE BECAUSE THE JURY'S DETERMINATION THAT BRAINTECH DID NOT HAVE GOOD CAUSE TO TERMINATE ADIL SHAFI'S EMPLOYMENT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.

Braintech answers yes.

## INDEX OF CONTROLLING AUTHORITIES

Cases                                                                                          Page

*Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890 (6th Cir.1997) ....................................11

*Carney v. Preston*, 683 A.2d 47 (Del.Super.1996) ........................................................12

*Drayton v. Price*, 2010 WL 1544414 (Del.Super.)........................................................11

*Holmes v City of Massillon, Ohio*, 78 F.3d 1041 (6th Cir. 1996)..................................12

*J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir. 1991).........12

*K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171 (6th Cir.1996)................................11

*Mazda Motor Corp. v. Lindahl*, 706 A.2d 526 (Del.1998)...........................................12

*Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992)...............................................16

*Noble v. Brinker Int'l, Inc.*, 391 F.3d 715 (6th Cir.2004) ............................................16

*Town of Cheswold v. Vann*, 9 A.3d 467 (Del.Supr. 2010)............................................11


Court Rules

Rule 50, Federal Rules of Civil Procedure .....................................................................10

Rule 59(a), Federal Rules of Civil Procedure .................................................................12

Rule 50, Delaware Rules of Superior Court ....................................................................11

## INTRODUCTION

Braintech, Inc. ("Braintech" or "Defendant") is entitled to judgment as a matter of law under Rule 50(b) because there is not a legally sufficient evidentiary basis to sustain the jury's verdict in this case. Based upon the record evidence, a reasonable jury would have concluded that Braintech had good cause to terminate Adil Shafi's ("Shafi") employment in November 2008. Other than general, conclusory denials of wrongdoing which are not evidence, Shafi did not offer any evidence to prove that Braintech did not have good cause as defined by the employment agreement at issue. Additionally, Braintech's evidence demonstrating good cause was uncontested, unimpeached, and unrebutted.

Alternatively, Braintech is entitled to a new trial under Rule 59 because the jury's determination that Braintech did not have good cause to terminate Shafi's employment is against the clear weight of the evidence.

## PROCEDURAL BACKGROUND

In Count II of Shafi's Counterclaim, he alleges that Braintech breached an employment agreement by failing to pay him severance pay upon termination of his employment. The severance provision is contained in Paragraph 12(g) of the employment agreement and provides that Shafi would not be entitled to severance pay if Braintech had good cause to terminate his employment. Jt.Ex.1.

This matter was tried to a jury beginning May 21, 2013. On May 22, 2013, Braintech made its Motion for Judgment as a Matter of Law under Rule 50(a). Tr.II.45.[1] The Court took the Motion under advisement. Tr.II.46. On May 23, 2013, the jury returned a verdict in favor of

---

[1] Vol. I of the trial transcript is appended as Exhibit A, and Vol. II is appended as Exhibit B.

Shafi in the amount of $180,000. The clerk entered judgment on the verdict on May 24, 2013.

## DISCUSSION OF THE RECORD EVIDENCE

### Shafi's Case in Chief

In Shafi's case-in-chief, he relied upon a single exhibit -- the employment agreement (Jt.Ex.1). Shafi presented a single witness - himself. His testimony can be succinctly summarized as follows:

1. He disagreed with defense counsel's opening statement. Tr.20.

2. In conclusory fashion only, he would not acknowledge any occasions of dishonesty - - without specifying what it was he was not dishonest about. Tr.20.

3. In conclusory fashion only, he would not acknowledge any accusations of wrongdoing and said he did not perpetrate "them" -- without specifying what it was he did not perpetrate. Tr.20-21.

4. In a conclusory fashion only, he said he did not make any misrepresentations to Braintech or Rick Weidinger -- without specifying what it was he did not misrepresent. Tr.21.

5. He admitted that when he was employed as Chief Operating Officer, he knew Braintech was in financial peril, Braintech's exclusive contract with ABB was ending in December 2008, and Braintech was desperate for Shafi to provide immediate access and market acceleration to Braintech. Tr.21-22.

6. He claimed he was stymied in performing his job duties, but he did not offer any testimony or documentary evidence to prove how he was stymied. Tr.22.

7. He testified about his meeting in Virginia on November 19, 2008 when he was first placed on administrative leave and when Braintech proposed a rescission of the entire transaction with Shafi. Tr.24.

8. He was terminated with a second letter just before Thanksgiving of 2008. Tr.25.

9. He generated zero dollars in revenue during the time he worked at Braintech. Tr.25.

10. The Reliabot technology he sold to Braintech had been previously incorporated at different companies that manufacture candy, ice cream bars, fighter jets, and

minivans, but he was unable to replicate this while he worked for Braintech because "they killed my ability to execute." Tr.26.

11. He explained that the Reliabot technology involved vision guided robotics and explained generally how it worked. Tr.26-27.

12. He read the definition of good cause from Paragraph 12 of the employment agreement and in response to a question about whether he had "ever perpetrated any of these paragraphs," he responded, "I did not, sir…." Tr.28.

13. He testified that he never destroyed emails and that he never had access to anything but his own laptop. Tr.28.

14. He testified that he was seeking $900,000 in contract damages. Tr.28.

   This concluded <u>all of the evidence</u> presented by Mr. Shafi before he was cross examined

by defense counsel.

## **<u>Braintech's Cross Examination of Shafi</u>**

   On cross examination, Shafi made critical admissions that demonstrate Braintech had

good cause to terminate his employment:

1. Shafi agreed that the primary purposes of his employment agreement included growing and diversifying Braintech's existing customer base, revenue generation, technology development, business development and market coverage. Tr.29-30.

2. Shafi also agreed that his job duties included managing the overall technology of the combined company; providing market access and business acceleration; developing and enhancing processes and practices so that companies would purchase Braintech's robotic vision system; developing and enhancing product offerings; and hiring, managing, and directing employees to support the business objectives. Tr.31-32.

3. Shafi admitted that revenue production was his top priority. Tr.33.

4. Initially, Shafi denied that he told the Braintech executive management team at the first Summit meeting that his Reliabot product was revenue-ready, Tr.34, but admitted that he told Braintech's Chief Sales Officer Jim Dara that getting Reliabot to market was going to be "duck soup." Tr.35.

3

5.  Shafi also admitted that he represented to the executive management team that his Reliabot product would be a "cash generation machine" for Braintech. Tr.35.

6.  Shafi further admitted that the "one rule" of "revenue, revenue, revenue" was repeatedly emphasized by CEO Rick Weidinger from the very outset of Shafi's employment. Tr.37-38.

7.  Shafi also admitted that Mr. Weidinger directed him to provide the Reliabot assets to Vancouver prior to the August 24th Summit, but that he failed to provide the assets as requested. Tr.39-40; Def.Ex.113.

8.  Shafi admitted that, contrary to his representations about the revenue-readiness of the Reliabot product, he could not produce the technology because the software was stored in hundreds of folders across several computers that were not linked or networked. Tr.40.

9.  Shafi admitted that it took weeks for him to assemble the technology so that it could be evaluated by Braintech's experts in Vancouver, and he also admitted that he missed the deadline given to him by Mr. Weidinger. Tr.43-44; Def.Ex.186.

10. In fact, Shafi admitted that as late as <u>November 9, 2008</u>, he still had not given Braintech all of the Reliabot technology. Tr.55.

11. Shafi also admitted that he refused to work with Pete Manias, Braintech's Chief Marketing Officer. Tr.50-51; Def.Ex.207.

12. Shafi admitted that, as of November 1, 2008, Braintech's Chief Sales officer Jim Dara was questioning his representations about the product readiness status of Reliabot and the gross misrepresentations Shafi was making to potential Braintech customers. Tr.53-54; Def.Ex.279.

13. Likewise, Shafi admitted that Braintech's Chief Scientist Dr. Remus Boca was questioning him about representations he made about the number of robots that Reliabot would work on. Tr.55; Def.Ex.290.

14. Shafi admitted that the employment agreement required him to at all times and full-time faithfully, industriously and to the best of his ability, experience and talents perform the services or any other duties required of him to the reasonable satisfaction of Braintech. Tr.II.7; Jt.Ex.1.

15. Shafi also admitted that he told Rick Weidinger that he had money in process ("in the pipeline") that was going to be revenues that were supposed to be paid August through December of 2008, but acknowledged that no money was ever received from

the pipeline revenue. Tr.II.9.

16. Shafi further admitted that he was given a report on October 6, 2008 comparing the Reliabot product and Braintech's eVF robotic vision technology product and was asked to provide his input into the report, but that he refused to provide an analysis of the report because, according to Shafi, "It was not worth my time because it was clearly wrong." Tr.II.10-11, 38; Def.Ex.316.

17. Shafi admitted that he was given a Braintech email address. Tr.II.12; Def.Ex.107.

18. Shafi admitted that he repeatedly represented to his boss that payment from Siemens was imminent. Tr.II.12-14.

19. Shafi admitted that he refused to work, attend meetings and travel until a medical bill was paid that was not covered by his health insurance. Tr.II.15-17, 27; Def.Ex.109, 304.

20. Shafi admitted that Braintech's refusal to pay this uncovered medical bill made him mad and was a turning point for him. Tr.II.17.

21. Shafi then conceded that his Employment Agreement did not require Braintech to pay uncovered medical bills. Tr.II.18-19.

22. Shafi also admitted that he refused to attend meetings, reduced his work hours, and refused to travel beyond a 50-mile radius until he was reimbursed for travel expenses. Tr.II.19-20, 23-24; Def.Ex.242, 253, 254.

23. Shafi also admitted that he refused to attend several meetings scheduled for his sales plan presentation. Tr.II.25-28; Def.Ex.281, 294.

24. Shafi admitted that his relationship with Chief Sales Officer Dara had deteriorated and that Mr. Dara accused him of substantial wrongdoing. Tr.II.29-32; Def.Ex.285.

25. Shafi testified that he never destroyed any Braintech emails. Tr.II.36.

26. Shafi admitted that he did not complete his required sales plan, did not complete the compensation and incentive plan, did not develop a satisfactory technology plan, and did not develop an integrator program. Tr.II.37-38.

27. Shafi also admitted that his working relationship with every member of the executive management team had deteriorated, and he was in combat with his boss Rick Weidinger. Tr.II.38.

5

It is plainly evident that at the conclusion of Braintech's cross examination of Shafi, the overwhelming record evidence demonstrated that Braintech had good cause to terminate Shafi's employment.

## Shafi's Re-Direct Examination

Despite the damaging admissions by Shafi that he willfully failed to perform his job duties, and that good cause existed for his termination, his re-direct testimony was brief:

1. He once again explained how the Reliabot technology he sold to Braintech worked. Tr.II.39.

2. He admitted that the source code for the Reliabot software was written by Kevin North, a former Shafi employee. Tr.II.40.

3. He had asked for him [Kevin North] to be made available to Braintech, but Mr. Weidinger "refused to make him available." Tr.II.40.

4. He testified that Mr. Weidinger did not make it possible for him to have John Neilson which stopped him from doing his job. Tr.II.40.

5. He attempted to explain why the Siemens' invoice remained unpaid despite telling Mr. Weidinger that payment was imminent on several occasions. Tr.II.41.

6. He testified about his pipeline of accounts and potential prospects but claimed he needed things that were denied. Tr.II.42-43.

This is the totality of Mr. Shafi's testimony on re-direct examination. Shafi's testimony focused primarily on the reason he believed he generated no revenue for Braintech.

## Braintech's Uncontested and Unimpeached Defense

Braintech introduced 83 defense exhibits that were unrefuted, uncontested and unimpeached by Shafi. In Exhibit 315, Shafi admitted that he destroyed Braintech emails which impeached his sworn testimony on cross examination that he did not destroy Braintech emails. Tr.II.47-48; Def.Ex.315.

6

In addition to the documentary evidence, Braintech's former Chief Executive Officer Rick Weidinger testified on behalf of Braintech and established the following:

1. Braintech never used the Reliabot product sold to it by Shafi because the product was not any good. Tr.II.54.

2. As Chief Operating Officer, Shafi reported to Mr. Weidinger. Tr.II.58.

3. During Mr. Shafi's employment as Chief Operating Officer, he made representations to Mr. Weidinger and other members of the executive management team about Reliabot's ability to work on different types of robots. Tr.II.61.
.

4. During Mr. Shafi's employment as Chief Operating Officer, he made representations to Mr. Weidinger and other members of the executive management team about Reliabot's integration into over 15 robots and over 22 robot controllers. Tr.II.62.

5. During Mr. Shafi's employment as Chief Operating Officer, he made representations to Mr. Weidinger and other members of the executive management team that he had established a network of over 200 integrators. Tr.II.62.

6. Mr. Weidinger determined that Mr. Shafi's representations were untruthful. He did not have a network of integrators, and his product did not work on the number of manufacturers he claimed. Tr.II.62-63.

7. Braintech hired John Neilson to work as a consultant and he reported to Braintech that Reliabot did not work as Shafi had represented. Tr.II.62.

8. Shafi also represented to Mr. Weidinger and others that Reliabot was revenue ready. Mr. Weidinger discussed Ex. 279 and explained that Shafi provided input to the Product Readiness Table which represented that Reliabot was immediately revenue ready -- 0 months to market. Tr.II.63-64; Def.Ex.279.

9. In addition to misrepresenting the Reliabot product to the Braintech executive management team, Mr. Weidinger learned that Shafi was misrepresenting the abilities of the Reliabot product to potential Braintech customers. Tr.II.66; Def.Ex.279.

10. Shafi refused to provide input into the Reliabot evaluation report despite an express request to do so from Mr. Weidinger. The evaluation report was one of Shafi's key duties and it was a matter of considerable significance to Braintech. Tr.II.66-69; Def.Ex.316.

11. Mr. Weidinger considered Shafi's refusal to provide the feedback that Mr. Weidinger requested as a willful failure to perform his duties. Tr.II.69.

12. Shafi was untruthful with Mr. Weidinger regarding the Siemens' invoice and the payment that Shafi told Weidinger was forthcoming. Tr.II.69-71.

13. Shafi refused to participate in meetings until Braintech agreed to pay a medical bill that was not covered by health insurance.  Tr.II.71.

14. Shafi was untruthful when he told Heather Greenlay that Braintech agreed to pay uncovered medical bills. Tr.II.72-73; Def.Ex.109, 278, 304.

15. Mr. Weidinger considered Shafi's refusal to participate in meetings until Braintech agreed to pay the medical bill as a willful failure to perform his duties. Tr.II.74.

16. Shafi's refused to travel beyond a 50-mile radius because an expense report was not paid as promptly as Shafi would have preferred. Tr.II.74.

17. Shafi's refusal to travel beyond a 50-mile radius brought his Access & Acceleration schedule and plan to a screeching halt. Tr.II.74.

18. Shafi was treated the same as other employees regarding expense reimbursement Tr.II.75.

19. As of October 20, Shafi still had not developed a compensation plan for the personnel he wanted to hire. Tr.II.76.

20. The sales plan presentation meeting that Shafi repeatedly refused to attend was of critical importance to Braintech and was the "lifeblood" of the company. Tr.II.75-78; Def.Ex.243.

21. Mr. Weidinger considered Shafi's refusal to participate in the sales plan presentation meetings as a willful failure to perform his duties. Tr.II.78.

22. Shafi repeatedly and willfully disobeyed Mr. Weidinger's directives to attend critical meetings. Tr.II.78-81; Def.Ex.243, 253, 254, 272, 288, 294.

23. Braintech had offices at ABB in Detroit, Michigan, and other members of the executive management team worked in locales that were substantial distances from corporate headquarters in Vancouver and did not have access to local satellite offices. Tr.II.82-83.

24. Shafi had authority to hire and terminate employees who reported to him. Tr.II.83-84; Def.Ex.208.

25. After Shafi was placed on administrative leave with pay and told that Braintech was proposing to rescind its agreements with him, Mr. Weidinger learned that Shafi deleted 80% of his Braintech emails. Tr.II.84-86; Jt.Ex.3 and 4.

26. Mr. Weidinger considered destruction of the Braintech emails to be gross misconduct. Tr.II.84-86.

27. Shafi was in charge of acquiring the Detroit office space but he failed to complete the assignment and the project had to be turned over to Jim Dara. Tr.II.86-87.

28. Shafi willfully and continually failed to substantially perform his duties as COO of Braintech. Tr.II.87.

29. Shafi engaged in gross misconduct which is or could reasonably be expected to be materially injurious to Braintech. Tr.II.87.

30. Shafi was dishonest during his employment with Braintech. Tr.II.87.

Shafi did not cross examine Mr. Weidinger on any of the key points of his testimony; therefore, his testimony remains uncontested and unimpeached.

## **Shafi's Rebuttal**

Like his case in chief, Shafi's rebuttal case relied on a single witness - Adil Shafi. He did not contest any of the exhibits introduced by Braintech demonstrating good cause. He did not rebut Mr. Weidinger's testimony. Instead, Mr. Shafi testified to the following:

1. The Braintech emails he destroyed were "spam" emails. Tr.II.91.

2. He admitted that he gave the Reliabot source code to a third party before he sold it to Braintech. Tr.II.91-92.

3. He described his "phone book." Tr.II.91-92.

4. He believed the "sales plan" was the access and acceleration schedule. Tr.II.92.

5. He admitted that John Neilson was hired by Braintech as a consultant. Tr.II.92.

9

6. He admitted that Rick Weidinger gave him authority to hire 6 people but claims that Mr. Weidinger did not provide the financial funding for all of the hires. Tr.II.92-93. Shafi offered no evidence to demonstrate a single time this occurred.

7. He admitted that he had a Braintech credit card but testified that it might as well have been "made out of wood" because he was required to get preapproval for business expenses. Tr.II.93. Shafi offered no evidence to demonstrate that a preapproval request or a credit card expense was ever disallowed by Mr. Weidinger.

Mr. Shafi concluded his rebuttal testimony without addressing the key components of the good cause definition -- his willful and continued failure to substantially perform his duties as COO of Braintech, his gross misconduct, and his dishonesty. Without doubt, the record evidence at this stage pointed to only one conclusion -- that Braintech had good cause to terminate Shafi's employment and he was not entitled to severance pay. Simply put, no reasonable jury could have reached the conclusion reached by this jury if it had relied solely upon the record evidence.

## STANDARD OF REVIEW UNDER RULE 50

A renewed motion for judgment as a matter of law is governed by Rule 50(b), which provides in pertinent part:

**RULE 50. JUDGMENT AS A MATTER OF LAW IN A JURY TRIAL; RELATED MOTION FOR A NEW TRIAL; CONDITIONAL RULING**
…
**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59….

Under Rule 50, a court may grant judgment as a matter of law on a particular issue if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that

issue...." Fed.R.Civ.P. 50(a)(1). In cases based on diversity jurisdiction, a state-law standard of review is applied when a Rule 50(b) motion for judgment as a matter of law is based on a challenge to the sufficiency of the evidence necessary to support the jury's verdict. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 176 (6th Cir.1996). Because this is a diversity case and the instant motion challenges the sufficiency of the evidence, Sixth Circuit precedent requires the Court to look to the standard of review used by the courts of the state whose substantive law governs the action. *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 (6th Cir.1997).

In this case, the parties agree that Delaware substantive law applies to the employment contract claims. Jt.Ex.1, ¶18. Accordingly, Delaware's standard of review governing post-trial motions for judgment as a matter of law should be applied.

> **Super. Ct. Civ. R. 50. Judgment as a matter of law in actions tried by jury; alternative motion for new trial; conditional rulings.**
> (a)(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court may determine the issue against the party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

In Delaware, as in most jurisdictions, jury verdicts should stand <u>unless</u> a reasonable jury could not have reached the result. *Town of Cheswold v. Vann*, 9 A.3d 467, 472 (Del.Supr. 2010). "When considering judgment as a matter of law the trial judge does not weigh the evidence but, rather, views the evidence in the light most favorable to the non-moving party and, drawing all reasonable inferences therefrom, determines if a verdict may be found for the party having the burden." *Drayton v. Price*, 2010 WL 1544414, at *4 (Del.Super.) (citation omitted). "Juries are

11

not permitted to make [ ] factual findings in favor of a party at trial if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue....'" *Carney v. Preston*, 683 A.2d 47, 54 (Del.Super.1996). "The court must determine if under any reasonable view, the jury could find in favor of the non-moving party." *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 530 (Del.1998).

In the instant matter, Braintech properly made a Rule 50(a) motion for judgment as a matter of law during the trial in this matter on May 22, 2013. Braintech renews the motion pursuant to Rule 50(b).

## STANDARD OF REVIEW UNDER RULE 59

A motion for new trial is governed by Rule 59, which provides in pertinent part:

**RULE 59. NEW TRIAL; ALTERING OR AMENDING A JUDGMENT**
…
**(a) In General.**
**(1) Grounds for new Trial.**  The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows:
**(A)** after a jury trial, for any for which a new trial has heretofore been granted in an action at law in federal court.

"[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." *Holmes v City of Massillon, Ohio*, 78 F.3d 1041, 1045-1046 (6th Cir. 1996). When deciding whether to grant a new trial, a district court is free to independently weigh the evidence. A trial court should grant a motion for a new trial when the verdict is clearly against the weight of the evidence. *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991).

## ARGUMENT

Viewing the record evidence in the light most favorable to Shafi and, drawing all reasonable inferences therefrom, there is no legally sufficient evidentiary basis for the jury verdict in this case. Under any reasonable view, Braintech had good cause to terminate Shafi's employment, and that is the only reasonable conclusion to be drawn from the record evidence.

### I.  THE UNCONTRADICTED RECORD EVIDENCE COMPELS REASONABLE PERSONS TO REACH ONE CONCLUSION, THAT IS, THAT BRAINTECH HAD GOOD CAUSE TO TERMINATE SHAFI'S EMPLOYMENT.

Under the employment agreement, Shafi was not entitled to severance pay unless he could demonstrate that Braintech did not have good cause to terminate him. Jt.Ex.1, ¶12(g). Paragraph 12(a) of the employment agreement defines "Good Cause" as follows:

> (a) "Good Cause" shall mean:
> i. the willful and continued failure by the EXECUTIVE to substantially perform his duties hereunder (other than due to incapacity from physical or mental illness);
>
> ii. gross misconduct which is or could reasonably be expected to become materially injurious to BRAINTECH or its business or reputation, including, without limitation, fraud, or misappropriation of Company property or unauthorized disclosure and/or non-disclosure of confidential information; and
>
> iii. dishonesty resulting, or intending to result, directly or indirectly, in gain or personal enrichment at the expense of the Company.

**The Uncontested Record Evidence Establishes The Willful And**
**Continued Failure By Shafi To Substantially Perform His Duties**

The uncontested evidence not only showed that Shafi willfully and continually failed to substantially perform his duties, it demonstrated that he willfully and petulantly **refused** to perform some of his most critical duties:

1. Shafi **refused** to provide his input into the report comparing the Reliabot product and

Braintech's eVF robotic vision technology product as requested by Braintech's Chief Scientist and by CEO Rick Weidinger because, according to Shafi, "It was not worth my time because it was clearly wrong." Tr.II.10-11, 38; Def.Ex.316.

2.  Shafi **<u>refused</u>** to work with Pete Manias, Braintech's Chief Marketing Officer. Tr.50-51; Def.Ex.207.

3.  Shafi **<u>refused</u>** to work, attend meetings and travel until a medical bill was paid that was not covered by his health insurance. Tr.II.15-17, 27; Def.Ex.109, 304. Shafi conceded the employment agreement did not require Braintech to pay uncovered medical bills. Tr.II.18-19.

4.  Shafi **<u>refused</u>** to attend meetings, reduced his work hours, and **<u>refused</u>** to travel beyond a 50-mile radius until he was reimbursed for travel expenses. Tr.II.19-20, 23-24; Def.Ex.242, 253, 254.

5.  Shafi **<u>refused</u>** to attend several meetings scheduled for his sales plan presentation. Tr.II.25-28; Def.Ex.281, 294.

6.  Shafi also willfully failed to complete his required sales plan and did not complete the compensation and incentive plan. Tr.II.37-38.

The record evidence is clear on the first prong of the good cause definition. In fact, Shafi **<u>proudly</u>** agreed that he continually and willfully refused to perform his duties. On this basis alone, Braintech is entitled to judgment as a matter of law.

**The Uncontested Record Evidence Establishes That Shafi Engaged In Gross <u>Misconduct That Was Or Could Have Been Materially Injurious To Braintech</u>**

In addition, the record evidence demonstrated that Shafi engaged in gross misconduct that was or could have been materially injurious to Braintech. First, Shafi's Response to Braintech's First Requests for Admissions impeaches his trial testimony that he did not destroy Braintech emails after he was placed on administrative leave in November 2008. Def.Ex.315. Shafi's trial testimony that he did not have access to Braintech email was also impeached by documentary evidence showing that he was given a Braintech email address and access to an

14

exchange server at the outset of his employment in August 2008. Def.Ex.107.

The record evidence also established that Shafi engaged in other acts of gross misconduct:

1. Shafi made material misrepresentations about the Reliabot product to potential Braintech customers. Tr.II.66; Def.Ex.279.

2. Shafi refused to provide input into the Reliabot evaluation report despite an express request to do so from Mr. Weidinger. The evaluation report was one of Shafi's key duties and it was a matter of considerable significance to Braintech. Tr.II.66-69; Def.Ex.316.

3. Shafi was in combat with his boss Rick Weidinger and repeatedly refused directives causing material injury to Braintech. Tr.II.38.

The record evidence is clear on the second prong of the good cause definition. Shafi engaged in gross misconduct that was or could have been materially injurious to Braintech. Accordingly, Braintech is entitled to judgment as a matter of law.

### The Uncontested Record Evidence Establishes That Shafi Engaged In Dishonesty That Was Intended To Result In Personal Gain To Shafi At The Expense Of Braintech

Finally, the record evidence established that Shafi was dishonest with Braintech for his own personal gain -- in his capacity as Chief Operating Officer, Shafi repeatedly was untruthful about the Reliabot product and its capabilities, as well as other matters, for purposes of acquiring compensation and potential bonuses from Braintech at the expense of the company:

1. Shafi was dishonest about Reliabot's ability to work on different types of robots and Reliabot's network of integrators. Tr.II.61-63.

2. Braintech hired John Neilson to work as a consultant and he reported to Braintech that Reliabot did not work as Shafi had represented. Tr.II.62.

3. Shafi was dishonest about the revenue readiness of Reliabot. In fact, Def.Ex.279 impeaches Shafi's trial testimony claiming that he did not tell the executive team the product was revenue ready. The Product Readiness Table reflects that Reliabot was

immediately revenue ready -- 0 months to market. Tr.II.63-64; Def.Ex.279.

4.  Shafi was dishonest about the abilities of the Reliabot product to potential Braintech customers. Tr.II.66; Def.Ex.279.

5.  Shafi was dishonest about the Siemens' invoice when he told Mr. Weidinger that payment was imminent. Tr.II.69-71.

6.  Shafi was dishonest when he told Heather Greenlay that Braintech agreed to pay uncovered medical bills. Tr.II.72-73; Def.Ex.109, 278, 304.

The record evidence is clear on the third prong of the good cause definition. Shafi was dishonest with Braintech for his own personal gain. Accordingly, Braintech is entitled to judgment as a matter of law.

## Conclusory Allegations And Subjective Opinion Are Not Evidence

It is well settled in the Sixth Circuit and in federal courts generally that conclusory allegations and subjective beliefs are not competent evidence. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992). But this is precisely the type of testimony given by Shafi in his direct and rebuttal examination. His conclusory and vague denials are not competent evidence to defeat the specific evidence of dishonesty, gross misconduct, and willful failure to perform job duties presented by Braintech during Shafi's cross examination and during its case-in-chief.

## Braintech Is Entitled To Judgment As A Matter Of Law

Judgment as a matter of law is appropriate when "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in favor of the moving party." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). There is but one conclusion that can be drawn from the record evidence presented to the jury -- Braintech had good cause to terminate

16

Shafi's employment, and he was, therefore, not entitled to severance pay under the employment agreement.

Accordingly, Braintech is entitled to judgment as a matter of law on Shafi's claim for breach of the employment agreement.

**II. ALTERNATIVELY, BRAINTECH IS ENTITLED TO A NEW TRIAL PURSUANT TO RULE 59(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE BECAUSE THE JURY'S DETERMINATION THAT BRAINTECH DID NOT HAVE GOOD CAUSE TO TERMINATE ADIL SHAFI'S EMPLOYMENT IS AGAINST THE CLEAR WEIGHT OF THE EVIDENCE.**

A new trial is warranted when a jury has reached a "seriously erroneous result" as evidenced by the verdict being against the weight of the evidence. *Holmes v City of Massillon, Ohio*, 78 F.3d 1041,1045-1046 (6th Cir. 1996).

Here, as outlined in the discussion of the record evidence, the clear weight of the evidence demonstrated that Braintech had good cause to terminate Shafi's employment and he was not entitled to severance pay under the employment agreement.

## <u>CONCLUSION</u>

WHEREFORE, Braintech respectfully requests that this Honorable Court grant its Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial and enter an Order directing the entry of judgment as a matter of law in favor of Braintech with a conditional ruling that Braintech is entitled to a new trial.

Respectfully submitted,

NEMETH BURWELL, P.C.

By:   _s/Susan D. Koval_____
Anne Widlak (P35763)
Susan D. Koval (P59297)
Attorneys for Braintech, Inc.
200 Talon Centre Drive, Suite 200
Detroit, Michigan 48207
(313) 567-5921
awidlak@nemethburwell.com
skoval@nemethburwell.com

June 21, 2013

## **PROOF OF SERVICE**

I hereby certify that on June 21, 2013, I electronically filed the foregoing paper (Braintech Inc's Renewed Motion for Judgment as a Matter of Law Or, in the Alternative, for New Trial and Brief in Support) with the Clerk of the Court using the ECF system, which will send notification of such filing and service of such documents to all parties via their counsel of record at the e-mail addresses disclosed on the Notice of Electronic Filing receipt.

s/Susan D. Koval
Susan D. Koval (P59297)
NEMETH BURWELL, PC
Attorney for Braintech, Inc.
200 Talon Centre Drive, Suite 200
Detroit, Michigan 48207
(313) 567-5921
skoval@nemethburwell.com
P59297
