UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION


ADIL SHAFI,

          Counter-Plaintiff,                                Case No.   09-10454


V.                                                          Detroit,  Michigan

                                                            May  21, 2013
BRAINTECH, INC.

          Counter-Defendant,

_____/


**EXCERPT** OF TRIAL - VOLUME ONE

BEFORE THE HONORABLE VICTORIA A. ROBERTS

UNITED STATES DISTRICT COURT JUDGE, and a Jury.



APPEARANCES:


For the Counter-Plaintiff:                    Susan Koval, Esq.
                                              Anne Widlak, Esq.


For the Counter-Defendant:                    Michael Doyle, Esq.



Proceedings taken by mechanical stenograph,  transcript produced by
computer-aided transcription

# T A B L E  O F  C O N T E N T S

**WITNESSES:**                                                    **PAGE**


**ADIL SHAFI (Defense)**

    Direct-Examination by Mr. Doyle          20

    Cross-Examination by Ms. Widlak         29



## E X H I B I T S


| NUMBER | IDENTIFICATION | RECEIVED |
|--------|----------------|----------|
| Joint Exh 1 | (Employment Agrmt) | 20 |
| Def Exh 138 | (Shafi email) | 35 |
| Def Exh 129 | (Summit Agenda) | 37 |
| Def Exh 149 | (One Rule email) | 38 |
| Def Exh 112 | (Weidinger email) | 40 |
| Def Exh 113 | (Email Response) | 41 |
| Def Exh 186 | (9/12 Email) | 43 |
| Def Exh 187 | (9/12 Email) | 45 |
| Def Exh 190 | (Email) | 47 |
| Def Exh 196 | (Email) | 48 |

1                    **Detroit, Michigan**

2                    **Tuesday, May 21, 2013**

3                    **(At about 10:46 a.m.)**

4                            **- - -**

5                    (Call to Order of the Court)

6        <u>**JURY VOIR DIRE REPORTED, NOT ORDERED TRANSCRIBED**</u>

7                    **<u>(Out of the Presence of the Jury)</u>**

8                    THE COURT: Counsel, you said you had objection to one of Mr. Doyle's

9        proposed exhibits.

10                   MS. KOVAL: Yes, Your Honor.

11                   THE COURT: This is the Employment Agreement?

12                   MS. KOVAL: Well, this isn't the signed Employment Agreement and did

13       you take -- he had the debt schedule out which was in my copy.  This is part of the

14       Share Purchase Agreement that the Court's excluded from evidence.

15                   THE COURT: That's the Appendix One?

16                   MR. DOYLE: I think I took that out of yours, Your Honor.

17                   THE COURT: It's here.  So you agree that that should not be in?

18                   MR. DOYLE: Yes, Your Honor, the back sheet.

19                   THE COURT: So I won't look at it.  I'll take it out. Is the Employment

20       Agreement otherwise a proposed trial exhibit?

21                   MS. KOVAL:  It's Joint Exhibit One, Your Honor, in our book and it's the

22       signed contract.  I haven't had an opportunity to go through this exhibit, but the one

23       that's joint exhibit that we provided an entire book for is the exhibit that should be

24       admitted.  It's the signed contract.

25                   THE COURT: Okay.  So Mr. Doyle, you've already agreed that the

1      signed contract would come in as a joint exhibit, so I think we don't need this.

2                    MR. DOYLE: Yes, Your Honor.  I'm cool then.

3                    THE COURT: You're cool?  Then okay.  All right.

4                    MS. KOVAL: The only other thing, Your Honor, and I know the captions

5      get changed.  The Clerk when she called the case included Mr. Weidinger as a party.

6      You did not when you introduced the case.  As we go forward, I just want to make

7      sure that if the caption is ever read or in some way it's on something that's given to

8      the Jury, that his name be redacted as a party.

9                    THE COURT: So it should just say Braintech.

10                   MS. KOVAL: Correct.

11                   THE COURT: We will change that.  It's on my big jury sheet.  Is there

12     anything else before we bring the Jury out?  Okay, we'll get them.

13                           (Jury entered courtroom at 10:54 a.m.)

14                   THE COURT:  Miss Howard says that I neglected to ask her about her

15     involvement in litigation and you are involved in litigation now over a car accident?

16                   JUROR HOWARD:  Yes.

17                   THE COURT: Are you the Plaintiff or the Defendant?

18                   JUROR HOWARD:  I'm the Defendant.  I had the accident.  I'm being

19     sued.

20                   THE COURT: You're being sued?

21                   JUROR HOWARD:  Yes.

22                   THE COURT: Where's that case pending?

23                   JUROR HOWARD:  It just started.  They haven't done anything really

24     other than the lawyers have the case and nothing really.  I haven't made any

25     statements other than I wrote out different things about the -- about what happened in

1   the accident, things like that and the lawyer last time I spoke to him about a month

2   ago that he would get in touch with me before -- because I have to do a sworn

3   statement and things of that nature.

4           THE COURT: Right, yes.  Counsel, anyone have questions of Miss

5   Howard?

6           MS. KOVAL: I don't, Your Honor.

7           THE COURT: You don't.  Mr. Doyle?

8           MR. DOYLE: Miss Howard, you say that you're the Defendant in this

9   case?

10          JUROR  HOWARD:  Ah-hum.

11          MR. DOYLE: Are there any other defendants?

12          JUROR HOWARD:  No.

13          MR. DOYLE: And was any ticket given with respect to the accident?

14          JUROR HOWARD:  Yes, it was.  I was given a ticket.

15          MR. DOYLE: And how long ago was this?

16          JUROR HOWARD:  This happened in April.

17          MR. DOYLE: And do you feel you've been treated fairly with regard to

18   what went on?

19          JUROR HOWARD:  Yeah, it is what it is.  I had an accident.  Yes.

20          MR. DOYLE: Did you feel you deserved a ticket is my question?

21          THE COURT: I'm not sure we should be asking her.  It's ongoing

22   litigation.

23          MR. DOYLE: I apologize for that.

24          THE COURT: I don't want to put anything on the record that could harm

25   her.

1          MR. DOYLE: Does the fact that you've been issued a ticket cause you

2    to have any question about the criminal system?

3          JUROR HOWARD:  No.

4          MR. DOYLE: Thank you.

5          THE COURT: Are you satisfied, Mr. Doyle?

6          MR. DOYLE: Excuse me, Your Honor.

7          THE COURT: Ah-hum.

8          MS. KOVAL:  We're satisfied, Your Honor.

9          THE COURT: We can swear this Jury in, Counsel?

10         MR. DOYLE: Yes.

11         THE CLERK OF THE COURT:  I already did.

12         THE COURT: All right.  You did?  I was here?  Okay.  So, ladies and

13   gentlemen, now I have a few preliminary instructions to give you and then we will

14   proceed.

15         Ladies and gentlemen, it will be your duty to find from the evidence what the

16   facts are.  You and you alone will be the judges of the facts.  You will then have to

17   apply to those facts the law as the Court will give it to you and you must follow the law

18   whether you agree with it or not.  Nothing the Court says or does during the course of

19   the trial is intended to indicate or should be taken by you as indicating what your

20   verdict should be.

21         The evidence from which you will find the facts will consist of the testimony of

22   witnesses, documents and other things received into the record as exhibits and any

23   facts that the lawyers agree to or stipulate to or that the Court may instruct you to find.

24         Certain things are not evidence and must not be considered by you, and this is

25   what they include.  Statements, arguments and questions by lawyers are not

1    evidence.  Objections to questions are not evidence.  Lawyers have an obligation to

2    their clients to make objections when they believe evidence being offered is improper

3    under the Rules of Evidence.  You should not be influenced by the objection or by the

4    Court's ruling on it.  If the objection is sustained, ignore the question.  If it is overruled,

5    treat the answer like any other.

6         If you are instructed that some item of evidence is received for a limited

7    purpose only, you must follow the instructions.  Testimony that the Court excludes or

8    tells you to disregard is not evidence and must not be considered by you.

9         Anything that you see or hear outside of the courtroom is not evidence and

10   must be disregarded by you.  You are to decide the case solely on the evidence that

11   is presented here in the courtroom.

12        There are two kinds of evidence, direct and circumstantial.  Direct evidence is

13   direct proof of a fact such as the testimony of an eye witness and circumstantial

14   evidence is proof of facts from which you may infer or conclude that other facts exist.

15   The Court will give you further instructions on these as well as other matters at the

16   end of the case, but keep in mind you can consider both types of evidence.

17        It will be up to you to decide which witnesses believe, which witnesses not to

18   believe, and how much of any witness's testimony to accept or reject. The Court will

19   give you guidelines for determining the credibility of witnesses at the end of the case.

20        Now burden of proof.  This is very important.  This is a civil case.  The Plaintiff

21   has the burden of proving his case by what is call a preponderance of the evidence.

22   That means Plaintiff has to produce evidence which considered in the light of all of the

23   other facts leaves you to believe that what the Plaintiff claims is more likely true than

24   not.  To put it differently, if we were to put the Plaintiff's and the Defendant's evidence

25   on opposite sides of a scale, the Plaintiff would have to tip the scale somewhat on his

1    side.  If the Plaintiff fails to meet that burden, then the verdict must be for the

2    Defendant. Those of you who may have been part of a criminal case will have heard

3    that the burden of proof is beyond a reasonable doubt.  That is not the burden in a

4    civil case such as this one.

5        Now a few words about your conduct as jurors. You as jurors must decide this

6    case based solely on the evidence presented here in the courtroom.  This means that

7    during the trial, you must not conduct any independent research about this case, the

8    matters in the case or the individuals or the corporation involved in the case.  In other

9    words, you should not consult any outside reference, any dictionary, search the

10   Internet, web, blogs, anything, use any type of electronic tool to obtain information

11   about the case or to help you decide the case.  Do not try to find out any information

12   from any source outside of the evidence that is presented here in courtroom.

13       Until you have retired to deliberate, you may not discuss this case with anyone,

14   even your fellow jurors.  After you retire to deliberate, you may begin discussing the

15   case, but with your fellow jurors, but not with anyone outside of the courtroom or

16   outside of the jurors.

17       Many of you have cell phones, Blackberries and other tools of technology.  You

18   must not talk to anyone at any time about this case or use any of the tools that you

19   may have at your disposal to communicate electronically with anyone about the case

20   and that includes all your family and friends.  We have had verdicts set aside, ladies

21   and gentlemen, because of juror misconduct.  There have been instructions where

22   jurors have gone on the web and asked for advice from friends in making the decision

23   concerning the outcome of a case.  My best advice to you would be simply if you must

24   be involved in that technology during this case, to simply not even mention that you

25   are a juror or that you are involved in a court case.  Just say absolutely nothing about

1    it because we would not want to jeopardize the outcome of this case because of juror

2    misconduct.

3        We have already asked you and I reiterate, do not form any opinion until all the

4    evidence is in.  Keep an open mind until you start your deliberations.

5        You do have notebooks.  The Court will allow you to take notes during the

6    presentation of the evidence.  I'm going to ask that you not do that during the opening

7    statements or during the closing arguments because that's not evidence.

8        And the final instructions that I give you, each of you will have your set to look

9    at and to refer to during your deliberations and so you will need not take notes on any

10   of the instructions.

11       You're not required to take notes.  Some people learn better by doing that.

12   Remember that your notes are not evidence in the case and when you go back and

13   look at your notes during deliberations, if they don't comport with your recollection of

14   the evidence, then rely upon your recollection and not on the notes because they are

15   only a tool to help you organize your thoughts and the evidence.

16       You will be allowed to ask questions, ladies and gentlemen, of any of the

17   witnesses.  The lawyers will ask the questions first.  The Court may have questions of

18   a witness and then if you still have unanswered questions, we'll ask that you write

19   them down.  They'll be subject to objection just like any question that a lawyer might

20   ask and I will show them to the lawyers and then we'll decide whether your question

21   will be asked of a witness or not.

22       Your notes should just stay here at the end of this day.  Did Carol tell you what

23   the trial schedule is?  We're going to one o'clock today and until one o'clock tomorrow.

24   Once you begin your deliberations though, we're just going to ask that you stay here

25   for the balance of the day and see if you can reach a verdict.  If not, return the next

1  day.

2         The trial is going to get underway now.  I said that it's going to start with the

3  opening statements.  Then the Plaintiff will put in his evidence, his testimony and his

4  exhibits.  The Defense will have an opportunity to cross-examine any of the Plaintiff

5  witnesses.  Once the Plaintiff rests, the Defense then will have an opportunity to put in

6  evidence by way of testimony as well as exhibits.  Once that is done, if the Plaintiff

7  has any rebuttal evidence to put in, that can come in.  You will then get the closing

8  instructions.  You will then get closing argument and then the deliberations will begin.

9         Counsel, is there any instruction I failed to give this Jury?  Mr. Doyle?

10        MR. DOYLE: No, Your Honor.

11        MS. KOVAL: No, Your Honor.

12        THE COURT: All right then.

13        MS. WIDLAK: No, Your Honor.

14        JUROR HOWARD:  I have a question.  I'm Miss Howard.  I was a

15  witness in a case years ago.  Does that make a difference?

16        THE COURT: I believe that it does not, no.  Okay.  Are we ready?  No

17  notes during opening statements.  Mr. Doyle.

18        MR. DOYLE: Thank you, Your Honor.  First of all, I'm always in awe

19  when I have a trial in Federal District Court like this, especially a jury trial.  You have

20  the highest ranking Trial Judge you can get anywhere in the country.  You have a

21  Federal Court Judge. Her Honor was appointed by the President of the United States.

22  You're a Jury sitting in a Federal District Court.  There's no higher Jury.

23        As it's a great honor for me to argue a case in Federal Court, I believe it's a

24  great honor for you to be able to be on a jury in Federal District Court.  It's different.

25  It's a lot different than the State courts.  It's the highest court.

1        Now in this case as I've said during voir dire, the Plaintiff was hired by this

2   Braintech because he is a rock star in the industry, to put it mildly.  He's the only guy

3   who does or can do what he does in aerospace, in everywhere; jet engines.  He's the

4   one who functions with -- and you'll hear this -- what we call this visual robotics.

5        Now I'm kind of nontechnical that way, so I kind of didn't understand what it

6   was, but he'll explain what it is.  It involves a software product that allows a piece of

7   equipment to find parts in a part bin that is a part of perhaps an engine, of perhaps a

8   satellite and it not only goes to this bin of parts, unrelated parts and picks it out, but

9   then it takes it over and installs it.  There's no human involvement.  This is the

10  technology which he has perfected and the Defendant led by Mr. Weidinger, in other

11  words Braintech, they obviously knew who he was and they were competitors in the

12  industry.

13       There are two things that happen in cases like this.  I don't know if any of you

14  watch the Tigers on TV or listen to the Tigers on TV or know who Mike Ilitch is or

15  what-have-you, but there are two phases of what these guys do.  Mr. Ilitch knew that

16  he needed some talent, and he was willing to pay whatever was necessary to get the

17  talent when he went after Miguel and when he went after Prince and paid these

18  hundreds of thousands of dollars, millions and millions of dollars.  But the real thing

19  he's doing as he's buying this talent, he's wiping out the competition.  That's the

20  important thing in these business transactions.  Not only do you want the best, you

21  want the talent, but you don't want the competition to get this talent, to take advantage

22  of it and that was the case here.

23       Mr. Weidinger went to Mr. Shafi and offered him an enormous amount of

24  money, $180,000 a year for three years if they chose to terminate him and they didn't

25  have cause.  In addition to that, they added 10% each year to the hundred and 80 and

1   then 198 to get to the final 250.  Then he also offered him -- and it's in the contract,

2   you'll be able to look at it.  You'll roll your eyes at the amount of money.  It's a lot of

3   money.  The bonus was to be between 25% and 50% of what the package I just told

4   you about is.  So the minimum for the three-year period was to be $745,000 unless

5   you added the additional bonus of another 25% when you get between 25 and 50%

6   depending upon performance.  This guy hit more homeruns and he hit some more

7   homeruns.  Then he's up to about $900,000.

8       You're going to see the facts here and it's simple.  One thing that's been done

9   here is this.  This Judge in the past several years, she has taken this enormous case

10  down to this narrow issue.  She's been able with her decisions to get rid of everything

11  else.  What's left for the Jury is the amount of these damages under this contract if

12  you choose that Mr. Shafi was not guilty of some wrongdoing and should have been

13  fired for cause.

14      Now another interesting part and you'll hear this is this.  Of the $900,000, they

15  paid him a total of 45,000 and they paid it during the first three months of his

16  employment.  They never paid him anymore money.

17      Then the other thing that happened here is that this Braintech run by this Mr.

18  Weidinger and I guess he's not up here right now, what they did was they looked at

19  the technology I just talked about -- I don't understand it myself, but this visual

20  robotics that was developed by Mr. Shafi and during the first three months of his

21  employment, they had their technical people completely take advantage and learn all

22  of the technology, get it.  They now have -- they had all his contacts, all his clients, his

23  prospects, every one of them and they had people within Braintech now having

24  communication with these people and they kind of shuffled Mr. Shafi aside.

25      Now I drop back and say that Mr. Shafi accepted this contract for the 900,000;

1   yes, he did and one of the reasons he accepted it and you won't be deciding this is

2   Braintech is a publicly traded company.  He's not asking for the value of the stock he

3   received.  The Court has already done -- decided those issues so he's not asking for

4   the stock that he's to receive.

5        But then what happens here is Braintech, as I told, you during the three months

6   they get all they need from him basically, and the other thing is you're going to hear

7   they never had the money to close on the deal in the first place.  They told him they

8   had the cash to pay him this.  Be like Mr. Ilitch say I got your homeruns during the first

9   month.  That's it; I'm not going to pay you anymore.

10       So three months into his employment contract, you'll see this in the letter, they

11  call him into Virginia and they say okay, we now have this, this and this.  What we're

12  going to do is we're not going to let you be active anymore with the technology and

13  clients and customers.  This is three months.  You're going to go home and you're

14  going to be on administrative leave.  But don't worry, we'll pay you during the leave.

15       Well, a few days later you'll see they write him a letter and say no, we decided

16  we ain't going to pay.  You're history.  So he got the three months.  He gave up his

17  dream which was a dream, a wonderful dream. He became number one in the world

18  in doing this product.  I mean here's a man that you'll find out and he'll say and I told

19  you in voir dire he was educated by nuns in Pakistan and had a dream to come to the

20  United States 18 years ago.  Because he was so gifted, he knew he could develop

21  these products and he did for worldwide companies.

22       And what happened and you're going to hear this.  It's a short trial.  Excuse me

23  for talking so long in the opening, but you're going to hear this.  Number one, their

24  intention was to dominate this industry.  Their intention was to take over the

25  domination.  They accomplished that by doing this joke of a contract with him, then

1   taking everything he had wherein he was dominating technology and they stole it.

2   The -- they bought the opportunity to dominate this industry and they used -- you say

3   why were they offering all this money?  Because he's a rock star.  He's a hero.  So

4   now he sits here, finally gets in front of a jury and we're completely pleased that he

5   now has this opportunity for a jury of his peers and you are of his peers, to take a look

6   at it and say wait a minute.  We're not going to let this happen to him.  This isn't going

7   to happen to somebody of our peers.  It just isn't going to happen.  You're not going to

8   be able to take his company and three months later say we've got everything we want

9   now, you're history.  Thank you very much.

10          THE COURT: Thank you, Mr. Doyle.  Ms. Koval?

11          MS. KOVAL: Thank you, Your Honor.  I believe Mr. Doyle picked up the

12   wrong briefcase on his way into court this morning because the case that he just

13   outlined for you has nothing to do with the issues that are going to be presented in

14   this trial and the issue that you all have to resolve. He just made a series of promises

15   to you and I ask you to hold him to every single one of them.

16          Mr. Doyle presented you with a lot of excuses why Mr. Shafi failed to do his job

17   when he worked for Braintech.  I call that the foggy smoke screen strategy.  We're

18   going to do everything we can to keep the fog and the smoke out of this lawsuit, and

19   I'm going to ask you not to get lost in that fog and that smoke.

20          This case isn't complicated.  Mr. Doyle keeps talking about robots and vision

21   technology and you can believe that was the business of Braintech, but this case is

22   very straightforward.  It is a very simple case.  The only issue you will be resolving in

23   this case is whether Adil Shafi is entitled to severance pay.  The answer is also

24   simple; absolutely not.

25          The Employment Agreement that Adil Shafi signed plainly provides that he's

1  not entitled to severance pay if the company had good cause to terminate his

2  employment.  So what's this good cause?  What does that mean?  The greatest thing

3  here is that in advance before Mr. Shafi was even hired by the company, the parties

4  agree on what good cause meant.

5         Good cause has a simple definition and it's in the contract, so whatever idea

6  you may have of what good cause is, you'll be looking at the contract here because it

7  defines it for you.  It's not buried in fine print.  It's nice and big for everyone to see,

8  and it could be any of three things; failure to perform your job -- failure to perform your

9  duties, dishonesty and misconduct.  And who has the burden of proof here that the

10  Judge talked about?  Mr. Shafi has the burden to prove by a preponderance of the

11  evidence that the company did not have good cause to terminate his employment.

12         Because good cause can be any of those three things, Mr. Shafi must prove

13  three things to you:  One, he must prove to you that he did not fail to perform his

14  duties as the Chief Executive Officer of Braintech.  Two, he must prove to you that he

15  was at all times honest during his employment at Braintech and finally, three.  He

16  must prove to you that he did not engage in acts of misconduct, and one of the acts of

17  misconduct that we're going to be focusing on is the time period that Mr. Doyle

18  referenced between November 19th and November 24th when Mr. Shafi destroyed

19  Braintech emails.  So yes, it was at that point that he was then placed -- his

20  employment was terminated and he was no longer paid for his services.

21         Adil Shafi cannot prove his case and you don't have to take my word for it.

22  You don't have to take my colleague, Anne Widlak's word for it.  You can read Mr.

23  Shafi's admissions for yourself and his own words sink his case.  He cannot meet his

24  burden of proof for three simple reasons.

25         He's already admitted during his employment and during sworn testimony in

1    this case that we take by deposition that he not only failed to do his job, he willfully

2    refused to perform his job not just once, numerous occasions. You will see emails

3    written by Mr. Shafi in which he directly disobeys his boss.  It doesn't take a rocket

4    scientist to know that if you're directly disobeying what your boss is telling you to do,

5    you won't be employed very long.  In fact, Mr. Shafi's employment ended some three

6    months after he was hired.

7         The second reason that Mr. Shafi cannot meet his burden of proof is because

8    he was untruthful from the very beginning of his employment.  This dishonesty

9    continued throughout his employment and perhaps the worst part of it, he was not

10   only dishonest with Braintech personnel, but he was dishonest in his sales pitches to

11   potential Braintech customers.

12        And finally number three, the third reason that he cannot meet his burden of

13   proof is that he admitted that he destroyed emails while he was placed on suspension

14   with pay.

15        So how did it all begin?  How did we get here?  As Mr. Doyle said, Braintech

16   created and sold vision technology.  This notion that Mr. Shafi was the only person in

17   this industry is just not true.  Braintech's vision technology worked on robots

18   manufactured by one large robot manufacturer called ABB.  Braintech had an

19   exclusive contract with ABB that was ending in December, 2008.  Remember, Mr.

20   Shafi's employment starts August of 2008, and that was why Braintech hired Adil

21   Shafi.  When he came on as Chief Operating Officer -- and by the way, he signed that

22   Employment Contract and he had three or so lawyers who negotiated that contract

23   with Braintech.  In fact, Mr. Shafi is the only person I know who has an attorney

24   mentor, as Mr. Doyle described Mr. Mitchell's role.  And it's true as Chief Operating

25   Officer, Mr. Shafi reported to Rick Weidinger, then Chief Executive Officer or CEO of

1  Braintech.

2       Now as the Judge indicated from the outset and I believe Mr. Doyle referenced,

3  Mr. Shafi's employment was part of a larger transaction.  He sold two companies to

4  Braintech, including a technology product called Reliabot.  Reliabot, like Braintech's

5  product, was also a vision-guided technology that supposedly worked on robots

6  manufactured by other manufacturers.  Braintech's product only worked on ABB

7  robots.

8       Since Braintech was losing its exclusive deal with ABB, it wanted to gain

9  market access to those other manufacturers that Mr. Shafi's product supposedly could

10  run on.  At the time of his hire as Chief Operating Officer, Mr. Shafi knew that

11  Braintech's exclusive contract with ABB was ending and that it was to end four

12  months later.  He also knew that Braintech desperately needed revenue and they

13  needed it quickly.  When he was -- his most important responsibility as COO was to

14  generate that revenue, bring in the money.  And you didn't hear Mr. Doyle say it, but

15  here's how much Mr. Shafi brought in revenue-wise during his time as COO; zero.

16       When Mr. Shafi was hired as COO, he knew that new market access and

17  business acceleration were critical to Braintech's ability to survive beyond the ABB

18  contract that was expiring in December of 2008.  Braintech urgently needed to expand

19  its presence in the vision-guided technology market and to get the Braintech brand on

20  other robots.  As Chief Operating Officer, Mr. Shafi promised that he could do that.

21  He could deliver market access and accelerate Braintech's business.

22       From his very first day as Chief Operating Officer, Mr. Shafi told Braintech's

23  executive staff that Reliabot would be a cash cow for Braintech and would

24  immediately generate revenue because he had in process or pipeline revenue, but

25  Reliabot wasn't even close to being a cash cow.  It was road kill.

1    For weeks after Mr. Shafi signed the Employment Agreement you're going to

2    see he couldn't even produce the Reliabot technology.  And finally he confessed the

3    technology was nothing more than a jumbled mess spread across a bunch of old

4    computers in his basement.  This was the first of many Adil Shafi falsehoods.  In fact,

5    Mr. Shafi was incapable of generating revenue or making any project move past

6    square one.  He did nothing but spin his wheels for three months and for the entire

7    time he was employed at Braintech he generated not one cent of revenue.

8    As part of his job, Mr. Shafi was expected to cooperate and work with

9    Braintech's sales, marketing and technology teams, but Mr. Shafi's ego was too big

10   for Braintech.  He treated other members of the executive staff like they were his

11   minions, inferior to him.  Mr. Doyle used the expression rock star.  You know what

12   rock stars are, divas and he was indeed a diva.

13   You will see samples of the communications that he had with other members of

14   the executive team and besides Mr. Weidinger, the Chief Executive Officer that we've

15   talked about this morning, there were some other key members of that executive

16   team.  Dr. Remus Boca, Braintech's chief scientist; Jim Dara, Braintech's chief sales

17   officer; Pete Manias, Braintech's chief marketing officer; Babak Habibi, Braintech's

18   chief technology officer.  Once this executive team started to question Mr. Shafi about

19   his Reliabot product, his dishonesty, the promised revenue and the other failings, he

20   came up with manufactured excuses and pointed the finger at everyone else but

21   himself.

22   So what's Plaintiff's case?  You heard it; excuses, excuses, excuses,

23   blame-shifting, lack of personal accountability.  Nothing is Mr. Shafi's fault.  His huge

24   narcissistic ego blinded his decision-making abilities and when he didn't get his way,

25   he stopped working.  He refused to work and essentially told his boss, Rick

1   Weidinger, go fly a kite.  Can you imagine the Chief Operating Officer of the company

2   shut off his phones, turned of his email, refused to communicate and didn't care what

3   the consequences were to the other members of the management team, Braintech's

4   employees and Braintech shareholders.  Seriously.

5          So yes, after a short three months, Mr. Shafi's employment was terminated and

6   yes, the company had good cause to do so. Unfortunately for Braintech, the damage

7   caused by Mr. Shafi had been done and the company didn't survive not many months

8   after that.

9          Adil Shafi made a deal and now he is asking you to give him a different deal.

10   This case boils down to the Plaintiff wanting something that he doesn't deserve.  As

11   this case develops, remember this.  Mr. Shafi wasn't hired as some low level or

12   mid-level manager.  He was -- he held the second highest position in the company,

13   Chief Operating Officer.  Like Mr. Doyle said, his salary was $180,000 a year.  In fact,

14   he got money up front.  Mr. Shafi asked for and received $15,000 before he ever

15   started working one day for Braintech.  He got an advance on his salary.

16          The Employment Contract gave Braintech every right to terminate Mr. Shafi's

17   employment for any reason at all.  He knowingly agreed beforehand that he would not

18   get a severance if he failed to perform his job, if he was dishonest or if he engaged in

19   misconduct.  In this case, Mr. Shafi will offer you only excuses, but the bottom line is

20   there's no excuse for not doing your job, for being dishonest and failing to perform

21   your job duties and engaging in misconduct.

22          At the end of the road when all the evidence is in, we believe you will

23   determine the outcome of this case in favor of Braintech.  Thank you.

24                 THE COURT: Thank you, Ms. Koval.  Mr. Doyle, are you ready to call

25   your first witness?

1      MR. DOYLE: Yes, Your Honor.  We call Mr. Shafi.

2      THE COURT: Thank you.  Mr. Shafi, come forward.

3                          **A D I L   S H A F I,**

4      **Having been sworn under oath at about 11:32 a.m., testified:**

5      MR. DOYLE:  If it please the Court, we have a Joint Exhibit One that I

6   think the parties have agreed upon.

7      THE COURT: The Employment Agreement?

8      MR. DOYLE: Yes, Your Honor.

9      THE COURT: It is admitted into evidence.  Thank you.

10     MR. DOYLE: Thank you.

11                       **DIRECT-EXAMINATION**

12  **BY MR. DOYLE:**

13  Q.     Well, Mr. Shafi, you heard what the attorney said as far as all these

14  wrongdoings on your part.  Can you look at the Jury and tell them whether any of

15  those accusations are correct?

16  A.     No.  They're fabricating a lot of things.  A lot of things are taken out of context.

17  I'd like to have the chance to explain what happened.  There are hundreds of emails

18  that they cherry-picked a few and I don't know how long my response should be.

19  Q.     I just wanted you to acknowledge that you disagreed with it.

20  A.     I do.

21  Q.     And for instance -- and this is like proving a negative if you will -- have you

22  stopped beating your wife.  In other words, are you acknowledging any of these

23  occasions of dishonesty?

24  A.     No, I do not.

25  Q.     And with respect to any of the accusations of wrongdoing, do you acknowledge

1    any of those?

2    A.    I do not.

3    Q.    And in fact, did you perpetrate any of them?

4    A.    No, I did not.

5    Q.    And with respect to Exhibit One, is there anything in Exhibit One which

6    specifically talks about what the attorney has said Mr. Weidinger found?

7    A.    I --

8    Q.    Strike that.  Strike that please.  Did you in fact -- is there any instance of

9    misrepresentation made by you to Braintech or Mr. Weidinger?

10   A.    No, there's not.

11   Q.    Do you see Mr. Weidinger in the courtroom?

12   A.    No, I don't.

13   Q.    He's not even here?

14   A.    He's not here.

15   Q.    With respect to performing your duties, what were your duties?

16   A.    I had an overall role of being Chief Operating Officer and there were three roles

17   under that.  The first role was to be the technology lead.  My job was to combine the

18   technology of Shafi, Inc., the company I sold with a product called Reliabot that runs

19   hundreds of systems even today and you'll recognize these brands that Reliabot runs

20   on, and to combine that technology with Braintech's technology, so that was my

21   number one charter.  The CTO, Babak Habibi, was to report to me and assist me in

22   combining the technology short-term and long-term.  That was the first job.  The

23   second job was to help with sales and as the Defendant attorney mentioned, my job

24   was to help with sales.  Braintech was running out of their contract at the end of

25   December of 2008.  Their exclusive contract of 10 million with ABB was terminating

1    and ABB had still not sold six million of that, so there was no way that ABB was going

2    to renew their contract with Braintech.  They were desperate as has been alluded, to

3    get beyond ABB.  That's all their software ran on was the company called ABB.  The

4    company is called Asea,  A-s-e-a, Brown, Bovera; that's what ABB stands for -- based

5    in Sweden and that's one of several -- maybe 20 major industrial robot companies.

6    Braintech software just ran on that.  That's all they had.  My company, Shafi, had

7    systems that ran on not just ABB, but 15 other platforms; Fanuc Robotics, Kawasaki --

8    Q.    (Interjecting) You've gotta be careful with the court reporter.  Could you please

9    --

10   A.    I apologize.  My company software, Shafi, ran on 16 robot platforms.  Basically

11   picked a robot, picked a vision system, picked a solution and even today many of

12   these systems run and I won't get into those details. The third job I had was

13   operations.  So technology integration, sales acceleration and operations were the

14   three jobs.  I was given a lot of promises as I got into the contract --

15   Q.    (Interjecting)  Excuse me.  Did you perform these duties?

16   A.    I did the best I could.  I put 80 to a hundred hours every week trying to make it

17   work, but I was stymied.  A lot of things that I needed were denied up front and they

18   made my job impossible.

19   Q.    And how did they make it impossible?

20   A.    There were a number of conditions that I asked for before I took this job and

21   some of them are in the contract; that's called the revenue conditions.  Let's focus on

22   the sales first.  In order to -- this is not like selling a pound of sugar.  The robots cost

23   $50,000, a hundred thousand dollars.  People don't just go to like Staples or Best Buy,

24   pick a CD and say let's make it work.  In order for these customers like F-35 fighter

25   jets are tested with Reliabot software.  Stow & Go, 30 million a day responsibility runs

1   on Reliabot software even today across the river.  And so when customers want to do

2   sales, they want to see brick and mortar.  They want to see an office.  They want to

3   see people trained.  They want to see equipment on their floor that runs, and they

4   want to be assured that we can support them.  None of these things was enabled by

5   Braintech.  To the end of my employment I was working out of coffee shops.  I had no

6   office to work with.  I'd go to a customer and say okay, we are combined Shafi and

7   Braintech.  We want to do sales.  They would say you have an office?  I said no, we

8   don't have an office.  Do you have people trained?  No, we don't have.  Do we have

9   any robots we can demonstrate?  You can go to Braintech in Vancouver 3000 miles

10  away and yeah, there's some robots there.  Those were my answers and so my job

11  was made impossible and then I had been through a financial problem myself and I

12  needed --

13  Q.      (Interjecting) Just get into answering the question.

14  A.      I'm sorry.

15  Q.      And with respect to -- tell the Jury.  The contract has been admitted into

16  evidence.  The Jury will have copies to review it, but tell the Jury what your annual

17  salary was to be?

18  A.      The first year was to be $180,000.

19  Q.      What was the second year?

20  A.      Guaranteed raise of 10%, so it would be $198,000.  And then the year after

21  10% on top of that.  It was a three-year contract.

22  Q.      And with respect to the three-year contract, was there a bonus provision?

23  A.      Yes.

24  Q.      What was that?

25  A.      It was a minimum I believe of 25%.

1    Q.    And it was to be between 25% and what?

2    A.    And 50%.

3    Q.    And was this money paid you?

4    A.    No, they did not pay.

5    Q.    With respect to this, tell the Jury what happened with respect to your

6    termination.

7    A.    They asked me to -- three months into the job they had frustrated me

8    endlessly --

9    Q.    (Interjecting) I'm sorry to interrupt you.  Who's they?

10   A.    Braintech.  Braintech.

11   Q.    Who from Braintech?

12   A.    Weidinger in particular.

13   Q.    Thank you.

14   A.    He made my job particularly absolutely impossible from day one.  He asked me

15   to reduce the titles I had, took away my authority to execute.  So after three months of

16   a deteriorating relationship, they asked me to come to Virginia in November 19th I

17   believe, 2008.  I went there.  They handed me a piece of paper saying we want to

18   rescind the acquisition of Shafi and such.  We want you to sign it, and they tried to

19   strongarm me into doing that and I declined, and then they gave me this letter saying

20   that I was on administrative leave.  This thing is never mentioned in the Employment

21   Agreement.  There's no reference --

22   Q.    (Interjecting) Excuse me.  Just tell them what happened please.

23   A.    And then they asked me to leave and go back to Michigan.  But the letter said

24   that I was on administrative leave with pay.  Two, three days later they said I had

25   destroyed, which is an absolute falsehood because I didn't have access to their

1   computers.  I had absolutely no access.  I wasn't in a position to destroy any notes.

2   That is a total absolute lie that they made as excuse to say okay, we're not paying

3   you.  At that point that is a day before Thanksgiving in 2008 just before the recession

4   and they put me in extremely difficult position.

5   Q.    Excuse me.  Just please articulate what happened.

6   A.    Okay.

7   Q.    So they terminated you with the second letter?

8   A.    Yes.

9   Q.    And by that -- drop back just a little bit and in opening statement the attorney

10  said that you had made no sales in your career?

11  A.    I had made millions of dollars worth of sales prior to my coming to Braintech.

12  At Braintech I made zero dollars in revenue because they made my job impossible.

13  Q.    Tell the Jury though, did you transfer your technology to Braintech when you

14  got there?

15  A.    I did.  I did.

16  Q.    And with respect to -- you articulated that maybe there was some common

17  products that the Jury might recognize.  Can you articulate those for the Jury?

18  A.    That the software runs on?

19  Q.    Yes.

20  A.    Well, Dove Bars, ice cream Snicker Bars.  They're put together with software,

21  with my software, M & M in Burridge, Illinois.  Those systems have been running for

22  17 years.

23  Q.    Slow down please and articulate this.  We're not all on the same level.

24  A.    M & M Mars, the candy company, their ice cream bars like Dove bars and

25  Snicker bars are put together by five wash down robots in Burridge, Illinois that runs

1   on my Reliabot software.  This was done in 1995.  F-35 fighter jets, these are 64

2   million dollar airplanes.  They are picked up by giant gantries in Fort Worth, Texas

3   with Reliabot software and they have to be picked up with these cables and put on

4   these pylons and the gantry gets out of the room and they do radar testing, and then

5   that allows them to make 17 such jets every month.  That runs on Reliabot software.

6   Across the river, Stow & Go minivans, they make 1500 vans everyday and there is no

7   manual backup, sir.  If that system goes down, the plant will shut down.  That's been

8   running for more than nine years with Reliabot software.  I could take anybody for a

9   tour there and I could go on in dozens of situations.  I have a box with purchase

10  orders for Reliabot worth millions of dollars.  The problem is when I brought this to

11  Braintech, they didn't help me to execute.  The problem was they killed my ability to

12  execute and that's what happened.

13  Q.      What was the technology that you left at Braintech when you were terminated?

14  A.      It's called vision-guided robotics.  If I have something on a table and I pick it up

15  as a human being and put it on, what just happened?  Three things happened.  My

16  human eyes are able to see this thing.  Then that information goes to my brain and

17  my brain is able to compute where that something is, and then my brain can

18  command my hand and arm to go get it and use my arm and hand and fingers to get

19  it.  We do this naturally all the time.  Vision-guided robotics when we mechanized this

20  is that capability, giving robots eyesight.  And so what works there is you have

21  cameras.  The cameras can be on the robot or they can be fixed mount.  You take a

22  picture.  That information comes backs to a brain.  That brain is either a PC or a

23  Smart camera or something, or a PLC, programmable logic controller and then we

24  compute where this thing is.  It could be on a flat plane, it could be up in space, some

25  kind of an angle and then we tell the robot to go get it.  Now this technology is very

1   useful because if you can pick things up randomly anywhere on a table or something,

2   you don't have to make expensive tooling.  You don't have to do -- use new racks and

3   new bins and new tools in factories every time a product changes.  You can use the

4   same conveyors, so this technology is very useful for that reason.  I pioneered a lot of

5   these solutions.  I wasn't the only one in the industry, but I had the highest ranking in

6   the world according to Google and several search engines above all universities  and

7   all companies in the world for bin picking.  Bin picking is the act of looking at parts

8   totally jumbled in a bin and even today now after my Braintech episode, I still pioneer

9   and accelerate in that industry.  I just happened to be gifted and I'm humble about it,

10  but that's what VGR is, vision-guided robotics.

11  Q.     Can you put paragraphs 12 up on your elmo please?  Can the Jury see that?

12  Can you see that Miss Howard?

13          JUROR HOWARD:  Yes.

14  Q.     (By Mr. Doyle continuing)  The reason I have the patent attorney is to run the

15  elmo.  I'm not technical enough to do it.  Anyway, Mr. Shafi, can you read what in the

16  contract -- this is paragraph 12 of the contract which is in evidence.  Can you read

17  what good cause is under that contract?

18  A.     I can.

19  Q.     Would you please read it for me?

20  A.     Okay.  It starts 12(a):  Good cause shall mean the willful and continued failure

21  by the executive, which would be me, o substantially perform his duties hereunder

22  other than due to incapacity from physical or mental illness.  Number two, gross

23  misconduct which is or could reasonably be expected to become materially injurious

24  to Braintech or its business or reputation, including without limitation fraud or

25  misappropriation of company property or unauthorized disclosure and/or

1    nondisclosure of confidential information and three, dishonesty resulting or intending

2    to result directly or indirectly in gain or personal enrichment at the expense of the

3    company.

4    Q.    Have you ever perpetrated any of these paragraphs?

5    A.    I did not, sir, and I took the oath.

6    Q.    Just a sample at opening.  The attorney said something about you destroying

7    some kind of emails.  Were you guilty of that?

8    A.    I never did that.  That was a total shock to me to even be accused of that.  It

9    was a total surprise to me.  I did not have access to anything but my own laptop.

10   That's all I had and that's one of the many reasons I could not execute is because I

11   had no access to their servers.  I was denied access to their servers.  I didn't even

12   have ability to access anything like that, and I have all my emails, thousands of them

13   from my Braintech experience.  I have them all categorized and I can show all of

14   them.

15   Q.    Now with regard to this situation, are you asking the Jury for anything other

16   than the financial provisions in the contract totalling the $900,000?

17   A.    No, I'm not.  I just want justice.  It's been a few years.  I've waited for this day

18   for four or five years.  My family went through enormous amount of --

19   Q.    (Interjecting)  Okay.  Just --

20   A.    -- Distress.

21   Q.    In fact, who has the intellectual property now?

22   A.    Braintech does and their new round called RVT, robotic vision technology

23   under the command of Mr. Weidinger.

24   Q.    So they have what you brought to the --

25   A.    (Interjecting)  Yes.

1    Q.      -- Company?

2    A.      Correct.  They have that software.

3    Q.      To your knowledge have they ever done anything to dissolve their company?

4    A.      Braintech?

5    Q.      Yes.

6    A.      They --

7    Q.      To your knowledge.  Are they a dissolved company?

8    A.      Yes.  Braintech is no longer in operation.  It has a new form called Robotic

9    Vision Technologies under the command of the same person.

10   Q.      Thank you.  He's your witness.

11            THE COURT: Thank you, Mr. Doyle.

12                          **CROSS-EXAMINATION**

13   **BY MS. WIDLAK:**

14   Q.      Hello, Mr. Shafi.  I know we met when I took your deposition some time ago. I'll

15   be asking you some questions to supplement those asked by your attorney about the

16   transaction you had with -- not the transaction, forgive me -- the employment

17   experience you had with Braintech.  I think it would be useful if we put the

18   Employment Agreement up so that the Jury can watch.  I'm just going to review with

19   you, Mr. Shafi, the basics of your contract with Braintech and then I'll ask you about

20   some of your conduct during your employment.  Is that fair?

21   A.      Yes.

22   Q.      Okay.  Starting at the very beginning -- can everybody see this?  Okay.  You

23   would agree with me, Mr. Shafi, that I'm looking at capital B, that one of the single

24   purposes of your Employment Agreement as Chief Operating Officer with Braintech

25   appears at B, the business objectives for Braintech and your involvement in those

1    include growing, diversifying its existing customer base which you alluded to, revenue

2    generation, technology development, business development and market coverage.

3    Agreed?

4    A.    Yes.

5    Q.    And your employment began on August 12, 2008, is that right?

6    A.    Yeah.

7    Q.    But I think you didn't begin until August 16th?

8    A.    The 16th I think it was.

9    Q.    Thank you for that.  Just so the Jury understands the events leading up to your

10   signing this Employment Agreement, you negotiated the terms of this Agreement over

11   many, many months, is that right?

12         MR. DOYLE: Your Honor, I'll object to that.  The contract speaks for

13   itself.  It specifically says that this is the written agreement.

14         THE COURT: I'm not sure she's going to get into specifics of the

15   negotiations that didn't enter into -- that didn't make its way into this contract, but I

16   think she can confirm that the contract was negotiated over a period of time.

17         MS. WIDLAK: Thank you, Judge.  You're correct; I'm not getting into any

18   substantive terms.

19   Q.    But you would agree with me, Mr. Shafi, that you and Braintech spent

20   countless hours and many, many months negotiating the terms of this contract?

21   A.    That's right.

22   Q.    In fact, you were represented by several attorneys during that, correct?

23   A.    Yes.

24   Q.    And a CPA as well?

25   A.    Yes.

1    Q.    And you've described for the Jury quite succinctly what kind of product Reliabot

2    is and you've talked about certain applications.  You would agree with me that you

3    sold Reliabot to Braintech as part of the larger transaction that we're not talking about

4    today, but in connection with your employment, is that correct?

5    A.    Correct.

6    Q.    And as you earlier explained for the Jury, the purpose of Braintech acquiring

7    Reliabot was to permit it to expand its applications in the market because of the

8    expiration of the ABB contract in December of 2009, correct?

9    A.    2008.

10            MR. DOYLE: Again, Your Honor, I'll object.  The contract speaks for

11   itself.

12            THE COURT: Overruled.

13            MS. WIDLAK: Thank you, Judge.

14   Q.    (By Ms. Widlak continuing) Let's move on to the job duties.  I know you've

15   summarized your job duties, Mr. Shafi, but I'd like to just review them one by one for

16   the benefit of the Jury so the Jury can understand exactly what's expected of you and

17   what you were expected to perform in exchange for your $180,000 salary.  Under

18   duties, that you agreed to perform such duties as required for the position and carry

19   out the policies, procedures and projects independently or as assigned by the CEO,

20   that would be Mr. Weidinger, including without limitation, but with the exception of

21   legal and financial management roles, five things.  Manage overall technology of the

22   combined company, which I think you alluded to earlier, provide market access and

23   business acceleration.  And as I understand it, Mr. Shafi, that is a business term for

24   getting Reliabot into the market and expanding the customer base of Braintech so as

25   to make money.  Would you agree with that?

1    A.     Yes.

2    Q.     You were also expected to develop and enhance processes and practices

3    needed to accomplish the company's goal for doing business with industrial end users

4    and other end users.  For the Jury's sake, is an end user basically a customer?

5    A.     Yes.  An end user is a company that buys the total turn key solution which

6    includes a robot vision system.

7    Q.     And software,  the combined product?

8    A.     Yes.

9    Q.     The combined technology?

10   A.     Correct.

11   Q.     Thank you.  Then you were also expected to develop and commercialize

12   enhanced product offering, and I know you alluded to that.  And there's an expression

13   that's kind of quirky called an enhanced egg?  By that, that refers to the expected

14   combination of Reliabot with EVT which was Braintech's existing software for a

15   combined product to take to market, correct?

16   A.     Yes.  It's called EVF and Reliabot were to be combined and that became our

17   kind of colloquial term.  We used to call it enhanced egg that would come later.

18   Q.     I see.  But you agree that was one of your responsibilities?

19   A.     Yes.

20   Q.     Okay.  And then lastly, hire, manage and direct employees as required to

21   support the business objectives associated with all technical activity.  So you had the

22   personnel component responsibility as well, correct?

23   A.     Yes.

24   Q.     Thank you.  You conceded, but I'd like to emphasize that time was really of the

25   essence when you came on board at Braintech because they were literally desperate

1    for money.  Would you agree with that?

2    A.      Yes.

3    Q.      And so the production of revenue was a top priority?

4    A.      Yes.

5    Q.      Let me not get ahead of myself.  Let's just examine so the Jury has a context

6    as this other evidence comes in.  If we could look at the good cause definition.  I know

7    Mr. Doyle went over this with you, but I think it would help the Jury to take a look at

8    the definition of good cause, and you would agree that this good cause standard

9    relates exclusively to the question of whether you would be entitled to severance pay

10   in the event you were fired?  Do you agree with that?

11   A.      Okay.

12   Q.      Okay.  So if good cause existed for your termination, you agree you would not

13   be entitled to severance?

14   A.      Like Mr. Doyle said, the contract speaks for itself.

15   Q.      I'm asking you to look at the contract.  You've articulated the three -- and you

16   read into the record the three criteria for good cause; willful and continued failure of

17   you to substantially perform your duties,  gross misconduct and dishonesty.  You

18   would agree with me that once you signed that contract, there were no amendments,

19   no revisions, that that provision stood as is?

20   A.      Yes, that was our contract.

21   Q.      Okay.  Now do you remember after you came on the job on August 16th of

22   2008, there was a sales summit held in Vancouver.  Do you remember that?

23   A.      It was near there; not exactly Vancouver.

24   Q.      But in Canada near Braintech's offices in Vancouver, Canada?

25   A.      Yes.

1    Q.    And do you remember that your executive colleagues were also present, Mr.

2    Weidinger, the Chief Operating Officer, Mister -- well,  the chief technology officer, the

3    chief marketing officer, the chief sales officer and the chief scientist were all present,

4    and at that summit you and your colleagues reviewed plans for sales in other matters

5    over the next few months?

6    A.    Yes, we did.

7    Q.    Okay.  And at that point Reliabot was, as we discussed, the product that

8    Braintech purchased from you and was eager to get out on the market, agreed?

9    A.    Yes.

10   Q.    And at this sales summit, you told your colleagues that Reliabot was ready to

11   go to market, ready to hit the ground running?

12   A.    I disagree because of a few things.  Number one, it wasn't just ready to sell as

13   is.  There were a number of revenue-related conditions attached to several

14   documents.  Number one was the access and acceleration plan which may or may

15   not be part of the evidence right now.  The second document was my own

16   Employment Contract which is part of the evidence here.  There were a number of

17   revenue-related conditions.  Like I said before, this is not like selling a pound of sugar.

18   There were a number of requirements in order to succeed that everybody knew going

19   in.

20   Q.    Mr. Shafi, do you deny --

21           MR. DOYLE: Excuse me, Your Honor.  I think he has a right to finish his

22   answer.

23           THE COURT: No, I think that he was going beyond it and she has a

24   right to ask a question.  What's your question, Ms. Widlak?

25   Q.    (By Ms. Widlak continuing) My question is Mr. Shafi, do you deny telling Jim

1    Dara, the Chief Sales Officer that getting Reliabot to market was going to be duck

2    soup?  You deny that?

3    A.    I don't, but it was tied to the conditions.  Yes.

4    Q.    Okay, thank you.  And in fact, Your Honor, may I approach the witness?

5          THE COURT: You may.

6    Q.    Mr. Shafi, I'm handing you what is marked Defendant's Exhibit 138, and I'll ask

7    you to take a look at it at your own pace.  Then I will ask you to identify it for me.

8    A.    Sure.  If it will help, Mr. Shafi, I invite you to examine the entire exhibit, but I'll

9    only be talking about the first page.  Can you identify Exhibit 138 for me?

10    A.    Yes.  It's an email from me to the team and it's an email that outlines a

11    suggestion.

12    Q.    Thank you.  Does it appear in all respects identical to one you created?

13    A.    Yes.

14    Q.    Your Honor, I'd offer it into evidence.

15          THE COURT: Is there objection, Mr. Doyle?

16          MR. DOYLE: No, Your Honor.

17          THE COURT: Then 138 is in.

18    Q.    (By Ms. Widlak continuing) Thank you, Judge.  I'd like you to look at the

19    highlighted section and this portion of the email was drafted by you, correct?

20    A.    Yes.

21    Q.    And in it you write:  Since Reliabot will be our cash generation machine in the

22    next few months, the following are suggested.

23    A.    Yes.

24    Q.    You wrote that?

25    A.    Yes.

1    Q.    And you wrote that on August 29th, 2008?

2    A.    Correct.

3    Q.    Thank you.  Now I'd like to turn your attention back to the summit in August.

4    As I recall from the documents I think it was August 24th to the 26th.  Does that sound

5    right?

6    A.    I think so.

7    Q.    I mean it can be rough.  At that time, Rick Weidinger was Chief Operating

8    Officer of Braintech, correct?

9    A.    Yes.

10   Q.    And he pretty much led that summit?

11   A.    Not technically.

12   Q.    He made opening remarks?

13   A.    Yes.

14   Q.    And do you remember the expression that he used called one rule?

15   A.    I don't recall the one rule expression.  There are a number of expressions I

16   know about him, but not the one rule.

17   Q.    Let me see if I can clarify.  May I approach, Judge?

18         THE COURT: You may.

19   Q.    (By Ms. Widlak continuing) Mr. Shafi, I'm handing you what is marked as

20   Defendant's Exhibit 129.  I'll ask you to take a look at it.  Do you recognize Exhibit

21   129?

22   A.    I do.

23   Q.    Could you describe it to the Jury, what it is?

24   A.    It's an email from Rick Weidinger to the team.

25   Q.    Including yourself?

1    A.    Yes.  It's before our sales summit.  It's an agenda of what he wanted to cover.

2    Q.    Thank you.  Judge, we offer Exhibit 129?

3    A.    Mr. Doyle?

4          MR. DOYLE: No objection.

5          THE COURT: It's in.

6    Q.    (By Ms. Widlak continuing) Thank you.  Just to refresh your recollection, as I

7    understand this roman numeral one section, the welcome was given by Rick

8    Weidinger, correct?

9    A.    Yes.

10   Q.    And the very first item on the agenda was this one rule?

11   A.    Okay.

12   Q.    Does that refresh your recollection about what that is?

13   A.    I don't remember the one rule phrase as I mentioned before, but there was

14   another phrase that he used a lot during that time.

15   Q.    I just want to stay on the one rule.  I think I can refresh your recollection.  May I

16   approach?

17         THE COURT: Yes, you may.

18   Q.    (By Ms. Widlak continuing) Mr. Shafi, this is Defendant's Exhibit 149 for

19   identification.  If you would just review it. Do you recognize that?

20   A.    Yes.

21   Q.    Could you tell the Jury what it is?

22   A.    It's another email from Mr. Weidinger in early September just saying what he

23   meant by the one rule, which was revenue, revenue, revenue.  That's the term I

24   remember.

25   Q.    Just a moment please.  We offer Exhibit 149, Judge.

1       THE COURT: Mr. Doyle?

2       MR. DOYLE: No objection.

3       THE COURT: Then 149 is in as well.

4   Q.   (By Ms. Widlak continuing) So Mr. Shafi, you would agree that this was an

5   email to you among others on the executive staff of September 1st of 2008, and Mr.

6   Weidinger -- this is after the summit, the Technology and Sales Summit writes to you

7   all:  Just to be clear, the purpose of the Summit was the one rule; revenue, revenue

8   and revenue, whatever it takes.  Does that refresh your recollection?

9   A.   Yes.

10  Q.   Okay, thank you.  Let's go back to -- I won't talk about the terms of the

11  transaction, but when you sold Reliabot to Braintech as part of your employment

12  arrangement with them, it's true, isn't it, that you did not permit anyone at Braintech to

13  examine Reliabot before the company bought it?

14  A.   Actually it was not asked for.

15  Q.   You admit that it was not examined -- are you denying that you refused to have

16  it examined?

17  A.   No.  Nobody asked me to show Reliabot source code.  However, installations

18  were inspected.  Two people went with me to the Chrysler factory in Ohio to see

19  Reliabot running in operation.

20  Q.   This was before August 12, 2008?

21  A.   Yes.  Ah-hum, yes.  They saw it running.

22  Q.   Now just so the Jury understands, at the time you were hired by Braintech,

23  Braintech had its team of scientists and others out in Vancouver, correct?

24  A.   Yes.

25  Q.   And the plan was for you to send the Reliabot asset that the company had

1   purchased to Vancouver to be analyzed by the gurus, if you will?

2   A.      Before or after the transaction?

3   Q.      After the transaction?

4   A.      Yes.

5   Q.      And you were expected to do that -- actually you were expected to do it before

6   the Summit, is that right?  Mr. Weidinger asked you --

7   A.      There's a context that needs to be explained, if I may.  I mean I can give you a

8   yes/no answer, but it won't tell the Jury what's going on.

9   Q.      Please do.

10  A.      Here's what happened.

11  Q.      No, no.  Mr. Shafi, I don't mean to be rude.  Isn't it true that Mr. Weidinger

12  directed you to provide the Reliabot asset to the folks in Vancouver prior to the August

13  24th Summit?  Yes or no?

14  A.      He asked, but there were a number of things needed.

15          THE COURT: Mr. Shafi, you really do have to listen to the question as

16  posed.  Mr. Doyle might have some follow-up questions for you and may allow you

17  the explanation, but I don't think that Ms. Widlak is interested in getting that from you

18  now.

19          MS. WIDLAK: Thank you, Judge.

20          THE COURT: Thank you.

21          MS. WIDLAK:  May I approach Judge?

22          THE COURT: Yes.

23  Q.      (By Ms. Widlak continuing) Mr. Shafi, I'm handing you Defendant's proposed

24  Exhibit 112.  Please take a look at it.  Could you identify Exhibit 112?

25  A.      It's an email from me to Rick Weidinger explaining his request for the software.

1    Q.      Judge, we would offer Exhibit 112.

2            THE COURT: Thank you.  Mr. Doyle?

3            MR. DOYLE: I have no objection.

4            THE COURT: All right, it's in.  Thank you.

5    Q.      (By Ms. Widlak continuing) Okay.  Now if you go to the second page, if you

6    would.  Your email, Mr. Shafi, is a response to this communication from Mr. Weidinger

7    requesting that you provide to the folks in Vancouver the Reliabot software, correct?

8    A.      Yes.

9    Q.      Let's look at your response.  Now this is August 20th of 2008 where you write:

10   Thirdly, there is no way I can comply with this software gathering request until after

11   the Summit because I have the software in hundreds of folders across several

12   computers that are not linked and networked right now.  My question to you, Mr.

13   Shafi, is had you ever advised anybody prior to this communication to Mr. Weidinger

14   on August 20th that Reliabot was not in one place?

15   A.      It was never asked for.

16   Q.      Did you ever tell anybody?

17   A.      I didn't have to.

18   Q.      Yes or no?

19   A.      I can't give you a yes/no answer.  The issue is that the software was

20   deliberately separate --

21   Q.      (Interjecting) Excuse me for interrupting.  My question to you, Mr. Shafi, is did

22   you ever tell anybody, whether you were asked or not, prior to August 20th that you

23   had software in hundreds of folders across several computers that were not linked or

24   networked?

25   A.      No, I didn't have to.  I wasn't asked.

1  Q.      Thank you.  Now it's fair to say Mr. Weidinger was not happy with that

2  response, correct?

3  A.      I don't know.

4  Q.      Well, let's take a look.  May I approach?

5          THE COURT: You may.

6  Q.      (By Ms. Widlak continuing) Mr. Shafi, I'm giving you Defendant's proposed

7  Exhibit 113 for identification.  Please review it.  Do you recognize 113?

8  A.      Yes.

9  Q.      What is it please?

10 A.      It's basically his response to my email and basically he did not understand the

11 technology --

12 Q.      (Interjecting)  I'm just asking you to identify it because it's not yet in evidence.

13 So just confirm what it is.

14 A.      It's an email back from him to me saying it should have already been done.

15 Q.      We offer Exhibit 113, Judge.

16          THE COURT:  Mr. Doyle?

17          MR. DOYLE: No objection.

18          THE COURT: All right, 113 is in.

19 Q.      (By Ms. Widlak continuing) Now I'll ask you a question about it.  Mr. Weidinger

20 was not happy with your news because he writes:  This software gathering should

21 already have been done.  I would like our Vancouver guys to have a look at the

22 software before the Summit, but as we know that didn't happen, right?

23          MR. DOYLE: I object.  That calls for some kind of speculation on

24 whether he knows what the mood of Mr. Weidinger was.

25          MS. WIDLAK: Well, I'm just asking him to deduce from the tone of the

1    email.  I'm not asking for state of mind.  I'm asking him to read and interpret that.

2                    THE COURT: If you can answer it, Mr. Shafi.

3    A.      He had no idea what he was asking for.  He did not know the technology, so

4    you can say that, but it's not a light switch.  It was a lot of software and a lot of places.

5    Q.      Let's talk about the process of getting -- Reliabot eventually landed -- found its

6    way to Vancouver, correct?

7    A.      Correct.

8    Q.      We'll get to this in a few minutes, but it was examined by this team of experts

9    and analyzed, but I'll reserve that.  But it eventually got out there, correct?

10   A.      Yes.

11   Q.      Was it your understanding at this juncture, this time that the analysis of your

12   Reliabot asset that you sold to Braintech had to happen before it went to market?

13   A.      Could you rephrase that please?

14   Q.      Yes.  Was it your understanding that Braintech wanted to analyze the Reliabot

15   product prior to taking it to market where it could earn revenue?

16   A.      I can't speak for what they wanted to do.  I just did what I was asked to do.

17   Q.      Fair enough.  You've answered my question.  Sorry for the delay.  May I

18   approach?

19                   THE COURT: Yes.

20   Q.      (By Ms. Widlak continuing) Mr. Shafi, I'm handing you Defendant Exhibit 186

21   for review and identification.

22   A.      Yes, I recognize it.

23   Q.      Could you describe for the record what it is?

24   A.      In this email Mr. Weidinger is applying pressure on me --

25   Q.      (Interjecting)  No.  Just identify what it is please and we'll get to the contents.

1  A.    It's an email from me pressuring me to get the software to me --

2  Q.    Mr. Shafi, I don't think you understand.  In this process the procedure before I

3  can get this admitted into evidence when you can talk about the exhibit, I need to just

4  have you identify that it is what it appears to be.

5  A.    It's an email from Mr. Weidinger.

6  Q.    To you?

7  A.    To me.

8  Q.    Dated what?

9  A.    September 12th.

10  Q.    Thank you.  Judge, we offer --

11           MR. DOYLE: No objection.

12           MS. WIDLAK: Thank you.

13           THE COURT: Number 186 then is in evidence.

14  Q.    (By Ms. Widlak continuing) Thank you.  All right.  So as we've said, Mr.

15  Weidinger writes to you September 12th.  This is a full month after the deal closes,

16  correct?

17  A.    Yes.

18  Q.    And it's to you, and he says:  Adil, how are we doing on completing this so

19  Vancouver can do a deep dive into Reliabot?  I want all this in Vancouver no later

20  than Wednesday, September 17th.  This is priority over San Francisco, for example.

21  Thanks, Rick.  I'll break down my question into parts.  First of all, for those of us who

22  are not in your area of expertise, a deep dive is an analysis of the Reliabot

23  technology?

24  A.    Yes.

25  Q.    Okay, thank you.  Then when Mr. Weidinger writes this is a priority over San

1    Francisco, do you recall what he was referring to?  Were you expected to be in San

2    Francisco for some reason?

3    A.    I don't recall my being in Vancouver as a requirement.

4    Q.    No, no.  I'm referring to the wording that this is priority over San Francisco.  It

5    appears he wants the Reliabot asset in Vancouver, not you.

6    A.    Yes.  There was something needed for this that he wasn't letting me do so

7    that's what was causing the delay.

8    Q.    Let's back up a minute.  At a minimum you admit that a month after the

9    transaction closed September 12th, Reliabot still wasn't in Vancouver?

10   A.    Right.  I was not enabled to do so.  I just was not able to do so.

11                   THE COURT: Mr. Shafi just answer the question?

12                   THE WITNESS:  Yes, you're right.

13   Q.    (By Ms. Widlak continuing) So your boss, Mr. Weidinger, writes to you and

14   says I'm directing you to get this Reliabot asset to Vancouver no later than

15   Wednesday, September 17th?

16   A.    Yes.

17   Q.    That didn't happen, did it?

18   A.    No.

19   Q.    Let's stay on 186 just for a couple of moments.  Part of this email string where

20   Mr. Weidinger appears at the top, could you tell the Jury who Jeff Clark was?

21   A.    He was one of the engineers at Braintech in Vancouver, Canada.

22   Q.    And listed here apparently is the components of the Reliabot technology that

23   the folks in Vancouver needed to have.  Would you agree?

24   A.    Some of them.

25   Q.    Some of them.  But you agree this relates to components of the asset, the

1    technology that they needed out in Vancouver?

2    A.    Some of it.

3    Q.    But it does relate to Reliabot is really my question?

4    A.    Yes.

5    Q.    Okay.  May I approach?

6          THE COURT: Yes, you may.

7    Q.    (By Ms. Widlak continuing) Mr. Shafi, this has been marked as Defendant's

8    Exhibit 187.  Please take a look at a couple of pages.

9    A.    Okay.  Yes, I recall it.

10   Q.    What is it?

11   A.    An email from Mr. Weidinger.

12   Q.    To you?

13   A.    Yes.

14   Q.    And it -- is there a date on it?

15   A.    September 12th.

16   Q.    Great.  We offer Exhibit 187, Judge.

17         MR. DOYLE: No objection.

18         THE COURT: All right, it's in.

19   Q.    (By Ms. Widlak continuing) Okay.  Now it appears, Mr. Shafi, that this Exhibit

20   187 is a continuation of your email conversation with Mr. Weidinger about getting the

21   Reliabot asset out to Vancouver.  Would you agree down at the bottom is the

22   message we just read in the preceding exhibit?

23   A.    Yes.

24   Q.    Good.  Now we can -- so Mr. Weidinger emails you again on the same date,

25   September 12th, a month after the deal closed and he says at the very bottom:  To be

1   clear, in two weeks when I ask for the Reliabot technical report I hope not to hear that

2   they have not been able to technically review the technology because they are waiting

3   for items from Detroit.  Did I read that correctly?

4   A.     Yes.

5   Q.     Because Mr. Weidinger responds to your reaction to his earlier email where

6   you say and it's underscored:  This is all under good control under several regular

7   calls with Vancouver.  Bottom line, most everything needed to get Reliabot up and

8   running with Vancouver will go out tomorrow, meaning it would go out September

9   13th, correct?  But that didn't happen, did it?  Yes or no?

10   A.     I believe -- yeah.  It did not because I was travelling on duty --

11   Q.     (Interjecting) That's sufficient.  Thank you.  May I approach, Judge?

12          THE COURT: Yes, you may.

13   Q.     (By Ms. Widlak continuing) Mr. Shafi, this is Defendant's Exhibit 190.  Please

14   review it.

15   A.     I recall it.

16   Q.     You do.  Could you identify it please?

17   A.     It's an email from me to Pete Manias praising him for what he just outlined

18   below this email.

19   Q.     And if you turn to page two and identify for the Jury what appears at the top of

20   that email correspondence?

21   A.     It's an email from Remus Boca to me.

22   Q.     Dated September 7th?

23   A.     Yes.

24   Q.     We offer Exhibit 190, Judge.

25          MR. DOYLE: I don't have any objection.

1          THE COURT: All right, 190 is in.

2     Q.    (By Ms. Widlak continuing) Thank you.  All right.  Could you tell the Jury who

3     was Remus Boca?

4     A.    Remus Boca was an engineer at Braintech in Vancouver.

5     Q.    He was a Chief Scientist?

6     A.    He was promoted to that and his authority was changed over time, but yes.

7     Q.    So he at the time this correspondence was exchanged --

8     A.    Yes.

9     Q.    Dr. Boca was the Chief Scientist at Braintech?

10    A.    I don't remember if he was appointed before or after this email, but he was one

11    of the key engineers.

12    Q.    Thank you.  So he writes to you:  I think it's great we get organized.  In the

13    meantime, we need the minimum hardware and software from the list below to get a

14    Reliabot system running in Vancouver as soon as possible in order to analyze support

15    Reliabot and get the inside and outside look at Reliabot.  Is it possible to make this list

16    a high priority?  Thank you, Remus.  Do you remember getting this email?

17    A.    Yes.

18    Q.    And if I understand your testimony, Dr. Boca was among the experts that was

19    going to review the Reliabot technology?

20    A.    Yes.

21    Q.    Thanks.  Mr. Shafi, this is Defendant's Proposed Exhibit Number 196, a

22    one-page email.  Please take a look at it.  Can you identify this?

23    A.    Yes.  It's an email from me to Jim Dara.

24    Q.    And is it dated?

25    A.    Yes, September 18th.

1    Q.       Thank you.  Of 2008?

2    A.       Yes.

3    Q.       We offer Exhibit 196, Your Honor.

4             THE COURT: All right.  Is there an objection?

5             MR. DOYLE: No, Your Honor.

6             THE COURT: And 196 is in.

7    Q.       (By Ms. Widlak continuing) Thank you.  Just so the Jury understands, who was

8    Jim Dara?

9    A.       Jim Dara was VP of Sales for Braintech.

10   Q.       And it was part of your anticipated job performance or duty to work closely with

11   Mr. Dara to get Reliabot out into the market?

12   A.       He was to report to me.

13   Q.       Okay, but my question.  As a sales effort to get Reliabot to market, you were

14   going to work -- you were working closely with Mr. Dara?

15   A.       I was his boss.

16   Q.       Okay.  And you write to him that your wife was going to leave a Reliabot 2D

17   and 3D key on the porch of your home tomorrow morning.  Isn't it true that there were

18   components of Reliabot that were actually still in the basement of your house?

19   A.       There's a lot of context I'd like to explain later.

20   Q.       True or false?  There were a lot of Reliabot components that were in the

21   basement of your house?

22   A.       Yes, there were.

23             MR. DOYLE: Your Honor, to save time for the Jury and

24   what-have-you, which I think it's all of our dues, we have no objection to any of these

25   exhibits.

1        THE COURT: That would save time, sure.

2        MS. WIDLAK:  Thank you, Counsel.  In light of that, we'll try to

3   streamline this a little bit more.  May I approach.

4        THE COURT:  Yes.

5   Q.   If you could please turn to Exhibit 206.

6   A.   Yes.

7   Q.   Okay.  And this is an email from Pete Manias to you dated September 23rd,

8   2008?

9   A.   Yes.

10  Q.   Could you explain to the Jury who Pete Manias was?

11  A.   Pete Manias was a VP of Marketing at Braintech.

12  Q.   So he was another one of the high level executives that you were collaborating

13  with getting Reliabot out to market?

14  A.   Yes.

15  Q.   Thank you.  If you would turn your attention to the second to last paragraph:

16  Per the conversation we had in Vancouver.  Let me back up.  Was Mr. Manias at the

17  Technology and Sales Summit in August?

18  A.   I'm sorry?

19  Q.   Was Mr. Manias at the Technology and Sales Conference in August of 2008?

20  A.   Yes, he was.

21  Q.   When he says per the conversation we had in Vancouver, is it fair to assume

22  that that was a conversation you had out in Vancouver at the Sales Summit?

23  A.   Yeah, I might have.

24  Q.   I guess I'll ask this another way.  Did you go to Vancouver at any time between

25  the Sales Summit in August and September 23rd of 2008 where you would have a

1    conversation with Mr. Manias?

2    A.    I think I made one more trip there, yes.

3    Q.    You could have had this conversation at the Sales Summit or at a subsequent

4    visit?

5    A.    Yes, it's possible.

6    Q.    Okay, that's fair.  So he writes to you:  Per the conversation we had in

7    Vancouver and in the car with Jim, would that be Jim Dara?

8    A.    Yes.

9    Q.    On the way to Dayton, I still don't think you treat Braintech as a we.  There is

10   no I in team.  Your pride and ego get in the way of your decision-making.  I get you

11   are proud of what you built in Shafi, Inc., but it's now much bigger than you.  We have

12   to work as a team and I just don't see that.  You still talk about your revenue

13   responsibility, your everything and I don't feel like you are embracing this

14   management team.  Now I know eventually or ultimately your relationship with Mr.

15   Manias became so strained --

16                MR. DOYLE: (Interjecting)  Objection, Your Honor.  She's testifying.

17                THE COURT: Sustained.

18   Q.    (By Ms. Widlak continuing) I'll ask it another way.  Was it at this point that your

19   relationship with Mr. Manias began to deteriorate?

20   A.    Yes.

21   Q.    And did Mr. Manias report to you?

22   A.    Yes.  Officially, yes.

23   Q.    Could you turn to tab number 207 please?  Were you able to find 207?

24   A.    Yes, yes.

25   Q.    All right.  So the same day, it looks like just a couple of hours after Mr. Manias

1   was critical of your attitude, you wrote an email to Mr. Weidinger saying you'll be

2   better off using Manias for marketing for G&D from the Northern Virginia office?

3   A.    Yes.

4   Q.    I do not need him in caps -- I do not want him?

5   A.    Right.

6   Q.    How soon after Mr. Manias' communication did you write this to Mr. Weidinger?

7   A.    Shortly afterwards.  Yeah.

8   Q.    Thank you.  Could you turn to Exhibit 225, Mr. Shafi?  And this is an email

9   dated October 12th, 2008 from you to Mr. Weidinger where you write:  Rick, I have

10  some significant packing to do for computers to give to Lou Kondek tomorrow

11  morning.  He's coming over to take them to Dan for making backups and then sending

12  them to Vancouver.  So it's true, is it, that as of October 12th, 2008, a full two months

13  after the transaction closed where you sold Reliabot to Braintech, the product was still

14  not in Vancouver?  Yes or no?

15  A.    No, it's not true.

16        THE COURT: You're saying no?  You're saying the product was in

17  Vancouver by then?

18        THE WITNESS: Yes.

19  Q.    (By Ms. Widlak continuing) So what would be -- who -- I have some significant

20  packing to do for computers.  Did that relate to Reliabot?

21  A.    Some of it; not all of it.  Yeah.

22  Q.    But you would agree with me that even if some of the components of the

23  technology were in Vancouver, they did not have complete Reliabot technology?

24  A.    They had appropriate content, not every last thing.  Yeah.

25  Q.    Turn to if you would please, Mr. Shafi, Exhibit 226.  Have you been able to find

1   it?

2   A.      Yes.

3   Q.      And this is an email from you on October 13 to Lou Kondek.  Who was Lou

4   Kondek?

5   A.      He was one of two engineers that Braintech had in Detroit.  Everybody else

6   was in Vancouver, but he was one of two engineers here in Detroit.

7   Q.      You write to him:  Thank you much for visiting and taking the equipment and

8   here's the list of equipment PCs, and it looks like -- well, let's read this into the record:

9   He picked up to go to Vancouver, correct?  Three unburned parallel port dongles.  Did

10  that relate to Reliabot?

11  A.      Yes.

12  Q.      Set of master Reliabot dongles, also related to the product.  Set of master

13  Reliabot CDs for various versions.  Reliabot, yes?

14  A.      Yes.

15  Q.      And instructions on how to cut Reliabot dongles.  And could you explain for the

16  Jury?  That's a word lot of people don't know.  What is a dongle?

17  A.      It's a key that prevents people from copying and stealing software.  So if we

18  give a software CD to put on their PC, it prevents people from copying it over and

19  over because they're expected to pay.

20  Q.      Thank you.  That's very helpful.  So Hardlock Alladin protection information,

21  does that relate to Reliabot as well?

22  A.      Hardlock, dongle, that's all the same thing.  Alladin.

23  Q.      Protective devices to protect your property?

24  A.      Correct.

25  Q.      Thanks.  Iceberg PC with ISA bus.  Used for making Reliabot licenses.  That

1   was also related to Reliabot?

2   A.   Yes.

3   Q.   And were these other materials related to Reliabot or something else?

4   A.   They were.  These PCs had different things on them pertaining to Reliabot.

5   Q.   Good.  So everything listed in Exhibit 226 related to Reliabot?

6   A.   Yes, ma'am.

7   Q.   Thank you. If you could please turn to tab number 279, Mr. Shafi.  Have you

8   found the exhibit?

9   A.   Yes, I have.

10  Q.   Good.  And this is an email from Jim Dara who you've identified earlier to you

11  on November 1st, 2008, correct?

12  A.   Yes.

13  Q.   And I want to ask you a couple of questions about Exhibit 279.  First of all, Mr.

14  Dara is writing you as of November 1st?

15  A.   Yes.

16  Q.   That -- and I'm quoting now -- "What I am continually confused about is our

17  product readiness status and the reason for Shafi acquisition as it relates to Reliabot.

18  Please reference the attachment", and then down to the fourth paragraph he writes:

19  "I don't think I can credibly reference this video as evidence of our expertise in this

20  area.  You have mentioned in the past multiple times that bin picking bolts, camera

21  and laser stripe is something you had done in the past and was an existing Reliabot

22  offering.  This was again reviewed at the Summit meetings and is our item number

23  two in our Product Readiness Table with a Time to Market of zero months, an

24  Installed Base and serious Revenue attached to it."  I'm still quoting:  "I trust I am

25  missing something.  Please help me understand as our near term revenue model

1    continues to rely on the merits of your product's readiness and the network of Reliabot

2    engineers and Integrators that will act as our channels." So Mr. Shafi, my question to

3    you is isn't it true that as of November 1st, 2008, you had generated not one penny of

4    revenue from the Reliabot product?

5    A.    That's correct. I'll need to explain it later.

6    Q.    And Mr. Dara is asking you to explain why that's happening. Would you agree

7    with me?

8          MR. DOYLE: Objection, Your Honor. The email speaks for itself on

9    what it says. What he's doing he can't possibly know.

10         THE COURT: Mr. Shafi can testify how he read this email.

11         THE WITNESS: Mr. Dara did not have all the understanding that was

12   needed.

13   Q.    (By Ms. Widlak continuing) Did you ever respond to this email?

14   A.    I don't recall. There are hundreds of emails; you just picked a few.

15   Q.    Did you bring any with you today?

16   A.    I have them all on my computer. I have 3000 emails. You cherry-picked a few,

17   but there are many more.

18   Q.    But you would agree with me that you introduced one exhibit today which is the

19   Employment Agreement, correct?

20   A.    Yeah.

21         THE COURT: No, that's not true. The Joint Exhibit --

22         MS. WIDLAK: That's what I meant. I misspoke. Excuse me. Joint

23   Exhibit Number One which is the Employment Agreement.

24         THE WITNESS: If I may.

25         MR. DOYLE: Excuse me. Mr. Shafi, the Jury has been here a long

1    morning.  You just have to answer the questions.

2              THE WITNESS: Yes, sir.

3    Q.    (By Ms. Widlak continuing) If you please turn to Exhibit 290.

4    A.    Yes, I have it.

5    Q.    Thank you.  This is an email to you from Dr. Boca.  Now it's November 9th,

6    2008 and I want to concentrate on references to Reliabot.  If you turn your attention to

7    the last paragraph where he writes:  One of the reasons we acquired Shafi was to

8    take advantage of the existing multi-robot communication modules in Reliabot:  15

9    robot manufacturers, 22 robot controllers.  Based on the source code that you

10   provided, we were not able to identify the 15 robot manufacturer and 22 robot

11   controllers.  We were able to identify ourselves only communication for ABB and then

12   it goes on to list a number of other companies and he ends with:  Could you provide

13   the 15 robots and 22 controllers robot communication software existing in Reliabot?

14   So you would agree with me, Mr. Shafi, that as of November 9th of 2008, the folks in

15   Vancouver still didn't have the Reliabot product?

16   A.    They did not have everything subject to explanation.

17   Q.    Okay.  But you admit they did not have everything they needed to analyze

18   Reliabot.  That's what Mister -- or Dr. Boca seems to be writing to you?

19   A.    Correct.

20             THE COURT: Ms. Widlak, I think we'll stop there.  You're not going to

21   finish this examination by one o'clock.

22             MS. WIDLAK: Exactly.  This is a great time to break.

23             THE COURT: So you will have Mr. Weidinger here tomorrow?

24             MS. WIDLAK: Yes, we will, Judge.

25             THE COURT: We'll bring today to conclusion.  It's a long day.  You

1  started early this morning to get here and you're probably ready for lunch, so we will

2  start tomorrow morning at 9:00.  Please get here in time.  Hopefully we'll be able to

3  start promptly and be safe going home.  All rise for this Jury please.

4  **(Jury exited courtroom at 12:51 p.m.)**

5  THE COURT: Counsel, do you have anything before we close the

6  record today?

7  MS. KOVAL: I don't have anything.

8  THE COURT: Mr. Doyle, do you have anything?

9  MR. DOYLE: You like my cowboy boots?

10  THE COURT: I love them.

11  MS. KOVAL: I'm wearing some tomorrow for sure.

12  MS. WIDLAK: We'll keep the Jury awake.

13  THE COURT: I'll wear mine.  Thank you, everyone.  We're adjourned.

14  **(Proceedings adjourned at about 12:51 p.m.)**

15  - - -

16

17

18

19

20

21

22  **COURT REPORTER'S CERTIFICATION**

23

24

25  STATE OF MICHIGAN)

JANICE COLEMAN, CSR/RPR
OFFICIAL FEDERAL COURT REPORTER
(313) 964-5066

1                         )  SS.

2    COUNTY OF WAYNE   )

3

4

5    I,  Janice Coleman,  Official Court Reporter, certify that the

6    foregoing pages are a correct excerpt of a transcript from the

7    record of proceedings taken by me to the best of my ability in

8    the above-entitled matter.

9

10

11                   S/_____

12                      JANICE COLEMAN, CSR 1095/RPR

13

14

15

16   DATED:  May 21, 2013

17

18

19

20

21

22

23

24

25