UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

ADIL SHAFI,

     Counter-Plaintiff,

                                Case No.  09-10454

V.                         Detroit, Michigan

                              May 22, 2013

BRAINTECH, INC.,

     Counter-Defendant,

_____/

TRIAL - VOLUME TWO

BEFORE THE HONORABLE VICTORIA A. ROBERTS

UNITED STATES DISTRICT COURT JUDGE, and a Jury.

APPEARANCES:

For the Counter-Plaintiff:        Susan Koval, Esq.
                                 Anne Widlak, Esq.

For the Counter-Defendant:      Michael Doyle, Esq.

Proceedings taken by mechanical stenograph,  transcript produced by computer-aided transcription

---

**T A B L E   O F   C O N T E N T S**

**WITNESSES:**                                  **PAGE**

**ADIL SHAFI (Plaintiff)**

   Cross-Examination by Ms. Widlak       4

   Redirect-Examination by Mr. Doyle    39

   Recross-Examination by Ms. Widlak    44

**Rule 50(a) Motion Arguments**          45

**RICK WEIDINGER (Defense)**

   Direct-Examination by Ms. Koval       48

   Cross-Examination by Mr. Doyle       88

   Redirect-Examination by Ms. Koval    88

**ADIL SHAFI (Rebuttal)**

   Direct-Examination by Mr. Doyle      91

**E X H I B I T S**

**NUMBER**        **IDENTIFICATION**       **RECEIVED**

None.

---

Detroit, Michigan

Wednesday, May 22, 2013

(At about 9:11 a.m.)

- - -

(Call to Order of the Court)

THE CLERK OF THE COURT: Calling the case of Adil Shafi versus Braintech, Inc., case number 09-10454.  Counsel, please state your appearances for the record.

MR. DOYLE: Your Honor, Mike Doyle and Jim Mitchell for the Plaintiff.

THE COURT: Good morning.

MR. DOYLE: Good morning.  Good morning.

MS. WIDLAK: Anne Widlak and Susan Koval for the Defendant.

MS. KOVAL:  Good morning, Your Honor.

THE COURT: So Mr. Doyle, are those boots?

MR. DOYLE: Yes.

THE COURT: They're very nice.

MR. DOYLE: Thank you.

THE CLERK OF THE COURT: I like those better.

THE COURT: They must be newer.

MR. DOYLE: That's all I wear are boots.

THE COURT: They're very nice.  Good morning again.  Ladies and gentlemen, are you ready to proceed?  You've got your notebooks and we're ready to go.  Mr. Shafi, please resume the witness stand.  You're still under oath from yesterday.

THE WITNESS: Yes, ma'am.

---

**A D I L   S H A F I,**

**Having retaken the witness stand at about 9:12 a.m.**

THE COURT: Ms. Widlak?

MS. WIDLAK: Thank you, Your Honor.

CROSS-EXAMINATION CONTINUED

BY MS. WIDLAK:

Q.  Good morning. Mr. Shafi, what are the papers that you just brought to the witness stand?

A.  I have some personal notes.

MR. DOYLE:  You can't. I didn't see those.  Thank you.

MS. WIDLAK: Thank you.

MR. DOYLE: Thank you.

MS. WIDLAK: You're welcome.

Q.  (By Ms. Widlak continuing) Now Mr. Shafi I was reviewing my notes of our trial yesterday, in particular the -- my notes about my attorney's opening statement and I think it would be helpful to the Jury to clarify a few things.  I'd like to turn to paragraph eight of your Employment Agreement.  Now you recall that in your attorney's opening statement he suggested to the Jury that if you prevail in this case you would be entitled to a certain amount of compensation, severance pay which in his view included bonus monies.  Do you remember that argument?

A.  Yes, I do.

Q.  All right.  I'd like you to turn your attention to paragraph eight of your Employment Agreement which states: Bonus cash incentive.  The executive is entitled -- eligible to earn an annual cash bonus at each anniversary of the executive's employment known as the bonus.  Executive's bonus shall not be less than 25% and

---

5

1   not more than 50% of executive's annual salary based upon the extent to which
2   revenue goals of Braintech are achieved. Now you testified yesterday -- you admitted
3   yesterday that at no time during your employment at Braintech did you generate any
4   revenue, correct?
5   A.   Correct.
6   Q.   So you would agree with me that you would not be entitled to that bonus
7   because you had not generated any revenue.
8        MR. DOYLE: I object to that, Your Honor. The contract speaks for itself.
9        THE COURT: I will -- your objection is overruled and you may answer
10  the question.
11       THE WITNESS: Yeah, I don't agree.
12  Q.   (By Ms. Widlak continuing) Well, you would agree that paragraph eight requires
13  the generation of revenue in order to qualify for this bonus. That's what it says.
14  A.   Yes. I disagree because the conditions of the revenue were not met. The
15  conditions that I needed to generate revenue were not met.
16  Q.   But there's no controversy that you did not generate revenue?
17  A.   Correct.
18  Q.   And there's nothing in paragraph eight that has any exceptions for extenuating
19  circumstances that would otherwise qualify you for that bonus when you haven't
20  generated any revenue.
21  A.   The revenue conditions are in a separate part of the contract, so it speaks for
22  itself.
23  Q.   Okay. Well, we'll get to that.
24       THE COURT: I know that several times you've answered that the
25  contract speaks for itself. That's not an appropriate answer for you to give. Counsel

6

1   is asking you about your understanding of a contract that you signed and entered into
2   and so please don't let that be a part of your answer again. Thank you.
3        MS. WIDLAK: Thank you, Judge.
4   Q.   (By Ms. Widlak continuing) Now let's turn to paragraph 14 of the Employment
5   Agreement, and we haven't had the opportunity to talk about this provision, but it's
6   clearly at the heart of this case. Oh, excuse me. I'm getting ahead of myself. Could
7   you turn to the severance provision? Thank you. Sorry about that. Now as I started
8   to say, at the heart of this case you would agree, Mr. Shafi, is whether or not you were
9   entitled to severance pay. Do you agree with that?
10  A.   Yes.
11  Q.   And that is dictated by the terms of your Employment Agreement, right?
12  A.   Correct.
13  Q.   So the Jury understands what you would be entitled to should you win this, let's
14  go over the terms of the severance pay paragraph: In the event of a termination of
15  this Agreement by the company without good cause, due to total permanent disability
16  or due to the death of the executive or by the executive by good reason, that would be
17  of course if you ended the agreement. Do you agree?
18  A.   Yes.
19  Q.   Then the executive or the executive heirs will be entitled to unpaid
20  compensation and benefits described hereunder earned up to the termination date to
21  be paid within 10 business days of termination. Now would you agree with me that at
22  the end of your employment with Braintech you were paid all the salary that you had
23  earned to date?
24  A.   Correct.
25  Q.   Thank you. Now in small ii: A lump sum payment less all deductions required

7

1   by law such as income taxes equal to the remainder of the then based salary
2   remaining in the three-year employment terms set out in paragraph five, which I think
3   we reviewed yesterday, to be paid within 20 business days after the termination date.
4   The executive agrees that after the termination date, but prior to payment of the
5   severance pay -- well, that's not pertinent. So let's concentrate on what I already
6   read into the record. There's nothing in this provision, you would agree, that entitles
7   you to payment of any bonus?
8   A.   I disagree.
9   Q.   Could you point out to the Jury in this paragraph where -- we can put the whole
10  thing up so that I think there's a little bit missing in little ii. All right. So there's the
11  entire provision of the Severance Agreement. Where does it say there that you are
12  entitled to a bonus?
13  A.   It doesn't.
14  Q.   Thank you. Now let's turn to paragraph 14, and I know yesterday, Mr. Shafi,
15  we reviewed your job duties, the fact that you reported to Mr. Weidinger at all times
16  during this, but I think it's important that the Jury knows of another promise you made
17  which appears at paragraph 14 entitled Best Efforts: The executive will at all time -- at
18  all times and full-time faithfully, industriously and to the best of his ability, experience
19  and talents perform the services provided herein or any other duties required of or
20  from him or her pursuant to the express and implied terms set forth in this Agreement
21  to the reasonable satisfaction of Braintech. And at the time you signed this
22  Agreement you were aware that this provision was in the contract?
23  A.   Yes.
24  Q.   All right, thank you. Now another thing. I note when you and I were together
25  for your deposition you very clearly -- and I'm switching gears to the network of

8

1   integrators that you brought to Braintech. Since that is a very commercial term in your
2   business, I'm going to repeat what you told me in the deposition and see if it's
3   accurate, okay? You testified that an integrator is a company that puts a turn key
4   system together by a robot, by a vision system, by a software like Reliabot and put
5   together a whole system that will do something for an end user like Ford or GM. Is
6   that accurate?
7   A.   Yes.
8   Q.   Okay. And when you were hired by Braintech, you represented that you had a
9   network of some 200 integrators, correct?
10  A.   One hundred I believe I said.
11  Q.   Fair enough. All right, and as I understand it, but I need your guidance on this.
12  The integrator network, if you will, provided a liaison between Braintech and the end
13  user like GM or Ford, is that correct?
14  A.   Correct.
15  Q.   And these integrators had physical plants where they would do the work,
16  correct?
17  A.   Yes.
18  Q.   And they had personnel and other people would interact with your customers
19  and with you?
20  A.   Yes.
21  Q.   Yes. Okay. Thank you for clearing that up. Now another detail that I didn't
22  cover yesterday but I want to make sure the Jury knows. When you came on board at
23  Braintech, you told the folks at Braintech that there was in process revenue that you
24  said was already owed to the Shafi Company, your companies that you sold to
25  Braintech that would be paid to Braintech in August, September, October, November

**9**

1 and December of 2008, correct?

2 A. Do you want a yes or no answer.

3 Q. Yes please.

4 A. I'm asking if she wants a yes or no answer. The answer is I can't say a yes or

5 no answer to that.

6 Q. Well, did you or did you not tell Braintech as part of being hired that you had

7 money in process or to use another expression, in the pipeline, that was going to be

8 revenues that were supposed to be paid August through December of 2008?

9 A. Yes.

10     MR. DOYLE: Excuse me, Your Honor. I object to this line. Let's identify

11 to whom he spoke. Let's identify the dates. I think he has a right to know that.

12     THE COURT: I think he already answered yes, but to clarify the record

13 can you tell us who he said that to?

14 Q. (By Ms. Widlak) Didn't you discuss that with Mr. Weidinger?

15 A. Yes.

16 Q. Your boss?

17 A. Ah-hum.

18 Q. And it's true, isn't it, that no revenue from that in process pipeline ever came in

19 the door?

20 A. Correct.

21 Q. I think we alluded to this yesterday, but there came a time when the scientists

22 and experts out in Vancouver at Braintech compared a comparison of Reliabot and

23 the Braintech technology called EVF which you correctly identified yesterday. Do you

24 remember that comparison evaluation?

25 A. Yes.

**10**

1 Q. If you would turn to tab 316 please. Mr. Shafi, we're not going to go through

2 the whole thing, but I just want you to confirm that in fact this was the document that

3 you were given to review in connection with this comparison analysis between the two

4 technologies.

5 A. Could you clarify that please? I was just handed this document. I was not

6 consulted about it.

7 Q. That wasn't my question, but you admit that you were given a copy of that?

8 A. It looks similar.

9 Q. Take your time. If you'd like to confirm, I would encourage you to do that.

10 A. It looks similar to what I recall.

11 Q. All right, thank you. And you sent an email to Dr. Boca which appears at tab

12 299. So if you would turn to that?

13 A. Yes, I recall this email.

14 Q. So let's start at the bottom. Mister -- Dr. Boca writes to you: I hope everything

15 is okay and you're doing well. On the week of October 6 when you were in Vancouver

16 Babak, who was the Chief Technology Officer, correct?

17 A. Yeah.

18 Q. Babak Habibi -- Gave you a Reliabot evaluation done in Vancouver. I didn't

19 see or remember any response from your side regarding the Reliabot evaluation.

20 Could you send me your opinion about the Reliabot evaluation please. Do you

21 remember getting that email from Dr. Boca?

22 A. Yes.

23 Q. So let's review your response which appears just above it, and you sent this on

24 Monday, November 10th and you wrote: I disagree with many parts of this so-called

25 evaluation since it is not an objective third-party review and is written by people who

**11**

1 know EVF well and do not know Reliabot well. I will write when I feel better and have

2 time. Regards, Adil. Is the evaluation referred to by you in this email what we just

3 referenced at Exhibit 316?

4 A. Yes.

5 Q. And so it's true, isn't it, that the evaluation was highly critical of the quality of

6 Reliabot?

7 A. Yes.

8 Q. And it seems from your email that that was very upsetting to you?

9 A. Yes.

10 Q. And in fact, you refused to do what Dr. Boca asked you to do and that was to

11 review the Evaluation, which it appears you had, but to render a detailed opinion?

12 A. Yes. This was --

13 Q. You refused to do it?

14 A. He did not report to me, and this was an intrusion on my duty, so I didn't do it.

15 Q. Let's see what he responds: Hi, Adil. We need to get down to specifics for a

16 balanced comparison and your written points would certainly help. It is a month since

17 you received the report and I wonder if this should become a priority. So you admit

18 that you never conducted the analysis that Dr. Boca had requested?

19 A. It was not worth my time because it was clearly wrong.

20     THE COURT: I'm sorry. What is your answer?

21     THE WITNESS: It was not worth my time because it was clearly not

22 correct evaluation.

23 Q. (By Ms. Widlak continuing) All right. Now I'd like to turn -- change the topic a

24 little bit and talk about some of the monies that were apparently due to you that were

25 going to be paid to Braintech by third parties and I'll be specific. If you turn to Exhibit

**12**

1 107 please. First I note for the record that at the top Rick Weidinger sends you an

2 email indicating that they have set up a Braintech email address for you and it's

3 AShafi@Braintech.com. Do you remember having that email address?

4 A. Yes.

5 Q. So let's go on to a new topic and that is it's true that at the time this was written

6 August 15th, that a company known as Siemens owed you money that you were

7 going to give to Braintech, correct?

8 A. Not exactly. There was a contract in process and there were two progress

9 payments in it.

10 Q. They owed you money?

11 A. If the work was completed, yes.

12 Q. Yes, we'll get to that. So you write to your boss: P.S. -- this relates to

13 something else apparently. P.S. I'll get the Siemens invoice to you by tomorrow. Did

14 I read that correctly?

15 A. Yes.

16 Q. And Siemens invoice references was for $25,000, correct?

17 A. I don't recall the exact number.

18 Q. We'll go over it.

19 Q. So you're telling your boss on August 15th that you'll get him the invoice by

20 tomorrow. So please turn to Exhibit 109. Have you found 109?

21 A. Yes.

22 Q. And this is an email from Rick Weidinger, your boss, to you dated August 19th

23 and I'd ask you to turn to item number five and Mr. Weidinger writes: We expect

24 Siemens' payment in August. Hope we receive. Did you say anything to Mr.

25 Weidinger around the time of this email that would indicate to him that payment was

**13**

1  not going to be made immediately?

2  A.  Yes, there was several emails exchanged about that.

3  Q.  Let's turn to Exhibit 127.  All right.  This is -- 127 is an email from you to your

4  boss dated August 22nd, so about a week later, also about the Siemens invoice.  I

5  misspoke.  This seems to indicate it was for $10,500.

6  A.  Yeah.  I don't recall the exact number.

7  Q.  But you wrote to your boss:  On the list, Siemens has verbally approved that

8  money comes from Nashua and John Agapakis is the key contact and friend, so it

9  should be fast.  I am rusty at invoices but Donna gave me the scoop and the next

10  invoice number.  Will do it tonight also.  Do you remember writing that?

11  A.  Yes.

12  Q.  So at this point, you are representing to your boss that payment was going to

13  happen quickly?

14  A.  Yes.

15  Q.  Let's go to Exhibit 155.  So Exhibit 155 is another email from you to your boss

16  dated September 3rd, 2008 where you write:  Rick, John Agapakis, head of Siemens

17  biz development I assume and technical management called yesterday with three

18  points.  I want you to look at the third point.  He will push payment through.  That was

19  referring to the outstanding amount, correct?

20  A.  I don't recall.  There were two parts to that contract.

21  Q.  But I'm asking you whether the reference to a payment related to the net

22  amount of what was owed to Braintech by Siemens?

23  A.  That's not a correct characterization.  If I may explain --

24  Q.  (Interjecting) Well --

25  MR. DOYLE: Excuse me please.  Again, she asked the question.  Yes

**14**

1  or no.

2  Q.  (By Ms. Widlak continuing) So at this point payment is referring to the amount

3  owed by Siemens to Braintech and it suggests here that payment is going to be

4  quick?

5  A.  Yes.

6  Q.  Let's turn to Exhibit 191.  Okay.  This is an email from your boss to you and

7  now we're at September 16th and he says: Adil, where are they with the $10,500

8  payment?  Can we bring up on Thursday and the check home with us.  Best, and the

9  re line indicates that this does reference Siemens.  Would you agree with that?

10  A.  Yes.

11  Q.  And so your boss at this point over a month after the closing of the deal is still

12  asking you where is the money from Siemens?

13  A.  Correct.

14  Q.  Let's turn to Exhibit 192.  Are you at 192?

15  A.  Yes.

16  Q.  Okay, thanks.  Let's start -- let's start at your email to your boss on September

17  16th, and I won't read the whole thing for the Jury, but it appears -- and correct me if

18  I'm wrong -- that you are for the first time explaining to your boss that in fact there is a

19  glitch with the payment, that in fact Siemens is not going to pay Braintech because

20  there's some additional work that needs to be completed.  Is that true?

21  A.  No.  I had articulated that they needed to supply a FANUC robot and they did

22  not, so although they wanted to pay and John Agapakis was eager to pay, the

23  requirement was to do two drivers with KUKA and FANUC.  We had completed the

24  KUKA exercise, but we were waiting on the FANUC payment.

25  Q.  That was an impediment, an obstacle to payment?

**15**

1  A.  Correct.

2  Q.  But you had never told Rick Weidinger about that until September 16th?

3  A.  I had verbally explained the situation to him and to other people, I had.

4  Q.  And so -- well, I don't want you to speculate.  Let's go back up to the top which

5  would be apparently Mr. Weidinger's response to your revelations:  Nothing is easy or

6  simple with your arrangements.  You were correct the Aptura and Siemens payment

7  are linked.  We will pay Aptura until we receive payment from Siemens as indicated in

8  the documented debt schedule at closing.  The Siemens amounts represented by you

9  in the debt schedule were to be paid to Braintech in the amount of $10,500 for

10  August, which is what we've been talking about, correct?

11  A.  Ah-hum.

12  Q.  And $14,500 for September.  So far we have received nothing.  We will need to

13  collect in September.  I will need to bring up on Thursday at Siemens.  So it looks like

14  you were planning a visit to Siemens?

15  A.  Yes.

16  Q.  And what was the purpose of that visit, if you remember?

17  A.  To introduce the combined company and to make introductions.

18  Q.  Okay, and it's true that Siemens never paid Braintech as long as you were

19  employed there?

20  A.  Yes, that's true.

21  Q.  Now I want to switch topics, Mr. Shafi, and talk to you about a medical bill that

22  you had some communications with Heather Greenlay about.  So the Jury

23  understands, who is Heather Greenlay?

24  A.  She was the Accounts Payable lady stationed in Vancouver, Canada.  She was

25  the one that paid the bills from Braintech.

**16**

1  Q.  Good.  That's helpful.  Thank you.  Let's look at Exhibit 278.  Mr. Shafi, this is

2  an email from you on October 30th to Ms. Greenlay, correct?

3  A.  Yes.

4  Q.  And this was Heather attaches a medical bill that is not covered by our

5  personal insurance.  Was this a medical bill related to some tests your daughter was

6  having?

7  A.  Yes.

8  Q.  And I direct your attention to the third paragraph that says -- where you write:

9  Our family personal insurance premiums are well below this total plan and the agreed

10  plan was to use this as a budget for medical bills that would not be covered by

11  personal insurance coverage.  So you were telling Ms. Greenlay that there was an

12  agreement that Braintech would pay for medical bills that weren't covered by health

13  insurance, correct?

14  A.  By my personal insurance, yes.

15  Q.  Okay.  Let's go to Exhibit 304 and I'd like to start with the second page in that

16  exhibit.  Okay.  Are you on page two of the Exhibit Number 304?

17  A.  Yes.

18  Q.  Second page?

19  A.  Yes.

20  THE COURT: I'm sorry.  What exhibit is this?

21  MS. WIDLAK: This is 304.

22  THE COURT: Thank you.

23  Q.  (By Ms. Widlak continuing) Now this is an email to you from Ms. Greenlay on

24  November 10th, and the pertinent section is paragraph two.  St. Joseph Mercy

25  Hospital, that's where your daughter's test was to take place?

**17**

1 A. Yeah, I believe so. Yeah.

2 Q. So we're talking about this medical bill that's not covered by your insurance.

3 Ms. Greenlay makes it clear that this bill is not covered by Braintech as per your

4 Employment Agreement. Braintech is obligated to pay your personal Blue Cross

5 premium until eligible for Braintech's Blue Cross Plan. Skipping the sentence: Rick

6 has indicated that there was no agreement to deduct these types of expenses from

7 the Blue Cross Line item in the debt schedule. We would be happy to help, however.

8 If there are any cash flow issues with you paying the bill on time, we would be happy

9 to pay it now and then deduct the amount from either future payroll or expense

10 reimbursements you submit. Please let me know if that's what you would like us to

11 do. Do you remember getting that message?

12 A. This is not what we had agreed on.

13 Q. So you disagree with what Mr. Weidinger and Miss Greenlay?

14 A. Yes.

15 Q. That upset you a lot?

16 A. Yes.

17 Q. It made you mad?

18 A. It was a turning point for me, yeah.

19 Q. Okay. Now just to refresh the Jury's recollection, this is all -- could you put that

20 back up? Thank you. This dust up, if you will, about this is happening on November

21 10th, 2008, correct?

22 A. Yeah.

23 Q. Now I think you testified yesterday, but I want to make it clear for the record

24 that at the time you were hired by Braintech in August of 2008 you received a $15,000

25 cash bonus -- I mean signing bonus?

**18**

1 A. Salary advance.

2 Q. Let's bring up Joint Exhibit Number One, the Employment Agreement:

3 What number please?

4 Q. It's Joint Exhibit One. It should be the first one in the book. Now I will ask you,

5 Mr. Shafi, to turn to paragraph 20 of the Employment Agreement. You can just let me

6 know when you're there.

7 A. Yes.

8 Q. Paragraph 20 entitled Complete Agreement says: This Agreement, including

9 non -- contains the complete Agreement concerning the employment arrangement

10 between the parties and shall as of the effective date hereof supersede all other

11 agreements between the parties. The parties stipulate that neither of them has made

12 any representation with respect to the subject matter of this Agreement or any

13 representation, including the execution and delivery of this Agreement, except such

14 representations as are specifically set forth in this Agreement and each of the parties

15 acknowledges that he or she or it has relied on its own judgment in entering into this

16 Agreement. So at the time you signed this Agreement, the Employment Agreement

17 contained every term in your Employment Agreement with Braintech, correct?

18 A. Correct.

19 Q. Okay. So I'd like to point out for the Jury where in this Agreement

20 Braintech promises that you will be reimbursed for uninsured medical bills?

21 A. Okay, I'll be glad to.

22 Q. In the Agreement. In the paper.

23 A. It's not in this Agreement, but there were a package of seven Agreements.

24 Q. The other Agreements refer to this Agreement, including the debt schedule. The debt

25 schedule had the provision --

**19**

1 Q. (Interjecting) Mr. Shafi, I'm sorry to interrupt you. My question is please point

2 out where in the Employment Agreement Braintech promises to cover uninsured

3 medical bills?

4 A. It's not here; it's elsewhere.

5 Q. Thank you. If you would please turn to Exhibit 242, Mr. Shafi. Sorry for the

6 pause. I'd like to focus your attention on your initial email to your boss where on

7 October 16th you write to Mr. Weidinger: Due to your reluctance on spending on

8 travel dollars and pay expenses back promptly, I have scaled back on travel plans.

9 Just so the Jury is clear, part of your job duties were to travel and make sales calls to

10 try to generate revenue?

11 A. Yes.

12 Q. And you continue: Currently there are no plans to travel beyond a 50-mile

13 radius of Brighton until mid-November for PackExpo. So as of October 16th, you

14 were redefining your job duty about travel, weren't you?

15 A. I was not paid, ma'am. I couldn't travel.

16 Q. But you refused to travel beyond this self-defined --

17 A. I didn't have the funds to travel.

18 Q. My question is you agree that at this point time for whatever reason you're

19 going to give me, whatever excuse, you refused to travel as you had been doing

20 before?

21 A. Correct.

22 Q. All right. Let's turn to Exhibit 247, Mr. Shafi. Exhibit 247, do you have it, Mr.

23 Shafi?

24 A. Yes, I do.

25 Q. Okay. This is an email to your boss from you dated October 20th where -- let's

**20**

1 look at the bottom of the full paragraph: Full-time work is legally defined as 40 hours

2 per week, you wrote. I have been putting in 80 to a hundred hours per week until

3 now. As of this email, I will scale back to 60 hours per week and will continue to

4 monitor the working climate at Braintech. So you would agree where me, Mr. Shafi,

5 that as of October 20th, you reduced your working hours?

6 A. Yes.

7 Q. And let's look at Mr. Weidinger's part of his response.

8 A. This is not the response. This is what I responded to.

9 Q. Oh, good. Thank you for the clarification. Okay. So you responded to this by

10 scaling back your work hours?

11 A. Correct.

12 Q. Let's see what Mr. Weidinger wrote in the second paragraph quoting: "You are

13 correct. It is all about revenue, but I'm wondering where all your revenue is after two

14 months into the transaction. Your Shafi revenue pipeline commit for August was

15 $10,500, which would have been the Siemen monies, correct?"

16 A. Yes.

17 Q. For September was 14,500, which was the second Siemens payment? Yes?

18 A. Yes.

19 Q. For October is $75,000, for November is $75,000 and December is $85,000,

20 et cetera, et cetera. To date we have received zero and still patient in our

21 understanding that this is in process pipeline orders as detailed in schedules. So just

22 so the Jury understands, in response to Mr. Weidinger's apparent displeasure about

23 the lack of revenue, you reduced your work hours, correct?

24 A. Yes. He had made my job impossible, so yeah.

25 Q. Okay. Let's turn to Exhibit 244 please. Now just to give the Jury a little bit of

**21**

1  background, this is in the time period of mid-October of 2008 and there was

2  something that was known as the 2008 Plus Up application. Could you briefly

3  describe what that was? It was an application to the Government as I understand it?

4  A.   Yes. It was an application that I had made with SCIC which is a 40 billion a

5  year company to the U.S. Army to help soldiers get safer in Iraq and Afghanistan

6  through the use of vision-guided robotics. This had been approved by Senator Levin,

7  Senator Stabenow, Bart Stupak had approved it and it was an earmark. It's another

8  way of saying Plus Up. It was for 1.9 million and we -- it had cleared the House

9  Armed Services Committee. Our work had been approved by the Senate Armed

10  Services Committee, had now gone to the Hack in the Sack (phonetic), which is

11  House Appropriations Committee and the Senate --

12  Q   (Interjecting) Excuse me.

13      MR. DOYLE: Excuse me. I think he's entitled to answer the question.

14  You asked him to explain. I object.

15  Q.   Well, because with all respect to Mr. Doyle, the fact is, Mr. Shafi, the money

16  was never paid, correct?

17  A.   But you asked me to explain it and I'm trying to explain --

18  Q.   (Interjecting) I know, but the bottom line is --

19  A.   You cut me off. You are not allowing me to explain.

20      MR. DOYLE: I object.

21      THE COURT: Why don't you let him finish his answer?

22  Q.   (By Ms. Widlak continuing) Please continue.

23  A.   Thank you. We had made an application which had met with approval by

24  Tardick (phonetic), the folks that do all the tank and automotive work in Warren. It

25  had been approved by Michigan Tech. Had been approved by two Senators in our

**22**

1  state and a Congressman who represented the First District. We had made several

2  trips to Washington, D.C. and met with Senators and their staff and this was liked by

3  everybody. The problem was this did not come through because this is exactly the

4  time when they bailing out banks, so although everybody wanted the solution to help

5  soldiers' safety, people that could -- we could have saved lives and created jobs in

6  Michigan, you know it didn't pass because the money wasn't there in the Government.

7  Q.   Thank you. That's helpful.

8  A.   Right.

9  Q.   So we're in agreement that there was -- it was an unsuccessful application?

10  A.   Correct.

11  Q.   And I'd like you to look at the top of this email which is -- in particular this from

12  Rick to you: Why was I not informed of this nonapproval, and your response was:

13  This was an unintended oversight on my part. How long between the time you

14  learned of the lack of approval for the application and the time you told Mr. Weidinger,

15  how long was that?

16  A.   Two, three days I think.

17  Q.   It was a substantial amount of money for Braintech, correct?

18  A.   Potentially.

19  Q.   And was there any reason why you waited to disclose that to him?

20  A.   Yeah, there's two reasons. Number one, I was extremely busy and we did not

21  connect everyday, we did not and we tried to sometimes, but he was busy with his

22  things. I was busy with my things. I had an enormous amount of tasks on my list to

23  accomplish. It wasn't that I was trying to hide anything. It was just that I was trying

24  to do my job and when this came to light, I said yeah, this happened and I said this is an

25  unintended part. I'm not trying to hide anything. We didn't get it.

**23**

1  Q.   Okay. Let's look at Exhibit 253.

2      MR. DOYLE: I'm sorry. I didn't get that.

3      MS. WIDLAK: I'm sorry, 253. My allergies are --

4      MR. DOYLE: Thank you.

5      MS. WIDLAK: Ah-hum.

6  Q.   Are you at 253, Mr. Shafi?

7  A.   Yes.

8  Q.   So this is on October 20th which is the same day Mr. Weidinger admonished

9  you for not telling him that the Government application was not approved, correct?

10  A.   Correct.

11  Q.   Let's look at what you wrote to Mr. Weidinger: I'll pass on this meeting today

12  that you've canceled several times, until I respond to your damage email and correct

13  some things in it and also write about my motivational damage. Have a good

14  meeting. Was this an executive staff meeting that you were refusing to attend?

15  A.   I think so.

16  Q.   Thanks. Let's turn to Exhibit 254 please. And this is --

17      THE COURT: What exhibit is it?

18      MS. WIDLAK: It's 254, Judge.

19      THE COURT: Thank you very much.

20  Q.   (By Ms. Widlak continuing) Now in response to your indication to Mr. Weidinger

21  that you were refusing to participate in the meeting, he wrote you back on that same

22  day and said: You are requested to be on the ESM, and is that the executive staff

23  meeting?

24  A.   Yes.

25  Q.   Call at 4:30 eastern standard time today. We have many important matters to

**24**

1  cover. Your participation is required. Do you remember getting that email?

2  A.   Yes.

3  Q.   Did you participate in that meeting?

4  A.   No, I did not.

5  Q.   Okay. Let's turn to Exhibit 287. Let's start at the first page of 287, and this

6  appears to -- who's Donna Burr?

7  A.   Donna was my Office Manager at Shafi, Inc. for many years. She's a great

8  employee and then I had requested as part of my employment at Braintech to hire

9  some --

10  Q.   (Interjecting) Excuse me for interrupting you. I just want to know -- to be able

11  to explain to the Jury who is writing this email. This was your Office Manager?

12  A.   Yes, and she now was working at Braintech.

13  Q.   Thanks. So she wrote to Rick Weidinger on November 6th looks like at about

14  8:10 in the morning indicating Adil is sick and has asked me to let you know he's

15  canceling the 11:30 conference call today and he will be unable to travel to Virginia

16  tomorrow. Regards, Donna. So you canceled. After Mr. Weidinger directed you to

17  participate in the executive staff meeting conference call, you became ill apparently

18  and canceled it?

19  A.   Well, first of all, I'm not sure if it's the same meeting, okay? That was in the

20  previous ESM, I don't know if this was the same meeting.

21  Q.   Maybe you can help the Jury. How often did the executive staff meetings take

22  place?

23  A.   Well, we scheduled them fairly often, but Mr. Weidinger was constantly

24  canceling these meetings. We had a very choppy regimen. It was very

25  unpredictable. In fact, people used to joke about bets, that so-and-so should pay

25

1  so-and-so because they missed a meeting. I was a very regimented person, but
2  these meetings were canceled all the time.
3  Q.   Let's talk about this particular meeting and I concede that if it was not the same
4  meeting that you refused to attend before, you were not going to attend this one
5  either, correct?
6  A.   This is because I was sick.
7  Q.   And let's see what Mr. Weidinger's response later on November 6 was. He
8  writes you --
9         THE COURT: (Interjecting) What is this one?
10       MS. WIDLAK: This is part of 287.
11       THE COURT: Part of 287. Thank you.
12  Q.   (By Ms. Widlak continuing) Let's -- I'm going to switch gears here for a moment
13  and ask you to turn to Exhibit 281. Have you found 281?
14  A.   Yes.
15  Q.   Now just by way of background, one of your responsibilities as Chief Operating
16  Officer was to develop a sales plan, correct?
17  A.   Yes.
18  Q.   So Mr. Weidinger is writing to apparently the entire sales team at Braintech:
19  Please plan to be in our offices in Northern Virginia on Friday, November 7th to
20  present, discuss and review our Sales Plan for 2009. Now was this the meeting for
21  which you were sick that we were just talking about?
22  A.   There were two or three scheduled. I don't recall exactly which one we're
23  talking about here. I believe one was canceled. I believe there was one that I did not
24  attend, then there was another one scheduled after that. I think there were three
25  different schedulings here.

26

1  Q.   Let's try to clear this up. So this -- strike that. That's fine. Let's go back to
2  Exhibit 287. Let's look at the second page of 287, and this was November 6th, the
3  day you indicated that you were ill?
4  A.   Yes.
5  Q.   And Mr. Weidinger writes to you that: I understand from your assistant that you
6  are not feeling well, and he goes on to say: As you know, it is critical we discuss and
7  understand your Sales Plan and we have previously organized and set aside
8  tomorrow to meet with you. It's very important that we do this on Friday. As you also
9  know, others have traveled to Virginia for the Friday meeting and for your
10  presentation. We have spent considerable money and time to organize tomorrow's
11  meeting. Please check in with me with a direct phone call at close of business today
12  to see if you are feeling better and can travel tomorrow. Do you remember getting
13  that from Mr. Weidinger?
14  A.   I believe so, yes.
15  Q.   You did understand at this time how important your Sales Plan was to the
16  company?
17  A.   It had been all along.
18  Q.   Okay. You did not attend that meeting though, did you?
19  A.   Correct.
20  Q.   Let's go to Exhibit 294, and this is Mr. Weidinger writing to you again about
21  some upcoming meetings and he writes this on November 10th and he said: Plan to
22  attend the following meetings this week with me. These meetings take priority over
23  anything else you do this week, and then he lists an executive staff meeting on
24  November 11th, a Board of Directors meeting on November 12th and it's true you
25  were a member of the Board of Directors of Braintech?

27

1  A.   Correct.
2  Q.   Which was a publicly traded company?
3  A.   Correct.
4  Q.   And then there was another meeting scheduled for Friday, November 14th in
5  the Virginia offices of Braintech where you were going to present -- you were
6  expected to present your Sales Plan, correct?
7  A.   Yes.
8  Q.   Okay. Let's turn to 295. Okay, so is this what you wrote in response to Mr.
9  Weidinger's directive to attend meetings?
10  A.   Yes, I believe so.
11  Q.   All right. So you respond by referencing your daughter's medical test bill and
12  that's the one we were talking about a little earlier, correct?
13  A.   Correct.
14  Q.   Where you took the position that Braintech was responsible to pay it and it
15  doesn't appear in the Employment Agreement that that's their obligation, correct?
16  A.   Not in that document, yes.
17  Q.   So were you taking the position that you wouldn't attend these meetings until
18  that bill was paid?
19  A.   There was a litany of problems and this is just one of them. By this time, a lot
20  of these things reflect toward the latter part of the employment when things had been
21  made so impossible for me, so difficult at so many fronts that I was losing motivation
22  and it was starting to become a problem to work.
23  Q.   So you admit that there is a relationship between Braintech's position with
24  regard to your daughter's medical bill and your refusal to attend meetings?
25  A.   It's one of many, many issues.

28

1  Q.   Okay. Let's turn to Exhibit 304, Mr. Shafi. Let's take a look at this. This was
2  dated November 11th and you're writing to Mr. Weidinger once again and you write:
3  These are two new promises that you are breaking. The list of your broken promises
4  is getting long. Our family health insurance is not in effect. My wife just checked
5  again today. I cannot go see a doctor even though I've been sick since Wednesday,
6  five days. The other bill is to be covered in the 8.6K DS reserve. We had agreed to it,
7  and I'd like the Jury to pay particular attention to this -- I am sick today, but have some
8  energy and will go to PackExpo -- that was a trade show, right?
9  A.   Correct.
10  Q.   Knowing that I will get worse when I come back on Wednesday or Thursday,
11  but all calls you have requested this week are canceled. We can continue after you
12  reinstate your promises. You need to learn to keep your promises. This is a repeat of
13  the time when you ignored my travel expenses for weeks. Also, I will be very sick by
14  the time I get back, so I will not come to Virginia on Friday. We can resume after
15  these two bills are paid probably, next week. So it's fair to say, Mr. Shafi, that as of
16  the November date, you are basically refusing to work until these bills are paid?
17  A.   Correct.
18  Q.   All right. Let's look at Exhibit 301 please. I note by way of background there
19  was an issue, wasn't there, with whether the premium for the health care coverage
20  that Braintech provided to you and your family in November of 2008 had been
21  processed timely. Do you remember that?
22  A.   Yes. It was canceled because Braintech failed to pay.
23  Q.   But it was eventually straightened out, correct?
24  A.   Correct.
25  Q.   I'd like you to focus on the email from Mr. Weidinger to yourself on November

29

1 11th where he writes: Please use the company credit card in your possession for any

2 doctor appointments necessary that would otherwise be covered by your health

3 insurance coverage. So Mr. Weidinger, was this situation was being cleared up

4 suggested that you charge it so that you could proceed and get the health care you

5 needed?

6 A.   Yeah, after a lot of damage was done. Yes.

7 Q.   But you don't dispute that he wrote that, do you?

8 A.   No, I don't. He did write that.

9 Q.   I know yesterday we talked about the fact that your working relationship with

10 Pete Manias began to deteriorate at some point?

11 A.   Correct.

12 Q.   And it's true your working relationship with Jim Dara also began to deteriorate,

13 correct?

14 A.   Correct.

15 Q.   I'd like you to turn to Exhibit 285 please. Do you remember getting this email

16 from Mr. Dara?

17 A.   Let me --

18 Q.   Take a moment. It's a lengthy email, so I want you to take your time.

19 A.   Yeah, I believe I saw this email.

20 Q.   And I'm not going to go through every entry on this, but I want to just note

21 some high points for the Jury, all right?

22 A.   Okay.

23 Q.   He opens by saying: Adil, some comments and overflowing frustrations and I'll

24 just point it if I might. Starting here:  I was clearly led to believe that Reliabot,

25 including Random Bin Picking was off-the-shelf ready, supportable in the marketplace

30

1 and that you would significantly fast track --

2        MR. DOYLE: Excuse me, Your Honor.

3        THE COURT: Ms. Widlak, an objection. What is it?

4        MR. DOYLE: This exhibit is admitted to say it was second. I believe

5 counsel is trying to articulate that it's stating some truth. I don't think  --

6        THE COURT: No, no, no. Let me interrupt you, Mr. Doyle. I thought

7 you said yesterday you had no objection to any of the exhibits coming into evidence.

8 Is that true?

9        MR. DOYLE: Yes.

10        THE COURT: So once they're in evidence, they can be used for any

11 purpose. They didn't come in for a limited purpose and she's free to read from it and

12 ask questions about it.

13        MR. DOYLE: Thank you, Your Honor.

14        MS. WIDLAK: Thank you, Your Honor.

15        THE COURT: Thank you.

16 Q.   (By Ms. Widlak continuing) All right. Let's start at the top: I was clearly led to

17 believe that Reliabot, including Random Bin Picking was off-the-shelf ready,

18 supportable in the marketplace and that you would significantly fast track EVF

19 communication with non-ABB robots and non-Matrox vision hardware. These things

20 were often described by you as duck soup. As such, I accepted the minimum

21 revenue levels identified and it appears he agreed to the transaction. So Mr. Dara

22 goes on to say: Most recently emails from you suggest that the above deliverables

23 are now anything but duck soup, and then he lists a number of things that in fact he

24 now requires brick, mortar, robots, equipment, internal training, ex-Shafi employees,

25 advance debt payment scheduling, a strong economy, several new hires. Then

31

1 expanding list of reasons for failure including remarkably EVF readiness is of grave

2 concern. More troubling is the fact that as COO you are directly responsible for or

3 involved with all the items you have referenced over the last few weeks, yet based on

4 activity levels they do not appear to be your top priorities. He goes on to say -- I'm

5 starting with the paragraph starting as worrisome: An internal investigation has

6 determined Reliabot is anything but ready for significant sales; that a handful of PhD's

7 cannot even cut a new license if sold. How can this be the case a full quarter into this

8 process? Well -- and he goes on to say -- strike that. Let's go to the next page.

9 Unless I am missing something -- I'm reading from the second paragraph, Mr. Shafi --

10 we have now gone a full quarter without one penny of revenue from your in process

11 sales or one single firm Reliabot product proposal from your Access and Acceleration

12 schedule. Are you really suggesting that this is due to a lack of office space, which at

13 best case would just now be coming on line? Let's talk about the office space issue.

14 You would agree, Mr. Shafi, that there were measures taken to acquire a lease on

15 office space early in your employment, correct? I'm talking about efforts, not

16 completion.

17 A.   Yeah. The efforts took forever. We never had an office to work in.

18 Q.   But you would admit that as of the time Mr. Dara is writing this to you in early

19 November, that even if office space had been completed, you would just be moving

20 into the office as of that time period? True or false?

21 A.   The statement is correct, but the backdrop is that it's not like selling a pound of

22 sugar. You have to have a number of things, as I explained yesterday; that you can't

23 just do this by selling a CD like you buy at Best Buy. I'll just limit it to that right now.

24 Q.   Okay, I appreciate that. Let's just conclude because the Jury will be able to

25 read this. Let's go to the last paragraph please on page three please, and he closes

32

1 with in the last paragraph: Based on the issues I have noted above, the lack of

2 performance to goal and the mounting level of organizational fracture, some very

3 serious decisions need to be made on how best to proceed. So it's fair to say, Mr.

4 Shafi, that Mr. Dara was very displeased with your performance, would you agree with

5 that?

6 A.   He actually reported to me. I was displeased with his performance.

7 Q.   But my question is, he is expressing grave concern to use his words with your

8 job performance?

9 A.   The feeling was mutual.

10        THE COURT: No. Mr. Shafi, just answer the question.

11        THE WITNESS: Yes.

12 Q.   (By Ms. Widlak continuing) Okay, okay. Thank you. Yes, your earlier

13 testimony was that Mr. Dara in your view reported to you, but you had conceded that

14 you were to collaborate on sales efforts to get Reliabot to market to generate revenue,

15 correct?

16 A.   Correct.

17 Q.   But there's no question that you in fact reported to Mr. Weidinger?

18 A.   Correct.

19 Q.   Who at this time period was equally dissatisfied with your performance,

20 correct?

21 A.   In his opinion.

22 Q.   Okay. Let's go to Exhibit Number Two please. This is Joint Exhibit Number

23 Two. It should be in the front of your book, Mr. Shafi. Now we're in November 19th

24 and you had been directed by Mr. Weidinger to come -- to finally come to Virginia for

25 a meeting, correct?

**33**

1  A.   Correct.

2  Q.   And at that meeting in fact you were given this notice that you were being

3  placed on administrative leave with pay, but that you were not to have any further

4  contacts with employees or customers, correct?

5  A.   Correct, with one noted exception.  It's handwritten there.

6  Q.   Can you explain to the Jury if you know what that means?

7  A.   Yes.  It says except Jeffrey Milton, Special Counsel and that's his email

8  address and phone number.

9  Q.   And Mr. Milton was Special Counsel for Braintech?

10  A.   Correct.

11  Q.   And at this time -- we're going to talk about this in a second -- Braintech was

12  proposing that they do something called rescind the deal.  In other words, it's a

13  walk-away.  They give you back your Reliabot and the other assets and you give back

14  what they've given you and say see you later.  You agree?

15  A.   Yes.

16  Q.   So Mr. Milton was very instrumental in trying to structure that recision as it's

17  known?

18  A.   He was attempting that, yes.

19  Q.   So is that why you were able to stay in contact with him?

20  A.   Yes.  We had a meeting in Virginia at which Mr. Weidinger and Mr. Milton were

21  present and that's when this letter was presented to me and noted that the exception

22  was Mr. Milton that I could communicate with.

23  Q.   Thank you.  Let's turn to Joint Exhibit Number Three which should be right

24  behind that other one, and this is also dated November 19th, 2008.  Was this letter, if

25  you recall, given to you at the same time the other one was?

**34**

1  A.   Yes.

2  Q.   Okay.  And so the scene is clear.  Present at this meeting was yourself, Mr.

3  Weidinger and Mr. Milton?

4  A.   Correct.

5  Q.   The lawyer?

6  A.   Yes.

7  Q.   And let's look at Joint Exhibit Number Three.  This letter confirms that

8  Braintech, the company has decided to rescind the August 12, 2008 acquisition of

9  Shafi, Inc. and 80% of the stock of Shafi Innovation and accordingly, we hereby

10  tender back to you as seller, meaning give back to you, correct?  All of the

11  consideration you gave to the company, i.e. shares of Shafi, Inc. and Shafi Innovation

12  along with your agreement to serve as an Officer and Director of the company.  In

13  other words, your employment would come to end, correct?  He goes on to say in

14  return we demand back all of the consideration that the Company gave you.  As

15  discussed, we will -- you will let us know by close of business on Friday, November

16  21st, 2008 whether you want to work together towards a joint effort to effect the

17  recision and in the meantime as a showing of good faith, we have placed you on

18  Administrative Leave with pay and benefits until further notice.  And it goes on to

19  reference your job performance.  As you know from our discussion today, we have

20  ample grounds to terminate your agreement, Employment Agreement for good cause.

21  While we specifically reserve our rights to terminate your Employment Agreement

22  based upon the good cause that exists of today, we seek to unwind the Employment

23  Agreement as part of the transaction to be rescinded and we do not waive any basis

24  to terminate it and moreover, we do not accept any further performance from you

25  under the Agreement.  So as of November 19, Mr. Shafi, the company is proposing

**35**

1  this walk-away as I've described it and they have placed you on leave with pay and

2  continued benefits to try to work out a deal.  Is that fair?

3  A.   Yes, that was their position.

4  Q.   And just so the Jury is clear, during -- in the process of this walk-away, you

5  would be giving Reliabot back to Braintech, right?

6  A.   Other way around.  Braintech would be giving Reliabot back.

7  Q.   Excuse me.  You are absolutely right.  So you would regain possession of

8  Reliabot as part of a recision?

9  A.   That's what they were offering.

10  Q.   And I just want to make reference to Joint Exhibit Number Four, and we've

11  spoken just a moment ago about Mr. Milton.  This is a lengthy -- it's called Shafi

12  Recision Term Sheet from him to you dated November 24th, 2008.  Let me ask you

13  before I forget.  During this time period once the offer for the walk-away was given to

14  you, did you consult with your attorney?

15  A.   I believe, but I don't recall exactly.

16  Q.   And as of November 24th things had changed significantly from the company

17  standpoint?

18  A.   What do you mean by that?

19  Q.   Well, Mr. Milton writes that your arrangement was going to change effective

20  immediately and he writes:  I am authorized to advise you of the following:  Effective

21  as of the close of business on November 24th 2008, your status with Braintech, Inc. is

22  changed to Administrative Leave without pay and benefits.  You are to cease the

23  destruction or theft of either Braintech, Inc. or Shafi, Inc. documents, electronic or

24  paper.  You are return all Braintech and Shafi, Inc. documents, including documents

25  and emails which you deleted and all other property and equipment, including

**36**

1  computers and cell phones.  Did you receive this letter by phone or by -- in person or

2  by mail?

3  A.   By email and I completely disagree with this utter fabricated lie.  I never

4  destroyed any documents.  I never destroyed any emails.  It was a complete

5  fabrication and I said so in the deposition also.  This is not me.  I didn't even have

6  access to emails and don't want to get upset, but let me just say this is a

7  complete falsehood.  It was just manufactured to make an excuse by Braintech and I

8  took the oath, and I say that by keeping the oath in mind.  I never lied.  I never

9  destroyed these documents.  I never destroyed any emails.  I didn't even have access

10  to servers.

11        THE COURT:  I think Mr. Shafi the question was did you receive this.

12        THE WITNESS:  I did.

13  Q.   (By Ms. Widlak continuing) Thank you, and thank you, Your Honor.  Mr. Shafi,

14  so just to wrap up here, the bottom line here is as of November 19th, 2008 you had

15  not developed a single product for Braintech, is that true?

16  A.   Product?

17  Q.   Product.

18  A.   Yeah, we had not developed a new product.

19  Q.   And it's also true that you failed to create any new market access for

20  Braintech?

21  A.   Define market access.

22  Q.   You didn't have any customers.

23  A.   We had customers; we didn't have revenue.

24  Q.   So the market access may have been underway, but it didn't yield any money?

25  A.   Correct.

**37**

1  Q.   Okay.  You did not finish your Sales Plan?

2  A.   That's true.  We didn't finish.

3  Q.   And you had not developed or finished a Compensation Plan, right?

4  A.   For the employment -- for the team at Braintech we had envisioned to put

5  together a Compensation Plan and Incentive Plan for them, that was one of the

6  initiatives I was trying to work on, but that was not completed either.

7  Q.   And you had not developed a Technology Plan either.

8  A.   I had developed a Technology Plan.  It was refuted at many, many instances.

9  Q.   So I'll rephrase.  You had not developed a Technology Plan to Braintech's

10  satisfaction?

11  A.   The plan had been developed, ma'am, but there were numerous impediments

12  put in my place --

13       THE COURT: (Interjecting) Mr. Shafi, Mr. Doyle will have an opportunity

14  to Redirect you.  Please listen to the question and answer it.

15       THE WITNESS: I'm sorry.  Okay.  I'm sorry, Your Honor.

16  Q.   (By Ms. Widlak continuing) So you had not developed a Technology Plan that

17  was satisfactory to Braintech?

18  A.   Correct.

19  Q.   And you had not completed the development of an Integrator Program?

20  A.   Correct.

21  Q.   And you had not developed the Enhanced Egg that merged technology product

22  of Reliabot and Braintech's technology, right?

23  A.   That was envisioned to happen in six months to a year.  We were only at

24  month three here.

25  Q.   But as of the date?

**38**

1  A.   In three months we had not created the Enhanced Egg, you're right.  We did

2  not.

3  Q.   Thank you.  As we noted earlier, your relationship with Pete Manias had

4  deteriorated to the point where you told Mr. Weidinger you wouldn't work with him?

5  A.   Correct.

6  Q.   And your work relationship as we just saw with Jim Dara had been damaged

7  because he basically was calling you out about the revenue readiness of Reliabot, the

8  lack of revenues and the many problems that he saw with your performance, correct?

9  A.   Correct.

10  Q.   As we saw earlier today in the email where you refused to perform -- strike

11  that.  You refused to develop an opinion with regard to the evaluation of Braintech and

12  EVT?

13  A.   EVF.

14  Q.   But you admit that you did not do what you were requested to do and that was

15  to provide to the engineers a detailed analysis of your own commenting on the

16  evaluation?

17  A.   Correct.

18  Q.   Okay.  And is it fair to say by this time you were in basic combat with Mr.

19  Weidinger?

20  A.   You can characterize combat.

21  Q.   Okay.  And in fact, by November 19th of 2008 you were fighting with everybody

22  pretty much.

23  A.   I was powerless.  I couldn't execute my job.  I was frustrated with so many

24  problems that I couldn't do.

25  Q.   Okay.  And just not to belabor this, but there's no question in your mind that as

**39**

1  of your last date of employment you had not generated any revenue for Braintech?

2  A.   There was no revenue generated.

3  Q.   Thanks very much.  I have no further questions.

4       THE COURT: Thank you.  Mr. Doyle, do you have Redirect?

5       MR. DOYLE: Thank you, Your Honor.

6              **REDIRECT-EXAMINATION**

7  **BY MR. DOYLE:**

8  Q.   And when I say briefly, I mean briefly.  First of all, can you tell the Jury what

9  this product was that you were talking about, this vision optic?  Can you tell them first

10  of all, what's involved in this software that was to be transferred to Braintech?  What is

11  it?

12  A.   Sure, be glad to.  Basically the software is what connects what you see to how

13  you tell a robot to go pick something up.  So it's basically --

14  Q.   Excuse me.  I don't want to interrupt, but I don't need you to repeat yourself

15  either, okay?  Tell the Jury what the makeup of the software is.  What does it involve?

16  Does it involve humans?  Who does it involve?

17  A.   It involves numerous drivers, software files, people to customize them, key --

18  what's called configuration of the software.  It involves saying which robot are you

19  working with, what kind of cameras are you set up with, are they fixed mount or arm

20  mount.  Are there any drivers?  What are the products we're dealing with?  All this has

21  to be configured and it requires files, people, training, equipment, office, know-how.  It

22  needs all those things.  It's not like going to Staples and buying something to draw a

23  picture.  And moreover, people place an enormous amount of importance on these

24  projects because they're worth hundreds of thousands of dollars.  So the software is

25  not like you just go to a store and buy a $50 CD.

**40**

1  Q.   Excuse me.  With respect to this particular product that was discussed at

2  length yesterday and put everybody to sleep, I mean tell the jury if you would please

3  who was the person, if there was a person involved in this software?

4  A.   There were two key people -- actually three.  I was the architect.  I created the

5  overall mathematics and package many years ago.  Then I had an employee called

6  Kevin North and Kevin was for many years, 10 or 15 years involved in actually writing

7  the specific code that was needed to configure things, the things that Braintech was

8  asking for and he -- I had asked for him to be made available to Braintech, but Mr.

9  Weidinger at Braintech refused to make him available.  That's why you see so many

10  times software is not delivered to Vancouver because they didn't allow Mr. North to be

11  available through Mr. Dechow.  They didn't allow -- the third person was John Neilson.

12  John was very good at configuring software for is it an aerospace application, is it a

13  food application, is it an automotive application?  These were the two key people I

14  used to rely on for years and years to do this type of thing that Braintech needed, but

15  Braintech did not make that possible.  They refused these things and so that was one

16  of the first things that stopped me from executing, stopped me from doing my job.  I

17  really wanted to do the job.

18  Q.   Excuse me.  Excuse me.  Did you make Mr. North available?  Did you make

19  him available?

20  A.   Yes, he was available through Mr. Dechow and we made arrangements for him

21  to be available and that was stymied.  It wasn't approved.

22  Q.   Did Mr. North in fact submit a Proposal?

23  A.   He proposed to Mr. Dechow.  Mr. Dechow gave a Proposal to Mr. Weidinger

24  here and Mr. Weidinger didn't make that possible, so we could not provide the details

25  that Braintech needed.  Absolutely they made everything impossible, and then John

41

1    Neilson was consulted for a day, but he was not given the time to do the things that

2    were needed.

3    Q.   Excuse me.  With respect to Siemens?

4    A.   Yes.

5    Q.   Why -- do you know why that invoice was not paid?

6    A.   Yes, I do.

7    Q.   Would you tell the Jury please?

8    A.   Of course.  Siemens is a large company and they wanted -- they had a vision

9    product.  They wanted it to connect to some robots.  They approached my company,

10   Shafi and said please do two drivers for us.  One is a KUKA robot platform, the

11   second is a FANUC robot platform and there were two payments tied to that.  The first

12   one we did with KUKA robots we received a progress payment, I think it was 10,000

13   or 14,000, one of them before all this Braintech stuff started.  The second payment

14   was tied to the FANUC driver.  So although on one hand Mr. Agapakis, who was the

15   business manager wanted to pay and was approving things, he also was checking

16   with his technical people and they were saying we don't have a FANUC robot, we

17   cannot supply Mr. Shafi a FANUC robot.  So the reason this whole payment got

18   delayed for months and months and months is because we did not have a FANUC

19   robot to do this and Siemens could not approve it.  They did not give me the tools to

20   work with and there are hundreds of emails in the record, in the discovery about this.

21   But again, it was one of those things where I was trying to get a FANUC robot.  I

22   would call Siemens routinely.  There was a person called Bill -- I forget his name.

23   Q.   Do you know why the invoice was not paid?

24   A.   Yes, because we did not have a FANUC driver.  We did not have a FANUC

25   robot to work with.

42

1    Q.   Was the invoice contingent upon that?

2    A.   Yes.

3    Q.   With regard to -- you're only on the job for three months.  Did you have a

4    pipeline of accounts during this period of time?

5    A.   I had 60 prospects lined up.  I had a lot of people, but in order to make those

6    things come to fruition for revenue, we needed a lot of things and all of those things

7    were denied.  I was not able to execute my job as much as I wanted to.

8    Q.   For instance, give the jury a couple examples without going through the entire

9    list.  What was denied?

10   A.   Well, we didn't have an office to work with 'til the end of my employment.

11   Q.   Forget the office.  What else was denied?

12   A.   I needed my engineers, my old engineers to work on this to create enough of a

13   demo setup that we could take to Vancouver.  They were not made available.  We did

14   not have training.  The only robots -- I had actually arranged for other companies to

15   give us robots to work with aside from their ABB robots, but we did not have anybody

16   to send those robots.  I had worked out arrangements Motoman, with a couple other

17   companies to get robots so that we could do this.  Braintech had no place to send

18   these robots.  They wanted to send them to Vancouver where nobody would go 3000

19   miles to do this.

20   Q.   Can you give the Jury an idea of the names of some of the customers with

21   whom you had contact?  I think you talked about Chrysler?

22   A.   Chrysler, Ford Motor Company, General Motors, Honda, Toyota, Nissan, large

23   machine builders like Utica Enterprises, Valiant.  KUKA Flex, Coma Pico.

24   Q.   And you were contacting these prospects?

25   A.   Yes.  We had an Access and Acceleration Plan that was laid out as part of our

43

1    agreement and we were to hit -- to meet 60 or so customers in about a 90-day period.

2    In order to make that happen, we needed to schedule travel, we needed to schedule

3    meetings with these people and Mr. Weidinger because he wouldn't pay travel

4    expenses made it impossible for me to schedule these things.  On top of that he

5    directed a new thing after my employment started.

6    Q.   Wait a minute.  I just asked you who the customers were.

7    A.   Yes, sir.  Sorry.

8    Q.   And can you give the Jury an idea.  You have this pipeline.  What's the time

9    span normally as you develop a pipeline turning into revenue?

10   A.   It's several months and the customers look for these things.  The customers

11   see do you have an office, do you have a place where you can run this stuff?  Do you

12   have engineers who are trained to do this work?  Can you actually support this stuff?

13   If they're contemplating a hundred thousand or $500,000 order, they want to be

14   assured that the company they're dealing with has a place to work, has employees

15   that are trained, that are trustworthy that can support their work.  We had none of that.

16   I had asked for all this stuff.  I had asked for all this in multiple agreements.

17   Q.   I think you answered my question.

18   A.   Okay, sir.

19   Q.   The one question that was discussed on your Cross, the health care, where

20   was that promise?  Was that in another Agreement?

21   A.   Yes, it was in the Debt Schedule.  Braintech had a 90-day period to allow you

22   to get on their plan, so in the meantime they said --

23          MS. WIDLAK: I'll object, Your Honor, in reference to the Order in

24   connection with our Motion in Limine which is to exclude from this proceeding any

25   reference to the larger transactional documents and to concentrate only on the

44

1    Employment Agreement.

2          THE COURT: Sustained.

3          MS. WIDLAK: Thank you.

4          MR. DOYLE: Thank you, Your Honor. And thank you, Mr. Shafi. I'm

5    through. Thank you.

6          THE COURT: Is there any Recross?

7                    RECROSS-EXAMINATION

8    BY MS. WIDLAK:

9    Q.   Just one question, Judge.  Mr. Shafi, we talked a few moments ago about Joint

10   Exhibit Number Four which was the -- I'll let you take a moment to get it opened.  That

11   was the detailed memo to you from Mr. Milton.

12          MR. DOYLE: Your Honor, I object.  That's beyond the scope of my

13   Redirect.

14          THE COURT: What's the question you're asking?

15          MS. WIDLAK: I'm just asking if he ever responded to it.

16          THE COURT: To which one?

17          MS. WIDLAK: To Mr. Milton's --

18          THE COURT: Okay, it is beyond the scope.

19          MS. WIDLAK: Thank you.  No further questions.

20          THE COURT: All right.  Do you have anything more, Mr. Doyle?

21          MR. DOYLE: No, Your Honor.  Thank you.

22          THE COURT: Thank you.  Mr. Shafi, you're done.  Thank you.  You can

23   stand down.  I'm sorry.  Before you stand down, ladies and gentlemen, do any of you

24   have any questions of Mr. Shafi?  Anyone?  No?  All right.  Thank you.  Now you can

25   stand down. Mr. Doyle, do you have anymore evidence?

**45**

1    MR. DOYLE: No, Your Honor.  We would rest at this time.  Thank you.

2    THE COURT: You are resting, okay.  Then -- and you have Mr.

3    Weidinger ready to testify?

4    MS. KOVAL: We do, Your Honor.  We do have one matter to take up

5    with the Court.

6    THE COURT: So, ladies and gentlemen, we will take a break and when

7    we come back, the Defense will begin putting in its case.  All rise for this Jury please.

8    **(Jury exited courtroom at about 10:37 a.m.)**

9    THE COURT: You can take your seats.  Ms. Widlak?  Or I'm sorry, Ms.

10   Koval.

11   MS. KOVAL: It's my motion, Your Honor.  She would probably do a

12   much better job than I would.

13   Your Honor, under 50(a) of the Federal Rules of Civil Procedure Braintech

14   moves for judgment as a matter of law.

15   THE COURT: Please be brief.

16   MS. KOVAL: Oh, absolutely, Your Honor.  Your Honor knows the

17   standard.  We believe, Your Honor, that based on the evidence that's been presented

18   to the Court, and in addition, Your Honor, to admissions by Mr. Shafi that's at

19   Defendant's Exhibit 315 in which he admitted that he deleted Braintech emails, that

20   Mr. Shafi has not met his burden of proof and that there's no legally sufficient

21   evidentiary basis for a reasonable jury to find for Mr. Shafi given that he must disprove

22   all of the items that are listed under the good cause provision of the contract.

23   THE COURT: Thank you.  Mr. Doyle, do you have a response?

24   MR. DOYLE: Obviously, Your Honor, we feel that the motion must be

25   denied.  We feel that we've created a case for a jury to decide.  Thank you.

**46**

1    THE COURT: Okay.  The Court is going to take the Defense motion

2    under advisement and we will take a break until maybe -- for about 15 minutes or so.

3    Counsel, I asked -- the jury instructions that you submitted are quite

4    abbreviated.  They're not the normal set of instructions that I would give to a jury,

5    which are some of them are pretty standard.  Linda has pulled together some, I've

6    asked her to give you a copy and maybe at the conclusion of today we can sit down

7    and try to finalize the jury instructions.  So we will do that as soon as we end today.

8    Thank you.

9    **(Court recessed at about 10:40 a.m.)**

10   **(At about 11:05 a.m.)**

11   **(Court, Counsel and parties present)**

12   **(Out of the presence of the Jury)**

13   MS. KOVAL: Before we call Rick Weidinger to start our case, we want to

14   read into the record responses to Request to Admit by Mr. Shafi.

15   THE COURT: All right.  Mr. Doyle?

16   MS. KOVAL: They're part of the exhibit book, Exhibit 315.

17   THE COURT: Okay.

18   MR. DOYLE: When did he give these answers?

19   THE COURT: Does he have 315?

20   MS. KOVAL: It's in your book.  This was September 28th, 2009, Your

21   Honor when Mr. James P. Murphy --

22   THE CLERK OF THE COURT: All rise.

23   **(Jury entered courtroom at 11:06 a.m.)**

24   THE COURT: Do you have 315?

25   MR. DOYLE: I object to it.  I don't think it's appropriate.  It should have

**47**

1    been read in when Mr. Shafi was here.

2    THE COURT: Thank you.  You can take your seats.  Can I have a side

3    bar please?

4    **(Sidebar conference out of the hearing of the jury as follows)**

5    THE COURT: Mr. Doyle, you said yesterday that you did not object to

6    these exhibits coming into the record.

7    MR. DOYLE: I don't.

8    THE COURT: So what's your objection now?

9    MR. DOYLE: My objection is that she wants to read this and it should

10   have been read, anything he said should have been read at the time of his testimony.

11   THE COURT: Well, that's not true and since they are all in the record,

12   they don't even need to be read.  They all will go to the Jury and I don't know that you

13   even got through all of them, did you?  Did you get through all of them?

14   MS. KOVAL: No.

15   THE COURT: So your objections overruled, Mr. Doyle.

16   MS. KOVAL: Thank you, Judge.

17   MR. DOYLE: Thank you.

18   **(END OF SIDEBAR CONFERENCE)**

19   THE COURT:  You may call your first witness please.

20   MS. KOVAL: Your Honor, if I may?

21   THE COURT: You want to do that before he comes in?

22   MS. KOVAL: Yes, before I call Mr. Weidinger, we are reading into the

23   record, Your Honor, Defendant's Exhibit Number 315.  This is Adil Shafi's response to

24   Braintech, Inc.'s First Request for Admissions.  Defendant, Adil Shafi --

25   THE COURT: Wait.  Where is Mr. Shafi?

**48**

1    MR. DOYLE: Excuse me, Your Honor.  I apologize.  Thank you.

2    THE COURT: So start again, Ms. Koval, please.

3    MS. KOVAL: Yes, Your Honor.  These are Adil Shafi's response to

4    Braintech, Inc.'s first Request for Admission.

5    THE COURT: And Mr. Shafi, this is Exhibit Number 315.

6    MS. KOVAL: Defendant, Adil Shafi, through its attorneys, Berry

7    Moorman, PC in response to Braintech, Inc.'s First Request for Admission avers as

8    follows:  Turning the page to Request To Admit Number 62:  Admit that you have

9    deleted Braintech emails?  Response:  Admitted.  Request to Admit Number 63:

10   Admit that you have deleted SI or SII, which the record is clear -- will show is Shafi,

11   Inc. and Shafi Innovation emails.  Response:  Admitted.

12   In the document it is signed by -- on page three James P. Murphy, who was

13   then counsel for Mr. Shafi.

14   Braintech calls Mr. Rick Weidinger, Your Honor.

15   THE COURT: Okay, thank you.  Good morning, Mr. Weidinger.

16   THE WITNESS: Good morning, Your Honor.

17   THE CLERK OF THE COURT: Will you raise your right hand please?

18   R I C K   W E I D I N G E R,

19   **Having been sworn under oath at about 11:09 a.m., testified:**

20   DIRECT-EXAMINATION

21   BY MS. KOVAL:

22   Q.    Good morning, Mr. Weidinger.

23   A.    Good morning.

24   Q.    Would you state your full name for the record please?

25   A.    Frederick Wade Weidinger.

**49**

1  Q.  You've been subpoenaed to be here?

2  A.  Yes.

3  Q.  I understand your son graduated from college this week and you've been

4  travelling, so thank you for being here.

5  A.  Thank you for saying that.  He got his first job in New York City and we're very

6  proud.

7  Q.  That's wonderful.

8  A.  Thank you.

9  Q.  Do you reside in Michigan?

10  A.  No.  I reside in Virginia.

11  Q.  And you are though the former Chief Executive Officer of Braintech?

12  A.  Yes I am.

13  Q.  And when did you become Chief Executive Officer of Braintech?

14  A.  November/December of 2007.

15  Q.  And where was Braintech headquartered then?

16  A.  Vancouver, British Columbia.

17  Q.  When you were CEO of Braintech where did you reside?

18  A.  In Virginia.

19  Q.  How did you communicate with the people in Vancouver?

20  A.  I communicated quite a bit.  We rented an apartment there.

21  Q.  How did you come to be this CEO of Braintech?

22  A.  For the Fall of 2007, I was actually on the Board of Directors of Braintech which

23  was a publicly traded company at the time, and there was another founder and CEO

24  of the company and there was a certain time that he asked me if I would agree to

25  come on board and become the CEO and help turn the company around.

**50**

1  Q.  Tell the Jury, do you know why he would ask you to become the CEO?

2  A.  Well, we were on the Board together.  We got to know each other and he

3  became aware of a few of my past experiences and successes.

4  Q.  And you're no longer employed with Braintech, is that right?

5  A.  Correct.

6  Q.  Is Braintech still operating?

7  A.  No.

8  Q.  When did it cease operations?

9  A.  May, 2010.

10  Q.  Were you still working at the company when it ceased operations?

11  A.  No, I was not.

12  Q.  And was there ever a time period when you personally loaned Braintech

13  money or personally co-signed  a loan to Braintech?

14  A.  I co-signed a bank loan for the company, yes.

15  Q.  Was that just you on your own or were there other people involved?

16  A.  I believe six or seven of us in total.

17  Q.  And please if you will, explain to the Jury for what reason you co-signed that

18  loan?

19  A.  First I cared about it.  We had significant investments in the company and the

20  meaning of it was if the bank foreclosed on the loan, then they would go into our

21  individual accounts and seize the money out of our accounts to pay the bank off, to

22  pay the loan off in essence.

23  Q.  Why did Braintech need the loan?

24  A.  Because they couldn't get the loan on their credit alone, so they relied on their

25  full-faith and credit of six of us.

**51**

1  Q.  Do you recall when that loan was taken?

2  A.  I believe -- before I arrived in the Fall, in November/December of 2007.

3  Q.  Was the bank loan repaid by Braintech?

4  A.  No, it was not.

5  Q.  Did the bank foreclose on the loan?

6  A.  Yes, they did.

7  Q.  And what happened after the bank foreclosed on the loan?

8  A.  When they foreclosed on the loan they went into our accounts and they seized

9  the money and they paid off the bank loan and as per the Agreement of the six or

10  seven of us with the company prior, a year or two prior to that -- I'm not certain the

11  date, we signed the documents, but when that event occurred, if in fact it did occur,

12  then the co-signers, if you will the pledgers what we call legally the co-signers would

13  own the assets of the company.

14  Q.  And this Agreement that you referenced, was that approved by Braintech's

15  Board of Directors?

16  A.  Absolutely.

17  Q.  Would it have been reported in Braintech's public statements that it must file

18  with the Securities Exchange Commission?

19  A.  Yes, it was.  I mean we were -- that was an expensive process that we were a

20  publicly traded company, so we had a duty to report all the material things that were

21  happening in the company to the SEC and yes, that was reported.

22  Q.  The time period when the bank foreclosed on the loan, what time period was

23  that?

24  A.  That was in roughly May of 2010.

25  Q.  And did you just -- you and the other co-signer go in and seize assets and walk

**52**

1  away with them?

2  A.  Clearly we had a right to do that, but we wanted in an overabundance of

3  caution, what we decided to do, although at that point we legally owned the assets,

4  what we decided to do was put the assets up for public auction.

5  Q.  You wanted to be sure that no one ever questioned whether you paid

6  sufficiently for the Braintech assets, is that right?

7  A.  Yes, exactly.  So what we decided to do was put it up to the marketplace.

8  Q.  Anyone could have bid on Braintech's -- let me finish my questions and the

9  court reporter will like us a lot better.  That way she won't have to figure out who's

10  talking when.

11  A.  I'm sorry.

12  Q.  No problem.  Did Mr. Shafi bid on Braintech's assets?

13  A.  No, he did not.

14  Q.  Was there a successful bidder, if you will, for those assets?

15  A.  Yes, there was.

16  Q.  And are you presently employed?

17  A.  Yes.

18  Q.  And what is your current employment and who do you work for?

19  A.  Chairman and CEO of Robotic Vision Technologies.

20  Q.  Is Robotic Vision Technologies Braintech?

21  A.  No, it's not.

22  Q.  Now Mr. Doyle told the Jury that Braintech stole Reliabot from Mr. Shafi.  Is

23  that true?

24  A.  Absolutely not.

25       THE COURT:  I'm sorry.  Did you say you're CEO of Reliabot?

**53**

1    THE WITNESS: Of Robotic Vision Technology.

2    THE COURT: That's not Reliabot?

3    THE WITNESS: No, it's not. We have nothing to do with Reliabot.

4 Q.   (By Ms. Koval continuing) The Judge had a great question, Mr. Weidinger. If

5 you would explain to the Jury and to the Court how Reliabot and RVT are different?

6 A.   They're separate. Reliabot is a bunch of computers on pallets still

7 shrink-wrapped. After the evaluation of all our PhD's that's examined it in Vancouver,

8 we never touched it.

9 Q.   Reliabot was Mr. Shafi's product that he sold to Braintech?

10 A.   Correct.

11 Q.   RVT or Robotic Vision Technologies. I may refer to it as RVT, but if we ever

12 refer to it again, it is a company that you formed after Braintech's assets were sold at

13 public auction?

14 A.   Correct.

15 Q.   And I was going to ask you this later, but I'll ask it right now because I think this

16 is a good point.

17 A.   Sure.

18 Q.   Did Braintech ever use the Reliabot technology?

19 A.   Absolutely not.

20 Q.   Did RVT or has RVT ever used the Reliabot technology?

21 A.   Absolutely not.

22 Q.   Even though that was part of the assets that the co-signers purchased from

23 Braintech, is that true?

24 A.   Correct.

25    MR. DOYLE: Your Honor, I've been very patient because this is

**54**

1 background I assume, but the questions are extremely leading.

2    MS. KOVAL: It is background, Your Honor, and I'm just trying to make

3 things a little quicker for the Jury. I'm really moving on at this point.

4    THE COURT: Okay, thank you.

5 Q.   (By Ms. Koval continuing) Why did Braintech not use the Reliabot technology

6 that Mr. Shafi brought to the company with him?

7 A.   Well, as the company, Braintech's PhD scientists kind of flavored it for me,

8 Reliabot was a four --

9 Q.   You were --

10 A.   I was trying to say that the scientists in Vancouver described the difference

11 with what was Braintech software, it's technology. It's vision-guided robotic

12 technology. They described it clearly to me.

13    MR. DOYLE: Objection, Your Honor. That's hearsay.

14    THE COURT: Sustained.

15    THE WITNESS: It's in the Evaluation Report.

16    MS. KOVAL: Your Honor, I believe it would qualify as Mr. Weidinger's

17 then present sense impression when he read the Reliabot Comparison Report.

18    THE COURT: And what was the question again?

19    MS. KOVAL: The question was why didn't Braintech ever use the

20 Reliabot technology that it purchased from Mr. Shafi?

21 A.   Because we didn't think it was any good. It was like a Honda Civic

22 four-cylinder --

23    MR. DOYLE: (Interjecting) I object.

24    THE COURT: I didn't hear the rest of the answer. I didn't hear your

25 objection because you were talking at the same time. What is your objection?

**55**

1    MR. DOYLE: My objection is hearsay, Your Honor. He's saying what

2 somebody else told him.

3    THE COURT: I don't --

4    MR. DOYLE: -- To prove the truth of the matter.

5    THE COURT: I don't think he's saying that right now. I heard Honda

6 Civic and I didn't hear the rest of your answer. Could you start your answer again?

7    THE WITNESS: It was my impression from the debriefing that I received

8 from my scientists in Vancouver that this was their life, this is what they spent years

9 doing, looking and creating, that the difference between Reliabot and EVF which was

10 our software was the difference between a Honda Civic engine and a Formula One

11 race car, so there was no need to back our software or technology. That was coming

12 from them.

13 Q.   (By Ms. Koval continuing) During Mr. Shafi's employment, did Braintech ever

14 do business -- Braintech ever do business with any of the potential customers that Mr.

15 Shafi led them to?

16 A.   No.

17 Q.   Were these potential customers?

18    THE COURT: Is your microphone working.

19 Q.   I think I asked you whether Braintech ever did any business with any of the

20 potential customers that Mr. Shafi led them to and I just want to make sure your

21 response was heard?

22 A.   No, they did not.

23 Q.   Were these potential customers willing to do business with Adil Shafi?

24    MR. DOYLE: Objection, Your Honor. That calls for some kind of

25 speculation.

**56**

1    THE COURT: Overruled.

2    THE WITNESS: So I can go forward?

3    MS. KOVAL: Unless the Judge directs you not to answer, you can

4 answer?

5 A.   The two -- two of our key employees on officers of the company that are

6 responsible to go onto the Access and Acceleration endeavor with Mr. Shafi and

7 actually went to his customers with him, came back to me and said that --

8    MR. DOYLE: (Interjecting) I object to that, Your Honor. That's hearsay.

9 Q.   Not what anyone told you, but did you ever come to learn that whether the

10 potential customers that Mr. Shafi led you to were willing to do business with him?

11 That's the only question?

12 A.   Most of them were very upset with Mr. Shafi and his technology and they were

13 having problems with it.

14    MR. DOYLE: Your Honor, again, I object to that. He's saying people are

15 upset.

16    THE COURT: You're right. Your objection is sustained and the Jury is

17 asked to disregard that response.

18 Q.   (By Ms. Koval continuing) Mr. Weidinger, where's the Reliabot technology

19 today?

20 A.   Sitting in a pallet wrapped up in shrink wrap in Michigan about 15 feet high.

21 Q.   RVT has an office here in Michigan now?

22 A.   Yes, they do.

23 Q.   Going back to early 2008 when you just became CEO, what had been

24 Braintech's Business Plan before you assumed your role as CEO?

25 A.   They had an exclusive contract with one of the very large robot manufacturer

**57**

1  named ABB and it was a three-year Agreement and it was an exclusive Agreement,

2  so what the Agreement was that Braintech would sell its software, which we described

3  early as EVF to ABB exclusively and ABB would take that EVF and integrate it into

4  their ABB robot and they would rebrand that and call it True View.

5  Q.     And did could you keep that same Business Plan or did you move the company

6  in a different direction?

7  A.     No.  We realized that on the terms of that Agreement with ABB, that that

8  Agreement, that contract by its terms was due to expire at the end of 2008 and so we

9  knew -- and there was a project that we called and I initiated the project called We Are

10  The World, which meant guys, we have to learn how to sell our software, our

11  technology into other robots and ABB because this exclusive contract is coming to an

12  end.  So we need to learn and we need to do this quickly.  We need to integrate our

13  technology into KUKA, into FANUC, into Kawasaki and into all the other robot

14  manufacturers, and so that was a priority for the company.

15  Q.     Mr. Weidinger, how did you meet Mr. Shafi?

16  A.     My CTO Babak introduced me to Adil over the phone.

17  Q.     By CTO, the Chief Technology Officer?

18  A.     Yes.

19         THE COURT: What was the name?  I didn't hear?

20         THE WITNESS:  Babak

21  Q.     Babak Habibi, Your Honor.  And did you at some point become interested in

22  employing Mr. Shafi?

23  A.     Right.  In one of my staff meetings with Babak, I mentioned okay, we've

24  launched We Are The World, but is there another way we can do it quicker and Babak

25  brought up Mr. Shafi's name and disclosed to me that he was under the

**58**

1  understanding that Mr. Shafi's technology talked to more robots than ABB and I said

2  well Babak, if you would, if you could, could you put together a call with Mr. Shafi

3  and I and could we kind of broach this subject and talk to him about us possibly employing

4  him and acquiring his company.

5  Q.     And Mr. Weidinger, you have an exhibit book that we've put in front of you and

6  I'm going to ask you to turn to Joint Exhibit One and I will ask Erin to put that on the

7  screen.  I'll ask you to turn over to page eight?

8  A.     Excuse me.

9  Q.     I'll ask you to turn to page eight of the document.  I don't think we've talked

10  about this part.

11  A.     Page eight, section eight?

12  Q.     Page eight.  This part.  If you can see from there, we'll just do it this way.

13  That's your signature there.  You signed on behalf of Braintech to this Employment

14  Agreement to hire Mr. Shafi?

15  A.     Yes.

16  Q.     And turning to page one of the document, going to the bottom reporting

17  paragraph three, the Agreement provided that Mr. Shafi was going to report to you as

18  Chief Executive Officer, correct?

19  A.     Correct.

20  Q.     And on the second page of the document, Mr. Shafi's duties are explained

21  there.  What job was Mr. Shafi hired to do for Braintech?

22  A.     Well, it's pretty clearly listed in Section Four, but the first paragraph (a) covers

23  he would manage the overall technology of the combined company, and then the

24  Access and Acceleration schedule that we had designed and negotiated together.

25  Q.     And you're going down to paragraph (b) there?

**59**

1  A.     Correct.

2  Q.     And then (c), he would develop the Integrator Program which he called Brain

3  Power One, and then (d) gets into what we called the Enhanced Egg which was what

4  we thought we could develop was a synergistic product with both companies, we

5  called it Enhance.  And then lastly (e), hire, manage and direct the employees.

6  Basically -- and this was Mr. Shafi's parenthesis that he put into this Agreement and I

7  remember it clearly because I thought at the time it to be odd, but under his duties he

8  said but with the exception of legal and financial management roles.  So he wanted to

9  be responsible for everything except for financial management and legal.

10  Q.     And turning to page three of the document, I want to direct your attention to

11  paragraph number seven which refers to Bonus Stock Compensation, and it says

12  there the executive, meaning Mr. Shafi, shall also be entitled to bonuses based on

13  achieving certain milestones which will be provided in the form of issued restricted

14  Common Stock.  Then the very last sentence there it says the milestones and level of

15  incentive compensation are detailed in the executive Bonus Securities Compensation

16  Structure as set forth in Appendix I of this Agreement.  If you turn to Appendix I of the

17  Agreement, Appendix I relates to that Bonus Stock Option Compensation structure

18  that's referenced in paragraph seven of the Employment Agreement.  Is that right?

19  A.     That's right.

20  Q.     In fact, it says this Employment Agreement Appendix I details the Stock

21  Options the executive will be entitled to as described in paragraph seven of the

22  Employment Agreement.

23         MR. DOYLE: Excuse me, Your Honor.  I believe Counsel is arguing

24  rather than asking the witness to answer the question.  She said in fact this.

25         THE COURT: Overruled. There was no answer.

**60**

1         MR. DOYLE: It wasn't a question; it was narrative.

2         THE COURT: She says in fact the document says and then she read

3  the document, so I think she's asking for confirmation.

4  Q.     (By Ms. Koval continuing)  I'm asking you to confirm that, Mr. Weidinger.  This

5  Appendix I related to paragraph seven of the Employment Agreement, is that correct?

6  A.     Correct.  That's what it says.

7  Q.     And if we go back to paragraph seven just below that is paragraph eight, and

8  this was addressed earlier in Mr. Shafi's testimony, Bonus Cash Incentive and I'll give

9  you a second to catch up with everyone else.  We read that earlier when Mr. Shafi

10  was testifying.  Any bonus cash that Mr. Shafi was entitled to was tied to what, Mr.

11  Weidinger?

12  A.     It was tied to revenue.

13  Q.     Can you pull this up?  Mr. Weidinger, I'd like you to look at 9(c).  Paragraph

14  nine deals with benefits.  Paragraph C deals with medical group life insurance.  If you

15  look at small little I there, what was the deal with Adil Shafi regarding medical group

16  life insurance coverage?

17  A.     It was really twofold because it took a period of time for the company to get on

18  to the Blue Cross/Blue Shield, so it roughly took 60 to 90 days and we did not want

19  him to be uncovered during that 60 to 90 days, so we said go out and acquire your

20  own private health insurance for those 60 to 90 days, the company will pay for it and

21  then by then we should have you on the Braintech Blue Cross/Blue Shield Plan.

22  Q.     And the first sentence of small little I says exactly that, is that right?

23  A.     Yes, it does.

24  Q.     I'd like to turn your attention now to paragraph -- page five of the Agreement

25  and it will be paragraph 12(d), Termination by Braintech.  Did Braintech have to have

61

1  Q. any reason at all to terminate Adil Shafi's employment?

2  A. No.

3  Q. Now turning to paragraph 12(g). We haven't seen a lot of this paragraph, but

4  this is the Severance Pay Provision that's at issue in this lawsuit. Under the

5  Severance Pay Provision, Mr. Weidinger, if Mr. Shafi could demonstrate that he was

6  terminated for good cause, would he be entitled to severance pay?

7  A. No.

8  Q. If he could demonstrate that he was terminated or not terminated for good

9  cause, was he entitled to severance pay?

10  A. Yes.

11  Q. And what does the Agreement say if he could prove that he was entitled to

12  severance pay, what does it say he's entitled to under (g) ii in that first sentence?

13  A. A lump sum payment equal to the remainder of his then base salary remaining

14  in the three-year employment terms set out in paragraph five to be paid within 20

15  business days.

16  Q. Base salary?

17  A. Base salary.

18  Q. Do you see any reference to Appendix I, Appendix I in the Severance Pay

19  Provision in paragraph 12(g)?

20  A. No, and there's no reference to the bonuses either of any sort. It's base salary.

21  Q. Thank you.

22  A. It's pretty clear.

23  Q. During Mr. Shafi's employment as Chief Operating Officer, did he make certain

24  representations to you about Reliabot's ability to work on different types of robots?

25  A. Yes, he did.

62

1  Q. During his employment as COO, did he make certain representations to you

2  about Reliabot's integrator network?

3  A. Yes, he did.

4  Q. What did he represent to you?

5  A. On the Reliabot as far as integrated robots he represented to us over and over,

6  and it's fully in the record, that Reliabot is integrated into over 15 robots and over 22

7  robot controllers. As far as the integrator, he represented to us he had established a

8  network integrator of over 200 integrators and that's all over these documents today.

9  Q. Are you aware of any -- I'm going to turn your attention to Exhibit 316. I'll ask

10  whether you're aware of any evidence of the truthfulness or untruthfulness of Mr.

11  Shafi's representation regarding his integrator network?

12  A. The 316 which is the Evaluation? Is that --

13  Q. Yes.

14  A. This Evaluation was done by four PhD's in Vancouver and also our CTO and

15  also another author of this is one of Mr. Shafi's engineers --

16  Q. (Interjecting) Mr. Weidinger, try -- I know it's hard. Just try to concentrate on

17  the question I've asked.

18  A. It's the integrator question?

19  Q. Yes. Are you aware of any evidence that would speak to the truthfulness or

20  untruthfulness of Mr. Shafi's representations regarding Reliabot's ability to work on

21  different type robots or regarding his integrator network?

22  A. We never were introduced to but a handful of these integrators. Then there's a

23  comment on page -- I'm not sure what page. It's in section four. It says according to

24  John Neilson, who is at that time a Shafi employee engineer, only two companies can

25  integrate Reliabot and he names two of the integrators. He says only two.

63

1  Q. Is that the same John Neilson that Mr. Shafi just testified a few minutes ago

2  that Braintech supposedly refused to hire and work for him?

3  A. We paid him. We paid him as a consultant to come in and help us with this

4  Evaluation.

5  Q. Do you know whether it was the same John Neilson Mr. Shafi was referring to?

6  Do you know of any other John Neilson?

7  A. I don't. I believe it's the same John Neilson.

8  Q. Do you have Exhibit 275 there? Or 279. Exhibit 279. During Mr. Shafi's

9  employment as COO, did he make any representations to you regarding the revenue

10  readiness of the Reliabot product?

11  A. All the time. Specifically at the Summit that we held after we closed the

12  transaction. I thought it would be best to get a deal together with key officers of the

13  company and we called it the Summit and --

14  Q. When you're referring to the Summit, that happened after Mr. Shafi was

15  employed by Braintech, correct?

16  A. Correct.

17  Q. All right. And the representations that he made to you about Reliabot's

18  revenue readiness were what?

19  A. That it had in process -- and by the way, at the Summit he represented this to

20  everyone. We had about six or seven key employees there at that Summit. It was off

21  site. We were together for 53 hours and he represented to everybody in the group

22  that Reliabot was in revenue-ready and he spoke of the end process, which I think is

23  what Jim Dara in his email that you pointed us to is referring us to.

24  Q. I'd like to take a look at the very last page of this exhibit and I believe there's a

25  chart there. Focus in on the top piece of it just for a second. The chart that we

64

1  here is called a Product Readiness Table. Have you seen that document before, Mr.

2  Weidinger?

3  A. Yes. This document was produced at the Summit.

4  Q. And now I'm going to ask you to go back so we can view the whole document.

5  I don't know if the color comes through as well on this big screen or maybe I'm just

6  color blind today, but I think in your book the upper portion that looks a little green on

7  this screen is highlighted yellow on that table, is it not?

8  A. Correct.

9  Q. And there's a blue portion that's more towards the bottom, is that right?

10  A. Correct.

11  Q. The portion of the document that's in highlighted yellow or green, however

12  you're looking at the document, whose product or what product does that document

13  refer to?

14  A. That's Mr. Shafi's Reliabot product and he went in front of the Summit group on

15  a white board and we constructed this exhibit as a group at the Summit and the yellow

16  or the green, that's work from -- that's work and writing from Mr. Shafi.

17  Q. And the left-hand column, the products listed there, the capabilities that are

18  listed there, those are relating to Reliabot?

19  A. Yes.

20  Q. And there's a column. I'm pointing here. Don't move it on me. Time to Market,

21  who provided the information that went into that column?

22  A. Mr. Shafi.

23  Q. And for all of the Reliabot products that were Mr. Shafi's portion, time to

24  market, how many months, sir?

25  A. Zero.

65

1   Q.   Thank you.  Was there an Access and Acceleration schedule, Mr. Weidinger?

2   A.   Yes, there was.

3   Q.   And what was the purpose of that schedule?

4   A.   The purpose was to provide access to Braintech software into Mr. Shafi's

5   customer base and therefore the result of that hopefully would be to accelerate the

6   Braintech business model.

7   Q.   In Mr. Shafi's capacity as COO, did he make any representations to you that he

8   could fast track EVF and integrate it into Reliabot and/or -- I'll withdraw and start over.

9   Sometimes I don't ask great questions, so I'm going to correct myself here.  In his

10  capacity as COO, did Mr. Shafi make any representations to you that he could fast

11  track EVF with nonABB robots?

12  A.   Absolutely.  I mean he said several times that Reliabot would be the cash

13  generator for the company.

14  Q.   And let's put up Exhibit 138.  It appears to be an email to several people.  I

15  believe you're one of the people cc'd on the document dated Friday, August 29th.

16  The portion that's already highlighted here, since Reliabot will be our cash generation

17  machine in the next few months, do you see that?

18  A.   Yes.

19  Q.   Whose words are those?

20  A.   Mr. Shafi's.

21  Q.   Had you heard him use that expression before?

22  A.   Yes.  There's also a reference to a KUKA robot he was going to deliver.

23  Q.   Do you know as we sit here today, Mr. Weidinger, whether Braintech ever

24  received all of the Reliabot assets that it purchased from Mr. Shafi?

25  A.   I'm not entirely sure we did.

66

1   Q.   Did you ever come to learn that he had given Braintech source code for the

2   Reliabot product to some third-party?

3   A.   After the fact, yes.  And we wrote him a letter to that affect.

4   Q.   After what fact?  After his termination?

5   A.   No, after the transaction closed.

6   Q.   Did it ever --

7   A.   (Interjecting)  That's pretty critical when you give a third-party your source

8   code.  I mean your source code is your lifeblood.

9   Q.   Did it ever come to your attention that Mr. Shafi was misrepresenting the

10  abilities of his product to potential Braintech customers?

11  A.   Yes.  As we found out, yes.

12  Q.   Would you put Exhibit 279?

13  A.   Two what?

14  Q.   Seventy-nine.  Mr. Weidinger, this email dated Saturday, November 1st was

15  from Jim Dara to Mr. Shafi and is this Rick Weidinger, Rick@Weidingerfamily.com, is

16  that your email address that you use both for personal and business?

17  A.   That's my personal email address, correct.

18  Q.   So you received a copy of this email from Jim Dara that he sent to Mr. Shafi

19  about representations he was making to potential Braintech customers?

20  A.   Yes.

21  Q.   We'll move along then; 285 is already in.  The Evaluation Report -- you can

22  take that down.  The Evaluation Report that you looked at earlier, we testified Exhibit

23  316.

24  A.   Ah-hum.

25  Q.   Mr. Shafi testified about a request from Dr. Remus Boca for his input to

67

1   Evaluation Report and I believe, I could be mistaken, the Jury will know the testimony

2   for itself -- I believe he said that he didn't report to Dr. Boca and it wasn't worth his

3   time to do that.  Did you ever have any involvement in or have any discussion with Mr.

4   Shafi about providing input into the Comparison Report in Exhibit 316?

5   A.   Yes.  I mean I asked Shafi for his response to this and let's back up a step.  I

6   went to Babak, and I said Babak, make sure you deliver Mr. Shafi a copy of this

7   Evaluation Report and he did that I think the beginning of October when he was in

8   Vancouver.  I also asked Remus and I asked Mr. Shafi to respond to this because I

9   wanted a balance to it and it was very balanced and then I asked Dr. Boca to ask Mr.

10  Shafi for his responses too.  I was hoping they could sit down and discuss it.

11  Q.   I think it's in the record that it was the week of October 7th that Mr. Shafi was

12  given a copy of that report.  Did you notice after he had received the report, did you

13  notice any difference in Mr. Shafi in his interactions with you and others in Braintech?

14  A.   After the fact and I'm reflecting back on what happened, I certainly do.  It was

15  about this time that all of a sudden Mr. Shafi started accusing everyone of his

16  Employment Agreement breaches, et cetera, et cetera.

17        MR. DOYLE:  Objection, Your Honor.  I object to the narrative form of the

18  answer.

19        THE COURT:  Start again.

20        MR. DOYLE:  I object to the narrative form of the answer.  He's talking

21  about he was doing this or he's doing that.  There are no dates, not to whom he was

22  speaking and what-have-you.

23        THE COURT:  Ask the question please.

24  A.   What I noticed was --

25  Q.   Hang on.  I think she wants me to re-ask the question.

68

1   A.   Okay.

2   Q.   After Mr. Shafi received the Reliabot evaluation on or about October 7 of 2008,

3   did you notice anything about Mr. Shafi's relationships or his attitude about his work at

4   Braintech?

5   A.   I did.  I mean I noticed a change in his complete attitude.  Reliabot was Mr.

6   Shafi's baby and what was happening here is four PhD's, a CTO and in fact one of his

7   own engineers was producing a report, a 27-page report for the company basically

8   saying that it was antiquated, it was very cumbersome.

9         MR. DOYLE:  Objection, Your Honor.  He's talking about some report.

10  He's not talking about Mr. Shafi's attitude.

11        THE COURT:  The question was did you notice a change in his attitude

12  and if you could explain that?

13        THE WITNESS:  I did.  I did notice a change in his attitude and I think

14  this evaluation had a lot to do with it.

15  Q.   (By Ms. Koval continuing)  In response to your request to Mr. Shafi to provide

16  feedback to the report, did he do so?

17  A.   No.

18  Q.   Was that a key duty of his?

19  A.   Absolutely.

20  Q.   What was the significance of doing the evaluation and comparison between

21  Reliabot and EVF?

22  A.   We needed to know what we had because we weren't able to look under the

23  hood before the transaction.  We were not allowed to look under the hood before the

24  transaction and I had to make the decision to go forward or not without having been

25  able to -- without Mr. Shafi allowing us to look under the hood.  I made that decision

**69**

1  and we went forward with it, and then it took us two months to get the Reliabot out of

2  his basement, the Reliabot technology out of his basement and into Vancouver with

3  our four or five PhD scientists so they could evaluate it and --

4      MR. DOYLE: Your Honor, again he's going onto a narrative answering

5  something that wasn't asked.

6      THE COURT: Sustained.

7  Q.  (By Ms. Koval continuing)  Mr. Weidinger, Mr. Shafi's refusal to provide the

8  feedback that you requested, did you consider that a willful failure to perform his

9  duties?

10  A.  I did.

11  Q.  I want to direct your attention to the Siemens invoices that Miss Widlak went

12  over with Mr. Shafi this morning, and I want to start with Exhibit 107.

13  A.  107?

14  Q.  Yes, and I'm going to go very, very quickly through these.  To your recollection,

15  Mr. Weidinger, Friday, August 15th, 2008: , I'll get the Siemens invoice to you by

16  tomorrow, was that your first discussion with Mr. Shafi about the Siemens invoice?

17  A.  Well, I don't know if it was my first conversation about it, but it was pretty clear

18  that he'd get to it tomorrow.

19  Q.  Did that happen?

20  A.  No.

21  Q.  Exhibit 109.  On August 19th, 2008, four days later, this was Mr. Shafi's second

22  email to you:  I will send in Siemens invoice and cc you.  They have given verbal

23  approval already.

24  A.  Correct.

25  Q.  Did Mr. Shafi send you the invoice the next day that he promised?

**70**

1  A.  No.

2  Q.  And Exhibit 127.  We're now up to Friday, August 22nd and Mr. Shafi is telling

3  you that the Siemens has been -- or that Siemens has verbally approved and the

4  money is coming from his friend so it should be fast?

5  A.  Correct.

6  Q.  And anytime up to this point and time did Mr. Shafi ever tell you that there was

7  something more that had to be done or that there was some impediment to getting

8  payment from Siemens?

9  A.  The thing I remember about this Siemens payment is that there was a sum that

10  was due in August and then another sum due in September.

11      MR. DOYLE: Objection, Your Honor.  He's answering a question that

12  wasn't asked.

13      THE COURT: Sustained.

14  Q.  (By Ms. Koval continuing)  I know that sometimes it's hard to know what to do

15  in the courtroom, but as best you can just listen to my question and respond to it.

16  Exhibit 192.  Go down to number seven.  We're now almost a month later in

17  September of 2008.  I'm sorry.  Yeah, September 16th, 2008 and it looks as if Mr.

18  Shafi may have provided you information on September 14th about the Siemens

19  invoice.  My question to you sir, is was this the first time or had Mr. Shafi told you

20  before that there was any problem with the Siemens payment or that it would be held

21  up?

22  A.  No.  My recollection is that previously there was evidence in the emails you just

23  brought us to is that the invoice was going out and the payment was imminent.

24  Q.  In the end, what was your impression of Mr. Shafi's truthfulness or

25  untruthfulness with respect to this issue?

**71**

1  A.  He said the payment was on its way and he was fast-tracking, that turned out

2  to not be true.

3  Q.  Now at some point and time did you come to learn that Mr. Shafi was refusing

4  to participate in whether it be telephone meetings or in person meetings until you

5  agreed to pay a medical bill for him that was not covered by health insurance?

6  A.  Yes.

7  Q.  And did Mr. Shafi tell you in fact that he wasn't going to work until it was paid?

8  A.  Yes.

9  Q.  Who was the person responsible for procuring Mr. Shafi's medical insurance?

10  A.  He was.

11  Q.  Was he given authority to purchase any insurance coverage that he preferred?

12  A.  I think it's in writing that my message to him was you know, procure whatever

13  health insurance your family needs.

14  Q.  Let's look at Exhibit 109.

15  A.  109?

16  Q.  Yes.  On August 19th, 2008 when the ink was barely dry on the Employment

17  Agreement, Mr. Shafi sends you an email and there's a bullet point number two that

18  says blue Cross/Blue Shield and he says I have cleared this with Rick.  We will go

19  with an individual plan and send you bills.  Ted, we have budgeted eight -- I'm

20  assuming that's eight-some thousand dollars for this in the DS.  If the policy does not

21  cover certain things, we will have noncovered bills.  Please keep this allocation

22  amount available for planning.  You were copied on that email, were you not?

23  A.  Yes.

24  Q.  Go down to the first point here.  I'm directing your attention to number two.  Is

25  this your response to Mr. Shafi's suggestion that you had some type of a -- had

**72**

1  concurred or had approved this plan that he was talking about?

2  A.  Yes it is.

3  Q.  And in number two you say my understanding is that your individual plan will

4  cost approximately $600 per month.  I do not want to get into the commitment of

5  covering noncovered bills, too uncertain.  What is it as the rest of that sentence says,

6  you told Mr. Shafi with respect to finding insurance?

7  A.  You should find an acceptable plan to cover all needs within budget.

8  Q.  Did you expect Mr. Shafi to find whatever plan he needed to cover his needs?

9  A.  I did.  He was very focused on this.

10  Q.  So let's turn to Exhibit 278.  October 30.  Now we're September, October, at

11  the end of October, almost three months later.  Mr. Shafi -- who's Heather Greenlay?

12  A.  She was our accounts payable person in Vancouver.

13  Q.  And she reported to you or someone under you?

14  A.  She reported to Ted who was our CFO who reported to me.

15  Q.  And Mr. Shafi is sending an email to this Ms. Greenlay and you are copied on

16  this email, are you not?

17  A.  Yes.

18  Q.  And in the third paragraph Mr. Shafi tells Miss Greenlay:  Our family personal

19  insurance premiums are well below this total planned and the agreed plan was to use

20  this as a budget for medical bills that would not be covered by personal insurance

21  coverage.  Did you receive that?

22  A.  Yes.

23  Q.  So when Mr. Shafi told Miss Greenlay that the agreed plan was for Braintech to

24  pay uncovered medical bills, was that truthful or untruthful?

25  A.  It was untruthful.

73

1  Q.  Let's look at Exhibit 304.  This is Ms. Greenlay's response to Mr. Shafi on

2  November 10th and she indicates that she's had a discussion with you, is that right?

3  A.  Yes.

4  Q.  And did you authorize Miss Greenlay to send this email to Mr. Shafi?

5  A.  I did.

6  Q.  She wasn't out flying on her own.  She was acting on your direction, correct?

7  A.  Correct.

8  Q.  All right.  Now I'm curious about the piece -- and it's actually on the next page --

9  the piece from Miss Greenlay where even though there may not be coverage, there's

10  an offer made.  We would like to help.  What happened?  What was that about?  Was

11  that your suggestion?

12  A.  Yes, it was.  I mean we -- basically we said well, the company will pay for it if

13  you're in a jam with it and we will just true it up later.  In fact, I think when I found out,

14  when I discovered that it was actually regarding his daughter Sarah's blood test, I

15  think I offered personally to pay it.

16  Q.  And let's go back to the front page here where Mr. Shafi's -- rather than work

17  with Ms. Greenlay and get that bill paid, Mr. Shafi said the other bill was covered, we

18  had agreed to it and all calls this week are canceled.  Is that right?

19  A.  Correct.

20  Q.  And did you have any calls with Mr. Shafi that week?

21  A.  Yes, we did; quite a few if I remember.

22  Q.  According to Mr. Shafi, all of the meetings and calls would be canceled until the

23  bill was paid, is that right?

24  A.  Correct.

25  Q.  And in fact, he predicted that some three days later he would be sick and too

74

1  sick to attend the meeting that you had for Virginia, is that right?

2  A.  For him to present his Sales Plan to the company, yes.

3  Q.  Did you construe that as being a willful failure to perform his duties?

4  A.  Absolutely.

5  Q.  Did Mr. Shafi ever refuse to travel beyond a 50-mile radius of Brighton?

6  A.  I think he put that in a email to us, yes.

7  Q.  Exhibit 242.  The issue that Mr. Shafi had was that his expense report hadn't

8  been paid as promptly as he would have liked?

9  A.  Correct.

10  Q.  Was there ever any instances of Mr. Shafi not getting pre-approval for

11  expenses placed on his expense report?

12  A.  Yes.

13  Q.  What was the impact on the company of Mr. Shafi refusing to travel beyond a

14  50-mile radius of Brighton?

15  A.  Well, it brought his Access & Acceleration schedule and plan to a screeching

16  halt.

17  Q.  What was Braintech's practice for expense reimbursement?

18  A.  We were pretty good about reimbursing the employee within 30 days.

19  Q.  Let's look at Exhibit 221.  Is this an email that you wrote to Mr. Shafi on

20  Thursday, October 9th?

21  A.  Yes.

22  Q.  And it says your company credit card has come to my attention and all charges

23  have to be pre-approved by you.  Is that right?

24  A.  Yes, that is and that's a good point.  I mean he did have a company credit card

25  that he was free to charge with.  So any expense he may have for car or gas or a

75

1  sandwich while he's on Access & Acceleration, he had the company credit card.

2  Q.  You heard Mr. Shafi testify oh, I couldn't travel, I didn't have any money.

3  A.  He had the company credit card.

4  Q.  Was Mr. Shafi treated any differently with respect to expense reimbursement?

5  That is, they should be pre-approved and you get paid within 30 days or so?

6  A.  Correct.  And Vancouver -- Heather was very good about processing this stuff.

7  Q.  Let's look at Exhibit 223.  Exhibit 223, did you receive this email from Mr. Shafi

8  a little while later on the same day, October 9th?

9  A.  Yes.

10  Q.  And he agrees in this email that he in fact had charged expenses without or he

11  had incurred expenses without getting pre-approval from you?

12  A.  Ah-hum.

13  Q.  You have to say yes or for the record.

14  A.  Yes.

15  Q.  That happens sometimes in business; you have to take someone out, right?

16  A.  Sure.

17  Q.  The point is he needed to let you know when that happened and not just put it

18  on his expense report, is that true?

19  A.  True.

20  Q.  Let's look at Exhibit 243.  Exhibit 243, that's an email that you sent to Mr. Shafi

21  in response to an email that he had sent to you about things that he thought were

22  wrong and were unfair to him, is that right?

23  A.  Yes, that is correct.

24  Q.  All right.  And in this email you instruct Mr. Shafi to participate in a telephone

25  conference call on Monday morning, October 20th at 8:30 a.m. to discuss his Sales

76

1  Plan going forward.  We will call you from the Northern Virginia office, is that right?

2  A.  Correct.

3  Q.  This is some two weeks after Mr. Shafi received the Reliabot Evaluation Report

4  that upset him so much, is that right?

5  A.  That is right.

6  Q.  And you are responding to criticisms that he's making about you and other

7  people in the company, is that true?

8  A.  That is true. Constant.

9  Q.  And what point, at what phase was Mr. Shafi's Sales Plan at this point -- at this

10  juncture of his employment?  We're now at least two months into his employment and

11  the development of a Sales Plan.

12  A.  I don't understand the question.

13  Q.  Sorry.  Was his Sales Plan completed?

14  A.  No, no.  What he served up and we all huddled over it, but what he served up

15  was basically what we described as a phone book.

16  Q.  As a what?

17  A.  As a phone book.  It was just a mere digest of like it says here, names, codes,

18  schedules and employee phone numbers.  It wasn't a Sales Plan.  It didn't have

19  commissions.  It didn't have quotas.  It didn't have compensation for the Sales people.

20  It didn't have the number of Sales people.  It was nothing.

21  Q.  The Sales people that Mr. Shafi wanted to hire, are you telling the Jury that his

22  Sales Plan did not have compensation estimates for the people that he wanted to

23  hire?

24  A.  We had to ask Mr. Shafi several times if he -- the people he wanted to hire, if

25  he could suggest what salaries he wanted them to come in at, and we needed that for

77

1  cash flow purposes.

2  Q.  Do I understand that the purpose of this email was you're saying look, Mr.

3  Shafi, I don't think your plan is complete, but we're going to get behind you and we

4  are going to go forward, is that right?

5         THE COURT: Excuse me.  There's an objection.

6         MR. DOYLE: She's testifying, Your Honor.

7         THE COURT: Sustained.

8  Q.  (By Ms. Koval continuing) Thank you, Your Honor.  Mr. Weidinger, explain for

9  the Jury if you will what the purpose of this email, what the message was that you

10 were sending to Mr. Shafi?

11 A.   Well, at this point it was getting exasperating.  So basically there are two really

12 key things in that paragraph.  One is again to reiterate to Mr. Shafi time is of the

13 essence and the other is to give him a green light, and it says you know, here's your

14 green light.  If you really believe that what you served up is a Sales Plan that's going

15 to make this company effective and successful, go for it.  I'll back you.

16 Q.  And in fact in paragraph three, what is it that you tell Mr. Shafi there about

17 kick-starting his plan?

18 A.   I haven't seen this in a long time.

19 Q.  I apologize.  Can you see right here?  The purpose of this would be that you

20 kick-start the plan?

21 A.   Right.

22 Q.  Get moving?

23 A.   Yep. Well, that's the green light.  That's how I just explained the green light.  If

24 you really believe in this plan, you think you can be successful with it and the

25 company can be successful, go for it.

78

1  Q.  Up to October 20th, had Mr. Shafi yet made a presentation to the executive

2  plan (sic) on his Sales Plan draft?

3  A.   No, he had not.

4  Q.  All right.  And was this Sales Plan conference call that you scheduled, was that

5  -- did that have any significance?  Was it an optional meeting?  Did it have -- bear a

6  lot of significance?  What was the significance to the company of that meeting?

7  A.   At this point the sales plan was really the lifeblood of the company.  We

8  needed to know where were we going to generate revenue, revenue, revenue.  It's

9  rule one, revenue, revenue, revenue and we needed Mr. Shafi to take us through and

10 the executive staff, the key members of the company, we needed him to take us

11 through the Sales Plan and explain it and articulate it to us because we were going --

12 the expectation was we were going to fund it.

13 Q.  Let's look at Exhibit 253.  What was Mr. Shafi's response to your email about

14 participating in the Sales Plan presentation?

15 A.   I'll pass on this meeting today.

16 Q.  Was that part of Mr. Shafi's job duties to participate in these types of meetings?

17 A.   Huge, huge.  And these executive staff meetings were pretty regular so when

18 he said they were up and down, up and down, I mean I met with my executive staff

19 very frequently.

20        MR. DOYLE: Your Honor, again, he doesn't answer the question.  He

21 just puts in a narrative all his own.

22        THE COURT: That's a fair objection.  Sustained.

23 Q.  (By Ms. Koval continuing)  Did you interpret Mr. Shafi's refusal to participate in

24 the meeting as a willful failure to perform his job duties?

25 A.   I did.

79

1  Q.  Let's look at Exhibit 254.  Did you send this email on October 20th to Mr. Shafi

2  and request him to be on the executive staff meeting call at 4:30 that day?

3  A.   I did.

4  Q.  Did he -- let's look at Exhibit 255.  What was Mr. Shafi's response to your

5  request?

6  A.   No.

7  Q.  Exhibit 281.  Did you attempt to reschedule this Sales Plan meeting?

8  A.   Yes.  This was -- yes.

9  Q.  And the rescheduling of this, you wanted to have the whole Sales team in

10 Northern Virginia on Friday, November 7th, is that right?

11 A.   Correct.

12 Q.  Why did you decide to have the meeting not by telephone, but in person in

13 Virginia?

14 A.   Because the Sales Plan for the company at this time was too important to just

15 do it by teleconference.  We had to be there with the author of it and we had to ask

16 questions and we had to understand it. and he simply refused to do that.

17 Q.  Did there come a point and time when you learned that Mr. Shafi was

18 canceling his attendance at this meeting?

19 A.   I don't know when he did cancel it, but he did.

20 Q.  Let's look at Exhibit 288.  When you learned that Mr. Shafi was not -- would not

21 be attending the meeting, did you attempt to reach out to him to find out what the

22 situation was and whether there was any way he could attend the meeting?

23 A.   I did.  I mean I told him I hope he's feeling better and we really need to

24 know if you're going to make it into Virginia for the presentation because we have a lot

25 of people that were travelling in to attend that meeting and that if he could get back to

80

1  me by the close of business.

2  Q.  Did he ever respond to your efforts?

3  A.   I think he had his Assistant who we hired for him respond to me.

4  Q.  Let's look at Exhibit 272.  Mr. Shafi testified earlier today that he couldn't attend

5  this meeting on the 7th because he was sick and I believe that's what you learned

6  from his Assistant why he couldn't attend.  But I see that this email that's dated

7  October 27th, some 10 days before November 7th, Mr. Shafi writes an email.  Did you

8  receive this email?

9  A.   Yes.

10 Q.  And in this email he says this past weekend our household had a bout of flu

11 and we are all recovering now.  Did you receive that?

12 A.   Yes.

13 Q.  Did you hear anything from Mr. Shafi other than the call when you told him to

14 come to the meeting on November 7th, that he was in any way not recovering from

15 the flu that he reported to you on October 27th?

16 A.   I don't understand the question.

17 Q.  Okay.  Had you received -- after you received this email, did you ever receive

18 anything else from Mr. Shafi that he hadn't recovered from the flu that he's reporting

19 to you about in this email?

20 A.   I don't know.  I mean we invited him to that special Sales Plan meeting and his

21 secretary Donna e-mailed me back and said Adil will not be attending, he's sick.

22 Q.  Let's go to 294.  This is an email dated Monday, November 10th.  Did you send

23 this email to Mr. Shafi?

24 A.   Yes.

25 Q.  And the executive staff meeting on Tuesday, November 11th, was that a

81

1  meeting you expected him to attend?

2  A.   These were very important meetings, yes.

3  Q.   Did he --

4  A.   Each one of these.

5  Q.   Did he attend --

6  A.   No.

7  Q.   -- The meeting on Tuesday, November 11th that was set for a conference call?

8  A.   That were to take priority over anything else, no.

9  Q.   Did he attend the Board telephone meeting on Wednesday, November 12th?

10  A.   No, he did not.

11  Q.   Was that an important meeting?

12  A.   Yes it was and it was just call in.

13  Q.   And did he attend the Sales Plan presentation, and I see it says reschedule.

14  This is now the third time you've tried to have that meeting, is that right?

15  A.   Correct.

16  Q.   Did he attend the meeting on Friday, November 14th?

17  A.   No, he did not.

18  Q.   Do you believe that Mr. Shafi disobeyed your directives when he did not attend

19  these meetings?

20  A.   Yes, each and every time.

21  Q.   Put up Exhibit 286.  Mr. Weidinger, if you would turn to Exhibit 286.  Mr. Shafi

22  testified earlier today that there was some issue about the payment of his Blue

23  Cross/Blue Shield insurance premium.  Do you know who Donna Burr is?

24  A.   That's the Assistant that we hired for Mr. Shafi.

25  Q.   And this is an email to Mr. Shafi from Ms. Burr, is that right?

82

1  A.   Correct.

2  Q.   And in this email she's telling Mr. Shafi that his November Blue Cross/Blue

3  Shield premium had indeed been paid, is that right?

4  A.   Correct.

5  Q.   Do you know, sir, whether that Braintech paid the Blue Cross/Blue Shield

6  premium?

7  A.   I think Heather represented that it was paid.

8  Q.   Now you eventually convinced Mr. Shafi to attend a meeting with you on

9  November 19th in Virginia, is that right?

10  A.   Correct.

11  Q.   And I believe Mr. Shafi testified that Mr. Milton attended that meeting?

12  A.   Yes.

13  Q.   Before we go there, let me ask you a couple of questions, Mr. Weidinger.

14  During Mr. Shafi's employment with Braintech, where did Pete Manias live, the Chief

15  Sales Officer?

16  A.   Pete was the Chief Marketing Office and Chief of Staff.  He lived in Dallas,

17  Texas.

18  Q.   Did Braintech have an office in Dallas, Texas?

19  A.   No.

20  Q.   Where did Jim Dara live, the Chief Sales Officer?

21  A.   In Detroit.

22  Q.   Was he in the same situation as Mr. Shafi was with respect to office space?

23  A.   Yes, exact.

24  Q.   Did Braintech have access to an office in the Detroit area?

25  A.   Yeah, they did.  They had offices at ABB.

83

1  Q.   Your customer?

2  A.   Yes.

3  Q.   Had Mr. Shafi ever been there?

4  A.   I'm not sure.  I hope so.

5  Q.   Go to Exhibit 208.  Now this is as far back as September 24 of 2008 and it

6  starts actually at the bottom, Mr. Weidinger, and you weren't here yesterday when Mr.

7  Shafi testified about the issue that he had with Pete Manias and then came to you and

8  said -- and it's in this email -- I don't need him, I don't want him.  That being Mr.

9  Manias, is that right?

10  A.   That's what Mr. Shafi is saying about Mr. Manias.

11  Q.   And the top part of this document is your response to Mr. Shafi, is that right?

12  A.   Correct.  Yes.

13  Q.   And you're referencing something about Mr. Shafi's Employment Agreement

14  there and indicate that there have been, according to you, no violations of his

15  Employment Agreement.  Why were you making that statement?  What was it that Mr.

16  Shafi had been saying that caused you to make that response?

17  A.   Because anything that occurred in a typical business day that didn't go

18  everybody's way, Mr. Shafi would throw up as a breach of his Employment

19  Agreement, and he was going around and pounding his chest about this to everyone

20  and not just me, but even more importantly than to me, to all of our employees over

21  and over and over.

22       MR. DOYLE: Again, Your Honor, he doesn't answer the question.  He

23  just goes on in his own narrative and says whatever he feels like.

24       THE COURT: Overruled.

25  Q.   (By Ms. Koval continuing)  Mr. Weidinger, beginning at the bottom of that email

84

1  where I'm pointing, bottom line if they report to you, do you see that?

2  A.   Yes.

3  Q.   Read that into the record.

4  A.   Bottom line, if they report to you -- if they report to you and you are unhappy

5  with their performance, we should discuss before you terminate them.

6  Q.   Keep going.

7  A.   You have the authority to make this decision.  This will be your judgment.

8  Q.   Go head.

9  A.   You need to hire your own integrator sales person as soon as possible.  I

10  thought you were wanting to hire Kevin.  We have already spent two travel trips for

11  him to discuss this with me, Pete and Jim.

12  Q.   Read the last paragraph there.

13  A.   I am and continue to support you regarding my calls with you.  Lastly, as you

14  know, I completely support you in your sales effort and announce such publicly

15  requesting all their support to you to all our key employees at our Summit last month.

16  Let the contracts roll in.

17  Q.   Was this statement true that -- that -- this statement true that Mr. Shafi had the

18  authority to make the decision about his personnel, is that true?

19  A.   It's clear right there.  All I was asking from Mr. Shafi was can we please

20  discuss it before you make the termination.

21  Q.   And is it also true that you had given Mr. Shafi authority to hire those

22  individuals that he thought that he needed to hire?

23  A.   And in fact, we made I think offers to six people that Mr. Shafi had identified.

24  Q.   So let's go back to Joint Exhibit Three now and I'll direct your attention to -- let

25  me ask you this first.  I understand there was a Jeffrey Milton at this meeting?

85

1   A.    Yes.

2   Q.    Who is Jeffrey Milton?

3   A.    Special Counsel to Braintech.

4   Q.    And what was it that you were hoping to accomplish on the 19th of November,

5   2008 with Mr. Shafi?

6   A.    Well, in the first para -- and this is core to the whole thing here.  In the first

7   paragraph we wanted to notify Mr. Shafi and also discuss with him the best way to do

8   this.  We felt we wanted to rescind the transaction.  Basically it means Mr. Shafi, we

9   know now enough about your company.  What we'd like to do is we'd like to hand it

10  back to you.  We'd like to hand everything back to you.  You take it back and in return,

11  you give us everything that we have paid you in consideration for that.  It's like if you

12  buy a car and the car ends up being a lemon, what you want to do is you want to take

13  the lemon back to the car dealer and say here's your car back and this is why and I'd

14  like my money back.  That's exactly why, and we were just -- we were just puzzled

15  and dumfounded that he said no, I don't want it back.

16  Q.    And in the second paragraph, you were telling Mr. Shafi that you would accept

17  no further services from him as far as his employment, is that right?

18  A.    That yes, and we put him on Administrative Leave with pay.

19  Q.    And you didn't cut off his salary, is that right?

20  A.    Correct.

21  Q.    All right.  Did something come to your -- after this meeting on November 19th,

22  did something come to your attention with respect to Mr. Shafi's emails?  Not what

23  someone told you.  Did something come to your attention about his emails?

24  A.    Yes.

25  Q.    And what came to your attention?

86

1   A.    I was told that he deleted up to 80% of his emails.

2   Q.    Did Mr. Shafi have a Braintech email address?

3   A.    He did, and he had two other email addresses; Shafi, Inc. and I think Shafi

4   Innovation, Inc.

5   Q.    Let's look at Joint Exhibit Four.  This is an email to Mr. Shafi from Mr. Milton

6   and you're copied on this email.  Did you authorize Mr. Milton to send this email on

7   behalf of Braintech?

8   A.    Yes.

9   Q.    Did you consider destruction of Braintech emails gross misconduct?

10  A.    Yes.

11  Q.    And it wasn't until this November 24th email that you stopped paying Mr. Shafi

12  his salary, is that right?

13  A.    Correct.

14  Q.    Was he paid all salary earned by him up to November 24th?

15  A.    I believe so.

16  Q.    Did he earn any bonus while he was employed by Braintech?

17  A.    Bonus was based on revenue, so no.

18  Q.    Who was in charge of acquiring the office space and getting the Michigan office

19  open?

20  A.    Mr. Shafi.

21  Q.    Did that process begin as soon as Mr. Shafi was hired?

22  A.    Well, I'm not sure when that process was started.

23  Q.    Did you look at -- go head.

24  A.    No.

25  Q.    Did you look at offices in early August or mid-August after the Employment

87

1   Agreement was signed?

2   A.    I think we did, yes.

3   Q.    Did Mr. Shafi complete his assignment to select the office space for Braintech

4   in Michigan?

5   A.    No, he didn't.  As a matter of fact, my recollection is then we had to hand it

6   over to Jim Dara to have the task of finding an office for Braintech, which we did in

7   Pontiac.

8   Q.    Let's turn to Joint Exhibit One.  Mr. Weidinger, I'm directing you to paragraph

9   12(a) of the Employment Agreement.  At the time you terminated Mr. Shafi's

10  employment, do you believe Mr. Shafi had willfully and continually failed to

11  substantially perform his duties?

12  A.    Yes.

13  Q.    Do you believe that Mr. Shafi had engaged in gross misconduct which is or

14  could reasonably be expected to be materially injurious to Braintech?

15  A.    Yes.

16  Q.    Those words are a mouthful.  And do you believe at the time you terminated

17  Mr. Shafi's employment that Mr. Shafi had been untruthful or dishonest with you?

18  A.    Yes.

19  Q.    That's all the questions I have.  Thank you, sir.

20       THE COURT: Thank you.  Mr. Doyle?

21            CROSS-EXAMINATION

22  BY MR. DOYLE:

23  Q.    I have one rule; never cross-examine.  Just one question.  Who owns RVT?  I

24  think you said it's where you work now?

25  A.    Yeah, myself and four other individuals.

88

1   Q.    What percentage do you own?

2   A.    Fifty-eight percent.

3   Q.    How much?

4   A.    Fifty-eight percent.

5   Q.    Okay.  And RVT was successful at the auction of the Braintech -- they were the

6   successful bidder?

7   A.    Correct, Mr. Doyle, yes.  RVT was the --

8   Q.    (Interjecting)  And you own 58%, correct?

9   A.    Correct.

10  Q.    I don't have anything further.  Thank you.

11       THE COURT: Thank you.

12       MS. KOVAL: Your Honor, just one follow-up.

13            REDIRECT-EXAMINATION

14  BY MS. KOVAL:

15  Q.    Was RVT the co-signer or was that you personally?

16  A.    No, it was me personally.  I personally was along with four other individuals.

17  Q.    Thank you, Your Honor.

18       THE COURT: Thank you.  Mr. Doyle, do you have anything further?

19       MR. DOYLE: No, Your Honor.

20       THE COURT: Thank you.  Mr. Weidinger -- any questions from the

21  jurors?  Anybody have a question?  No?  All right.  Thank you.  Mr. Weidinger, you

22  can stand down.

23       THE WITNESS: Thank you.

24       THE COURT: Ms. Koval or Miss Widlak, do you have more witnesses?

25       MS. WIDLAK: We do not.

**89**

1    THE COURT: Mr. Doyle, do you have any witnesses in rebuttal?

2    MR. DOYLE: Yes, Your Honor, but I would -- I think the Court was

3    talking about getting together on some instructions.  I would like to adjourn until

4    tomorrow for my rebuttal.

5    THE COURT: May I have a side bar please?  One moment, ladies and

6    gentlemen.

7    **(Sidebar conference out of the hearing of the jury as follows)**

8    THE COURT: Can you tell me a little bit about your rebuttal case?

9    MR. DOYLE: Just about 20 minutes of having Adil just go through his

10   response to about 10 allegations that were made.

11   THE COURT: All right.  So we will just get started early on our jury

12   instructions now.

13   MS. KOVAL:  We have 25 minutes, Your Honor.

14   THE COURT: I know.

15   MS. KOVAL:  We could have Mr. Shafi finish his testimony?

16   THE COURT: That's what I asked.  You can't put him on now?

17   MS. KOVAL: Let's get the evidence wrapped up now.  And Mr.

18   Weidinger needs to get back to Virginia, Your Honor, and I don't want to be in a

19   situation.  I know typically there isn't surrebuttal, but I would like him here during Mr.

20   Shafi's rebuttal testimony.

21   THE COURT: Okay.  Mr. Doyle, is there any reason you can't proceed

22   now?

23   MR. DOYLE: It's your call.  I knew you wanted jury instruction situation.

24   Obviously everybody has busy schedules and I wanted time to review with the client

25   what Mr. --

**90**

1    THE COURT: I think I'll ask you to go forward so we can begin in the

2    morning.

3    MR. DOYLE: It's your call, Your Honor.

4    MS. KOVAL: Thank you, Judge.

5    MR. DOYLE: I would like a couple minutes to talk to him though.

6    THE COURT: Okay, that's fair.

7    MS. WIDLAK: We can work out WITH Mr. Weidinger his travel plans.

8    We can get him off on his way.

9    **(END OF SIDEBAR CONFERENCE)**

10   THE COURT: Ladies and gentlemen, we're going to try to wrap up the

11   testimony today.  Mr. Doyle just needs a couple minutes.  I don't want to adjourn

12   because it takes too long to get you back in here, but we should be done by one.

13   Why don't you step out and stand and stretch and we'll finish today.  Thank you.

14   **(Court recessed at about 12:36 p.m.)**

15   **(At about 12:44 p.m.)**

16   **(Court, Counsel,  Jury and parties present)**

17   MR. DOYLE: We call Mr. Shafi.

18   THE COURT: Mr. Shafi, come back.  You're still under oath.

19   A D I L   S H A F I,

20   **Having retaken the witness stand at about 12:44 p.m. testified:**

21   **DIRECT-EXAMINATION**

22   **BY MR. DOYLE:**

23   Q.    Thank you.  Thank you all for being patient with me.  Mr. Shafi, Mr. Weidinger

24   has stated that he said he never looked under the hood of your product.  Is that right?

25   A.    Yes, that's right.

**91**

1    Q.    Did you ever deny him access to look at this software product?

2    A.    He never asked for the software before the transaction took place.  He did ask

3    for it to be seen running in some factories and I did support that request.

4    Q.    So he's investing all this money and never asked to look at the product?

5    A.    Correct.

6    Q.    With respect to the email question describing emails in the submission, can

7    you explain what they're talking about?

8    A.    Yes, I can.  The emails that they're showing selectively in the deposition are

9    basically my Spam emails.  I did not destroy emails.  I've taken the oath.  I have all of

10   them on my laptop right here.  I have all those thousands of emails right here.  I never

11   deleted a single email.  They cannot produce any evidence to say do you have this

12   email.  I have them all.  I never deleted.

13   Q.    You never destroyed them.  They said something about giving Braintech

14   source code to somebody.  Did you give source code to somebody?

15   A.    There's two types of things here.  Braintech source code I never had access to.

16   Even though I was COO, I was never granted to access to Braintech's source code.

17   Now Reliabot because I had it, which was my old product, I had given to David

18   Dechow who's from Aptura to the Siemens driver.  That's the only  entity I had

19   given to and that was done before this transaction took place.  He was already

20   working on the KUKA job and he's the only other person who had it.  Other than that, I

21   never gay Reliabot source code to any other party.

22   Q.    With respect to this phone book that was discussed, can you tell the Jury what

23   your -- what the phone book really was?

24   A.    Yeah.  It wasn't a phone book.  These 60 companies were past customers.  I

25   had huge files.  I had 14 filing cabinets four feet high full of customer files that we had

**92**

1    done business with that still have systems running today on Reliabot, and so it wasn't

2    a phone digest.  I actually selected and actually laid out geographically the close ones

3    first, then the ones we would go after.  Then I laid them out by regions;  east coast,

4    South Carolina, North Carolina and various regions and I timed them so we could go

5    to these different places in a selective manner.  These are all companies I knew.

6    They're people I knew, business we had done and they were successful.

7    Q.    With regard to the -- there's been discussion with regard to the Sales Plan or

8    they wanted the Sales Plan.  Can you explain that to the Jury?

9    A.    The Sales Plan was already there on day one.  It was the Access and

10   Acceleration.  It was our plan to go visit these 60 companies or so.  It was done

11   numerous times before the transaction was finalized and it had initials on it;  AS and

12   RW, Adil Shafi and Rick Weidinger against so many of these visits.  He only went to

13   two customers.  I was the one who was left holding the bag to go to these companies

14   --

15   Q.    Okay.  You've explained that.  With respect to -- with respect to Mr. Neilson,

16   was he paid or was he working for Braintech?

17   A.    Mr. Neilson was owed about 10 or $12,000.  All Braintech paid him was for a

18   day or two to come in and talk about it.  Now the two-day thing that he talks about are

19   two integrators is about people that can write the code for that, which Kevin North did.

20   There were lots of companies that could configure it.  There were a lot of integrators

21   who configured and actually implemented solutions for us, but there were very few

22   that could actually write the code that Kevin North and I could do.  So that

23   characterization that Reliabot was only doable two integrators is wrong.

24   Q.    He said that -- in his testimony he said that he gave you the authority to hire six

25   people, is that correct?

**93**

1  A.  Yes.  That was actually a revenue-related condition.  It's in the Employment

2  Agreement.  First condition is to hire some people.  Now there are three that I

3  absolutely wanted right away; Donna Burr, my office manager.  He had the financial

4  approval gate.  So although I made recommendations, I mentioned salaries, he simply

5  denied the approval to get them on board.  So I said I need Donna within five days to

6  get this going.  She was not hired until day 45 or day 50 into the 90-day period.  For a

7  month and a half I didn't have Donna.  The other lady was Elsie White.  She was

8  never hired.  He never approved.  He brought them in for interviews, but never

9  approved the funding to get them hired.  The third person he was here yesterday,

10  Kevin Geschel (phonetic) for Sales, and I really needed him to help and again,

11  Weidinger didn't approve the financial funds because he had the final say-so in that.

12  So I didn't have the revenue conditions I needed.  That was the first condition I had.

13  The first condition I had was to hire these people and they were never hired, so how

14  could I make revenue?  It was a condition.

15  Q.  With respect to the credit card, he said you had a credit card.  Can you explain

16  to the Jury about this credit card?

17  A.  It might as well be made out of wood because the credit card he gave me, he

18  said yeah, he said you can't use it.  One time I used it for $30 gas payment and I got

19  reprimanded.  You cannot use this for gas unless I approve it.  All travel had to be

20  approved two weeks in advance and I was very cash-strapped at the time and so I

21  could not travel on getting paid in 30 days and he knew that.  He knew I needed the

22  money right away and reimbursements to go to customers, but he basically shackled

23  me, completely shackled me to be able to move me out 58 miles.

24  Q.  Just a second.  The last thing.  He said that for you to go ahead and hire Kevin,

25  is that correct?

**94**

1  A.  Yes, but he never approved it financially.  He never helped with that.

2  Q.  So it was go head and hire him, but you didn't have control over finances?

3  A.  I never had those people I absolutely needed to do my job.  I never had those

4  people.

5  Q.  That's all I have.  Thank you, Your Honor.

6     THE COURT: Thank you, Mr. Doyle.  Is there a Cross-examination of

7  Mr. Shafi?

8     MS. WIDLAK: I have no questions, Your Honor.

9     THE COURT: Thank you.

10     THE COURT: Ladies and gentlemen, any questions of Mr. Shafi?  No?

11  All right.  Mr. Shafi, you can stand down.  Thank you.

12     THE COURT: Do you have anything more Mr. Doyle in rebuttal?

13     MR. DOYLE: No, Your Honor.  Thank you.

14     THE COURT: Thank you.  And the Defense, anything in rebuttal?

15     MS. WIDLAK: No.  Thank you, Your Honor.

16     THE COURT: Both sides are resting?

17     MR. DOYLE: Yes, Your Honor.

18     MS. WIDLAK: Yes.

19     THE COURT: Thank you.  Ladies and gentlemen, that will end today.

20  Let me tell you a little bit about tomorrow.  We will begin at 9:00.  We will begin with

21  jury instructions.  The instructions that I have to give you at the end of the case will be

22  a little more lengthy than what I gave you at the beginning, but they won't take long.

23  Following that you will hear closing argument from Plaintiff and then Defendant and

24  then Mr. Doyle will have a few minutes to have the final word in the case and then you

25  will begin your deliberations.  I think that in light of that you probably should plan on

**95**

1  being here beyond one o'clock.  Once it's in your hands for deliberations, it's in your

2  hands.  I no longer control the time and so we have no clue how long your

3  deliberations will take, but we would want you to plan on being here beyond one

4  o'clock.  So whatever arrangements you need to make, please do that and then we'll

5  see what happens.

6     Any questions about what's going to happen tomorrow?  No?  Please get --

7  and Counsel, just so I sort of prepared, do you know how long you'll need for your

8  closings?

9     MR. DOYLE: I agree with the Court on protecting the Jury's time.  I'm

10  Irish, but I'm sure I won't be longer than 15 minutes or so.

11     MS. KOVAL: The same; about 15, 20 at maximum, Your Honor.

12     MR. DOYLE: Then I'll have a short rebuttal, correct?

13     THE COURT: Yes.  So you will have rebuttal.  You might be deliberating

14  pretty early like mid-morning, ladies and gentlemen.  All right.  Have a good evening

15  and good night's sleep and be safe going home.  All rise for this Jury.

16     **(Jury exited courtroom at 12:54 p.m.)**

17     THE COURT: Counsel, is there anything before we close the record?

18     MS. KOVAL: None from the Defense, Judge.

19     THE COURT: I have an hour before my afternoon starts, if you want to

20  come in chambers we will try to do the jury instructions.

21     MS. KOVAL: Your Honor, so that we don't waste your time, we haven't

22  had a chance to have a conference and we might be able to agree on some things.  I

23  haven't had a chance to look at your standard instructions.

24     THE COURT: Okay.  So why don't you take 15 or 20 minutes?  Can you

25  do that and then come in chambers, I'll be back here.

**96**

1     MS. KOVAL: That would be great.  Thank you.  Is that fine with you, Mr.

2  Doyle.

3     THE COURT: I didn't hear you.

4     MR. DOYLE: I didn't say anything.

5     THE COURT: She's talking to you, Mr. Doyle.

6     MS. KOVAL: I just wanted to know if that's okay with you, Mr. Doyle.

7     MR. DOYLE: Yes, it's fine with me.  Thank you.

8     THE COURT: Thank you very much.  We're adjourned.

9     **(Proceedings adjourned at about 12:55 p.m.)**

10     - - -

11

12

13

14

15

16

17

18

19

20

21     <u>COURT REPORTER'S CERTIFICATION</u>

22

23

24  STATE OF MICHIGAN)

25          ) SS.

97

```
1   COUNTY OF WAYNE  )
2
3
4   I,  Janice Coleman,  Official Court Reporter, certify that the
5   foregoing pages are a correct transcript from the record of
6   proceedings taken by me to the best of my ability in the
7   above-entitled matter.
8
9
10              S/_____
11              JANICE COLEMAN, CSR 1095/RPR
12
13
14
15  DATED:  May 22, 2013
16
17
18
19
20
21
22
23
24
25
```